## EXHIBIT C

**Supply Agreement**

4937-5675-9989.1 78006.00001

**EXECUTION VERSION**

## SODA ASH SUPPLY AND LIQUIDITY AGREEMENT

This SODA ASH SUPPLY AND LIQUIDITY AGREEMENT (this "***Agreement***") is made and entered into this 7th day of June, 2026 ("***Closing Date***"), between Searles Valley Minerals Inc., a Delaware corporation ("***Company***"), and TATA Chemicals North America Inc., a Delaware corporation ("***Supplier***"). Company and Supplier shall individually be referred to as "***Party***" and collectively as "***Parties***".

WHEREAS, Company is in the business of supplying soda ash ("***Material***") to its Customers (defined below) pursuant to certain Customer Contracts (defined below);

WHEREAS, Company recently curtailed its Material supply operations;

WHEREAS, Supplier is entering into this Agreement, agreeing to fulfill Company's obligations to supply Material to Customers under Customer Contracts, and making the Liquidity Advances in reliance upon, among other things, the existence, validity, and enforceability of the Corporate Guarantee (defined below), and would not enter into this Agreement, or make the Liquidity Advances, but for such Corporate Guarantee; and

WHEREAS, the Parties acknowledge the importance of uninterrupted Customer fulfilment of Material under the Customer Contracts during the pendency of the Chapter 11 Cases, and in furtherance of the foregoing, the Parties desire to enter into this Agreement on the terms and conditions set forth below.

NOW THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1.    DEFINED TERMS

As used in this Agreement and unless the context requires a different meaning, capitalized terms used but not defined herein (including the preamble hereto) shall have the meanings specified below:

"***Bankruptcy Code***" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.*, as amended from time to time.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware.

"***Chapter 11 Cases***" means the jointly administered cases filed by Company and its affiliates under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"***Company's Parent***" means Nirma Limited, a company incorporated under the Companies Act, 1956 and having its registered office at Nirma House, Ashram Road, Ahmedabad, 380009, Gujarat, India.

"***Company Termination Event***" means any one of the following: (i) Company's failure to repay the Liquidity Advances in full on or prior to the Maturity Date; (ii) (A) Company's failure to timely make any payment of Purchase Price such that the aggregate outstanding unpaid Purchase Price then due and payable equaling or exceeding $7,500,000 at any time, and which is not remedied within ten (10) days after written notice from Supplier to Company, or (B) the aggregate outstanding Purchase Price equaling or exceeding $3,000,000 for a period of more than thirty (30) consecutive days, measured from the earliest applicable due date of any component thereof; (iii) any representation, statement or warranty made or deemed made by Company herein, shall not be true and correct in all material respects (except to the extent already qualified by materiality, in which case it shall not be true and correct in all respects) on the date when made, and the foregoing shall remain unremedied for ten (10) days from the earlier of actual knowledge of, or written notice to, Company; (iv) Company shall be in violation, breach or default of, or shall fail to perform, observe or comply in any material respect with, any covenant, obligation or agreement set forth in this Agreement (not otherwise specifically dealt with in Section 8), and the foregoing continues unremedied for a period of ten (10) days from the earlier of actual knowledge of, or written notice to, Company; (v) Company's chapter 11 bankruptcy case is converted to a case under chapter 7 of the Bankruptcy Code or a trustee in the chapter 11 case is appointed, provided that, if within ten (10) days after such appointment, such chapter 11 trustee provides Supplier with evidence reasonably satisfactory to Supplier of the bankruptcy estate's ability to perform Company's obligations under this Agreement then it shall not be a Company Termination Event under this clause; (vi) the Corporate Guarantee ceases to be in full force and effect; (vii) the Interim Approval Order is not entered on or prior to the Interim Approval Order Date; (viii) the Final Approval Order is not entered on or prior to the Final Approval Order Date; (ix) this Agreement shall not have been assumed under section 365 of title 11 of the Bankruptcy Code pursuant to and as a part of the Final Approval Order; (x) a Material Adverse Change; (xi) an examiner with expanded powers is appointed in the Chapter 11 Cases; (xii) the filing of a plan of reorganization or any motion seeking approval of a sale or other disposition of all or substantially all of Company's assets that does not provide for payment in full of all obligations owing to Supplier hereunder or that has not been agreed to in writing by Supplier; or (xiii) termination or breach of the Corporate Guarantee.

"***Corporate Guarantee***" means that certain corporate guarantee, in form and substance reasonably satisfactory to Supplier, by Company's Parent, in favor of Supplier, guaranteeing certain of Company's obligations under this Agreement, together with all accrued and unpaid interest thereon.

"***Customer***" means a customer of Company and/or any of its affiliates with respect to a Customer Contract.

"*Customer Contract*" means each purchase order and/or customer contract by and between Company on the one hand, as supplier, and a Customer on the other, as purchaser, entered into prior to the Closing Date for the supply of Material to such Customer.

"*Final Approval Order*" means a final order entered by the Bankruptcy Court approving the relief granted in the Interim Approval Order on a final basis and approving, among other things, this Agreement, and its assumption, and protections to be provided to Company's Parent related to the Corporate Guarantee in form and substance  acceptable to Company's Parent in its sole discretion, and containing provisions reasonably satisfactory to and benefiting Supplier, in form and substance reasonably satisfactory to Company's Parent and Supplier and consistent with similar arrangements and transactions, and orders entered, in chapter 11 cases (a draft of which Supplier and Company's Parent shall have received sufficiently in advance to allow for meaningful review and approval, but in no event later than five (5) days prior to the filing of any motion with the Bankruptcy Court seeking entry of the order).

"*Final Approval Order Date*" means forty-five (45) days after entry of the Interim Approval Order.

"*Final Liquidity Advance*" means a Liquidity Advance made upon entry of the Final Approval Order in an aggregate amount equal to the difference between the Maximum Liquidity Advance Amount and the Liquidity Advances received by the Company pursuant to the Interim Approval Order.

"*Freight*" means all costs, charges, fees, and expenses incurred by or on behalf of Supplier in connection with the transportation, shipping, handling, and delivery of Material from Supplier's facility (or such other point of origin as may be designated by Supplier) to the delivery location specified in the applicable Customer Contract or otherwise directed by Company, including carrier charges, fuel surcharges, loading and unloading fees, insurance costs associated with transit, customs duties, and brokerage fees (to the extent applicable), demurrage or detention charges, and any other ancillary costs directly attributable to the physical movement of Material.

"*Initial Liquidity Advance*" means a Liquidity Advance made upon entry of the Interim Approval Order in an aggregate amount of up to $7 million (or such other amount as requested by Company and permitted by such Interim Approval Order).

"*Interim Approval Order*" means an interim order entered by the Bankruptcy Court approving, among other things, this Agreement, and protections to be provided to Company's Parent related to the Corporate Guarantee in form and substance acceptable to Company's Parent in its sole discretion, containing provisions reasonably satisfactory to and benefiting Supplier, in form and substance reasonably satisfactory to Supplier and Company's Parent and consistent with similar arrangements and transactions, and orders entered, in chapter 11 cases (a draft of which Supplier and Company's Parent shall have received sufficiently in advance to allow for

meaningful review and approval, but in no event later than three (3) days prior to the filing of any motion with the Bankruptcy Court seeking entry of the order).

"*Interim Approval Order Date*" means five (5) days after commencement of the Chapter 11 Cases.

"*Liquidity Advances*" means the aggregate amount of liquidity advances made by Supplier to Company pursuant to Section 4 of this Agreement.

"*Maturity Date*" means the date that is the earliest of (i) thirty (30) days after Supplier's issuance of its final invoice for Material supplied hereunder following the end of the Supply Contract Term, (ii) the date on which all or substantially all of the Customer Contracts are sold, and (iii) the occurrence of a Company Termination Event.

"*Material Adverse Change*" means any material change in (i) the business, assets, operations, properties, liabilities, or financial condition of Company, (ii) the ability of Company to perform its obligations under this Agreement, including its obligation to repay the Liquidity Advances, (iii) the rights and remedies of Supplier under this Agreement or the enforceability hereof, in each case, that has had, or could reasonably be expected to have, a material and adverse effect on each of the Customer Contracts taken as a whole with respect to the volumes and the Purchase Price therefor, or (iv) the rights and remedies of Supplier under the Corporate Guarantee or the enforceability thereof, in each case, that has had, or could reasonably be expected to have, a material and adverse effect on Supplier's rights and interests thereunder; provided that neither the filing of the Chapter 11 Cases nor a Supplier Termination Event (without regard to the cure periods) which results in Customer's terminating Customer Contracts shall in and of itself constitute a Material Adverse Change.

"*Maximum Liquidity Advance Amount*" means $20 million.

"*Purchase Price*" with respect to any quantity of Material to be supplied by Supplier to fulfill a Customer Contract, a price per metric ton equal to ▮▮▮▮ plus Freight.

"*Superpriority Claim*" means an allowed superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code granted to Supplier on account of all Liquidity Advances pursuant to the Interim Approval Order and Final Approval Order.

"*Supplier Termination Event*" means any one of the following: (i) Supplier shall be in breach, or shall fail to comply with, any covenant, obligation or agreement set forth in this Agreement (not otherwise specifically dealt with in Section 8), and such breach (x) has had, or could reasonably be expected to have, a material adverse effect on Supplier's ability to perform its obligations under this Agreement, or (y) involves or relates to obligations with an aggregate value in excess of $5,000,000, and, in either case, the foregoing continues unremedied for a period of thirty (30) calendar days (or ninety (90) calendar days in the case of non-performance due to force majeure) from the earlier of actual knowledge of, or written notice to, Supplier; provided, however, that if Supplier undertakes to remedy such breach within the applicable cure

period and is diligently pursuing such remedy, the foregoing thirty (30) or ninety (90) days cure periods, as applicable, shall be extended for an additional thirty (30) days; or (ii) the Liquidity Advances shall have been repaid to Supplier in full and Supplier shall have concurrently received the Termination Fee.

"***Supply Contract Term***" means the period beginning on the Closing Date and ending on the earliest to occur of (i) the last expiring term on the Customer Contracts, or (ii) the date this Agreement is terminated pursuant to Section 8.

"***Termination Fee***" means a fee equal to 2.5% of the Liquidity Advances ever outstanding at the date of termination, payable to Supplier in connection with Company's termination of this Agreement pursuant to Section 8 and concurrently with repayment of the Liquidity Advances.

"***Transaction Documents***" means, collectively, this Agreement, all schedules, exhibits, annexes, invoices, purchase orders, and other documents delivered or to be delivered in connection herewith or incorporated by reference herein.

2.     **SUPPLY, EXCLUSIVITY ARRANGEMENT, AND PAYMENT TERMS**

(a)     During the Supply Contract Term, Company agrees to purchase exclusively from Supplier, and Supplier agrees to use commercially reasonable efforts to maintain supply and support fulfillment of Company obligations to its Customers under the Customer Contracts by supplying such quantities of Materials as may be ordered by the Customers from time to time thereunder; provided that such exclusivity shall not apply to the roughly 12,000 metric tons of Material from Company's inventory which is scheduled for delivery to Customers as of the Closing Date. Except as a result of a Customer's breach or termination of a Customer Contract, each Customer Contract shall remain a valid and enforceable obligation of Company, without modification (excluding assignment to Supplier), and subject to the terms of this Agreement through the end of the Supply Contract Term. Supplier's commitment to fulfill Company's Material supply needs under the Customer Contracts shall, subject to a Company Termination Event, survive restructuring or insolvency proceedings (including any chapter 11 case) affecting either Party, to the maximum extent permitted by law, and the Parties acknowledge and agree to treat this Agreement as an executory contract in bankruptcy.

(b)     Supplier shall deliver the Materials directly to the Customers (or as directed by Company) and will invoice Company for the same.

(i)     Company will pay Supplier the Purchase Price for Materials so delivered by wire transfer no later than the earlier of (1) promptly upon Company's receipt of payment from a Customer or invoice factoring / discounting

5

provider, in the amount Company receives from such Customer or invoice factoring / discounting provider and applied to any unpaid Purchase Price at such time, provided that, to the extent such amount is less than the full Purchase Price, Company shall remain obligated to pay the remaining balance of the Purchase Price, or (2) in full on the date that is not later than forty-five (45) days from the date such invoice. Company's obligation to pay one hundred percent (100%) of the Purchase Price shall not be reduced or deemed satisfied by any discount, advance rate, holdback, or other reduction applied by any invoice factoring or discounting provider, and any shortfall between amounts received from such provider and the full Purchase Price shall remain due and payable by Company.

(ii)  Payment for Freight provided by Supplier to Company (or as directed by Company) under this Agreement shall, unless otherwise required by Supplier, be due and payable in its entirety by wire received by Supplier no later than fifteen (15) days from the date of invoice, with partial payments of Purchase Price being applied to Freight first.

(iii)  Any amount of Purchase Price not paid when due shall bear interest from the due date until paid at a rate per annum equal to the lesser of (x) the prime rate as published in the Wall Street Journal on the date such payment was due plus three percent (3%) and (y) the maximum rate permitted by applicable law.

(c)  The Parties shall work together in good faith to preserve continuity of supply of Materials to Customers and the commercial treatment of the Liquidity Advances in the event of any financial distress, restructuring or insolvency-related proceedings involving Company, all of which serve the procompetitive purpose of maintaining Customer supply and ensuring efficient market operation. Without limiting the foregoing, the Parties shall work together in good faith to facilitate direct communications between Supplier and Customers, including making introductions and providing necessary consents and authorizations to ensure continuity to customers in the event of any financial distress, restructuring or similar proceedings affecting either of the Parties, in all cases subject to applicable law (including U.S. antitrust law). Supplier shall have the right to coordinate directly with end Customers for operational continuity, forecasting, delivery, quality, and issue resolution, subject to applicable confidentiality restrictions and applicable law (including U.S. antitrust law).

(d)  The Parties acknowledge that Supplier shall have a Superpriority Claim for any unpaid amounts owing to Supplier hereunder, having priority over all other administrative expense claims in the Chapter 11 Cases, but being junior to

6

superpriority administrative expense claims of HSBC Bank (USA), N.A. or its affiliates, Company Parent and Karnavati Holdings, Inc..

## 3.   MATERIAL WARRANTY

Supplier warrants to Company that the Material supplied by it hereunder shall be of similar specifications to Material supplied prior to the Closing Date which meets the specifications of the applicable Customer pursuant to the related Customer Contract in all material respects.

EXCEPT FOR SUPPLIER'S OBLIGATION TO USE COMMERCIALLY REASONABLE EFFORTS TO SUPPLY MATERIALS PURSUANT TO SECTION 2(a), IN NO EVENT SHALL SUPPLIER, COMPANY OR ANY OF THEIR RESPECTIVE AFFILIATES, OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR ADVISORS, BE LIABLE TO THE OTHER PARTY OR ANY OTHER PERSON FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES (INCLUDING LOST PROFITS, LOST REVENUE, LOSS OF BUSINESS OPPORTUNITY OR DIMINUTION IN VALUE), WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OR ANY OTHER THEORY, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE. EXCEPT IN THE CASE OF SUPPLIER'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR BAD FAITH, SUPPLIER'S AGGREGATE LIABILITY UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL NOT EXCEED THE AGGREGATE AMOUNT OF LIQUIDITY ADVANCES ACTUALLY FUNDED BY SUPPLIER HEREUNDER.

## 4.   LIQUIDITY ADVANCES

(a)   Subject to the provisions of this Agreement, including, without limitation satisfaction of all the conditions set forth in Section 5 hereof, upon written request of Company (which may be by email from Company's Chief Financial Officer or similar verifiable position within Company), Supplier shall make Liquidity Advances in an aggregate amount not greater than the Maximum Liquidity Advance Amount. Supplier shall remit each Liquidity Advance by wire transfer in immediately available funds to a debtor in possession account designated by Company not later than the business day following such request, provided such account is designated pursuant to the Bankruptcy Court's entry of a cash management order and subject to Supplier's verification. Each Liquidity Advance shall be in U.S. Dollars.

(b)   The Liquidity Advances shall not bear interest; ***provided***, ***however***, that upon the occurrence and during the continuance of a Company Termination Event, the outstanding principal amount of the Liquidity Advances shall bear interest at a rate per annum equal to the prime rate as published in the Wall Street Journal on

7

the date of such Company Termination Event plus two percent (2%), calculated on the basis of a 360-day year for the actual number of days elapsed, payable on demand.

(c)    Company may only request a Liquidity Advance during the Supply Contract Term subject to the following parameters:

(i)    upon entry of the Interim Approval Order, the Initial Liquidity Advance; and

(ii)    upon entry of the Final Approval Order, the Final Liquidity Advance.

(d)    Company shall repay to Supplier the outstanding amount of the Liquidity Advances in full on the Maturity Date.

(e)    ▮▮▮▮ per metric ton of each payment of Purchase Price made by Company to Supplier hereunder shall be deemed to repay the outstanding Liquidity Advances on a dollar for dollar basis until the Liquidity Advances are repaid in full, to be calculated based upon the quantity of Material supplied under any Customer Contract.

(f)    If at any time (x) a Company Termination Event has occurred and is continuing, (y) any condition precedent to the making of a Liquidity Advance set forth in Section 5 has not been satisfied (and has not been waived by Supplier), or (z) a Materials Adverse Change has occurred, Supplier may, in its sole discretion, suspend its obligation to make further Liquidity Advances hereunder (without prejudice to any other rights or remedies of Supplier) upon written notice to Company. Such suspension shall continue until such Company Termination Event has been cured or waived, such condition precedent has been satisfied or waived, or such Material Adverse Change no longer exists, as applicable.

(g)    For the avoidance of doubt, the Liquidity Advances are not revolving in nature and, once repaid in whole or in part, may not be reborrowed. The only Liquidity Advances available hereunder are the Initial Liquidity Advance and the Final Liquidity Advance.

## 5.    CONDITIONS PRECEDENT

Supplier's obligation under this Agreement to make a Liquidity Advance shall be subject to the satisfaction (or waiver by Supplier) and continuation (as applicable) of the following conditions precedent:

(a)    on the Closing Date, each of the Parties shall have duly executed and delivered this Agreement;

(b)     the Corporate Guarantee shall have been duly executed, delivered to Supplier, and be in full force and effect, and shall constitute a legal, valid, and binding obligation of Company's Parent enforceable against Company's Parent in accordance with its terms;

(c)     on or prior to the Closing Date, Supplier received evidence from Company in form and substance reasonably satisfactory to it that the Customer Contracts provide for the supply of Material of at least ▮▮▮▮ metric tons, which Customer Contracts are in full force and effect;

(d)     with respect to the Initial Liquidity Advance, the Interim Approval Order shall have been entered by the Bankruptcy Court on or prior to the Interim Approval Order Date;

(e)     with respect to the Final Liquidity Advance, (x) the Final Approval Order shall have been entered by the Bankruptcy Court on or prior to the Final Approval Order Date and (y) this Agreement shall have been assumed under section 365 of the Bankruptcy Code pursuant to and as a part of the Final Approval Order, and in connection with such assumption Company must have cured any defaults hereunder and provided Supplier with adequate assurance of future performance (in accordance with applicable law) reasonably acceptable to Supplier;

(f)     with respect to the Initial Liquidity Advance, Supplier's timely receipt of rolling thirteen (13) week cash flow budgets, in form and detail reasonably satisfactory to Supplier, and containing information customary in chapter 11 cases;

(g)     Company is not in default of its obligations to pay Purchase Price hereunder as and when required pursuant to Section 2(b);

(h)     no Company Termination Event shall have occurred and be continuing;

(i)     no Company Termination Event would result from the making of such Liquidity Advance;

(j)     the representations and warranties of Company set forth herein shall be true and correct in all material respects as of the date of such Liquidity Advance (except to the extent such representations specifically relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date);

(k)     Company shall pay Supplier any and all unpaid amounts owed for supplying Material prior to commencement of the Chapter 11 Cases; and

(l)     since the Closing Date, no Material Adverse Change shall have occurred.

**6.     REPRESENTATIONS AND WARRANTIES**

Company represents and warrants to Supplier as of the Closing Date and, except for the representations in clauses (a) and (d), as of the date of each request for a Liquidity Advance (with the same force and effect as if made on such date):

(a)     Company is a Delaware corporation duly organized, validly existing and in good standing under the laws of the State of its incorporation and is duly qualified to do business, and is in good standing in its State of incorporation;

(b)     Company has all requisite power and authority (i) to own its properties and conduct its business as presently owned or conducted and (ii) to execute and deliver this Agreement and to perform its obligations hereunder;

(c)     The execution, delivery and performance by Company of this Agreement are within Company's corporate powers, have been duly authorized by all necessary action and do not contravene or constitute a default under, any provision of applicable law or of Company's organizational documents or bylaws or of any material agreement, judgment, injunction, decree or other instrument binding upon Company. This Agreement has been duly executed and delivered on behalf of Company;

(d)     No authorization or approval or other action by, and no notice to or filing with, any governmental authority is required for the due execution, delivery and performance by Company of this Agreement that has not already been given or obtained; and

(e)     Company is in compliance with all applicable law, except where the failure to do so could not reasonably be expected to result in a material adverse effect on the business, operations, properties, assets, liabilities or financial condition of Company, the legality, validity or enforceability of this Agreement or the ability of Company to perform its obligations hereunder;

(f)     No Company Termination Event has occurred and is continuing;

(g)     Except as a result of a Customer's breach or termination of a Customer Contract, each Customer Contract shall remain a valid and enforceable obligation of Company, without modification (excluding assignment to Supplier), and subject to the terms of this Agreement through the end of the Supply Contract Term;

(h)     This Agreement constitutes a legal, valid, and binding obligation of Company, enforceable against Company in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, or other laws affecting creditors' rights generally, and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law; and

(i)     All written information, financial statements, reports, and other materials furnished by or on behalf of Company to Supplier in connection with this Agreement are, as of the date furnished, true and correct in all material respects and do not contain any untrue statement of a material fact or omit to state a material fact necessary to make such statements not misleading in light of the circumstances under which they were made.

(j)     No Material Adverse Change has occurred and is continuing.

**7.     COVENANTS**

(a)     Company shall promptly, and in any event within five (5) business days of knowledge or receipt, as applicable:

(i)     give notice to Supplier of any Customer invoice that remains unpaid five (5) days after the due date therefor;

(ii)    deliver to Supplier copies of all material filings in Company's bankruptcy case in advance of filing to the extent practicable; and

(iii)   give notice to Supplier of any proposed sale, transfer, or encumbrance of the Customer Contracts or Company's assets.

(b)     Company shall, upon reasonable request by Supplier, promptly deliver to Supplier such information regarding the Customer Contracts as Supplier may reasonably request, including copies of all Customer Contracts and any amendments thereto, and shall promptly notify Supplier of any material modification to any Customer Contract.

(c)     Company shall use commercially reasonable efforts to obtain and maintain in effect the Interim Approval Order and Final Approval Order, and to oppose any motion to vacate, stay, or modify such orders.

(d)     Company shall not seek to reject, disaffirm, or otherwise repudiate this Agreement without the prior written consent of Supplier.

(e)     This Agreement, unless earlier terminated in accordance with its terms, shall be binding upon any successor, trustee, or estate representative of Company.

(f)     After the Initial Liquidity Advance, Company shall deliver to Supplier rolling thirteen (13) week cash flow budgets containing information customary in chapter 11 cases every two (2) weeks after Supplier's receipt of the initial such budget.

(g)     Company shall not after the Closing Date, without the prior written consent of Supplier, (i) create, incur, assume, or permit to exist any lien on any Customer

11

Contract or any proceeds thereof (other than (x) liens existing as of the Closing Date in favor of HSBC Bank USA, National Association (and its successors and assigns), (y) liens incurred in connection with any Company DIP facility and (z) liens in favor of the Company's Parent to secure the Company's obligation to repay amounts paid under the Corporate Guarantee following payment in full of the Liquidity Advances), (ii) sell, assign, transfer, or otherwise dispose of any Customer Contract or any interest therein, (iii) incur any indebtedness for borrowed money (other than the Liquidity Advances) in excess of $500,000 in the aggregate (excluding debt under any Company DIP facility), (iv) merge or consolidate with any other person, or sell, lease, or transfer all or substantially all of its assets, (v) declare or pay any dividend or other distribution to any equity holder, or (vi) amend, modify, or waive any material provision of any Customer Contract in a manner adverse to Supplier's interests hereunder, in each case without the prior written consent of Supplier (not to be unreasonably withheld, conditioned or delayed).

(h)     Company shall promptly notify Supplier in writing upon becoming aware of (i) any Material Adverse Change, (ii) any default or event which, with the giving of notice or lapse of time or both, would constitute a Company Termination Event, or (iii) any litigation, investigation, or proceeding that could reasonably be expected to result in a Material Adverse Change.

(i)     Company shall comply with all applicable laws, except where the failure to do so could not reasonably be expected to result in a Material Adverse Change.

## 8.     TERMINATION

(a)     Upon the occurrence of a Company Termination Event, (x) Supplier may, by written notice to Company, elect to terminate this Agreement and/or declare the outstanding amount of the Liquidity Advances immediately due and payable, (y) Supplier shall automatically have relief from the automatic stay to exercise its remedies under this Agreement without the necessity of obtaining such relief from the Bankruptcy Court, upon five (5) days' written notice to Company; provided however Company will have the right to contest that a Company Termination Event has actually occurred within such five (5) day period, and (z) Supplier may exercise any and all rights and remedies available to it under this Agreement, at law or in equity, including bringing suit to collect all amounts due hereunder, and in each case, together with all accrued and unpaid interest thereon and all other amounts owing hereunder.

(b)     Upon the occurrence of a Supplier Termination Event, Company may, by written notice to Supplier, (x) elect to terminate this Agreement in the case of a Supplier Termination Event under clause "(i)" of such definition, or (y) terminate this

Agreement subject to Supplier's receipt of the Termination Fee in the case of a Supplier Termination Event under clause "(ii)" of such definition.

**9. SETOFF**

Supplier is hereby authorized by Company at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Supplier to or for the credit or the account of Company against any and all of the obligations of Company now or hereafter existing under this Agreement to Supplier. Supplier agrees to promptly notify Company after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

Company hereby irrevocably waives any and all rights it may have to (a) require Supplier to proceed against any other person or entity (including the Company's Parent under the Corporate Guarantee) before proceeding against Company,  or (b) require Supplier to pursue any other remedy in Supplier's power before proceeding against Company. Company further waives presentment, demand, protest, notice of dishonor, and any requirement that Supplier exhaust any right or take any action against any other person or entity. All rights and remedies of Supplier hereunder are cumulative and not exclusive of any rights or remedies otherwise available.

**10. USE OF PROCEEDS**

Company shall use the proceeds of the Liquidity Advances solely for general corporate purposes during the pendency of the Chapter 11 Cases, including working capital needs, operating expenses, and other costs and expenses incurred in the ordinary course of Company's business. Company shall not use any portion of the Liquidity Advances to (a) make any distribution or dividend payment to equity holders, (b) make any investment in or loan to any affiliate (other than in the ordinary course of business), (c) repay any indebtedness that is junior in right of payment to the Liquidity Advances (if any), or (d) fund any litigation against Supplier or its affiliates.

**11. BOOKS AND RECORDS**

Company shall maintain proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions related to the Liquidity Advances in accordance with generally accepted accounting principles consistently applied. Supplier shall be entitled to such other documents, instruments, agreements and information as it may reasonably request in connection with the Liquidity Advance and Company's obligations under this Supply Agreement which are in the possession of, or reasonably attainable by, the Company, without undue cost or burden to the Company (and subject to applicable confidentiality restrictions).

**12. CONFIDENTIAL INFORMATION**

This Agreement is confidential, and except with respect to the obtaining the approvals required under this Agreement, may not be disclosed by one Party without the other Party's prior written consent; provided that, disclosure is permitted without consent (a) to each Party's respective employees, directors and affiliates and its and their respective agents, attorneys, accountants and other professional advisors who are made aware of the confidential nature of this Agreement and are instructed to maintain confidentiality in accordance herewith, (b) upon the request or demand of any governmental authority, (c) in response to any order of any court or other governmental authority or as may otherwise be required pursuant to any requirement of law, (d) if required to in connection with any litigation or similar proceeding, (e) to the extent this Agreement is publicly disclosed (other than as a result of a breach of any party's obligations hereunder), (f) to procure Interim and Final Approval Order, with commercially sensitive terms to be filed under seal, or (g) in connection with the exercise of any remedies. Notwithstanding the foregoing or anything to the contrary herein, the confidentiality obligations and permitted disclosures set forth in this provision shall be subject to, and shall not be construed to permit any violation of, applicable U.S. antitrust laws (including the Sherman Act, the Clayton Act, and the Federal Trade Commission Act) and insider trading laws (including the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder), and no Party shall use or disclose any information obtained pursuant to this Agreement in violation of such laws.

## 13.   NOTICES

All notices, approvals or requests under this Agreement shall be in writing and shall be deemed given when: (a) delivered by hand or by nationally recognized overnight courier service to the person specified for the receiving Party at the address specified below; or (b) sent via electronic mail to the e-mail address(es) specified below (provided that any notice sent by electronic mail shall also be simultaneously sent by overnight courier service). Each Party may change its notice information by providing written notice to the other Party in accordance with this Section.

If to Company

Address: 9401 Indian Creek Parkway, Suite 1000,
Overland Park, KS 66210
Email: cruise@svminerals.com
Attention:  Dennis Cruise

with copies to:

Nirma Limited
Email: ajaykhushu@nirma.co.in
Attention: Ajay Khushu

-and-

14

       Company's Independent Director
       Email:jdubel@dubel.com
       Attention: John S. Dubel

    If to Supplier

       Address: 111 East Sego Lily Drive, Suite 200,
       Sandy, UT 84070
       Email: nandu@tatachemicals.com
       Attention: Mr. Nandakumar Tirumalai

       -and-

       Address: 111 East Sego Lily Drive, Suite 200,
       Sandy, UT 84070
       Email: tmccoy@tatachemicals.com
       Attention: Timothy S. McCoy

**14.    MISCELLANEOUS**

(a)    Except for the occurrence of a Company Termination Event implicating the Corporate Guarantee, the terms and conditions of this Agreement (including Sections (b), (c), and (d) below) shall not be applicable to Supplier or Company's Parent or their respective rights and obligations under the Corporate Guarantee, or to the enforceability, or the place for enforceability, of the Corporate Guarantee. The Corporate Guarantee shall govern and be enforceable according to its terms and conditions.

(b)    Each Party shall bear the costs of their own expenses for the negotiation, execution and delivery of this Agreement; ***provided***, ***however***, that Company shall pay all reasonable and documented out-of-pocket costs and expenses incurred by Supplier (including the reasonable fees, charges and disbursements of counsel) only in connection with the enforcement of its rights under this Agreement where Supplier is the prevailing party or where, in connection with any action, suit, proceeding, or dispute (whether initiated by Company, Supplier, or any third party), (i) Supplier is named as a defendant or respondent and no final, non-appealable judgment or order is entered against Supplier on the merits of such action, suit, proceeding, or dispute, (ii) the matter is settled, dismissed, or otherwise resolved without a determination that Supplier is not the prevailing party, or (iii) a court of competent jurisdiction does not expressly determine that Company is the prevailing party, including, in each case, all such out-of-pocket expenses incurred during any workout, restructuring, or negotiations in respect of the Liquidity Advances.

(c)     THIS AGREEMENT AND ANY DISPUTE, SUIT, ACTION OR PROCEEDING, WHETHER IN CONTRACT, TORT OR OTHERWISE AND WHETHER AT LAW OR IN EQUITY, RELATING TO OR ARISING OUT OF THIS AGREEMENT OR TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF DELAWARE, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(d)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT WHETHER IN CONTRACT, TORT OR OTHERWISE AND WHETHER AT LAW OR IN EQUITY, MAY BE BROUGHT IN THE COURTS OF THE STATE OF DELAWARE OR OF THE UNITED STATES FOR THE DISTRICT OF DELAWARE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HERETO CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS.   EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, OR ANY LEGAL PROCESS WITH RESPECT TO ITSELF OR ANY OF ITS PROPERTY, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING WHETHER IN CONTRACT, TORT OR OTHERWISE AND WHETHER AT LAW OR IN EQUITY IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR ANY DOCUMENT RELATED HERETO.   EACH OF THE PARTIES HERETO WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY DELAWARE LAW.

(e)     THE PARTIES HERETO EACH WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST THE OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE AND WHETHER AT LAW OR IN EQUITY.   THE PARTIES HERETO EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.   WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE

16

THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF.   THIS WAIVER SHALL APPLY TO ANY AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

(f) This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

## 15. SUCCESSORS AND ASSIGNS; AMENDMENTS

This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the Parties (including any trustee, or estate representative of Company). Company may not assign this Agreement or any of its rights or obligations hereunder without the prior written consent of Supplier. Supplier may assign or transfer all or any portion of its rights and obligations under this Agreement (including all or any portion of the Liquidity Advances to the extent Supplier's obligation to make Liquidity Advances remains outstanding) (a) to any affiliate of Supplier with the financial wherewithal to perform Supplier's supply obligations hereunder and, if applicable, make the Liquidity Advances, provided that Supplier shall promptly inform Company in writing of any such assignment or transfer; or, (b) with the consent of Company (not to be unreasonably withheld), to any other person. No amendment, waiver, modification or supplement to this Agreement shall be effective unless in writing and signed by both Parties.

## 16. INDEMNIFICATION

(a) For the purposes of this clause: "***Claims***" means demands, actions, proceedings, judgments, orders, or arbitration awards brought by a bona fide third party (excluding affiliates of either party) against an Indemnified Party, but only to the extent such demands, actions, proceedings, judgments, orders, or awards are finally determined by a court of competent jurisdiction or agreed in a settlement approved by the Indemnifying Party. "***Losses***" means direct, out-of-pocket liabilities, damages (subject to customary mitigation obligations), costs, and expenses (excluding consequential, incidental, special, punitive, or exemplary damages, loss of profits, loss of revenue, loss of opportunity, and any diminution in value) actually suffered and paid by an Indemnified Party, net of any insurance proceeds, tax benefits, or recoveries from third parties. "***Indemnified Party***" means the party entitled to receive indemnification under this Section. "***Indemnifying Party***" means the party obligated to provide indemnification under this Section.

17

(a)  Company shall indemnify, defend and hold harmless Supplier and its affiliates, and their respective directors, officers, employees, agents and advisors (each, a "*Supplier Indemnified Party*") from and against any and all Losses incurred by any Supplier Indemnified Party arising out of, in connection with, or as a result of any Claim based upon (i) any breach by Company of any representation, warranty, covenant or obligation under this Agreement, (ii) any gross negligence or willful misconduct of Company relating to the Liquidity Advances or the use or proposed use of proceeds thereof, whether based on contract, tort or any other theory, (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any Customer Contract to the extent arising from Company's breach thereof, (iv) all Losses resulting from Supplier's use of Company provided intellectual property or specifications, (v) all regulatory fines, penalties, and attorneys' fees and expenses incurred because Company's instructions violated applicable laws or trade sanctions, (vi) any Losses, regulatory penalties, or Claims arising from Company's mishandling of shared data or breach of data privacy laws, (vii) death, personal injury, property damage Claims causes by Company's negligence or mishandling of Material, (xiii) any Claims or Losses for which Company is indemnified by Customer under the Customer Contracts or applicable law, or (ix) Company's willful, unauthorized disclosure of Supplier's confidential information to a direct competitor of Supplier, subject to Supplier demonstrating actual competitive harm. Company's indemnification obligations and the benefit to Supplier hereunder are independent of the Corporate Guarantee. Company's aggregate liability for indemnification under this Section shall not exceed an amount equal to the Purchase Price paid (or payable) for the volume of Material supplied under the applicable Customer Contract that is directly related to the event giving rise to indemnification under clauses (i) through (ix) above, as applicable

(b)  Supplier shall indemnify, defend and hold harmless Company and its affiliates, and their respective directors, officers, employees, agents and advisors (each, a "*Company Indemnified Party*") from and against any and all Losses incurred by any Company Indemnified Party arising out of, in connection with, or as a result of any Claim based upon (i) any breach by Supplier of any representation, warranty, covenant or obligation under this Agreement, (ii) any gross negligence or willful misconduct of Supplier relating to the Material supplied under this Agreement, whether based on contract, tort or any other theory, (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any Customer Contract to the extent arising from Supplier's material breach of its obligations hereunder, or (iv) Supplier's willful, unauthorized disclosure of Company's confidential information to a direct competitor of Company, subject to Company demonstrating actual competitive harm; provided Supplier shall have no liability where (A) Material was modified, altered, combined with other products, or used contrary to specifications after delivery, (B) a recipient of Material failed to conduct incoming inspection in accordance with good industry practice, (C) a

18

recipient of the Material failed to follow Supplier's written handling, storage, or use instructions, (D) the Claim relates to Material supplied more than six (6) months before the Claim is first asserted, or (E) Company failed to notify Supplier in writing within thirty (30) days of becoming aware of any Claim. Supplier's aggregate liability for indemnification under this Section shall not exceed an amount equal to the Purchase Price paid (or payable) for the volume of Material supplied under the applicable Customer Contract that is directly related to the event giving rise to indemnification under clauses (i) through (iv) above, as applicable.

(c) With respect to any third-party claim for which indemnification is sought under Section (b)(iii) or (c)(iii) of this Section, the Indemnifying Party shall have the right, at its sole cost and expense, to assume the defense of such claim with counsel reasonably acceptable to the applicable Indemnified Party. If Indemnifying Party assumes such defense, the Indemnified Party may participate in the defense at its own expense but Indemnifying Party shall control all decisions relating to the defense and settlement thereof; provided that Indemnifying Party shall not, without the prior written consent of the applicable Indemnified Party (not to be unreasonably withheld, conditioned or delayed), consent to any settlement that (x) imposes any non-monetary obligation on, or requires any admission of liability by, any Indemnified Party or (y) does not include a full and unconditional release of all Indemnified Parties. No Indemnified Party shall settle or compromise any third-party claim for which it seeks indemnification hereunder without the prior written consent of Indemnifying Party (not to be unreasonably withheld, conditioned or delayed).

## 17.   FURTHER ASSURANCES

Each Party shall execute and deliver such additional documents, instruments and agreements and take such further actions as may be reasonably necessary or desirable to carry out the provisions and purposes of this Agreement.

## 18.   ENTIRETY

(a) This Agreement, together with all schedules, exhibits, annexes, invoices, purchase orders, and other documents delivered or to be delivered in connection herewith or incorporated by reference herein (but excluding the Corporate Guarantee and Customer Contracts) (collectively, the "*Transaction Documents*"), constitutes an integrated agreement and Transaction Documents constitute embody the entire understanding between Supplier and Company with respect to the subject matter hereof and supersedes all prior negotiations, representations, warranties, commitments, offers, contracts, and understandings (whether oral or written) among the Parties relating to such subject matter. For purposes of assumption under section 365 of the Bankruptcy Code, this Agreement and the Transaction

19

Documents shall be treated as a single integrated executory contract, and assumption of this Agreement shall constitute assumption of all Transaction Documents (including all invoices, purchase orders, delivery confirmations, and other instruments issued in connection with the supply of Materials and the Liquidity Advances hereunder). No modification hereof shall be of any force or effect unless reduced to writing and signed by both Parties hereto.

(b)    In the event of any conflict, inconsistency, or ambiguity between the terms and conditions of this Agreement and those of any prior agreement, term sheet, letter of intent, or other document between the Parties relating to the subject matter hereof (but excluding the Corporate Guarantee), the terms and conditions of this Agreement shall govern and control in all respects.

(c)    The provisions of this Agreement are not severable. The Parties acknowledge and agree that the terms, conditions, covenants, representations, warranties, and obligations set forth in this Agreement are interdependent and have been entered into in consideration of one another, and that each such provision constitutes an essential and inseparable part of the overall transaction contemplated hereby. No individual provision, section, covenant, or obligation of this Agreement may be independently terminated, rejected, severed, or rendered unenforceable apart from the remainder of this Agreement. Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement and the effect thereof shall be confirmed to the provisions so held to be invalid or unenforceable.

[signature pages follow]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Closing Date.

**SEARLES VALLEY MINERALS INC.**

By: _____

    Name:
    Title:

**TATA CHEMICALS NORTH AMERICA INC.**

By: _____

    Name:
    Title:

ACKNOWLEDGED AND AGREED:

_____
John S. Dubel, Company's Independent Director

[Signature Page to Soda Ash Supply and Liquidity Agreement]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Closing Date.

**SEARLES VALLEY MINERALS INC.**

By: _Dennis Cruise_

Name:  Dennis Cruise
Title:   President

**TATA CHEMICALS NORTH AMERICA INC.**

By: _____

Name:
Title:

ACKNOWLEDGED AND AGREED:

_____

John S. Dubel, Company's Independent Director

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Closing Date.

**SEARLES VALLEY MINERALS INC.**

By: _____

    Name:

    Title:

**TATA CHEMICALS NORTH AMERICA INC.**

By: _____

    Name: John Mulhall

    Title: Managing Director / CEO

ACKNOWLEDGED AND AGREED:

_____

John Dubel, Company's Independent Director

[Signature Page to Soda Ash Supply and Liquidity Agreement]