**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEARLES VALLEY MINERALS INC., *et al.*,[1] | ) | Case No. 26-10966 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I) APPROVING
BIDDING PROCEDURES FOR THE SALE OF CERTAIN OR ALL OF THE
DEBTORS' ASSETS; (B) AUTHORIZING THE DEBTORS TO DESIGNATE ONE OR
MORE STALKING HORSE BIDDERS AND TO PROVIDE BID PROTECTIONS;
(C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES;
(D) SCHEDULING A HEARING TO CONSIDER ANY PROPOSED SALE; AND
(II) (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS,
(B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
(C) GRANTING RELATED RELIEF**

Searles Valley Minerals Inc. ("**SVM**") and certain of its subsidiaries, the debtors

and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), hereby move

(this "**Motion**") the United States Bankruptcy Court for the District of Delaware (this "**Court**")

for entry of orders granting the relief described below.  In support of this Motion, the Debtors rely

upon and incorporate by reference the contemporaneously filed *Declaration of Adrian Frankum*

*in Support of Chapter 11 Petitions and First Day Papers* (the "**First Day Declaration**"),[2] and

further represent as follows:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A).  The location of Searles Valley Mineral Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

[2]   Capitalized terms used but not defined herein shall the meanings ascribed to them in the First Day Declaration or the proposed Bidding Procedures, as applicable.

**RELIEF REQUESTED**

1.       By this Motion, the Debtors request entry of the following:

(a)      an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"):

   (i)      authorizing and approving certain proposed bidding and sale procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "**Bidding Procedures**"), in connection with one or more sales or dispositions (each, a "**Sale Transaction**" and collectively, the "**Sale**") of certain or all of the assets (the "**Assets**") of the Debtors;

   (ii)     establishing procedures for the Debtors to designate a stalking horse bidder or stalking horse bidders with respect to certain or all of the Assets (each, a "**Stalking Horse Bidder**") and to enter into a stalking horse agreement or stalking horse agreements (each, a "**Stalking Horse Agreement**") containing bid protections;

   (iii)    establishing certain dates and deadlines for the sale process, including scheduling an auction of the Assets (the "**Auction**"), if any, in accordance with the Bidding Procedures, and the hearing with respect to the approval of the Sale (the "**Sale Hearing**");

   (iv)     approving the Assumption Procedures in respect of the Assumed Contracts and approving the form and manner of service of the Contract Assumption Notice (each as defined below);

   (v)      approving the form and manner of service of the Sale Notice (as defined below); and

   (vi)     granting related relief; and

(b)      following entry of, and compliance with, the Bidding Procedures Order, one or more orders (each, a "**Sale Order**") at the Sale Hearing, the proposed form of which is attached hereto as **Exhibit B**, authorizing and approving the following:

   (i)      authorizing and approving the sale of the Assets to the Successful Bidder or Successful Bidders (or, if the Successful Bidder or Successful Bidders fail to consummate the Sale, to the Back-Up Bidder or Back-Up Bidders) free and clear of all liens, claims, encumbrances, and other interests;

   (ii)     authorizing and approving the assumption or assumption and assignment of the Assigned Contracts; and

   (iii)    granting related relief;

**JURISDICTION AND VENUE**

2.  This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157(a)–(b)(1) and 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.  The legal predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**").

4.  Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to the entry of a final order with respect to this Motion if it is determined that this Court would lack Article III power to enter such final order absent the consent of the parties.

**PRELIMINARY STATEMENT**

5.  The Debtors commenced these chapter 11 cases with the goal of achieving a value-maximizing going-concern sale of their business.  Subject to this Court's approval, the Debtors have secured much-needed liquidity to run a postpetition marketing process designed to supplement the Debtors' extensive prepetition efforts to procure a buyer, which were unsuccessful given the Debtors' legacy liabilities.  The proposed Bidding Procedures and Sale timeline are carefully calibrated to allow for the Debtors and their advisors to take advantage of groundwork already laid during the prepetition marketing process to generate as much interest and value as possible for the Debtors' estates, while also allowing them to operate within the liquidity runway provided by the financing arrangements supporting these cases.  While the Company would have

preferred to commence these cases with a stalking horse bidder locked in, the Company decided to commence these cases upon obtaining financing and a cash collateral arrangement. By this Motion, the Debtors seek authority, in accordance with the Bidding Procedures, to designate one or more Stalking Horse Bidders, in the exercise of the Debtors' business judgment, and to offer market based stalking horse bid protections to any such Stalking Horse Bidder, including a break-up fee and expense reimbursement in the aggregate of up to a 3% of the cash portion of the applicable Transaction Purchase Price.

## BACKGROUND

**I.      The Chapter 11 Cases**

6.      On June [●], 2026 (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors have requested that the Chapter 11 Cases be jointly administered under Local Bankruptcy Rule 1015-1.

7.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

9.      SVM (together with its Debtor and non-Debtor subsidiaries, the "**Company**") operates a vertically integrated mining and processing complex at Searles Lake in Trona, California, where it produces critical industrial minerals, including borates, sodium sulfate, and salt, sourced from one of the largest known deposits of water-soluble borates in North America. The Company is among the largest and lowest cost producers of borates, serving a diversified global customer base across industrial, agricultural, and specialty chemical end markets. The

Company historically mined and processed Sodium Carbonate (soda ash) until February 2026, and continues to source and supply soda ash to its customers in North America. In addition, the Debtors source and provide potable water for approximately 760 residential and commercial customers in certain areas on the west shoreline of Searles Lake, California, including the town of Trona, California. The Company's business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First Day Declaration.

## II.   The Debtors' Prepetition Marketing Efforts

10.   In February, 2024, Debtor SVM and SVM's immediate parent, non-Debtor Karnavati Holdings, Inc. ("**KHI**"), engaged Lazard & Co, Limited ("**Lazard Ltd.**") as their investment banker to assist in the evaluation and marketing of the Debtors' assets for a potential sale transaction. In August 2025, the Debtors, with the assistance of Lazard Ltd., commenced a comprehensive strategic marketing process to gauge market interest in the Debtors' business (the "**SVM Sale Process**"). In connection with that process and subsequent engagement to date, Lazard Ltd. contacted over 140 parties, with over 50 parties executing NDAs and obtaining confidential information on the Debtors' business. As the SVM Sale Process further developed, it became clear in April 2026 that an out-of-court transaction was not viable due in part to the Debtors' legacy liabilities and the lack of appetite from potential buyers to acquire the Debtors' business outside of a court-supervised process. At that time, Lazard pivoted to the preparation of an in-court process and shifted discussions in the SVM Sale Process with several buyers to potentially acquire the assets as part of an in-court sale process.[3]

---

[3]   Accordingly, on May 12, 2026, SVM entered into a further letter agreement with Lazard Ltd., which superseded the prior engagement and engaged Lazard Frères & Co. LLC and Lazard Ltd. (collectively, "**Lazard**") as SVM's investment banker in the evaluation of strategic and capital structure alternatives.

11.    As of the Petition Date, a number of potential buyers have engaged with the Company in advanced discussions regarding the in-court sale process.  There remains interest from multiple parties in the Debtors' assets and business.  Both the Debtors' management and Lazard have made themselves available for calls with interested parties upon request and have fielded diligence questions from potential buyers.

12.    Given that no actionable bids were received for the Debtors' business on an out-of-court basis, the Debtors began evaluating strategic alternatives to maximize value.  After consulting with their advisors and taking into account various factors, including the Debtors' liquidity position, the difficult decision to mothball soda ash production in February 2026, the corresponding reduction in force, and the time needed to conduct further diligence and finalize definitive documentation, the Debtors decided to commence these Chapter 11 Cases to implement a section 363 sale that would allow potential buyers to acquire the Debtors' assets free and clear of claims and interests.

13.    To this end, the Debtors have developed the terms of the Bidding Procedures and the Sale timeline set forth therein.  The Debtors submit that the Bidding Procedures and Sale timeline are reasonable and will assist the Debtors in reaching a resolution of these Chapter 11 Cases in advance of any liquidity shortfall.

## III.    The Bidding Procedures

14.    The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the manner in which bids become Qualified Bids (as defined in the Bidding Procedures), the receipt and negotiation of bids received, the conduct of any Auction, the selection and designation of a Stalking Horse Bidder, the selection and approval of any ultimate Successful Bidder, and the deadlines with respect to the foregoing.  The Debtors believe that the

Bidding Procedures afford the Debtors a sufficient opportunity to maximize the value of a sale of the Assets for their estates.

15.     In accordance with Local Bankruptcy Rule 6004-1, the below chart summarizes the Bidding Procedures and the procedures for conducting the Auction[4]:

| Provision | Summary |
| --- | --- |
| **Qualification of Bidders** | To participate in the bidding process and to receive access to due diligence (the "**Diligence Materials**"), a party must submit to the Debtors (i) an executed confidentiality agreement in such a form reasonably satisfactory to the Debtors and (ii) reasonable evidence demonstrating the party's financial capability to consummate a Sale Transaction as reasonably determined by the Debtors.  A party that qualifies for access to Diligence Materials pursuant to the prior sentence shall be a "**Potential Bidder**."   Any bidder that has previously satisfied the foregoing requirements prior to the date hereof will be deemed a Potential Bidder. |
| **Bid Deadlines** | The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction and to submit competing bids for the Assets.  The Debtors shall assist Potential Bidders in conducting their respective due diligence investigations and shall accept Bids (as defined below) until **August 6, 2026 at 11:59 p.m. (prevailing Eastern Time) (the "Bid Deadline"**); *provided* that any Potential Bidder submitting a Bid has submitted a letter of intent setting forth the primary commercial terms of such Potential Bidder's proposed Bid (an "**LOI**") by **July 10, 2026 at 11:59 p.m. (prevailing Eastern Time) (the "Non-Binding LOI Deadline"**). <br><br> None of the dates or deadlines set forth in Section III of the Bidding Procedures, including the Bid Deadline, may be extended, adjourned or otherwise modified in any respect (i) without the prior written consent of the DIP Lender, or (ii) in a manner that is inconsistent with the milestones or other applicable provisions in the DIP Order; *provided, however*, that the Debtors may waive or extend the Non-Binding LOI Deadline in their reasonable discretion following consultation with the DIP Lender. |
| **Qualified Bids** | To be eligible for consideration as a Qualified Bid to participate in the Auction, each Potential Bidder must deliver to the Debtors and their advisors a written, non-binding LOI prior to the Non-Binding LOI Deadline, and a written, irrevocable offer, solicitation or proposal (each, |

---

[4]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms have the meaning ascribed to them in the Bidding Procedures.

a "**Bid**") prior to the Bid Deadline that must be determined by the Debtors, in their business judgment and in consultation with the DIP Lender and the Prepetition Secured Lender (the "**Consultation Parties**"), to satisfy each of the following conditions:

(a) *Good Faith Offer*: Each Bid must constitute a good faith, bona fide offer to purchase all or certain of the Assets.

(b) *Purchase Price*: All Bids (other than a Credit Bid (as defined herein) by the DIP Lender and/or the Prepetition Secured Lender) must be for cash. The LOI and Bid must clearly set forth the cash purchase price, and any other non-cash consideration (with the form of such consideration specified), to be paid (the "**Transaction Purchase Price**"). If the LOI and Bid propose an acquisition of only certain of the Assets, the Transaction Purchase Price must be allocated among each of the categories of Assets expressly identified in such LOI and Bid.

(c) *Good Faith Deposit*: Each Bid must be accompanied by a deposit in the amount of ten percent (10%) of the cash consideration portion of the Transaction Purchase Price, before any reductions for assumed liabilities or other adjustments (the "**Good Faith Deposit**").

(d) *Executed Agreement*: Each Bid must be based on the proposed purchase agreement, which will be prepared by the Debtors, and will be filed as a supplement to this Motion and uploaded to the data room as soon as practicable following the filing of this Motion (the "**Purchase Agreement**"), and must include executed transaction documents, signed by an authorized representative of such Potential Bidder, pursuant to which the Potential Bidder proposes to effectuate a Sale Transaction (a "**Modified Purchase Agreement**"). Each Bid must also include a copy of the Modified Purchase Agreement marked against the Purchase Agreement to show all changes requested by the Potential Bidder (including those related to the assumption and assignment of contracts and licenses, and other material terms such that the Debtors may determine how such Bid compares to the terms of competing Bids). Each Modified Purchase Agreement must provide (i) a commitment to close within two business days after all closing conditions are satisfied and (ii) a commitment that the Potential Bidder will (A) make all necessary filings under the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**") and any other applicable antitrust, competition or merger control laws, rules or regulations enacted or promulgated by any governmental authority ("**Foreign Corruption Laws**"), and (B) submit all necessary filings under the HSR Act and any Foreign Competition Laws on the second business day following the conclusion of the Auction.

(e) *Designation of Assigned Contracts and Leases*: A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Potential Bidder wishes to assume pursuant to the Sale Transaction. A Bid must specify whether the Debtors or the Potential Bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs (which estimate may be provided by the Debtors).

(f) *Designation of Assumed Liabilities*: An LOI and Bid must identify all liabilities which the Potential Bidder proposes to assume.

(g) *Corporate Authority*: A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Sale Transaction; *provided* that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the Sale Transaction, then the Potential Bidder must also furnish written evidence reasonably acceptable to the Debtors of the approval of the Sale Transaction by the equity holder(s) of such Potential Bidder.

(h) *Disclosure of Identity of Qualified Bidder*: A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or otherwise participating in connection with such Bid (including the identity of any parent companies of such entity), and the complete terms of any such participation, including any connections, agreements, arrangements or understandings (a) with the Debtors, any officer, director, or equity holder of the Debtors, or any other known, potential, or prospective bidder and (b) concerning a collaborative or joint bid or any other combination concerning the proposed Bid; *provided* that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the Sale Transaction, then the Potential Bidder must fully disclose the identity of each direct and indirect equity holder of such Potential Bidder.

(i) *Contact Information and Affiliates*: A Bid must provide the identity and contact information for the Potential Bidder and full disclosure of any parent companies, controlling investors, or fund managers of the Potential Bidder.

(j) *Proof of Financial Ability to Perform*: A Bid must include written evidence from which the Debtors may reasonably conclude, in consultation with their advisors and the Consultation Parties, that the Potential Bidder has the necessary financial ability to consummate a Sale Transaction and must further contain information that can be publicly filed or disseminated providing adequate assurance of future performance of all contracts and leases to be assumed and assigned in such Sale

Transaction. Such information may include, among other things, the following:

(i) contact names and numbers for verification of financing sources;

(ii) written evidence of the Potential Bidder's internal resources and, if applicable, binding debt funding commitments from a recognized banking institution and equity commitments in an aggregate amount equal to the cash portion of such Bid, plus associated fees and expenses, or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Sale Transaction;

(iii) the Potential Bidder's most current audited (if any) and latest unaudited financial statements or, if the bidder is an entity formed for the purpose of making a bid, the current audited (if any) and latest unaudited financial statements of the equity holder(s) of the bidder or such other form of financial disclosure, and a guaranty from such equity holder(s);

(iv) a description of the Potential Bidder's pro forma capital structure; and

(v) any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Potential Bidder has the ability to close the Sale Transaction and pay all associated fees and expenses.

(k) *Regulatory and Third Party Approvals*: An LOI and Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the Sale Transaction, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals, and the Debtors, in consultation with the Consultation Parties, may consider the timing and likelihood of obtaining such approvals, and any actions the Potential Bidder will take to ensure receipt of such approval(s) as promptly as possible, when considering the other Bid Assessment Criteria (as defined below).

(l) *Conditions/Contingencies*: A Bid must not be subject to further due diligence or any financing contingency.

(m) *Bid Irrevocable*: Subject to the following sentence with respect to the requirement to serve as a Backup Bidder, a Bid must provide that it is irrevocable until two business days after the closing of

4914-2197-4965.1 78006.00001                    10

the relevant Sale Transaction; *provided* that if such Bid is accepted as the Successful Bid or the Backup Bid, such Bid shall continue to remain irrevocable as and to the extent provided in the Modified Purchase Agreement.  Each Potential Bidder that submits a Bid further agrees that, if not chosen as a Successful Bidder, such Potential Bidder shall serve, without modification, as a Backup Bidder as may be designated by the Debtors, in consultation with the Consultation Parties, at the Sale Hearing, in the event the relevant Successful Bidder with respect to a Sale Transaction fails to close as provided in the Successful Bidder Purchase Agreement, as modified, if at all, and the applicable Sale Order.

(n)     *As-Is, Where-Is*: Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has conducted, to its satisfaction, its own independent investigation of the condition (financial or otherwise), operations and business of the Debtors and the Assets to be acquired; (ii) in making its determination to proceed with the transactions contemplated by its Bid, it has relied solely on the results of its own independent investigation and has not relied directly or indirectly on any materials or information made available to it and/or its representatives by or on behalf of any Debtor; and (iii) that, should such Potential Bidder be deemed the Successful Bidder with respect to the proposed Sale Transaction and close such Sale Transaction, such Potential Bidder shall acquire the Assets to be acquired without any surviving representations or warranties, on an "as is" and "where is" basis.

(o)     *Consent to Jurisdiction*.  Each Potential Bidder must (i) submit to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, the Bidding Procedures, the Auction, any Modified Purchase Agreement, or the construction and enforcement of documents relating to any Sale Transaction, (ii) waive any right to a jury trial in connection with any disputes relating to the Debtors, the Bidding Procedures, the Auction, any Modified Purchase Agreement, or the construction and enforcement of documents relating to any Sale Transaction and (iii) commit to the entry of a final order or judgment in any way related to the Debtors, the Bidding Procedures, the Auction, any Modified Purchase Agreement, or the construction and enforcement of documents relating to any Sale Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

(p)     *No Bid Protections*.  Except with respect to any Stalking Horse Bidder designated by the Debtors as set forth below, a Bid must not entitle the Potential Bidder to any break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of payment or reimbursement and, by submitting a Bid, the Potential Bidder waives

| | |
|---|---|
| | the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction. Each Potential Bidder presenting a Bid will bear its own costs and expenses (including legal fees) in connection with any proposed Sale Transaction.<br><br>(q) *Credit Bids for Stalking Horse Assets*: Any Bid for all or some of any Assets included as part of a Stalking Horse Bid, if any, that is made as a credit bid pursuant to section 363(k) of the Bankruptcy Code shall include cash consideration in an amount equal to or greater than any Bid Protections granted to the applicable Stalking Horse Bidder. |
| **Bid Protections to Any Replacement Stalking Horse Bidder or Additional Stalking Horse Bidder** | The Debtors, as they may reasonably determine to be in the best interests of their estates, and in consultation with the Consultation Parties, may select a Stalking Horse Bidder or Stalking Horse Bidders for the Assets (or one or more subgroupings of Assets) for the purposes of establishing one or more minimum acceptable bids with which to begin the Auction with respect to certain or all of the Assets (each, a "**Stalking Horse Bid**") and provide any such Stalking Horse Bidder with Bid Protections (described below) pursuant to an agreement with such Stalking Horse Bidder (the "**Stalking Horse Agreement**"); *provided* that no insider or affiliate of the Debtors shall be entitled to any Bid Protections.<br><br>In the event that the Debtors designate a Stalking Horse Bidder and the Stalking Horse Bidder is not the Successful Bidder with respect to the Stalking Horse Bid, the Debtors shall be authorized, but not directed, to make certain payments in consideration of its being the Stalking Horse Bidder with respect to the Stalking Horse Bid and to reimburse it for its reasonable and necessary out-of-pocket expenses, including (a) a break-up fee (the "**Break-Up Fee**") and (b) reimbursement of reasonable, documented and necessary out-of-pocket expenses incurred in connection with such Stalking Horse Bid (the "**Expense Reimbursement Amount**"). The amount of any Break-Up Fee and the Expense Reimbursement Amount shall in the aggregate not exceed 3% of the cash portion of the applicable Transaction Purchase Price for such Stalking Horse Bid, with such amount to be paid in accordance with the terms and conditions set forth in the applicable Stalking Horse Agreement and as approved by the Bankruptcy Court in the Bidding Procedures Order (the "**Bid Protections**"); *provided*, *however*, that notwithstanding anything to the contrary herein, no other bidder, nor any party making a Credit Bid (irrespective of whether it is a Stalking Horse Bidder) will be entitled to any Bid Protections or any other expense reimbursement, break-up fee, termination fee or any other similar fee or payment. |
| **Modification of Bidding and** | *Additional Procedures.* The Debtors, in consultation with the Consultation Parties, may announce at the Auction additional or modified procedural rules that are reasonable under the circumstances for |

| | |
|---|---|
| **Auction Procedures** | conducting the Auction, so long as such rules are not inconsistent in any material respect with the Bidding Procedures. |
| | *Reservation of Rights*.  Except as otherwise provided in the Purchase Agreement, any Stalking Horse Agreement, the Bidding Procedures, or the Bidding Procedures Order, the Debtors, in consultation with the Consultation Parties, further reserve the right as they may reasonably determine to be in the best interest of their estates and in the exercise of their fiduciary duties to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine whether to enter into a Stalking Horse Agreement; (d) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal with respect to a Sale Transaction; (e) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, or the Bidding Procedures, or (3) contrary to the best interests of the Debtors and their estates, creditors, interest holders, or parties in interest; (f) waive terms and conditions set forth herein otherwise applicable to all Potential bidders; (g) impose additional terms and conditions with respect to all Potential bidders; (h) modify the deadlines set forth herein; (i) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (j) modify the Bidding Procedures and implement additional procedural rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge the Debtors' fiduciary duties and are not inconsistent with any Bankruptcy Court order. |
| **Closing with Alternative Backup Bidders** | Subject to the following sentence with respect to the requirement to serve as a Backup Bidder, a Bid must provide that it is irrevocable until two business days after the closing of the relevant Sale Transaction; *provided* that if such Bid is accepted as the Successful Bid or the Backup Bid, such Bid shall continue to remain irrevocable as and to the extent provided in the Modified Purchase Agreement.  Each Potential Bidder that submits a Bid further agrees that, if not chosen as a Successful Bidder, such Potential Bidder shall serve, without modification, as a Backup Bidder (as defined below) as may be designated by the Debtors at the Sale Hearing, in the event the relevant Successful Bidder with respect to a Sale Transaction fails to close as provided in the Successful Bidder Purchase Agreement, as modified, if at all, and the applicable Sale Order |
| | Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted with respect to a Sale Transaction, the Qualified Bidder with the next highest or otherwise best Bid with respect to such Sale Transaction at the Auction, as determined by the Debtors, in consultation with the Consultation Parties, in the exercise of their business judgment, will be designated as the backup bidder (the "**Backup** |

| | |
|---|---|
| | **Bidder**") for such Sale Transaction. The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "**Backup Bid**") with respect to such Sale Transaction open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern Time) on the date that is at least 60 calendar days after the date of entry of the Sale Order (or an order confirming a plan of reorganization if the Successful Bid is a Plan Bid) (the "**Outside Backup Date**"), or (ii) the closing of the transaction with the Successful Bidder (or effective date of the plan of reorganization if the Successful Bid is a Plan Bid). |
| | Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction with respect to the Assets that are the subject of the Successful Bid, the Backup Bidder will be deemed to have the new prevailing Bid with respect to such Assets, and the Debtors will be authorized, but not required, without further order of the Bankruptcy Court, to consummate the transaction with the Backup Bidder with respect to such Assets. |
| **Date, Time, Place, and Notice of Auction** | The Auction, if necessary, shall take place on **August 13, 2026 at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, 395 9th Ave., New York, New York 10001, or such other place (which may be virtual) and time as the Debtors shall notify all Qualified Bidders that have submitted Qualified Bids (including any Stalking Horse Bidders). The Auction may be postponed, adjourned or cancelled as the Debtors, in consultation with the Consultation Parties, deem appropriate. Reasonable notice as is reasonably practicable under the circumstances of such postponement or adjournment and the time and place for the commencement or resumption of the Auction or cancellation shall be given to all Qualified Bidders. |
| **No Collusion** | Each Qualified Bidder (including any Stalking Horse Bidder) participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein and (b) has reviewed, understands and accepts the Bidding Procedures, and (c) has consented to the core jurisdiction of the Bankruptcy Court. |
| **Auction Participation** | Only the Debtors, the DIP Lender, the Prepetition Secured Lender, and any Qualified Bidder that has submitted a Qualified Bid (including any Stalking Horse Bidders), in each case, along with their representatives and counsel, or such other parties as the Debtors shall determine shall attend the Auction and only such Qualified Bidders (including any Stalking Horse Bidders) will be entitled to make any further Bids at the Auction. |

| | |
|---|---|
| **Transcription or Video Recording** | The Auction shall be transcribed. |

## IV.    Key Dates and Deadlines

16.    The table below sets forth the proposed key dates and deadlines with respect to the Sale process:

| Date/Time | Event |
|---|---|
| **July 6, 2026** at 11:59 p.m. EDT | Entry of Bidding Procedures Order |
| **July 7, 2026** at 11:59 p.m. EDT | Sale Notice Deadline |
| **July 10, 2026** at 11:59 p.m. EDT | Assumption and Assignment Service Deadline |
| **July 10, 2026** at 11:59 p.m. EDT | Non-Binding LOI Deadline |
| **August 6, 2026** at 11:59 p.m. EDT | Bid Deadline (due date for Bids and Good Faith Deposits) |
| **August 13, 2026** at 10:00 a.m. EDT | Auction |
| **August 17, 2026** at 11:59 p.m. EDT | Deadline to enter into and file Successful Bidder Purchase Agreement with a Successful Bidder (the "**Transaction Approval Filing**") |
| **August 18, 2026** at 4:00 p.m. EDT | Sale Objection Deadline |
| **August 19, 2026** at 11:59 p.m. EDT | Deadline to respond to objections to the Sale of the Assets to Successful Bidder or Successful Bidders |
| **August 20, 2026** at [●] [a/p].m. EDT | Sale Hearing |

## V.    Procedures for the Designation of a Stalking Horse Bidder

17.    The Debtors are and will be continuing to evaluate the designation of a stalking horse bidder with respect to their Assets.  Accordingly, by this Motion, the Debtors seek to establish procedures to enter into a Stalking Horse Agreement or Stalking Horse Agreements containing certain bid protections.  The Debtors believe their ability to maximize value may be enhanced by entering into such agreements.  Pursuant to the Bidding Procedures, the Debtors, as they may reasonably determine to be in the best interests of their estates, may select a Stalking Horse Bidder or Stalking Horse Bidders for the Assets (or one or more subgroupings of Assets) for the purposes of establishing one or more minimum acceptable bids with which to begin the Auction with respect to certain or all of the Assets (each, a "**Stalking Horse Bid**") and provide

any such Stalking Horse Bidder with Bid Protections.  The proposed procedures provide that no insider or affiliate of the Debtors shall be entitled to any Bid Protections.

18.     The Debtors submit that in order to entice potential bidders to serve as a Stalking Horse Bidder, which would help facilitate a competitive Auction by setting a minimum price for the applicable Assets covered by any such Stalking Horse Bid at the Auction, they will need to offer such Stalking Horse Bidder the Bid Protections, in each case in an aggregate amount not to exceed to 3% of the cash portion of the applicable Transaction Purchase Price for such Stalking Horse Bid.  No other bidder, nor any party making a Credit Bid (irrespective of whether it is a Stalking Horse Bidder) will be entitled to any Bid Protections or any other expense reimbursement, break-up fee, termination fee or any other similar fee or payment.

19.     The Debtors submit that the Bid Protections are fair and reasonable in light of the circumstances because, in the event the Bid Protections are triggered, any Stalking Horse Bidder's efforts will have promoted more competitive bidding, and thereby increased the chances that the Debtors will receive the highest or otherwise best offer for the Sale Transaction contemplated by such Stalking Horse Bid, to the benefit of the Debtors' creditors.  As such, the Debtors seek authority to enter into a Stalking Horse Agreement or Stalking Horse Agreements containing such Bid Protections pursuant to the procedures described herein, without further order of the Court.

20.     For reference, the proposed form of purchase agreement for the Sale Transactions contemplated by the Sale (the "**Purchase Agreemen**t" or the "**APA**") will be filed as a supplement to this Motion and uploaded to the data room as soon as practicable following the filing of this

Motion.  The Debtors anticipate that the material terms of the Purchase Agreement, including those provisions required to be highlighted pursuant to Local Bankruptcy Rule 6004-1, are as follows[5]:

| Provision[6] | Summary |
|---|---|
| **Sale to Insider** | N/A |
| **Agreements with Management** | N/A |
| **Releases** | N/A |
| **Private Sale/No Competitive Bidding**<br><br>*Section [•]* | N/A<br><br>The Purchase Agreement will be subject to higher and better offers as set forth herein and provides for a fiduciary out as follows:<br><br>Notwithstanding anything in this Agreement to the contrary, Sellers may participate in discussions or negotiations with, or furnish information with respect to Sellers, the Business[, or the Transferred Subsidiaries] to any Person if (a) (i) such Person has submitted to Sellers a bona fide written proposal to acquire the stock or assets of Sellers, upon receipt of which Sellers shall give prompt written notice to Buyer and (ii) Sellers determine in their good faith judgment that taking such action is consistent with their fiduciary duties or (b) in accordance with the Bidding Procedures.  In addition, notwithstanding anything in this Agreement to the contrary, Sellers may terminate this Agreement if Sellers determine in their good faith judgment that taking such action is consistent with their fiduciary duties. |
| **Closing and Other Deadlines**<br><br>*Section [•]* | The Debtors' DIP Financing facility requires, and the Debtors' liquidity constraints dictate, that the Sale be consummated not later than 90 days after the Petition Date |
| **Good Faith Deposit**<br><br>*Section [•]* | The Buyer has deposited an amount equal to 10% of the cash consideration portion of the Transaction Purchase Price such amount, together with all interest and other earnings accrued thereon, the "**Deposit Funds**") into escrow with an escrow agent reasonably acceptable to Sellers (the |

---

[5]    The following summary and terms defined in this Part III are qualified in their entirety by reference to provisions of the applicable APA. In the event of any inconsistencies between the provisions of the APA and the terms herein, the terms of the APA shall govern.  Capitalized terms used in this section of the Sale Motion and not otherwise defined shall have the meanings ascribed thereto in the APA.

[6]    **NTD:** To be updated in accordance with form APA.

| Provision[6] | Summary |
|---|---|
| | "**Escrow Agent**"), pursuant to the terms of an escrow agreement reasonably acceptable to and executed by the Sellers and Buyer (the "**Escrow Agreement**").  Notwithstanding the foregoing, no Good Faith Deposit shall be required in connection with any Credit Bid submitted by the DIP Lender and/or the Prepetition Secured Lender pursuant to section 363(k) of the Bankruptcy Code.<br><br>The Deposit Funds shall be released by the Escrow Agent and delivered to either (x) Buyer or (y) SVM on behalf of the Sellers, as follows:<br><br>(a)     if the Closing shall occur, the Deposit Funds shall be applied towards the Purchase Price payable by Buyer;<br><br>(b)     if the APA is terminated by Sellers pursuant to Section [●] of the APA, related to [a breach by Buyer of any of its representations, warranties or covenants set forth in the APA in a manner that, either individually or in the aggregate, would prevent the satisfaction of its conditions to Closing], the Deposit Funds shall be delivered to [SVM]; or<br><br>(c)     if the APA is terminated other than in a manner provided by the preceding subsection, the Deposit Funds shall be delivered to Buyer. |
| **Interim Arrangements with Proposed Buyer** | N/A |
| **Use of Proceeds** | Proceeds to be paid at closing to pay broker fee and Prepetition Lender and DIP Lender claims secured by assets being sold. |
| **Tax Exemption** | N/A |
| **Record Retention**<br><br>*Section [•]* | From and after the Closing, until the closing of the Chapter 11 Case, Buyer will provide Sellers and their Representatives, at Sellers' sole expense, with reasonable access, during normal business hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of Buyer or the Business, to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Transferred Assets, the Assumed Liabilities, or the Excluded Assets with respect to periods or occurrences prior to the Closing Date, for the purposes of (i) complying with the requirements of any Governmental Authority, including the Bankruptcy Court, (ii) the closing of the Chapter 11 Case and the wind down of Sellers' estates (including reconciliation of claims and preparation of Tax Returns or other Tax proceedings and the functions of any trusts |

| Provision[6] | Summary |
|---|---|
| | established under a Chapter 11 plan of Sellers or any other successors of Sellers), (iii) complying with applicable Laws, or (iv) other reasonable business purposes; *provided* that Buyer shall not be obligated to provide any such access that would, in the reasonable, good faith judgment of Buyer, conflict with the Disclosure Limitations.  Unless otherwise consented to in writing by SVM, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to SVM such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of. |
| **Sale of Avoidance Actions** | N/A |
| **Requested Findings as to Successor Liability**<br><br>*Section [•]/Form of Sale Order Paragraph [•]* | The Debtors are requesting that any Sale Order (a) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, the sale of the Transferred Assets to Buyer on the terms set forth in the Purchase Agreement and free and clear of all Encumbrances (other than Encumbrances included in the Permitted Encumbrances), and (b) find that Buyer shall have no Liability for any Liability that is not an Assumed Liability, including, without limitation, under any otherwise applicable law, rule, regulation, or legal theory that otherwise would impute successor liability on Buyer.<br><br>By virtue of the Sale Transaction, and notwithstanding any otherwise applicable law, rule, or regulation to the contrary, neither the Buyer nor any of its affiliates shall be deemed to: (i) be a legal successor, or otherwise deemed to be a successor, to any of the Debtors under any theory of law or equity; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors or their estates; (iii) have a common identity or a continuity of enterprise with the Debtors; or (iv) be a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or any business, enterprise, or operation of the Debtors; or (v) to be liable for any acts or omissions of the Debtors in the conduct of their business or arising under or related to the Transferred Assets, other than as set forth in the Asset Purchase Agreement.  To the maximum extent available under applicable law, the Buyer's acquisition of the Debtors' right, title and interest in the Transferred Assets shall be free and clear of any "successor liability" claims and other types of transferee liability of any nature whatsoever, whether known or unknown and whether asserted or unasserted at the time of the closing of the Sale Transaction.  The operations of the Buyer and its Affiliates shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Transferred Assets. |

| Provision[6] | Summary |
|---|---|
| **Sale Free and Clear of Unexpired Leases**<br><br>*Form of Sale Order Paragraph [•]* | Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions of the Purchase Agreement and subject to approval of the Bankruptcy Court, at the Closing, Sellers shall sell, assign, transfer, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, all right, title and interest of Sellers, in, to or under the Transferred Assets free and clear of any and all Encumbrances (other than Permitted Encumbrances), with the same attaching to the proceeds of such sale. |
| **Credit Bid**<br><br>*Bidding Procedures* | See Bidding Procedures, *supra*.<br><br>Any Qualified Bidder may submit a Final Bid or Overbid in cash, cash equivalents or other forms of consideration, including a credit bid, either in whole or in part, to the extent permitted under and consistent with section 363(k) of the Bankruptcy Code up to the full allowed amount of the Debtors' Prepetition Secured Lender's claims or DIP Lender's claims, which credit bid(s), if otherwise meeting the above requirements, as determined by the Debtors, shall be deemed as a part of a Qualified Bid in connection with the bidding process, the Auction, and the Sale.<br><br>Notwithstanding anything to the contrary contained herein, each of (i) the DIP Lender and (ii) the Prepetition Secured Lender shall be deemed a Qualified Bidder and shall have the right (but not the obligation) to credit bid at the Auction all or any portion of the aggregate amount of its applicable outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code, and any such credit bid will be considered a Qualified Bid (a "**Credit Bid**").<br><br>For the avoidance of doubt, the Debtors shall not be required to consult with any Consultation Party (and its advisors) during a period, if any, during which a party has ceased to be a Consultation Party pursuant to Section II of the Bidding Procedures. |
| **Relief from Bankruptcy Rule 6004(h)** | This Motion seeks relief from Bankruptcy Rule 6004(h) in connection with the Sale. |

## VI.    Notice Procedures

21.    **Notice of Sale Hearing.**  Within three business days following the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors will cause the notice substantially in the form attached as **Exhibit 2** to the Bidding Procedures Order (the "**Sale Notice**") to be served on: (a) all entities reasonably known by the

Debtors to have expressed a bona fide interest in acquiring any of the Assets during the year preceding the date hereof; (b) all entities known to have asserted any claim, liens, interests, or encumbrances in or upon any of the Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the U.S. Trustee; (e) counsel to the Prepetition Secured Lender; (f) counsel to the DIP Lender; (g) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors, (h) the office of the attorney general for each of the states in which the Debtors operate; (i) the United States Attorney's Office for the District of Delaware; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission, (l) the United States Department of Justice; (m) the U.S. Environmental Protection Agency, (n) counsel to any statutory committee appointed in the Chapter 11 Cases; (n) the representatives for the union party to a collective bargaining agreement with the Debtors; (o) the Federal Trade Commission; (p) the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice; (q) each governmental agency that has a reasonably known interest with respect to the Sale and transactions proposed thereunder; (r) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (s) all parties entitled to notice pursuant to Local Bankruptcy Rules 2002-1(b) and 9013-1(m).

22.      **Publication Notice.**  Additionally, on the Mailing Date or as soon as reasonably practicable thereafter, the Debtors shall publish a notice, substantially in the form of the Sale Notice, on one occasion, in the national edition of *The New York Times* and *The Daily Independent*, a local publication based in Ridgecrest, California.  Such publication notice shall be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

23.    **Notice of Successful Bidder**.  As provided in the Bidding Procedures, promptly following the Debtors' selection of the Successful Bid or Successful Bids with respect to all Sale Transactions considered at the Auction and the resulting conclusion of the Auction, the Debtors shall announce the Successful Bid or Successful Bids and Successful Bidder or Successful Bidders with respect to all such Sale Transactions and shall file with the Court notice of such Successful Bid or Successful Bids and Successful Bidder or Successful Bidders.

24.    The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures and certain dates and deadlines related thereto; (c) the objection deadline for the Sale of the Assets to the Successful Bidder or Successful Bidders (the "**Sale Objection Deadline**") and the date, time, and place of the Sale Hearing; (d) reasonably specific identification of the assets for sale; (e) instructions for promptly obtaining a copy of the Stalking Horse Agreement (if any); (f) representations describing the Sale Transactions as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; (g) the commitment by the Stalking Horse Bidder (if any) to assume the Assumed Liabilities (as defined in the Stalking Horse Agreement); and (h) notice of the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder or Successful Bidders and the right, procedures, and deadlines for objecting thereto, and, thus, no other or further notice of the Sale should be required.

## VII.    Assumption Procedures

25.    The Debtors are also seeking approval of procedures regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to a Successful Bidder or Successful Bidders

pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale (the "**Assumption Procedures**").

26.    The Assumption Procedures are intended to facilitate the assumption and assignment of all of the Debtors' executory contracts and unexpired leases to be assumed and assigned in connection with the Sale (each, an "**Assigned Contract**," and, collectively, the "**Assigned Contracts**"), subject to the payment of any payments necessary to cure any defaults arising under any Assigned Contract (the "**Cure Payments**").

27.    The key provisions of the Assumption Procedures are:

(a)    **Contract Assumption Notice.**  No later than **July 10, 2026 at 11:59 p.m. (prevailing Eastern Time)** (the "**Assumption and Assignment Service Deadline**"), the Debtors shall serve a notice of contract assumption in substantially the form attached to the Bidding Procedures Order as **Exhibit 3** (the "**Contract Assumption Notice**") via first-class mail on all counterparties to all potential Assigned Contracts and provide a copy of the same to any Stalking Horse Bidder. The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to the potential assumption and assignment of the Assigned Contracts to a Successful Bidder or Successful Bidders upon entry of the Sale Order, and, to the extent applicable, (i) Debtors' good faith estimates of the Cure Payments (if any) required in connection with the executory contract or unexpired lease, as applicable, (ii) whether the potential Assigned Contract is anticipated to be assumed and assigned to any Stalking Horse Bidder in connection with a Stalking Horse Bid; (iii) the Cure Objection Deadline, and (iv) the Sale Objection Deadline; *provided*, *however*, that service of a Contract Assumption Notice does not constitute an admission that any contract is an executory contract or that the stated Cure Payment related to any contract or unexpired lease constitutes a claim against the Debtors or a right against any Stalking Horse Bidder (all rights with respect thereto being expressly reserved).  Further, the inclusion of a contract or unexpired lease, as applicable, on the Contract Assumption Notice is not a guarantee that such contract or unexpired lease, as applicable, will ultimately be assumed and assigned.

(b)    **Cure Payments and Adequate Assurance of Future Performance.** The payment of the applicable Cure Payments by the Debtors or any Successful Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

(c)    **Supplemental Contract Assumption Notice.**  Although the Debtors intend to make a good faith effort to identify all Assigned Contracts that may be assumed

and assigned in connection with a Sale Transaction, the Debtors may discover certain executory contracts inadvertently omitted from the Assigned Contracts list or Successful Bidders may identify other executory contracts that they desire to assume and assign in connection with a Sale Transaction. Accordingly, the Debtors reserve the right, at any time after the Assumption and Assignment Service Deadline and at least two days before the closing of a Sale Transaction, or as otherwise agreed by the Debtors and the Successful Bidder or Successful Bidders, to (i) supplement the list of Assigned Contracts with previously omitted executory contracts ("**Additional Assigned Contracts**"), (ii) remove Assigned Contracts from the list of executory contracts ultimately selected as Assigned Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, and/or (iii) modify the previously stated Cure Payment associated with any Assigned Contracts. In the event the Debtors exercise any of these reserved rights, the Debtors will promptly serve a supplemental notice of contract assumption (a "**Supplemental Assumption Notice**") on each of the counterparties to such contracts and their counsel of record, if any; *provided*, *however*, the Debtors may not add an executory contract to the list of Assigned Contracts that has been previously rejected by the Debtors by order of the Court. Each Supplemental Assumption Notice will include the same information with respect to listed Assigned Contracts as was included in the Contract Assumption Notice, or in the event of a removal, indicating that the Debtors no longer intend to assign the counterparty's contract or unexpired lease, as applicable, to the applicable Successful Bidder in connection with a Sale Transaction.

(d)     **Objections.** Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, *must* (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed amount of the Cure Payment, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by proposed counsel to the Debtors and counsel to the applicable Successful Bidder (if such counsel is known), as applicable, on or before **the 14th day after service (or as reflected by the postmarked date) of the relevant Contract Assumption Notice or Supplemental Assumption Notice** (the "**Cure Objection Deadline**"), or such deadline set forth in the applicable Supplemental Assumption Notice.

The deadline for objections to the proposed assumption and assignment of an Assigned Contract *solely* with respect to (i) the identity of the Successful Bidder or Successful Bidders or (ii) adequate assurance of future performance provided by the Successful Bidder or Successful Bidders shall be the Sale Objection Deadline.

28.     Any party failing to timely file an objection to the proposed Cure Payment, the

proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract

listed on a Contract Assumption Notice or Supplemental Assumption Notice, or the Sale is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Assigned Contract or Additional Assigned Contract (including the adequate assurance of future payment), (c) the related relief requested in the Motion, and (d) the Sale. Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Assigned Contract, or Additional Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder or Successful Bidders for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder or Successful Bidders, as applicable, with respect to such party's Assigned Contract or Additional Assigned Contract.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

### I.     The Sale Represents a Sound Exercise of the Debtors' Business Judgment.

29.     Ample authority exists for approval of the Bidding Procedures, the Bid Protections, and the Sale. The Debtors submit that application of the section 363(b) standard for sales outside of the ordinary course of a debtor's business is met here. Section 363(b) of the Bankruptcy Code provides, in relevant part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). This Court's power under section 363 of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* § 105(a). As set forth below, the Debtors submit they have satisfied the requirements of sections 105, 363, and 365 of the Bankruptcy Code as those sections have been construed by courts in the Third Circuit.

30.     "Under Delaware law, the business-judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *accord Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefor. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991).

31.     The Debtors have sound business justifications for selling the Assets at this time through the proposed postpetition marketing process. After an extensive prepetition marketing process, the Debtors, in their reasonable business judgment, have determined that the proposed Sale of their Assets through the court supervised Auction process will yield the highest value for their Assets. The marketing process set forth in the Bidding Procedures is value maximizing, in that it allows Potential Bidders maximum flexibility to structure Bids in a manner that best suits the goals of the Potential Bidder, while ensuring that Qualified Bids provide maximum value for the Assets. To this end, this Court should approve the Bidding Procedures and the Sale.

**II.     The Bidding Procedures Are Fair and Are Designed to Maximize the Value Received for the Assets.**

32.     The purpose of bidding procedures is to promote competitive bidding and maximize the value of the Debtors' assets. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992). Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are

appropriate in the context of bankruptcy transactions. *See, e.g., In re Dura Auto, Sys.*, No. 06-11202(KJC), 2007 WL 7728109, at \*90 (Bankr. D. Del. Aug. 15, 2007) (bidding procedures "enhanc[ing] competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

33. Here, the Bidding Procedures are designed to ensure that the bidding process is fair and, by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids (while giving Potential Bidders flexibility in structuring their Bids), designed to yield the maximum value for the Debtors' estates and stakeholders. In particular, the Bidding Procedures contemplate an open auction process with minimal barriers to entry and provide prospective purchasers with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing Bids and to select, in their reasonable business judgment, and after consultation with the Consultation Parties, the highest and best offers for the Assets. Thus, all parties in interest can be assured that the consideration received for the Assets will be fair and reasonable.

34. Further, and as described above, the Debtors submit that the Sale timeline is reasonable. As noted above, the Debtors, with the assistance of their advisors, developed a reasonable Sale timeline for a potential sale of the Assets consistent with the realities of the Debtors' postpetition liquidity. In developing the sale timeline outlined above, the Debtors and their advisors took various factors into account, including but not limited to the Debtors' most recent liquidity forecasts, the time needed to market the Assets, and the time potential buyers

would need to complete diligence and submit Bids.  Accordingly, proposed Bidding Procedures and associated Sale process timeline will provide the Debtors with ample time to ensure an extensive and robust marketing process, while ensuring that the Debtors are not unnecessarily continuing to incur costs associated with preserving the value of the Assets pending consummation of a Sale.

35.    For these reasons, the Debtors submit that the proposed Bidding Procedures, including the Debtors' proposed Sale timeline, will encourage competitive bidding and maximize value for the Debtors' estates, are appropriate under section 363 of the Bankruptcy Code, and are consistent with other procedures previously approved by this Court.  *See, e.g.*, *In re Reliz Technology Group Holdings Inc.*, Case No. 26-10371 (TMH) (Bankr. D. Del. Apr. 14, 2026) (approving bidding procedures 19 days after filing motion (30 days after petition date), including bid deadline 29 days after entry of bidding procedures order (60 days after petition date) and sale hearing 63 days after motion filed (75 days after petition date)); *In re Tonopah Solar Energy, LLC*, Case No. 26-10060 (JKS) (Bankr. D. Del. Feb. 10, 2026) (approving bidding procedures 20 days after filing motion (20 days after petition date), including bid deadline 17 days after entry of bidding procedures order (37 days after petition date) and sale hearing 57 days after petition date); *In re Out The Gate, Inc.*, Case No. 25-12023 (KBO) (Bankr. D. Del. Dec. 10, 2025) (approving bidding procedures 19 days after filing motion (28 days after petition date), including bid deadline 27 days after entry of bidding procedures order (55 days after petition date) and sale hearing 61 days after motion filed (70 days after petition date)); *In re Village Roadshow Ent. Grp. USA Inc.*, Case No. 25-10475 (TMH) (Bankr. D. Del. Apr. 22, 2025) (approving bidding procedures with designated stalking horse bid protections, including bid deadline 25 days after entry of bidding procedures order (61 days after petition date) and sale hearing 57 days after motion filed (87 days

after petition date)); *In re Nikola Corp.*, Case No. 25-10258 (TMH) (Bankr. D. Del. Mar. 7, 2025) (approving bidding procedures with designated stalking horse bid protections 17 days after filing motion (concurrently with petition date), including bid deadline 28 days after entry of bidding procedures order (44 days after petition date) and sale hearing 51 days after petition date); *In re True Value Company, L.L.C.*, Case No. 24-12337 (KBO) (Bankr. D. Del. Nov. 4, 2024) (approving bidding procedures 22 after filing motion (concurrently with petition date) with designated stalking horse bid protections, including bid deadline four days after entry of bidding procedures order (26 days after petition date) and sale hearing 30 days after petition date).

### A.     The Bid Protections Should be Authorized.

36.     The Debtors believe that having the ability to offer the Bid Protections to a Stalking Horse Bidder will ensure the Debtors' ability to maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other parties in interest.  Approval of break-up fees and expense reimbursements, and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become established practice in chapter 11 cases.  Such bidding protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with an opportunity to enhance the value received by its estate through an auction process.

37.     Historically, bankruptcy courts have approved bidding incentives similar to the Bid Protections pursuant to the business judgment rule.  *See Integrated Res., Inc.*, 147 B.R. at 654–63; *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28–29 (Bankr. S.D.N.Y. 1989).  The United States Court of Appeals for the Third Circuit, however, has established standards for determining the propriety of bidding incentives in the bankruptcy context.  *See In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533–38 (3d Cir. 1999); *see also Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant Energy Channelview*

*LP)*, 594 F.3d 200, 206 (3d Cir. 2010).  The Court has held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  *See In re Reliant Energy*, 594 F.3d at 206 (finding that there is no "compelling justification for treating an application for a break-up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." (citing *In re O'Brien*, 181 F.3d at 535)).

38.    Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate.  *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3rd Cir. 2018), *In re O'Brien*, 181 F.3d at 533.  The Third Circuit has recognized several instances in which a break-up fee might confer a benefit on the estate.  *In re Energy Future Holdings*, 904 F.3d at 314.  For example, "such a benefit could be found if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited" or by "serv[ing] as a catalyst to higher bids."  *In re O'Brien*, 181 F.3d at 537.  Break-up fees may also benefit the estate by "induc[ing] a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely," thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*  Finally, a break-up fee may also benefit the estate if it induces a bidder to remain committed to its purchase after an auction is ordered.  *In re Reliant Energy*, 594 F.3d at 207–08; *see also In re Energy Future Holdings*, 904 F.3d at 314.

39.    The Debtors will only designate a Stalking Horse Bidder or offer Bid Protections in the event that the Debtors determine that doing so will promote competitive bidding and will not hamper bidding.  The ability to offer Bid Protections will induce potential bidders to serve as

a Stalking Horse Bidder, which enables the Debtors to promote a sale of the Assets with the greatest benefit to the estates. The Bid Protections only become payable in the event the Stalking Horse Bidder is not the Successful Bidder. Accordingly, payment of the Bid Protections in the context of a sale to another purchaser will not diminish the Debtors' estates to the extent they become payable, as the Bidding Procedures require that any competing bid must exceed the Stalking Horse Bid by an amount in excess of the Break-Up Fee and Expense Reimbursement. Thus, the Bid Protections are actual and necessary to preserve the value of the estates. Without the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for their Assets and would certainly lose the downside protection that will be afforded by the existence of a Stalking Horse Bidder.

40.     Further, the aggregate amount of the Bid Protections is reasonable and appropriate in light of the size and nature of the transaction and the efforts that will be expended by any Stalking Horse Bidder. Similar types of bid protections have been approved by this Court. *See, e.g.*, *In re Nikola Corp.,* Case No. 25-10258 (TMH) (Bankr. D. Del. Mar. 7, 2025) (authorizing stalking horse break-up fee of 3% and expense reimbursement of $400,000); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Mar. 5, 2025) (authorizing stalking horse break-up fee and expense reimbursement of up to 3% in the aggregate); *In re Am. Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Nov. 26, 2024) (authorizing stalking horse break-up fee and expense reimbursement of up to 4% in the aggregate); *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Aug. 29, 2024) (authorizing stalking horse break-up fee of 3% and expense reimbursement of $550,000); *In re Vyaire Medical, Inc.*, No, 24-11217 (BLS) (Bankr. D. Del. July 11, 2024) (authorizing stalking horse break-up fee of 3% and expense reimbursement of

$250,000); *In re Sientra, Inc.*, No. 24- 10245 (JTD) (Bankr. D. Del. Mar. 5, 2024) (authorizing stalking horse break-up fee of 3% and expense reimbursement of $500,000).

41.    Accordingly, based on the foregoing, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

**III.    Approval of the Sale Is Warranted Under Section 363(b) of the Bankruptcy Code Because a Sound Business Justification Exists.**

42.    The Debtors submit that compelling business justifications exist for the proposed Sale, and, therefore, the Sale should be approved as a sound exercise of the Debtors' business judgment.  Section 363 of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  "It is a well-established principle of bankruptcy law that the … [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.  *In re Integrated Res.*, 147 B.R. at 659.  Courts in the Third Circuit have used the "sound business purpose" standard for approving sales pursuant to section 363.  *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also, e.g.*, *In re ICL Holding Co. Inc.*, 802 F.3d 547, 551 (3d Cir. 2015); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (approving a sale pursuant to section 363 where there was a "legitimate business justification").

43.    The Debtors have articulated a clear business justification for entering into the Sale. As explained in greater detail above, after extensively exploring strategic alternatives and engaging in an out-of-court sale process for over 10 months that yielded no actionable bids, the Debtors have determined in their business judgment that a sale of the Assets, conducted in accordance with the Bidding Procedures, will maximize value and is in the best interests of the Debtors, their creditors,

their estates, their stakeholders, and other parties in interest.  It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'I Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) ("[I]t is worth noting that a [section] 363(b) sale transaction does not require an auction procedure. The auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").  Consequently, the Debtors believe that any Successful Bid, after being market-tested in accordance with the Bidding Procedures through a competitive, arms' length process, will provide a greater recovery for their estates than any known or practically available alternative.  As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into a purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment.  Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.[7]

IV.     **The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of all Encumbrances, Including Successor Liability Claims.**

44.     Section 363(f) of the Bankruptcy Code provides:

The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

---

[7]     The Debtors intend to submit evidence at or prior to the Sale Hearing to further support these conclusions.  The Debtors reserve the right to submit supplemental materials, including declarations, in connection with the Sale.

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in *bona fide* dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

45.     As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f).  The Debtors submit that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to any Sale Transaction as part of the Sale process.

46.     The Debtors will send the Sale Notice to, among others, all parties who assert liens or claims against the Assets.  Any holder of a claim against or interest in the Assets who does not object to the applicable Sale Transaction will be deemed to have consented to the sale of the Assets free and clear.  11 U.S.C. 363(f)(2); *see Hargrave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994).  Moreover, the Debtors believe that any parties that do object on the basis that they hold liens or claims against the Assets will either (a) be holders of liens or claims that are subject to a *bona fide* dispute or (b) would be compelled to accept cash in satisfaction of their interests. *Cf.* 11 U.S.C. §§ 363(f)(3) & 363(f)(5).

47.     Any lienholder also will be adequately protected by having its liens, if any, attach to the proceeds of the applicable Sale Transaction, in the same order of priority, with the same validity, force, and effect, that such creditor had prior to the sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto. *Cf. id.* § 363(f)(3).  Therefore, pursuant to section 363 of the Bankruptcy Code, the Debtors may sell the Assets free and clear of all liens, claims, and encumbrances, except to the extent of the permitted encumbrances.

48.    The Debtors also submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtors' businesses.  Such a provision ensures that any Successful Bidder will be protected from any claims or lawsuits premised on the theory that such Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 of the Bankruptcy Code sale takes free and clear from successor liability relating to the debtor's business.  *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–93 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585–87 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 505–06 (Bankr. S.D.N.Y. 2009) (holding that "[t]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale.").

49.    The purpose of an order authorizing the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.

Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced Bid amounts. To that end, the Successful Bidder or Successful Bidders for the Debtors' Assets should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets free and clear. The Debtors accordingly request authority to convey the assets to the Successful Bidder free and clear of all liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances, with any such liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances to attach to the proceeds of the Sale.

**V.     Any Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m).**

50.     Section 363(m) of the Bankruptcy Code provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m). Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 8 (1st Cir. 1993); *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D. N.J. May 11, 2007); *In re Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

51.     As set forth in greater detail herein, the Debtors' marketing efforts and negotiations with potential bidders have been and will continue to be undertaken at arm's-length and without collusion, with all parties having the opportunity to be represented by their own sophisticated counsel.   Accordingly, the Debtors request that any Sale Order include a provision that any Successful Bidder for the Assets is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code.   The Debtors believe that providing the Successful Bidder or Successful Bidders with such protection will ensure that the maximum price will be received by the Debtors for the Assets and that the closing of the Sale will occur promptly.   Moreover, neither the Debtors nor any potential bidder has engaged in any conduct that would cause or permit any Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.   Additionally, the Bidding Procedures are designed to prevent the Debtors or any Successful Bidder (or any Backup Bidder) from engaging in any conduct that would cause or permit any Sale Transaction to any Successful Bidder (or any Backup Bidder) pursuant thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.   Accordingly, the Debtors believe that the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

## VI.    Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Authorized.

### A.    The Assumption and Assignment Procedures Reflect the Debtors' Reasonable Business Judgment.

52.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."   11 U.S.C. § 365(a).   The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.   *See, e.g.*, *In*

*re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to assume or reject executory contract is governed by business-judgment standard and can only be overturned if decision was "product of bad faith, whim, or caprice"); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989) (same); *Grp. of Institutional Inv'rs v. Chi. M. St. P. & P.R. Co.*, 318 U.S. 523, 550–51 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment).

53.     Here, the Court should approve the Debtors' decision to assume and assign certain designated executory contracts and unexpired leases in connection with the Sale as a sound exercise of the Debtors' business judgment. Many of the executory contracts and unexpired leases are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. It is unlikely that any purchaser would want to acquire the Assets unless a significant number of the executory contracts and unexpired leases needed to manage the Debtors' day-to-day operations were included in the transaction. In addition, the Assigned Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases. Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**B.      Defaults Under the Assigned Contracts Will be Cured Through the Sale Transaction(s).**

54.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b)(1) of the Bankruptcy Code, specifically that a debtor must "cure[, or provide] adequate assurance that the [debtor] will promptly cure" any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

55.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) and (B) of the Bankruptcy Code will be promptly satisfied because the Purchase Agreement will require the cure of all defaults associated with, or that are required to properly assume, any Assigned Contracts.  Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over Cure Payments or other defaults, the Debtors maintain that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of contract counterparties.

C.     **Contract Counterparties Will Be Adequately Assured of Future Performance.**

56.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if . . . the trustee assumes such contract . . . and . . . adequate assurance of future performance . . . is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *see also In re*

*Decora Indus. Inc.*, 2002 WL 32332749 at *8 (D. Del. May 20, 2002) ("adequate assurance falls short of an absolute guaranty of payment"); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

57.    Adequate assurance of future performance under both section 365(b)(1) and 364(f)(2) of the Bankruptcy Code is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance,' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the degree of assurance necessary falls considerably short of an absolute guaranty." *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) (citing I*n re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994)).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See Dura Auto.*, 2007 WL 7728109, at *97 (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding); *In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (same).

58.    The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under any contracts and leases to be assumed) and will demonstrate such financial wherewithal, willingness, and ability to perform

under any contracts or leases to be assumed and assigned to a Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed Cure Payments.

59.     To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of any Successful Bidder to perform under the Assumed Contracts.  The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder or Successful Bidders to provide adequate assurance of future performance under the Assumed Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.  Further, as set forth above, the Debtors will give notice to all parties to the Assumed Contracts of their intention to assume or assume and assign the Assumed Contracts, as the case may be, and what the Debtors believe are the Cure Payments. The Court, therefore, should have a sufficient basis to authorize the Debtors to reject or assume and assign the any executory contract and unexpired lease to be assumed and assigned to any Successful Bidder.

**D.     Assignment of the Executory Contracts and Unexpired Leases Will Maximize the Value of the Debtors' Estates.**

60.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  *See L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) ("[T]he Code generally favors free assignability as a means to maximize the value of the debtor's estate . . . ."); *see also Leonard v. Gen. Motors Corp.(In re Headquarters Dodge, Inc.)*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).  Section 365(f)(1) of the

Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from anti-assignment restrictions, providing, in pertinent part, that:

> [n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).

61.     Furthermore, section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  *See* 11 U.S.C. § 365(f)(3); *see, e.g.*, *In re Jamesway Corp.*, 201 B.R. 73, 77–78 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any lease clause creating a right to terminate the lease because it is being assumed or assigned, thereby indirectly barring assignment by a debtor).  Courts have recognized that provisions that have the effect of restricting assignments cannot be enforced.  *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators like have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").

62.     The Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of certain executory contracts and unexpired leases to any Successful Bidder.  The assumption or assumption and assignment is necessary for the Successful Bidder or Successful Bidders to conduct business going forward.  Because no purchaser would take the Assets without certain executory contracts and unexpired leases, the assumption and assignment of such agreements is essential to securing the highest or otherwise best offer for the Assets.  Further, upon consummation of any Sale Transaction, the Debtors will no longer continue

to operate the Assets and will therefore have no use for any of the executory contracts and unexpired leases previously utilized in the ordinary course of the operation of the Assets.

63.    Accordingly, the Debtors submit that implementation of the proposed Assumption Procedures is appropriate in these cases.  The Court, therefore, should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in the Successful Bidder's or Successful Bidders' APA.

## VII.    The Forms of Notice and Notice Procedures for the Bidding Procedures, the Auction, and the Sale Hearing Are Reasonable and Appropriate.

64.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business. Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  *See* Fed. R. Bankr. P. 2002 (a), (c).

65.    The Debtors submit that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, and the Sale Hearing to the Debtors' creditors and all other interested parties that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Assets.  Accordingly, the Debtors respectfully request that the Court approve the notice procedures set forth herein, including the form and manner of service of the Sale Notice, and that no other or further notice of the Bidding Procedures, the Auction, and Sale Hearing is necessary or required.

## VIII.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

66.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  The Debtors request that each of the Bidding Procedures Order and the Sale Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

67.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before an order can be implemented.  *See* Fed R. Bankr. P. 6004(h), 6006(d) advisory committee's note to 1999 amendment.  The stay pursuant to Bankruptcy Rule 6004(h) may be waived to allow a Sale to close immediately "where there has been no objection to the procedure." *See* 10 Collier on Bankruptcy ¶ 6004.11 (16th ed. 2016).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file an appeal.  *Id*.

68.     Following the Sale Hearing, the Debtors seek to close the Sale as soon as possible following the Sale Hearing in order to maximize value received for the Assets.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## RESERVATION OF RIGHTS

69.     Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other

obligation; (d) granting third party beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.  The inclusion of a contract, lease or other agreement on the Sale Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtors and their estates with respect thereto shall be reserved.  Nothing contained in the Sale Order shall be deemed to increase, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

### NOTICE

70.     Notice of this Motion will be given to: (a) all entities reasonably known by the Debtors to have expressed a bona fide interest in acquiring any of the Assets during the year preceding the date hereof; (b) all entities known to have asserted any claim, liens, interests, or encumbrances in or upon any of the Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the U.S. Trustee; (e) counsel to the Prepetition Secured Lender; (f) counsel to the DIP Lender; (g) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors, (h) the office of the attorney general for each of the states in which the Debtors operate; (i) the United States Attorney's Office for the District of Delaware; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission, (l) the United States Department of Justice; (m) the U.S. Environmental Protection Agency, (n) counsel to any statutory committee appointed in the Chapter 11 Cases; (n) the representatives for the union party to a collective bargaining agreement with the Debtors; (o) the Federal Trade Commission; (p) the California Public Utilities Commission; (q) the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice; (r) each governmental agency that has a

reasonably known interest with respect to the Sale and transactions proposed thereunder; (s) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (t) all parties entitled to notice pursuant to Local Bankruptcy Rules 2002-1(b) and 9013-1(m).

## NO PRIOR REQUEST

71.      No previous request for the relief sought therein has been made to this Court or any other court.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

**CONCLUSION**

The Debtors respectfully request that this Court enter the Bidding Procedures Order and, following the Sale Hearing, the Sale Order, each substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
      June 15, 2026

*/s/Laura Davis Jones*

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: 302-652-4100
ljones@pszjlaw.com
joneill@pszjlaw.com
ecorma@pszjlaw.com

*Proposed Co-Counsel to Debtors and Debtors in Possession*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Joseph O. Larkin (I.D. No. 4883)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com

- and -

James J. Mazza, Jr. (*pro hac vice* pending)
Mike Jones (*pro hac vice* pending)
320 S. Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
James.Mazza@skadden.com
Mike.Jones@skadden.com

- and -

Jennifer Madden (*pro hac vice* pending)
525 University Ave
Palo Alto, California 94301
Telephone: (650) 470-4500
Jennifer.Madden@skadden.com

- and -

Destiny N. Almogue (*pro hac vice* pending)
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone: (213) 687-5000
Destiny.Almogue@skadden.com

*Proposed Co-Counsel to Debtors and Debtors in Possession*