**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARLES VALLEY MINERALS INC., *et al.* [1] | Case No. 26-10966 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Related Docket No. 15** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS
TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE
CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
THE PREPETITION SECURED LENDER, (III) MODIFYING THE AUTOMATIC
STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED
RELIEF**

Upon the motion (the "Motion") of the above-referenced debtors, as debtors and debtors

in possession (the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), pursuant to

sections 105, 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C.

§§101-1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2 and 9013-

1(m) of the Local Rules for the United States Bankruptcy Court for the District of Delaware

(the "Local Rules"), seeking, among other things,

1.　　　authorization for the Debtors, pursuant to sections 105, 361, 362, 363, 364, 503 and
507 of the Bankruptcy Code, to (i) use cash collateral, as such term is defined in
section 363(a) of the Bankruptcy Code ("Cash Collateral"), and all other Prepetition
Collateral (as defined herein), solely in accordance with the terms of this interim
order (this "Interim Order"), (ii) use the proceeds of the DIP Loans (as defined
herein), solely in accordance with the terms of the DIP Loan Documents and this
Interim Order, (iii) to provide adequate protection to the Prepetition Secured Lender
(to the extent set forth herein), and (iv) grant related relief;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway
Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Mineral
Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland
Park, Kansas 66210.

2.    from HSBC Bank USA, National Association (the "Prepetition Secured Lender"), authorization for Debtor Searles Valley Minerals Inc. ("SVM") to continue to perform under and incur postpetition obligations under the Receivables Facility (as defined below), which obligations (together with any obligations outstanding as of the Petition Date) shall continue to be secured by a first-priority lien on all pre-petition Receivables funded by Advances and all Related Rights (which shall not be subject to the Carve Out (defined below)) and a first-priority lien that is subject to the Carve Out on all other of the Prepetition Collateral (as defined below) and shall be additionally secured by a first priority lien (not subject to the Carve Out) on all postpetition Receivables as to which the Prepetition Secured Lender makes a postpetition Advance and all Related Rights, and, subject to the Carve Out, by a lien junior to the DIP Liens (defined below) on all other DIP Collateral that was unencumbered as of the Petition Date, with the lien priorities reflected in the Lien and Claim Priorities Chart (as defined below);[2]

3.    authorization for SVM (the "DIP Borrower") and its affiliated Debtors (the "DIP Guarantors", and together with the DIP Borrower, the "DIP Parties") to obtain postpetition financing on a secured basis from Karnavati Holdings, Inc. (the "DIP Lender"), comprised of a secured term loan facility in an aggregate principal amount of up to $20 million (the "DIP Facility", and all loans extended thereunder, the "DIP Loans"), which, subject to certain conditions, may be increased pursuant to the LC Upsize (as defined in the DIP Credit Agreement), of which (i) $7 million shall be funded to the DIP Borrower upon the entry by the Court of (x) this Interim Order, and (y) the TATA Interim Order in form and substance acceptable to the DIP Lender and its corporate parent Nirma Limited ("Nirma") and (ii) $13 million shall be funded to the DIP Borrower when and as provided in the Budget (defined below) and subject to the entry by the Court of a final order, in form and substance reasonably acceptable to the DIP Lender, approving the transactions contemplated by the DIP Facility (the "Final Order", and together with the Interim Order, the "DIP Orders"), in each case, subject to the terms and conditions set forth in this Interim Order, that certain Debtor-in-Possession Credit Agreement executed by the DIP Parties and the DIP Lender and annexed hereto as **Exhibit 2** (as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with its terms and the terms of this Interim Order, the "DIP Credit Agreement" and, together with any other schedules, exhibits, agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection with any of the foregoing; each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Loan Documents") and the other DIP Loan Documents;

---

[2] Capitalized terms "Advances", "Receivables" and "Related Rights" as used in this sentence have the meanings ascribed thereto in the Prepetition Receivables Purchase Agreement (defined below).

2

4.      authorizing the DIP Parties to incur the principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts (including, without limitation, all "DIP Obligations" (as defined in the DIP Credit Agreement)), as and when due and payable under and in accordance with each of the DIP Loan Documents (collectively, the "DIP Obligations"); and

5.      authorizing the DIP Parties to enter into the DIP Credit Agreement and the other DIP Loan Documents; and

6.      granting allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases and any Successor Cases (as defined in this Interim Order) to all DIP Obligations, Prepetition Obligations, and postpetition obligations arising under the Receivables Facility, in each case subject to the priorities set forth herein;

and the Court having considered the First Day Declaration, the Frankum DIP Declaration, and the Tempke DIP Declaration; and an interim hearing (the "Interim Hearing") having been held by the Court on June 16, 2026, at 9:00 a.m. (prevailing Eastern Time); and a final hearing (the "Final Hearing") having been scheduled by the Court for July 7, 2026, at 10:00 a.m. (prevailing Eastern Time) pursuant to Bankruptcy Rule 4001 and Local Rule 40012, and notice of the Motion and the relief sought therein having been given by the Debtors as set forth in this Interim Order; and the Court having considered the evidence adduced, and the statements of counsel at the Interim Hearing; and it appearing to the Court that granting the relief sought in the Motion on the terms and conditions herein contained is necessary and essential to enable the Debtors to preserve the value of the Debtors' business and assets and that such relief is fair and reasonable and that entry of this Interim Order is in the best interest of the Debtors and their estates and creditors; and due deliberation and good cause having been shown to grant the relief sought in the Motion,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      **Petition Date.** On June 15, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware. The Debtors have continued with the management

4919-2555-3333.2 78006.00001

and operation of their business and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases. To date, the office of the U.S. Trustee (as hereinafter defined) has not appointed an official committee of unsecured creditors in the Chapter 11 Cases or any other committee (if any, the "Committee").

B.   **Jurisdiction and Venue.** Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. § 157(b)(2). This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.   **Debtors' Admissions With Respect to the Prepetition Obligations and Prepetition Liens**. Subject only to the rights of parties in interest specifically set forth in paragraph 26 of this Interim Order (and subject to the limitations thereon contained in such paragraph), the Debtors admit, stipulate and agree (the "Debtors' Stipulations") that:

i.   *Prepetition Demand Line Obligations*.   SVM is a party to that certain Demand Line of Credit Agreement, dated as of March 29, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Demand Credit Agreement" and together with that certain Security Agreement, dated as of March 29, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Demand Security Agreement"), by and between SVM and the Prepetition Secured Lender, and all other related documents, guaranties and agreements, the "Prepetition Demand Line Documents"), by and between SVM and the Prepetition Secured Lender.   Under the Prepetition Demand Line Documents, the Prepetition Secured Lender provided a demand line in

4

the aggregate principal amount of up to $59,500,000 for working capital purposes with a sublimit for performance and/or financial standby letters of credit.  As of the Petition Date, $47.4 million in aggregate principal amount of loans are issued and outstanding under the demand line facility and $12.1 million face amount of letters of credit for the account of SVM have been issued and remain outstanding (the "Prepetition Demand Line Obligations").  The Prepetition Demand Line Obligations are secured by a first-priority security interest in and liens (the "Prepetition Demand Line Liens") on the Collateral (as defined in the Prepetition Demand Security Agreement) (the "Prepetition Demand Line Collateral").

ii.    *Prepetition Receivables Facility Obligations*  SVM is a party to that certain Recourse Receivables Purchase Agreement, dated as of March 29, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Receivables Purchase Agreement" and, together with the Prepetition Demand Credit Agreement, the "Prepetition Credit Agreements," and the Prepetition Receivables Purchase Agreement together with that certain Security agreement, dated as of March 29, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Receivables Facility Security Agreement," and together with the Prepetition Demand Security Agreement, the "Prepetition Security Agreements), and all other related documents and agreements (the "Prepetition Receivables Facility Documents," and together with the Prepetition Demand Line Documents, the "Prepetition Loan Documents"), by and among SVM and the Prepetition Secured Lender.  Under the Prepetition Receivables Facility Documents, the Prepetition Secured Lender provides a factoring facility with respect to the Debtors' receivables for certain soda ash contracts (the "Receivables Facility").  As of the Petition Date, approximately $26 million in aggregate principal amount is outstanding under the Receivables Facility (together

with all other obligations arising thereunder, the "Prepetition Receivables Facility Obligations," and together with the Prepetition Demand Line Obligations, the "Prepetition Obligations"). The Prepetition Receivables Facility Obligations are secured by a first-priority security interest in and liens (the "Prepetition Receivables Facility Liens" and together with the Prepetition Demand Line Liens, the "Prepetition Liens") on the Collateral (as defined in the Prepetition Receivables Facility Security Agreement) (the "Prepetition Receivables Facility Collateral," and together with the Prepetition Demand Line Collateral, the "Prepetition Collateral").

iii.     *Prepetition Obligations*. The Debtors acknowledge that the Prepetition Obligations owing to the Prepetition Secured Lender constitute legal, valid, and binding obligations of SVM, enforceable against SVM in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Obligations owing to the Prepetition Secured Lender is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any Successor Cases (as defined below). The Debtors further acknowledge that the Prepetition Obligations constitute allowed secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

iv.     *Prepetition Liens*. The Debtors acknowledge that the Prepetition Liens granted to the Prepetition Secured Lender constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests in and liens on the Prepetition Collateral, were granted to, or for the benefit of, the Prepetition Secured Lender for fair consideration and reasonably equivalent value,

6

and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.  The Debtors further acknowledge that, as of the Petition Date, the Prepetition Liens were senior in priority over any and all other liens on the Collateral, subject only to certain liens senior by operation of law and otherwise permitted by the Prepetition Loan Documents.

D.      **Corporate Authority.** Subject to entry of this Interim Order, the Debtors have all requisite power and authority to execute and deliver the DIP Loan Documents to which they are parties and to perform their obligations thereunder.

E.      **Need for Postpetition Financing and Use of Cash Collateral.** The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2 and have an immediate need to enter into the DIP Facility and obtain use of the Prepetition Collateral, including the Cash Collateral (subject to the terms and conditions of this Interim Order), in order to, among other things, preserve,  maintain, and maximize the value of their assets and business, and to permit, among other things, the orderly continuation of the operation of their businesses and to fund these Chapter 11 Cases. An immediate and critical need exists for the Debtors to obtain funding under the DIP Facility and to use the Cash Collateral and the proceeds of the DIP Loans and the Supplier Liquidity Advance (as defined below), in accordance with a Budget (subject to Permitted Variances (as defined below)) and this Interim Order, for working capital purposes, to pay costs and fees under the DIP Facility and this Interim Order, for other general corporate purposes, and the satisfaction of costs and expenses of administering the Chapter 11 Cases. The ability of the Debtors to obtain liquidity through the use of the proceeds of the DIP Loans, the Supplier Liquidity Advance, and the Cash Collateral is vital to the Debtors and their efforts to maximize the value of their assets. Absent entry of this Interim Order, the Debtors'

7

4919-2555-3333.2 78006.00001

estates and reorganization efforts will be immediately and irreparably harmed. The terms of the proposed DIP Facility pursuant to the DIP Loan Documents and this Interim Order, and the use of the Prepetition Collateral pursuant to the terms of this Interim Order are fair and reasonable, reflect the Debtors' exercise of their prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

F.      **No Credit Available on More Favorable Terms.** The DIP Lender is an affiliate of the Debtors.  The "Supplier" under that certain Soda Ash Supply and Liquidity Agreement, dated as of the date hereof (the "Supply and Liquidity Agreement") has committed to provide a liquidity advance of up to $20,000,000 pursuant to the terms thereof and this Court's interim and final orders approving the Supply and Liquidity Agreement (the "Supplier Liquidity Advance"), which will be guaranteed (subject to satisfaction of certain conditions) by Nirma Limited ("Nirma"), an affiliate of the Debtors.   The Debtors will be bound by certain secured reimbursement obligations, secured by liens and claims in accordance with the terms of that certain Reimbursement and Indemnity Agreement, dated as of June 16, 2026, by and among Nirma and the Debtors.  The Debtors' Budget reflects that the Debtors require additional liquidity or financing to continue to operate their businesses during the Chapter 11 Cases.  The Debtors have been unable to obtain adequate financing or other financial accommodations (in addition to the Supplier Liquidity Advance) from sources other than the DIP Lender on terms more favorable than those provided under the DIP Credit Agreement and the other DIP Loan Documents. The Debtors have been unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors have also been unable to obtain adequate credit for money borrowed (a) not having priority over administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code or (b) secured only by a

4919-2555-3333.2 78006.00001

lien on property of the Debtors and their estates that is not otherwise subject to a lien. Postpetition financing is not otherwise available without granting the DIP Lender, (1) the DIP Liens on all DIP Collateral, as and to the extent set forth herein, (2) the DIP Superpriority Claims (as defined below), and (3) the other protections set forth in this Interim Order. After considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available at this time, and is in the best interests of their estates and creditors.

G.      **Use of Proceeds of the DIP Loans and Cash Collateral.** As a condition to entry into the DIP Loan Documents, the extension of credit and other financial accommodations made under the DIP Facility and the consent to use Cash Collateral, the Debtors, the DIP Lender, and the Prepetition Secured Lender have agreed that Cash Collateral, the proceeds of the DIP Loans, and the Supplier Liquidity Advance shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Loan Documents.  None of the Cash Collateral, proceeds of the DIP Loans, the Supplier Liquidity Advance, or the Carve Out shall be used (a) to permit the Debtors, or any other party-in-interest or their professionals or representatives to challenge or otherwise contest or institute any proceeding to determine (or support any other person or entity in challenging or contesting) (i) the validity, perfection, priority or extent of claims, liens, and security interests in favor of the DIP Lender or Prepetition Lender or (ii) the enforceability of the obligations of the Debtors under the other DIP Loan Documents; (b) to investigate (except to the extent of $300,000 in the aggregate for the Debtors and $100,000 for the Committee or in amounts otherwise agreed to in writing by the DIP Lender), commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the Prepetition Lender, the

9

DIP Lender or any of their respective affiliates, agents, employees, insiders attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims; or (c) to investigate, commence, prosecute or defend (or support any other Person in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations under this Agreement and/or the DIP Loan Documents, including the DIP Obligations.

H.      **Business Judgment and Good Faith Pursuant to Section 364(e).** Based on the Motion, the First Day Declaration, the Frankum Declaration, the Tempke Declaration, and the record presented to the Court at the Interim Hearing, (i) the extension of credit and other financial accommodations made under the DIP Facility and the DIP Loan Documents, (ii) the terms of the DIP Facility, (iii) the fees and other amounts paid and to be paid thereunder, (iv) the terms of adequate protection granted to the Prepetition Secured Lender, (v) the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral), and (vi) the Cash Collateral arrangements described therein and herein, in each case, pursuant to this Interim Order and the DIP Loan Documents: (a) are fair, reasonable, and the best available to the Debtors under the circumstances; (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; (c) are supported by reasonably equivalent value and fair consideration; and (d) represent the best financing available under the circumstances. The DIP Facility and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arms' length among the Debtors, the DIP Lender, and the Prepetition Secured Lender. The use of Prepetition Collateral (including Cash Collateral) and the credit to be extended under the DIP Facility conclusively shall be deemed to have been so allowed, advanced, made, used, and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the

Bankruptcy Code, and the DIP Lender and the Prepetition Secured Lender are therefore entitled to the protections and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

I.      **Notice.** Notice of the requested relief sought at the Interim Hearing was provided by the Debtors consistent with Local Rule 9013-1(m) to: (i) the Office of the United States Trustee; (ii) counsel to the Prepetition Secured Lender; (iii) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (iv) counsel to the DIP Lender; (v) the Internal Revenue Service; (vi) the United States Attorney's Office for the District of Delaware; (vii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (ix) all parties entitled to notice pursuant to Local Bankruptcy Rules 2002-1(b) and 9013-1(m). Notice was provided by the Debtors to all parties who have asserted or could assert a lien on the DIP Collateral. Given the nature of the relief sought, the foregoing notice of the Interim Hearing was, in the Debtors' good faith belief, the best available under the circumstances and complies with Local Rule 9013-1(m). No further notice of, or hearing on, the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

J.      **Consent by Prepetition Secured Lender.** The Prepetition Secured Lender consents to the Debtors' use of Cash Collateral and the entry into the DIP Facility and the DIP Loan Documents, solely in accordance with and subject to the terms and conditions provided for in this Interim Order.

K.      **Prepetition Obligations Adequate Protection**.  The Prepetition Secured Lender is entitled to receive adequate protection pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code and as set forth in paragraph 8 of this Interim Order resulting from the (a) use of Prepetition Collateral (including Cash Collateral), (b) use, sale, lease, or depreciation or other

11

diminution in value of the Prepetition Collateral, and/or (c) the imposition of the automatic stay under the Bankruptcy Code.  The terms of the adequate protection being provided reflect the Debtors' prudent exercise of business judgment and constitute a reasonable compromise for the use of the Prepetition Collateral (including the Cash Collateral).

L.  **Immediate Entry of Interim Order**.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Entry into the DIP Facility and DIP Loan Documents and use of Prepetition Collateral (including Cash Collateral) on the terms set forth herein is in the best interest of the Debtors' estates.

**NOW, THEREFORE, UPON THE RECORD OF THE PROCEEDINGS HERETOFORE HELD BEFORE THIS COURT WITH RESPECT TO THE MOTION, THE EVIDENCE ADDUCED AT THE INTERIM HEARING, AND THE STATEMENTS OF COUNSEL THEREAT, IT IS HEREBY ORDERED THAT:**

1.  **Motion Granted.** The Motion is granted as set forth herein. Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled and all reservations of rights included therein, are hereby denied and overruled with prejudice.

2.  **Final Hearing.** A final hearing on the relief requested in the Motion shall be held on **July 7, 2026, at 10:00 a.m. (prevailing Eastern Time)**. Any party in interest objecting to the relief sought at the Final Hearing shall file written objections no later than **June 30, 2026, at 4:00 p.m. (prevailing Eastern Time)**.

3.  **Authorization of DIP Facility**.

(a)  Subject to the terms and conditions of this Interim Order, the Debtors are hereby authorized to execute, enter into, and perform all obligations under the DIP Facility and the DIP Loan Documents to which they are parties. The DIP Loan Documents and

12

this Interim Order govern the financial and credit accommodations to be provided to the Debtors by the DIP Lender in connection with the DIP Facility.

(b)    The DIP Loan Documents are binding upon and enforceable against the Debtors and the Debtors' estates.

(c)    From the entry of this Interim Order through the entry of the Final Order, the DIP Borrower is authorized to incur up to an aggregate principal amount of $7.5 million in DIP Loans on an interim basis, together with applicable interest, protective advances, expenses, fees, and other charges payable in connection with the DIP Facility (the "Initial DIP Loan"), as applicable, and the DIP Guarantors are authorized to unconditionally guarantee the DIP Obligations, in each case, subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents until the DIP Termination Date.

(d)    Without limiting the foregoing, and without the need for further approval of this Court, the Debtors are authorized to perform all acts to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages or deeds of trust, and financing statements), and to pay all fees or expenses that may be required, necessary, or desirable for the Debtors to implement the terms of, performance of their obligations under, or effectuate the purposes of and transactions contemplated by this Interim Order, the DIP Facility, and the DIP Loan Documents (as applicable) in accordance herewith and therewith, including, without limitation:

(1)    the execution and delivery of, and performance under, the DIP Loan Documents;

(2)    the execution and delivery of, and performance under, one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case, as Debtors and the DIP Lender (in accordance with and subject to the terms of the applicable DIP Loan Documents) may agree, it being understood that no further approval of the Court shall be required for non-material authorizations, amendments, waivers, consents, or other modifications to and under the DIP Loan

13

4919-2555-3333.2 78006.00001

Documents (and any fees and other expenses (including any attorneys', accountants', appraisers', and financial advisors' fees), amounts, charges, costs, indemnities, and other obligations paid in accordance and connection therewith);

(3)     the non-refundable and irrevocable payment of any and all fees, costs, and expenses payable pursuant to the DIP Loan Documents, including, without limitation, (a) the Commitment Fee (as defined in the DIP Credit Agreement), any audit fees, appraisal fees, servicing fees, liquidator fees, or similar amounts (which fees, in each case, shall be, and shall be deemed to have been, approved upon entry of this Interim Order, and which fees shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, or other claim, cause of action, or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Loan Documents, and (b) the reasonable and documented invoiced out-of-pocket fees, costs, and expenses as may be due from time to time of (x) the DIP Lender, including, without limitation, professional fees, transaction costs and expenses (including legal, financial advisor, appraisal, and valuation-related fees and expenses) incurred by the DIP Lender in connection with the DIP Facility, whether incurred prior to or after the Petition Date, including without limitation those incurred in connection with the preparation, negotiation, documentation, court approval, administration and enforcement of the DIP Facility, monitoring of and participation in the Chapter 11 Cases, monitoring of and participation in any process the Debtors may undertake for the marketing and sale of the DIP Collateral, and protection of the DIP Lender's interest in the DIP Collateral, and (y) the Prepetition Secured Lender, including, without limitation, the reasonable and documented fees and expenses of Alston & Bird LLP, in each case, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, without the need to file retention or fee applications, and without the need to provide notice to any party or obtain further Court approval;

(4)     subject to the Carve Out (as defined below), the granting and perfection of the DIP Liens (as set forth herein), and the granting of the DIP Superpriority Claims, in each case, as set forth herein and in the DIP Loan Documents; and

(5)     the performance of all other acts necessary, required, or desirable to implement the DIP Facility and to facilitate the transactions contemplated by the DIP Loan Documents and this Interim Order in accordance therewith and herewith.

(e)     The DIP Lender shall not have any obligation or responsibility to monitor the DIP Parties' use of the DIP Loans, and the DIP Lender may rely upon the DIP Borrower's representations that the amount of the DIP Loans requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the Budget (subject to Permitted Variances), the DIP Loan Documents, and Bankruptcy Rule 4001(c)(2).

14

4. **DIP Obligations.** Upon entry of this Interim Order and execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of the Debtors, and shall be fully enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in the Chapter 11 Cases, in any chapter 7 cases to which any of the Chapter 11 Cases may be converted, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of the Chapter 11 Cases or any chapter 7 cases to which any of the Chapter 11 Cases may be converted (collectively, "Successor Cases"), in each case, in accordance with the terms thereof and this Interim Order. Upon execution and delivery of the DIP Credit Agreement, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by the Debtors to the DIP Lender, under, or secured by, and in accordance with, the DIP Loan Documents or this Interim Order, including all principal, interest, costs, fees, expenses, and other amounts under the DIP Loan Documents (including this Interim Order). No obligation, payment, transfer, or grant of security under the DIP Loan Documents or this Interim Order to the DIP Lender shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 362, 502(d), 544, 548, or 549 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, counterclaim, offset, holdback or any other challenge under the Bankruptcy Code or any applicable law.

5.      **No Obligation to Extend Credit.** The DIP Lender shall have no obligation to make any loan or advance under the applicable DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit by the DIP Lender under the DIP Loan Documents and this Interim Order have been satisfied in full or waived in accordance with the terms of the DIP Loan Documents.

6.      **DIP Liens**.

(a)      As security for the DIP Obligations, effective immediately upon the date of this Interim Order, as set forth more fully in this Interim Order, the DIP Lender is hereby granted (without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by the DIP Lender) valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "DIP Liens"), in all DIP Collateral (as defined below), having the priorities specified in subsections (1) and (2) of this paragraph 6(a) and as summarized in the chart attached as **Exhibit 3** (the "Lien and Claim Priorities Chart") as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all DIP Obligations, such grant to DIP Lender being a grant of:

(1)      a valid, binding, fully perfected, lien and security interest pursuant to section 364(c)(3) of the Bankruptcy Code on all DIP Collateral that is subject to valid, perfected and nonavoidable liens in existence at the time of the commencement of the Chapter 11 Cases or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code, including, for the avoidance of doubt, the Prepetition Liens (except to the extent avoided pursuant to any Challenge or otherwise) (the "Permitted Prior Liens"), subject only to the Carve Out and Permitted Prior Liens; and

(2)      subject only to the Carve Out, a valid, binding, enforceable, fully-perfected first-priority lien and security interest pursuant to section 364(c)(2) of the Bankruptcy Code on (i) all DIP Collateral that was unencumbered as of the Petition Date and (ii) any DIP Collateral that was subject to an avoidable lien as of the Petition Date that is subsequently avoided; *provided*, however, that the Receivables Facility Liens shall be first-

16

priority liens, not subject to the Carve Out, with respect to all post-petition Receivables funded by Advances and all Related Rights (each as defined in the Prepetition Receivables Purchase Agreement).

(3)        *"DIP Collateral"* means all assets and property of each of the Debtors and their estates of any kind or nature whatsoever, real, personal, or mixed, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all Prepetition Collateral, all "DIP Collateral" as defined in the DIP Credit Agreement, all contracts, contract rights, licenses (including IP licenses), general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, money, insurance policies and proceeds thereof, receivables, deposits, refunds, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all intellectual property, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), records and data, know-how and other proprietary information and materials, all equity interests, all books and records relating to the foregoing, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof), and all other personal and real property of the Debtors (but excluding any property subject to a purchase money lien, capital lease or similar arrangement permitted under the DIP Loan Documents to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third party consent thereunder), claims and causes of action (whether asserted or unasserted, but excluding claims and causes of action against affiliates of the DIP Lender), including commercial tort claims (excluding Avoidance Actions (defined below)), proceeds from all claims and causes of action arising under section 549 of the Bankruptcy Code, and subject to entry of the Final Order, the proceeds from all claims and causes of action against affiliates of the DIP Lender and the proceeds from all claims and causes of action arising under sections 502(d), 542, 545, 547, 548, 550, 551, 553(b), or 724(a) of the Bankruptcy Code (the "Avoidance Actions") or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents.

(b)        Except as set forth in paragraph 6(a) of this Interim Order, the DIP Liens (i) shall not be made subject to, junior to, or *pari passu* with (A) any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases (other than the Carve Out, Prepetition Liens and Permitted Prior Liens in accordance with the priorities set forth

17

on the Lien and Claim Priorities Chart), (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, or (C) any intercompany or affiliate lien, and (ii) shall not be subject to sections 506(c) (subject to and pending entry of the Final Order), 510, 549, 550, or 551 of the Bankruptcy Code.  The DIP Liens shall be valid and enforceable against the Debtors, their estates, any trustee, and any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases.

(c)      Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent, or the payment of any fees or obligations to, any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest in any property or the proceeds thereof, is and shall hereby be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens or Replacement Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by the Debtors, in favor of the DIP Lender or the Prepetition Secured Lender in accordance with the terms of the DIP Loan Documents and this Interim Order.

(d)      **DIP Superpriority Claims**. Effective immediately upon entry of this Interim Order, and subject only to the Carve Out and the Prepetition Superpriority Claims (in accordance with the priorities set forth in the Lien and Claim Priorities Chart), the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Chapter 11 Cases and any Successor Cases on account of the DIP Obligations, with priority over any and all administrative expenses of the kind specified in, among other sections, section 105, 326, 330, 331, 503(b), 506(c) (subject to and pending entry of

18

the Final Order), 507(a), 507(b) and 726 of the Bankruptcy Code (the "DIP Superpriority Claims"). Except only with the written consent of the DIP Lender, no other claim allowed in the Chapter 11 Cases, or any Successor Cases, shall be senior to or *pari passu* with the DIP Superpriority Claims (other than as expressly set forth in the Lien and Claim Priorities Chart).

7.   **Approved Budget; Budget Testing.**

(a)   Cash Collateral and the proceeds of the DIP Facility and Supplier Liquidity Advance shall be used solely to pay the expenditures set forth in the Budget (subject to Permitted Variances).

(b)   As used in this Interim Order: "Budget" means the budget attached as Exhibit A to the DIP Credit Agreement, a summary of which is attached hereto as **Exhibit 1** (as may be modified from time to time with the prior written consent of DIP Lender).

(c)   Beginning on the first Business Day that is at least one (1) full calendar week following the Petition Date (the "First Testing Date"), and every week thereafter (each such date, a "Testing Date"), in each case on or before 12:00 p.m. (New York time) on Thursday of each week, the DIP Borrower will provide to the DIP Lender and Prepetition Secured Lender a reconciliation for the preceding one-week period ending (and including) the preceding Friday (each such period, a "Testing Period" and each such report, a "Reconciliation Report"), in form and substance reasonably satisfactory to the DIP Lender, detailing the following each on a single, line item basis: (i) actual cash receipts and (ii) actual disbursements made (which disbursements shall include ordinary course operating expenses but exclude the flow of funds into or out of the Professional Fees Escrow Account (defined below), provided that details on such flow of funds shall be provided separately to DIP Lender on a weekly basis) to the amounts set forth in the Budget for such periods and, commencing with the Reconciliation Report for the

19

second week of the Budget, the rolling 2-week variance from Budget amounts for each Budget line item.

(d)     Pursuant to the terms set forth in the DIP Credit Agreement, and as further set forth herein, the Debtors shall not make any payments, or incur any obligations or liabilities, except as expressly projected and provided for in the Budget.  Notwithstanding the foregoing, as of the last day of each weekly period covered in a Reconciliation Report, (x) cash receipts may vary from the applicable Budget by not more than twenty percent (20%), (y) cash disbursements paid by the Credit Parties may vary from the applicable Budget by not more than twenty percent (20%) for cash disbursements in the aggregate or for any line item, (which disbursements shall exclude, for purpose of such variance testing, professional fees and expenses), and (z) Operating Cash Flow (as shown in the applicable line of the Budget, and which shall be Total Net Cash Flow excluding Court-approved critical vendor payments and utility deposits pursuant to section 366 of the Bankruptcy Code) may vary from the applicable Budget by not more than twenty percent (20%), in each case ((x), (y) and (z)), for any rolling two (2) week period (such variances, collectively, the "Permitted Variances").  Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the written consent of the DIP Lender in its sole discretion. Permitted Variances are not cumulative beyond a given Testing Period. The DIP Borrower's failure to comply with the Budget subject to the Permitted Variances will constitute an Event of Default as defined in the DIP Loan Documents.

(e)     On a weekly basis, the Debtors shall include in their weekly financial reporting to the DIP Lender and the Prepetition Lender a good faith cash flow projection for the balance of the period covered by the Budget (the "Projection Period") in a form reasonably acceptable to the DIP Lender and the Prepetition Lender (each, a "Weekly Projection"), which

20

4919-2555-3333.2 78006.00001

Weekly Projection shall assume, for each week of the Projection Period, that fees and expenses of Professional are not less than the aggregate amount for Professionals set forth in the Budget for such week.

(f)     It shall be an Event of Default under the DIP Credit Agreement if any Weekly Projection reflects, for any week prior to the week ending August 21, 2026, a negative cash balance at the end of such week exclusive of funds in the Professional Fee Escrow Account.

8.     **Adequate Protection**.  As adequate protection against any Diminution in Value, the Prepetition Secured Lender shall:

(a)     receive a claim to the extent of such Diminution in Value, having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, sections 105, 325, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 725, and 1114, subject to the Carve Out (the "Prepetition Superpriority Claims");

(b)     have valid, binding, enforceable and perfected liens in the Prepetition Collateral, and upon entry of the Final Order, other DIP Collateral subject, in each case, to (i) the Carve Out (except as otherwise expressly set out in the Lien and Claim Priorities Chart) and (ii) Permitted Prior Liens, in each case equal to the sum of the aggregate Diminution in Value, with the priorities set forth in the Lien and Claim Priorities Chart (the "Replacement Liens"); and

(c)     be entitled to (i) payment of current interest at the non-default rate and (ii) reimbursement from the Debtors and their estates for the fees and costs of its professionals, as provided in paragraph 3(d)(3) above.

9.     **Diminution in Value.** For purposes of this Interim Order, "Diminution in Value" shall mean an amount equal to the diminution from and after the Petition Date of the value

21

as of the Petition Date of the Prepetition Secured Lender's interests in the Debtors' Prepetition Collateral upon which the Prepetition Secured Lender has valid, perfected, enforceable and non-avoidable liens or security interests, resulting from the use, sale, or lease of the Prepetition Collateral, including Cash Collateral (whether in accordance with the terms and conditions of this Interim Order or otherwise), or the imposition of the automatic stay, including without limitation diminution on account of (i) the Supplier Liquidity Advance in an amount that is not less than any postpetition paydowns of the Supplier Liquidity Advance, and (ii) the Carve Out.

10.    **Priority of Replacement Liens and Prepetition Superpriority Claims.**
Except for (i) the Carve Out, (ii) the DIP Liens and DIP Superpriority Claim, and (iii) as set forth in Lien and Claim Priorities Chart, or as otherwise provided in paragraph 8 of this Interim Order, the Replacement Liens and Prepetition Superpriority Claims, if any, granted to the Prepetition Secured Lender pursuant to paragraph 8 of this Interim Order shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code and shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under section 364 of the Bankruptcy Code or otherwise.

11.    **Receivables Facility.**

(a)    The Debtors are authorized to continue performing under the Receivables Facility and all obligations of the Debtors thereunder shall constitute superpriority administrative obligations of the Debtors' estates (the "**Receivables Facility Superpriority Claims**"). The Prepetition Lender consents to the continued availability and functioning of the Receivables Facility during the pendency of these Chapter 11 Cases with maximum availability of up to $30,000,000 in accordance with the terms of the Prepetition Receivables Purchase

22

Agreement.  Debtors shall timely pay any prepetition or postpetition obligations under or related to the Receivables Facility in the ordinary course of business when and as the same come due under the Receivables Facility.  The Debtors are further authorized, subject to the Budget, to use estate property and to expend estate funds consistent with prepetition practices and in the ordinary course of business in connection with the Receivables Facility.

(b)      Any advances provided to the Debtors by the Prepetition Lender through the Receivables Facility on account of receivables arising from a contract being fulfilled by the Supplier pursuant to the Supply and Liquidity Agreement (such an advance, a "**Supplier-Related Advance**" and such a contract or order, a "**Supplier-Fulfilled Order**") shall be used solely to pay the Debtors' payment obligations to Supplier under the Supply and Liquidity Agreement for Supplier's fulfillment of that Supplier-Fulfilled Order (or to reimburse the Debtors for any prior payment of such obligations). Except only to the extent that the Debtors' payment obligations to Supplier on account of Supplier's fulfillment of the related Supplier-Fulfilled Order have been previously paid by the Debtors, all Supplier-Related Advances shall be moved into a segregated account of SVM, and not co-mingled with any other funds of the Debtors, within one business day of any Debtors' receipt of such Supplier-Related Advance.

(c)      Any existing agreements governing the Receivables Facility shall continue to govern the Debtors with respect the transactions thereunder, and such Prepetition Receivables Purchase Agreement shall remain in full force and effect in accordance with its terms, other than provisions that would be unenforceable under section 365 of the Bankruptcy Code were the Receivables Facility not a contract to make financial accommodations; *provided however* that the Debtors shall not cause the maximum prepetition and postpetition obligations under the Receivables Facility to exceed $30 million in the aggregate at any point in time, and in no event

23

shall the Prepetition Secured Lender be obligated to make Advances to SVM that would cause aggregate obligations of SVM under the Receivables Facility to exceed $30 million.

(d)    As additional security for all obligations arising under the Receivables Facility after the Petition Date (the "Postpetition Receivables Facility Obligations"), effective immediately upon the date of this Interim Order, as set forth more fully in this Interim Order, the Prepetition Secured Lender is hereby granted (without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by the Prepetition Secured Lender) valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "Receivables Facility Liens"), in (i) all Receivables and Related Rights funded by Advances from the Prepetition Secured Lender, which shall be first priority liens not subject to the Carve Out, and (ii) all other DIP Collateral that was unencumbered as of the Petition Date or subject as of the Petition Date to an avoidable lien that is subsequently avoided, having the priorities specified in the Lien and Claim Priorities Chart as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all Postpetition Receivables Facility Obligations.

12.    **Carve Out**.

(a)    As used in this Interim Order, the "Carve Out" means the sum, without duplication, of the following: (I) (a) all fees of the Debtors required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, and all unpaid fees and expenses included in the Budget for periods up to and including the date of a Carve-Out Trigger Notice for services provided by any claims and noticing agent under the Clerk of the Court's delegation of duties

24

permitted by 28 U.S.C. § 156(c); (b) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (c) unpaid Allowed Professional Fees (defined below) incurred by the Debtors and any Committee appointed in the Chapter 11 Cases prior to delivery of a Carve Out Trigger Notice (as defined below), and (II) after the delivery of a Carve Out Trigger Notice, (A) Allowed Professional Fees of the Debtors' Professional Persons in an aggregate amount not to exceed $1,050,000 incurred on or after the first day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amount set forth in this clause (II)(A) being the "Debtor Post-Carve Out Trigger Notice Cap") and (B) Allowed Professional Fees of the Committee's Professional Persons in an aggregate amount not to exceed $100,000 incurred on or after the first day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (II)(B) being the "Committee Post-Carve Out Trigger Notice Cap" and together with the Debtor Post-Carve Out Trigger Notice Cap, the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, the Debtors' lead restructuring counsel, the U.S. Trustee, lead restructuring counsel to the Prepetition Secured Lender and lead counsel to the Committee, if any (collectively, the "Carve Out Notice Parties") which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    On the third business day of each week (the "Delivery Date"), starting with the first full calendar week following the Petition Date, each of the professionals

retained by the Debtors and the official committee of unsecured creditors (if any) (each professional, a "Professional Person") shall deliver to the Debtors' financial advisor and lead counsel and the DIP Lender's financial advisor and lead counsel a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Professional Person (the end of the day on Friday of such preceding week being the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of accrued postpetition fees, disbursements, costs and expenses ("Accrued Professional Fees") incurred by such Professional Person through the applicable Calculation Date (each, a "Weekly Statement"); *provided* that, within one business day of the occurrence of the date on which a Carve Out Trigger Notice has been delivered ("Carve Out Trigger Notice Date"), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred by such Professional Person during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Carve Out Trigger Notice Date.  If any Professional Person fails to deliver a Weekly Statement within two (2) calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in Professional Fee Escrow Account with respect to the aggregate unpaid amount of the Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget for such period for such Professional Person (for each such Professional Person, the "Reporting Default Amount").

(c)     To fund the Carve Out, so long as a Carve Out Trigger Notice has not been delivered the Debtors shall on the fourth business day of each week fund a trust account

26

that shall function as a segregated account held in trust for and exclusively available for the payment of Allowed Professional Fees (the "Professional Fees Escrow Account") in the amount necessary for the balance in the Professional Fees Escrow Account as of such date to equal the sum of (A) the aggregate Accrued Professional Fees of all Professional Persons as reflected in the Weekly Statement delivered by each on the immediately prior Delivery Date, *plus* the Reporting Default Amount for any Professional Person that has not provided the Weekly Statement that was due on the immediately prior Delivery Date, *minus* all prior postpetition payments to Professional Persons, (B) the aggregate amount of Professional Fees included in the Budget for all Professional Person for such week and the following week, and (C) the Post Carve Out Trigger Notice Cap. Such funds shall be held in the Professional Fee Escrow Account for the benefit of the Professional Persons to be applied to the Professional Fees of the Professional Persons that are approved for payment pursuant to one or more orders of the Bankruptcy Court ("Allowed Professional Fees"). Allowed Professional Fees shall be paid first out of the Professional Fees Escrow Account. Funds transferred to the Professional Fees Escrow Account shall not be subject to any liens or claims granted to the Prepetition Secured Lender or the DIP Lender herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute Prepetition Collateral or Cash Collateral; *provided*, that, notwithstanding anything to the contrary herein or in the DIP Loan Documents, the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fee Escrow Account and such reversionary interest shall be treated as DIP Collateral and subject to the Replacement Liens, the DIP Liens, the DIP Superpriority Claims, and the Prepetition Superpriority Claims.

(d)     On the Carve Out Trigger Notice Date, the Carve Out Trigger Notice shall constitute a demand to the Debtors to, and the Debtors shall, utilize cash on hand as of such

27

date and any available cash thereafter held by any Debtor to fund the Professional Fee Escrow Account with the amount necessary to bring the balance in the Professional Fee Escrow Account up to the sum of (1) the full amount permitted to be funded under subparagraph (c) above, plus (2) an amount equal to the aggregate amount by which Final Statements of Professional Persons exceed the amount included in the Budget for such Professional Person for the week in which the Carve-Out Trigger Notice is given.

(e)     No portion of the Carve Out may be used to pay any fees or expenses incurred in connection with any matter for which proceeds of the DIP Loans, the Supplier Liquidity Advance and Cash Collateral may not be used as set forth under paragraph G of this Interim Order.

(f)     For the avoidance of doubt, no Professional shall be obligated to perform services for which funds are not included in the Budget to compensate such Professional.

13.     **Postpetition Lien Perfection.** The DIP Liens and Replacement Liens shall attach and become, and are,  valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Lender or the Prepetition Secured Lender, respectively, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, deeds of trust, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions.  If the DIP Lender or Prepetition Secured Lender hereafter requests that the Debtors execute and deliver financing statements, security agreements, pledge agreements, control agreements, collateral assignments, mortgages, deeds of trust or other instruments and documents considered by the DIP Lender or Prepetition Secured Lender to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or the

4919-2555-3333.2 78006.00001

Replacement Liens, as applicable, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, deeds of trust, collateral assignments, instruments, and documents and to pay all fees, taxes, and other governmental charges required to be paid as a result of or as a condition to recording or filing any such agreements, financing statements, instruments and other documents, and the DIP Lender and the Prepetition Secured Lender are hereby authorized (but not obligated) to file or record such documents without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the Petition Date.  The DIP Lender and/or the Prepetition Secured Lender may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.

14.     **Inspection Rights.** In addition to, and without limiting, whatever rights to access the Prepetition Secured Lender has under any prepetition agreement and the DIP Lender has under the DIP Credit Agreement, upon reasonable prior written notice (including via acknowledged electronic mail) during normal business hours, the Debtors shall permit representatives, agents, advisors and employees of the Prepetition Secured Lender and/or the DIP Lender to: (i) participate (along with the financial advisor to the Debtors) in one conference call per week with management at a date and time mutually agreed to by the parties as may be reasonably requested, (ii) have reasonable access to and inspect and copy the Debtors' books and records, including all records and files of the Debtors pertaining to the Prepetition Collateral and the DIP Collateral, (iii) have reasonable access to and inspect the Debtors' properties, including

29

the Debtors' facilities and bank accounts, and (iv) discuss the Debtors' affairs, finances, and condition with the Debtors' officers, professionals, and financial advisors.

15.      **DIP Termination Events.** Subject to paragraphs 12 and 17 of this Interim Order, unless waived in writing by the DIP Lender or, with respect to the use of Cash Collateral, the Prepetition Secured Lender, the following events shall constitute termination events: (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order; (b) entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending this Interim Order; (c) the failure of the Debtors to comply with the Sale Milestones and/or DIP Milestones (each, as defined in the DIP Credit Agreement); (d) the occurrence of the "Termination Date" under the DIP Credit Agreement; or (e) the occurrence of an "Event of Default" pursuant to the DIP Credit Agreement, (such events in (a) through (e) of this paragraph 15, each a "DIP Termination Event," and the date of such termination, the "DIP Termination Date"). On the DIP Termination Date, (a) the maturity of the DIP Facility shall be accelerated to the DIP Termination Date, (b) the commitment of the DIP Lender to make the DIP Loans will be terminated to the extent any such commitment remains outstanding under the DIP Credit Agreement, (c) the commitment of the Prepetition Secured Lender to provide continued availability and functioning of the Receivables Facility shall terminate, and (d) after the Notice Period, the DIP Borrower's right to use Cash Collateral and proceeds of the DIP Facility shall automatically terminated; provided that during the Notice Period, the Debtors' continued use of the Cash Collateral and proceeds of the DIP Facility and Supplier Liquidity Advance shall be in accordance with the terms of this Interim Order.

16.      **Remedies After a Termination Date.** The Debtors shall promptly provide notice to counsel to the DIP Lender and Prepetition Secured Lender and counsel to the Committee,

30

if any, upon the occurrence of a DIP Termination Event. Upon the occurrence and during the continuation of a DIP Termination Event (regardless of whether the Debtors have given the notice described in the previous sentence), and following the giving of not less than five (5) business days' advance written notice by counsel for the DIP Lender or the Prepetition Secured Lender, which may be by email (such period the "Notice Period" and such notice, the "Enforcement Notice"), to Debtors' lead restructuring counsel, the U.S. Trustee, lead restructuring counsel to the Prepetition Secured Lender and lead counsel to the unsecured creditors' committee, if any, and subject to the obligations with respect to the Carve Out (i) the DIP Lender may exercise any rights and remedies against the DIP Collateral available to it under this Interim Order, the DIP Credit Agreement and applicable non-bankruptcy law, subject to the Carve Out; and (ii) the Prepetition Secured Lender may exercise any rights and remedies, including against Prepetition Collateral, to satisfy the Prepetition Obligations and the Replacement Liens and the Prepetition Superpriority Claims, subject to the Carve Out, and consistent with the Prepetition Loan Documents. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified to permit the giving of any Enforcement Notice. The automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically vacated with respect to the DIP Lender and the Prepetition Secured Lender at the end of the Notice Period, without further notice or order of the Court, unless, (a) the DIP Lender and the Prepetition Secured Lender elect otherwise in a written notice to the Debtors, or (b) the Court has determined that a DIP Termination Event has not occurred or the Court orders otherwise.

17.     **Emergency Hearing.** Upon the delivery of an Enforcement Notice, each of the DIP Lender, the Prepetition Secured Lender, the Debtors, and any Committee, as applicable, consent to a hearing on an expedited basis (the "Emergency Default Hearing") regarding the DIP

31

Termination Event(s), after which the Court may grant any relief it deems appropriate. Nothing herein shall alter the rights or burden of proof with respect to any request by the Debtors or other party in interest to re-impose or continue the automatic stay under section 362(a) of the Bankruptcy Code, use Cash Collateral, or to obtain any other injunctive relief. In addition, after the DIP Lender or Prepetition Secured Lender delivers an Enforcement Notice, but prior to the expiration of the Notice Period, except as may be otherwise ordered by the Court, the DIP Borrower shall not use any Cash Collateral or proceeds of the DIP Facility to pay any expenses except those which are (a) solely to pay necessary expenses set forth in the Budget to avoid immediate and irreparable harm to the estate, (b) the amount necessary to contest in good faith whether a DIP Termination Event has occurred not to exceed: (i) the amount set forth in the Budget; or (ii) if a Carve Out Trigger Notice has been issued (x) Budgeted Professional Expenses that have accrued through the date of the Carve Out Trigger Notice but have not yet been paid into the Professional Fee Escrow Account, and (y) the Post-Carve Out Trigger Notice Cap. Notwithstanding anything in this paragraph to the contrary, after notice and hearing, the Court may order such relief as it determines is appropriate following a DIP Termination Event. Any delay or failure of the Prepetition Secured Lender or the DIP Lender to exercise rights under the Prepetition Loan Documents, the DIP Loan Documents, or this Interim Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise. Notwithstanding anything to the contrary in this Interim Order, the entry of this Interim Order and the grant of adequate protection to the Prepetition Secured Lender pursuant to the terms hereof shall be without prejudice to the rights of the Debtors to, following the occurrence of the DIP Termination Date, seek authority (at any time) to use Cash Collateral and the Prepetition Collateral without the consent of the Prepetition Secured Lender or the DIP Lender, as applicable, and the Prepetition Secured Lender and the DIP Lender reserve all of their

32

respective rights with respect to contesting any such motion or request by the Debtors or any other person; provided that the Debtors may not utilize Cash Collateral, proceeds of the DIP Facility, the Supplier Liquidity Advance, or the Carve Out to seek such authority.

18.    **Payments Free and Clear.** Any and all payments or proceeds remitted to the Prepetition Secured Lender or to the DIP Lender pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be irrevocable (subject, in the case of the Prepetition Secured Lender,  to paragraph 26 of this Interim Order), received free and clear of any claim, charge, assessment or other liability, including without limitation, subject to entry of the Final Order, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through, or on behalf of the Debtors) or 552(b) of the Bankruptcy Code, and may not be re-borrowed.

19.    **Limitation on Charging Expenses Against Collateral**. Subject to entry of the Final Order, all rights to surcharge the interests of the Prepetition Secured Lender in any Prepetition Collateral or DIP Collateral under section 506(c) of the Bankruptcy Code or any other applicable principle of equity or law shall be and are finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in the Chapter 11 Cases and all cases to which the Chapter 11 Cases may be converted.  Subject to entry of the Final Order, all rights to surcharge the interests of the DIP Lender in any DIP Collateral under section 506(c) of the Bankruptcy Code or any other applicable principle of equity or law shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in the Chapter 11 Cases and all cases to which the Chapter 11 Cases may be converted.

20.    **Modification of Automatic Stay**. The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably

necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby, including (a) the granting of the Replacement Liens, Receivables Facility Liens, DIP Liens, and the DIP Superpriority Claims, and to perform such acts as the Prepetition Secured Lender and DIP Lender may reasonably request to assure the perfection and priority of the Replacement Liens, Receivables Facility Liens, DIP Liens, and the DIP Superpriority Claims, and (b) the Debtors incurring all liability and obligations, including all the Postpetition Receivables Facility Obligations and DIP Obligations, to the Prepetition Secured Lender and DIP Lender as contemplated under this Interim Order, the Prepetition Loan Documents, and the DIP Loan Documents, and to enter into and perform under the Prepetition Loan Documents, DIP Loan Documents, and any and all other instruments, certificates, agreements, and documents that may be reasonably required, necessary, or prudent for the performance by the Debtors under the Prepetition Loan Documents and DIP Loan Documents and any transactions contemplated therein or in this Interim Order, in each case in accordance herewith or therewith. The stay of section 362 of the Bankruptcy Code is hereby modified to permit the parties to accomplish the transactions contemplated by this Interim Order.

21.     **Survival of Interim Order**. The provisions of this Interim Order shall be binding upon any trustee appointed during the Chapter 11 Cases or any Successor Cases, and any actions taken pursuant hereto shall survive entry of any order which may be entered converting the Chapter 11 Cases to a chapter 7 case, dismissing the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise, or confirming or consummating any plan(s) of reorganization. The terms and provisions of this Interim Order, as well as the priorities in payments, liens, and security interests granted pursuant to this Interim Order shall continue notwithstanding any conversion of the Chapter 11 Cases to a chapter 7 case, dismissal of any of the Chapter 11 Cases

34

or confirmation or consummation of any plan(s) of reorganization. The terms of this Interim Order shall be valid and binding upon the Debtors, all creditors of the Debtors and all other parties in interest from and after the entry of this Interim Order by this Court.

22.    **Insurance**. Upon entry of this Interim Order, the Debtors shall use commercially reasonable efforts to cause the DIP Lender to be named as additional insured and loss payee on each insurance policy maintained by the Debtors on all DIP Collateral that is not subject to the Prepetition Liens.

23.    **No Liability to Third Parties**. With respect to the use of Cash Collateral, the entry into the DIP Facility or the providing of the DIP Loans, or any approval or disapproval of expenditures set forth in the Budget including, without limitation, any Permitted Variance allowed pursuant to paragraph 7 of this Interim Order, the DIP Lender, and Prepetition Secured Lender shall not: (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, its respective creditors, shareholders or estate; or (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any similar federal or state statute).

24.    **Payments Held in Trust**. Prior to the indefeasible payment in full in cash of all DIP Obligations and termination of the commitment in accordance with the DIP Loan Documents, if any party who holds a lien or security interest in DIP Collateral that is junior and/or subordinate to the DIP Liens or a claim that is subordinate to the DIP Superpriority Claims receives or is paid the proceeds of any DIP Collateral other than as expressly permitted in the DIP Loan Documents and this Interim Order, such party shall be deemed to have received such proceeds or

35

payments in trust for the DIP Lender and upon demand by the DIP Lender shall immediately turn over such amounts to the DIP Lender to repay the DIP Obligations in accordance with the DIP Loan Documents and this Interim Order until the DIP Obligations are indefeasibly paid in full in cash.

25. **Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.** The DIP Lender and the Prepetition Secured Lender have acted in good faith in connection with the DIP Facility, the DIP Loan Documents, the Initial DIP Loan, the Prepetition Loan Documents, the Supplier Liquidity Advance, and this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, the DIP Lender and the Prepetition Secured Lender are entitled to the protections provided in section 364(e) of the Bankruptcy Code, this Interim Order, the Prepetition Loan Documents, and the DIP Loan Documents. To the extent provided in section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect the validity, priority, or enforceability of the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Replacement Liens, the Prepetition Superpriority Claims, the Prepetition Liens, or the Prepetition Obligations. Notwithstanding any such reversal, modification, vacatur, or stay of this Interim Order, any DIP Obligations, DIP Liens, DIP Superpriority Claims, Replacement Liens, Prepetition Superpriority Claims, Prepetition Liens, or Prepetition Obligations incurred by the Debtors to the DIP Lender or the Prepetition Secured Lender, as the case may be, prior to the actual receipt of written notice by the DIP Lender or Prepetition Secured Lender of the effective date of

such reversal, modification, vacatur stay shall be governed in all respects by the original provisions of this Interim Order.

26.    **Reservation of Certain Third-Party Rights and Bar of Challenge and Claims**. The Debtors' admissions and releases contained in paragraphs C and 27 of this Interim Order (i) shall be binding upon the Debtors for all purposes and (ii) shall be binding upon all other parties in interest, including any Committee and any chapter 7 trustee, for all purposes unless a Committee or party in interest (subject in all respects to any agreement or applicable law which may limit or affect such party's right or ability to do so) has properly commenced an adversary proceeding or contested matter by no later than the date that is seventy-five (75) days after entry of this Interim Order (the "Challenge Deadline") (subject to entry of a Final Order granting such relief), (x) challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations or the Prepetition Liens, or (y) otherwise asserting or prosecuting any action for preference, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests and defenses against the Prepetition Secured Lender, or relating to any Prepetition Obligations or Prepetition Liens, on behalf of the Debtors' estates (collectively, "Challenges"). If no such Challenge is properly filed by the Challenge Deadline or the plaintiff's claims are dismissed or denied by final and unappealable order in any such proceeding or matter, then: (a) the Debtors' admissions and releases contained in paragraphs C and 27 of this Interim Order shall be binding on all parties in interest, including any Committee; (b) the obligations of the Debtors under the Prepetition Loan Documents shall constitute allowed claims for all purposes in the Chapter 11 Cases or any Successor Cases; (c) the Prepetition Secured Lender's security interests in and liens upon the Prepetition Collateral and the DIP Collateral shall be deemed to have been, as of the Petition Date,

37

legal, valid, binding, perfected, first priority security interests and liens, and not subject to recharacterization, subordination or otherwise avoidable; and (d) the Prepetition Obligations and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further challenge by the Committee or any other party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto. If any such adversary proceeding or contested matter is properly filed as of such dates, the Debtors' admissions and releases  contained in paragraphs C and 27 of this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) except to the extent that such admissions and releases were expressly challenged in such adversary proceeding or contested matter, provided that no more than $50,000 in the aggregate amount of the proceeds of the DIP Collateral, Prepetition Collateral, the Supplier Liquidity Advance, and the Carve Out (which amount, for the avoidance of doubt, shall be credited against the aggregate amount allocated to Committee professionals, if any, under the Budget) may be used by the Committee, if any, solely to investigate (but not prosecute or Challenge) the Debtors' admissions and releases contained in paragraphs C and 27 of this Interim Order. For the avoidance of doubt, notwithstanding anything else to the contrary in this Interim Order, any chapter 7 or chapter 11 trustee appointed or elected in this case shall, until the expiration of the Challenge Deadline, and thereafter for the duration of any adversary proceeding or contested matter timely commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the admissions and releases of the Debtors in this Interim Order.

27.     **Release of Prepetition Secured Lender**. The Debtors hereby acknowledge that, effective upon entry of the Interim Order and as of such date, subject to the right of any party in interest to commence a Challenge pursuant to paragraph 26 hereof, the Debtors have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Debtors' liability to repay the Prepetition Secured Lender, or to seek affirmative relief or damages of any kind or nature from the Prepetition Secured Lender. Effective upon entry of this Interim Order, and subject to the right of any party in interest to commence a Challenge pursuant to paragraph 26 hereof, the Debtors hereby fully, finally and forever release and discharge the Prepetition Secured Lender and each of its officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them, each solely in their capacity as such (collectively, the "Released Prepetition Lender Parties"), of and from any and all actions, causes of action, demands, suits, claims, liabilities, liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, arising prior to the Petition Date, whether in law, equity or otherwise (including, without limitation, those arising under sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or relating to the Prepetition Loan Documents and/or the DIP Orders; *provided* that the foregoing shall not release any claims against a Released Prepetition Lender Party that a court of competent jurisdiction determines, pursuant to a final, non-appealable order, results primarily from the gross negligence, bad faith, or willful misconduct of such Released Prepetition Lender Party.

39

28.     **Release of DIP Lender**. The Debtors hereby acknowledge that, effective upon entry of the Interim Order and as of such date, the Debtors have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that may be asserted to reduce or eliminate all of any part of the Debtors' liability to repay the DIP Lender.  Effective upon entry of this Interim Order, the Debtors hereby fully, finally and forever release and discharge the DIP Lender and each of its officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them, each solely in their capacity as such (collectively, the "Released DIP Lender Parties"), of and from any and all actions, causes of action, demands, suits, claims, liabilities, liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, arising prior to the Petition Date, whether in law, equity or otherwise (including, without limitation, those arising under sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or relating to the DIP Loan Documents and the DIP Orders; *provided* that the foregoing shall not release any claims against a Released DIP Lender Party that a court of competent jurisdiction determines, pursuant to a final, non-appealable order, results primarily from the gross negligence, bad faith, or willful misconduct of such Released DIP Lender Party.

29.     **Nirma Guarantee of Certain Debtor Obligations**. To the extent that Nirma is called upon to, and does, pay the obligations of the Debtors pursuant to any guarantee issued in favor of the Prepetition Secured Lender with respect to: (i) the Prepetition Obligations under the Prepetition Loan Documents or (ii) the Postpetition Receivables Facility Obligations of

40

the Debtors under the Receivables Facility, Nirma shall be subrogated to all liens, rights, and claims of the Prepetition Secured Lender against the Debtors and their assets in these Chapter 11 Cases and otherwise, including, without limitation, to the Prepetition Liens on the Prepetition Collateral, the Replacement Liens, the Receivables Facility Liens, the Prepetition Superpriority Claims, the Receivables Facility Superpriority Claims, and any other liens, rights, and claims granted to the Prepetition Secured Lender pursuant to the Prepetition Loan Documents or this Interim Order; *provided, however,* that in the case of only a partial payment by Nirma to the Prepetition Secured Lender under any guaranty, such subrogated liens, rights and claims of Nirma shall be subordinate to the remaining liens, rights and claims that continue to be held by the Prepetition Secured Lender under the Prepetition Loan Documents and this Interim Order.

30.   **Cash Management.**   Except to the extent inconsistent with the express terms of this Interim Order, the Debtors shall use (and shall continue to use) a cash management system that is the same as or substantially similar to the Debtors' cash management system in place prior to the Petition Date.  Any material changes from such pre-petition cash management system must be acceptable to the DIP Lender and Prepetition Secured Lender each in its reasonable discretion.

31.   **Joint and Several Liability**.   The Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Loan Documents.

32.   **Indemnity.**   The Debtors are hereby authorized and directed to indemnify and hold harmless the Prepetition Secured Lender, DIP Lender, their affiliates, and their respective officers, directors, employees, agents, advisors, attorneys and representatives (each an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses

41

(including, without limitation, reasonable fees and disbursements of counsel and financial advisors), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the Receivables Facility, DIP Facility or the Prepetition Loan Documents or DIP Loan Documents, or any actual or proposed use of Cash Collateral or the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense (x) is found in a non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence, bad faith, or willful misconduct or (y) results from any Indemnified Party's material breach of such Indemnified Party's obligations under any DIP Loan Document or Prepetition Loan Document. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtors, any of their directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

33.     **Enforceability; Waiver of Any Applicable Stay**. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

4919-2555-3333.2 78006.00001

34.     **Proofs of Claim**. Neither the Prepetition Secured Lender nor the DIP Lender will be required to file proofs of claim in the Chapter 11 Cases or any Successor Cases, and the Debtors' stipulations in this Interim Order shall be deemed to constitute a timely filed proof of claim against the Debtors. Notwithstanding the foregoing, each of the Prepetition Secured Lender and the DIP Lender are hereby authorized and entitled, in each in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim for any claims of the Prepetition Secured Lender or DIP Lender, as applicable.

35.     **Section 552(b) of the Bankruptcy Code**. Subject to entry of the Final Order, the Prepetition Secured Lender and the DIP Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Lender or to the DIP Lender with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral, the Collateral or the DIP Collateral.

36.     **Credit Bid**. Subject to entry of the Final Order, the DIP Lender shall have the right pursuant to section 363(k) to credit bid up to and including the full amount of the DIP Obligations, including without limitation any or all outstanding principal and any or all accrued interest, fees and expenses thereunder, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  Any such credit bid may provide for the assignment of the right to purchase the acquired assets to a sub-agent or a newly formed acquisition vehicle.

37.     **Collateral Proceeds**. Subject in all respects to the Carve Out, the funding of the Professional Fee Escrow Account in accordance with paragraph 12(d) of this Interim Order,

4919-2555-3333.2 78006.00001

and entry of the Final Order, and without limiting rights of the Prepetition Secured Lender or the DIP Lender with respect to any other proceeds from any disposition of Prepetition Collateral or DIP Collateral: (i) all net cash proceeds generated from the sale of the Debtors' assets that constitute Prepetition Collateral shall be indefeasibly paid by the Debtors to the Prepetition Secured Lender upon the closing of the such sale transaction for application against the Prepetition Obligations; and (ii) all net cash proceeds generated from the sale of the Debtors' assets that constitute DIP Collateral, to the extent such proceeds remain after payments made to the Prepetition Lender, shall be indefeasibly paid by the Debtors to the DIP Lender at the closing of the such transaction for application against the obligations owing by the Debtors under the DIP Obligations; in each case, in accordance with any applicable provisions of the DIP Credit Agreement and the Prepetition Loan Documents.

38.    **No Marshaling**. Upon entry of the Final Order, the DIP Lender and the Prepetition Secured Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with the DIP Loan Documents and the Prepetition Loan Documents, as applicable.

39.    **Discharge Waiver**.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such plan provides for either (x) the indefeasible payment in full in cash to DIP Lender of all DIP Obligations on the effective date of such plan or (y) such other treatment of the DIP Obligations acceptable to the DIP Lender in its sole and absolute discretion.

4919-2555-3333.2 78006.00001

40.     **Notice Procedures for Professional Fees**. Professionals for the Prepetition Secured Lender and the DIP Lender (collectively, the "Lender Professionals") shall not be required to submit invoices to this Court. All fees and expenses of Lender Professionals payable pursuant to this Interim Order or the DIP Credit Agreement shall be payable by the DIP Borrower (whether accrued or incurred prior to, on, or after the Petition Date) within ten calendar days after the delivery of invoices (which invoices shall not be required to comply with any particular format and may be in summary form only and may be in redacted form to protect privileged and confidential information) to counsel to the Debtors, the U.S. Trustee, and the Committee (if any), without the necessity of filing motions or fee applications, and such fees and expenses shall not be subject to any further review, challenge, or disgorgement following the expiration of such period. The DIP Borrower shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a fee objection has been timely filed by the Debtors, the Committee, if any, or the U.S. Trustee (or which is subsequently allowed by agreement or an order of the Court), and (b) all fees, costs, and expenses on an invoice to which no fee objection has been timely filed by the Debtors, the Committee, if any, or the U.S. Trustee.

41.     **No Waiver by Failure to Seek Relief**. The failure of the DIP Lender or the Prepetition Secured Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Credit Agreement, the DIP Loan Documents, the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder or otherwise of the DIP Lender or Prepetition Secured Lender.

42.     **Headings**. The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

4919-2555-3333.2 78006.00001

46

43.    **Retention of Jurisdiction**. The Court has and shall retain jurisdiction to enforce this Interim Order (including if the Chapter 11 Cases are closed and then reopened).

BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

Dated: June 17th, 2026
Wilmington, Delaware

46

4919-2555-3333.2 78006.00001