## EXHIBIT 2

## DIP CREDIT AGREEMENT

4919-2555-3333.2 78006.00001

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

by and among

**SEARLES VALLEY MINERALS INC.**

as Debtor and Debtor-in-Possession and DIP Borrower,

**THE DIP GUARANTORS PARTY HERETO,**

and

**KARNAVATI HOLDINGS, INC.,**

as DIP Lender

**dated as of June 15, 2026**

ARTICLE I DEFINED TERMS ...................................................................................1

    Section 1.1    Definitions..........................................................................1

ARTICLE II LOANS ...................................................................................................12

    Section 2.1    DIP Loans ..........................................................................12
    Section 2.2    Borrowing Mechanics.........................................................12
    Section 2.3    Use of Proceeds..................................................................13
    Section 2.4    Evidence of Debt................................................................13
    Section 2.5    Interest on Loans................................................................14
    Section 2.6    Fees....................................................................................14
    Section 2.7    Repayment..........................................................................15
    Section 2.8    Optional Prepayments.........................................................15
    Section 2.9    Mandatory Prepayments......................................................15
    Section 2.10    Application of Payments and Proceeds................................15
    Section 2.11    General Provisions Regarding Payments.............................15
    Section 2.12    Termination of DIP Commitment........................................16

ARTICLE III CONDITIONS PRECEDENT TO DIP LOANS .....................................16

    Section 3.1    Conditions Precedent to Initial DIP Loan............................16

ARTICLE IV REPRESENTATIONS AND WARRANTIES ........................................19

    Section 4.1    Representations and Warranties...........................................19

ARTICLE V AFFIRMATIVE COVENANTS...............................................................20

    Section 5.1    Affirmative Covenants........................................................20

ARTICLE VI NEGATIVE COVENANTS ...................................................................23

    Section 6.1    Negative Covenants ...........................................................23

ARTICLE VII SECURITY AND PRIORITY ...............................................................27

    Section 7.1    Grant of Security Interest....................................................27
    Section 7.2    DIP Superpriority Claim. .........................**Error! Bookmark not defined.**
    Section 7.3    Cash Management...............................................................28

ARTICLE VIII TAXES; INDEMNIFICATIONS, SET OFF; ETC. ..............................28

    Section 8.1    Taxes; Withholding, Etc .....................................................28
    Section 8.2    Indemnification ..................................................................29
    Section 8.3    Right of Set Off..................................................................29

ARTICLE IX EVENTS OF DEFAULT.........................................................................30

Section 9.1    Events of Default .................................................................................30
Section 9.2    Remedies.............................................................................................33
Section 9.3    Remedies Cumulative .........................................................................34

ARTICLE X   34

Section 10.1   Marshalling, Waiver of 506(c) Claims and Waiver of Equities. ..............34
Section 10.2   Credit Bidding....................................................**Error! Bookmark not defined.**
Section 10.3   Lien Validation and Perfection.  .........................................................34
Section 10.4   Bankruptcy Court Filings.  .................................................................35
Section 10.5   Carve Out. ..........................................................................................35
Section 10.6   Sale Process.  ......................................................................................35
Section 10.7   DIP Milestones.  ..................................................................................36
Section 10.8   Termination Date Remedies.  ...............................................................36

ARTICLE XI MISCELLANEOUS .......................................................................................37

Section 11.1    Amendments and Waivers ..................................................................37
Section 11.2    Notices ...............................................................................................37
Section 11.3    Expenses ............................................................................................38
Section 11.4    Enforceability; Successors and Assigns...............................................39
Section 11.5    Integration ..........................................................................................39
Section 11.6    No Waiver; Remedies .........................................................................39
Section 11.7    Setoff  **Error! Bookmark not defined.**
Section 11.8    Execution in Counterparts...................................................................39
Section 11.9    Governing Law; Submission to Jurisdiction; Venue ...............................40
**Section 11.10 Waiver of Jury**.......................................................................................41
Section 11.11   Severability ........................................................................................41
Section 11.12   Survival...............................................................................................41
Section 11.13   Maximum Lawful Interest ...................................................................42
Section 11.14   Interpretation......................................................................................42
Section 11.15   Ambiguities.........................................................................................42
Section 11.16   The PATRIOT Act...................................................**Error! Bookmark not defined.**
Section 11.17   Conflicting Provisions in DIP Loan Documents ....................................42
Section 11.18   Modifications .....................................................................................42
Section 11.19   Release ...............................................................**Error! Bookmark not defined.**

ARTICLE XII GUARANTEE..............................................................................................43

Section 12.1    Guarantee ...........................................................................................43
Section 12.2    Guarantee of Payment and Performance; Continuing Guarantee ..............44
Section 12.3    No Limitations, Etc............................................................................44
Section 12.4    Reinstatement......................................................................................46
Section 12.5    Agreement To Pay; Contribution; Subrogation ......................................46
Section 12.6    Information .........................................................................................47
Section 12.7    Maximum Liability...............................................................................47

Schedules

Schedule 6.1(a)(iii)    Permitted Indebtedness
Schedule 6.1(b)(iii)    Permitted Liens

Exhibits

Exhibit A        Budget
Exhibit B        Interim DIP Order
Exhibit C        Delivery of Product to DIP Lender

THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), is entered into as of June 15, 2026, among SEARLES VALLEY MINERALS INC., a Delaware corporation, as a borrower and debtor and debtor-in-possession in the Chapter 11 Cases (as defined below) (the "DIP Borrower"), each DIP Guarantor (as defined below), and KARNAVATI HOLDINGS, INC., a Delaware corporation (the "DIP Lender"). The DIP Borrower, the DIP Guarantors and the DIP Lender are referred to herein as the "Parties" and each as a "Party". Capitalized terms used but not defined herein shall have the meanings given to them in Article I or the Recitals hereto.

## RECITALS

A.      **WHEREAS**, on June 15, 2026 (the "Petition Date"), the DIP Borrower and the DIP Guarantors (collectively, the "Debtors"), commenced voluntary cases for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.      **WHEREAS**, the DIP Borrower has requested that the DIP Lender provide a secured debtor-in-possession financing facility for the purposes provided for herein (the "DIP Facility"), and the DIP Lender is willing to provide the DIP Facility on the terms and conditions hereof.

C.      **WHEREAS**, the Debtors have agreed to secure all DIP Obligations by granting the DIP Lender the DIP Liens, as more fully described in this Agreement, the other DIP Loan Documents and the DIP Orders (each, as defined below), subject only to the Carve Out and Permitted Liens as set forth herein.

D.      **WHEREAS**, the DIP Guarantors have agreed to guarantee the DIP Obligations.

E.      **WHEREAS**, each Party has reviewed, or has had the opportunity to review, this Agreement and all attachments hereto with the assistance of legal counsel of its own choosing.

**NOW THEREFORE**, in consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINED TERMS

Section 1.1      Definitions.  As used in this Agreement, including, without limitation, the preamble, recitals, exhibits and schedules hereto, the following terms have the meanings stated:

"Action" against a Person means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination or other proceeding threatened or pending against or affecting such Person or its property, whether civil, criminal, administrative, investigative or appellate, in law or equity before any arbitrator or Governmental Authority.

"Affiliate" means, with respect to a Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (i) any Person which beneficially owns or holds five (5%) percent or more of any class of the Capital Stock of such Person or other equity interests in such Person, (ii) any Person of which such Person beneficially owns or holds five (5%) percent or more of any class of the Capital Stock or in which such Person beneficially owns or holds five (5%) percent or more of the equity interests, (iii) any director or executive officer of such Person.  For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Capital Stock, by agreement or otherwise.  Notwithstanding any provision to the contrary set forth in this Agreement, for purposes of this Agreement, (i) in no event shall "Affiliates" of the DIP Lender include any Credit Party and (ii) in no event shall "Affiliates" of any Credit Party include the DIP Lender.

"Agreement" has the meaning stated in the Preamble to this Agreement.

"Asset Sale" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person, in one or more transactions or a series of related transactions, of all or any part of the businesses of any Credit Party, and/or of all or any part of the assets or properties of any kind of any Credit Party, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, other than inventory (or other assets) sold or leased in the ordinary course of business or pursuant to the TATA Liquidity Agreement.

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board, executive director (or the equivalent thereof), chief financial officer or treasurer of such Person or the Person or entity acting in that capacity.

"Avoidance Actions" means all claims or causes of action arising under chapter 5 of the Bankruptcy Code or any applicable state fraudulent transfer statutes.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" has the meaning given to such term in the Recitals to this Agreement.

"Bid Procedures" has the meaning given to such term in Section 10.6(a).

"Bid Procedures Motion" means a motion of the Debtors seeking entry of the Bid Procedures Order in form and substance reasonably satisfactory to the DIP Lender.

"Bid Procedures Order" means an order in form and substance reasonably satisfactory to the DIP Lender approving the Bid Procedures Motion and granting, among other things, the approval of the Bid Procedures.

"Borrowing" means an advance of a DIP Loan made hereunder.

2

"Borrowing Date" means the date of a Borrowing.

"Borrowing Notice" has the meaning assigned to such term in Section 2.2(b).

"Budget" means the 13-week cash flow forecast of the Debtors attached hereto as Exhibit A and each subsequent rolling 13-week cash flow forecast of the Debtors delivered by the Debtors to the DIP Lender in form substantially consistent with Exhibit A and approved in writing by the DIP Lender (each such forecast, a "Subsequent Budget"); provided, that Subsequent Budgets shall not be delivered by the Debtors more frequently than once in any rolling two-week period. References herein to the "Budget" shall be deemed to include references to the "Interim Budget."

"Business Day" means a day other than Saturday or Sunday or other day on which commercial banks in New York, New York are authorized or required by law or other governmental action to close.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP (as in effect prior to the adoption and/or effectiveness of Accounting Standards Codification 842 (Leases) or any replacement, successor or similar account pronouncement), is or should be accounted for as a capital lease on the balance sheet of that Person.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"Carve Out" has the meaning given such term in the Interim DIP Order (before the entry of the Final DIP Order) and, after the entry of the Final DIP Order, the Final DIP Order.

"Cash" means a credit balance in any deposit account, money or currency.

"Change of Control" means any one or more of the following events: (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934), directly or indirectly, of fifty percent (50%) or more of the equity interests of the DIP Borrower entitled to vote for members of the board of directors or equivalent governing body of the DIP Borrower on a fully-diluted basis, other than any person or group, including any affiliate thereof, that holds (directly or indirectly) equity interests in the DIP Borrower as of the Closing Date, (ii) the sale of all or substantially all of the assets, or the liquidation or dissolution, of the DIP Borrower, other than any sale of Sale Assets in accordance with the Sale Milestones or (iii) the DIP Borrower ceasing to own 100% of the equity interests of the DIP Guarantors, except in each case, to the extent approved in writing by the DIP Lender.

"Chapter 11 Cases" has the meaning set forth in the Recitals to this Agreement.

3

"Closing Date" means the date hereof.

"Commitment Fee" has the meaning given such term in Section 2.6(a).

"Committee" means any statutory committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases.

"Consents" means any approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any Governmental Authority or other Person.

"Credit Parties" means the DIP Borrower and the DIP Guarantors.

"Debtor" and "Debtors" means, individually and collectively, each Credit Party, as debtor and debtor-in-possession in the Chapter 11 Cases, and each of their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such Debtor, whether under chapter 11 of the Bankruptcy Code or any subsequent chapter 7 case and such Debtor's successor upon conclusion of the Chapter 11 Cases).

"Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"DIP Collateral" means all assets and property of each of the Credit Parties and their estates of any kind or nature whatsoever, real, personal, or mixed, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all collateral securing the obligations under the Prepetition Credit Agreements, all contracts, contract rights, licenses (including IP licenses), general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, money, insurance policies and proceeds thereof, receivables, deposits, refunds, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all intellectual property, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), records and data, know-how and other proprietary information and materials, all equity interests, all books and records relating to the foregoing, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof), and all other personal and real property of the Debtors (but excluding any property subject to a purchase money lien, capital lease or similar arrangement permitted under the DIP Loan Documents to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third party consent thereunder), claims and causes of action (whether asserted or unasserted, but excluding claims and

4

causes of action against Affiliates of the DIP Lender), including commercial tort claims (excluding Avoidance Actions (defined below)), proceeds from all claims and causes of action arising under section 549 of the Bankruptcy Code, and subject to entry of the Final DIP Order, the proceeds from all claims and causes of action against Affiliates of the DIP Lender and the proceeds from all claims and causes of action arising under sections 502(d), 542, 545, 547, 548, 550, 551, 553(b), or 724(a) of the Bankruptcy Code (the "Avoidance Actions") or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents.

"DIP Commitment" means an aggregate amount of $20,000,000 committed by the DIP Lender to make DIP Loans hereunder (which amount, for the avoidance of doubt, excludes any interest or fees that are paid-in-kind and capitalized into the principal amount of the DIP Loans) (the "Original DIP Commitment"); provided, that if the DIP Lender shall have received written evidence acceptable to the DIP Lender that the Prepetition Lender has agreed to extend the expiry date of the Existing Prepetition LCs and the DIP Borrower shall have delivered written notice to the DIP Lender of its intent to cash collateralize one or more of the Existing Prepetition LCs in an amount agreed upon in writing by the Prepetition Lender and the DIP Lender (such amount, the "Existing Prepetition LC Cash Collateral Amount", and such notice, the "LC Upsize Notice"), and the DIP Lender has consented in writing to the LC Upsize Notice, then the aggregate amount of the DIP Commitment shall be increased (such increase, an "LC Upsize") by an amount equal to the Existing Prepetition LC Cash Collateral Amount; provided, further, that the LC Upsize Notice shall also constitute a request for Borrowing for all purposes herein.

"DIP Commitment Period" means the period commencing on the date on which the Bankruptcy Court issues the Interim DIP Order and ending on the Termination Date.

"DIP Guarantor" means each of Searles Domestic Water Company LLC, a Delaware limited liability company, and Trona Railway Company LLC, a Delaware limited liability company, both individually and collectively.

"DIP Lender" has the meaning stated in the Preamble to this Agreement.

"DIP Liens" has the meaning given such term in Section 7.1.

"DIP Loan Documents" means this Agreement and all other documents, instruments or agreements executed and delivered by any Credit Party for the benefit of the DIP Lender in connection herewith.

"DIP Loans" has the meaning given such term in Section 2.1.

"DIP Milestones" has the meaning given to such term in Section 10.1.

"DIP Obligations" means all indebtedness, obligations, covenants, duties of payment or performance of every kind and all other liabilities of any Credit Party from time to time owed to the DIP Lender, whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, owing, arising, due or incurred under this Agreement, the DIP Orders or any other DIP Loan Document or in respect of any of the DIP Loans, or any other instruments at any time evidencing any of the foregoing or otherwise, including, without limitation, all obligations

5

(including Guarantee Obligations of the DIP Guarantors under this Agreement) to repay principal of and interest on the DIP Loans (including all PIK Interest and PIK Fees), and to pay interest, Fees, other fees, costs, charges, expenses, professional fees, and all sums chargeable to the Credit Parties under the DIP Loan Documents and the DIP Orders, whether or not evidenced by any note or other instrument.

"DIP Orders" means, collectively, the Interim DIP Order, the Final DIP Order and such other orders relating thereto or authorizing the granting of credit to the Debtors on an emergency, interim or permanent basis, pursuant to section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any asset or property by any Person.

"Dollars" and the sign "$" mean the lawful money of the United States of America.

"Equipment" means all of the Credit Parties' equipment, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located, and whether now-owned and hereafter acquired.

"Event of Default" means each of the conditions or events set forth in Section 9.1.

"Existing Prepetition LCs" means, collectively, the letters of credit issued for the account of the DIP Borrower under the Prepetition Demand Credit Agreement which are outstanding as of the Petition Date.

"Fee" means the Commitment Fee.

"Final DIP Loan" has the meaning given such term in Section 2.2(b).

"Final DIP Order" means the order or judgment of the Bankruptcy Court entered in the Chapter 11 Cases approving this Agreement, the other DIP Loan Documents, the DIP Loans and the other transactions contemplated by this Agreement and the DIP Loan Documents, on a final basis, in form and substance reasonably satisfactory to the DIP Lender.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

6

"Guarantee Obligations" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or intended to guarantee any Indebtedness or other payment obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (i) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor; (ii) the obligation to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement; or (iii) any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guarantee Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Indebtedness" means, with respect to any Person, without duplication, the following: (i) all indebtedness of such Person for borrowed money; (ii) all obligations of such Person for the deferred purchase price of property or services (other than accounts payable and accrued liabilities that would be classified as current liabilities under GAAP which payables and liabilities are incurred in respect of property or services purchased in the ordinary course of business if and only for so long as either (A) no item of such accounts payable and accrued liabilities is more than 90 days past due or (B) in the case of the Credit Parties, the Credit Parties have notified the DIP Lender in writing thereof (including pursuant to the Schedules hereto) and payments in respect thereof are being made (or not made, as applicable) in accordance with and if permitted by the Budget and the DIP Orders); (iii) all obligations of such Person evidenced by notes, bonds, debentures or similar borrowing or securities instruments; (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person; (v) all obligations of such Person as lessee under Capital Leases; (vi) all obligations of such Person in respect of banker's acceptances and letters of credit; (vii) all obligations of such Person secured by Liens on the assets and property of such Person; (viii) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock or other ownership or profit interest in such Person or any other Person or any warrants, rights or options to acquire such Capital Stock; (ix) net liabilities in respect of such Person's hedge agreements as determined in accordance with GAAP; (x) all obligations of such Person in respect of any guaranty by such Person of any obligation of another Person of the type described in clauses (i) through (ix) of this definition; and (xi) all obligations of another Person of the type described in clauses (i) through (x) secured by a Lien on the property or assets of such Person (whether or not such Person is otherwise liable for such obligations of such other Person).

7

"Indemnified Party" has the meaning stated in Section 8.2.

"Initial DIP Loan" has the meaning given such term in Section 2.2(a).

"Intellectual Property" means, collectively, all copyrights, all patents and all trademarks, together with: (i) all inventions, processes, production methods, proprietary information, know-how and trade secrets; (ii) all licenses or user or other agreements granted to any Credit Party with respect to any of the foregoing, in each case whether now or hereafter owned or used including the licenses or other agreements with respect to any DIP Collateral; (iii) all customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (iv) all sales data and other information relating to sales or service of products now or hereafter manufactured; (v) all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (vi) all causes of action, claims and warranties, in each case, now or hereafter owned or acquired by any Credit Party in respect of any of the items listed above.

"Interim Budget" means the initial budget of the Chapter 11 Cases, as approved by the DIP Lender and attached to the Interim DIP Order.

"Interim DIP Order" means the order or judgment of the Bankruptcy Court entered in the Chapter 11 Cases substantially in the form of Exhibit B approving this Agreement, the other DIP Loan Documents, the DIP Loans and the other transactions contemplated by this Agreement and the other DIP Loan Documents, on an interim basis, in form and substance reasonably satisfactory to the DIP Lender.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Knowledge" means, with respect to any Credit Party, the knowledge of such Credit Party's Authorized Officers, after reasonable inquiry by such Authorized Officers.

"Lien" means any mortgage, deed of trust, leasehold deed of trust, security interest, charge, pledge, hypothecation, assignment, attachment, deposit arrangement, encumbrance, lien (statutory, judgment or otherwise, but excluding any right of set off arising by operation of law or pursuant to agreements entered into in the ordinary course of business), or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any Capital Lease, any synthetic lease, any financing lease involving substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC or comparable law of any jurisdiction in respect of the foregoing).

"Losses" has the meaning stated in Section 8.2.

"Material Adverse Effect" means any material adverse effect on or change in (i) the business, operations, properties or financial condition of the Credit Parties, taken as a whole,

(ii) the ability of the Credit Parties, taken as a whole, to perform its payment obligations hereunder or under of any of the DIP Loan Documents, (iii) the legality, validity or enforceability against any Credit Party of any DIP Loan Document to which it is a party, or (iv) the DIP Collateral or the perfection or priority of any DIP Liens granted to the DIP Lender under any of the DIP Loan Documents; provided, that the effect of (x) the filing of the Chapter 11 Cases, and (y) any actions required to be taken under the DIP Loan Documents or the DIP Orders shall not be considered in determining whether there has been a Material Adverse Effect.

"Material Contracts" means, with respect to any Person, each contract to which such Person is a party which is material to the business, financial condition, operations, performance or properties of such Person.

"Maturity Date" means December 1, 2026.

"Net Proceeds" means: (i) in connection with any Asset Sale, the proceeds thereof in the form of cash and cash equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale, net of reasonable attorneys', accountants' and investment banking fees directly related thereto, amounts applied to the repayment of Indebtedness secured by a valid, perfected, enforceable and unavoidable Lien expressly permitted hereunder on any asset which is the subject of such Asset Sale and other reasonable customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements); and (ii) in connection with any casualty or condemnation event, the insurance proceeds or condemnation awards paid in the form of cash and cash equivalents, net of reasonable out-of-pocket expenses actually incurred and paid by any Credit Party in connection with receiving the payment of such insurance proceeds or condemnation awards in such casualty or condemnation event (including reasonable attorneys' and accountants' fees)  and net of taxes paid or reasonably estimated to be payable as a result thereof.

"Notices" has the meaning stated in Section 11.2.

"Operating Account" means the account ending in x6658 of the DIP Borrower at HSBC Bank USA, N.A., currently used as its general operations deposit account.

"Party" and "Parties" have the meanings stated in the Preamble to this Agreement.

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"Permit" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any federal, state, local or foreign Regulation.

"Permitted Liens" has the meaning stated in Section 6.1(b).

9

"Permitted Variances" has the meaning stated in Section 5.1(e).

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Governmental Authorities.

"Petition Date" has the meaning stated in the Recitals to this Agreement.

"PIK Fees" has the meaning given such term in Section 2.6(a).

"PIK Interest" has the meaning given such term in Section 2.5(a).

"Postpetition" means following the Petition Date.

"Prepetition" means prior to the Petition Date.

"Prepetition Credit Agreements" means the Prepetition Demand Credit Agreement and the Prepetition Receivables Purchase Agreement, collectively.

"Prepetition Demand Credit Agreement" means the Demand Line of Credit Agreement dated as of March 29, 2024, between the DIP Borrower and the Prepetition Lender (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"Prepetition Demand Line Obligations" means the obligations under the Prepetition Demand Credit Agreement.

"Prepetition Lender" means HSBC Bank USA, National Association.

"Prepetition Payment" means a payment of (i) any Indebtedness or trade payables of any Debtor; or (ii) or other Prepetition claims against any Debtor, including by way of adequate protection payments, in each case arising prior to the Petition Date.

"Prepetition Receivables Purchase Agreement" means the Recourse Receivables Purchase Agreement dated as of March 29, 2024, between the DIP Borrower and the Prepetition Lender (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"Product" has the meaning given such term in Section 2.6(c).

"Professional Fees and Expenses" means fees and expenses of the Professionals.

"Professional Fees Escrow Account" has the meaning given such term in the Interim DIP Order (before the entry of the Final DIP Order) and, after the entry of the Final DIP Order, the Final DIP Order.

"Professionals" means professionals retained by the DIP Borrower or any Committee, to the extent such professionals are retained by an order of the Bankruptcy Court pursuant to section 327, 328, 363 or 1103(a) of the Bankruptcy Code.

10

"Regulation" means each applicable law, rule, regulation, order, guidance or recommendation (or any change in its interpretation or administration) by any Governmental Authority, central bank or comparable agency and any request or directive (whether or not having the force of law) of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Authority, arbitrator or other Person.

"Released Parties" has the meaning given such term in Section 11.19.

"Required Milestones" means, collectively, the DIP Milestones, the Sale Milestones and the Other Milestones.

"Sale Agreements" has the meaning given such term in Section 5.1(b)(ii).

"Sale Assets" has the meaning given such term in Section 10.6(a).

"Sale Milestones" has the meaning given such term in Section 10.6.

"Subsequent DIP Loans" has the meaning stated in Section 2.2(b).

"Subsidiary" means as to any Person, a corporation, partnership, limited liability company or other entity of which shares of Capital Stock having ordinary voting power (other than Capital Stock having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"TATA" means TATA Chemicals North America Inc., a Delaware corporation.

"TATA Final Order" means that order or judgment entered by the Bankruptcy Court in these Chapter 11 Cases, approving a final advance of the remaining $13 million under the TATA Liquidity Agreement.

"TATA Interim Order" means that order or judgment entered by the Bankruptcy Court in these Chapter 11 Cases, approving an initial advance of $7 million under the TATA Liquidity Agreement.

"TATA Liquidity Advance" means the advance of up to $20 million to be made by TATA to the DIP Borrower under the TATA Liquidity Agreement.

"TATA Liquidity Agreement" means the Soda Ash Supply and Liquidity Agreement, dated as of June 15, 2026, by and between the DIP Borrower and TATA.

"Tax" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed.

"Termination Date" means the earliest to occur of (i) the Maturity Date; (ii) the date on which the sale of the Sale Assets is consummated in accordance with the Sale Milestones; and (iii)

11

the date the DIP Lender provides written notice to the DIP Borrower of its election to accelerate all DIP Obligations <u>upon the occurrence</u> and continuation <u>of an Event of Default</u> in accordance with <u>Section 9.2</u> .

"<u>UCC</u>" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in the State of New York; *provided* that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the DIP Liens is governed by the Uniform Commercial Code as in effect in a United States jurisdiction other than New York, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"<u>Weekly Budget Report</u>" means, commencing on the first Business Day that is one calendar week after the Petition Date and for each weekly period ending thereafter, in each case on or before 12:00 p.m. (New York time) on Thursday of each such week, a budget variance and reconciliation report for the one-week period ending (and including) the preceding Friday (each such period, a "<u>Testing Period</u>") setting forth in form and substance reasonably satisfactory to the DIP Lender (i) actual cash receipts and (ii) actual cash disbursements made (including ordinary course operating expenses but excluding the flow of funds into or out of the Professional Fees Escrow Account, *provided* that details regarding such flow of funds shall be provided separately to the DIP Lender on a weekly basis) to each such item set forth in the Budget for the relevant period, and commencing with the Weekly Budget Report for the second week of the Budget, the rolling two-week variance from Budget amounts for each Budget line item.

ARTICLE II
<u>LOANS</u>

Section 2.1    <u>DIP Loans.</u> Subject to the terms and conditions set forth herein and in the DIP Orders, the DIP Lender agrees to make term loans pursuant to this <u>Section 2.1</u> (the "<u>DIP Loans</u>") during the DIP Commitment Period. Each DIP Loan shall be for purposes consistent with the Budget and otherwise consistent with this Agreement; *provided* that both before and after giving effect to any DIP Loan, the DIP Loans shall not exceed the DIP Commitment (after giving effect to all prior Borrowings of DIP Loans) on the date of such Borrowing. Once repaid, DIP Loans borrowed hereunder may not be reborrowed.

Section 2.2    <u>Borrowing Mechanics.</u>

(a)    On the date of the Bankruptcy Court's entry of the Interim DIP Order, subject to the satisfaction or waiver of each of the conditions precedent set forth in <u>Section 3.1</u>, the DIP Lender shall make a DIP Loan to the DIP Borrower in a single advance in an amount equal to $7,000,000 (the "<u>Initial DIP Loan</u>").

(b)    Commencing on the date of the Bankruptcy Court's entry of the Final DIP Order until the Termination Date, subject to <u>the</u> satisfaction or waiver of each of the conditions precedent set forth in <u>Section 3.2</u>, the DIP Lender shall make one or more additional DIP Loans (each, a "<u>Final DIP Loan</u>") in one or more draws; <u>provided</u>, that (i) the DIP Lender shall make such Final DIP Loan no later than two (2) Business Days after

12

receipt by the DIP Lender of a notice of borrowing, which may be by email, setting forth the amount of the Final DIP Loan requested and the Borrowing date thereof (each, a "Borrowing Notice"), (ii) the amount of such Final DIP Loan shall not exceed the lesser of (x) the remaining Original DIP Commitment and (y) the amount set forth in the applicable Budget for such Final DIP Loan and (iii) there shall not be more than one Final DIP Loan made in any two (2) calendar week period. Within two (2) Business Days after the DIP Lender receives the LC Upsize Notice, and provided that the DIP Lender has consented in writing to the LC Upsize Notice, the DIP Lender shall make a DIP Loan to the DIP Borrower in a single advance in an amount equal to the Existing Prepetition LC Cash Collateral Amount (the "LC Upsize Loan" and together with the Final DIP Loans, the "Subsequent DIP Loans").

(c)     The DIP Lender shall disburse the DIP Loans to the Operating Account and shall use reasonable efforts to make the funds available to the DIP Borrower no later than 2:00 p.m. (New York time) on the applicable Borrowing Date.

Section 2.3     Use of Proceeds.  The proceeds of the DIP Loans shall be used by the DIP Borrower solely for the following purposes (and, in each case, solely to the extent identified and provided for in the Budget): (a) to fund Postpetition operating expenses and working capital needs of the DIP Borrower incurred during the DIP Commitment Period, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to pay interest, fees and expenses to the DIP Lender in accordance with the DIP Loan Documents; (c) to fund fees and expenses incurred in connection with a sale process conducted in accordance with the Sale Milestones; (d) to pay permitted Prepetition claim payments and adequate protection payments; (e) to pay any Professionals and Professional Fees and Expenses; (f) to pay fees for the United States Trustee; (g) to pay certain other costs and expenses of administration of the Chapter 11 Cases, and (h) for other general corporate purposes.  None of the proceeds of the DIP Loans, the Carve Out, the TATA Liquidity Advance or any Debtor's cash collateral shall be used (a) to permit the Credit Parties, or any other party-in-interest or their professionals or representatives to challenge or otherwise contest or institute any proceeding to determine (or support any other person or entity in challenging or contesting) (i) the validity, perfection, priority or extent of claims, liens, and security interests in favor of the DIP Lender or Prepetition Lender, or (ii) the enforceability of the obligations of the Credit Parties under this Agreement and/or the other DIP Loan Documents or (b) to investigate (except to the extent of $300,000 in the aggregate for the Credit Parties and $100,000 in the aggregate for the Committee, or in amounts otherwise agreed in writing by the DIP Lender), commence, prosecute or defend (or support any other Person in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the Prepetition Lender, the DIP Lender or any of their respective affiliates, agents, employees, insiders, attorneys, advisors or representatives, including, without limitation, any lender liability claims or subordination claims; or (c) to investigate, commence, prosecute or defend (or support any other Person investigating, commencing, prosecuting or defending) any claim, proceeding or cause of action  to disallow or challenge the obligations under this Agreement and/or the DIP Loan Documents, including the DIP Obligations.

Section 2.4     Evidence of Debt.  The DIP Lender shall maintain in its internal records an account or accounts evidencing the DIP Obligations owed to the DIP Lender, including the

13

amounts of the DIP Loans owed to it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on the DIP Borrower, absent manifest error; *provided*, failure to make any such recordation, or any error in such recordation, shall not affect the DIP Commitment, the DIP Loans or any of the DIP Obligations.

Section 2.5     Interest on Loans.

(a)     Applicable Rate; Payment of Interest.  Except as otherwise set forth herein, the aggregate outstanding principal amount of the DIP Loans (including all PIK Interest and PIK Fees) shall bear interest on the unpaid principal amount thereof and shall accrue from the date of funding of each applicable DIP Loan until repayment of such DIP Loan (whether by acceleration or otherwise) at a rate per annum equal to eleven percent (11.00%). Interest shall accrue monthly in arrears and shall be paid-in-kind by being capitalized and added to the outstanding principal amount of the DIP Loans on the first Business Day of each subsequent calendar month (all interest which is paid-in-kind in accordance with this Section 2.5(a), "PIK Interest").

(b)     Calculation of Interest Rates.  Interest payable pursuant to this Section 2.5 shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.  In computing interest on any DIP Loan, the date of the making of such DIP Loan shall be included, and the date of payment of such DIP Loan shall be excluded; *provided*, if such DIP Loan is repaid on the same day on which it is made, one day's interest shall be paid on such DIP Loan.

(c)     Default Interest.  Effective immediately upon the occurrence of an Event of Default and during the continuation thereof, unless waived in writing by the DIP Lender in its sole and absolute discretion, all outstanding DIP Obligations shall thereafter bear interest at a rate per annum equal to 2.00% in excess of the interest rate otherwise payable hereunder to the fullest extent permitted by applicable Laws.

Section 2.6     Fees; Costs and Expenses; Delivery of Product.

(a)     The DIP Lender will be entitled to a fee equal to the sum of (i) one percent (1.00%) of the Original DIP Commitment , which shall be deemed fully earned and payable at the time of the funding of the Initial DIP Loan plus (ii) one percent (1.00%) of any Upsize Loan, which shall be deemed fully earned and payable at the time of the funding of such Upsize Loan (collectively, the "Commitment Fee"), and the Commitment Fee shall be non-refundable once paid (whether in cash or in kind); provided that, at the DIP Borrower's election, the Commitment Fee may be paid-in-kind (for the avoidance of doubt, if paid in kind, the Commitment Fee shall be capitalized and added to the outstanding principal amount of the DIP Loan (such Commitment Fee as so capitalized and added, "PIK Fees") and shall accrue interest as set forth in Section 2.5(a)).

(b)     Subject to the DIP Orders, the DIP Borrower shall pay all professional fees, transaction costs and expenses required to be paid by the DIP Borrower pursuant to Section 11.3.

(c)    Following entry of the Interim DIP Order and prior to entry of the Final DIP Order, the DIP Borrower shall deliver to the DIP Lender or its designee VBOR product conforming to Exhibit C attached hereto ("Product") on the dates and in the quantities reflected on Exhibit C, or at times otherwise agreed to in writing by the DIP Borrower and the DIP Lender. The DIP Lender's right to receive such portion of the Product to be delivered prior to entry of the Final DIP Order shall be deemed fully earned upon entry of the Interim DIP Order. Following entry of the Final DIP Order, the DIP Borrower shall continue to deliver to the DIP Lender or its designee on the dates and in the quantities reflected on Exhibit C, or at times otherwise agreed to in writing by the DIP Borrower and the DIP Lender.  The DIP Lender's right to receive such portion of the Product to be delivered after entry of the Final DIP Order shall be deemed fully earned upon entry of the Final DIP Order.

Section 2.7    Repayment.  Subject to Section 2.11, the DIP Loans shall be due and payable, and the DIP Borrower shall be required to repay all of the outstanding DIP Obligations in full in cash, on the Termination Date.

Section 2.8    Optional Prepayments.  Without limiting the DIP Borrower's obligations under any other section of this Agreement, including, without limitation, Sections 2.5 and 2.6, the DIP Borrower shall be permitted to prepay the DIP Obligations, in whole or in part, without penalty or premium.

Section 2.9    Mandatory Prepayments. Subject to the DIP Orders (including the Carve Out) and without limitation of the restrictions on Dispositions set forth in Section 6.1(d), upon receipt by the Credit Parties of Net Proceeds from any Asset Sale or any casualty or condemnation event, the DIP Borrower shall prepay the outstanding DIP Obligations in cash in accordance with Section 2.10 in an amount equal to 100% of such Net Proceeds that are not required to be paid to the Prepetition Lender.

Section 2.10    Application of Payments and Proceeds.  Subject to the DIP Orders (including the Carve Out), any amount required to be paid pursuant to Section 2.9 and all proceeds of the DIP Collateral (whether before or after an Event of Default) shall be applied, without duplication, (a) *first,* to pay accrued and unpaid interest, fees, costs and expenses constituting outstanding DIP Obligations, in each case, to the extent not paid in kind, and (c) *second*, to repay any principal amounts outstanding in respect of the DIP Loans.

Section 2.11    General Provisions Regarding Payments.

(a)    Payments.  All payments by the DIP Borrower of principal, interest, fees, costs and expense reimbursements, and other DIP Obligations shall be made by the DIP Borrower to the DIP Lender.  All such payments shall be in Dollars in same day funds, and shall be without defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, setoff, counterclaim holdback or any other challenge under the Bankruptcy Code or applicable law, and free of any restriction or condition, and delivered to the DIP Lender not later than 2:00 p.m. (New York time) on the date due at the DIP Lender's office for receipt of notices hereunder (or as otherwise instructed by the DIP Lender to the DIP Borrower).

15

(b)      Non-Conforming Payments.   Any payment by or on behalf of the DIP Borrower that is not made in same day funds prior to 2:00 p.m. (New York time) shall be deemed to be a non-conforming payment.  Any such payment shall not be deemed to have been received by the DIP Lender until the later of (i) the time such funds become available funds and (ii) the applicable next Business Day.  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.5 from the date such amount was due and payable until the date such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day).

(c)      Payments to Include Accrued Interest.   All payments in respect of the principal amount of any DIP Loan (whether mandatory or optional) shall include payment of accrued interest (other than PIK Interest) on the principal amount being repaid or prepaid calculated in accordance with Section 2.5.

(d)      Business Days.   Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

Section 2.12    Termination of DIP Commitment.   Unless previously terminated in accordance with the terms hereof, the DIP Commitment shall automatically terminate on the last day of the DIP Commitment Period.  Upon the making of any DIP Loan, the DIP Commitment shall be permanently reduced by an amount equal to the principal amount of such DIP Loan.

ARTICLE III
CONDITIONS PRECEDENT TO DIP LOANS

Section 3.1    Conditions Precedent to Initial DIP Loan.  The obligation of the DIP Lender to make the Initial DIP Loan is subject to the satisfaction, or waiver in accordance with Section 11.1, of the following conditions on or before the Closing Date:

(a)      Chapter 11 Cases. The Debtors shall have commenced the Chapter 11 Cases and all of the "first day motions," "first day orders" and all related pleadings entered or to be entered at the time of the Petition Date or shortly thereafter shall have been made available to the DIP Lender in advance, and shall be in form and substance reasonably satisfactory to the DIP Lender.  The Chapter 11 Cases shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.  No trustee under chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases.

(b)      Execution of Agreement.   The DIP Lender shall have received a duly executed copy of this Agreement.

16

(c)      Interim DIP Order. The Bankruptcy Court shall have entered (i) the Interim DIP Order authorizing and approving (x) this Agreement and the transactions contemplated hereby, including, without limitation, the granting of valid, enforceable, non-avoidable and fully perfected DIP Liens and granting allowed superpriority claims in favor of the DIP Lender; (y) the current cash payment of expenses, including such amounts arising before and after the Petition Date and without the necessity of filing motions, to the extent such expenses have actually been incurred; and (ii) the TATA Interim Order. The Interim DIP Order and the TATA Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, without the consent of the DIP Lender (such consent not to be unreasonably withheld).  The Debtors shall be in compliance in all respects with the Interim DIP Order and the TATA Interim Order, and all other orders of the Bankruptcy Court binding on them.

(d)      Approved Budget.  The Credit Parties shall be in compliance with the Interim Budget, subject to the Permitted Variances.

(e)      Delivery of Product.  The Credit Parties shall have delivered, or caused to delivered, to the DIP Lender the portion of the Product required to be delivered to the DIP Lender pursuant to clause (i) of Section 2.6(c).

(f)      No Default.  No Default or Event of Default under this Agreement shall exist at the time of the Borrowing of the Initial DIP Loan.

(g)      Representations and Warranties.  All representations and warranties in the DIP Loan Documents shall be true and correct in all material aspects as of the date of the Borrowing of the Initial DIP Loan, as if made on and as of such date (except to the extent such representations and warranties specifically relate to an earlier date, such representations and warranties were true and correct on and as of such earlier date).

(h)      Fees and Costs.  The Interim DIP Order and the Budget shall provide, in form and substance satisfactory to the DIP Lender in its sole and absolute discretion, for the Debtors to pay, on the terms and schedule provided therein, all reasonable fees of the DIP Lender's financial advisor and counsel and their reasonable out-of-pocket expenses incurred in connection with this Agreement and the other DIP Loan Documents.

Section 3.2      Conditions to Each Subsequent DIP Loan.  The obligations of the DIP Lender to make any Subsequent DIP Loan on any Borrowing Date is subject to the satisfaction, or waiver in accordance with Section 11.1 in the reasonable discretion of the DIP Lender, of the following conditions precedent:

(a)      Final DIP Loans; LC Upsize Notice.  (i) With respect to any Borrowing of a Final DIP Loan, the DIP Lender shall have received a Borrowing Notice with respect to such Final DIP Loan and such Final DIP Loan shall be in accordance with the then applicable Budget, and (ii) with respect to the Borrowing of the LC Upsize Loan, the DIP Lender shall have received a fully executed LC Upsize Notice.

17

(b)      Final DIP Order, TATA Final Order and Bid Procedures Order.   The Bankruptcy Court shall have entered the Final DIP Order, the TATA Final Order and the Bid Procedures Order, which shall be in full force and effect and shall have not been reversed, modified, amended, stayed, vacated, rescinded or subject to a presently effective stay pending appeal, in the case of any modification or amendment, without the consent of the DIP Lender (such consent not to be unreasonably withheld).

(c)      DIP Liens.  The DIP Loan Documents and the Interim DIP Order shall be effective to create in favor of the DIP Lender a valid and perfected Lien on and security interest in the DIP Collateral with the priority described herein.  The DIP Lender shall have received a security agreement duly executed by the DIP Credit Parties, together with such mortgages, deeds of trust, trust deeds or similar documentation as shall have been reasonably requested by the DIP Lender, in each case, with respect to the DIP Collateral.

(d)      UCC Financing Statements.  The DIP Lender shall have received UCC financing statements in form for filing with respect to the DIP Collateral in the jurisdiction of organization of each Credit Party, together with any additional filings (including any fixture filings) as shall be necessary in connection with the mortgages, deeds of trust, trust deeds and similar documentation described in clause (c) of this Section 3.2.

(e)      Insurance.  The DIP Borrower shall have used commercially reasonable efforts to cause the DIP Lender to  be named as an additional insured and loss payee under all insurance policies to be maintained by the Credit Parties with respect to the properties of the Credit Parties forming part of the DIP Collateral that is not subject to the Liens securing Indebtedness outstanding under the Prepetition Credit Agreements.

(f)      Compliance.  The Debtors shall be in compliance with the Budget (subject to the Permitted Variances), the Final DIP Order, and the Bid Procedures Order in all material respects.

(g)      Delivery of Product.  With respect to the funding of the first Final DIP Loan following the entry of the Final DIP Order, the Credit Parties shall have delivered, or caused to be delivered, to the DIP Lender the portion of the Product required to be delivered to the DIP Lender pursuant to clause (ii) of Section 2.6(c).

(h)      Representations and Warranties.   As of such Borrowing Date, the representations and warranties contained in the DIP Documents shall be true and correct in all material aspects on and as of that Borrowing Date, as if made on and as of that Borrowing Date (except to the extent such representations and warranties specifically relate to an earlier date, such representations and warranties were true and correct on and as of such earlier date).

(i)      No Default or Event of Default.  As of such Borrowing Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Borrowing (or the application of its proceeds) that would constitute an Event of Default or a Default.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES

Section 4.1     Representations and Warranties.  In order to induce the DIP Lender to enter into this Agreement and for the DIP Lender to make each DIP Loan, each Credit Party, jointly and severally, hereby represents and warrants to the DIP Lender, on the Closing Date and on each Borrowing Date as follows:

(a)     Status; Authorization; Consents; No Conflicts.  Such Credit Party is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or formation and is duly qualified and in good standing in every other jurisdiction where it is doing business except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and, subject to the entry by the Bankruptcy Court of the Interim DIP Order and the Final DIP Order, the execution, delivery and performance by such Credit Party of each DIP Loan Document to which it is a party (i) are within its respective power and authority, (ii) have been duly authorized, and (iii) do not conflict with or contravene its constitutive documents.  Subject to the entry by the Bankruptcy Court of the Interim DIP Order and the Final DIP Order, the execution, delivery, performance of its obligations, and exercise of its rights under the DIP Loan Documents by such Credit Party, including, without limitation, the making of the DIP Loans under this Agreement, (x) do not require any Consents that have not been obtained and (y) are not and will not be in conflict with or be prohibited or prevented by any Regulation.

(b)     Execution and Binding Effect.  Subject to the entry by the Bankruptcy Court of the Interim DIP Order and the Final DIP Order, upon execution and delivery thereof, this Agreement shall constitute the legal, valid and binding obligation of each Credit Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c)     Governmental Approvals and Filings.  Other than the Bankruptcy Court's entry of the DIP Orders, no approval, order, consent, authorization, certificate, license, permit or validation of, or exemption or other action by, or filing, recording or registration with, or notice to, any Governmental Authority is or will be necessary in connection with the execution and delivery of this Agreement or any other DIP Loan Document, consummation by such Credit Party of the transactions herein or therein contemplated, or performance of or compliance with the terms and conditions hereof or thereof.

(d)     TATA Liquidity Agreement. No "event of default" or similar event has occurred under the TATA Liquidity Agreement.

(e)     DIP Collateral. The Interim DIP Order or, if the Final DIP Order has been entered, the Final DIP Order, is effective to create in favor of the DIP Lender legal, valid,

enforceable and fully perfected DIP Liens on the DIP Collateral, free and clear of any Liens other than the Carve Out and Permitted Liens.

(f)     Absence of Events of Default.   Since the Petition Date, no event has occurred and is continuing and no condition exists which constitutes a Default or Event of Default.

(g)     DIP Orders.   The Interim DIP Order or, at all times after its entry by the Bankruptcy Court, the Final DIP Order, is in full force and effect, and has not been vacated, reversed, terminated, stayed, modified or amended in any manner without the reasonable written consent of the DIP Lender.

ARTICLE V
AFFIRMATIVE COVENANTS

Section 5.1     Affirmative Covenants. Each Credit Party, jointly and severally, covenants and agrees that until payment in full of all DIP Obligations (other than indemnification obligations for which a claim does not exist as of the applicable date of determination), such Credit Party shall perform all the covenants in this ARTICLE V applicable to it:

(a)     Financial and Management Reporting Requirements.   Promptly (i) upon (but no later than three (3) Business Days after) request therefor by the DIP Lender, the Credit Parties shall deliver such information regarding the business or the financial or corporate affairs of the Credit Parties or the compliance by the Credit Parties with the terms of the DIP Loan Documents as the DIP Lender may from time to time reasonably request; and (ii) upon any Authorized Officer of the Credit Parties becoming aware thereof, notify the DIP Lender in writing of (A) the occurrence of any Default or Event of Default, and (B) any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect (which notice shall include a statement of an Authorized Officer of the DIP Borrower setting forth the details of such event or development requiring such notice and any action taken or proposed to be taken with respect thereto).

(b)     Other Information.   The Credit Parties shall furnish to the DIP Lender:

(i)     as soon as practicable in advance of filing with the Bankruptcy Court or delivering to any Committee appointed in the Chapter 11 Cases or to the United States Trustee for the District of Delaware, as the case may be, the Final DIP Order (which must be in form and substance reasonably satisfactory to the DIP Lender), all other proposed orders and pleadings related to the approval of this Agreement and the transactions contemplated herein (which must be in form and substance reasonably satisfactory to the DIP Lender) and any plan of reorganization and/or any disclosure statement related thereto or any proposed asset purchase agreements, merger agreements, or acquisition agreements (collectively, "Sale Agreements"); provided that if the DIP Lender credit bids all or any portion of the aggregate amount of the DIP Obligations pursuant to section 363(k) of the Bankruptcy Code, and such credit bid is considered a "Qualified Bid" pursuant to the Bid Procedures approved by the Bankruptcy Court, the Credit Parties shall have no obligation to

20

furnish to the DIP Lender any proposed Sale Agreements with any party other than the DIP Lender, or any pleadings or orders related thereto; and

(ii)     promptly, and in any event, within three (3) Business Days after any Credit Party receives any written notice from any Governmental Authority, a copy of such notice and copies of all reports, certificates and notices that such Credit Party may provide to such Governmental Authority.

(c)     Access.  The Credit Parties shall (i) upon reasonable prior written notice (including via acknowledged electronic mail) during normal business hours, permit the DIP Lender to visit and inspect any of the Credit Parties' properties and to have full access to and the right to audit, check, inspect and make abstracts and copies from each Credit Party's books, records, audits, correspondence and all other papers relating to the operation of the Credit Parties' businesses; and (ii) cause their management team to be available to provide periodic telephonic updates of such reports to the DIP Lender from time to time (but not less frequently than weekly), as reasonably requested by the DIP Lender.

(d)     Use of Proceeds.  The Credit Parties shall use the proceeds of the DIP Loans solely for the purposes set forth in Section 2.3.

(e)     Budget Compliance.  The Credit Parties shall not make any payments, or incur any obligations or liabilities, except as expressly projected and provided for in the Budget.  Notwithstanding the foregoing, as of the last day of each weekly period covered in a Weekly Budget Report, (A) cash receipts may vary from the applicable Budget by not more than twenty percent (20%), (B) cash disbursements paid by the Credit Parties may vary from the applicable Budget by not more than twenty percent (20%) for cash disbursements in the aggregate or for any line item (which disbursements shall exclude, for purpose of such variance testing, professional fees and expenses), and (C) operating cash flow (as shown in the applicable line of the Budget, and which shall be total net cash flow excluding Court-approved critical vendor payments and utility deposits pursuant to section 366 of the Bankruptcy Code) may vary from the applicable Budget by not more than twenty percent (20%), in each case of (A), (B) and (C), for any rolling two (2) week period (such variances, collectively, the "Permitted Variances").  Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the written consent of the DIP Lender in its sole discretion.  Permitted Variances are not cumulative beyond a given Testing Period.

(i)     On a weekly basis, the Credit Parties shall include in their weekly financial reporting to the DIP Lender a good faith cash flow projection for the balance of the period covered by the Budget (the "Projection Period") in a form reasonably acceptable to the DIP Lender (each, a "Weekly Projection"), which Weekly Projection shall assume, for each week of the Projection Period, that fees and expenses of Professionals are not less than the aggregate amount for Professionals set forth in the Budget for such week.

(f)     Maintenance of Existence.  Each Credit Party shall (i) preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the

21

jurisdiction of its organization; and (ii) except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect, take all commercially reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business.

(g)    Maintenance of Properties.  Each Credit Party shall maintain, preserve and protect all of its material properties and equipment that are used or useful in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and make all commercially reasonable and appropriate repairs, renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof except where failure to do so would not reasonably be expected to have a Material Adverse Effect.

(h)    Compliance with Laws.  Except as otherwise excused by the Bankruptcy Code, each Credit Party shall comply with all laws, rules, licenses, permits, regulations and orders of any Governmental Authority applicable to it or its property, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(i)    Taxes.  To the extent permitted by the Bankruptcy Court and the Bankruptcy Code, each Credit Party shall pay and discharge all material Taxes, assessments and governmental charges or levies arising after the Closing Date imposed upon them or upon their income or profits, or upon any properties belonging to them; *provided* that the Credit Parties shall not be required to pay any such Tax, assessment, charge, levy or claim (i) which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto unless and until any Tax Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors or (ii) non-payment of which is required under the Bankruptcy Code or order of the Bankruptcy Court.

(j)    Compliance with DIP Orders.  The Credit Parties shall comply with the applicable DIP Order in all material respects to the extent the Debtors' compliance therewith is required at such time.

(k)    Required Milestones.  The Credit Parties shall comply with each of the Required Milestones, in each case, as set forth in Sections 10.6, 10.7 and 10.8.

(l)    Further Assurances.

(i)    The Credit Parties shall cooperate with the DIP Lender, take such action, execute such documents, and provide such information as the DIP Lender may from time to time reasonably request in order to effect the transactions contemplated by and the purposes and intent of the DIP Loan Documents.

(ii)    Each Credit Party shall promptly, upon request by the DIP Lender, correct, and cause each of the other parties to the DIP Loan Documents to promptly correct, any defect or error that may be discovered in any DIP Loan Document or in the execution, acknowledgment or recordation of the DIP Loan Document. Promptly upon request by the DIP Lender, the Credit Parties shall execute,

22

authorize, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, documents, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments as the DIP Lender may reasonably require from time to time in order to carry out more effectively the purposes and intent of each DIP Loan Document. Without limiting the foregoing, the Debtors shall (A) authorize the filing by the DIP Lender of UCC-1 financing statements in the jurisdiction of organization of such Credit Party, and (B) take such action from time to time (including, without limitation, authorizing, filing, executing and/or delivering such assignments, security agreements and other instruments) as shall be reasonably requested by the DIP Lender to create, in favor of the DIP Lender, to the extent required under the respective DIP Loan Documents and to the maximum extent permitted under applicable law, a perfected Lien in all of the DIP Collateral, subject only to the Carve Out and applicable Permitted Liens.

ARTICLE VI
NEGATIVE COVENANTS

Section 6.1    Negative Covenants.  Each Credit Party, jointly and severally, covenants and agrees that until payment in full of all DIP Obligations (other than indemnification obligations for which a claim does not exist as of the applicable date of determination) have been paid in full to the DIP Lender, such Credit Party shall perform all covenants in this Section 6.1 applicable to it:

(a)    Indebtedness.  No Credit Party shall incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), any Indebtedness of any other Person, except the Indebtedness described in the following clauses (i) through (xi):

(i)    the DIP Obligations;

(ii)    purchase money Indebtedness (including Capital Leases) arising after the date hereof to the extent secured by purchase money security interests in Equipment (including Capital Leases) not to exceed $100,000 in the aggregate at any time outstanding to the extent consistent with the Budget;

(iii)    Indebtedness existing on the Petition Date, including the Indebtedness under the Prepetition Credit Agreements (and renewals, refinancings and extensions thereof) and the Indebtedness set forth on Schedule 6.1(a)(iii); provided, that in no event shall the aggregate principal amount of Indebtedness outstanding under the Prepetition Receivables Purchase Agreement exceed $30,000,000 at any time;

(iv)    obligations of the Credit Parties arising under the TATA Liquidity Agreement as in effect on the Petition Date;

23

(v)      unsecured trade debt of the Debtors incurred in the ordinary course of business after the Petition Date to the extent consistent with the Budget;

(vi)      obligations and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business;

(vii)      Indebtedness consisting of (a) (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business or (b) Taxes;

(viii)      Indebtedness incurred by any Credit Party in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(ix)      the Carve Out;

(x)      Guarantees with respect to Indebtedness permitted under this Section 6.01(a); and

(xi)      intercompany Indebtedness among the Credit Parties.

(b)      Liens.  No Credit Party shall create or incur any Liens on any of their respective property or assets, except (the Liens described in the following clauses (i) through (xviii), the "Permitted Liens"):

(i)      Liens of the DIP Lender securing the DIP Obligations;

(ii)      Liens securing the payment of Taxes, assessments or other governmental charges or levies either not yet overdue or described in clause (i) or (ii) of the proviso to Section 5.1(h);

(iii)      Liens existing on the Petition Date and listed on Schedule 6.1(b)(iii), (including Liens securing Indebtedness outstanding as of the Petition Date under the Prepetition Credit Agreements);

(iv)      Adequate protection Liens consented to by the DIP Lender and included in the Interim DIP Order or the Final DIP Order;

(v)      non-consensual statutory Liens (other than Liens securing the payment of taxes) arising in the ordinary course of the Credit Parties' business to the extent: (A) such Liens secure Indebtedness which is not overdue or (B) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer

24

or being contested in good faith by appropriate proceedings diligently pursued by the applicable Credit Party, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

(vi)     Liens securing Indebtedness permitted under Section 6.1(a)(ii).

(vii)     any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or licenses entered into by any Credit Party in the ordinary course of business and covering only the assets so leased, subleased, licensed or sublicensed and Liens arising from precautionary Uniform Commercial Code financing statements or similar filings (or equivalent filings, registrations or agreements in foreign jurisdictions) in connection with any such applicable leases or subleases;

(viii)     statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business;

(ix)     easements, rights-of-way, restrictions, encroachments, protrusions and other similar encumbrances and minor title defects affecting real property that, in the aggregate, do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(x)     deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(xi)     Liens securing judgments for the payment of money (or appeal or other surety bonds relating to such judgments) that do not result in an Event of Default under Section 9.1(s);

(xii)     normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions not arising in connection with the issuance or repayment of Indebtedness;

(xiii)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(xiv)     Liens that are contractual rights of setoff (i) relating to pooled deposit or sweep accounts of any Credit Party to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of such Credit Party

25

or (ii) relating to purchase orders and other agreements entered into with customers of any Credit Party in the ordinary course of business;

(xv)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xvi)    any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of (i) the DIP Borrower, individually, or (ii) the Credit Parties, taken as a whole;

(xvii)    Liens consisting of an agreement to Dispose of any property in a Disposition permitted under Section 6.1(d), in each case, solely to the extent such Disposition would have been permitted on the date of the creation of such Lien; provided, that any such Lien shall be junior and subject in all respects to the Liens of the DIP Lender securing the DIP Obligations; and

(xviii)    the Carve Out.

In addition, the Credit Parties shall not create or permit to exist (y) any administrative expense, unsecured claim, or other claim or Lien on the DIP Collateral, or apply to the Bankruptcy Court for authority to do so, except for the Carve Out or as may be included in the Budget, and (z) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than any adequate protection obligations owed to the Prepetition Lender in connection with authorization to use cash collateral.

(c)    Fundamental Changes.  No Credit Party shall merge, dissolve, liquidate, consolidate with or into another Person, split or allow any change to the ownership of such Credit Party,  except in connection with a sale of the Sale Assets.

(d)    Dispositions.  No Credit Party shall make any Disposition or enter into any agreement to make any Disposition, except:

(i)    Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of any Credit Party, in each case to the extent constituting immaterial property;

(ii)    Dispositions in the ordinary course of business of cash and cash equivalents, solely as provided for in the Budget;

(iii)    sales of inventory in the ordinary course of business;

(iv)    Dispositions pursuant to the TATA Liquidity Agreement;

(v)    Dispositions subject to or resulting from casualty losses and condemnation proceedings (including in lieu thereof or any similar proceedings);

26

(vi)    the lapse, abandonment or cancellation of immaterial Intellectual Property which is no longer used or useful in any material respect in the business of the Credit Parties;

(vii)    Dispositions of Product pursuant to Section 2.6(c).

(viii)    any other Disposition in accordance with the Budget; and

(ix)    any other Disposition (including any Disposition of Sale Assets in accordance with the Sale Milestones) approved by the Bankruptcy Court and approved by the DIP Lender.

(e)    <u>Amendments to Organizational Documents</u>.  No Credit Party shall amend its certificate of incorporation, certificate of formation, bylaws, limited liability company agreement or other organization documents, without the written consent of the DIP Lender.

(f)    <u>Chapter 11 Claims</u>.  Except as provided in the DIP Orders, the Credit Parties will not incur, create, assume, suffer to exist or permit any other superpriority expense claim under section 364 of the Bankruptcy Code or any or Lien which is senior to or pari passu with, the DIP Liens securing the DIP Obligations.

(g)    <u>Revision of Orders; Applications to Bankruptcy Court</u>.  The Credit Parties shall not:

(i)    seek or consent to any stay, vacation, amendment or other modifications of the DIP Orders or the Bid Procedures Order, or file any other application, motion or other pleading materially inconsistent with this Agreement and/or the DIP Loan Documents, except for any modifications and amendments agreed to in writing by the DIP Lender; or

(ii)    apply to the Bankruptcy Court for authority to take any action prohibited by this <u>Section 6.1</u> (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the DIP Lender).

(h)    <u>Retention Plans</u>.  The Credit Parties shall not file with the Bankruptcy Court a motion to approve, or otherwise seek approval of or pay, any incentive or retention plan, except as otherwise consistent with the Budget.

ARTICLE VII
SECURITY AND PRIORITY

Section 7.1    <u>Security Interest</u>.  Each Credit Party hereby grants to the DIP Lender valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "DIP Liens"), in all DIP Collateral, having the priorities specified in the chart attached as Exhibit 3 to the Interim DIP Order, and the rights attendant thereto as provided in the Interim DIP Order and, as applicable, the Final DIP Order, as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all DIP Obligations.

27

Section 7.2    DIP Superpriority Claim. Pursuant to section 364(c)(1) of the Bankruptcy Code, all amounts owing by the DIP Borrower shall, subject to the Carve Out, at all times constitute allowed superpriority administrative expense claims of the DIP Lender in the Chapter 11 Cases, having priority over all administrative expenses of the kind specified in, among other sections, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code. Except with the written consent of the DIP Lender, no other claim allowed in the Chapter 11 Cases shall be senior to or *pari passu* with the superpriority administrative expense claims of the DIP Lender.

Section 7.3    Cash Management.  The Credit Parties shall use a cash management system that is the same as or substantially similar to their Prepetition cash management system. Any changes from such Prepetition cash management system must be approved in writing by the DIP Lender and approved by an order of the Bankruptcy Court.

ARTICLE VIII
TAXES; INDEMNIFICATIONS, SET OFF; ETC.

Section 8.1    Taxes; Withholding, Etc.

(a)    Payments to Be Free and Clear.  Except as otherwise required under this Section 8.1, all sums payable by the Credit Parties hereunder and under the other DIP Loan Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than (i) a Tax on the overall net income of the DIP Lender, (ii) a Tax imposed on or in respect of the DIP Lender pursuant to a law in effect on the date hereof, or (iii) a Tax attributable to the DIP Lender not timely providing a valid Internal Revenue Service Form W-9 to the applicable Credit Party) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of the Credit Parties or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b)    Withholding of Taxes.  If any Credit Party is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by such Credit Party to the DIP Lender in the ordinary or general conduct of business:  (i) such Credit Party shall notify the DIP Lender of any such requirement or any change in any such requirement as soon as the Credit Party becomes aware of it, (ii) such Credit Party shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on such Credit Party) for its own account or (if that liability is imposed on the DIP Lender, as the case may be) on behalf of and in the name of the DIP Lender, (iii) in the case of Taxes other than Taxes on the overall net income of the DIP Lender or Taxes otherwise excluded from payment or indemnity under Section 8.1(a), the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, the DIP Lender receives an amount equal to what it would have received had no such deduction, withholding or payment been required or made, and (iv) within 30 days after paying any

28

sum from which it is required by law to make any deduction or withholding, and within 30 days after the due date of payment of any Tax which it is required by clause (ii) above to pay, such Credit Party shall deliver to the DIP Lender evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the timely remittance thereof to the relevant taxing or other authority.

Section 8.2    Indemnification.  Each Credit Party will indemnify and hold harmless the DIP Lender, its Affiliates, and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, the "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel and financial advisors), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Loans, the DIP Loan Documents, or any of the transactions contemplated herein, or any actual or proposed use of the proceeds of the DIP Loans, except to the extent such claim, damage, loss, liability or expense (x) is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence, bad faith or willful misconduct or (y) results from any Indemnified Party's material breach of such Indemnified Party's obligations hereunder or under any other DIP Loan Document. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Credit Parties, any of their directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  This Section 8.2 shall survive termination of this Agreement, and shall not apply with respect to any Taxes other than Taxes arising from non-Tax claims.

Section 8.3    Right of Set Off.  Notwithstanding the provisions of section 362 of the Bankruptcy Code and subject to the DIP Orders, upon the occurrence of any Event of Default, the DIP Lender is hereby authorized by the DIP Borrower at any time or from time to time, without notice to the DIP Borrower or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts), credits, collateral and property, and any other Indebtedness, in each case, at any time held or owing by the DIP Lender to or for the credit or the account of the DIP Borrower (and, in each case, whether existing as of the date of this Agreement or hereafter arising), against and on account of the DIP Obligations of the DIP Borrower to the DIP Lender hereunder, irrespective of whether or not (a) the DIP Lender shall have made any demand hereunder or (b) the principal of or the interest on the DIP Loans or any other amounts due hereunder or the other DIP Loan Documents shall have become due and payable and although such obligations and liabilities, or any of them, may be contingent or unmatured.  ANY AND ALL RIGHTS TO REQUIRE THE DIP LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER DIP COLLATERAL WHICH SECURES THE DIP OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO THE SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE CREDIT PARTIES IS HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

ARTICLE IX
EVENTS OF DEFAULT

Section 9.1    Events of Default.  Any one or more of the following events which shall occur shall constitute an "Event of Default":

(a)    Failure to Make Payments When Due.  Failure by the DIP Borrower to pay (i) any principal on the DIP Loans when due or (ii) any interest or other DIP Obligation, within three (3) business days following the due date thereof;

(b)    Noncompliance.  Failure of any Credit Party to observe or perform (i) any covenant, or agreement set forth in Section 5.1(d) 5.1(e), 5.1(f) (solely with respect to clause (i) thereof), 5.1(k), or 6.1 of this Agreement, or (ii) any other covenant or agreement set forth in this Agreement (other than Section 2.6(c) or as expressly provided in this Section 9.1), and, in the case of this clause (ii), such failure shall continue unremedied for a period of thirty (30) days after the earlier of the date on which any Credit Party has knowledge thereof or receives notice thereof from the DIP Lender;

(c)    TATA Liquidity Agreement. Any "event of default" or similar event (after giving effect to any grace period) occurs under the TATA Liquidity Agreement;

(d)    Breach of Representations, Etc.  Any representation or warranty made or deemed by the DIP Borrower in this Agreement or any of the DIP Loan Documents shall prove to have been incorrect or misleading in any material respect on the date when made or deemed to have been made;

(e)    Change of Control.  A Change of Control occurs (other than as a result of a Disposition of Sale Assets in accordance with the Sale Milestones or otherwise consented to in writing by the DIP Lender);

(f)    Prepetition Claims. The Debtors shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any Prepetition claim in excess of $100,000 in the aggregate other than (x) as provided for in the "first day" and "second day" orders and included in the Budget or (y) otherwise consented to by the DIP Lender in writing; (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $50,000 in the aggregate; or (iii) except as provided in the DIP Orders with respect to the Prepetition Lender, approving any settlement or other stipulation in excess of $50,000 in the aggregate not approved by the DIP Lender and not included in the Budget with any secured creditor of the Debtors providing for payments as adequate protection or otherwise to such secured creditor;

(g)    Appointment of Trustee or Examiner.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Credit Party shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under section 1104 of the Bankruptcy Code or (ii) an examiner with enlarged powers (powers beyond those set forth sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(h)     Dismissal of Chapter 11.  An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the DIP Loan Commitment and indefeasible payment in full in cash of all DIP Obligations prior to the effective date of such dismissal, or any Credit Party files a motion or other pleading seeking or supporting entry of any such order;

(i)     Conversion of Chapter 11. The conversion of any of the Chapter 11 Cases from one under chapter 11 of the Bankruptcy Code to one under chapter 7 of the Bankruptcy Code, or if any Credit Party files a motion or other pleading seeking or supporting the conversion of any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(j)     Certain Motions with Respect to Chapter 11 Cases. The bringing of a motion or application by any of the Debtors in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases without the express prior written consent of the DIP Lender (i) to obtain additional Postpetition financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the indefeasible payment in full in cash of all DIP Obligations to the DIP Lender immediately upon the consummation of such financing; (ii) to revoke, reverse, stay, modify, supplement, or amend any of the DIP Orders in a manner inconsistent with this Agreement or the other DIP Loan Documents that is not otherwise consented to by the DIP Lender; (iii) to permit any administrative expense or claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Debtors equal or superior to the priority of the DIP Loans (other than the Carve Out or adequate protection provided to the Prepetition Lender in the DIP Orders); or (iv) to grant or permit the grant of a Lien on the DIP Collateral (other than applicable Permitted Liens) that is senior to the DIP Liens;

(k)     Application for Order by Third Party. An application for any of the orders described in clauses (f), (g), or (h) of this section shall be made by a Person other than the Debtors and such application is not contested by the Debtors in good faith or any Person obtains a non-appealable final order charging any of the DIP Collateral under section 506(c) of the Bankruptcy Code against the DIP Lender or the Prepetition Lender or obtains a final order adverse to the DIP Lender or the Prepetition Lender;

(l)     DIP Orders or DIP Loan Documents Impaired.  At any time after the execution and delivery thereof, (i) this Agreement, the DIP Orders or any DIP Loan Document ceases to be in full force and effect (other than by reason of a release of DIP Collateral in satisfaction in full of the DIP Obligations in accordance with the terms hereof) or shall be declared null and void, or the DIP Lender shall not have or shall cease to have a valid and perfected DIP Liens, subject only to the Carve Out and applicable Permitted Liens, in any of the DIP Collateral, (ii) any Credit Party shall contest the validity or enforceability of any DIP Order or DIP Loan Document in writing or deny in writing that it has any further liability under any DIP Order or DIP Loan Document to which it is a party, or (iii) any order is entered by the Bankruptcy Court staying, reversing, vacating or otherwise modifying, without the DIP Lender's consent, the DIP Orders, this Agreement or any of the other DIP Loan Documents;

31

(m)    <u>Liens or Superpriority Claims</u>. Any superpriority administrative expense claim or Lien (other than the Carve Out or applicable Permitted Liens) that is *pari passu* with or senior to the DIP Liens and/or claims of the DIP Lender in connection with the DIP Loans shall have arisen or be authorized or allowed;

(n)    <u>Ownership of Assets</u>.  Any order of the Bankruptcy Court is entered determining that (i) any of the Sale Assets are not property of the Debtors' bankruptcy estates, (ii) the Sale Assets are not capable of being sold pursuant to Section 363 of the Bankruptcy Code or (iii) any of the Sale Assets cannot be sold free and clear of a Lien or other encumbrance thereon;

(o)    <u>Cash Collateral; Adequate Protection</u>. Any order of the Bankruptcy Court is entered denying or terminating the use of cash collateral by the Debtors, or the Debtors make payment of or grant adequate protection with respect to prepetition debt (other than as approved by the DIP Lender and the Bankruptcy Court or as otherwise contemplated by the DIP Loan Documents);

(p)    <u>Challenges</u>.  The challenge by any Debtor to the validity, extent, perfection or priority of any liens granted under or obligations arising under the Prepetition Credit Agreement;

(q)    <u>Right to File Chapter 11 Plan</u>.  (i) The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of the Debtors to file a plan of reorganization with respect to any Credit Party pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender, or (ii) the filing of a motion seeking to terminate or modify the exclusive right of the Debtors to file a plan of reorganization unless actively contested by the Debtors;

(r)    <u>Filing of Chapter 11 Plan</u>.  The filing of any plan of reorganization or liquidation or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Credit Party, unless such plan and disclosure statement provide for the indefeasible payment in full in cash, on or before the earlier of the effective date of such plan and the Maturity Date, of all DIP Obligations and all obligations under the Prepetition Credit Agreements (including cash collateralization of all Existing Prepetition LCs and contingent exposure) (the "<u>Approved Plan</u>");

(s)    <u>Approval of Disclosure Statement and Plan</u>. The entry of an order in any of the Chapter 11 Cases approving a disclosure statement in respect of a plan other than an Approved Plan, or the entry of an order confirming a plan of reorganization or liquidation other than the Approved Plan;

(t)    <u>Right to Credit Bid</u>. (i) The Debtors file a motion or application seeking, or the entry of an order precluding the DIP Lender (or its designee) from having the right to or being permitted to "credit bid" any amount of the obligations outstanding under the Prepetition Credit Agreements with respect to the assets of any of the Debtors, or (ii) the Bankruptcy Court enters an order prohibiting, restricting, precluding, or otherwise impairing the unqualified right of the DIP Lender (or its designee) from having the right to

32

or being permitted to "credit bid" any amount of the obligations outstanding under the Prepetition Credit Agreements, with respect to the assets of any of the Debtors;

(u)    Relief from Automatic Stay.  The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (other than the DIP Lender) (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Credit Party with a value in excess of $25,000, or (ii) to permit other actions that the DIP Lender may, in its reasonable discretion, deem to have a Material Adverse Effect;

(v)    Judgments.  Any final judgments for the payment of money which are in the aggregate in excess of $100,000 (to the extent not covered by insurance) as to any Postpetition obligation shall be rendered against any Credit Party and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants);

(w)    Weekly Projections. Any Weekly Projection reflects, for any week prior to the week ending August 21, 2026, a negative cash balance at the end of such week exclusive of funds in the Professional Fee Escrow Account (as defined in the DIP Orders); or

(x)    Permitted Variances. The Credit Parties fail to comply with the Budget subject to the Permitted Variances.

Section 9.2    Remedies.  Immediately upon the occurrence and continuation of an Event of Default and subject to any contrary provision in the DIP Orders, the DIP Lender may (without further notice or grace period, unless required by applicable law) take any or all of the following actions without further notice (other than the Enforcement Notice, as defined below), motion or application to, order of or hearing before the Bankruptcy Court:

(a)    (i) declare all DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party and (ii) terminate the Credit Parties' use of cash collateral;

(b)    following the delivery of five (5) days' prior written notice by counsel for the DIP Lender, which may be by email (such period, the "Notice Period" and such notice, the "Enforcement Notice"), to the Debtors' lead restructuring counsel, the U.S. Trustee, lead restructuring counsel to the Prepetition Lender, and lead counsel to the Committee (if any), terminate, reduce, or restrict the DIP Commitment and/or cease making DIP Loan advances to the DIP Borrower, but without affecting any of the DIP Obligations, the DIP Liens, or the DIP Superpriority Claim status; provided, that no further notice or order of the Bankruptcy Court shall be required prior to the exercise of any and all rights and remedies provided for in this Agreement, the DIP Loan Documents, the Prepetition Credit Agreements or at law;

(c)    in addition to the foregoing, upon the occurrence of an Event of Default, the DIP Lender may, subject to the DIP Orders, (i) exercise any right of counterclaim, setoff, banker's lien or otherwise which it may have with respect to money or property of the

33

Credit Parties, (ii) bring any lawsuit, action or other proceeding permitted by law for the specific performance of, or injunction against any violation of, any DIP Loan Document and may exercise any power granted under or to recover judgment under any DIP Loan Document, and (iii) exercise any other right or remedy permitted or otherwise available to the DIP Lender, at law, in equity or otherwise, including realizing on the DIP Collateral; and

(d)      take any other actions or exercise any other rights or remedies permitted under this Interim DIP Order or the Final DIP Order, as applicable, this Agreement or any of the DIP Loan Documents, or applicable law to effectuate the repayment of the DIP Obligations.

Section 9.3      Remedies Cumulative.  No remedy herein conferred for the benefit of the DIP Lender is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

ARTICLE X
CERTAIN BANKRUPTCY MATTERS

Section 10.1      Marshalling, Waiver of 506(c) Claims and Waiver of Equities. Subject to entry of the Final DIP Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, and all proceeds thereof shall be received and used in accordance with the Interim DIP Order and the Final DIP Order.  Subject to the entry of the Final DIP Order, the DIP Lender shall (i) be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the DIP Lender with respect to proceeds, products, offspring, or profits of any of the DIP Collateral, and (ii) not be subject to any surcharge claim under sections 506(c) or 105(a) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral and no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Lender or any of its claims or Liens, and the Credit Parties hereby irrevocably waive any such claims.

Section 10.2      Credit Bidding.  Subject to entry of the Final DIP Order, the DIP Lender shall have the right pursuant to section 363(k) to credit bid up to and including the full amount of the DIP Obligations, including without limitation any or all outstanding principal and any or all accrued interest, fees and expenses thereunder, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. Any such credit bid may provide for the assignment of the right to purchase the acquired assets to a sub-agent or a newly formed acquisition vehicle.

Section 10.3      Lien Validation and Perfection.  All Liens authorized and granted pursuant to the Interim DIP Order or the Final DIP Order entered by the Bankruptcy Court

approving the DIP Loans protection shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.

Section 10.4    Bankruptcy Court Filings.    At least twenty-four (24) hours in advance of filing with the Bankruptcy Court, the Debtors shall furnish to the DIP Lender all of the following, which shall be in form and substance reasonably acceptable to the DIP Lender in all respects:

(a)    the "first-day" pleadings and all orders sought pursuant thereto;

(b)    the motion seeking approval of and proposed forms of the Interim DIP Order and the Final DIP Order;

(c)    the Bid Procedures Motion and Bid Procedures Order;

(d)    all other proposed orders and pleadings related to this Agreement, the other DIP Loan Documents, the completion of any Sale Milestone, and the DIP Facility;

(e)    any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

(f)    any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods set forth in section 1121 of the Bankruptcy Code; and

(g)    any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive plan or severance plan, the assumption, rejection, modification or amendment of any material contract.

Section 10.5    Carve Out.    Subject to entry of the Interim DIP Order and Final DIP Order, the Liens and claims granted to the DIP Lender and any adequate protection obligations provided for in this Agreement, the Interim DIP Order or the Final DIP Order are all subject to the Carve Out.

Section 10.6    Sale Process.    The Debtors shall achieve each of the following milestones (as the same may be extended from time to time with the consent of the DIP Lender, the "Sale Milestones"), in each case on terms and conditions, and subject to documentation in form and substance, reasonably acceptable to the DIP Lender in all respects:

(a)    Prior to the first day hearing but within three (3) days after the Petition Date, file a motion with the Bankruptcy Court seeking (i) approval of bid procedures for the sale of all of the assets of the Debtors on a going-concern or liquidation basis (the "Sale Assets") in accordance with the Sale Milestones (the "Bid Procedures"), which Bid Procedures shall specify that acceptable bids must (x) contemplate minimum net cash proceeds from the initial payment thereunder in an amount sufficient to repay in full the obligations under the Prepetition Credit Agreements and the DIP Loan Documents (including cash collateralization of all Existing Prepetition LCs and contingent exposure), (y) be on terms and conditions acceptable to the DIP Lender, and (z) provide customary information and

35

consultation rights to the Prepetition Lender and DIP Lender; and (ii) approval of the sale of the Sale Assets. Such motion, Bid Procedures and proposed bidding procedures and sale orders to be in form and substance reasonably satisfactory to the DIP Lender;

(b)      On or before 24 days after the Petition Date, the Bankruptcy Court shall have entered the Bid Procedures Order on a final basis, which order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated, rescinded or subject to a presently effective stay pending appeal;

(c)      On or before 60 days after the Petition Date, receive going-concern bids for the sale of the Sale Assets, copies of which shall be provided to the DIP Lender and Prepetition Lender within one day of receipt, and determine which bids shall be acceptable to the Debtors, the DIP Lender and the Prepetition Lender;

(d)      On or before 70 days after the Petition Date, hold an auction for the sale of the Sale Assets on a going-concern basis and declare a winning bid or bidders thereof, which shall (i) provide for minimum net cash proceeds in an amount sufficient to repay in full the obligations under the Prepetition Credit Agreements and the DIP Loan Documents (including cash collateralization of all Existing Prepetition LCs and contingent exposure) and the TATA Liquidity Advance, and (ii) otherwise be in form and substance reasonably acceptable to the DIP Lender (collectively, the "Winning Bid");

(e)      On or before 73 days after the Petition Date, the Bankruptcy Court holds a hearing in respect of the approval of the sale of the Sale Assets pursuant to the Winning Bid;

(f)      On or before 90 days after the Petition Date, consummate the sale of the Sale Assets, with sufficient net cash proceeds in an amount sufficient to repay in full in cash all obligations under the Prepetition Credit Agreements and the DIP Loan Documents (including cash collateralization of all Existing Prepetition LCs and contingent exposure) and the TATA Liquidity Advance.

Section 10.7   DIP Milestones.  The Debtors shall achieve each of the following milestones (as the same may be extended from time to time with the consent of the DIP Lender, the "DIP Milestones"), in each case on terms and conditions, and subject to documentation in form and substance, reasonably acceptable to the DIP Lender in all respects:

(a)      on the Petition Date, the Debtors shall file a motion seeking approval of the DIP Loans and use of the Prepetition Lender's cash collateral;

(b)      on or before three (3) days after the Petition Date, the Interim DIP Order shall have been entered by the Bankruptcy Court; and

(c)      on or before twenty-eight (28) days after the Petition Date, the Final DIP Order shall have been entered by the Bankruptcy Court.

Section 10.8   Other Milestones. The Debtors shall achieve each of the following milestones (as the same may be extended from time to time with the consent of the DIP Lender,

the "Other Milestones"), in each case on terms and conditions, and subject to documentation in form and substance, reasonably acceptable to the DIP Lender in all respects:

       (a)     on or before the date of entry of the Interim DIP Order, the TATA Interim Order, approving an interim advance of $7 million under that facility, shall have been entered by the Bankruptcy Court;

       (b)     on or before the date of entry of the Final DIP Order, the TATA Final Order Approving $20M TATA Liquidity Advance Facility, approving a final advance of the remaining $13 million under that facility, shall have been entered by the Bankruptcy Court;

       (c)     on or before eighty (80) days after the Petition Date, the DIP Borrower shall file a plan of reorganization and related disclosure statement, each in form and substance reasonably acceptable to the DIP Lender, and shall have obtained all authorizations, consents, regulatory approvals, rulings, waivers or other documents that are necessary to implement and effectuate such plan of reorganization;

       (d)     on or before one hundred twenty (120) days after the Petition Date, the Bankruptcy Court shall enter the order approving the disclosure statement and confirming the plan of reorganization, in form and substance reasonably acceptable to the DIP Lender; and

       (e)     the effective date of the plan of reorganization shall occur by one hundred twenty-seven (127) days after the Petition Date.

ARTICLE XI
MISCELLANEOUS

Section 11.1   Amendments and Waivers.  No amendment, modification, termination (other than pursuant to the express terms of the DIP Loan Documents) or waiver of any provision of the DIP Loan Documents, or consent to any departure by any Credit Party therefrom, shall be effective without the written consent of all Parties hereto.

Section 11.2   Notices.  All notices, requests, demands and other communications to any party or given under any DIP Loan Document (collectively, the "Notices") will be in writing and delivered personally, by overnight courier or by registered mail to the parties at the following address or sent by electronic transmission (provided that notices or other communications sent by electronic transmission shall be deemed to have been given went sent, provided that if not given during normal business hours of the recipient, such notice or other communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient), to the address specified below (or at such other address as will be specified by a party by like notice given at least five calendar days prior thereto):

       (a)     If to the DIP Borrower or any other Credit Party, at:

            Searles Valley Minerals Inc.
            Attn: Dennis Cruise, President
            9401 Indian Creek Parkway, Suite 1000

37

Overland Park, Kansas 66210
Email: cruise@svminerals.com

with a copy to (which shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
320 South Canal Street
Chicago, Illinois 60606
Attention: James J Mazza
Email: james.mazza@skadden.com

(b)      If to DIP Lender:

Karnavati Holdings, Inc.
Attn: Ajay Khushu, General Counsel
Nirma House, Ashram Road
Ahmedabad-Gujarat, India 38009
Email: ajaykhushu@nirma.co.in

with a copy to (which shall not constitute notice):

Troutman Pepper Locke LLP
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19801
Attention: David Fournier
Email: david.fournier@troutman.com

All Notices will be deemed delivered when actually received.  Each of the parties will hereafter notify the other in accordance with this Section of any change of address or email address to which notice is required to be mailed.

Section 11.3   Expenses.  Whether or not the transactions contemplated hereby shall be consummated or any DIP Loans shall be made, the Debtors agree to pay promptly, subject to the DIP Orders and the Budget (but no later than the Termination Date)

(a)      all of the actual, documented, and reasonable, out-of-pocket costs and expenses of the DIP Lender (including, without limitation, legal, financial advisor, appraisal, and valuation-related fees and expenses), whether incurred prior to or after the Petition Date, including without limitation those incurred in connection with the preparation, negotiation, documentation, court approval, administration and enforcement of the DIP Loans, this Agreement and the other DIP Loan Documents (including, without limitation, any consents, amendments, waivers or other modifications thereto), monitoring of and participation in the Chapter 11 Cases, and protection of the DIP Lender's interest in the DIP Collateral;

(b)      all of the actual, documented, and reasonable, out-of-pocket costs and expenses of creating and perfecting Liens in favor of the DIP Lender pursuant hereto,

including without limitation, filing and recording fees, expenses, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements;

(c)    all of the actual, documented, and reasonable, out-of-pocket costs and expenses of the DIP Lender (including, without limitation, fees and disbursements of counsel, including local counsel, and financial and accounting advisors) incurred in connection with any litigation, contest, dispute, suit, proceeding or action (whether instituted by the DIP Lender, the Credit Parties or any other Person) in any way relating to this Agreement or the other DIP Loan Documents; and

(d)    upon the occurrence of an Event of Default, all the actual, documented, and reasonable, out-of-pocket costs and fees, expenses and disbursements of any attorneys, auditors, accountants, consultants, appraisers, advisors and agents employed or retained by the DIP Lender, in connection with the inspection, verification, custody or preservation of any of the DIP Collateral, to the extent required or permitted hereunder.

Section 11.4    Enforceability; Successors and Assigns. This Agreement will be binding upon and inure to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto.  No Credit Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other DIP Loan Document without the prior written consent of the  DIP Lender.  The DIP Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement and the other DIP Loan Documents; provided, that so long as no Event of Default shall exist, the DIP Borrower shall have consented to such assignment (provided, further, that no such consent to assignment shall be required in connection with an assignment to an Affiliate of the DIP Lender).  Any assignment or attempted assignment in contravention of this Section will be void ab initio and will not relieve the assigning party of any obligation under this Agreement.

Section 11.5    Integration.  This Agreement and the other DIP Loan Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto.

Section 11.6    No Waiver; Remedies.  No failure or delay by any party in exercising any right, power or privilege under this Agreement or any of the other DIP Loan Documents will operate as a waiver of such right, power or privilege.  A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power or privilege.  The rights and remedies provided in the DIP Loan Documents will be cumulative and not exclusive of any rights or remedies provided by law.

Section 11.7    [Reserved].

Section 11.8    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this

Agreement by facsimile or other electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 11.9    Governing Law; Submission to Jurisdiction; Venue.

(a)    SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE OTHER DIP LOAN DOCUMENTS, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAWS RULES AND PRINCIPLES THEREUNDER) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT.  IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THEN IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, EACH PARTY HERETO HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HERETO HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACKS PERSONAL JURISDICTION OVER SUCH PARTY, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT BROUGHT IN THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY.  EACH PARTY FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AND IN THE MANNER SET FORTH IN SECTION 10.2 HEREOF. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER DIP LOAN DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE DIP LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY CREDIT PARTY IN ANY OTHER JURISDICTION.

(b)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (A) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURTS HAVE BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    THE BANKRUPTCY COURT SHALL RETAIN EXCLUSIVE JURISDICTION WITH RESPECT TO ALL MATTERS RELATING TO THE EXERCISE OF RIGHTS AND REMEDIES OF THE DIP LENDER HEREUNDER, WITH RESPECT TO THE CREDIT PARTIES, UNDER THE DIP ORDERS, OR WITH RESPECT TO THE DIP COLLATERAL; *PROVIDED* THAT THE CREDIT PARTIES MAY SEEK RELIEF FROM THE BANKRUPTCY COURT SOLELY REGARDING THE QUESTION WHETHER AN EVENT OF DEFAULT HAS OCCURRED OR IS CONTINUING.

**Section 11.10 Waiver of Jury.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, DIP LENDER, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 11.11 Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 11.12 Survival.  All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement or the other DIP Loan Documents shall survive (a) the making of the DIP Loans and the payment of the DIP Obligations and (b) the performance, observance and compliance with the covenants, terms and conditions, express or

41

implied, of all DIP Loan Documents, until the due and punctual (i) indefeasible payment of the DIP Obligations and (ii) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Loan Documents; *provided*, *however*, that the provisions of <u>ARTICLE VIII</u> and <u>Section 11.3</u> shall survive (x) indefeasible payment of the DIP Obligations and (y) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Loan Documents.

Section 11.13  <u>Maximum Lawful Interest</u>.  Notwithstanding anything to the contrary contained herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement or any other DIP Loan Document exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  The Parties, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and other charges for the use of money and manner of payment stated within it; *provided*, *however*, that, anything contained herein to the contrary notwithstanding, if the amount of such interest and other charges for the use of money or manner of payment exceeds the maximum amount allowable under applicable law, then, <u>ipso</u> <u>facto</u> as of the Closing Date, the DIP Lender shall only be entitled to payment of such maximum as allowed by law, and payment received from any Credit Party in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the DIP Loans to the extent of such excess.

Section 11.14  <u>Interpretation</u>.  As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate.  Unless otherwise expressly provided in this Agreement (a) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement and (b) article, section, subsection, and schedule references are references with respect to this Agreement unless otherwise specified.  Unless the context otherwise requires, the term "including" will mean "including, without limitation."  The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.

Section 11.15  <u>Ambiguities</u>.  This Agreement and the other DIP Loan Documents were negotiated between legal counsel for the parties and any ambiguity in this Agreement or the other DIP Loan Documents shall not be construed against the party who drafted this Agreement or such other DIP Loan Documents.

[Reserved].

Section 11.17  <u>Conflicting Provisions in DIP Loan Documents</u>.  In the event that any provisions of this Agreement conflict with any DIP Loan Document, the provisions of this Agreement shall govern. In the event that any provisions of this Agreement conflict with DIP Orders, the provisions of DIP Orders shall govern.

Section 11.18  <u>Modifications</u>.  Except as specifically contemplated in the DIP Orders, the administrative priorities and other rights and remedies granted to the DIP Lender pursuant to this

42

Agreement and the DIP Orders shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Credit Parties (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Cases, or by any other act or omission whatsoever (other than in connection with any asset disposition permitted hereunder).  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission, except for the Carve Out and Permitted Liens having priority over the DIP Obligations, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the DIP Lender against any Credit Party in respect of any DIP Obligation.

Section 11.19  Release.  The Credit Parties hereby acknowledge that, effective upon entry of the Interim DIP Order and as of such date, the Credit Parties have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that may be asserted to reduce or eliminate all of any part of the Credit Parties' liability to repay the DIP Lender. Effective upon entry of the Interim DIP Order, the Credit Parties hereby fully, finally and forever release and discharge the DIP Lender and each of its officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them, each solely in their capacity as such (collectively, the "Released Parties"), of and from any and all actions, causes of action, demands, suits, claims, liabilities, liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, arising prior to the Petition Date, whether in law, equity or otherwise (including, without limitation, those arising under sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or relating to the DIP Loan Documents and the DIP Orders; *provided* that the foregoing shall not release any claims against a Released Party that a court of competent jurisdiction determines, pursuant to a final, non-appealable order, results primarily from the gross negligence, bad faith or willful misconduct of such Released Party.

ARTICLE XII
GUARANTEE

Section 12.1   Guarantee. Subject to the DIP Orders, each DIP Guarantor unconditionally guarantees, jointly with the other DIP Guarantors and severally, to the DIP Lender as a primary obligor and not merely as a surety, the due and punctual payment and performance of the DIP Obligations. Each DIP Guarantor further agrees that the DIP Obligations may be extended or renewed, in whole or in part, or amended or modified, in each case, in accordance with the terms of the DIP Loan Documents, without notice to or further assent from such DIP Guarantor, and that such DIP Guarantor will remain bound upon its guarantee hereunder notwithstanding any extension or renewal, or amendment or modification, of any DIP Obligation.  Each DIP Guarantor waives promptness, presentment to, demand of payment from and protest to the DIP Borrower or any other Credit Party of any of the DIP Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment.

Section 12.2    <u>Guarantee of Payment and Performance; Continuing Guarantee</u>. Each DIP Guarantor further agrees that its guarantee hereunder constitutes a guarantee of payment and performance when due (whether at the stated maturity, by acceleration or otherwise) and not merely of collection, and waives any right to require that any resort be had by the DIP Lender to any security held for the payment of any of the DIP Obligations or to any balance of any deposit account or credit on the books of the DIP Lender in favor of any Credit Party or any other person. The obligations of each DIP Guarantor hereunder are independent of the obligations of the DIP Borrower or any other DIP Guarantor, and a separate action or actions may be brought and prosecuted against each DIP Guarantor whether or not action is brought against the DIP Borrower or any other DIP Guarantor and whether or not the DIP Borrower or any other DIP Guarantor is joined in any such action or actions. Each DIP Guarantor agrees that its guarantee hereunder is continuing in nature and applies to all of the DIP Obligations, whether currently existing or hereafter incurred.

Section 12.3    <u>No Limitations, Etc</u>.

(a)    Except for termination of a DIP Guarantor's obligations hereunder as expressly provided for in this Agreement, the obligations of each DIP Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the DIP Obligations, any impossibility in the performance of any of the DIP Obligations or otherwise. Without limiting the generality of the foregoing, except for termination or release of a DIP Guarantor's obligations hereunder in accordance with the terms of this Agreement (but without prejudice to Section 12.4), the obligations of each DIP Guarantor hereunder, to the fullest extent permitted by applicable law, shall not be discharged or impaired or otherwise affected by, and each DIP Guarantor hereby waives any defense to the enforcement hereof by reason of:

(i)    the failure of DIP Lender to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any DIP Loan Document or otherwise;

(ii)    any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, any DIP Loan Document or any other agreement, including with respect to any other DIP Guarantor under this Agreement;

(iii)    the failure to perfect any security interest in, or the impairment of or the release of, any of the DIP Collateral held by or on behalf of the DIP Lender for the DIP Obligations;

(iv)    any default, failure or delay, willful or otherwise, in the performance of the DIP Obligations;

44

(v)     any other act or omission that may in any manner or to any extent vary the risk of any DIP Guarantor or otherwise operate as a discharge of any DIP Guarantor as a matter of law or equity;

(vi)    any illegality, lack of validity or enforceability of any DIP Obligation or any DIP Loan Document;

(vii)   any change in the corporate existence, structure or ownership of any Credit Party, or any insolvency, bankruptcy, reorganization or similar proceeding affecting any Credit Party or its assets or any resulting release or discharge of any of the DIP Obligations;

(viii)  the existence of any claim, set-off or other rights that any DIP Guarantor may have at any time against the DIP Borrower, the DIP Lender, or any other person, whether in connection herewith, the other DIP Loan Documents or any unrelated transactions;

(ix)    this Agreement having been determined (on whatsoever grounds) to be invalid, non-binding or unenforceable against any other DIP Guarantor *ab initio* or at any time after the Closing Date;

(x)     the fact that any person that, pursuant to the DIP Loan Documents, was required to become a party hereto may not have executed or is not effectually bound by this Agreement, whether or not this fact is known to the DIP Lender;

(xi)    any action permitted or authorized hereunder;

(xii)   any other circumstance (including any statute of limitations) or any act or omission that may in any manner or to any extent vary the risk of any DIP Guarantor or otherwise operate as a defense to, or a legal or equitable discharge of, the DIP Borrower or any DIP Guarantor or any other guarantor or surety (other than the payment in full in cash or immediately available funds of the DIP Obligations (without prejudice to Section 12.4)); or

(xiii)  any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the DIP Borrower, any other DIP Guarantor or any other person under any DIP Loan Document, by operation of law or otherwise.

Each DIP Guarantor expressly authorizes the DIP Lender to take and hold security for the payment and performance of the DIP Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their reasonable discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the DIP Obligations or take any other actions permitted by the DIP Loan Documents, all without affecting the obligations of any DIP Guarantor hereunder.

(b)     To the fullest extent permitted by applicable law and except for termination or release of a DIP Guarantor's obligations hereunder in accordance with the terms of this

45

Agreement (but without prejudice to Section 12.4), each DIP Guarantor waives any defense based on or arising out of any defense of any other Credit Party or the unenforceability of the DIP Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Credit Party.  The DIP Lender may, at its election, exercise any right or remedy available to them against any other Credit Party pursuant to this Agreement or the other DIP Loan Documents, without affecting or impairing in any way the liability of any DIP Guarantor hereunder except to the extent that after giving effect thereto all DIP Obligations have been terminated and paid in full (but without prejudice to Section 12.4).  To the fullest extent permitted by applicable law, each DIP Guarantor waives any defense arising out of any such election or exercise by DIP Lender though such election or exercise operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such DIP Guarantor against any other Credit Party, or any security, including, without limitation, the DIP Collateral. To the fullest extent permitted by applicable law, each DIP Guarantor waives any all suretyship defenses.

Section 12.4    Reinstatement. Each DIP Guarantor agrees that its guarantee hereunder shall continue to be effective or be reinstated, as the case may be, if, at any time payment, or any part thereof, of any DIP Obligation is rescinded or must otherwise be restored by the DIP Lender upon the bankruptcy or reorganization (or analogous proceeding in any jurisdiction) of the DIP Borrower or any other Credit Party or otherwise. The provisions of this Section 12.4 shall survive the termination of this Agreement.

Section 12.5    Agreement To Pay; Contribution; Subrogation. In furtherance of the foregoing and not in limitation of any other right that the DIP Lender has at law or in equity against any DIP Guarantor by virtue hereof, upon the failure of any Credit Party to pay any DIP Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each DIP Guarantor hereby promises to and will forthwith pay, or cause to be paid, to the DIP Lender in cash or other immediately available funds the amount of such unpaid DIP Obligation. Subject to the foregoing, to the extent that any DIP Guarantor shall, under this Agreement as a joint and several obligor, repay any of the DIP Obligations constituting DIP Loans or other advances made to or reimbursement obligations owed by another Credit Party under this Agreement (an "Accommodation Payment"), then the DIP Guarantor making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other DIP Guarantors in an amount equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other DIP Guarantor's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the DIP Guarantors; provided that such rights of contribution and indemnification shall be subordinated to the discharge of DIP Obligations. As of any date of determination, the "Allocable Amount" of each DIP Guarantor shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such DIP Guarantor hereunder and under this Agreement without (a) rendering such DIP Guarantor "insolvent" within the meaning of section 101(31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such DIP Guarantor with unreasonably small capital or assets, within the meaning of section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such DIP Guarantor unable to pay its debts as they become due within the meaning of section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

46

Section 12.6    Information. Each DIP Guarantor assumes all responsibility for being and keeping itself informed of the financial condition and assets of the DIP Borrower and each other Credit Party and of all other circumstances bearing upon the risk of nonpayment of the DIP Obligations and the nature, scope and extent of the risks that such DIP Guarantor assumes and incurs hereunder, and agrees that DIP Lender will not have any duty or obligation to advise such DIP Guarantor of information known to it or any of them regarding such circumstances or risks.

Section 12.7    Maximum Liability. Each DIP Guarantor, and by its acceptance of this guarantee, DIP Lender confirms that it is the intention of all such persons that this guarantee and the DIP Obligations of each DIP Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, the UFCA, the UFTA or any similar foreign, federal or state law to the extent applicable to this guarantee and the DIP Obligations of each DIP Guarantor hereunder. To effectuate the foregoing intention, the DIP Lender and the DIP Guarantors hereby irrevocably agree that the DIP Obligations of DIP Guarantor under this guarantee at any time shall be limited to the maximum amount as will result in the Obligations of such DIP Guarantor under this guarantee not being void or voidable under applicable law, including under Section 548 of the Bankruptcy Code or any comparable provisions under any other applicable law.

*[Remainder of Page Intentionally Left Blank; Signatures on Following Pages]*

47

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective representatives thereunto duly authorized as of the date first written above.

**DIP BORROWER:**

SEARLES VALLEY MINERALS INC.,
a Delaware corporation

By: _Dennis Cruise_
      34BFA7C0B46949A...
Name: Dennis Cruise
Title: President

**DIP GUARANTORS:**

SEARLES DOMESTIC WATER COMPANY LLC,
a Delaware limited liability company

By: _Dennis Cruise_
      34BFA7C0B46949A...
Name: Dennis Cruise
Title: President

TRONA RAILWAY COMPANY LLC,
a Delaware limited liability company

By: _Dennis Cruise_
      34BFA7C0B46949A...
Name: Dennis Cruise
Title: President

Signature page to DIP Credit Agreement

**DIP LENDER:**

KARNAVATI HOLDINGS, INC.,
a Delaware corporation

By: _____

Name: MANAN SHAH

Title: DIRECTOR

Signature page to DIP Credit Agreement

## EXHIBIT A

Budget

**[See Exhibit 1 to Interim DIP Order]**

**<u>EXHIBIT B</u>**

Interim DIP Order

**[See Interim DIP Order]**

# EXHIBIT C

Delivery of Product to DIP Lender

## Exhibit C

## VBOR Deliveries

 SVM shall ship to Nirma Limited or another designee of DIP Lender, (i) during June, 2026, not less than 100 metric tons of VBOR, (ii) during July, 2026, between 300 metric tons and 450 metric tons of VBOR, and (iii) during each calendar month thereafter between 350 Metric Tons and 450 metric tons of VBOR, until SVM shall have shipped a total of 3,300 metric tons of VBOR to Nirma Limited or another designee of DIP Lender, in each case as partial satisfaction of balance of payment advances made by Nirma to SVM.  Actual volumes provided and delivered within the ranges below will vary depending on SVM's actual production volumes and possible logistical issues.  The weekly schedule below is only an estimate of actual deliveries and could vary during the course of the bankruptcy case:

| Week Ending | Delivery Volume of VBOR |
| --- | --- |
| June 20, 2026 | 0 |
| June 27, 2026 | 50 -100 Metric Tons |
| July 4, 2026 | 75-150 Metric Tons |
| July 11, 2026 | 75-150 Metric Tons |
| July 18, 2026 | 75-125 Metric Tons |
| July 25, 2026 | 75-150 Metric Tons |
| August 1, 2026 | 75-150 Metric Tons |
| August 8, 2026 | 85-150 Metric Tons |
| August 15, 2026 | 85-150 Metric Tons |
| August 22, 2026 | 85-150 Metric Tons |
| August 29, 2026 | 85-150 Metric Tons |
| September 5, 2026 | 100-150 Metric Tons |
| September 12, 2026 | 100-150 Metric Tons |
| September 19, 2026 | 100-150 Metric Tons |