**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

_____

|  |  |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| SEARLES VALLEY MINERALS | ) |
| INC., *et al.*, | ) Case No. 26-10966 (BLS) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Re:  Docket Nos. 10, 48 |
| | ) |
| | ) Obj. Deadline: 6/30/26 at 4:00 p.m. |
| | ) Hearing Date: 7/7/26 at 10:00 a.m. |
| | ) |

_____

**OBJECTION OF CONSTELLATION NEWENERGY – GAS DIVISION, LLC AND
SOUTHERN CALIFORNIA EDISON COMPANY TO THE MOTION OF DEBTORS FOR
ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING DEBTORS'
PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT; (II)ESTABLISHING
PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY COMPANIES; (III)
PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR
DISCONTINUING SERVICE; AND GRANTING RELATED RELIEF**

Constellation NewEnergy – Gas Division, LLC ("CNEG") and

Southern California Edison Company ("SCE") (collectively, the

("Utilities"), hereby object to the *Motion of Debtors For Entry*

*of Interim and Final Orders (I) Approving Debtors' Proposed Form*

*of Adequate Assurance of Payment; (II) Establishing Procedures*

*For Resolving Objections By Utility Companies; (III) Prohibiting*

*Utility Companies From Altering, Refusing, or Discontinuing*

*Service; and (IV) Granting Related Relief* (the "Utility

Motion")(Docket No. 10), and set forth the following:

## Introduction

The Debtors' Utility Motion improperly seeks to shift the

Debtors' obligations under Section 366(c)(3) of the Bankruptcy

Code from seeking to modify the amounts of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amounts of the adequate assurance of payment acceptable to the Debtors.  This Court should not permit the Debtors to avoid the plain language and requirements of Section 366(c).

Through the Utility Motion, the Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account containing approximately $1.8 million that supposedly reflects approximately two weeks of utility charges based on the average monthly cost for utility services over the prior three month period (the "Bank Account"). The Utility Company List attached as Schedule "1" to the Interim Utility Order (defined below) reflects the following proposed amounts to be contained in the Bank Account on behalf of the Utilities: (a) CNEG – $523,802; and (b) SCE – $660,670.

This Court should reject the Debtors' proposed Bank Account because: (1) The Utilities bill the Debtors on a monthly basis and provide the Debtors with generous payment terms pursuant to applicable state law, tariffs, regulations and/or contract, such that a supposed two-week account maintained by the Debtors is not sufficient in amount or in form to provide the Utilities with adequate assurance of payment; (2) Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate

assurance of payment in Section 366(c)(1), none of which include a segregated bank account; and (3) Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment for the Utilities (which it should not), this Court should reject it as an insufficient form of adequate assurance of payment for the reasons set forth in Section A.1. of this Objection.

The Utilities are seeking the following two-month cash deposits from the Debtors, which are amounts that they are authorized to obtain pursuant to applicable state law or contract: (a) CNEG - $2,095,200; and (b) SCE - $3,030,675.  Based on of the foregoing, this Court should deny the Utility Motion as to the Utilities because the amounts of the Utilities' post-petition deposit requests are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1.   On June 15, 2026 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

2.    The Debtors' Chapter 11 bankruptcy cases are being jointly administered.

## The Utility Motion

3.    On the Petition Date, the Debtors filed the Utility Motion.

4.    On June 16, 2026, this Court entered the *Interim Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures For Resolving Objections By Utility Companies; (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* (the "Interim Utility Order")(Docket No. 48). The Interim Utility Order set (i) an objection deadline of June 30, 2026 and (ii) the final hearing on the Utility Motion to take place on July 7, 2026 at 10:00 a.m.

5.    The Debtors claim that prior to the Petition Date, they spent approximately $3.6 million each month for utility services.  Utility Motion at ¶ 9.

6.    Through the Utility Motion, the Debtors seek to avoid the applicable legal standards under Bankruptcy Code Sections 366(c)(2) and (3) by seeking Court approval for their own proposed form of adequate assurance of payment, which is the Bank Account containing approximately $1.8 million that supposedly reflects approximately two weeks of utility charges based on the average monthly cost for utility services over the

4

three month period prior to the Petition Date.  Utility Motion at ¶ 10.

7.    The Debtors propose to "place a deposit" equal to approximately two weeks of utility charges into the Bank Account for each utility company, and refer to the Bank Account as the "Utility Deposit Account."  Utility Motion at ¶ 10.  However, monies contained in an escrow account controlled by a customer of a utility such as the proposed Bank Account are not recognized by any state public utility commission as a "cash deposit" provided by a customer to a utility.  Additionally, Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated utility bank account.  Simply put, the Debtors are not proposing to provide any of their utilities with cash deposits as adequate assurance of payment pursuant to Section 366(c) of the Bankruptcy Code.

8.    The proposed Bank Account is not acceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amounts of the security sought by the Utilities under Section 366(c)(2).

9.   The Debtors claim that they intend to timely pay all undisputed post-petition charges owed to the utility companies. Utility Motion at ¶ 11.   However, Section 366(c)(1)(B) expressly provides that an administrative expense priority shall not constitute an assurance of payment.   See also Section 366(c)(3)(B)(iii).

10.   The Debtors propose that they will maintain the Bank account until the earlier of (i) the Court's entry of an order authorizing the return of the monies contained in the Bank Account to the Debtors, or (ii) the effective date of a chapter 11 plan.   Utility Motion at ¶ 14.   The Utilities bill the Debtors in arrears and will likely provide post-petition utility goods/services to the Debtors through the effective date of a plan, meaning that any monies contained in the Bank Account should not be returned to the Debtors until the Debtors confirm that they have paid in full their post-petition utility expenses owed to their utility companies.

11.   The Utility Motion does not address why the Bank Account would be underfunded with supposedly two-weeks of utility charges when the Debtors know that the Utilities are required by applicable state laws, regulations, tariffs or contract to bill the Debtors monthly.   Moreover, the Debtors presumably want the Utilities to continue to bill them monthly and provide them with the same generous payment terms that they

received prepetition.  Accordingly, if the Bank Account is relevant, which the Utilities dispute, and two-week amounts were actually contained in the Bank Account for each of the Utilities, the Debtors need to explain: (A) Why they are only proposing to deposit supposed two-week amounts into the Bank Account; and (B) How such insufficient amounts could even begin to constitute adequate assurance of payment for the Utilities' monthly bills.

12.   Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).  Rather, without providing any specifics, the Utility Motion merely states that "the Utility Deposits to be held in the Utility Deposit Account" constitutes adequate assurance of payment for the Debtors' utility companies.  Utility Motion at ¶ 11.

### The Debtors' Financing Motion

13.   On the Petition Date, the Debtors filed the *Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, (B) Continue To Access Financing Under Its Receivables Facility; and (C) Utilize Cash Collateral; (II) Granting Adequate Protection To the Prepetition Secured Lender; (III) Modifying the Automatic Stay;*

7

*(IV) Scheduling Final Hearing and (V) Granting Related Relief* (the "Financing Motion") (Docket No. 15).

14.   Through the Financing Motion, the Debtors seek Court approval of $20 million of new capital in the form of a parent junior DIP facility to fund a 363 sale process, with $7 million available on an interim basis and up to $13 million available on a final basis.  Financing Motion at ¶ 1.

15.   Also through the Financing Motion, the Debtors seek approval of a carve-out for payments to the Debtors' professionals incurred prior to the delivery of a Carve-Out Trigger Notice, plus an additional $1,050,000 after delivery of a Carve-Out Trigger Notice (the "Carve-Out").  Financing Motion at pages 14-15.

16.   On June 17, 2026, this Court entered the *Interim Order (I) Authorizing the Debtors To (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection To the Prepetition Secured Lender, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Interim Financing Order")(Docket No. 59).

17.   The Interim Financing Order authorized the Debtors to up to $7.5 million in DIP Loans on an Interim Basis.  Interim Financing Order ate page 13.

18.   The Interim Financing Order also approved the Carve-Out.   Interim Financing Order at pages 24-28

19.   Attached as Exhibit "1" to the Interim Financing Order is a 13-week Approved Budget through the week ending September 11, 2026 (the "Budget").   The Budget does not include a line-item for the payment of post-petition utility charges.   As such, it is not apparent from the Budget whether sufficient funds have in fact been budgeted for the timely (and full) payment of the Debtors' post-petition utility charges.

### The Debtors' Critical Vendor Motion

20.   On the Petition Date, the Debtors filed the *Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors To Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* (the "Critical Vendor Motion") (Docket No. 11).   Through the Critical Vendor Motion, the Debtors sought authority to pay Critical Vendor Claims in an amount not to exceed $1.5 million on an interim basis and $2 million on a final basis.   Critical Vendor Motion at ¶ 2.

21.   On June 16, 2026, this Court entered the *Interim Order (I) Authorizing the Debtors To Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* (the "Interim Critical Vendor Order") (Docket No. 49).   The Interim Critical Vendor Order authorized the Debtors to pay Critical Vendor Claims in an amount not to exceed $1.5 million on an interim basis.

Interim Critical Vendor Order at ¶ 2.

22.   The Debtors claim in Paragraph 9 of the Utility Motion that "[t]he Debtors rely on uninterrupted utility services to operate their facilities and ongoing business."  However, the Critical Vendor Motion does not reflect that the Debtors sought Court authority to pay prepetition utility charges.

**The Bid Procedures Motion**

23.   On the Petition Date, the Debtors filed the *Motion of Debtors For Entry of Orders (I) Approving Bidding Procedures For the Sale of Certain or All of the Debtors' Assets; (B) Authorizing the Debtors To Designate One or More Stalking Horse Bidders and To Provide Bid Protections; (C) Approving Assumption and Assignment Procedures; (D) Scheduling a Hearing To Consider Any Proposed Sale; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Bid Procedures Motion")(Docket No. 18).

24.   The Debtors' propose the following dates and deadlines with respect to the Sale process: (i) July 6, 2026 – entry of Bid Procedures Order; (ii) July 7, 2026 – sale notice deadline; (iii) July 10, 2026 – assumption and assignment service deadline and

non-binding letter of intent deadline; (iv) August 6, 2026 – bid deadline; (v) August 13, 2026 – auction; (vi) August 17, 2026 – deadline to enter into and file Successful Bidder Purchase Agreement with a Successful Bidder; (vii) August 18, 2026 – sale objection deadline; (viii) August 19, 2026 – deadline to respond to objection to the sale of the assets to Successful Bidder or Successful Bidders; and (ix) August 20, 2026 – sale hearing. Bid Procedures Motion at ¶ 16.

**Facts Regarding CNEG**

25.   CNEG provides natural gas and related services to the Debtors pursuant to a Master Retail Natural Gas Supply Agreement and related Transaction Confirmation (collectively, the "Gas Agreement") that sets forth the terms and conditions concerning CNEG's provision of natural gas and related services to the Debtors.   CNEG has continued to provide the Debtors with natural gas and related services pursuant to the Gas Agreement since the Petition Date.

26.   Pursuant to the Gas Agreement, the Debtors receive approximately one month of natural gas and related services before CNEG issues a bill.   Once a bill is issued, the Debtors have approximately fifteen (15) days after the date of an invoice to pay the applicable bill.   Accordingly, the Debtors could receive more than two months of natural gas and related services before CNEG could terminate the Gas Agreement after a post-

petition payment default.

27.  The pre-petition debt owed by the Debtors to CNEG is estimated to be not less than $3,488,921.83.  CNEG is requesting a two-month cash deposit of $2,095,200 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Gas Agreement.

## Facts Regarding SCE

28.  SCE provided the Debtors with prepetition utility goods/services and has continued to do so for the Debtors post-petition.  Under SCE's billing cycle, the Debtors receive approximately one month of utility goods and/or services before SCE issues a bill for such charges.  Once a bill is issued, the Debtors have approximately 19 days to pay the applicable bill. If the Debtors fail to timely pay a bill, a past due notice is issued and a late fee may be subsequently imposed on the account.  If the Debtors fail to pay the bill after the issuance of the past due notice, SCE issues a notice that informs the Debtors that they must cure the arrearage within a certain period of time or its service will be disconnected. Accordingly, under SCE's billing cycle, the Debtors could receive approximately two months of unpaid service before SCE could cease the supply of goods and/or services for a post-petition payment default.

29.    In order to avoid the need to bring witnesses and have lengthy testimony regarding SCE's regulated billing cycle, SCE requests that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the SCE billing cycle.    Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the SCE web site link to the tariffs and/or state laws, regulations and/or ordinances obtained at: https://www.sce.com/regulatory/tariff-books

30.    Subject to a reservation of SCE's right to supplement its post-petition deposit request if additional accounts belonging to the Debtors are subsequently identified, SCE requests a two-month cash deposit in the amount of $3,030,675 as adequate assurance of payment pursuant to Section 366(c) of the Bankruptcy Code.

## Discussion

**A.    THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

(3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the Supreme Court of the United States, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000)); *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner.").  A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition.  *In re Lucre*, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005).  If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of

14

payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors.  Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c), and it should deny the Utility Motion as to the Utilities.

      **1.    The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A).  Moreover, even if this Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

1. Unlike the statutorily approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

2. It is underfunded from the outset because even if the Debtors were to place two-week amounts in the Bank Account for the Utilities, the Utilities issue monthly bills and by the time a default notice is issued, the

15

Debtors will have received approximately 60 days of commodity or service.

3. The Debtors fail to state whether draws from the Bank Account would be limited to two-week amounts.

4. The Debtors should not reduce the amount of the Bank Account on account of the termination of utility services to a Debtor account until the Debtors confirm that all post-petition charges on a closed account are paid in full.

Accordingly, this Court should not approve the Bank Account as adequate assurance as to the Utilities because the Bank Account: (a) Is not the **form** of adequate assurance requested by the Utilities; (b) Is not a form recognized by Section 366(c)(1)(A); and (c) Is an otherwise unreliable form of adequate assurance.

**2. The Utility Motion Should Be Denied As To The Utilities Because The Debtors Have Not Set Forth Any Basis For Modifying The Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amounts of the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.,* 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  However, the Debtors do not provide this

16

Court with any evidence or factually supported documentation to explain why the amounts of the Utilities' adequate assurance requests should be modified.  Accordingly, this Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

**B.      THIS COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), holding that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907

17

F.2d 1418, 1424 (3d Cir. 1990).  The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor."  *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986).  In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed."  *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

The Utilities bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month.  They then provide the Debtors with approximately 15 to 19 days to pay the bill, the timing of which is set forth in applicable state laws, tariffs, regulations, and/or contract.  Based on the foregoing state-mandated, or contract-mandated, billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months.  Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of approximately 60 days or more based on their billing cycles.  Furthermore, the forms and amounts of the Utilities' adequate assurance requests are the forms and amounts that the applicable public service commission, which is a neutral third-party entity, or contract, permits a Utility to request from its customers.  The Utilities

18

are not taking the position that the cash deposits that they are entitled to obtain under applicable state law or contract are binding on this Court, but instead are introducing those forms and amounts as evidence of the forms and amounts that the applicable regulatory entity or contract permit the Utilities to request from their customers.

In contrast, the Debtors failed to address in the Utility Motion why this Court should modify, if at all, the amounts of the Utilities' adequate assurance of payment requests, which is the Debtors' statutory burden.  Instead, the Debtors merely asked this Court to approve the Bank Account supposedly containing approximately two-weeks of the Debtors' utility charges.  The Debtors did not provide an objective, much less an evidentiary, basis for their proposed adequate assurance in the form of the Bank Account.  Moreover, in contrast to the improper treatment proposed to the Utilities, the Debtors have made certain that supposed Critical Vendors and post-petition professionals are favored creditors over the Utilities by ensuring (i) the payment of Critical Vendor Claims in an amount of up to $1.5 million on an interim basis and $2 million on a final basis, and (ii) the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition default on the use of cash collateral, by obtaining a $1,050,000 professionals' carve-out

19

for the payment of their fees/expenses after a default and a guarantee of payment for fees incurred up to a default.

Despite the fact that the Utilities continue to provide the Debtors with admittedly crucial post-petition utility goods/services on the same generous terms that were provided prepetition, with the risk of non-payment, the Debtors are seeking to deprive the Utilities of any adequate assurance of payment for which they are entitled to receive for continuing to provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security that they have requested herein.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.    Denying the Utility Motion as to the Utilities;

2.    Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amounts and form satisfactory to the Utilities, which is the form and amounts requested herein;

3.    Require the Debtors to close any account(s) with the Utilities when they no longer require post-petition service from the Utility for the account(s) or remain administratively responsible for such charges until they do close the account(s); and

4.    Providing such other and further relief as this Court

deems just and appropriate.

Dated: June 23, 2026        WHITEFORD, TAYLOR & PRESTON, LLC

/s/ *William F. Taylor, Jr.*
William F. Taylor, Jr. (#2936)
600 North King Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 353-4145
Facsimile: (302) 357-3270
E-mail: wtaylor@whitefordlaw.com

and

LAW FIRM OF RUSSELL R. JOHNSON III, PLC
Russell R. Johnson III (VSB No. 31468)
John M. Craig (VSB No. 32977)
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
E-mail: russell@russelljohnsonlawfirm.com
john@russelljohnsonlawfirm.com

*Counsel for Constellation NewEnergy – Gas
Division, LLC and Southern California
Edison Company*