# **Exhibit A**

# ASSET PURCHASE AGREEMENT

by and among

**SEARLES VALLEY MINERALS INC.,**

**TRONA RAILWAY COMPANY LLC,**

**AND**

**SEARLES DOMESTIC WATER COMPANY LLC**

as Sellers,

AND

**[●]**

as Buyer,

Dated as of [●], 2026

# TABLE OF CONTENTS


Page

Article I

DEFINITIONS

Section 1.1 Defined Terms ....1

Article II

PURCHASE AND SALE

Section 2.1 Purchase and Sale ....13
Section 2.2 Excluded Assets ....15
Section 2.3 Assumed Liabilities ....16
Section 2.4 Excluded Liabilities ....17
Section 2.5 Assignment of Transferred Contracts ....17
Section 2.6 Consideration ....18
Section 2.7 Deposit Funds ....19
Section 2.8 Closing ....19
Section 2.9 Purchase Price Allocation ....21
Section 2.10 Designated Buyer(s) ....21
Section 2.11 Withholding ....22

Article III

REPRESENTATIONS AND WARRANTIES OF SELLERS

Section 3.1 Organization ....23
Section 3.2 Authority ....23
Section 3.3 No Conflict; Required Filings and Consents ....23
Section 3.4 Transferred Assets; Sufficiency of Assets ....24
Section 3.5 Absence of Certain Changes or Events ....24
Section 3.6 Compliance with Law; Permits ....25
Section 3.7 Litigation ....25
Section 3.8 Employee Benefit Plans ....25
Section 3.9 Labor and Employment Matters ....26
Section 3.10 Real Property ....27
Section 3.11 Intellectual Property ....27
Section 3.12 Tax Matters ....28
Section 3.13 Environmental Matters ....28
Section 3.14 Transferred Contracts ....29
Section 3.15 Certain Payments ....29
Section 3.16 Insurance ....29

Section 3.17 Brokers....29
Section 3.18 Exclusivity of Representations and Warranties....29

Article IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Section 4.1 Organization....30
Section 4.2 Authority....30
Section 4.3 No Conflict; Required Filings and Consents....30
Section 4.4 Absence of Litigation....31
Section 4.5 Qualification....31
Section 4.6 Legal Requirements and Approvals....31
Section 4.7 Brokers....32
Section 4.8 Sufficient Funds....32
Section 4.9 Solvency....32
Section 4.10 Exclusivity of Representations and Warranties....32

Article V

BANKRUPTCY COURT MATTERS

Section 5.1 Debtors-in-Possession....33
Section 5.2 Sale Order....33
Section 5.3 Cooperation with Respect to Bankruptcy Court Approvals....33
Section 5.4 Bidding Procedures Order....34
Section 5.5 Bankruptcy Court Filings....34

Article VI

COVENANTS

Section 6.1 Conduct of Business Prior to the Closing....34
Section 6.2 Covenants Regarding Information....36
Section 6.3 Employee Matters....37
Section 6.4 Consents and Filings; Further Assurances....40
Section 6.5 Certain Preference Claim Matters....42
Section 6.6 Refunds and Remittances....42
Section 6.7 Public Announcements....43
Section 6.8 Communications with Customers and Suppliers....43
Section 6.9 Communications with Employees....43
Section 6.10 Intercompany Accounts and Arrangements....44

Article VII

TAX MATTERS

Section 7.1 Transfer Taxes....44

Section 7.2 Tax Cooperation....................44

Article VIII

CONDITIONS TO CLOSING

Section 8.1 General Conditions....................44
Section 8.2 Conditions to Obligations of Sellers....................45
Section 8.3 Conditions to Obligations of Buyer....................45

Article IX

TERMINATION

Section 9.1 Termination....................46
Section 9.2 Effect of Termination....................47
Section 9.3 Alternative Proposals....................48

Article X

GENERAL PROVISIONS

Section 10.1 Nonsurvival of Representations, Warranties and Covenants....................48
Section 10.2 Bulk Sales....................48
Section 10.3 Fees and Expenses....................48
Section 10.4 Transition of Permits....................48
Section 10.5 Amendment and Modification....................48
Section 10.6 Waiver....................49
Section 10.7 Notices....................49
Section 10.8 Interpretation....................50
Section 10.9 Entire Agreement....................50
Section 10.10 Parties in Interest....................50
Section 10.11 Governing Law....................50
Section 10.12 Submission to Jurisdiction....................51
Section 10.13 Personal Liability....................51
Section 10.14 Assignment; Successors....................51
Section 10.15 Specific Performance....................52
Section 10.16 Currency....................52
Section 10.17 Severability....................52
Section 10.18 Waiver of Jury Trial....................52
Section 10.19 Counterparts....................53
Section 10.20 Jointly Drafted....................53
Section 10.21 Limitation on Damages....................53
Section 10.22 No Recourse....................53
Section 10.23 Time of Essence....................54

**INDEX OF EXHIBITS**


| | |
|---|---|
| EXHIBIT A | FORM OF SALE ORDER |
| EXHIBIT B | FORM OF IP ASSIGNMENT AGREEMENT |

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of [●], 2026 (the "Execution Date"), by and among (i) Searles Valley Minerals Inc., a Delaware corporation ("SVM Parent"), Trona Railway Company LLC, a Delaware limited liability company ("SVM Railway"), and Searles Domestic Water Company LLC, a Delaware limited liability company ("SVM Water" and together with SVM Parent and SVM Railway, each a "Seller" and collectively, "Sellers"), and (ii) [●], a [●] ("Buyer").[1] Capitalized terms have the definitions set forth in Article I below.

## RECITALS

A. Sellers are engaged in the Business;

B. Sellers filed voluntary petitions for relief commencing cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on June 15, 2026 (the "Petition Date"), and are being jointly administered for procedural purposes as *In re Searles Valley Minerals Inc., et al.*, case number 26-10966 (collectively, the "Chapter 11 Case");

C. Sellers desire to sell to Buyer all of the Transferred Assets and Buyer desires to purchase from Sellers the Transferred Assets and assume the Assumed Liabilities in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order; and

D. The execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code, as further set forth herein. The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1 Defined Terms. For purposes of this Agreement:

---

[1] Note to Draft: Buyer structure to be discussed. We expect Buyer to demonstrate that it has sufficient cash on hand or other liquid assets, or provide definitive financing commitments, in each case, sufficient to consummate the transaction.

"Action" means any action, complaint, claim, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, or appellate proceeding), hearing, inquiry, investigation or audit commenced, brought, conducted or heard by or before any Governmental Authority, other than an Avoidance Action.

"Advisors" means, with respect to any Person, the accountants, attorneys, consultants, advisors, investment bankers, or other Representatives of such Person.

"Affiliate" means, with respect to any Person, another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in Section 2.9.

"Allocation Methodology" has the meaning set forth in Section 2.9.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, of a portion of the Transferred Assets, in a transaction or series of transactions with one or more Persons other than Buyer.

"Ancillary Agreements" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the Assignment and Assumption Agreement, the CBA Assumption Agreement, and the IP Assignment Agreement.

"Antitrust Authority" has the meaning set forth in Section 6.4(a).

"Antitrust Law" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"Assigned Benefit Plans" has the meaning set forth in Section 6.3(h).

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(b)(i).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" has the meaning set forth in the Bidding Procedures.

"Avoidance Actions" has the meaning set forth in Section 2.1(r).

"Banker's Fees" means the aggregate amount of fees and expenses payable to Sellers' financial advisor, Lazard & Co, in connection with the transactions contemplated by this Agreement.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures" means the bidding procedures in the form attached to the Bidding Procedures Order, as they may be amended in accordance with the Bidding Procedures Order.

"Bidding Procedures Order" means the Order of the Bankruptcy Court governing the bidding procedures for the Auction.

"Business" means (a) the operation of a vertically integrated mining and processing complex at Searles Lake in Trona, California, the production and sale of critical industrial minerals, including borates, sodium sulfate, and salt, sourced from Searles Lake in Trona, California and the sourcing and supply of soda ash to end users as conducted by Sellers as of the date hereof, (b) with respect to SVM Railway, the operation of a short-line railroad to transport mined minerals, and (c) with respect to SVM Water, the operation of a water company that distributes water to residents of Trona, California.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the State of Delaware, the State of California, the State of Kansas, or the State of New York.

"Business Employees" means, as of the relevant date, all individuals employed by Sellers.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Non-Recourse Person" has meaning set forth in Section 10.22(a).

"Buyer Plan" has the meaning set forth in Section 6.3(g).

"Cash and Cash Equivalents" means all of any Seller's cash (including petty cash and checks received on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"Cash Consideration" has the meaning set forth in Section 2.6(a).

"CBA Assumption Agreement" has the meaning set forth in Section 2.8(b)(ix).

"Chapter 11" means chapter 11 of the Bankruptcy Code.

"Chapter 11 Case" has the meaning set forth in the Recitals.

"Closing" has the meaning set forth in Section 2.8(a).

"Closing Date" has the meaning set forth in Section 2.8(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means that certain Agreement, dated as of May 8, 2023, by and between SVM Railway and the International Association of Sheet Metal, Air, Rail and Transportation Workers Transportation Division GO-887.

"Compliance Date" means [●].

"Confidentiality Agreement" means the Confidentiality Agreement, dated as of [●], entered into between SVM Parent and [●] with respect to the transactions contemplated hereby.

"Contract" means any written contract, agreement, insurance policy, Lease, license, sublicense, sales order, purchase order, instrument, or other commitment, that is binding on any Person or any part of its assets or properties under applicable Law.

"Cure Claims" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Transferred Contracts to be assumed and assigned to Buyer.

"Deposit Funds" has the meaning set forth in Section 2.7(a).

"Designated Buyer" has the meaning set forth in Section 2.10(a).

"Designated Parties" has the meaning set forth in Section 2.1(r).

"Designation Deadline" has the meaning set forth in Section 2.5(e).

"DIP Credit Agreement" means that certain debtor-in-possession credit agreement, dated as of June 15, 2026, by and among SVM Parent, as borrower, the other guarantors party thereto, and Karnavati Holdings, Inc., a Delaware corporation, as lender, as the same may be amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time in accordance with the DIP Order.

"DIP Order" means the final Order entered by the Bankruptcy Court approving or authorizing Sellers' entry into and performance under the DIP Credit Agreement.

"Disclosure Letter" means the disclosure letter being delivered to Buyer contemporaneously with the execution of this Agreement. Notwithstanding anything to the contrary contained in the Disclosure Letter or in this Agreement, (a) the information and disclosures contained in any section of the Disclosure Letter shall be deemed to be disclosed and incorporated by reference in any other section of the Disclosure Letter as though fully set forth in such other section for which the applicability of such information and disclosure is reasonably apparent on the face of such information or disclosure, (b) the disclosure of any matter in the Disclosure Letter shall not be construed as indicating that such matter is necessarily required to be

disclosed in order for any representation or warranty to be true and correct, (c) the Disclosure Letter is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations and warranties by any Party except to the extent expressly set forth herein, (d) the inclusion of any item in the Disclosure Letter shall be deemed neither an admission that such item is material to the business, financial condition or results of operations of any Seller or the Business, nor an admission of any liability to any third party, (e) matters reflected in the Disclosure Letter are not necessarily limited to matters required by this Agreement to be reflected therein and any additional matters are set forth therein for informational purposes and (f) headings are inserted in the Disclosure Letter for convenience of reference only and shall not have the effect of amending or changing the express description of the sections as set forth in this Agreement.

"Disclosure Limitations" has the meaning set forth in Section 6.2(a).

"Employee Benefit Plans" means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based compensation, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other employment, consulting or other individual agreement or arrangement, in each case, (a) that is sponsored or maintained or contributed to (or required to be contributed to) by any Seller or any of its Affiliates in respect of any current or former employees, directors, independent contractors, consultants or leased employees of any Seller, including any dependents or beneficiaries thereof or (b) with respect to which any Seller has any actual or contingent Liability.

"Encumbrance" means any charge, claim, mortgage, lien, encumbrance, option, pledge, hypothecation, security interest or similar interest, preemptive right, right of first refusal, conditional sale or title retention agreements or other similar restriction.

"Enforceability Exceptions" has the meaning set forth in Section 3.2.

"Environmental Claim" means any action, cause of action, claim, suit, proceeding, investigation, Order, demand or notice by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Materials; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which liability is imposed under Environmental Laws.

"Environmental Law" means any Law relating to pollution, the protection of, restoration or remediation of the environment or natural resources, or the protection of human health and safety (regarding exposure to Hazardous Materials), including Laws relating to: (a) the exposure

to, or Releases or threatened Releases of, Hazardous Materials; (b) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Materials; or (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"Environmental Permit" means any Permit required under or issued pursuant to any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and regulations promulgated thereunder.

"ERISA Affiliate" means any entity which is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (c) an affiliated service group (as defined under Section 414(m) of the Code) or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller.

"Escrow Agent" has the meaning set forth in Section 2.7(a).

"Escrow Agreement" has the meaning set forth in Section 2.7(a).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.3(b).

"Execution Date" has the meaning set forth in the Preamble.

"Foreign Competition Laws" has the meaning set forth in Section 3.3(a).

"Fundamental Representations" means the representations and warranties set forth in Section 3.1 and Section 3.2.

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Go-Forward Trade Claim" means any claim against the Sellers (other than any intercompany claims or unsecured claims) as of the commencement of the Chapter 11 Cases that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court and has been identified by the Sellers, in consultation with the Purchaser, as being integral to and necessary for the ongoing operations of the Business, including those set forth on Section 1.1(b) of the Disclosure Letter.

"Governmental Authority" means any United States or non-United States national, federal, state or local governmental, regulatory or administrative authority, agency, court, tribunal or commission or any other judicial or arbitral body, including the Bankruptcy Court.

"Hazardous Materials" means any material, substance, chemical, or waste (or combination thereof) that (a) is listed, defined, designated, regulated or classified as hazardous, toxic,

radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Law relating to pollution, hazardous or toxic waste, or protection of the environment; or (b) forms the basis of any Liability under any Law relating to pollution, hazardous or toxic waste, or protection of the environment.

"HSBC Demand Line Agreement" means that certain facility letter, dated as of August 29, 2025, by and between SVM Parent and HSBC Bank USA, National Association ("HSBC") (as modified, amended, amended and restated, or supplemented from time to time).

"HSBC Receivables Agreement" means that certain Recourse Receivables Purchase Agreement, dated as of March 29, 2024, by and between SVM Parent and HSBC.

"HSR Act" has the meaning set forth in Section 3.3(a).

"Intellectual Property" means all intellectual property rights throughout the world, including all U.S. and foreign rights in: (a) trade names, trademarks and service marks, business names, corporate names, domain names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("Trademarks"); (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof ("Patents"); (c) copyrights and copyrightable subject matter (whether registered or unregistered) ("Copyrights"); (d) intellectual property rights in Software; (e) confidential or proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies; (f) all applications and registrations for any of the foregoing; and (g) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

"Inventory" means all raw materials, works-in-progress, finished goods, supplies, packaging materials and other inventories owned by Sellers for use primarily in the Business.

"IP Assignment Agreement" has the meaning set forth in Section 2.8(b)(ii).

"IRS" means the Internal Revenue Service of the United States.

"KHI Loan Agreement" means that certain 2026 Term Loan Agreement, dated as of January 12, 2026, by and between SVM Parent and Karnavati Holdings, Inc.

"Knowledge" with respect to Sellers means the actual (but not constructive or imputed) knowledge of Dennis Cruise and Don Pemberton as of the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate).

"Labor Organization" means any labor union, labor organization, works council or other similar employee representative.

"Law" means any and all federal, state, local and foreign laws, statutes, ordinances, rules, regulations, policies, orders, judgments and decrees, in each case, enacted, adopted or promulgated by a Governmental Authority.

"Lease" means any lease, sublease, license, or other use or occupancy agreement with respect to real property to which any Seller is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"Lease Assignment" has the meaning set forth in Section 2.8(b)(vii).

"Leased Real Property" means any real property used primarily in connection with the Business that is leased, subleased, licensed or otherwise occupied by any Seller pursuant to a Lease.

"Legal Restraint" has the meaning set forth in Section 8.1(a).

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any event, change, condition, occurrence or effect that individually or in the aggregate (a) has had, or would reasonably be expected to have, a material adverse effect on the Business or the condition (financial or otherwise), assets, liabilities, or operations of the Business, taken as a whole, or (b) prevents or materially delays or impedes, or would reasonably be expected to prevent or materially delay or impede, the performance by Sellers of their obligations under this Agreement, other than, in each case of the preceding clauses (a) and (b), any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry or geographical areas in which the Business operates, (ii) any national, international, foreign, domestic or regional economic, financial, social or political conditions (including changes therein), including (1) hostilities, acts of war, protests, riots, unrest, sabotage, terrorism, cyberterrorism or cybercrime or military actions or any escalation or worsening of any of the same, (2) any Executive Order of the U.S. President, or any public statement or announcement by or on behalf of the U.S. President or formal statement by or on behalf of the U.S. White House, (3) any actual or potential sequester, stoppage, shutdown, default or similar event or occurrence of any Governmental Authority, including any shutdown or furlough of the U.S. federal government or its employees, (4) changes in any financial, debt, credit, capital or banking markets or conditions, including any increase in operating costs or capital expenses (including any disruption thereof) to the extent arising from such changes, and (5) changes in interest, currency or exchange rates or tariffs or any trade wars, (iii) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, earthquake, fire, flood, hurricane, tornado or other weather event, or the onset or continuation of any global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Authority), viral outbreak (including "Coronavirus" or "COVID-19" or any variant thereof) or any quarantine, lockdown, travel restriction, business restriction or trade restriction related thereto, (iv) changes in any applicable Laws (or authoritative interpretations or enforcement thereof), (v) changes in GAAP or other accounting practices, policies or requirements, or authoritative interpretations or enforcement thereof, (vi) the execution, existence, performance, announcement, pendency or consummation of this Agreement or the transactions contemplated hereby, (vii) the announcement or pendency of the Chapter 11 Case (and any limitations therein pursuant to the Bankruptcy Code, any Order of the Bankruptcy Court,

or the DIP Credit Agreement (or limitations of funding thereunder)), the events leading or giving rise to the Chapter 11 Case, or any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby, (2) the reorganization of Sellers and any related plan of reorganization or disclosure statement, (3) the Sale Motion, (4) the assumption of any Transferred Contract or (5) any action approved by the Bankruptcy Court, (viii) any action taken by any Seller at the request of Buyer or that is required by this Agreement, (ix) the identity of Buyer or any of its Affiliates, (x) any failure, in and of itself, of the Sellers to achieve any internal or published budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but, for the avoidance or doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (xi) the effect of any action taken by Buyer or its Affiliates with respect to the transactions contemplated by this Agreement, (xii) any breach by Buyer of its obligations under this Agreement, or (xiii) any change in the cost or availability or other terms of any financing; provided, however, that changes or developments set forth in clauses (i), (ii), (iii), (iv) or (v) may be taken into account in determining whether there has been or is a Material Adverse Effect if such changes or developments have a disproportionate impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"Offer Employee" has the meaning set forth in Section 6.3(a).

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business in the ordinary and usual course consistent with past practice and custom of Sellers, as such practice and custom is, or may have been, modified as a result of the Chapter 11 Case, in each case subject to (a) the filing of the Chapter 11 Case, (b) any Orders of the Bankruptcy Court, and (c) the conduct of the process as contemplated by the bidding procedures approved by the Bankruptcy Court.

"Organizational Documents" means (i) with respect to any corporation, its certificate or articles of incorporation, its bylaws, and any shareholder or stockholder agreement, (ii) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (iii) with respect to any general partnership, any statement of partnership and its partnership agreement, (iv) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, (v) with respect to any other form of entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and any agreement amongst its members, (vi) any documents equivalent to any of the foregoing applicable to non-U.S. jurisdictions, and (vii) any amendments, side letters, modifications, or other arrangements with respect to any of the foregoing.

"Owned Real Property" means any real property owned by SVM Parent or any other Seller, including all of SVM Parent's or such other Seller's right, title and interest in and to any improvements, fixtures and structures thereon and appurtenances thereto.

"Party" or "Parties" means, individually or collectively, Buyer and Sellers.

"Permits" has the meaning set forth in Section 3.6(b).

"Permitted Encumbrance" means (a) Encumbrances for Taxes not yet due and payable or the validity or amount of which is being contested in good faith by appropriate proceedings, (b) mechanics', carriers', workers', repairers', suppliers', vendors' and other similar common law or statutory Encumbrances arising or incurred in the Ordinary Course of Business, (c) pledges, deposits or other liens securing the performance of bids, trade Contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (d) with respect to any Leased Real Property, any Encumbrance primarily affecting the interest of the landlord, sublandlord or licensor of such real property, (e) with respect to any Real Property, covenants, conditions, restrictions, easements, licenses, rights-of-way and other similar charges or encumbrances or defects or imperfections of title of any kind (i) that do not, individually or in the aggregate, materially interfere with the present use or materially impair the value of the Real Property subject to such encumbrances or (ii) that would be revealed by an investigation of title to the extent and nature that a prudent buyer of property in the jurisdiction in which the applicable Real Property is located would carry out, (f) any licenses or other grants of rights to use or obligations with respect to Intellectual Property, (g) public roads, highways, zoning codes, building codes, entitlements, conservation restrictions or other land use or environmental Laws regulating the use or occupancy of the Real Property or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over the Real Property, (h) Encumbrances arising under purchase money security interests, equipment leases or other similar arrangements entered into in the Ordinary Course of Business and (i) any Encumbrances permitted by or that will be removed or released by operation of the Sale Order.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Petition Date" has the meaning set forth in the Recitals.

"Prepaid Expenses" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise)) for rent, electricity, telephone bonds or other sureties or other expenses (including all prepaid rent and all prepaid charges, expenses and rent under any personal property leases), advances, prepaid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent), except that professional fee retainers and prepaid deposits related thereto shall not be included in the definition of "Prepaid Expenses."

"Proceeding" means any claim, charge, investigation, audit, complaint, action, suit, arbitration or other alternative dispute resolution process or any other proceeding (including by or before any Governmental Authority) of whatsoever nature, whether civil, administrative, criminal or otherwise, other than an Avoidance Action.

"Purchase Price" has the meaning set forth in Section 2.6.

"Qualified Leave Recipient" means any Business Employee who is absent from active employment as of immediately prior to the Closing Date as a result of an approved leave of absence.

"Real Property" means the Leased Real Property and the Owned Real Property.

"Registered IP" has the meaning set forth in Section 3.11(a).

"Release" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the migration of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"Representatives" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, Advisors, bankers and other representatives of such Person.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Motion" means the motion filed with the Bankruptcy Court seeking entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, the form of which Order is attached hereto as Exhibit A, with such changes that are in form and substance reasonably acceptable to Buyer and Sellers.

"Sales & Use Tax Exemption Certificates" means the certificates set forth on Section 1.1(c) of the Disclosure Letter.

"Seller" has the meaning set forth in the Preamble.

"Seller Non-Recourse Person" has meaning set forth in Section 10.22(b).

"Software" means computer programs (whether in source code, object code, or other form), firmware, software, models, algorithms, methodologies, databases, compilations, data, all technology supporting the foregoing, and all documentation, including user manuals and training materials.

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

"Supply and Liquidity Agreement" means that certain Soda Ash Supply Agreement and Liquidity Arrangement, dated as of June 14, 2026, by and between SVM Parent and TATA Chemicals North America Inc.

"SVM Parent" has the meaning set forth in the Preamble.

"SVM Railway" has the meaning set forth in the Preamble.

"SVM Water" has the meaning set forth in the Preamble.

"Tax Law" means any statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order of any Governmental Authority relating to Taxes.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, information statement or other information or filing relating to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"Taxes" means any and all U.S. federal, state and local, non-U.S., and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments imposed by any Governmental Authority, including net income, gross income, gross receipts, sales, use, *ad valorem*, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, withholding, payroll, employment, fringe, fringe benefits, excise, estimated, severance, stamp, occupation, premium, property, windfall profits or other taxes, together with any interest, penalties, additions to tax, or other additional amounts imposed with respect thereto.

"Termination Pay" means any contractual or statutory severance, termination, compensation, notice pay, paid vacation or annual leave, paid sick leave, paid time off, contractual or statutory bonuses, contractual or statutory gratuity or long service payments, or any other legally mandated termination payment or benefits obligations.

"Transfer Taxes" has the meaning set forth in Section 7.1.

"Transferred Assets" has the meaning set forth in Section 2.1.

"Transferred Contracts" has the meaning set forth in Section 2.1(f).

"Transferred Employee" has the meaning set forth in Section 6.3(a).

"Transferred Employee Records" means records of Sellers that relate to the Transferred Employees, but only to the extent that such records pertain to (a) skill and development training, (b) seniority histories, (c) salary and benefit information, (d) Occupational, Safety and Health Administration reports and records and (e) active medical restriction forms.

"Transferred IP" has the meaning set forth in Section 2.1(g).

"Treasury Regulations" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

"Virtual Data Room" has the meaning set forth in Article III.

"Visa Employees" has the meaning set forth in Section 6.3(l).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar applicable state or local law requiring notice to employees in the event of a plant closing or mass layoff.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1 Purchase and Sale. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement and subject to approval of the Bankruptcy Court, at the Closing, Sellers shall sell, assign, transfer, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, all right, title and interest of Sellers, in, to or under the Transferred Assets free and clear of any and all Encumbrances (other than Permitted Encumbrances). "Transferred Assets" shall mean all right, title and interest of Sellers to or under the properties and assets of Sellers, of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, to the extent owned, leased, licensed, used, occupied or held for use in or relating to the Business, including all right, title and interest of Sellers in, to or under the following (but excluding in each case any Excluded Assets):

(a) all rights, claims or causes of action of Sellers against any party arising out of events occurring prior to the Closing related to the Transferred Assets, including, for the avoidance of doubt, arising out of events occurring prior to the commencement of the Chapter 11 Case, and including any rights under or pursuant to any and all warranties, licenses, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, in each case, relating to the Business;

(b) all Leases for Leased Real Property;

(c) all Owned Real Property;

(d) all tangible property, accounts, machinery, equipment, Inventory (including any goods in transit, even if title to such goods would pass free on board destination) and tenant improvements, including such assets that are located at or associated with the Real Property;

(e) all information technology assets, and related systems and equipment;

(f) (i) all Contracts including, but not limited to, each of the Contracts set forth on Section 2.1(f)(i) of the Disclosure Letter, as may be amended from time to time pursuant to Section 2.5(e) and (ii) the Collective Bargaining Agreement (collectively this Section 2.1(f), the "Transferred Contracts") and the rights thereunder; provided that any applicable Cure Claims shall either be waived by the contract counterparty or paid by or on behalf of Buyer or its designee in an amount and on terms agreed upon between Buyer and contract counterparty;

(g) all Intellectual Property owned by any Seller, including the Intellectual Property listed on Section 3.11(a) of the Disclosure Letter (the "Transferred IP");

(h) all goodwill associated with the Transferred Assets or the Business;

(i) subject to Section 2.2(e), all Prepaid Expenses;

(j) all accounts receivable of the Business and all cash receipts received from customers of the Business after the Closing;

(k) to the extent not prohibited by Law and not subject to attorney-client privilege or other work product doctrine, all documents and other books and records, correspondence, the Transferred Employee Records, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are related primarily to the Business or any Transferred Asset, in each case, except as set forth in Section 2.2(b); provided, however, that Sellers have the right to retain copies at Sellers' expense;

(l) all telephone and facsimile numbers of the Business and all records of email addresses of customers and suppliers of the Business;

(m) subject to obtaining the applicable consents set forth on Section 3.3(a) of the Disclosure Letter, all Permits and licenses held by Sellers and relating to the Business, but only to the extent such Permits may be transferred under applicable Law;

(n) all rights to use, treat and/or sell water;

(o) any other assets and properties of Sellers relating to the Business;

(p) any rights to receive amounts owing from any Subsidiary of Sellers to any Seller;

(q) all rights and obligations under or arising out of all insurance policies (except as set forth in Section 2.2(g)) relating to the Business or any of the Transferred Assets or Assumed Liabilities;

(r) all avoidance claims or causes of action available to Sellers under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (collectively, "Avoidance Actions") against the following (collectively, the "Designated Parties"): (i) any Seller's vendors, suppliers, customers or trade creditors with whom Buyer continues to conduct business in regard to the Transferred Assets after the Closing, (ii) any of Sellers' counterparties under any licenses of Intellectual Property that are Transferred Contracts or counterparties under any other Transferred Contracts, (iii) any officer, manager or employee of Sellers that is a Transferred Employee and (iv) any Affiliates of any of the Persons listed in clauses (i) through (iii); provided, however, that it is understood and agreed by the parties that Buyer will not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense (to the extent permitted under applicable Law) against any claim or cause of action raised by such Designated Party; and

(s) all assets under each Employee Benefit Plan (to the extent assets under such plans are held by Sellers), together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts).

Section 2.2 Excluded Assets. Notwithstanding anything contained in Section 2.1 to the contrary, Sellers are not selling, and Buyer is not purchasing, any right, title or interest in, to or under the following assets of Sellers, all of which shall be retained by Sellers (collectively, the "Excluded Assets"):

(a) all assets expressly excluded or excepted from the definition of Transferred Assets pursuant to Section 2.1;

(b) Sellers' documents, written files, papers, books, reports and records, including those prepared or received by any Seller or any of its Affiliates or Representatives: (i) in connection with any sale or potential sale of SVM Parent and its Subsidiaries, the Business, or any portion thereof including the Transferred Assets (including, but not limited to, this Agreement and the transactions contemplated hereby), (ii) relating to the Chapter 11 Case, (iii) that are subject to any privilege in favor of Seller or any of its Affiliates, or (iv) that any Seller is required by Law or other requirement to retain;

(c) all rights, claims and causes of action to the extent relating to any Excluded Asset (and not relating to any Transferred Asset);

(d) shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller;

(e) all retainers or similar prepaid amounts paid to the Advisors of Sellers;

(f) the assets of Sellers listed in Section 2.2(f) of the Disclosure Letter;

(g) all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, solely to the extent payable to or on behalf of, or in respect of amounts payable by any Seller or any Subsidiary of any Seller to, any individuals covered by such policies;

(h) each Contract of any Seller that is not a Transferred Contract;

(i) (i) all books and records to the extent related to any of the Excluded Assets or Liabilities of Sellers other than Liabilities assumed by Buyer pursuant to Section 2.3; (ii) all minute books, Organizational Documents, stock registers and such other books and records of any Seller or any Subsidiary of any Seller, as pertaining to ownership, organization, qualification to do business, capitalization, or existence of such Seller or Subsidiary of any Seller, Tax Returns (and any related work papers) of any Seller or any Subsidiary of any Seller, and corporate seal of any Seller or any Subsidiary of any Seller; and (iii) all books and records, including any records of Sellers that relate to the Transferred Employees, that any Seller is required by Law to retain or

prohibited by Law from transferring or are otherwise subject to attorney-client privilege or other work product doctrine;

(j) all Tax refunds and Tax attributes of Sellers that are not transferred by the operation of applicable Tax Law;

(k) all bank and lock box accounts of the Business;

(l) all Cash and Cash Equivalents;

(m) the Cash Consideration; and

(n) all rights, claims or causes of action of Sellers under this Agreement and the Ancillary Agreements and under any Contracts that are not Transferred Contracts.

Section 2.3 Assumed Liabilities. In connection with the purchase and sale of the Transferred Assets pursuant to this Agreement, at the Closing, Buyer shall assume and pay, discharge, perform or otherwise satisfy, when due, in accordance with their respective terms, the following Liabilities (the "Assumed Liabilities"):

(a) all Liabilities of Sellers under the Transferred Contracts and the transferred Permits that are to be performed on or after, or in respect of periods following, the Closing;

(b) all Cure Claims associated with Transferred Contracts;

(c) all Liabilities relating to or arising out of the ownership and operation of the Transferred Assets or the Business from and after the commencement of the Chapter 11 Case except for any Liabilities set forth on Section 2.3(b) of the Disclosure Letter (the "Excluded Liabilities");

(d) trade and vendor accounts payable incurred in the Ordinary Course of Business prior to the Closing for vendors continuing to provide goods and services to the Business from and after Closing to the extent not paid prior to the Closing, including any accounts payable for goods in transit (even if title to such goods would pass free on board destination);

(e) Liabilities for all unpaid fees payable under 28 U.S.C. § 1930(a);

(f) any Liabilities of Sellers for any amounts owing to any Subsidiary of Sellers;

(g) all Go-Forward Trade Claims;

(h) Liabilities assumed by Buyer pursuant to Section 6.3; and

(i) those specific Liabilities arising out of, resulting from, or relating to (i) the employment or termination of employment of the Transferred Employees by Buyer or its Affiliates, (ii) each Employee Benefit Plan, including sponsorship thereof, (iii) the Collective

Bargaining Agreement, or (iv) a breach by Buyer or an Affiliate of Buyer of its or their obligations and covenants set forth in Section 6.3.

Section 2.4 Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Transferred Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstance taking place prior to the Closing, other than the Assumed Liabilities. For the avoidance of doubt, the Assumed Liabilities are not Excluded Liabilities, and nothing in this Section 2.4 shall limit, reduce, or otherwise affect Buyer's assumption of the Assumed Liabilities.

Section 2.5 Assignment of Transferred Contracts.

(a) Prior to the Sale Hearing, Sellers shall take all reasonably necessary actions in order to determine the Cure Claims with respect to any Transferred Contract entered into prior to the Petition Date, including the right to negotiate in good faith and litigate, if necessary, with any Contract counterparty the Cure Claims needed to cure all monetary defaults under such Transferred Contract. Notwithstanding the foregoing, prior to the Designation Deadline, Buyer may identify any Transferred Contract that Buyer no longer desires to have assigned to it in accordance with Section 2.5(e).

(b) To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.5, on the Closing Date, Sellers shall assign the Transferred Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to the provision of adequate assurance by Buyer as may be required under Section 365 of the Bankruptcy Code and payment by Buyer of the Cure Claims in respect of the Transferred Contracts, and Buyer shall assume such Transferred Contracts. All Cure Claims in respect of all of the Transferred Contracts shall be paid by Buyer.

(c) To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.5, Sellers shall transfer and assign all of the Transferred Assets to Buyer, and Buyer shall assume all of the Transferred Assets from Sellers, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code.

(d) Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to Buyer of any asset that would be a Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any applicable Law or would require any consent from any Governmental Authority or any other third party and such consents shall not have been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Closing shall proceed without any reduction in Purchase Price without the sale, transfer, assignment, conveyance or delivery of such asset. In the event that any failed condition is waived and the Closing proceeds without the transfer or assignment of any such asset, then following the Closing, Sellers shall use their commercially reasonable efforts at Buyer's

sole expense and subject to any approval of the Bankruptcy Court that may be required, and Buyer shall cooperate with Sellers, to obtain such consent as promptly as practicable following the Closing. Pending the receipt of such consent, the parties shall, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other to provide Buyer with all of the benefits of use of such asset. Once consent for the sale, transfer, assignment, conveyance or delivery of any such asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, Sellers shall promptly transfer, assign, convey and deliver such asset to Buyer. To the extent that any such asset cannot be transferred or the full benefits or use of any such asset cannot be provided to Buyer, then as promptly as practicable following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, Buyer and Sellers shall enter into such arrangements (including subleasing, sublicensing or subcontracting), and shall, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other, to provide Buyer with all of the benefits of use of such asset. Sellers shall hold in trust for, and pay to Buyer, promptly upon receipt thereof, all income, proceeds and other monies received by Sellers derived from their use of any asset that would be a Transferred Asset in connection with the arrangements under this Section 2.5(d). The parties agree to treat any asset the benefits of which are transferred pursuant to this Section 2.5(d) as having been sold to Buyer for Tax purposes to the extent permitted by Law. Sellers and Buyer agree to notify the other parties promptly in writing if the party determines that such treatment (to the extent consistent with the relevant arrangement agreed to by Sellers and Buyer pursuant to this Section 2.5(d)) is not permitted for Tax purposes under applicable Law. Where such treatment is not so permitted, and subject to the terms of any relevant arrangement agreed to by Sellers and Buyer pursuant to this Section 2.5(d), Buyer shall indemnify and hold harmless the applicable Seller for any Taxes imposed on such Seller or any of its Affiliates with respect to any such Transferred Asset after the Closing Date.

(e) Notwithstanding anything in this Agreement to the contrary, Buyer may amend or revise Section 2.1(f)(i) of the Disclosure Letter setting forth the Transferred Contracts, in order to add any Contract to, or eliminate any Contract from, such section at any time during the period commencing from the date hereof and ending at the end of the Auction (or if no Auction occurs, the date that is two (2) Business Days before the commencement of the Sale Hearing) (the "Designation Deadline"). Automatically upon the addition of any Contract to Section 2.1(f)(i) of the Disclosure Letter, such Contract shall be a Transferred Contract for all purposes of this Agreement. Automatically upon the removal of any Contract from Section 2.1(f)(i) of the Disclosure Letter such Contract shall be an Excluded Asset for all purposes of this Agreement, and no liabilities arising thereunder shall be assumed or borne by Buyer unless such liability is otherwise specifically assumed pursuant to Section 2.3.

Section 2.6 Consideration. The aggregate consideration for the purchase, sale, assignment and conveyance of the Transferred Assets from Sellers to Buyer (the "Purchase Price") shall consist of:

(a) the payment by Buyer and/or one or more Designated Buyers, by wire transfer of immediately available funds to one or more accounts designated in writing by SVM Parent in accordance with Section 2.8(c)(v) (the "Cash Consideration") in an aggregate amount equal to [●] U.S. dollars ($[●]); and

(b) the assumption by Buyer, or a Designated Buyer, as applicable, of the Assumed Liabilities from Sellers.

Section 2.7 Deposit Funds.

(a) On the date hereof, unless already deposited, Buyer shall deposit into escrow with an escrow agent reasonably acceptable to Sellers (the "Escrow Agent") an amount equal to [●] dollars ($[●]) (such amount, together with all interest and other earnings accrued thereon, the "Deposit Funds"),[2] by wire transfer of immediately available funds pursuant to the terms of an escrow agreement reasonably acceptable to and executed by SVM Parent and Buyer (the "Escrow Agreement"). The Deposit Funds shall be released by the Escrow Agent and delivered to either (x) Buyer or (y) SVM Parent on behalf of Sellers, as follows:

(i) if the Closing shall occur, the Deposit Funds shall be applied towards the Purchase Price payable by Buyer pursuant to Section 2.6(a);

(ii) if this Agreement is terminated by Sellers pursuant to Section 9.1(d)(i), the Deposit Funds shall be delivered to SVM Parent; or

(iii) if this Agreement is terminated other than in a manner provided by Section 9.1(d)(i), the Deposit Funds shall be delivered to Buyer.

(b) The parties acknowledge that the agreements contained in this Section 2.7 are an integral part of the transactions contemplated in this Agreement, that the damages resulting from termination of this Agreement under circumstances where Sellers are entitled to the Deposit Funds are uncertain and incapable of accurate calculation and that the delivery of the Deposit Funds is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate Sellers in the circumstances where Sellers are entitled to the Deposit Funds for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, and that, without these agreements, Sellers would not enter into this Agreement. If Buyer fails to take any action necessary to cause the delivery of the Deposit Funds to Sellers pursuant to the Escrow Agreement under circumstances where Sellers are entitled to the Deposit Funds and, in order to obtain such Deposit Funds, Sellers commence a suit which results in a judgment in favor of Sellers, Buyer shall pay to Sellers an amount in cash equal to the costs and expenses (including attorney's fees) incurred by Sellers in connection with such suit.

Section 2.8 Closing.

(a) The purchase, sale, assignment and conveyance of the Transferred Assets contemplated by this Agreement shall take place at a closing (the "Closing") to be held by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, located at One Manhattan West, New York, NY 10001) at 10:00 a.m. Eastern Time on the second (2nd) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all

[2] Note to Draft: To be equal to 10% of Cash Consideration.

conditions to the obligations of the Parties set forth in Article VIII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as Sellers and Buyer mutually may agree in writing. The day on which the Closing takes place is referred to as the "Closing Date."

(b) At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(i) a bill of sale, assignment and assumption agreement, in form and substance reasonably satisfactory to the Parties (the "Assignment and Assumption Agreement"), duly executed by the applicable Sellers;

(ii) an intellectual property assignment agreement, in the form attached hereto as Exhibit B (the "IP Assignment Agreement"), duly executed by the applicable Sellers;

(iii) a copy of the Sale Order;

(iv) for each Seller (as determined for U.S. federal income Tax purposes) who is a "United States person" within the meaning of Section 7701(a)(30) of the Code, an IRS Form W-9, and for each Seller who is not a "United States person," an applicable IRS Form W-8, in each case, duly executed by such Seller;

(v) possession of each Owned Real Property, together with, for each Owned Real Property recorded in the name of a Seller, a quitclaim deed (or its jurisdictional equivalent) in recordable form for all such Owned Real Property conveying such Owned Real Property subject only to Permitted Encumbrances, duly executed by the applicable Seller, and such ordinary and customary documents (including customary affidavits) as may be reasonably required by any title company or title insurance underwriter to enable Buyer to obtain customary owner's title policies insuring Buyer's fee simple title to such Owned Real Property (without expanding or supplementing any of the representations and warranties hereunder or Buyer's remedies with respect thereto);

(vi) Transfer Tax forms as required pursuant to Section 7.1, duly executed by the applicable Seller;

(vii) an assignment and assumption of each Lease, duly executed by the applicable Seller (each, a "Lease Assignment");

(viii) a duly executed certificate of a duly authorized officer of SVM Parent certifying the satisfaction of the conditions set forth in Section 8.3(a) and Section 8.3(b);

(ix) an assignment and assumption agreement pertaining to the Collective Bargaining Agreement, substantially in form and substance reasonably satisfactory to the Parties (the "CBA Assumption Agreement") and duly executed by SVM Railway; and

(x) such other documents as Buyer may reasonably request that are not inconsistent with the terms of this Agreement and reasonably necessary to effectuate or consummate the transactions contemplated by this Agreement (without expanding or supplementing any of the representations and warranties hereunder or Buyer's remedies with respect thereto).

(c) At or prior to the Closing, Buyer shall deliver or cause to be delivered to Sellers:

(i) the Assignment and Assumption Agreement, duly executed by Buyer;

(ii) the IP Assignment Agreement, duly executed by Buyer;

(iii) the Lease Assignments, duly executed by Buyer;

(iv) Transfer Tax forms as required pursuant to Section 7.1, duly executed by Buyer;

(v) the Cash Consideration in cash by wire transfer of immediately available funds to an account or accounts designated by Sellers;

(vi) Sales & Use Tax Exemption Certificates, each duly executed by Buyer;

(vii) the CBA Assumption Agreement, duly executed by Buyer; and

(viii) a duly executed certificate of an executive officer of Buyer certifying the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b).

Section 2.9 Purchase Price Allocation. For U.S. federal and applicable state, local and foreign Tax purposes, Buyer, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any amounts treated as consideration for applicable Tax purposes) among Transferred Assets in accordance with the methodology set forth in Schedule 2.9 of the Disclosure Letter (the "Allocation Methodology," and such allocation, the "Allocation").[3] The Parties and their respective Affiliates shall (a) file all applicable Tax Returns in accordance with such Allocation and (b) not take any Tax-related action in connection with any Tax audit or proceeding that is inconsistent with the Allocation, except, in each case, to the extent otherwise required by a change in applicable Law occurring after the date hereof or pursuant to a "determination" within the meaning of Section 1313(a) of the Code or any similar provision of state, local or non-U.S. Tax Law.

Section 2.10 Designated Buyer(s).

---

[3] Note to Draft: The Allocation Methodology will provide that certain assets (e.g., the Real Property) will have a value equal to the book value of such assets.

(a) In connection with the Closing, without limitation by the terms of Section 10.14, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.10, one (1) or more Affiliates to purchase specified Transferred Assets and employ specified Transferred Employees on and after the Closing Date subject to the terms of any applicable Collective Bargaining Agreement (any such Affiliate of Buyer that shall be properly designated by Buyer in accordance with this Section 2.10, a "Designated Buyer"); provided that no such designation would impede or materially delay the Closing or affect the timely receipt of any regulatory approval; provided, further, that no such designation shall be permitted if any Taxes required to be withheld under applicable Law from any amounts otherwise payable hereunder would be higher than the amount of Taxes that would be required to be withheld absent such designation. At and after the Closing, Buyer shall, or shall cause its Designated Buyer(s) to, honor Buyer's obligations at the Closing. After the Closing, any reference to Buyer made in this Agreement in respect of any purchase, assumption or employment referred to in this Agreement shall include reference to the appropriate Designated Buyer(s), if any. Buyer shall be jointly and severally liable for all obligations of Buyer and its Designated Buyer(s) under this Agreement as to any particular Assumed Liability that a Designated Buyer is assuming at the Closing.

(b) Without limitation of Section 6.4, the designation of a Designated Buyer in accordance with Section 2.10(a) shall be made by Buyer by way of a written notice to be delivered to Sellers as soon as reasonably practicable following the date of this Agreement but in no event later than two (2) Business Days prior to Closing, which written notice shall (i) contain appropriate information about the Designated Buyer(s), (ii) indicate which Transferred Assets and Transferred Employees Buyer intends such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement pursuant to which the Designated Buyer(s) agree to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and which authorizes Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder. Notwithstanding the foregoing, and for the avoidance of doubt, any designation pursuant to Section 2.10(a) shall not relieve Buyer of any of its obligations under this Agreement (or otherwise) and Buyer shall remain primarily liable therefor.

Section 2.11 Withholding. Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any amount (or portion thereof) payable under this Agreement such Taxes as are required to be deducted and withheld from such amount under the Code or any other applicable provision of U.S. or non-U.S. Tax Law. To the extent that Buyer intends to withhold any such amounts from the Purchase Price, it shall notify Sellers of such intention as soon as reasonably possible after the date hereof and shall provide Sellers with an opportunity to provide forms or evidence that would exempt or reduce such amounts from withholding and shall otherwise cooperate in good faith with Sellers and use commercially reasonable efforts to minimize or eliminate any such deductions or withholdings. To the extent that any amounts are so deducted and withheld and paid to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (a) set forth in the Disclosure Letter attached hereto or (b) disclosed, reflected or made available to Buyer or its Representatives in the documents and information contained in the electronic data room established and maintained by or on behalf of Sellers in connection with the transactions contemplated by this Agreement (the "Virtual Data Room") as of 11:59 p.m. Eastern Time on the date that is one (1) Business Day prior to the Execution Date, each Seller jointly and severally represents and warrants to Buyer as follows:

Section 3.1 Organization. Each Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

Section 3.2 Authority. Subject to required Bankruptcy Court approvals, (a) each Seller has the corporate (or equivalent) power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, (b) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (c) this Agreement has been, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will have been, duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

Section 3.3 No Conflict; Required Filings and Consents.

(a) Except as set forth on Section 3.3(a) of the Disclosure Letter and assuming that (x) requisite Bankruptcy Court approvals are obtained, (y) the notices, authorizations, approvals, Orders, permits or consents set forth on Section 3.3(b) of the Disclosure Letter are made, given or obtained (as applicable), and (z) the requirements of the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and any other applicable antitrust, competition or merger control Laws promulgated by any Governmental Authority ("Foreign Competition Laws") are complied with, the execution, delivery and performance by Sellers of this Agreement and the consummation by Sellers of the transactions

contemplated hereby, do not: (i) violate the Organizational Documents of Sellers; (ii) in any material respect conflict with or violate any Law applicable to Sellers or by which any Transferred Asset is bound; or (iii) result in any material breach of, constitute a material default (or an event that, with notice or lapse of time or both, would become a material default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any material Encumbrance (other than a Permitted Encumbrance) on any Transferred Asset under, any Transferred Contract; except, in each case, for any such violations, breaches, defaults or other occurrences that are not material to the Business taken as a whole.

(b) Except as set forth on Section 3.3(b) of the Disclosure Letter, no Seller is required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Sellers of this Agreement or the consummation by Sellers of the transactions contemplated hereby, except (i) requisite Bankruptcy Court approvals, (ii) any filings required to be made under the HSR Act and any Foreign Competition Laws, (iii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not material to the Business taken as a whole, or (iv) as may be necessary as a result of any facts or circumstances relating to Buyer or any of its Affiliates.

Section 3.4 Transferred Assets; Sufficiency of Assets. Subject to requisite Bankruptcy Court approvals and except as a result of the commencement of the Chapter 11 Case:

(a) Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Seller, as applicable, has indefeasible title to, and owns and possesses all rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in, or with respect to licensed Transferred Assets, valid licenses to use.

(b) This Agreement and the instruments and documents to be delivered by Sellers to Buyer at the Closing shall be adequate and sufficient to transfer (i) Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to Buyer, good title to the Transferred Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), claims and interests, other than Assumed Liabilities, subject to entry of the Sale Order.

(c) Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole and except for any Business Employees who do not become Transferred Employees, the Transferred Assets to be conveyed to Buyer hereunder at Closing constitute (i) all the properties, rights and other assets and personnel necessary, and are sufficient, to carry on the Business as it is currently conducted by Sellers and (ii) except for the Excluded Assets, all of the assets owned by Sellers or any of their Subsidiaries, held for use by Sellers and their Subsidiaries primarily in the conduct of the Business.

Section 3.5 Absence of Certain Changes or Events. Except (i) for discussions, negotiations, execution and activities related to this Agreement or other potential strategic transactions, (ii) for the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Transferred Assets, (iii) for the preparation and commencement of the Chapter 11 Case and

Sellers' debtor-in-possession financing in the Chapter 11 Case, or (iv) as set forth on Section 3.5 of the Disclosure Letter or as expressly contemplated by this Agreement, from [●], 2026, until the date hereof, no Seller has taken any action or failed to take any action, as applicable, that would be prohibited by Section 6.1(b)(i), Section 6.1(b)(ii), Section 6.1(b)(v), or Section 6.1(b)(vi), if taken, failed to be taken or proposed to be taken, except for the execution and delivery of this Agreement.

Section 3.6 Compliance with Law; Permits.

(a) Except as set forth on Section 3.6(a) of the Disclosure Letter, as of the date hereof, (i) the Business is being conducted in compliance with, and Sellers are in material compliance with, all applicable Laws relating to the operation of the Business and the Transferred Assets and (ii) there are no pending or, to the Knowledge of Sellers, threatened in writing, claims from any Governmental Authority relating to any non-compliance of the Business or the Transferred Assets, except, in each case of (i) and (ii), that has not had, or would be reasonably expected to have, a Material Adverse Effect.

(b) Sellers are in possession of all material permits (including work permits and visas), licenses, franchises, approvals, certificates, consents, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority (the "Permits") necessary for them to own, lease and operate their assets and properties, to employ or engage officers, workers and employees who are not citizens of the country where they are carrying out their duties or performing their services and to carry on the Business as currently conducted. All material Permits held by Sellers: (i) are valid and in full force and effect and no Seller is in default under, or in violation of, any such Permit, except for such defaults or violations which would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with Buyer's ability to operate the Business as currently operated and no suspension or cancellation of any such Permit is pending (other than pursuant to its terms) or, to Sellers' Knowledge, threatened and (ii) subject to entry of the Sale Order, each such Permit may be transferred or reissued to Buyer in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Court).

Section 3.7 Litigation. Except for the Chapter 11 Case, and any Order entered in the Chapter 11 Case, as of the date hereof, there is no Action by or against any Seller in connection with the Business or the Transferred Assets pending, or to the Knowledge of Sellers, threatened other than any Action pursuant to which no injunctive or equitable relief is sought and where the monetary damages are covered by insurance or would not reasonably be expected to have a Material Adverse Effect.

Section 3.8 Employee Benefit Plans.

(a) (i) Each Employee Benefit Plan has been operated and administered in all material respects in accordance with its terms and applicable Law, and (ii) there are no pending or threatened actions, suits or claims by, on behalf of or against any Employee Benefit Plan or any administrator or fiduciary thereof (other than routine claims for benefits) that would reasonably be expected to have a Material Adverse Effect.

(b) The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not, alone or in combination with any other event, (i) entitle any Business Employee to severance pay, transaction bonus or any other similar compensation or benefit (other than from a Governmental Authority), (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any Business Employee, (iii) cause any individual to accrue or receive additional benefits, service or accelerated rights to payment of benefits under any Employee Benefit Plan, (iv) directly or indirectly cause Sellers or any Affiliate of Sellers to transfer or set aside any assets to fund benefits for any individual, or (v) result in any payment or benefit that would constitute an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code) or subject any Person to Liability for tax under Section 4999 of the Code or cause the loss of a deduction to any Seller under Section 280G of the Code.

(c) All contributions and premiums required by Law or by the terms of any Employee Benefit Plan have been timely made to any funds or trusts established thereunder or in connection therewith in all material respects.

(d) Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has either received or is entitled to rely on a favorable determination or opinion letter as to such qualification from the IRS and, to the Knowledge of Sellers, and has, in operation, been qualified under the Code from the effective date of such Employee Benefit Plan. No event has occurred, either by reason of any action or failure to act, which would reasonably be expected to cause the loss of any such qualification.

(e) None of Sellers or any of their ERISA Affiliates has ever maintained, sponsored, contributed to, or had an obligation to maintain, sponsor or contribute to, or has any Liability with respect to (i) a "defined benefit plan," as defined in Section 3(35) of ERISA, (ii) a plan subject Title IV of ERISA or Sections 412 or 430 of the Code or to the minimum funding standards of Section 302 of ERISA, (iii) a "multiemployer plan," as defined in Section 3(37) of ERISA, (iv) any employee benefit plan, program or arrangement that provides for post-retirement medical or welfare benefits (except health continuation coverage required by COBRA), (v) any "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA, (vi) any "multiple employer plan" as defined in Section 210 of ERISA or Section 413(c) of the Code, or (vii) any "voluntary employee beneficiary association" within the meaning of Section 501(c)(9) of the Code or any other "welfare benefit fund" as defined in Section 419 of the Code.

Section 3.9 Labor and Employment Matters.

(a) Except as set forth on Section 3.9(a) of the Disclosure Letter, no Seller is a party to or bound by a Collective Bargaining Agreement.

(b) As of the date hereof, solely with respect to the Business Employees, (i) there is no unfair labor practice charge or complaint pending or, to the Knowledge of Sellers, threatened against Sellers before the National Labor Relations Board or any similar Governmental Authority, (ii) no Labor Organization or group of Business Employees has made a pending demand in writing for recognition or certification as the bargaining agent of the Business Employees, and there are no representation or certification proceedings or petitions seeking a representation

proceeding presently pending or, to the Knowledge of Sellers, threatened to be brought or filed with the National Labor Relations Board or any similar Governmental Authority, (iii) to the Knowledge of Sellers, there are no pending or threatened union organizing or certification activities and (iv) there are no pending or, to the Knowledge of Sellers, threatened strikes, work stoppages, lockouts, slowdowns or other labor disputes, that, in each case of (i) through (iv), have had, or would be reasonably expected to have, a Material Adverse Effect.

Section 3.10 Real Property.

(a) Each Seller has good and valid fee simple title (or its jurisdictional equivalent) to the Owned Real Property it owns that is, subject to the entry of the Sale Order, free and clear of all Encumbrances, other than Permitted Encumbrances.

(b) Each Seller has a valid leasehold, subleasehold or other similar interest in all Leased Real Property, that is, subject to the entry to the Sale Order, free and clear of all Encumbrances, other than Permitted Encumbrances. Sellers have made available to Buyer true, correct and complete copies of each Lease for Leased Real Property.

(c) Except as set forth on Section 3.10(c) of the Disclosure Letter, no Seller is a party to or obligated under any option, right of first refusal or other contractual right to sell, dispose of or lease any of the Real Property or any portion thereof or interest therein to any Person other than Buyer.

Section 3.11 Intellectual Property.

(a) A true, correct and complete (in all material respects) list of all (i) issued Patents and pending Patent applications, (ii) registered Trademarks and applications to register any Trademarks, (iii) registered Copyrights and applications for registration of Copyrights, and (iv) domain name registrations, in each case which constitute Transferred IP (the "Registered IP") is set forth on Section 3.11(a) of the Disclosure Letter. Sellers are the sole and exclusive beneficial and record owners of all Registered IP, and all material items of such Registered IP are subsisting and, to the Knowledge of Sellers, valid and enforceable.

(b) To the Knowledge of Sellers, (i) the conduct of the Business, and the use, practice or exploitation of the Registered IP and other Intellectual Property as currently used, practiced or exploited by Sellers in the conduct of the Business, does not infringe, misappropriate or otherwise violate (and, since January 1, 2025 has not infringed, misappropriated or otherwise violated) any Person's Intellectual Property rights, and (ii) since January 1, 2025 there has been no such Action asserted or, to the Knowledge of Sellers, threatened in writing against any Seller, in each case of the foregoing clauses (i)-(ii), as have had, or would be reasonably expected to have, a Material Adverse Effect.

(c) To the Knowledge of Sellers, no Person is infringing, misappropriating or otherwise violating in any material respect any Transferred IP, and since January 1, 2025, no such Actions have been asserted or threatened in writing against any Person by any Seller or, to the Knowledge of Sellers, any other Person.

(d) Sellers take commercially reasonable steps to safeguard and maintain the confidentiality of all trade secrets and other material confidential or proprietary information included in the Transferred IP.

(e) Notwithstanding anything to the contrary in this Agreement, the representations and warranties set forth in this Section 3.11 constitute the sole and exclusive representation and warranties made by Sellers with respect to any matter relating to Intellectual Property. No other representation or warranty contained in this Agreement shall be construed or deemed to constitute, directly or indirectly, a representation or warranty with respect to any Intellectual Property matter.

Section 3.12 Tax Matters.

(a) All material Tax Returns required to be filed by or with respect to the Transferred Assets or the Business have been timely filed, and all such Tax Returns are true, correct and complete in all material respects. Subject to any obligation of Sellers under the Bankruptcy Code, all material Taxes due and payable by or with respect to the Transferred Assets or the Business have been paid.

(b) There is no action, suit, claim, deficiency, assessment, or audit pending, proposed in writing, or, to Sellers' Knowledge, threatened in writing with respect to material Taxes of or relating to the Transferred Assets or the Business.

(c) There are no Encumbrances for Taxes upon the Transferred Assets, other than Permitted Encumbrances.

(d) No agreement, waiver, extension or consent regarding the application of the statute of limitations with respect to any material Taxes or Tax Returns of or with respect to the Transferred Assets or the Business is outstanding, nor is there pending any request for such an agreement, waiver, extension or consent.

(e) The representation and warranties set forth in this Section 3.12 are the sole and exclusive representations and warranties with respect to Taxes.

Section 3.13 Environmental Matters. Except as would not be reasonably be expected to be material to the Business, taken as a whole:

(a) As of the date hereof, Sellers, the Transferred Assets and the Business are in compliance in all respects with all applicable Environmental Laws, which compliance includes the possession of, and compliance with the terms of, all Environmental Permits required in connection with the conduct or operation of the Business and the ownership or use of the Transferred Assets except as has had, or would be reasonably expected to have, a Material Adverse Effect. There is no claim or action currently pending or, to the Knowledge of Sellers, threatened, that is or would reasonably be expected to result in the cancellation, revocation or other adverse or limiting modification of any such Environmental Permit.

(b) There is no Environmental Claim pending or, to the Knowledge of Sellers, threatened against or affecting any Seller, Transferred Asset or the Business that would be

reasonably expected to have a Material Adverse Effect. There are no environmental conditions, including the presence of any Hazardous Material at the Real Property, which would be reasonably likely to form the basis of any Liability of the Business, any Transferred Asset or of any Environmental Claim against or affecting any Seller or the Business that would be reasonably expected to have, a Material Adverse Effect.

Section 3.14 Transferred Contracts. Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including payment by Buyer of Cure Claims) and except as a result of the commencement of the Chapter 11 Case, each Transferred Contract and each of the Leases for Leased Real Property is in full force and effect and is a valid, binding and enforceable obligation of the applicable Seller and, to the Knowledge of Sellers, each of the other Parties thereto, except as may be limited by the Enforceability Exceptions. Except as set forth on Section 3.14 of the Disclosure Letter, or as would not reasonably be expected to be material to the Business, taken as a whole, no Seller is in default, or is alleged in writing by the counterparty thereto to have breached or to be in default, under any Transferred Contract (including any such Transferred Contract that is a Lease for Leased Real Property), and, to the Knowledge of Sellers, the other party to such Transferred Contract (including any such Transferred Contract that is a Lease for Leased Real Property) is not in default thereunder. No Transferred Contract (including any such Transferred Contract that is a Lease for Leased Real Property) has been canceled or otherwise terminated, and no Seller has received any written notice from any Person regarding any such cancellation or termination.

Section 3.15 Certain Payments. Since the Compliance Date, no Seller (nor, to the Knowledge of Sellers, any of their respective Representatives) (a) has used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) has used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees; (c) has violated or is violating any provision of the Foreign Corrupt Practices Act of 1977; (d) has established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or (e) has made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature.

Section 3.16 Insurance. Each material insurance policy maintained by Sellers on the properties, assets, products, business or personnel of Sellers is legal, valid, binding, enforceable by Sellers, and in full force and effect, and all premiums with respect thereto covering all periods up to and including the date hereof have been paid, and no notice of cancellation or termination has been received with respect to any such insurance policy.

Section 3.17 Brokers. Except for the Banker’s Fees, no broker, finder or investment banker is entitled to any brokerage, finder’s or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

Section 3.18 Exclusivity of Representations and Warranties. Notwithstanding the delivery or disclosure to Buyer or any of its Affiliates or Representatives of any documentation or other information (including any financial projections or other supplemental data), except for the representations and warranties expressly set forth in this Article III, no Seller makes, or has made, (and each Seller and their respective Affiliates and Representatives, hereby disclaims) any express

or implied representation or warranty with respect to the Business, Transferred Assets, or Assumed Liabilities, or with respect to the accuracy or completeness of any information provided, or made available, to Buyer or any of its Affiliates or Representatives, and Buyer and its Representatives are not relying on any representation, warranty or other information of any Seller or any Person except for those expressly set forth in this Article III. No Seller makes (and each Seller and their respective Affiliates and Representatives, hereby disclaims) any express or implied representation or warranty (including as to completeness or accuracy) to Buyer with respect to, and no Seller or any other Person shall be subject to any liability to Buyer or any other Person resulting from, any Seller or their respective Representatives providing, or making available, to Buyer or any of its Affiliates or its Representatives, or resulting from the omission of, any estimate, projection, prediction, data, budget, forecast, financial information, memorandum, prospect information, presentation or any other materials or information, including any oral, written, video, electronic or other materials or information presented to or made available to Buyer in connection with presentations by SVM Parent's management or information made available on any "data sites" or in the course of their due diligence investigation of the Business, the negotiation of this Agreement or the course of the transactions contemplated by this Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

Section 4.1 Organization. Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement.

Section 4.2 Authority. Buyer has the power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action and this Agreement has been, and upon its execution each of the Ancillary Agreements to which Buyer will be a party will have been, duly executed and delivered by Buyer and assuming due execution and delivery by each of the other Parties and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which Buyer will be a party will constitute, the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with its respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 4.3 No Conflict; Required Filings and Consents.

(a) Assuming that (x) requisite Bankruptcy Court approvals are obtained and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on Section 3.3(b) of the Disclosure Letter are made, given or obtained (as applicable), the execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which Buyer will be a party, and the consummation of the transactions contemplated hereby and thereby, or compliance by Buyer with any of the provisions hereof, do not and will not:

(i) conflict with the Organizational Documents of Buyer;

(ii) conflict with or violate any Law applicable to Buyer or by which any property or asset of Buyer is bound or affected;

(iii) conflict with or violate any Order of any Governmental Authority; or

(iv) conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to, any Contract to which Buyer is a party.

(b) Buyer is not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party or the consummation of the transactions contemplated hereby or thereby, except for any filings required to be made under the HSR Act or Foreign Competition Laws.

Section 4.4 Absence of Litigation. There is no Action pending or, to the knowledge of Buyer, threatened in writing, against Buyer that, if adversely determined, (a) would prevent or materially restrict, impede or delay the performance by Buyer of its obligations under this Agreement or (b) would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

Section 4.5 Qualification.

(a) To the knowledge of Buyer, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

(b) As of the Closing, Buyer will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Transferred Contracts.

Section 4.6 Legal Requirements and Approvals. Buyer has no knowledge of any consent of any Governmental Authority that will be required to consummate the transactions contemplated by this Agreement that it will not be able to obtain or make, or that it may obtain only after substantial delay, or any material requirement of any Governmental Authority that it will be unable to satisfy in connection with the transactions contemplated hereby.

Section 4.7 Brokers. No broker, finder or investment banker is entitled to any fee, commission or expense from Buyer that would be payable by Sellers in connection with the transactions contemplated hereby.

Section 4.8 Sufficient Funds. Buyer has, and will have, available to it at all times through the Closing sufficient funds to (i) satisfy all obligations of Buyer under this Agreement, including the payment of the Purchase Price and Cure Claims and (ii) pay any and all fees, costs and expenses required to be paid by Buyer related to the transactions contemplated hereby.

Section 4.9 Solvency. Immediately after giving effect to the transactions contemplated by this Agreement and the Ancillary Agreements (including the payment of the Purchase Price, and the payment of all related fees and expenses), (i) Buyer and its Affiliates will not have incurred debts beyond their ability to pay such debts as they mature or become due, (ii) the then present fair saleable value of the assets of Buyer and its Affiliates will exceed the amount that will be required to pay their existing debts (including the probable amount of all contingent liabilities) as such debts become absolute and matured, (iii) the assets of Buyer and its Affiliates at a fair valuation will exceed their debts (including the probable amount of all contingent liabilities) and (iv) Buyer and its Affiliates will not have unreasonably small capital to carry on their business as proposed to be conducted following the Closing. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby, in either case, with the intent to hinder, delay or defraud either present or future creditors of Buyer and its Affiliates.

Section 4.10 Exclusivity of Representations and Warranties.

(a) Except for the representations and warranties expressly set forth in this Article IV, neither Buyer nor any other Person on behalf of Buyer makes (and Buyer, on behalf of itself, its Subsidiaries, and their respective Affiliates and Representatives, hereby disclaims), and SVM Parent has not relied on, any express or implied representation or warranty with respect to Buyer, its Subsidiaries or any of their respective businesses, operations, properties, assets, liabilities or otherwise in connection with this Agreement or the transactions contemplated hereby, including as to the accuracy or completeness of any information.

(b) Except for the representations and warranties expressly set forth in Article III, Buyer acknowledges and agrees that (x) no Seller or any other Person on behalf of any Seller makes, or has made, any express or implied representation or warranty, at law or in equity, with respect to Sellers or with respect to the accuracy or completeness of any information provided, or made available, to Buyer or any of its Affiliates or Representatives, including with respect to the Business, operations, assets (including the Transferred Assets), liabilities (including the Assumed Liabilities), conditions (financial or otherwise), prospects or otherwise in connection with this Agreement or the transactions contemplated by this Agreement, including any representation or warranty as to value, merchantability, fitness for any particular purpose or for ordinary purposes, and Buyer and its Representatives are not relying on any written or oral statement, representation, warranty, guaranty or other information of any Seller or any Person except for those expressly set forth in Article III or (y) no person has been authorized by Sellers or any other Person on behalf of Sellers to make any representation or warranty relating to the Business, Transferred Assets, or Assumed Liabilities in connection with this Agreement, and if made, such representation or warranty shall not be relied upon by Buyer as having been authorized

by such entity. Without limiting the generality of the foregoing, Buyer acknowledges and agrees that no Seller or any other Person has made a representation or warranty (including as to completeness or accuracy) to Buyer with respect to, and no Seller or any other Person shall be subject to any liability to Buyer or any other Person resulting from, Sellers or their respective Representatives providing, or making available, to Buyer or any of its Affiliates or their respective Representatives, or resulting from the omission of, any estimate, projection, prediction, data, financial information, memorandum, presentation or any other materials or information, including any materials or information made available to Buyer and/or its Representatives in connection with presentations by SVM Parent's management or information made available on any "data sites." Buyer acknowledges that it has conducted, to its satisfaction, its own independent investigation of the condition (financial or otherwise), operations and business of Sellers and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of its own independent investigation and representations and warranties set forth in Article III and has not relied directly or indirectly on any materials or information made available to Buyer and/or its Representatives by or on behalf of any Seller. Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Business and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

## ARTICLE V

## BANKRUPTCY COURT MATTERS

Section 5.1 Debtors-in-Possession. As of the date hereof through the Closing, Sellers shall continue to operate their businesses as debtors-in-possession pursuant to the Bankruptcy Code.

Section 5.2 Sale Order. The Sale Order shall (i) be substantially in the form attached hereto as Exhibit A or otherwise in form and substance reasonably acceptable to Buyer and Sellers and (ii) among other things, (a) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Transferred Assets to Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances, excluding, solely for purposes of this Section 5.2, clause (i) of the definition thereof), and (iii) the performance by Sellers of their respective obligations under this Agreement; (b) find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and the sale is entitled to the protections afforded under Section 363(m) of the Bankruptcy Code; (c) authorize and empower Sellers to assume and assign to Buyer the Transferred Contracts; (d) find that Buyer has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption and assignment of the Transferred Contracts; (e) find that Buyer shall have no Liability for any Liability that is not an Assumed Liability; and (f) find that Buyer did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code.

Section 5.3 Cooperation with Respect to Bankruptcy Court Approvals. Buyer shall take such actions as are reasonably requested by Sellers to assist in obtaining entry by the Bankruptcy Court of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes of, among other things: (a) demonstrating that Buyer

is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and (b) establishing "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code.

Section 5.4 Bidding Procedures Order. Buyer shall comply with the Bidding Procedures Order, including with respect to serving as a "Backup Bidder" (as defined therein).

Section 5.5 Bankruptcy Court Filings. Sellers shall consult with Buyer concerning the Sale Order and any other Orders of the Bankruptcy Court entered after the date hereof relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and provide Buyer with copies of any material applications, pleadings, notices, proposed Orders and other documents to be filed by Sellers in the Chapter 11 Case that relate in any material respect to this Agreement, the Transferred Assets or Buyer prior to the making of any such filing or submission to the Bankruptcy Court.

## ARTICLE VI

## COVENANTS

Section 6.1 Conduct of Business Prior to the Closing. From the date of this Agreement until the Closing Date or earlier termination of this Agreement,

(a) Sellers shall conduct the Business in the Ordinary Course of Business, except (1) as otherwise expressly permitted, contemplated or required by this Agreement, (2) as expressly set forth in Section 6.1 of the Disclosure Letter, (3) as required by, arising out of, relating to or resulting from the Chapter 11 Case or otherwise required by Law (including the Bankruptcy Code) or required or approved by any Order, (4) for any limitations on operations imposed by the Bankruptcy Court, the Bankruptcy Code, the DIP Credit Agreement, the HSBC Receivables Agreement, or the Supply and Liquidity Agreement, or (5) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed); provided, that, in the case of this clause (5), if Buyer fails to respond to a request from SVM Parent for consent required pursuant to this Section 6.1 within five (5) Business Days after receipt of SVM Parent's request, Buyer's approval of such action shall be deemed granted; and

(b) Sellers shall not:

(i) sell, transfer, lease, sublease, encumber or otherwise dispose of any material tangible Transferred Assets other than immaterial dispositions thereof and Inventory sold or disposed of in the Ordinary Course of Business;

(ii) acquire any corporation, partnership, limited liability company, other business organization or division thereof related to or affecting the Business or the Transferred Assets, except (1) acquisitions in all material respects in the Ordinary Course of Business, or (2) acquisitions pursuant to Contracts in existence on the date of this Agreement;

(iii) merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(iv) declare, set aside or pay any dividend or other distribution of any Transferred Asset;

(v) enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Business or the Transferred Assets;

(vi) (1) reject, terminate (other than by expiration in accordance with its terms), or materially amend any Transferred Contract or seek Bankruptcy Court approval to do so, or (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Transferred Contract;

(vii) make any loans, advances or capital contributions to, or investments in, any other Person (other than to a Seller in the Ordinary Course of Business);

(viii) subject any of the Transferred Assets to any Encumbrance other than Permitted Encumbrances;

(ix) incur any indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness except for indebtedness under the DIP Credit Agreement, the HSBC Receivables Agreement, the HSBC Demand Line Agreement, the KHI Loan Agreement, the Supply and Liquidity Agreement or any intercompany indebtedness;

(x) in each case solely with respect to the Offer Employees (as defined in Section 6.3(a)) and except as required by the Collective Bargaining Agreement, applicable Law, or permitted pursuant to Bankruptcy Court Order approving a retention bonus plan or incentive bonus plan, (1) make or grant any general or special wage or salary increase (other than standard increases in the Ordinary Course of Business), (2) materially increase the level of benefits under any Employee Benefit Plan, (3) take any action with respect to the grant of any material severance or termination pay (other than pursuant to Employee Benefit Plans in effect on the date of this Agreement), (4) adopt, amend or terminate any material Employee Benefit Plan, other than in the Ordinary Course of Business or as required by Law, and (5) enter into any material employment, consulting or similar agreement or amend any existing material employment agreement; provided that the foregoing shall not restrict any Seller from entering into or making available, to newly hired Business Employees or to Business Employees in the context of promotions based on job performance or workplace requirements, in each case, in the Ordinary Course of Business, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions; or

(xi) agree or commit to any of the foregoing.

Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers, or the Business

prior to the Closing and (ii) prior to the Closing, Sellers shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and their operations.

Section 6.2 Covenants Regarding Information.

(a) Subject to the Bidding Procedures and applicable Law, from the date hereof until the Closing Date or earlier termination of this Agreement, upon reasonable request, Sellers shall afford Buyer and its Representatives reasonable access to the properties, offices, plants and other facilities, books and records (including Tax books and records) of Sellers, solely with respect to the Transferred Assets or Assumed Liabilities, and shall furnish Buyer with such financial, operating and other data and information, and access to all the officers, employees, accountants and other Representatives of Sellers, solely with respect to the Transferred Assets or Assumed Liabilities, as Buyer may reasonably request in connection with the transactions contemplated by this Agreement. Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to provide access to or disclose any information to Buyer or its Representatives if (i) such access or disclosure is prohibited pursuant to the terms of a confidentiality agreement with a third party entered into prior to the date hereof, (ii) such access or disclosure would violate applicable Law, or (iii) such access or disclosure would adversely affect any attorney-client or other legal privilege or contravene any applicable Laws (the "Disclosure Limitations"); provided that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of Sellers after consultation with outside counsel) violate any such confidentiality agreement or applicable Law, or cause such privilege to be undermined with respect to such information.

(b) The information provided pursuant to this Section 6.2 prior to Closing will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. No Seller makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Buyer may not rely on the accuracy of any such information.

(c) From and after the Closing, until the closing of the Chapter 11 Case, Buyer will provide Sellers and their Representatives, with reasonable access, during normal business hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of Buyer or the Business, to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Transferred Assets, the Assumed Liabilities, or the Excluded Assets with respect to periods or occurrences prior to the Closing Date, for the purposes of (i) complying with the requirements of any Governmental Authority, including the Bankruptcy Court, (ii) the closing of the Chapter 11 Case and the wind down of Sellers' estates (including reconciliation of claims and preparation of Tax Returns or other Tax proceedings and the functions of any trusts established under a Chapter 11 plan of sellers or any other successors of Sellers), (iii) complying with applicable Laws or (iv) other reasonable business purposes; provided that Buyer shall not be obligated to provide any such access that would, in the reasonable, good faith judgment of Buyer, conflict with the Disclosure Limitations. Unless otherwise

consented to in writing by SVM Parent, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to SVM Parent such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of.

Section 6.3 Employee Matters.

(a) Buyer shall, or shall cause one of its Affiliates to, within a reasonable period of time (but no later than fifteen (15) Business Days prior to the Closing Date), provide (or cause an Affiliate to provide) to each Business Employee (including each Qualified Leave Recipient) (each, an "Offer Employee") an offer of employment on terms and conditions sufficient to avoid triggering an "employment loss" under the WARN Act and on such other terms and conditions that are consistent with this Section 6.3, in each case with such employment to commence effective as of, and contingent upon the occurrence of, the Closing, or in the case of a Qualified Leave Recipient, the date of his or her return to active employment; provided that such Qualified Leave Recipient returns to active status within six (6) months following the Closing Date (or such later date as may be required by applicable Law). Buyer shall comply with all applicable Laws, including the National Labor Relations Act and any non-discrimination Laws, in making decisions designating or otherwise affecting Business Employees who may receive an offer of employment from Buyer or an Affiliate of Buyer. Unless a written acceptance of an offer of employment is required by applicable Law, any Offer Employee who does not expressly reject Buyer's (or an Affiliate of Buyer's) offer of employment prior to the Closing and actually commences employment with Buyer or one of its Affiliates immediately following the Closing (or such later time as may be required by applicable Law) shall be deemed for purposes of this Agreement to have accepted such offer as of the Closing. Each Offer Employee who receives and accepts (or is deemed to have accepted) Buyer's (or an Affiliate of Buyer's) offer of employment and who commences employment with Buyer or an Affiliate thereof on or following the Closing shall be a "Transferred Employee." Sellers shall reasonably cooperate with Buyer in effecting the Transferred Employees' transfer of employment from Sellers to Buyer or an Affiliate of Buyer as contemplated hereby. Buyer shall notify Sellers in a reasonable timeframe with respect to whether each offer of employment to an Offer Employee has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the Offer Employees will accept an offer of employment or will continue in employment with Buyer following the Closing for any period of time. Sellers and Buyer intend that Transferred Employees will have continuous and uninterrupted employment immediately before and immediately after the Closing.

(b) For a period commencing upon the Closing and ending on the twelve (12) month anniversary of the Closing, Buyer shall, or shall cause one of its Affiliates to, provide each Transferred Employee, except where more favorable treatment is required by applicable Law, by the Collective Bargaining Agreement, to avoid triggering any notice requirements under the WARN Act or to prevent Termination Pay from becoming payable under applicable Law: (i) a total compensation package that is no less favorable than that employee's existing total compensation package, including (1) a base salary or hourly base wage rate (as applicable) that is at least equal to such Transferred Employee's existing base salary or hourly wage rate as provided to the Transferred Employee by Sellers and their Affiliates immediately prior to the Closing, and (2) annual incentive bonus and long-term incentive compensation opportunities that are no less

favorable in the aggregate to such Transferred Employee than such opportunities currently provided to the Transferred Employee by Sellers and their Affiliates immediately prior to the Closing, and (ii) other employee benefits that are no less favorable in the aggregate than such other employee benefits currently provided to the Transferred Employees by Sellers and their Affiliates immediately prior to the Closing.

(c) Notwithstanding anything in this Agreement to the contrary, Buyer shall or shall cause an Affiliate of Buyer to, effective upon the Closing (i) recognize each Labor Organization that is party to a Collective Bargaining Agreement covering any Transferred Employee as the collective bargaining representative for the applicable Transferred Employees covered by such Collective Bargaining Agreement, (ii) assume each such Collective Bargaining Agreement and any and all Liabilities relating thereto or arising thereunder, and (iii) provide to the Transferred Employees whose employment is subject to a Collective Bargaining Agreement, terms and conditions of employment in accordance with such agreement until its expiration, modification, or termination in accordance with its terms and applicable Law. The Parties shall, and shall cause their respective Affiliates to, mutually cooperate with and provide reasonable assistance to the other in undertaking all reasonably necessary or legally required provision of information to, or bargaining, consultations, discussions or negotiations with, any Business Employees or any Labor Organization that represents Business Employees affected by the transactions contemplated by this Agreement.

(d) Buyer shall, or shall cause one of its Affiliates to, assume and pay, at the times such amounts are due, all unpaid base wages, base salaries, commissions and other accrued compensation, employee expenses, incentives and benefits, earned or accrued by or in respect of Transferred Employees, which are earned or accrued during the payroll period in which the Closing Date occurs.

(e) Except as otherwise required by Law, all unused vacation and paid time off of the Transferred Employees accrued as of the Closing Date shall, effective as of the Closing Date or, if later, the date on which such Transferred Employee becomes an employee of Buyer or an Affiliate of Buyer, be transferred to and assumed by Buyer or an Affiliate of Buyer, as applicable, and Buyer or its Affiliate shall honor such accrued vacation and paid time off on the same basis as under Sellers' vacation and paid time off policy(ies) as in effect immediately prior to the Closing.

(f) Effective as of the Closing, Buyer and its Affiliates shall be responsible for and assume all Liabilities related to all claims for workers' compensation benefits and coverage which are incurred by Business Employees, whenever incurred, and Buyer and its Affiliates shall be responsible for the administration of all such claims. In the event that Buyer and its Affiliates are unable to assume any such liability or the administration of any such claim because of applicable Law or Contract, Sellers or one of their Affiliates shall administer and/or discharge such Liabilities, as applicable, and Buyer and its Affiliates shall reimburse and otherwise fully indemnify Sellers or one of their Affiliates for all such Liabilities.

(g) Buyer shall, and shall cause its Affiliates to, provide each Transferred Employee with credit for such Transferred Employee's service with any Sellers or their Affiliates or predecessors prior to the Closing for all purposes, including for purposes of eligibility and determination of level of benefits (including for purposes of vacation, but excluding for purposes

of severance, equity compensation and benefit accruals under any defined benefit pension plan or retiree medical plan), under any benefit plan sponsored or maintained by Buyer or any of their Affiliates in which such Transferred Employee is eligible to participate on or following the Closing Date (each, a "Buyer Plan"); provided, however, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits. With respect to each Buyer Plan that is a health or welfare plan, Buyer shall, and shall cause its Affiliates to use commercially reasonable efforts to, (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements and requirements to show evidence of good health and (ii) credit each such Transferred Employee with all deductible payments, co-payments and co-insurance paid by such Transferred Employee under any Employee Benefit Plan prior to the Closing during the year in which the Closing occurs for the purpose of determining the extent to which any such Transferred Employee has satisfied any applicable deductible and whether such Transferred Employee has reached the out-of-pocket maximum for such year.

(h) The Parties shall cooperate in good faith to, and Sellers shall give commercially reasonable assistance as Buyer may reasonably request in order to, cause the assignment of the Employee Benefit Plans from the respective Seller to Buyer or its Affiliates, which assignment shall be effective as of the Closing (as assigned, the "Assigned Benefit Plans"), and Buyer shall assume all obligations under, and Liabilities with respect to, the Assigned Benefit Plans consistent with Section 2.3(i) as Assumed Liabilities. For all purposes under each Assigned Benefit Plan, Buyer shall credit (or cause to be credited) the Transferred Employees for service earned prior to the Closing with Sellers in addition to service earned with Buyer on and after the Closing. At any time and from time to time after the Execution Date, Sellers and Buyer shall take, or cause to be taken, any and all actions necessary to effectuate the terms of this Section 6.3(h), including taking all action necessary to assign and assume and adopt each Assigned Benefit Plan in the manner contemplated by this Agreement effective as of the Closing. Nothing herein shall prohibit Buyer or its Affiliates, as applicable, from terminating, amending, or otherwise affecting any Assigned Benefit Plan in accordance with its terms, at any time and from time to time following the Closing.

(i) Without limitation of Section 10.10, nothing express or implied in this Section 6.3 or this Agreement shall (i) confer upon any Business Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be treated as an amendment to, or prevent or otherwise restrict the amendment or termination of any Assigned Benefit Plan, Buyer Plan or any other employee benefit plan, program, arrangement or agreement sponsored or maintained by Buyer, Sellers or their respective Affiliates, as applicable, or (iii) obligate Buyer, Sellers or any of their respective Affiliates to maintain any particular employee benefit plan, program or arrangement.

(j) Prior to the Closing, any written or material oral communications proposed to be delivered by Buyer or an Affiliate of Buyer to any Business Employee regarding such employees' level of (or rights with respect to) continued employment or benefits or compensation at or after Closing shall be subject to the prior written approval of SVM Parent, which shall not be unreasonably withheld, conditioned or delayed; provided that in all cases, SVM Parent shall be given no less than three (3) Business Days to review and comment on any such communications.

(k) For a period of ninety (90) days after the Closing Date, Buyer shall not, and shall cause its Affiliates not to, engage in any conduct that would result in an employment loss or layoff for a sufficient number of employees of Buyer or an Affiliate of Buyer (including Transferred Employees) which, if aggregated with any such conduct on the part of Sellers on or prior to the Closing Date, would trigger the WARN Act. The Parties agree to cooperate in good faith to comply in all material respects with preparing and delivering any notices required or potentially required pursuant to the WARN Act in connection with the transactions contemplated by this Agreement.

(l) Buyer and its Affiliates, as applicable, shall employ those Transferred Employees who are foreign nationals working in the United States in non-immigrant status and those Transferred Employees for whom there are pending or approved I-140 immigrant petitions as of the Closing Date (collectively, the "Visa Employees"), under terms and conditions such that Buyer or its Affiliate, as applicable, qualify as a "successor employer" under applicable United States immigration laws effective as of the Closing Date, including, but not limited to, 8 U.S.C. section 1184(c)(10). As of the Closing, Buyer or its Affiliate, as applicable, agrees to assume all immigration-related Liabilities and responsibilities under applicable United States immigration Laws with respect to such Visa Employees.

Section 6.4 Consents and Filings; Further Assurances.

(a) Subject to the terms and conditions of this Agreement, each of the Parties shall, and shall cause its Subsidiaries to, cooperate with each other Party to, promptly take, or cause to be taken, any and all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement and the Ancillary Agreements, including taking, or causing to be taken, all actions, and doing, or causing to be done, all things necessary to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from any third-party Person. Without limiting the generality of the previous sentence, the Parties shall (i) cooperate with each other party hereto to take, or cause to be taken, any and all actions, and to do, or cause to be done, all things necessary, appropriate or desirable to obtain from Governmental Authorities all consents, approvals, clearances, expiration or termination of waiting periods, authorizations, qualifications and orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) as promptly as practicable, make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement required under the HSR Act (if required) or any other applicable Law, including any other Antitrust Law; (iii) take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to comply at the earliest practicable date with any request under the HSR Act, or other Antitrust Law, for additional information, documents or other materials received by each of them or any of their respective Subsidiaries from the Federal Trade Commission, the Antitrust Division of the United States Department of Justice or any other Governmental Authority in respect of such filings (collectively, an "Antitrust Authority"); (iv) cooperate with each other in connection with any such filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any

investigation or other inquiry of any of the Antitrust Authorities under the HSR Act or Foreign Competition Law with respect to any such filing; (v) (1) take all other actions necessary, proper or advisable to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as possible or (2) not enter into any agreement with an Antitrust Authority not to consummate the transactions contemplated hereby; and (vi) take any and all steps not prohibited by applicable Law to defend and resolve any investigation or other inquiry of any Governmental Authority under all applicable Laws, including by defending against and contesting administratively and in court any litigation or adverse determination initiated or made by a Governmental Authority under applicable Law. This Section 6.4(a) does not apply with respect to Taxes.

(b) In furtherance of the foregoing Section 6.4(a), each of the Parties shall promptly notify the other Parties of, and if in writing, furnish the other Parties with copies of (or, in the case of oral communications, advise the others of the contents of) any material communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority. No Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties and their respective counsel the opportunity to attend and participate at such meeting. The Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination or expiration of any applicable waiting periods, including under the HSR Act. Subject to applicable Law, the Parties will provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby. This Section 6.4(b) does not apply with respect to Taxes.

(c) From time to time, whether at or following the Closing, Sellers and Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in Buyer all the right, title, and interest in, to or under the Transferred Assets, to provide Buyer and Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements. Each of the Parties will take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied. Notwithstanding the foregoing, nothing in this Section 6.4 shall (i) require Sellers or any of their Affiliates to make any expenditure or incur any obligation on their own or on behalf of Buyer (unless funds in the full amount thereof are advanced to Sellers in cash) or (ii) prohibit Sellers or any of their Affiliates from ceasing operations or winding up its affairs following the Closing.

(d) Subject to any approval of the Bankruptcy Court that may be required, Sellers and Buyer shall cooperate with each other and, as promptly as practicable after the date of this Agreement, take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to obtain the transfer or reissuance to Buyer of all Environmental Permits necessary to lawfully own and operate the Business and Transferred Assets. The Parties shall take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper or advisable under applicable Laws to (i) respond promptly to any requests for additional information made by such agencies, (ii) participate in any hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Environmental Permits, and (iii) cause regulatory approval to be obtained as soon as practicable after the date of filing. Each Party will bear its costs of the preparation and review of any such filing. Sellers and Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection any filings to transfer the Environmental Permits and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.

(e) Following Closing, Sellers shall cooperate with Buyer's reasonable requests with respect to the investigation and prosecution of any Actions related primarily to the Business or the Transferred Assets (other than in connection with disputes between the Parties), including taking, or causing to be taken, all actions, and doing, or causing to be done, all things necessary, proper or advisable under applicable Laws to furnish all reasonably available information and testimony, to arrange discussions with, and the calling as witnesses of, officers, directors, employees, agents and Representatives, and to provide other reasonable assistance in connection with any such Actions, with such cooperation to be at the cost and expense of Buyer. Without limiting this Section 6.4, Buyer agrees to take any and all steps and to make any and all undertakings necessary to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably practicable, including proposing, negotiating, committing to, and effecting by consent decree, hold separate order, or otherwise, the sale, divestiture, licensing, or disposition of such assets or businesses of Buyer (or its Subsidiaries or other Affiliates) or the Business, or otherwise taking or committing to take actions that limit Buyer's or its Subsidiaries' or Affiliates' freedom of action with respect to, or their ability to retain, any of the businesses, product lines, or assets of Buyer (or its Subsidiaries or other Affiliates) or the Business, in each case, as may be required in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order, or other order in any suit or proceeding that would otherwise have the effect of preventing or delaying the Closing.

Section 6.5 Certain Preference Claim Matters. Buyer shall not initiate, and shall cause its Affiliates not to initiate, any civil or administrative Proceeding related to Avoidance Actions against any non-Seller party to any Transferred Contract.

Section 6.6 Refunds and Remittances.

(a) After the Closing: (i) if Sellers or any of their Affiliates receive any refund or other amount that is a Transferred Asset or is otherwise properly due and owing to Buyer in accordance with the terms of this Agreement, Sellers promptly shall remit, or shall cause to be remitted, such amount to Buyer in accordance with this Agreement and (ii) if Buyer or any of its

Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to Sellers or any of their Affiliates in accordance with the terms of this Agreement, Buyer promptly shall remit, or shall cause to be remitted, such amount to Sellers in accordance with this Agreement.

(b) In the event that, from and after the Closing, (i) Sellers or any of their Affiliates have retained ownership of a Transferred Asset, then, for no additional consideration to Sellers or any of their Affiliates, Sellers shall, and shall cause their controlled Affiliates to, convey, assign or transfer promptly such Transferred Asset to Buyer or its designees in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Transferred Asset to Buyer or its designees in accordance with this Agreement or (ii) any Excluded Asset has been conveyed to or is received by Buyer, then, without any consideration payable to Buyer or any of its Affiliates, Buyer shall convey, assign or transfer promptly such Excluded Asset to Sellers in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Excluded Asset to Sellers or their designees in accordance with this Agreement.

Section 6.7 Public Announcements. From the date hereof through the Closing Date, neither Buyer, on the one hand, nor Sellers, on the other hand, shall issue any public report, statement, press release or otherwise make any public statement regarding this Agreement or the transactions contemplated hereby, without the prior written consent of Buyer and SVM Parent, unless otherwise required by applicable Law, in which case such Party shall coordinate and consult with the other Party with respect to the timing, basis, scope and content before issuing any such report, statement or press release; provided, however, that nothing in this Section 6.7 shall delay any required filing or other disclosure with the Bankruptcy Court or any other Governmental Authority or otherwise hinder either SVM Parent's or its Representatives' ability to timely comply with all Laws (including the Bankruptcy Code) or rules and regulations of any Governmental Authority including with respect to any public announcement, regulatory filing, statement or comment made in order to comply with applicable Laws (including the Bankruptcy Code) or rules of any Governmental Authority in the reasonable judgment of SVM Parent.

Section 6.8 Communications with Customers and Suppliers. Prior to the Closing, Buyer shall not, and shall cause its Affiliates and instruct its Representatives not to, contact, or engage in any discussions or otherwise communicate with, Sellers' customers, suppliers, licensors, licensees and other Persons with which Sellers have commercial dealings without obtaining the prior written consent of Sellers (other than any such communication in the ordinary course of business of Buyer or its Affiliates without reference to or any purpose relating to the Business, the Transferred Assets, the Assumed Liabilities or the transactions contemplated by this Agreement), which consent shall not be unreasonably withheld, conditioned or delayed.

Section 6.9 Communications with Employees. Prior to the Closing, Buyer shall not, and shall cause its Affiliates and instruct its Representatives not to, contact, or engage in any discussions or otherwise communicate with, Sellers' employees without obtaining the prior written consent of Sellers (other than any such communication in the ordinary course of business of Buyer or its Affiliates without reference to or any purpose relating to the Business, the Transferred Assets,

the Assumed Liabilities or the transactions contemplated by this Agreement), which consent shall not be unreasonably withheld, conditioned or delayed.

Section 6.10 Intercompany Accounts and Arrangements. Effective prior to the Closing, all outstanding intercompany accounts, whether payables or receivables, between any Seller, on the one hand, and any non-Seller Affiliate of Sellers, on the other hand, shall be settled in full without any cash payment required to be made, and shall be of no further force and effect, in each case, without Liability to the Business or the Sellers at or after the Closing.

## ARTICLE VII

## TAX MATTERS

Section 7.1 Transfer Taxes. Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes ("Transfer Taxes") payable solely as a result of the sale or transfer of the Transferred Assets and the assumption of the Assumed Liabilities pursuant to this Agreement shall be borne by Buyer. Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce, or eliminate any such Transfer Taxes, and shall each sign and file (or cause its respective Affiliates to sign and file) all documentation with the relevant Governmental Authority relating to such Transfer Taxes as it may be required to sign or file under applicable Law. Buyer shall prepare and file all necessary Tax Returns or other documents with respect thereto and shall promptly provide a copy of any such Tax Returns or other documents to Sellers.

Section 7.2 Tax Cooperation. Buyer and Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Business, the Transferred Assets and the Assumed Liabilities as is reasonably necessary for determining any Liability for Taxes, the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Any reasonable expenses incurred in furnishing such information or assistance pursuant to this Section 7.2 shall be borne by the Party requesting it.

## ARTICLE VIII

## CONDITIONS TO CLOSING

Section 8.1 General Conditions. The respective obligations of Buyer and Sellers to consummate the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any Party in its sole discretion (provided that such waiver shall only be effective as to the obligations of such Party):[4]

[4] Note to Draft: To be updated for any foreign filings, if applicable.

(a) No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), or shall have initiated and be actively pursuing any legal proceedings seeking any such Order, that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements (any such Law or Order, a "Legal Restraint").

(b) Any waiting period (and any extension thereof) under the HSR Act or any other Antitrust Law applicable to the transactions contemplated by this Agreement shall have expired or shall have been terminated or the necessary clearance or approval thereunder shall have been received.

(c) The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, reversed or modified in a manner materially adverse to Buyer absent consent of Buyer.

Section 8.2 Conditions to Obligations of Sellers. The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by SVM Parent in its sole discretion:

(a) The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct in all material respects as of such date or with respect to such period).

(b) Buyer shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c) Sellers shall have received the documents listed in Section 2.8(c).

Section 8.3 Conditions to Obligations of Buyer. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

(a) Representations and Warranties.

(i) The representations and warranties of Sellers contained in this Agreement, other than the Fundamental Representations of Seller, shall be true and correct as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period), except where the failure of such representations and warranties to be true and correct (without giving effect to any "materiality" or "Material Adverse Effect" qualifiers set forth therein)

would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(ii) The Fundamental Representations of Seller contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and at and as of the Closing with the same force and effect as if made at and as of the Closing (other than those Fundamental Representations of Seller that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct in all material respects as of such date or with respect to such period).

(b) Sellers shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it at or prior to the Closing.

(c) Since the date of this Agreement, there shall not have occurred any Material Adverse Effect that is continuing.

(d) Buyer shall have received the documents listed in Section 2.8(b).

## ARTICLE IX

## TERMINATION

Section 9.1 Termination. This Agreement may be terminated at any time prior to the Closing (the date on which this Agreement terminates in accordance with its terms):

(a) by mutual written consent of Buyer and SVM Parent;

(b) by either SVM Parent or Buyer, if:

(i) a Legal Restraint is in effect that has become final and nonappealable; provided that no Party may terminate this Agreement pursuant to this Section 9.1(b)(i) whose breach of any of its representations, warranties, covenants or agreements contained herein results in such Legal Restraint; or

(ii) if Sellers consummate any Alternative Transaction that the Bankruptcy Court finally approves as "superior" in accordance with the Bidding Procedures Order (unless the Bankruptcy Court approves the acceptance by Seller of an Alternative Transaction as a "back-up bid" in the event the Closing does not occur).

(c) by Buyer, if:

(i) at any time, if Seller shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement in a manner that would prevent the satisfaction of the conditions to Closing set forth in Section 8.3(a) or Section 8.3(b), and (except in the case of a breach of the obligation to close within two (2) Business Days after the date contemplated in Section 2.8, in which case such two (2) Business Day period shall apply) such breach or violation shall not have been cured within

ten (10) days after written notice thereof has been given by Buyer to Seller, provided that Buyer shall not be entitled to terminate the Agreement pursuant to this Section 9.1(c) if the failure of the Closing to be consummated by such date is caused by Buyer's breach of any of its obligations under this Agreement;

(ii) if the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(iii) Sellers withdraw or seek authority to withdraw the Sale Motion; or

(iv) Sellers publicly announce any plan of reorganization or plan of liquidation or support any such plan filed by any third party, other than any such transaction that would not prevent or materially delay the Closing from occurring in accordance with the terms of this Agreement.

(d) by SVM Parent:

(i) at any time, if (x) Buyer shall have breached or violated any of its representations, warranties or covenants set forth in this Agreement in a manner that, either individually or in the aggregate, would prevent the satisfaction of the conditions to Closing set forth in Section 8.2(a) or Section 8.2(b), as the case may be, or (y) Buyer shall have materially breached the Bidding Procedures Order or the Sale Order, and in each case, (except in the case of a breach of the obligation to close within two (2) Business Days after the date contemplated in Section 2.8, in which case such two (2) Business Day period shall apply) such breach or violation shall not have been cured within ten (10) days after written notice thereof has been given by SVM Parent to Buyer, provided that SVM Parent shall not be entitled to terminate the Agreement pursuant to this Section 9.1(d) if the failure of the Closing to be consummated by such date is caused by SVM Parent's breach of any of its obligations under this Agreement; or

(ii) if the Board of Directors of SVM Parent determines in the exercise of its sole authority that proceeding with the transactions contemplated by this Agreement would be inconsistent with its fiduciary duties.

The Party seeking to terminate this Agreement pursuant to this Section 9.1 (other than Section 9.1(a)) shall, if such Party is SVM Parent, give prompt written notice of such termination to Buyer, and if such Party is Buyer, give prompt written notice of such termination to Sellers.

Section 9.2 Effect of Termination. In the event of termination of this Agreement as provided in Section 9.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (i) for the provisions of Section 6.7 (Public Announcements), Section 10.3 (Fees and Expenses), Section 10.7 (Notices), Section 10.10 (Parties in Interest), Section 10.11 (Governing Law), Section 10.12 (Submission to Jurisdiction) and this Article IX and (ii) that no such termination shall relieve any Party from liability for any willful and material breach of this Agreement.

Section 9.3 Alternative Proposals. Notwithstanding anything in this Agreement to the contrary, Sellers may participate in discussions or negotiations with, or furnish information with respect to Sellers, the Business, or the Transferred Assets to any Person if (a) (i) such Person has submitted to Sellers a *bona fide* written proposal to acquire the stock or assets of Sellers, upon receipt of which Sellers shall give prompt written notice to Buyer and (ii) Sellers determine in their good faith judgment that taking such action is consistent with their fiduciary duties or (b) in accordance with the Bidding Procedures. In addition, notwithstanding anything in this Agreement to the contrary, Sellers may terminate this Agreement if Sellers determine in their good faith judgment that taking such action is consistent with their fiduciary duties.

## ARTICLE X

## GENERAL PROVISIONS

Section 10.1 Nonsurvival of Representations, Warranties and Covenants. The respective representations, warranties and covenants of Sellers and Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 10.1 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing.

Section 10.2 Bulk Sales. Notwithstanding any other provisions in this Agreement, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer.

Section 10.3 Fees and Expenses. Except as otherwise provided herein (including Section 6.4(a) and Section 7.1) or in the DIP Order, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 10.4 Transition of Permits. To the extent that Buyer has not obtained all of the Permits included in the Transferred Assets that are necessary for Buyer to take title to all of the Transferred Assets at the Closing and to operate all aspects of the Business as of immediately following the Closing in the same manner in all material respects as it was operated by Sellers immediately prior to the Closing, Sellers shall, to the extent permitted by applicable Laws, use commercially reasonable efforts to maintain after the Closing such Permits that Buyer reasonably requests, at Buyer's sole expense, until the earlier of (x) the time Buyer has obtained such Permits, (y) six (6) months following the Closing (or the remaining term of any such Permit or the closing of the Chapter 11 Case, if shorter), or (z) the time Sellers have substantially wound down all operations following the Closing.

Section 10.5 Amendment and Modification. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 10.6 Waiver. No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 10.7 Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a nationally recognized next-day courier, (c) on the day of transmission if sent via email transmission to the email address(es) given below and the sender does not receive a notice of such transmission being undeliverable to such email address or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i) if to Sellers, to:

Searles Valley Minerals Inc.
9401 Indian Creek Parkway, Suite 1000
Overland Park, KS 66210
Attention: Dennis Cruise, President
Email: cruise@svminerals.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Attention: James J. Mazza, Jr.
Dohyun Kim
Email: James.Mazza@skadden.com
Dohyun.Kim@skadden.com

(ii) if to Buyer, to:

[●]
[●]
[●]
[●]
[●]
Attention: [●]
Email: [●]

with copies (which shall not constitute notice) to:

[●]
[●]
[●]
[●]
[●]
Attention: [●]
Email: [●]

Section 10.8 Interpretation. When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein. The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement. The term "or" is not exclusive. The word "will" shall be construed to have the same meaning and effect as the word "shall." References to days mean calendar days unless otherwise specified.

Section 10.9 Entire Agreement. This Agreement (including the Exhibits and Schedules hereto) and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 10.10 Parties in Interest. Except as specifically set forth in Section 5.2, Section 6.5, Section 10.5, Section 10.13, and Section 10.22, this Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (including Business Employees and other employees) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.11 Governing Law. Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this

Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

Section 10.12 Submission to Jurisdiction. Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (x) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (y) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; provided, however, that, if the Chapter 11 Case is closed or declines jurisdiction, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in the Court of Chancery of the State of Delaware, or if jurisdiction is not available in the Court of Chancery, then in the United States District Court for the District of Delaware, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient, without limiting any other manner of service permitted by Law. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts of the State of Delaware, and of the United States District Court for the District of Delaware as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 10.13 Personal Liability. This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect stockholder of Sellers or Buyer or any officer, director, employee, Representative or investor of any Party hereto.

Section 10.14 Assignment; Successors. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Seller without the prior written consent of Buyer, and by Buyer without the prior written consent of SVM Parent, and any such assignment without such prior written consent shall be null and void. Notwithstanding the foregoing, subject to the terms of Sections 2.9 and 2.10, Buyer may assign any of its rights under this Agreement to any of its Affiliates without obtaining the prior written consent of SVM Parent; provided that in connection with such assignment, such assignment shall not relieve Buyer of any of its obligations under this

Agreement (or otherwise). Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 10.15 Specific Performance. Each Party acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such Party and that any such breach would cause Buyer, on the one hand, and Seller, on the other hand, irreparable harm. Accordingly, each Party hereto also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such Party, Buyer, on the one hand, and Seller, on the other hand, shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance. Any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy. Seller, on the one hand, and Buyer, on the other hand, hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by Seller or Buyer, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of Seller or Buyer, as applicable, under this Agreement.

Section 10.16 Currency. All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement.

Section 10.17 Severability. If any term or other provision of this Agreement, or any portion thereof, is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms and provisions of this Agreement, or the remaining portion thereof, shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any such term or other provision, or any portion thereof, is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are consummated to the fullest extent possible.

Section 10.18 Waiver of Jury Trial. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF

LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.18.

Section 10.19 Counterparts. This Agreement may be executed in any number of counterparts, including by means of email in portable document format (.pdf), each of which when executed shall be deemed to be an original copy of this Agreement and all of which taken together shall constitute one and the same agreement.

Section 10.20 Jointly Drafted. This Agreement is the product of negotiations among the Parties, each of which is represented by legal counsel, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Rules of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by each Party. The Parties acknowledge and agree that prior drafts of this Agreement and the other agreements and documents contemplated hereby will not be deemed to provide any evidence as to the meaning of any provision hereof or the intent of the Parties with respect hereto and that such drafts will be deemed to be the joint work product of the Parties.

Section 10.21 Limitation on Damages. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL BUYER OR ANY SELLER OR SELLER NON-RECOURSE PERSON BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES.

Section 10.22 No Recourse.

(a) This Agreement may be enforced only by the Sellers against, and any claim, action, suit, or other legal proceeding by Seller may be brought only against Buyer, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement. Neither Seller nor any other Person shall have any recourse against any past, present, or future director, officer, employee, incorporator, manager, member, general or limited partner, stockholder, Affiliate, agent or Advisor of Buyer or of any Affiliate of Buyer or any of their successors or permitted assigns (each, a "Buyer Non-Recourse Person"), and no such Buyer Non-Recourse Person shall have any liability for any obligations or liabilities of Buyer under this Agreement or for any claim, action, or proceeding based on, in respect of or by reason of the transactions contemplated hereby.

(b) This Agreement may be enforced only by Buyer against, and any claim, action, suit, or other legal proceeding by Buyer may be brought only against, Sellers, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement. None of Buyer, any Designated Buyer, nor any other Person shall have any recourse against any past, present, or future director, officer, employee, incorporator, manager, member, general or limited partner, stockholder, Affiliate, agent or Advisor of Sellers or of any Affiliate of Sellers or any of their

successors or permitted assigns (each, a "Seller Non-Recourse Person"), and no such Seller Non-Recourse Person shall have any liability for any obligations or liabilities of Seller under this Agreement or for any claim, action, or proceeding based on, in respect of or by reason of the transactions contemplated hereby.

Section 10.23 Time of Essence. Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement. When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

**SELLERS:**

**SEARLES VALLEY MINERALS INC.**

By: ______________________________
Name:
Title:

**TRONA RAILWAY COMPANY LLC**

By: ______________________________
Name:
Title:

**SEARLES DOMESTIC WATER COMPANY LLC**

By: ______________________________
Name:
Title:

**BUYER:**

**[●]**

By: ______________________________
Name:
Title: