**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARLES VALLEY MINERALS INC., *et al.*,[1] | Case No. 26-10966 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Related Docket Nos. 12, 15** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
THE MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING;
(B) CONTINUE TO ACCESS FINANCING UNDER ITS RECEIVABLES FACILITY;
AND (C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE
PROTECTION TO THE PREPETITION SECURED LENDER; (III) MODIFYING
THE AUTOMATIC STAY; (IV) SCHEDULING FINAL HEARING
AND (V) GRANTING RELATED RELIEF [DOCKET NO. 15] AND THE MOTION OF
THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING
THE DEBTORS TO ASSUME SODA ASH SUPPLY AND LIQUIDITY AGREEMENT
AND OBTAIN FINANCING THEREUNDER [DOCKET NO. 12]**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the

chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the

"**Debtors**"), by and through its undersigned proposed counsel, hereby objects (the "**Objection**")

to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to

(A) Obtain Postpetition Financing; (B) Continue to Access Financing Under its Receivables

Facility; and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition

Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing and

(V) Granting Related Relief* [Docket No. 15] (the "**DIP Motion**") and the *Motion of the Debtors*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Mineral Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

*for Entry of Interim and Final Orders Authorizing the Debtors to Assume Soda Ash Supply and Liquidity Agreement and Obtain Financing Thereunder* [Docket No. 12] (the "**Supply Motion**"). In support of this Objection, the Committee states as follows:

**PRELIMINARY STATEMENT**

1.      This case is part of a larger series of extraordinary actions taken by the direct and indirect owners of the Debtors to avoid liability to the Debtors' creditors. The ultimate parent of the Debtors is Nirma Limited ("**Nirma**"), one of the largest manufacturing conglomerates in India.

2.      Nirma, along with its subsidiary KHI the DIP Lender, concocted a DIP Facility that goes to great lengths to protect itself, including the unusual requirement that the Debtor supply thousands of metric tons of valuable product to Nirma itself for no new consideration.  Nirma has granted overly generous relief to the existing secured lender, and then granted itself a right to take advantage of that advantageous position through subrogation.  Additionally, through the Supply Motion, Nirma would receive a lien on all of the Debtors' assets.  As if this were not enough, on the eve of bankruptcy, the Debtors' limited liability company agreements were amended and purport to shield the Debtors' owners.

3.      The loan facility that the Debtors seek to approve through the DIP Motion (the "**DIP Facility**") and the supply facility covered by the Supply Motion (the "**Supply Facility**") are so prejudicial that the estates and creditors may well fare better off in a Chapter 7.  The Committee acknowledges that the Debtors need money if they are to continue to operate and pursue a sale process in chapter 11, and Nirma may be the only source of funding.  However, absent a sale that is the equivalent of a ninth inning grand slam, unsecured creditors' most likely source of recovery is through litigation.  Based on the Committee's investigation thus far, there appear to be colorable

causes of action that could yield meaningful recoveries for creditors.   This possibility, however, will be lost if the DIP and Supply Agreement are approved on the terms presented.

4.      Even though it may be the only source of funds, that does not justify giving Nirma the right to turn the Bankruptcy Code on its head and force the Debtors to ship product to Nirma on an ongoing basis, for no new consideration, and run the Debtors into administrative insolvency. The Court should not grant the relief on the terms that were requested.  Among the most egregious provisions:

a.      *First*, the DIP Facility requires the Debtors to deliver ***3,300 metric tons*** of product to Nirma or Nirma's designee—***without the Debtors receiving any new money***. This is not a standard DIP term, and it is grossly overreaching.  *See* Interim Order [Docket No. 59], Ex. 2 (the "**DIP Credit Agreement**"), § 2.6(c); DIP Credit Agreement,  Ex. C.

b.      *Second*, the amount of the DIP Facility is not adequate to fund the case and there is a grave risk of administrative insolvency.

c.      *Third*, the terms are designed to lock the Committee out of meaningful participation:

- an overall carve-out for Committee professionals that is 11% of the overall carve-out for Debtor professionals

- a professional fee carve-out for Committee counsel that is 19% of the carve-out for the two Debtor counsel firms

- a professional fee carve-out for the Committee financial advisor that is 6% of the carve-out for the Debtor financial advisor firms (and even if the Debtor investment banker is excluded, the carve-out is 15%)

WBD (US) 4897-1602-9628

- a professional fee carve-out for the Committee of only $100,000 for investigation of HSBC Bank USA, National Association ("**HSBC**") (the Debtors' prepetition lender), Karnavati Holdings, Inc. ("**KHI**" or the "**DIP Lender**"), and Nirma (compared to $300,000 for the Debtors)

- an investigation budget of HSBC of only $50,000

- liens on causes of action and proceeds of causes of action – including against Nirma, KHI and affiliates

- broad releases of causes of action against Nirma, KHI and affiliates

- subrogation and credit bid rights in favor of the insiders, are all prejudicial to creditors. *See* DIP Credit Agreement, §§ 10.7, 10.8; Interim DIP Order, ¶¶ 12(a), 26.

d.      *Fourth*, the DIP Lender claims to have made approximately $135.2 million in alleged unsecured loans to Searles Valley Minerals, Inc. ("**SVM**") between 2019 and 2026, on which no principal or interest has ever been paid.  These loans are strong candidates for recharacterization as equity contributions.  *See In re SubMicron Systems, Inc.*, 432 F.3d 448, 455–56 (3d Cir. 2006). Through the DIP, the Debtors and its non-Debtor affiliates would eliminate the Committee's ability to seek recharacterization of these loans and other payments.

e.      *Fifth*, the relief granted to HSBC is overly generous.  The combination of the DIP and Supply Facilities disproportionately improve HSBC's position, and notably, HSBC's liens are not subject to the Carve Out.  While the Supply Facility will cause HSBC's Receivables Facility to expand by $4 million, it will also augment HSBC's collateral by $20 million in receivables.  All of the Receivables Facility is granted

- 4 -

administrative claim status, resulting in a 6.5:1 rollup, and the Debtors waive the marshaling doctrine, ensuring that HSBC need not look to Nirma's guarantee before depleting estate assets.  Finally, the Interim Order provides that if Nirma pays on its guaranty of the HSBC debt, Nirma is subrogated to *all* of HSBC's liens, rights, and claims—meaning Nirma could end up with first-priority liens on all estate assets, superior even to the DIP claims and the Carve Out, and a super-priority administrative claim.  *See* DIP Mot., ¶ 18; Interim Order, ¶ 29.

5.      For these reasons and as set forth more fully below, the Committee respectfully requests that the Court deny final approval of the DIP Facility and the Supply Facility, unless and until they are modified to address the objections raised herein.

## BACKGROUND

6.      On June 15, 2026 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      The Debtors are SVM, Trona Railway Company LLC ("**Trona**"), and Searles Domestic Water Company LLC ("**SDWC**").  SVM is a manufacturer and supplier of soda ash, borax, and specialty minerals, with operations centered at Searles Lake in Trona, California.

8.      SVM is wholly owned by KHI, a Delaware corporation, which is in turn wholly owned by Nirma, headquartered in Ahmedabad, Gujarat, India.  *See* Declaration of Adrian Frankum in Support of Chapter 11 Petitions and First Day Papers [Docket No. 17] ("**Frankum Decl.**") ¶ 22.

WBD (US) 4897-1602-9628

9.      The Debtors, KHI and Nirma are closely related and they share board members. Three members of SVM's board of directors - Matthew Dowd, Kaushik Patel, and Avinash Puri - also serve on KHI's board. *See* Frankum Decl. ¶ 44 n. 10. Kaushik Patel is also on the board of Nirma. Manan Shah, a director of KHI, is Nirma's CFO.

10.      The independent director, John S. Dubel, was appointed on May 26, 2026. Frankum Decl., ¶ 43. The Independent Committee was created on June 12—only three days before the Petition Date—and it consists of one member, Mr. Dubel. DIP Mot., ¶ 26.

### Nirma's Formation

11.      Nirma was founded in 1969 by Karsanbhai Patel. Nirma, named after Mr. Patel's daughter, began as a household soap business operated out of Mr. Patel's backyard. Mr. Patel grew the operations to a multi-segmented, multibillion dollar conglomerate. Nirma's ascendency and success has been studied in business schools worldwide, as an example of successful market positioning and "backward integration."

12.      Today, Nirma's debt securities are listed on the wholesale debt market segment of the National Stock Exchange of India Limited. Nirma has historically engaged primarily in the business of manufacturing consumer products such as soap, detergents and edible salt, but it also owns industrial chemicals, cement and pharmaceutical businesses. Nirma's ownership is closely held by members of the Patel family.

### Nirma's Success and Control of Its Supply Chain

13.      Historically, one of Nirma's core strengths has been the affordability of its products. Nirma initially achieved market prominence by selling its products at prices that competitors could not beat. One strategy that Nirma employed to control costs was to control its supply chain. Soda ash is a key ingredient in Nirma's soaps and detergents. Employing backward

integration, Nirma acquired key links in its supply chain. It acquired soda ash and other industrial product capability, which reduced its dependence on external suppliers and controlled input costs for the soap and detergent business. Ultimately Nirma became one of the largest manufacturers of soda ash in the world.

14.     Nirma acquired SVM as part of its backward integration strategy. Based upon the Committee's limited investigation to date, there were tens (and likely hundreds) of millions of dollars of transfers between the Debtors, Nirma and KHI in the years leading to the Petition Date. Importantly, these transfers were not only in cash – they were also in kind, in the form of soda ash and minerals. While the Debtors admit in their papers that KHI advanced $135.2 million to the Debtors over the years as alleged unsecured "loans," it is telling that not one cent of the "loans" was ever repaid.

15.     Through its affiliates, including the Debtors, Nirma controlled its costs and supply for other operations. Reverse integration has been a very beneficial strategy for Nirma and its affiliates. Unfortunately, synthetic soda ash became available at prices cheaper than the Debtors could make it. Indeed, the Debtors cite the decline of the soda ash market, together with a 2019 earthquake, as the primary factors contributing to their bankruptcy. On or about March 31, 2026, Nirma's auditors issued a going concern opinion for the Debtors' operations. [2] Around the same time, it became clear that an out-of-court sale of the Debtors was not viable. Declaration of Christian Tempke [Docket No. 15-5], ¶ 9.

---

[2] *See* Nirma Statement of Assets and Liabilities, Note 8, from https://nirma.co.in/wp-content/uploads/2026/05/Audit-Financial-Results-31.03.2026.pdf (last accessed 7.7.26) ("there is substantial doubt about the Foreign subsidiaries' ability to continue as a going concern.")

- 7 -

**The Spinoff of the Good Assets from the Bad for Purposes of "Ring Fencing"**

16.    Two months before the Petition Date, likely in response to the Debtors' decline, Nirma commenced a demerger Scheme of Arrangement in India to "ring fence" its profitable assets from its risky assets, and to shield itself from liability relating to the Debtors.  To spirit Nirma's profitable business segments away from risk, on April 15, 2026, only sixty-one (61) days before the Petition Date, Nirma's board of directors approved a Scheme of Arrangement to spin off valuable assets owned by Nirma to another company in India, Ocular Enterprise Private Limited ("**Ocular**") f/k/a Nirma Management Services Private Limited, through a "de-merger."  *See* Scheme of Arrangement.[3]   Both Nirma and Ocular are owned by the same individual shareholders. *Id*.  According to the scant public information that is available, the assets spun off by Nirma relate to the manufacture of industrial chemicals and consumer products*.  Id.*  Nirma's Scheme of Arrangement disclosure states that, among other things, the de-merger was undertaken for purposes of "ring fencing" and to "avoid any intermingling of the risks from operations in different sectors." *Id*., at 11.

**HSBC Is Insecure and Requires a Guaranty from Nirma**

17.    Not coincidentally, HSBC demanded that Nirma guaranty the entire balance of HSBC's demand line of credit, in the amount of $59.5 million.  Shortly after announcing the de-merger, on May 1, 2026, Nirma did so. The Committee believes that this was the first time that HSBC had required a guaranty, even though the facility had been in place for two years and SVM had pledged all of its personal property as collateral, suggesting that HSBC believed itself to be undersecured.  As of June 18, 2026, HSBC obtained a second guaranty from Nirma in the amount

---

[3] The Committee's efforts to investigate this spinoff thus far have been thwarted.  The Scheme of Arrangement document may be found at https://nirma.co.in/wp-content/uploads/2026/05/Draft-Scheme-of-Demerger.pdf.

WBD (US) 4897-1602-9628

of ██ million, to cover HSBC's demand line, receivables facility, credit card obligations (in the amount of ██ million), and ACH exposure (in the amount of ██ million).[4]

**New Limited Liability Company Agreements Further Protect Nirma and Affiliates**

18.     To further protect KHI and Nirma's interests, on June 14, 2026—the very eve of the Petition Date—Trona and SDWC revised their limited liability agreements.  The amended limited liability company agreements contain broad exculpation and indemnity clauses that would purport to protect any "affiliate" of SVM, which would include both KHI (as the sole member of SVM) and Nirma (as the sole member of KHI).[5]

**The Debtors Erect A DIP Shield to Protect Nirma**

19.     While Nirma is not named as the DIP Lender, the Committee understands that KHI does not have sufficient funds to advance the DIP, and that funds will originate from Nirma.  The DIP is exceedingly protective of KHI and Nirma.  The DIP grants a first lien on all causes of action against KHI, and all proceeds of causes of action against KHI's affiliates (i.e., Nirma).

20.     The DIP Facility is secured by, among other things:

(a) liens on all claims and causes of action, except against affiliates of KHI;

(b) proceeds of all claims and causes of action against affiliates of KHI;

(c) commercial tort claims;

(d) proceeds of avoidance actions;

(e) junior liens on all prepetition collateral (behind HSBC's first-priority liens);

(r) first-priority liens on all previously unencumbered assets (primarily real property);

---

[4] The credit card and ACH exposures were not disclosed in connection with the DIP Motion or the Supply Motion.
[5] The Committee has requested the limited liability company agreement of SVM, and the immediately preceding limited liability company agreements, from the Debtors.

The DIP Lender is also granted superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code.  See Interim Order, ¶¶ 6, 37.

21.     For the benefit of KHI and Nirma, and without an investigation having been conducted, the Debtors represented in the Interim Order that no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature would limit their liability to repay KHI, and the Debtors released KHI, Nirma and their affiliates from everything other than gross negligence, willful misconduct and bad faith.  Interim Order, ¶ 28; DIP Credit Agreement, § 11.19.

22.     Nirma through KHI's DIP will receive first priority liens on the Debtors' unencumbered assets.  The unencumbered assets are significant; they include the Debtors' interests in acres of real estate, mineral rights and various causes of action and proceeds.  Notably, the liens on causes of action would cover causes of action against KHI, and the lien on proceeds of causes of action would cover causes of action against KHI's affiliates, including Nirma.

### The DIP Requires SVM to Supply Nirma With Thousands of Metric Tons of Product – For No New Money

23.     The DIP contains other highly prejudicial terms.  While Nirma now obtains its soda ash elsewhere, SVM still supplies Nirma with VBOR, an essential input for Nirma's soap and detergent operations.  Consequently, baked into the DIP Facility is an unusual provision—a covenant that requires SVM to supply Nirma or Nirma's designee with ***3,300 metric tons*** of VBOR.  The Debtors do not disclose the value of the VBOR.  The VBOR is not being credited against the DIP.  In fact, the Debtors are receiving no new consideration for the VBOR.  Instead, according to the Debtors' professionals, SVM is supplying Nirma with thousands of metric tons of valuable product, postpetition, in order to satisfy an alleged, *unsecured prepetition claim* that

WBD (US) 4897-1602-9628

Nirma alleges that it has against SVM.[6] Section 553 does not preserve the rights to such setoffs. A breach of SVM's covenant to deliver VBOR in the specified amounts could have the catastrophic result of triggering an Event of Default under the DIP Agreement. Boiled down to its essence, the DIP Loan is a draconian supply agreement that will not only provide Nirma with product for no new consideration, but it will also effectuate Nirma's and KHI's release, and establish liens on all of the Debtor's unencumbered assets in favor of Nirma's non-Debtor affiliate.

### Nirma Gives HSBC Overly Favorable Treatment - And then Demands that It Have the Right to Be Subrogated to HSBC

24.     HSBC is the prepetition lender under a Receivables Facility that had a balance of approximately $26 million as of the Petition Date. Through the DIP Motion, the Debtors seek authority to use HSBC's cash collateral and the Receivables Facility, postpetition. HSBC has agreed to afford the Debtors an additional $4 million of liquidity under the Receivables Facility and authorize use of its cash collateral on a Proposed Final Order's terms.

25.     HSBC's collateral position will be significantly enhanced by the DIP. First, the DIP is conditioned on approval of the Supply Facility. The Supply Facility will have the effect of increasing HSBC's collateral package by $20 million of receivables related to TATA Chemicals North America Inc. ("**TATA**"). In addition to the significant boost to HSBC's collateral package, the Interim Order grants superpriority administrative expense status to HSBC's Receivables Facility (prepetition and that portion advanced postpetition).

26.     Importantly, and unfairly, most if not all of HSBC's collateral is exempt from the Carve Out. *See* Notes 3 and 4 to Exhibit 3 to the DIP Motion (stating that the Receivables Facility Liens shall be first-priority liens, not subject to the Carve Out, with respect to all pre-petition and

---

[6] The Debtors sought to sanction this setoff through the proposed cash management motion, by obtaining authority to continue intercompany transactions "in the ordinary course of business."

post-petition Receivables).  This puts the administration of the estate unnecessarily at risk, and it unfairly benefits Nirma.

27.     Nirma was required to guaranty all of the Debtors' obligations to HSBC.  The Interim Order and Proposed Final Order would subrogate Nirma, to the extent Nirma pays HSBC, to all of HSBC's liens, rights and claims.  The Committee objects to this treatment.

**Contrary to the Debtors' Representations, the Supply Facility**
**is Secured by a Lien in Favor of  Nirma**

28.     Contemporaneously with the DIP Facility, TATA has agreed to provide a $20 million unsecured liquidity advance to SVM under the Supply Facility.  *See* DIP Mot., ¶ 21.  The Supply Facility is intertwined with the DIP Facility.  TATA conditioned its willingness to enter into the Supply Facility on obtaining a guaranty from Nirma.  Because TATA does not have a lien on any assets, the Debtors characterize the Supply Facility as unsecured.

29.     The Supply Facility is not unsecured.  As a condition of giving its guaranty, Nirma required the Debtors to enter into a reimbursement agreement secured by a lien on all DIP Collateral, in favor of Nirma, junior to KHI's DIP liens.  Nirma is further given the same protections as the DIP Lender under Paragraphs 4 (making the obligations unassailable under a wide array of theories), 6(c) (overriding any non-bankruptcy consent rights to the grants of the liens), 13 (automatic perfection), and 24 (payments received by others held in trust) of the Interim DIP Order.   The lien on the DIP Collateral in favor of Nirma suffers from the same infirmities as the lien in favor of KHI.

30.     The Committee understands that the Debtors had a supply relationship with TATA before the Petition Date.  The Debtors do not disclose whether amounts were owed to TATA as of the Petition Date or how the Supply Facility terms compare to the terms that they employed before the Petition Date.  The Interim Order authorized the Debtors to pay TATA for all prepetition debt

WBD (US) 4897-1602-9628

in full, and the Proposed Final Order would release TATA from all claims.  Interim Supply Order [Docket No. 50], ¶ 4; Interim Order, ¶ 36.

### There is Grave Risk of Administrative Insolvency and the Budget is Inadequate, Hamstringing the Committee

31.  The Committee believes that the proposed DIP budget is inadequate.  It may not provide sufficient funding to pay administrative costs and expenses of the Debtors through the projected closing date of a potential sale, and it is inadequate to bridge to a plan, leaving the estate exposed to the risk of administrative insolvency.  Instead, these bankruptcy cases are being run for the benefit of Nirma, without Nirma picking up the freight.

32.  The investigation caps are grossly undersized and would make it impossible for the Committee to appropriately investigate claims that the estate may have against Nirma and its affiliates (assuming that such claims survive entry of the final DIP Order).  The investigation of any claims against HSBC, Nirma, KHI and affiliates is capped at $100,000 for the Committee, and $300,000 for the Debtors' professionals.  Interim DIP Order, Recital G.  The Committee would not be able to appropriately evaluate potential claims against HSBC because the cap on fees for investigation of HSBC's liens is capped at $50,000 (which is a part of the aforementioned $100,000), and no funds may be used to prosecute or challenge the liens.  Interim DIP Order, ¶ 26.

### The Debtors' Prepetition Capital Structure

33.  As of the Petition Date, the Debtors' describe their prepetition funded indebtedness as follows:

a.  *Demand Line Facility*: A $59.5 million credit facility with HSBC (the "**Prepetition Secured Facility**"), of which approximately $47.4 million in principal and $12.1 million in outstanding letters of credit were outstanding as of the Petition Date. The Prepetition

- 13 -

Secured Facility is secured by a first-priority lien on all of the Debtors' personal property and is guaranteed by Nirma. *See* DIP Mot., ¶ 3 n. 6.

b.  *Receivables Facility*: A Recourse Receivables Purchase Agreement with HSBC, with approximately $26 million outstanding as of the Petition Date, secured by a first-priority lien *pari passu* with the Demand Line. Nirma has guaranteed this facility. *See id.*, ¶ 3.

c.  *Unsecured Parent "Loans"*: KHI allegedly made a series of advances to SVM between 2019 and 2026, totaling approximately $135.2 million by the Petition Date. *See* Frankum Decl., ¶ 28. No principal or interest payments have ever been made by the Debtors to KHI on account of these transactions.

## OBJECTION

34.  The relief requested in the Motions include a number of provisions that, if approved, will (a) prejudice the rights and powers that the Bankruptcy Code confers on the Court, the Debtors, and the Committee, (b) unjustifiably benefit the DIP Lender and Nirma at the expense of the unsecured creditors, and (c) give the DIP Lender undue control over these Chapter 11 Cases. The relief requested by the Motions should be denied for the following reasons:

## I. The Proposed Financing is an Insider Transaction That Cannot Withstand Heightened Scrutiny.

35.  Section 364 of the Bankruptcy Code authorizes a debtor in possession to obtain postpetition credit, including secured credit with superpriority status, subject to court approval. *See* 11 U.S.C. § 364(c), (d). The debtor bears the burden of demonstrating that: (a) the proposed financing is an exercise of sound business judgment;[7] (b) no other financing is available on more favorable terms; (c) the proposed financing is necessary to preserve the assets of the estate; and

---

[7] Here, the business judgment standard is supplanted by the "heightened scrutiny standard" at a minimum, or by the "entire fairness standard," given the proposed DIP Lender's insider relationship with the Debtors. *See infra*, ¶ 38.

(d) the terms and conditions of the proposed financing are fair, reasonable, and adequate. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).

36.    Where, as here, a DIP facility is proposed by the debtor's insiders,[8] "rigorous scrutiny" of the proposed terms is warranted. *See, e.g., In re SPAC Recovery Co.*, 676 B.R. 260, 273 (Bankr. S.D.N.Y. 2026); *In re Latam Airlines Grp.*, 620 B.R. 722, 769-70 (Bankr. S.D.N.Y. 2020) (citing *In re Lafayette Hotel P'ship*, 227 B.R. 445, 454 (S.D.N.Y. 1998) (explaining that insider "dealings with the debtor" receive "rigorous scrutiny by the court," and must satisfy entire fairness standard)).

37.    The analysis not only takes into account the interests of creditors, but also maintains the integrity of the process. *See e.g., In re Laffite's Harbor Dev. I, LP*, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) (emphasizing that bankruptcy courts "do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender"); *In re Ames Dep't Stores*, 115 B.R. at 39 (explaining that "proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate"); *In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) (stating "credit should not be approved when it is sought for the primary benefit of a party other than the debtor . . ."); *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (explaining that when applying heightened

---

[8] An insider includes an "affiliate" of the debtor, 11 U.S.C. § 101(31)(E), and an affiliate includes an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." Id. at 101(2)(A). This Court has found that "as parent of a the Debtor, [parent] was an insider of the Debtor as defined in the Bankruptcy Code." *In re AIG Financial Products Corp.*, 660 B.R. 603, 617 (Bankr. D. Del. 2024) (concluding that the insider parent's actions "vis a vis the Debtor as subject to the heightened scrutiny standard" which "applies to all insiders and is not dependent on the insider having specific fiduciary duties"). *See also In re Winstar Comm., Inc.*, 554 F.3d 382, 397 (3d Cir. 2009) ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms' length with the debtor.").

WBD (US) 4897-1602-9628

scrutiny, "courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration").

38.    The entire fairness standard, rather than the business judgment rule, governs transactions if an opposing party "can show one of four elements: (1) the directors did not in fact make a decision, (2) the directors' decision was uninformed; (3) the directors were not disinterested or independent; or (4) the directors were grossly negligent." *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011). *See also In re Latam Airlines Group S.A.*, 620 B.R. 722, 768–71 (Bankr. S.D.N.Y. 2020) (finding that proposal for post-petition financing through a junior loan funded by certain shareholders of the debtor was an insider transaction and thus would be evaluated for the entire fairness of the transaction and that a post-petition financing through a senior secured loan from a non-insider would also be evaluated for the entire fairness of the transaction because it is intertwined with the proposed insider transaction).

39.    The directors were not disinterested or independent.  Three of the Debtors' directors—Matthew Dowd, Kaushik Patel, and Avinash Puri—are also directors of the DIP Lender.  *See* Frankum Decl., ¶ 44 n.10. Nor does the DIP Facility's approval by John S. Dubel, whom Debtors appointed as an independent director May 26, 2026, insulate the proposed transaction from heightened scrutiny.  *See* Frankum Decl., ¶ 43.  On June 12, 2026—just three days before the Petition Date—the Board formed the so-called independent "committee" compromised solely of Mr. Dubel (the "***Independent Committee***").  The Independent Committee (i.e., Mr. Dubel) was purportedly delegated "exclusive" authority to review, negotiate, and approve transactions between KHI and the Debtors, including the terms of the DIP Facility.  *Id.*, ¶ 44.  Mr. Dubel's tardy appointment and the formation of the "Independent" Committee on the eve of a

- 16 -

bankruptcy filing do not cleanse transactions negotiated by insiders. *See In re Tronox Inc.*, 429 B.R. 73, 95 (Bankr. S.D.N.Y. 2010) (noting that "special committees appointed near the time of a transaction are inherently suspect").

40.    "The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Weinberger v. UOP*, 457 A.2d 701, 710 (Del.1983). This Court has previously explained what is required under the standard:

> This "fairness" requirement contains both (i) fair dealing and (ii) fair price, examined together as a whole. "Fair dealing" involves elements such as (i) when the transaction was timed, (ii) how it was initiated, (iii) how it was structured, (iv) how it was negotiated, (v) how it was disclosed to the directors, and (vi) how the approvals of the directors and the stockholders were obtained. "Fair price" includes such considerations as "economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."

*In re Broadstripe, LLC*, 444 B.R. 51, 106 (Bankr. D. Del. 2010). *See also In re Marvel Ent. Grp., Inc.*, 273 B.R. 58, 78 (D. Del. 2002) ("Under the standard of entire fairness, the burden is on the parent corporation to prove, subject to exacting scrutiny, that its transactions with the subsidiary were objectively fair."). As further discussed below, the Debtors will not be able to sustain their burden before the Court.

## II.    The Product Delivery Covenant is a Gross Overreach.

41.    The DIP obligates SVM to deliver 3,300 metric tons of VBOR product to Nirma or its designee. *See* DIP Mot., Exhibit C. Exhibit C states that these deliveries are "as partial satisfaction of balance of payment advances made by Nirma to SVM." After pressing the Debtors for clarification, the Committee learned that Nirma claims to have paid for the product before the Petition Date, and Nirma does not plan to pay any new funds for it. Further investigation has revealed that Nirma made these payments years ago, so these payments (like the alleged $135

- 17 -

WBD (US) 4897-1602-9628

million of "loans" by KHI) are in the nature of equity contributions.[9]  *At best*, with respect to any alleged prepayments, Nirma holds nothing more than a prepetition, unsecured claim.

42.     This arrangement was barely disclosed in the DIP Motion.  Worse, the economic impact of the arrangement has not been disclosed.  The Court should be apprised of the dollar value of the VBOR that SVM would be obligated to deliver and that SVM is foregoing valuable market opportunities in order to supply Nirma instead.

43.     The Committee understands that VBOR is in extremely high demand and that the fair market value of the VBOR demanded by Nirma exceeds $1 million, which is an additional cost of financing the $20 million DIP facility.  Setting aside the impropriety of setting off a purported prepetition unsecured claim against postpetition product, the VBOR obligation transforms the DIP into an egregious overreach.  The true cost of the DIP Facility – the effective interest rate – is usurious, and far exceeds the touted 11% interest with a 1% commitment fee.

44.     The Committee objects to the product delivery requirement in its entirety. If Nirma wishes SVM to supply product to it, Nirma should pay for the product, at a market rate.  Otherwise the estate should not be expending resources, or foregoing lost opportunities, to supply Nirma for no additional consideration.

## III.    The Budget is Inadequate, and the Caps on Investigations Prevent the Committee from Fulfilling its Statutory Duties.

45.     The Debtors will not be able to prove that the DIP Budget is sufficient to avoid administrative insolvency.  Coupled with Nirma's refusal to pay for VBOR that it is demanding under the DIP Facility, this is an untenable situation for creditors, and the Court.

---

[9] The argument that Nirma is entitled to the product on account of prepayments is contradicted by Paragraph 2.6(c) of the DIP Credit Agreement, which provides that the right to receive product is not earned until entry of the DIP Orders.

WBD (US) 4897-1602-9628

46.     The DIP Budget attached to the Interim Order contains a line for "Restructuring Related Disbursements," in the aggregate amount of nearly $25 million.  The Committee understands that approximately $10 million of that is allotted to the Debtors' legal financial advisors, other than Lazard, while approximately $1.6 million is allotted to the Committee's legal and financial advisors.  This disparate ratio puts the Committee at a severe disadvantage and is far lower than the customary allowances for Committee professionals of 30 – 40% of the Debtors' professional fees.

47.     Furthermore, the Interim Order establishes a meager $100,000 cap on investigation of causes of action against, and any liens of, HSBC, Nirma, KHI and affiliates.  Of this amount, a $50,000 cap is applied to the investigation of the Prepetition Secured Lender's liens.  *See* Interim Order, ¶ 26.  These amounts are wholly inadequate to fund an appropriate evaluation of the complex insider relationships at issue in these cases, which extend to India.  In a case with this level of complexity and global reach, the Committee must be afforded sufficient resources to investigate the validity and extent of potential claims and causes of action.

48.     For example, the Committee must investigate: (a) whether KHI's $135.2 million in unsecured parent loans should be recharacterized as equity; (b) whether Nirma's purported advances to SVM for product should also be recharacterized as equity; (c) whether claims exist against Nirma, KHI, and their officers and directors under unjust enrichment, breach of fiduciary duty, alter ego or other theories; (d) the magnitude and circumstances of the millions of cash and in-kind transfers to Nirma and its affiliates made during the avoidance periods; and (e) whether the Committee should object to or seek a stay of Nirma's proposed spinoff of profitable assets, so that sources of recovery are not moved out of the reach of the estates' creditors.

WBD (US) 4897-1602-9628

49.     Considering the factual and global complexity of the transactions at issue, the Committee should be allotted at least $400,000 to perform its investigation.

## IV.     Claims, Including Avoidance Actions, and the Proceeds of Claims Against Insiders Must Remain Unencumbered and Free of Any Superpriority Claims.

50.     The Motion proposes to grant liens in favor of the DIP Lender on all previously unencumbered assets of the Debtors, including first-priority liens on all DIP Collateral not subject to existing liens. *See* Interim Order, ¶ 6(a)(2); DIP Mot., ¶ 35 & n.3.[10] The DIP Facility expressly includes liens on unencumbered commercial tort claims, and liens on proceeds of all claims and causes of action against affiliates of KHI (which would include Nirma)[11] and avoidance actions. These liens are being established to benefit insiders of the Debtors; they do not maximize collateral value and are prejudicial to unsecured creditors.

51.     The inappropriateness of encumbering proceeds of claims and causes of action against KHI, Nirma and their affiliates is particularly acute because the DIP Lender *is itself* a potential target of litigation claims. KHI's $135.2 million in unsecured parent loans may be subject to recharacterization as equity, *see* Frankum Decl., ¶ 28, Nirma's purported advances to SVM may be subject to the same fate, and transfers to KHI and Nirma during the avoidance look-back periods must be investigated. Granting KHI a lien on avoidance action proceeds would permit the insider DIP Lender to insulate itself from its own misconduct—a result fundamentally incompatible with the Bankruptcy Code's equitable principles. *See Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. Partnership IV*, 229 F.3d 245, 250 (3d. Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all

---

[10] Paragraph 6(b) of the Interim Order specifically provides that "the DIP Liens (i) shall not be made subject to, junior to, or *pari passu* with ... (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise."

[11] Counsel for KHI has advised that the current language inadvertently encumbers causes of action against KHI, and has advised that KHI intends that the lien be limited to proceeds of causes of action against itself.

- 20 -

unsecured creditors"); *In re Cybergenics Corp.*, 226 F.3d 237, 244-45 (3d Cir. 2000) (recognizing that avoidance powers are exercised for the benefit of the estate and its creditors); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) ("case law permits all unsecured creditors to benefit from avoidance action recoveries").

52.     Accordingly, no liens or superpriority claims should attach to causes of action against the DIP Lender, its affiliates, or any insider, or to the proceeds thereof. *See In re Autoseis, Inc.*, 2014 WL 2558257, at *11 (Bankr. S.D. Tex. Apr. 25, 2014) (concluding DIP liens should not extend to commercial tort claims and their proceeds); *In re EWGS Intermediary, LLC*, 2013 WL 6978602, at *3 (Bankr. D. Del. Dec. 5, 2013) (excluding avoidance actions against any insiders of the Debtors from the DIP Liens); *In Re Highway Technologies Inc.*, 2013 WL 5418650, at *9 (Bankr. D. Del., Aug. 14, 2013) (waiving and releasing all claims and causes of action under Bankruptcy Code section 547 except for claims against insiders and professionals); *In re Belle Foods, LLC*, 2012 WL 13339724, at *2 (Bankr. N.D. Ala. May 30, 2012) (excluding from DIP Liens all (i) Avoidance Actions and all proceeds of Avoidance Actions, (ii) commercial tort claims against the Lenders, Directors and Officers, and insiders of the Debtor; and (iii) other causes of action or claims against the Lenders, Directors and Officers, and insiders of the Debtor).

## V.     The Prepetition Releases Are Overbroad and Premature.

53.     The Interim Order includes a blanket release of the DIP Lender (KHI) and all "Released DIP Lender Parties" from all claims, causes of action, and liabilities arising prior to the Petition Date. *See* Interim Order, ¶ 28.  Given KHI's status as an insider that has made $135.2 million in unsecured loans to SVM on which no principal or interest has ever been paid, *see* Frankum Decl., ¶ 28, and the complex web of insider transactions at issue in these cases, these releases are patently inappropriate.

WBD (US) 4897-1602-9628

54.    The blanket release would extinguish potential recharacterization claims, equitable subordination claims under section 510(c), breach of fiduciary duty claims, undue enrichment, alter ego claims and fraudulent transfer claims—all before the Committee has had any opportunity to investigate.  Such releases should not be granted until the Committee has had an opportunity to complete its investigation. *See* Del. Bankr. L.R. 4001-2(a)(i)(C) (identifying releases as provisions that require heightened scrutiny).

55.    The Committee respectfully requests that: (a) all releases of claims against KHI, Nirma, and their affiliates be stricken from the Proposed Final Order; and (b) to the extent any release is approved, it be limited to claims arising solely from KHI's role as DIP Lender (and not from its prepetition relationship with the Debtors).

**VI.    The Roll-Up of the Receivables Facility is Prejudicial to Unsecured Creditors.**

56.    Roll-ups of prepetition debt are disfavored and should be approved only where there is a clear and demonstrable benefit to the estate sufficient to justify the elevation of prepetition secured claims to superpriority status. As the Eleventh Circuit has observed, "[b]y their express terms, sections 364(c) & (d) apply only to future—i.e., postpetition—extensions of credit. They do not authorize the granting of liens to secure [or award administrative expense status to] prepetition loans." *Shapiro v. Saybrook Mfg. Co., Inc. (In re Saybrook Mfg. Co., Inc.)*, 963 F.2d 1490, 1495 (11th Cir. 1992); *see also In re Tri-Union Dev. Corp.*, 253 B.R. 808, 814 (Bankr. S.D. Tex. 2000) (stating that "this Court in the context of other [c]hapter 11 cases has ruled that it is improper under the current [Bankruptcy] Code and caselaw for the debtor, pre-confirmation, to cross-collateralize or 'refinance and re-collateralize' a prepetition secured debt secured by substantially all of the debtor's assets"); *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 570 (Bankr. D.N.H. 1989) (concluding that section 364 of the Bankruptcy Code does not authorize the granting of administrative expense priority for prepetition debt). Rollup financings can sometimes "shift

- 22 -

WBD (US) 4897-1602-9628

the dynamics of chapter 11 reorganization dramatically." 3 COLLIER ON BANKRUPTCY ¶ 364.06[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  They dramatically improve the priority of a prepetition creditor through superpriority administrative expense status and can create structural impediments to plan alternatives by eliminating "cram down" treatment for rolled-up debt, while failing to provide any additional value to the debtor's estate. *Id*.

57.    One yardstick courts consider is especially troubling here—only $4 million in additional liquidity is being given under the Receivables Facility, yet *"all obligations of the Debtors thereunder"* are being accorded superpriority administrative expense claim status.  Interim Order, ¶ 11(a).  The Receivables Facility has a ceiling of $30 million and as of the Petition Date, approximately $26 million was outstanding. *Id*., ¶ 11(c); Mot., ¶ 14.  In addition, as additional security for all obligations arising under the Receivables Facility after the Petition Date, HSBC is to be granted liens and security interests in (i) all Receivables and Related Rights funded by Advances from the Prepetition Secured Lender, which shall be first priority liens not subject to the Carve Out, and (ii) all other DIP Collateral that was unencumbered as of the Petition Date or subject as of the Petition Date to an avoidable lien that is subsequently avoided, having the priorities specified in the Lien and Claim Priorities Chart as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all Postpetition Receivables Facility Obligations.[12]

## VII.    Nirma's Subrogation Rights and the Marshaling Waiver Create a Backdoor Priority Inversion.

58.    The combined effect of Nirma's guarantee of the Prepetition Secured Facility and the marshaling waiver in the Interim Order creates a mechanism by which Nirma can acquire first-

---

[12] The 6.5:1 ratio of prepetition debt to new money exceeds the ratios customarily approved by the Court.

WBD (US) 4897-1602-9628

priority liens on all estate assets, superior to all other claims including the DIP claims. *See* Interim Order, ¶¶ 29, 38; DIP Mot., ¶ 18.

59.     Under paragraph 29 of the Interim Order, if Nirma pays on its guarantee to HSBC, Nirma is subrogated, to the extent of that payment, to all of HSBC's liens, rights, and claims, including HSBC's first-priority liens on all prepetition collateral, the Replacement Liens, and all superpriority claims. This subrogation would enable Nirma to vault over every other claim in the case, including the DIP superpriority claims and all unsecured creditors.

60.     The Debtors' waiver of marshaling prevents the estate from requiring that HSBC first look to Nirma for recovery. *See Meyer v. United States*, 375 U.S. 233, 236 (1963) (recognizing the equitable doctrine of marshaling, under which a senior creditor with recourse to multiple funds may be required to satisfy its claims first from the fund to which the junior creditor has no recourse). The Committee objects to the subrogation and marshaling waiver provisions proposed by the Debtors.

## VIII.     The DIP Facility Improperly Improves Nirma's Position as an Insider and Violates Fundamental Principles of Bankruptcy Priority.

61.     The DIP Lender is SVM's direct 100% parent, itself wholly owned by Nirma. Frankum Decl., ¶ 22. As the equity holder, Nirma should occupy the absolute bottom of the priority ladder under section 1129(b)(2)(B) of the Code. Yet through the DIP Facility, Nirma (through KHI) seeks to convert this equity position into: (a) secured liens on *all* of the Debtors' assets, *see* Interim Order, ¶ 6; (b) Superpriority administrative claims, *see id.*, ¶ 6(d); (c) credit bidding rights under section 363(k), *see* DIP Credit Agreement, § 10.2; Interim Order, ¶ 36; (d) compulsory product deliveries, *see* DIP Credit Agreement, § 2.6(c); and (e) control through restrictive milestones, *see* DIP Credit Agreement, §§ 10.7, 10.8. This represents a wholesale circumvention of the absolute priority rule.

62.     By transforming its equity interest into a superpriority secured position with credit bidding rights, or a superpriority administrative claim, Nirma is predetermining the outcome of these cases without the safeguards of the plan confirmation process.  *See In re Laffite's Harbor Dev. I, LP*, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) (denying DIP financing that had sub rosa plan effect).  Moreover, through the Reimbursement Agreement, Nirma obtains *pari passu* superpriority claims and liens alongside KHI—meaning Nirma secures superpriority status through two separate mechanisms: once as DIP Lender (through KHI) and again as guarantor (through the Reimbursement Agreement).  *See* Supply Agreement Mot., ¶¶ 2–3; Interim Order, Ex. 3 (Lien and Claim Priorities Chart).  This dual-track priority inversion for the equity holder is unprecedented and violates the fundamental principles of bankruptcy distribution.

## IX.     The DIP Motion and Supply Motion Contain Other Objectionable Provisions Which Should Not Be Approved by the Court.

63.     The Committee objects to additional provisions of the DIP Motion, Supply Motion and their respective Proposed Final and Interim Orders and requests, to the extent the Court is otherwise inclined to approve the DIP Facility notwithstanding the Committee's vigorous opposition thereto, that the Proposed Final Order and Final Supply Order be amended consistent with the following. By objecting to these provisions in bullet point format, the Committee does not suggest that these objections are either technical or minor in nature.

- Releases. The releases granted to the DIP Lender should expressly be limited to the DIP Lender in its capacity as such. Moreover, such releases should not be extended to each of these parties' unnamed successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns except for in their specific capacity as related to the DIP Facility. In addition, the release of any post-petition claims against the DIP Lender is improper and an end run around this jurisdiction's restrictions on exculpation. *See* DIP Agreement at § 11.19.

- 25 -

- <u>Inappropriate Consent Rights Granted to Supplier</u>.   The proposed Supply Agreement grants the Supplier, TATA, the right to withhold its consent to the sale of any of the Customer Contracts or interests therein, which interferes with the Debtors' ability to freely market the Customer Contracts as part of the sale.  See Supply Agreement at §7(g)(ii).

- <u>Material Amendments</u>.  The Committee should receive advanced notice of any amendments to the Proposed Final Order or DIP Credit Agreement, and all material amendments of the same should be approved by the Court after notice and a hearing.

- <u>Financial Reporting</u>. Any financial reporting the Debtor sends to the DIP Lender should be simultaneously provided to the Committee, and the Committee should receive advance notice of any changes to the budget.

- <u>Good Faith Finding</u>. Given the various (and significant) issues identified with the DIP Financing, the Court should decline to find any purported "good faith" in accordance with 11 U.S.C. § 364(e).

- <u>Surcharge Waiver and Section 552(b) Waiver</u>.  The Interim Order waives the estate's right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code and waives the "equities of the case" exception under section 552(b) of the Bankruptcy Code.  *See* Interim Order, ¶¶ 19, 35; DIP Credit Agreement, § 10.1. These waivers are entirely inappropriate where the DIP Lender is the Debtors' parent company.  Section 506(c) is a rule of fundamental fairness that ensures secured creditors share the burden of satisfying administrative expenses incurred to preserve and sell their collateral, preventing unsecured creditors from bearing costs that solely benefit secured parties.  *See In re Domistyle, Inc.*, 811 F.3d 691, 696 (5th Cir. 2015); *In re Visual Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995) ("section 506(c) is designed to prevent a windfall to the secured creditor").  By waiving section 506(c), the Debtors agree to pay all expenses of preserving and disposing of the DIP Collateral even though the DIP Facility is expressly designed to benefit the DIP Lender and Nirma.  *See In re Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve postpetition financing to the extent it purported to waive section 506(c)).  Similarly, the waiver of section 552(b)'s "equities of the case" exception prevents the estate from arguing that unencumbered assets used to increase the value of prepetition collateral should inure to the benefit of unsecured creditors.  *See In re Cafeteria Operators, L.P.*, 299 B.R. 400, 409-10 (Bankr. N.D. Tex. 2003).  These waivers cannot be granted at the outset of this case given the high degree of uncertainty about the ultimate case outcome.  *See In re TerreStar Networks, Inc.*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (denying summary judgment request for 552(b) waiver as premature because factual record was not fully developed).  At a minimum, any such waivers should not be granted at the financing stage and should be subject to the Committee's investigation.

- <u>No Committee Review of Ancillary Documents</u>.  The DIP Credit Agreement contemplates the execution and delivery of a security agreement, mortgages, deeds

- 26 -

of trust, and similar documentation with respect to the DIP Collateral. *See* DIP Credit Agreement, § 3.2(c). These ancillary documents may contain terms that further expand the DIP Lender's rights or impose additional obligations on the estate. The Committee should have the opportunity to review all ancillary documents before they are executed, and no such documents should be executed without the prior consent of the Committee or further order of this Court.

- Court Flexibility to Prime DIP Lien. The Interim Order provides that, except with the written consent of the DIP Lender, no claim in the Chapter 11 Cases shall be senior to or *pari passu* with the DIP Superpriority Claims. *See* Interim Order, ¶ 6(d). This provision improperly restricts the Court's flexibility to authorize any future financing on terms that might prime the DIP Lender's claims, even if such financing would benefit the estate. The Court should retain its inherent power to approve senior or pari passu financing pursuant to section 364(d) of the Bankruptcy Code if doing so is in the best interests of the estate.

- Adequate Protection Payments to HSBC. The Interim Order provides that, as adequate protection against any Diminution in Value, HSBC is entitled to payment of current interest at the non-default rate and reimbursement for fees and costs. *See* Interim Order, ¶ 8(c). The Debtors have not established that HSBC is fully secured as of the Petition Date—a prerequisite to such adequate protection payments. *See* 11 U.S.C. § 506(b) (permitting interest only on oversecured claims); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372 (1988). To the extent HSBC is not fully secured, the payment of current interest improperly depletes estate assets. Such interest payments should be eliminated or, at minimum, subject to recharacterization as a reduction of principal if HSBC is not oversecured.

- Improper Definition of "Diminution in Value". The Interim Order defines "Diminution in Value" to include diminution "on account of (i) the Supplier Liquidity Advance in an amount that is not less than any postpetition paydowns of the Supplier Liquidity Advance." *See* Interim Order, ¶ 9. By including the Supplier Liquidity Advance within the definition of Diminution in Value, the Debtors improperly expand the scope of adequate protection to cover postpetition events that have nothing to do with the use, sale, or lease of Prepetition Collateral. This inflated definition could entitle HSBC to additional replacement liens and superpriority claims far beyond what is necessary to protect against actual diminution. The Committee objects to any postpetition events being included in the definition of Diminution in Value.

- Carve-Out Disparity. The proposed budget provides an overall carve-out for Committee professionals that is 11% of the overall Carve-Out for Debtor professionals. Furthermore, the Carve-Out provides that, following delivery of a Carve-Out Trigger Notice, the Committee's Professional Persons are capped at a mere $100,000 in aggregate allowed professional fees, compared to $1,050,000 for the Debtors' Professional Persons. *See* Interim Order, ¶ 12(a); DIP Mot. at 14-15. This 10:1 disparity is patently inequitable and designed to hamstring the Committee at the most critical juncture of the case—when an Event of Default has occurred

- 27 -

and the Committee's advocacy is most needed.  The Bankruptcy Code contemplates a level playing field between debtor and committee professionals.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (finding DIP financing carveouts for both debtor and committee professional fees necessary because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Committee's overall Carve-Out should be increased to the 30%-40% of the Debtors' professionals that is often approved in this Court, and the Post-Carve Out Trigger Notice Cap should be no less than 30% of the total professional fee carve-out.

## RESERVATION OF RIGHTS

64.     The Committee reserves all of its rights, claims, and defenses, including, without limitation, the right to: (a) raise additional objections to the DIP Motion and any proposed DIP Orders; (b) investigate and challenge the validity, extent, priority, and perfection of any prepetition liens or claims; (c) seek equitable subordination or recharacterization of any claims; (d) assert the doctrine of marshaling; (e) challenge any credit bid by the DIP Lender or its affiliates; (f) seek appointment of an examiner or chapter 11 trustee; and (g) raise any and all other arguments and objections that may become apparent upon further investigation and discovery.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that this Court:

1. Apply a heightened scrutiny or entire fairness standard to the review of the appropriateness of the DIP Facility;

2. Condition approval of the DIP Motion and Supply Motion on the adoption of modifications that are consistent with the objections set forth herein or, in the alternative, deny approval of the DIP Motion and Supply Motion;

- 28 -

WBD (US) 4897-1602-9628

3.  Grant such further relief as the Court deems just and proper.

Dated: July 9, 2026
        Wilmington, Delaware

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Matthew P. Ward*
Matthew P. Ward (DE Bar No. 4471)
Lisa Bittle Tancredi (DE Bar No. 4657)
Marcy J. McLaughlin Smith (DE Bar No. 6184)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone:        (302) 252-4320
Facsimile:        (302) 252-4330
Email: matthew.ward@wbd-us.com
Email: lisa.tancredi@wbd-us.com
Email: marcy.smith@wbd-us.com

—and—

Philip J. Mohr, Esquire (*pro hac vice*)
300 North Greene Street, Suite 1900
Greensboro, North Carolina 27401
Telephone:(336) 574-8030
Email:        philip.mohr@wbd-us.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*

WBD (US) 4897-1602-9628