**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SEARLES VALLEY MINERALS INC., *et al.*,[1] | ) Case No. 26-10966 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Related Docket No(s). 12, 15, 161 |

**REPLY OF DEBTORS TO OBJECTION OF THE COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING; (B) CONTINUE TO ACCESS FINANCING UNDER ITS RECEIVABLES FACILITY; AND (C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDER; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING FINAL HEARING AND (V) GRANTING RELATED RELIEF [DOCKET NO. 15] AND THE MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO ASSUME SODA ASH SUPPLY AND LIQUIDITY AGREEMENT AND OBTAIN FINANCING THEREUNDER [DOCKET NO. 12]**

Searles Valley Minerals Inc. ("**SVM**") and certain of its subsidiaries, the debtors and

debtors in possession in the above-captioned cases (collectively, the "**Debtors**") file this reply (this

"**Reply**") to the objection [Docket No. 161] (the "**Objection**") filed by the Official Committee of

Unsecured Creditors (the "**Committee**") to, and in further support of, the Debtors' DIP Motion

and Supply Motion.[2] In support thereof, the Debtors refer to the previously filed declarations of

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Minerals Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

[2] "DIP Motion" means the *Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing; (B) Continue Access Financing Under Its Receivables Facility; and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing and (V) Granting Related Relief* [Docket No. 15] and "Supply Motion" means the *Motion of Debtors For Entry of Interim and Final Orders Authorizing the Debtors to Assume Soda Ash Supply and Liquidity Agreement and Obtain Financing Thereunder* [Docket No. 12]. Each capitalized

Christian Tempke and Adrian Frankum (the "**Tempke Declaration**" and the "**DIP Frankum Declaration**," respectively),[3] the previously filed declaration of Adrian Frankum in connection with the TATA Supply Agreement[4] (the "**Supply Agreement Frankum Declaration**,"[5] and together with the DIP Frankum Declaration, the "**Frankum Declarations**") and further rely upon and incorporate by reference the contemporaneously filed *Declaration of John S. Dubel in Further Support of the Debtors' DIP Motion* (the "**Dubel Declaration**")[6], and respectfully state as follows:

**PRELIMINARY STATEMENT**

1.     The Parent Junior DIP Facility and Liquidity Advances under the TATA Supply Agreement provide much needed cash for the Debtors' business to operate while they pursue a value-maximizing sale transaction.  The overall financing package is on favorable terms and is the only available option after the Debtors' investment banker thoroughly canvassed the market.  The Committee, however, objects and takes issue with certain features of the package without offering any alternative.

2.     Based primarily upon its misunderstandings or misconstruction of certain provisions of the proposed financings, the Committee impugns the Debtors' process and implies

---

term used but not defined herein shall have the meaning ascribed to it in the DIP Motion, the Supply Agreement Motion, the Interim DIP Order or the Supply Agreement Interim Order (each as defined herein), as applicable.

[3]   The Tempke Declaration and the DIP Frankum Declaration were attached as Exhibit 4 and Exhibit 5, respectively, to the DIP Motion.

[4]   The "**TATA Supply Agreement**" means that certain soda ash supply and liquidity agreement by and between SVM and TATA Chemicals North America Inc. ("**TATA**") dated as of June 7, 2026.

[5]   The Supply Agreement Frankum Declaration was attached as Exhibit E to the Supply Motion.

[6]   The Debtors intend to file additional declarations to support this Reply in due course.

that the parent's financial support of the Debtors is part of a sinister plot designed to protect the parent. This is an unfounded and unfortunate misconception.

3.      Since the Committee's professionals were hired in these cases, the Debtors have worked to provide information and educate the Committee, and that will remain a high priority. An impartial evaluation of the proposed financings before this Court makes clear that its terms are balanced, commercially reasonable, and well within the Debtors' business judgment. The Committee will have a genuine opportunity to investigate the parent's relationship with the Debtors. And an independent estate investigation of such relationship is already well underway, and nearing completion. But the Committee's suspicion and speculation are no reason to deny the Debtors much needed liquidity.

4.      The truth is that the Debtors' business, which is central to the town of Trona, California, employing approximately 250 employees and supplying potable water to the town and electricity to the local airport, could not operate through the ongoing sale process without the critical support of the parent. Simply put, the protections that the parent is receiving in exchange for providing such support are well within the bounds of reasonableness, and were approved by a highly involved independent director appointed nearly three weeks before the Petition Date with a clear mandate. The Committee's overarching theme is that the DIP Lender should not receive liens on unencumbered assets because it is an insider. But the Committee ignores a critical point— that providers of new money or value (insider or not) routinely receive such protections when there is no better alternative. The Court should approve the financing package and overrule the Committee's objection.

**REPLY**

**I.     Entry Into the Debtors' Proposed Financing Arrangements Satisfies Both the Business Judgment and the Heightened Entire Fairness Standards.**

5.     The Committee argues that entry into the DIP Facility cannot withstand an "entire fairness" or "heightened scrutiny" review.  The Debtors submit that the business judgment rule applies because the DIP Facility was approved by the Debtors' Independent Committee (consisting of the Debtors' Independent Director).  *See Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991) (finding that Delaware law allows a committee of disinterested directors to approve a transaction and bring it within the scope of the business judgment rule); *see also Stegemeier v. Magness*, 728 A.2d 557, 562 (Del. 1999) (declining the application of a heightened standard of review after finding that the administrator of the estate was disinterested, independent, and the product of an orderly process); *Powell v. First Republic Bank*, 274 F. Supp. 2d 660, 669–70 (E.D. Pa. 2003) (upholding determination of a "committee of one" independent investigator where properly constituted and no evidence of bad faith or self-dealing was presented); *see also In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) (holding that the business judgment standard was appropriately applied to a debtor's decision to enter into a plan support agreement with an insider counterparty where the debtor was represented in negotiations by an unconflicted fiduciary).  Nevertheless, as described in the DIP Motion, the Debtors' entry into the DIP Facility would satisfy even a heightened standard, including entire fairness.

**A.     Dubel's Appointment and the Independent Committee Process.**

6.     The Committee argues that the formation of the Independent Committee days before the chapter 11 filings taints the process.  However, the Committee's argument mischaracterizes both the law and the facts.

4

7.    The truth is that John S. Dubel was appointed as Independent Director on May 26, 2026—nearly three weeks before the Petition Date. *Dubel Declaration* ¶ 4.  Mr. Dubel had no prior association of any kind with KHI[7], Nirma, or the Debtors. *Id.*

8.    On June 1, 2026, KHI as the sole stockholder of SVM, passed resolutions (the "**Appointment Resolutions**") pursuant to which KHI delegated to Mr. Dubel and any other disinterested members of the Board the "power and authority to review, negotiate, authorize, approve, implement and otherwise act on behalf of the Company with respect to any transaction, agreement, arrangement, matter or other action in which [KHI] or any affiliate of [KHI] has, or may have an actual or potential conflict of interest with [SVM] (each, a "**Conflict Matter**")." *Id*. The resolutions provided that SVM cannot, *without the prior affirmative consent of Mr. Dubel*, approve any Conflict Matter. *Id*.

9.    The Appointment Resolutions also provide that SVM cannot approve "any financial restructuring of the Company's debt obligations, including the incurrence of additional debt financing, recapitalization of the Company, and/or a sale, merger, consolidation, restructuring, asset sale (other than in the ordinary course of business) or similar transaction involving [SVM] (each, a "**Restructuring Transaction**") . . . *without the prior affirmative consent of Mr. Dubel*" (emphasis added). *Id*. at ¶ 5.  Put another way, Mr. Dubel's vote was required to approve any Conflict Matter or Restructuring Transaction, *i.e.,* a veto power. *Id*.

10.    From the outset of his engagement, Mr. Dubel, with over 40 years of experience in restructuring, including serving as CFO of several companies where he negotiated DIP and supply agreements, familiarized himself with the Debtors' business, financial condition, and the proposed

---

[7]    The DIP Lender in these Chapter 11 Cases is Karnavati Holdings Inc., the sole stockholder of SVM.  The DIP Lender is referred to herein as both the DIP Lender and "**KHI**".

financing terms. *Id*. at ¶ 6. In addition, from the start of his appointment, Mr. Dubel worked closely with the Debtors' management and advisors in reviewing, evaluating and providing significant input and guidance on negotiating the terms of the Parent Junior DIP Facility, the TATA Supply Agreement, and the Reimbursement Agreement, including reviewing the earliest drafts and subsequent revisions to the same. *Id*. Among key items, Mr. Dubel was involved in providing significant input and guidance in negotiating the Carve-Out from the collateral, including causes of action against affiliates and avoidance actions, and ensuring liens would only attach to proceeds of affiliate causes of action and avoidance actions at a final hearing. *Id*. The Debtors first received a term sheet and draft Credit Agreement reflecting the DIP Lender's proposed terms for the Parent Junior DIP Facility on May 25, 2026. Mr. Dubel discussed this first draft of the Parent Junior DIP Facility with the Debtors' counsel shortly after it was sent. *Id*. Mr. Dubel continued to have frequent phone calls with Debtors' counsel regarding key terms of the financing arrangements, including the collateral package and economic terms. *Id*. Mr. Dubel significantly contributed to the negotiations and drafts of the DIP Documents that were exchanged working closely with the Debtors' advisors to negotiate the terms of the Parent Junior DIP Facility.

11. After weeks of evaluating and negotiating the financing arrangements, the disinterested members of the Board approved the TATA Supply Agreement and Reimbursement Agreement and Mr. Dubel (acting as the Independent Committee) approved the Parent Junior DIP Facility. *Id*. at ¶ 6.

12. In fact, the board of directors of SVM (the "**Board**"), including Mr. Dubel, considered postponing the filing of the Chapter 11 Cases at least a week or more to allow the Debtors to continue to pursue a stalking horse buyer. *Id.* at ¶ 8. However, certain utilities had threatened to terminate service, and the Debtors already faced contracting trade terms from

vendors. *Id.* Given the risks associated with delaying the filing, the Board ultimately determined to file the Chapter 11 Cases on June 15, 2026. *Id.*

13. The Committee makes much about the fact that the Independent Committee was constituted on June 12, 2026—three days before the Petition Date. However, formation of the Independent Committee was simply an enabling act pursuant to the Debtors' bylaws to grant Mr. Dubel the affirmative authority to act on the Debtors' behalf with respect to Conflicts Matters such as the Parent Junior DIP Facility. As explained above, Mr. Dubel already had a veto right over any Conflict Matter or Restructuring Transaction. The Committee's attempt to present Mr. Dubel's involvement in the process as rushed and uninformed belies the facts. Had the Committee simply asked for the information surrounding Mr. Dubel's involvement rather than jumping to the conclusions in their Objection of a tainted process, they would have learned that their version of the facts is wrong. The actual facts and circumstances support application of the business judgment rule.

### B.      Entire Fairness

14. The Debtors' proposed financings would also easily pass muster under an entire fairness standard of review. Entire fairness requires (i) fair dealing and (ii) fair price. *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013). The Tempke Declaration and Frankum Declarations establish the comprehensive process conducted by the Debtors with respect to the financing arrangements and the fact that no alternative financing options were presented on superior terms, let alone on any terms. Moreover, the resulting substantive terms of the Parent Junior DIP Facility—a 1% commitment fee, 11% interest paid in kind, a modest roll-up of

prepetition obligations (if any),[8] unpenalized prepayment rights, and junior liens that do not prime the Prepetition Secured Lender—are modest by market standards. The absence of any competing proposal from the market—despite the Debtors' extensive efforts—conclusively establishes that the price is fair. *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 791 (Bankr. S.D.N.Y. 2020) ("Fair price can also be established by demonstrating that no better alternatives were available.").

15.     Nor can the Committee credibly claim that the financing structure is the product of insider overreaching. Mr. Dubel was appointed Independent Director nearly three weeks before the Petition Date. Evaluation and negotiation of the Parent Junior DIP Facility was negotiated by Mr. Dubel, who as explained above, had veto rights over any such transaction since his appointment. From the outset, Mr. Dubel retained the "clear mandate" and "'critical power' to say 'no'" that Delaware courts require of an effective special committee. *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1146 (Del. Ch. 2006). In addition, the Debtors and the DIP Lender were represented by separate, experienced counsel, and the terms of the Parent Junior DIP Facility were independently reviewed, negotiated, and approved by Mr. Dubel in his capacity as the sole member of the Independent Committee before those terms were ever presented to this Court. *See id.* at 1145 ("[T]he establishment of an independent special committee can serve as powerful evidence of fair dealing.").

## II.     There Are No Alternative Sources of Financing Available on Better or More Favorable Terms and the Financing Parties' Requirements are Necessary to Obtain Financing.

16.     As detailed in the DIP Motion and the Tempke Declaration, none of the parties contacted by Lazard were willing to provide postpetition financing on a junior basis. *DIP Motion*

---

[8]    As discussed below, if the VBOR feature of the Parent Junior DIP Facility is viewed as a "roll-up," it is extremely modest. *See infra* ¶26.

¶ 22; *Tempke Decl.* ¶ 14.  Indeed, none of the parties contacted by Lazard presented any proposal for postpetition financing.  *Id.*  And since the filing of the DIP Motion, the Debtors have still not received any alternative financing proposals despite Lazard's continued outreach to potential financing sources.  The only sources of liquidity that are available for the Debtors to fund their sale process are the $20 million new money Parent Junior DIP Facility, the $20 million new money provided by TATA under the TATA Supply Agreement, and continued access to the Receivables Facility, which access itself ensures a $28 million liquidity hole is not opened.  *See Frankum Decl.* ¶ 16.

17.     Importantly, the Committee acknowledges that the Debtors "need money if they are to continue to operate and pursue a sale process in chapter 11, and Nirma may be the only source of funding." Comm. Obj. ¶ 3.  The Committee does not point to any other alternative source of financing, let alone a source of financing that would be willing to provide the financing on the terms they desire–*i.e.,* no liens on causes of action or the proceeds thereof, a significant increase of funding available to the Committee (notwithstanding the substantial sum budgeted for the Committee from the outset), including for its investigation, challenge litigation and pursuit of other causes of action, and no releases.  *See generally* Comm. Obj. ¶ 4.

18.     Quite simply, the DIP Lender, TATA, Nirma, and the Prepetition Secured Lender are all providing new value to the estates to ensure the Debtors' sale process is funded, and they cannot be forced to provide financing to the Debtors on any other terms and conditions than the ones contained in the governing documents and applicable orders.  *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1358 (7th Cir. 1990) (stating that a postpetition lender in chapter 11 cannot be required to "loan more money" or operate under different terms than those

set forth in a loan agreement); *Bank of Smithtown v. 264 W. 124 LLC*, 105 A.D.3d 468, 469 (1st Dep't 2013) (finding the lender "was under no obligation to modify the loan").

     **A.**     **Granting Liens and Superpriority Claims on Unencumbered Collateral, Including the *Proceeds* of Avoidance Actions and Causes of Action Against Affiliates is Necessary and Appropriate.**

19.     The Committee takes issue with the liens granted to Nirma under the Reimbursement Agreement and objects to the granting of liens to the DIP Lender and Nirma, as guarantor of the TATA Supply Agreement, on the proceeds of claims and causes of action on avoidance actions. These objections should be overruled.

20.     The DIP Lender is committed to putting in $20 million of new money and Nirma has guaranteed an additional $20 million of new money from TATA in the form of the Liquidity Advance that is necessary to fund the Chapter 11 Cases. The liens on proceeds of avoidance actions and causes of action against the DIP Lender and its affiliates[9] serve as security for this new money. Substantially all of the Debtors' other assets (other than real property assets that would have uncertain value in a default scenario and causes of action) are already encumbered with a first-priority lien for the benefit of the Prepetition Secured Lender on the Prepetition Demand Line Obligations and the obligations under the Receivables Facility which, together, represent approximately $85.5 million of funded debt obligations (including issued letters of credit). Naturally, any party funding and guaranteeing $40 million of additional value would seek security in the form of unencumbered assets. Securing new money postpetition financing with previously

---

[9]    The Interim DIP Order (defined herein) excludes "claims and causes of action against affiliates of the DIP Lender" but includes the proceeds thereof. The Objection suggests in numerous places an intent to retain liens on causes of action against the DIP Lender, KHI. However, both the Debtors and the DIP Lender counsel advised the Committee that was not the intent, as the Committee acknowledges in footnote 11, and advised that the proposed Final DIP Order would be revised to correct that. However, despite numerous requests for the Committee to suggest revisions to the Final Order to provide clarification, the Committee instead decided to make this a contested issue.

unencumbered assets—including the proceeds of Avoidance Actions and causes of action—is a common and necessary feature of postpetition financing and is expressly authorized by section 364(c)(2) of the Bankruptcy Code (allowing for liens to a DIP lender "secured by a lien on property of the estate that is not otherwise subject to a lien").

21.    Contrary to the Committee's suggestion otherwise, unsecured creditors do not hold exclusive rights to the proceeds of causes of action.  Indeed, there is no requirement that proceeds of avoidance actions be reserved for unsecured creditors, as proceeds of avoidance actions are for the benefit of the estate generally.  *See* 11 U.S.C. § 550(a) (preserving recoveries on avoidance actions "for the benefit of the estate"); see also id. §§ 541(a)(3)–(4).  As with any estate asset, the Debtors may grant DIP or adequate protection liens on those assets to the extent necessary to obtain financing or the use of cash collateral.  *See* 11 U.S.C. § 361(2) ("[S]uch adequate protection may be provided by . . . (2) providing . . . an *additional* or replacement lien[.]") (emphasis added); id. § 364(c), (c)(2) ("If the trustee is unable to obtain unsecured credit . . ., the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt . . . secured by a lien on property of the estate that is not otherwise subject to a lien . . . . "); *see also In re AppliedTheory Corp.*, Nos. 02–11868 (REG), et seq., 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. Apr. 24, 2008) ("Of course those assets started out unencumbered.  But those assets can thereafter be encumbered (or made available to satisfy superpriority claims), if necessary to provide adequate protection.  That's expressly authorized under section 361(2).").  Liens on proceeds of avoidance actions are particularly appropriate in cases such as these where debtors have only limited unencumbered assets.  *See In re Metaldyne Corp.*, No. 09–13412 MG, 2009 WL 2883045, at *4 (Bankr. S.D.N.Y. June 23, 2009) (approving grant of lien on proceeds of avoidance actions where, among other things, "[t]he Debtors have only limited unencumbered assets upon which replacement liens can

be provided"); s*ee also* Final Order at 5, *In re Spanish Broad. Sys., Inc.*, No. 26-10708 (BLS) (Bankr. D. Del. June 8, 2026) Dkt. No. 119 (granting postpetition financing approving liens on all causes of action (other than avoidance actions) and liens on avoidance action proceeds); *accord* Final Order at 3, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Mar. 19, 2025), Dkt. No. 300; Final Order at 31-33, *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Feb. 6, 2025), Dkt. No. 662; Final Order at 5, *In re Am. Tire Distribs.*, No. 24-12391 (CTG) (Bankr. D. Del. Nov. 22, 2024) Dkt. No. 340, Final Order at 5, *In re LL Flooring Holdings, Inc.*, No. 24-11680 (BLS) (Bankr. D. Del. Sept. 4, 2024), Dkt. No. 219; Final Order at 34-36, *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 11, 2024), Dkt. No. 248.

22.     The Committee posits that these liens "permit the insider DIP lender to insulate itself from its own misconduct," effectively arguing that insider liens on *proceeds* of causes of actions are forbidden. Comm. Obj. ¶¶ 50-51.   Bankruptcy courts in this district and others, however, do grant such protections in connection with DIP facilities provided by affiliates.  *See, e.g., In re TRM NRE Holding LLC,* Case No. 26-10568 (KBO) (Bankr. D. Del. June 3, 2026) (approving insider liens on all causes of action (other than avoidance actions) and on proceeds of avoidance actions to secure a DIP facility provided by the Debtor's sponsor, as is exactly the case here)*; In re AIO US, Inc.,* Case No. 24-11836 (CTG) (Bankr. D. Del. Oct. 29, 2024) (approving liens on proceeds of avoidance actions to secure a DIP facility provided by an affiliate)*; In re John Varvatos Enters., Inc.*, Case No. 20-11043 (MFW) (Bankr. D. Del. June 9, 2020) (same); *In re Lakeland Tours, LLC*, Case No. 20-11647 (JLG) (Bankr. S.D.N.Y. Aug. 6, 2020) (same); *In re Juno USA, L.P.*, Case No. 19-12484 (MFW) (Bankr. D. Del. Feb. 20, 2020) (same); *In re Patriot Well Sols. LLC*, Case No. 20-33642 (DRJ) (Bankr. S.D. Tex. Aug. 12, 2020) (same).

12

23.     As noted above, the DIP Lender is committing $20 million of new money and Nirma has guaranteed $20 million of new money critical to the estates' operation and pursuit of a value-maximizing transaction.  The DIP liens on proceeds of causes of action against insiders are tailored to secure only the new money and value that is being provided to the Debtors' estates.

24.     In addition, the proposed Final DIP Order does not grant the DIP Lender or Nirma a lien on the underlying causes of action themselves.  This is a critical distinction because without a lien on the causes of action the DIP Lender cannot control the underlying litigation. The estate does.  In *Lyondell*, Judge Gerber illustrated this point distinguishing between a lien on the proceeds of avoidance actions and an absolute assignment of the actions themselves, holding that granting liens on avoidance action proceeds to secure postpetition financing was appropriate under the facts presented.  *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (Gerber, J.) (Hr'g Tr. at 748) ("The lenders argued that they drafted their entitlement in this area to only obtain a lien on the proceeds of avoidance actions and not liens on the actions themselves.  Drafting to recognize that distinction affects *who gets to control those actions*, and that's no small thing.") (emphasis added).

25.     Here, the estates' rights to pursue such causes of action are fully preserved.  The Committee has a budget allowance in line with other cases to investigate any claims, and the existence of a lien supporting new value on any recovery does not change these rights.  The lien grant on proceeds of avoidance actions and affiliate causes of action is thus appropriate.

**B.      The VBOR Delivery Obligation Is Necessary and Appropriate.**

26.     The VBOR delivery terms under the DIP Credit Agreement (the "**VBOR Terms**") were the result of good-faith, arm's-length negotiations with the DIP Lender and are a required condition for the DIP Lender to provide financing.  As an initial matter, and for the sake of the record, the VBOR Terms were clearly disclosed in the DIP Motion, the Debtors' Motion to

Authorize the Continued Use of Their Cash Management System [Docket No. 7] (the "**Cash Management Motion**"), the *Declaration of Adrian Frankum in Support of Chapter 11 Petitions and First Day Papers* [Docket No. 17] (the "**First Day Declaration**"), and on the record before the Court at the first day hearing. *See* DIP Motion ¶ 27 (chart at p. 13) (describing VBOR delivery obligation under sections 5, 6, and 3.2(g) of DIP Credit Agreement) and Exhibit C to DIP Credit Agreement (providing that VBOR shipments to Nirma or another designee of DIP Lender shall be "in each case as partial satisfaction of balance of payment advances made by Nirma to SVM."); Cash Management Motion ¶¶ 36 and 39 (describing prepetition intercompany sales of VBOR by SVM to Nirma and Nirma's affiliate, Navin Overseas FZC ("**Navin**"), including the average historical value of such sales and the prepayments by Nirma and Navin for VBOR sales); First Day Declaration ¶¶ 15, 82, and 85 (same); and First Day Hr'g Tr. 45:9–11, 57:20, 58:1 (describing relief sought by the Debtors to continue intercompany VBOR sales by SVM to Nirma and its affiliates and the Exhibit C to the DIP Credit Agreement requiring the VBOR sales that had been prepaid).

27.     As to the substance of the argument, the Committee misses the point. Again, the Parent Junior DIP Facility provides $20 million of new money to the Debtors' estates, and the VBOR Terms—which the Committee estimates involves shipment by the Debtors of product valued at over $1 million—represents, at most, a *de minimis* additional financing cost relative to the total facility size. Comm. Obj. ¶ 43. While not a true roll-up, the VBOR Terms are akin to a roll-up of unsecured prepetition prepayments made by the parent and its affiliate for the supply of VBOR. When compared to the $20 million in new money, this "roll-up" represents a ratio of approximately 1:20, far below roll-up ratios in debtor-in-possession facilities frequently approved by bankruptcy courts in this district. *See, e.g.,* Final Order at 8, *In re Avenger Flight Grp., LLC,*

No. 26-10183 (MFW) (Bankr. D. Del. Mar. 11, 2026) (approving 2:1 roll-up); Final Order at 6, *In re Hudson 1701/1706, LLC,* No. 25-11853 (KBO) (Bankr. D. Del. Jan. 14, 2026) (approving 1:1 roll-up); Final Order at 4, 8, *In re Am. Tire Distribs.*, No. 24-12391 (CTG) (Bankr. D. Del. Nov. 22, 2024), Dkt. No. 340 (approving 3:1 roll-up of prepetition term loans against new money); Final Order at 2, 22-23, *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 11, 2024), Dkt. No. 248 (approving 3:1 roll-up).

28.     Moreover, the Committee fails to recognize that the obligation to deliver VBOR is qualified as set forth in Exhibit C to the DIP Credit Agreement.[10]  Specifically, Exhibit C states that "[a]ctual volumes provided and delivered within the ranges below will vary depending on SVM's actual production volumes and possible logistical issues.  The weekly schedule below is only an estimate of actual deliveries and could vary during the course of the bankruptcy case[.]" And contrary to the Committee's narrative of an overbearing parent making a last-minute "draconian" demand, the VBOR provision was highly negotiated.  The provision was initially structured as a fee and involved a greater quantity of VBOR.  But after negotiating with the DIP Lender, the Debtors negotiated that the VBOR supply would pay off prior prepetition obligations to deliver the product.[11]  As the Debtors continued to negotiate with the DIP Lender, they also decreased the VBOR production volumes in Exhibit C in order to preserve the estate's ability to continue providing VBOR to other customers.  In fact, since the Petition Date, the Debtors have not delivered any VBOR to Nirma, but have delivered to other customers.

---

[10]    The Debtors have explained this to the Committee since it filed its Objection in the hopes of resolving the VBOR issue.

[11]    The Proposed Final DIP Order includes additional language to clarify this mechanism.

**III.    The Terms of the Continued Usage of the Receivables Facility Are Appropriate.**

29.    As detailed in the DIP Frankum Declaration, access to the Receivables Facility is critical. *DIP Frankum Decl.* ¶ 11.  Without access to the Receivables Facility, the Debtors would require approximately $28 million in incremental financing during the Chapter 11 Cases. *Id.*  The Prepetition Secured Lender has no obligation to continue to allow access to the Receivables Facility as it is a classic financial accommodation. *See* 11 U.S.C. § 365(e)(2) (permitting creditors, after the commencement of the debtor's bankruptcy filing, to terminate "a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor" notwithstanding the automatic stay).  It is a condition of the Prepetition Secured Lender for consensual use of cash collateral and continued access to the Receivables Facility that (a) the outstanding obligations continue to be paid in the ordinary course and receive adequate protection, (b) obligations arising postpetition be secured by typical debtor-in-possession financing protections, and (c) Nirma provide a guarantee.  In exchange for providing the guarantee to the Prepetition Secured Lender, Nirma requires subrogation rights to the Prepetition Secured Lender's position.

**A.    Paydown of Prepetition Obligations Under the Receivables Facility From Prepetition Cash Collateral Tied To That Facility Preserves the Debtors' Liquidity.**

30.    The Prepetition Secured Lender is requiring, as a condition to continue providing access to the Receivables Facility, that its cash collateral continue to be used to pay down the Receivables Facility in the ordinary course.  Put simply, the Prepetition Secured Lender was under no obligation to allow the Debtors continued access to the Receivables Facility, without which the Debtors would have lost access to a $28 million line of liquidity.

31.    In exchange for such consideration, the Prepetition Secured Lender requested the reasonable accommodation of cash collateral usage.  The Committee attempts to confuse the issue

16

by arguing that this feature of the financing package is an improper roll-up, which it is not.  Most simply, "a [roll-up] is the payment of pre-petition debt with the proceeds of a post-petition loan." *Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC*, 527 B.R. 157, 167 (D. Del. 2015), *aff'd*, 648 F. App'x 277 (3d Cir. 2016) (citing *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010)).  As such, there are three elements of a roll-up: (i) there must be a prepetition loan; (ii) there must be a paydown of the prepetition loan with the proceeds of a postpetition financing facility; and (iii) the amount due under the postpetition facility on account of the paydown must be senior in priority.  These elements must be met conjunctively.

32.      Here, the three elements of a roll-up are not met.  The Prepetition Secured Lender holds a first-priority security interest on the Prepetition Receivables Facility Collateral as a result of its prepetition position, which includes the receivables it has financed.  As the receivables that secure the prepetition obligations are collected postpetition, those proceeds are applied to reduce outstanding amounts under the Receivables Facility.  To the extent the Debtors continue to operate in the ordinary course as a going concern, the Debtors expect that the Prepetition Secured Lender is oversecured on the obligations arising under the Receivables Facility.  Even if the paydown of the prepetition obligations from collection on receivables postpetition were considered a "roll-up", this arrangement is fundamentally different from a traditional "roll-up" in which a prepetition creditor's unsecured or undersecured claims are elevated to superpriority status through a postpetition loan.[12]

---

[12]   The Debtors have added language to the proposed Final DIP Order to clarify that all amounts received after the Petition Date will be applied first to reduce prepetition obligations under the Receivables Facility until such obligations are paid in full, and then to reduce postpetition obligations under the Receivables Facility.  Final DIP Order ¶10.

33. The Committee also misunderstands the relationship between the TATA Supply Agreement and the Prepetition Secured Lender's collateral base. TATA's $20 million Liquidity Advance does not increase the Prepetition Secured Lender's collateral. TATA's advance is new money provided to SVM to help fund the Chapter 11 Cases. The receivables generated from the sales of soda ash, to the extent factored under the Receivables Facility, are already pledged to the Prepetition Secured Lender as collateral. Those sales are being facilitated with soda ash supplied by TATA. Besides providing liquidity for SVM to continue operations, including TATA supplying soda ash to SVM customers, the Liquidity Advance itself does not generate receivables that bolster the Prepetition Secured Lender's security position.

34. As noted above, continued access to the Receivables Facility is critical for the Debtors' liquidity, and the Prepetition Secured Lender was not willing to continue to provide access to this financing, nor was Nirma willing to provide the required guarantee of the Receivables Facility without a commitment that the Receivables Facility would continue to be paid in the ordinary course. Even if the prepetition claims were left outstanding for the duration of the case, the Prepetition Secured Lender would have first-priority access to the proceeds of the receivables.

**B.      Nirma's Subrogation Rights For Its Guarantee of the Prepetition Secured Lender Debt Are Required to Access the Receivables Facility and Thus Are Reasonable.**

35. The Committee also objects to the subrogation rights afforded to Nirma in exchange for its guarantee of the Receivables Facility and asserts that Nirma could "vault over" every other claim in the case if it pays the Prepetition Secured Lender. Comm. Obj. ¶¶ 58–60. Again, the Committee mischaracterizes the nature of the subrogation rights.

36. The Debtors, the primary beneficiaries of the Receivables Facility, are the primary obligors under the Receivables Facility. As a backstop to the financial risk the Prepetition Secured

Lender is undertaking by continuing to lend to an insolvent entity, the Prepetition Secured Lender is requiring, and was unwilling to continue to provide financing under the Receivables Facility without, a guarantee from Nirma. Nirma was unwilling to provide the guarantee of the Receivables Facility without its right to be subrogated to the Prepetition Secured Lender's rights and liens against SVM. Once again, to support the Debtors in their pursuit of a value-maximizing sale, Nirma provided the necessary support to the Debtors.

37. Subrogation is a standard commercial construct. If Nirma is required to fund amounts pursuant to the guarantee, Nirma would step into the third-party shoes of the Prepetition Secured Lender and hold whatever liens and claims the Prepetition Secured Lender holds. In that scenario, Nirma would be entitled to no more and no less than the Prepetition Secured Lender. Notably, this does not result in additional debt or additional encumbrances against the Debtors, and it does not "vault" Nirma over other creditors as the Committee claims. Importantly, the Prepetition Secured Lender's liens and claims remain subject to the Committee's rights to Challenge during the Challenge Period. Final DIP Order ¶ 25. Accordingly, if Nirma were to step into the Prepetition Secured Lender's shoes with respect to such liens and claims by way of subrogation, they would remain subject to the same Challenge.

38. The Committee also argues that the Debtors' waiver of marshaling somehow also elevates Nirma's claims against the estate. Specifically, the Committee argues that the Prepetition Secured Lender should be forced to look to Nirma before the Debtors. However, the doctrine of marshaling does not compel a senior secured creditor to proceed against a guarantor first before liquidating its collateral. *Cf. Meyer v. United States*, 375 U.S. 233, 237 (1963) (finding that marshaling "is applied only when it can be equitably fashioned as to all of the parties," and declining to compel a senior lienholder to satisfy its claim from a particular fund where doing so

19

would prejudice a third party). The Committee does not point to any example of a postpetition lender agreeing to proceed against a guarantor before the primary obligor. However, in the Committee's version of its ideal financing package, not only should the Prepetition Secured Lender look to the guaranty first, but the guarantor should not have any subrogation rights against the primary obligor. Unsurprisingly, neither the Prepetition Secured Lender nor Nirma agreed to provide access to liquidity or the guarantee on those terms.

39.    Regardless, the Committee has no standing to invoke rights as to marshaling, in any event. Marshaling is an equitable doctrine available only to secured creditors; it is not available to unsecured creditors. *See In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007) ("[U]nsecured creditors cannot invoke the equitable doctrine of marshaling." (citation omitted)); *accord Interfirst Bank Fannin v. Bernell (In re Mesa Intercontinental, Inc.)*, 79 B.R. 669, 672 (Bankr. S.D. Tex. 1987) ("The majority view is that an unsecured creditor may not invoke the doctrine of marshaling of assets."). The Committee has no standing to invoke marshaling, and its objection on this basis should be overruled.

## IV.    The Releases Under the Parent Junior DIP Facility Are Narrowly and Appropriately Tailored.

40.    The Committee misconstrues the language of the DIP Order when it argues that the Debtors are providing sweeping releases under the DIP Order.

41.    In its misinterpretation of the releases, the Committee omits key language circumscribing the DIP Lender release. Specifically, as illustrated below, the Committee neglects to describe that the releases granted to the DIP Lender are expressly limited to KHI in its capacity as a DIP Lender and are specifically limited to claims related to the DIP Loan and DIP Orders:

> Effective upon entry of this Interim Order, the Debtors hereby fully, finally and forever release and discharge the DIP Lender and each of its officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them, ***each solely in their capacity***

20

*as such* (collectively, the "Released DIP Lender Parties"), of and from any and all actions, causes of action, demands, suits, claims, liabilities, liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, arising prior to the Petition Date, whether in law, equity or otherwise (including, without limitation, those arising under sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), *directly or indirectly arising out of, connected with or relating to the DIP Loan Documents and the DIP Orders*; *provided* that the foregoing shall not release any claims against a Released DIP Lender Party that a court of competent jurisdiction determines, pursuant to a final, non-appealable order, results primarily from the gross negligence, bad faith, or willful misconduct of such Released DIP Lender Party. Interim DIP Order ¶ 28 (emphasis added).

42.     Thus, the full picture makes clear that the DIP Lender release is tied to the DIP Loan Documents and DIP Orders.  And those documents were negotiated prior to the Petition Date.  Hence the limited release in the DIP Order logically applies to prepetition acts.  There is nothing out of the ordinary about that.   Moreover, the release of the DIP Lender does not eliminate the Committee's ability to investigate or seek standing bring alleged claims against KHI or Nirma based on their prepetition conduct, nor does it eliminate the Debtors ability to investigate or bring such claims.  The only limitation is the investigation budget.

43.     The Committee also misconstrues typical DIP order repayment language to conclude that any ability to equitably subordinate the DIP Lender's $135 million in unsecured advances is being bargained away.[13]   The Debtors do not believe the language speaking to "repay[ment]" of a DIP lender can be bootstrapped into waiver of equitable subordination of

---

[13]   The relevant language is as follows: "The Debtors hereby acknowledge that, effective upon entry of the Interim Order and as of such date, the Debtors have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that may be asserted to reduce or eliminate all of any part of the Debtors' liability to repay the DIP Lender."  Interim DIP Order ¶28.

*prepetition unsecured loans*.   The proposed Final DIP Order does not acknowledge, bless or determine any aspect of the DIP Lender's prepetition loans, or impair any party's rights with respect to such loans.   Nevertheless, the Debtors invited the Committee to propose clarifying comments to the DIP Order to resolve their concern.   The Committee did not propose any such clarifying language, but instead pressed the issue in its objection.

44.     At bottom, a debtor agreeing to repay its postpetition financing and release the lender from claims related to the new money provided under the DIP financing facility is hardly extraordinary; indeed, it would be strange for a DIP lender not to ask for such standard protections in exchange for providing new money.   Lenders routinely receive releases and such releases are appropriate and standard in this district.   *See In re GBI Servs., LLC*, No. 25-12089 (CTG) (Bankr. D. Del. Jan. 7, 2026); *In re Norcold LLC*, No. 25-11933 (TMH) (Bankr. D. Del. Dec. 16, 2025); *In re Claire's Holdings LLC*, No. 25-11454 (BLS) (Bankr. D. Del. Sept. 9, 2025); *In re Marelli Auto. Lighting USA LLC*, No. 25-11034 (CTG) (Bankr. D. Del. July 30, 2025); *In re Conscious Content Media, Inc.*, No. 25-12231 (BLS) (Bankr. D. Del. July 1, 2025).   And the releases here are as advertised, narrowly-tailored.

45.     The Committee's objection to the releases fundamentally mischaracterizes their mechanics and scope.   The objection should be overruled.

## V.     The TATA Supply Agreement and Reimbursement Agreement Provide Critical Liquidity to the Estate and their Terms are Appropriate.

46.     The Committee does not say much in its Objection about the TATA Supply Agreement or Reimbursement Agreement, but it complains about (a) the liens granted to Nirma pursuant to the Reimbursement Agreement in exchange for its entry into the Corporate Guarantee and to support the TATA Supply Agreement and (b) the release granted to TATA.   These terms

are reasonable and appropriate as part of a liquidity package that preserves estate value. *See infra* ¶ 16.

47.     With respect to the liens granted to Nirma, the Committee suggests that the Debtors have misled the Court and stakeholders by calling the Supply Facility "unsecured."  The liens granted to Nirma as a condition of its guaranty of the Supply Facility were fully disclosed in the Supply Motion and explained to the Court at the first-day hearing. *Supply Motion* ¶¶ 16, 24. First Day Hr'g Tr. 62:23–63:2, 64:6–12.  The Committee ignores the fact that the Supply Motion discusses clearly and at length that the Corporate Guarantee was a requirement of TATA for entry into the TATA Supply Agreement, and that Nirma was unwilling to supply the Corporate Guarantee without the Reimbursement Agreement and security from the postpetition liens, including on unencumbered collateral. *Supply Agreement Frankum Decl.* ¶¶ 10–11.

48.     The Committee also attacks the release of TATA from claims related to TATA's prepetition dealings with the Debtors.  But the release is a fair exchange for the benefits of the liquidity facility.  The Committee ignores that the TATA release constitutes bargained-for consideration, which TATA required in exchange for extending the $20 million unsecured Liquidity Advance and for the continued supply commitments on the Debtors' behalf.  Absent this release, TATA was unwilling to step into the Debtors' shoes to fulfill outstanding customer contracts during the pendency of these Chapter 11 Cases—commitments that, if unmet, could cause the Debtors to lose these valuable assets.  The releases granted to TATA were "part of the quid pro quo for the Debtors' ability to obtain the Liquidity Advances."  Supply Motion ¶ 32; Supply Agreement Frankum Decl. ¶ 18.

49.     From the Debtors' perspective, providing releases to TATA to continue servicing these contracts would preserve significant estate value.  But in furtherance of a litigation agenda,

the Committee would substitute its wisdom for that of the Debtors.  In the Debtors' business judgment, foregoing the benefits of the liquidity and preservation of the underlying contracts to preserve speculative causes of action against TATA does not make sense.  Indeed, the Debtors view the largely ordinary course payments made to TATA prior to the Petition Date to be in exchange for the new value TATA contributed by continuing to honor the Debtors' soda ash contracts, which the Debtors themselves could not honor given the mothballing of the soda ash operations back in February 2026.  *See*, *e.g.*, *In re Opus East, LLC*, 528 B.R. 30, 94 (Bankr. D. Del. 2015) (applying the new value and ordinary course of business defense to the alleged preference); *In re Winter Haven Truss Co.*, 154 B.R. 592, 594-96 (Bankr. M.D. Fla. 1993) (applying both defenses to challenged transfers).  Thus, in the Debtors' business judgment such release is entirely appropriate.

50.     The Committee also challenges a covenant in the TATA Supply Agreement which provides that the Company cannot, "without the prior written consent of [TATA]. . . sell, assign, transfer, or otherwise dispose of any [soda ash contracts]." TATA Supply Agreement Section 7(g). The Committee misses the key point.  The Debtors have an unequivocal right to terminate the TATA Supply Agreement by paying a 2.5% termination fee.  If the Company pays the fee and terminates, the covenant would fall by the wayside.  The Debtors are not constrained in the manner imagined by the Committee.

**VI.     There is No Evidence of Administrative Insolvency and the Committee's Budget and Investigation Demands Are Not Well Founded.**

51.     The DIP Frankum Declaration details that Ankura assisted the Debtors in putting together a 13-week cash flow forecast and budget based on an analysis and assessment of the Debtors' liquidity needs from the Petition Date until the estimated date of closing of the sale transaction (approximately 90 days later).  *DIP Frankum Declaration* ¶¶ 8–10.  Based on the

24

Debtors' and Ankura's analysis and discussions with the DIP Lender and its advisors, Ankura determined that approximately $40 million of incremental liquidity would be required (assuming, among other things, continued access to the Receivables Facility) to fund the Chapter 11 Cases. *Id.* at ¶ 10.   The Debtors' experienced and sophisticated financial advisors worked with the Debtors to create a budget that the financial advisors believe to be reasonable and achievable.  The Committee's speculation about the risk of administrative insolvency is overstated and unsupported.

52.   Most of the Committee's concern seems to be related to the amount reserved for it in the budget to investigate Nirma.   However, the Committee's ask for more funding is an overreach.  The $100,000 set aside for the Committee's investigation of the DIP Lender and Nirma is consistent with, and in several cases exceeds, amounts approved in analogous cases in this district.  *See, e.g.*, Final Order at 63–64, *In re Big Lots, Inc.*, No. 24-11967 (JKS) (Bankr. D. Del. Oct. 22, 2024), Dkt. No. 584 (approving an investigative budget of $100,000); Final Order at 74–76, *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Sept. 10, 2024), Dkt. No. 252 (approving an investigative budget of $75,000); Final Order at 60, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Mar. 19, 2025), Dkt. No. 300 (approving an investigative budget of $50,000); Final Order at 70–71, *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Aug. 4, 2023), Dkt. No. 332 (approving an investigative budget of $50,000).  Accordingly, there is sufficient room in the budget for the Committee to conduct a meaningful investigation.

53.   Moreover, the Committee seems to be seeking to use estate resources for an investigation of transactions in India that are well outside the scope of these Chapter 11 Cases.  Specifically, the Committee dedicates a large part of its objection to its suspicions about an ongoing demerger transaction in India involving non-Debtor Indian entities subject to Indian law,

regulatory oversight, and an Indian court approval process.  Nirma's corporate reorganization in India is not before this Court, and the Committee's speculation regarding Nirma's motives for those transactions has nothing to do with the DIP financing package before this Court.  To the extent the Committee believes those transactions give rise to colorable claims *by the Debtors or its stakeholders* against Nirma or its affiliates, the Committee's rights remain fully preserved to investigate and seek standing to pursue such claims, but they are not a basis to deny approval of financing the Debtors urgently need to preserve estate value.[14]

54.    Finally, the Committee also argues that the budget may not be sufficient to bridge to a plan.  The binding bid deadline is set for August 6 and the auction is scheduled for August 13.  Until the outcome of the sale process becomes clear, the Debtors, the Committee, and their respective advisors would only be speculating as to the funding need to bridge to a plan.  It is not reasonable to require the DIP Lender to fund speculative, open-ended contingencies at the outset of a case; the appropriate time to revisit wind-down funding is after the auction when the actual scope of wind-down costs becomes clearer.

## VII.    The Committee's Carve-Out Demands Misconstrue the DIP's Mechanics.

55.    Arguing that the Carve-Out should be increased, the Committee complains that the Carve-Out for Committee professionals is only 11% of the carve-out for Debtor professionals.  The Committee seems to be conflating the "carve-out" and the budget.  The "Carve-Out" includes all Allowed Professional Fees incurred by the Debtors and the Committee prior to the delivery of a Carve Out Trigger Notice *plus* after the delivery of a Carve Out Trigger Notice, an additional $1.05 million for the Debtors' professionals and $100,000 for Committee professionals to wind-down

---

[14]    The Committee also sows further seeds of suspicion calling out pre-bankruptcy amendments to the sole-member (SVM) managed Debtor subsidiaries (TRC and SDWC) designed to avoid automatic dissolution of these entities under the Delaware Act upon a bankruptcy filing and that generally modernize these decades-old agreements, which is hardly a nefarious purpose and has no relevance to the financing package before this Court.

their services.  Final DIP Order ¶ 12(a).  Notably, the Carve Out is not limited to amounts in the budget.  In addition, the DIP Lender has agreed that the Debtors can fund a professional fee escrow for the benefit of the retained professionals of both the Debtors and the Committee in an amount equal to unpaid fees incurred *plus* two weeks of budgeted professional fees.  Final DIP Order ¶ 12(c).  Such professional fee escrow could be higher or lower than the budget.

56.     The Committee is not entitled to a budget that reflects 30% to 40% of the Debtors' professionals.  This demand is excessive–there is no dispute that the scope of the Debtors' professionals' responsibility in these cases far outweighs those of Committee professionals.  The amounts allocated to the Committee's counsel and financial advisor are very substantial in absolute dollars—$1.6  million over just 12 weeks—and equal 17% of those allocated to the Debtors' counsel and financial advisor.  Courts in this district routinely approve Committee professional fee allocations of 17–24% of the Debtors' allocations, and the allocation here falls within that range. *See, e.g.*, *In re First Guar. Mortg. Corp.*, No. 22-10584 (CTG) (Bankr. D. Del. Dec. 21, 2022) (committee fees comprised approximately 17% of debtor professional counterparts); *In re Advantage Holdco, Inc.*, No. 20-11259 (JTD) (Bankr. D. Del. Mar. 2, 2022) (committee fees comprised approximately 24% of debtor professional counterparts); *In re SHL Liquidation Indus. Inc.*, No. 20-12024 (LSS) (Bankr. D. Del. July 16, 2021) (aggregate fees of professionals of the official committee of unsecured creditors amounting to approximately 24% of aggregate fees of comparable debtor professional counterparts); *In re BBGI US, Inc.*, No. 20-11785 (CSS) (Bankr. D. Del. May 20, 2021) (aggregate fees of professionals of the official committee of unsecured creditors amounting to approximately 21% of aggregate fees of comparable debtor professional counterparts).  In any event, the Debtors and their advisors engaged in extensive negotiations with the DIP Lender to obtain the terms as reflected in the current DIP budget with the needs of all

stakeholders in mind.  As a result, the budget contained within the Parent Junior DIP Facility is reasonable and appropriate, including the amount allocated to the Committee's professionals.

## VIII. Other Terms of the Parent Junior DIP Facility and the TATA Supply Agreement Raised by the Committee.

57.     The Committee asserts that a number of other provisions of the Parent Junior DIP Facility and the TATA Supply Agreement are not reasonable under the circumstances.  The Committee is wrong.  The Debtors address several of these items below:

- The DIP Does Not Implicate the Absolute Priority Rule.  The Committee's assertion that the Parent Junior DIP Facility effects a "wholesale circumvention" of the absolute priority rule by converting Nirma's equity position into a superpriority secured position is absurd and reflects a fundamental misunderstanding of the absolute priority rule.  The absolute priority rule, codified in section 1129(b) of the Bankruptcy Code, applies to plan confirmation—not to DIP financing.  No prepetition KHI claims—other than the de minimis VBOR obligations addressed above—are being elevated, converted, or rolled up.  To the extent the DIP Lender or Nirma hold prepetition claims against the Debtors, those claims remain subject to the applicable priority scheme and the Committee's challenge rights, and are not being pre-confirmed through the financing arrangements.

- Adequate Protection Payments to the Prepetition Secured Lender.  The Committee's objection to the adequate protection payments to the Prepetition Secured Lender rests on the premise that section 506(b) bars payment of current interest unless the Prepetition Secured Lender is fully secured as of the Petition Date, but that provision governs a secured creditor's entitlement to interest as part of its allowed claim; it does not limit what may be provided as adequate protection.  Adequate protection is properly evaluated on a case-by-case basis and may take many forms regardless of a lender's over- or under-secured status. *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry" focused on "protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  Payment of current interest is routinely granted as adequate protection. *See e.g., In re John Varvatos Enters,* Inc., No. 20-11043 (Bankr. D. Del. May 6, 2020) (Dkt. No. 176); *In re Accuride Corp.,* No. 24-12289 (Bankr. D. Del. Feb. 6, 2025) (Dkt. No. 662); *In re Ame. Tire Distribs., Inc.*, No. 24-12391 (Bankr. D. Del. Nov. 22, 2024) (Dkt. No. 340); *In re* Liberated Brands LLC, No. 25-10168 (Bankr. D. Del. Mar. 19, 2025) (Dkt. No. 300).

- Improper Definition of "Diminution in Value."  The Committee's challenge of the Debtors' definition of "Diminution in Value" is based on a misconstruction of the law.  Adequate protection must be provided to the extent of diminution in value of a prepetition lender's collateral to the extent it is used postpetition. The Committee objects to postpetition events being included in the definition, but it is the postpetition use of collateral or events that may cause a diminution in value to give rise to adequate protection. *In re Satcon Tech.*

28

*Corp.*, No. 12–12869 KG, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) ("[Adequate protection] is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor."); *see also In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)).

- Surcharge Waiver and Section 552(b) Waiver. The Committee's challenge to the Debtors' waivers of sections 506(c) and 552(b) of the Bankruptcy Code likewise fails, as those waivers rest within the discretion of the Debtors as debtors in possession and were a material inducement—and ultimately a condition—to the DIP Lenders' agreement to provide financing and consent to the use of Cash Collateral. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 12–13 (2000)) (holding that Section 506(c) may be invoked only by "the trustee," or a debtor in possession under Section 1107, and expanding it further "could make secured creditors less willing to provide postpetition financing"); *Precision Steel Shearing, Inc. v. Fremont Fin. Co. (In re Visual Indus., Inc.)*, 57 F.3d 321, 323 n.3, 327 (3d Cir. 1995) (cash collateral order barred charges "chargeable to [the secured lender] pursuant to Section 506(c)," and "the availability of Chapter 11 financing would be jeopardized" absent such protections). The waivers strike the appropriate balance between preserving the DIP Lender's rights and furthering the rehabilitative purposes of the Bankruptcy Code. The Committee is protected by the professional fee escrow and Carve-Out, the presence of which courts generally find to be grounds for a section 506(c) waiver. *See In re Molycorp, Inc.,* 562 B.R. 67, 76 (Bankr. D. Del. 2017) ("The carve-out is essentially an agreement by the secured creditor to subordinate its liens and claims to certain allowed administrative expenses, permitting such professionals' fees to come first in terms of payment from the estate's assets"). Moreover, given the nature of the Receivables Facility and its generation of post-petition receivables, a section 552 waiver is appropriate to ensure the Debtors' access to the critical liquidity provided under the continued availability of the Receivables Facility.

## CONCLUSION

58.    The financing structure provided through the DIP Credit Agreement, TATA Supply Agreement, and Reimbursement Agreement allows the Debtors to continue their operations in the ordinary course, complete the ongoing sale process, and generally maximize the value of their assets for all stakeholders.    There is no alternative financing available.    The Independent Committee—led by Mr. Dubel, who was properly empowered and actively engaged—reviewed and approved the terms of the Parent Junior DIP Facility, and the independent directors (including

29

Mr. Dubel) reviewed and approved the terms of the TATA Supply Agreement, each of which is fair and reasonable.  The Committee's Objection should be overruled.

**[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]**

WHEREFORE, the Debtors respectfully request that this Court (a) overrule the Objection, (b) enter the Final DIP Order, (c) enter the Final Supply Agreement Order, and (d) grant such other and further relief as is just and proper.

Dated: Wilmington, Delaware

July 17, 2026

*/s/ Laura Davis Jones*

| | |
|---|---|
| **PACHULSKI STANG ZIEHL & JONES LLP** | **SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP** |
| Laura Davis Jones (DE Bar No. 2436) | Joseph O. Larkin (I.D. No. 4883) |
| James E. O'Neill (DE Bar No. 4042) | Jason M. Liberi (I.D. No. 4425) |
| Edward A. Corma (DE Bar No. 6718) | One Rodney Square |
| 919 North Market Street, 17th Floor | 920 N. King Street |
| P.O. Box 8705 | Wilmington, Delaware 19801 |
| Wilmington, Delaware 19899-8705 | Telephone: (302) 651-3000 |
| (Courier 19801) | Joseph.Larkin@skadden.com |
| Telephone: 302-652-4100 | Jason.Liberi@skadden.com |
| ljones@pszjlaw.com | |
| joneill@pszjlaw.com | - and - |
| ecorma@pszjlaw.com | |

*Co-Counsel to Debtors and Debtors in Possession*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Joseph O. Larkin (I.D. No. 4883)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com
Jason.Liberi@skadden.com

- and -

James J. Mazza, Jr. (admitted *pro hac vice*)
Jennifer Madden (admitted *pro hac vice*)
320 S. Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
James.Mazza@skadden.com
Jennifer.Madden@skadden.com

- and -

Destiny N. Almogue (admitted *pro hac vice*)
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone: (213) 687-5000
Destiny.Almogue@skadden.com

*Co-Counsel to Debtors and Debtors in Possession*