**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SEARLES VALLEY MINERALS INC., *et al.* [1] | Case No. 26-10966 |
| Debtors. | (Jointly Administered) |
|  | **Re: D.I. 12, 15, 50, 59, 161, and 215** |

**JOINDER AND REPLY OF KARNAVATI HOLDINGS, INC. AND NIRMA LIMITED IN SUPPORT OF THE DEBTORS' SUPPLY AGREEMENT MOTION AND DEBTOR-IN-POSSESSION FINANCING MOTION AND IN REPLY TO THE UNSECURED CREDITORS' COMMITTEE'S OBJECTION THERETO**

Karnavati Holdings, Inc. ("KHI" or the "DIP Lender") and Nirma Limited ("Nirma") file this joinder and reply: (i) in support of the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Assume Soda Ash Supply Liquidity Agreement and Obtain Financing Thereunder* [D.I. 12] (the "Supply Motion") and the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing; (B) Continue to Access Financing Under its Receivables Facility; and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing and (V) Granting Related Relief* [D.I. 15] (the "DIP Motion" and, together with the Supply Motion, the "Motions"); (ii) as a joinder to the *Reply Of Debtors To Objection Of The Committee Of Unsecured Creditors To The Motion Of Debtors For Entry Of Interim And Final Orders (I) Authorizing The Debtors To (A) Obtain Postpetition Financing; (B) Continue To Access Financing Under Its Receivables Facility; And (C) Utilize*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Minerals Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

*Cash Collateral; (II) Granting Adequate Protection To The Prepetition Secured Lender; (III) Modifying The Automatic Stay; (Iv) Scheduling Final Hearing And (IV) Granting Related Relief [Docket No. 15] And The Motion Of The Debtors For Entry Of Interim And Final Orders Authorizing The Debtors To Assume Soda Ash Supply And Liquidity Agreement And Obtain Financing Thereunder [Docket No. 12]* [D.I. 215] (the "Debtors' Reply"); and (iii) in opposition to the *Objection of the Official Committee of Unsecured Creditors to the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing; (B) Continue to Access Financing Under its Receivables Facility; and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing and (V) Granting Related Relief [Docket No. 15] and the Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Assume Soda Ash Supply and Liquidity Agreement and Obtain Financing Thereunder [Docket No. 12]* [D.I. 161] (the "Committee Objection").[2]

The DIP Lender and Nirma join in the arguments advanced by the Debtors in support of the Supply Motion and the DIP Motion as set out in the Debtors' Reply, and in further reply to the Committee Objection state as follows:

## REPLY

1.      While the Committee acknowledges that Nirma is a major manufacturing conglomerate whose success has been studied in no less an academic environment than Harvard Business School, the Committee Objection is underpinned by the unfounded implication that Nirma is somehow stripping the Debtors of value.  As the Committee will learn as it becomes more

---

[2] Capitalized terms used, but not defined herein, shall have the meaning ascribed to them in the DIP Motion, the Debtors' Reply, or the Committee Objection, as applicable.

familiar with the facts and less reliant on conjecture, nothing could be further from the truth. Over the past several years, Nirma and KHI have provided significant support to the Debtors, both as a customer in the case of Nirma, and as a source of financial support. While not an issue for today—and not an issue relevant to approving the DIP Loan on a final basis—the facts of this case will bear out that, far from stripping value from the Debtors, Nirma and KHI consistently dealt on commercially reasonable terms in any transactions with the Debtors.

2.      More relevant for purposes of the Motions is that, as an insider providing DIP Financing, the DIP Lender has avoided overreaching provisions in the proposed financing. The DIP Lender has not demanded a deadline for any party to challenge its prepetition claims, nor has it requested findings in the Interim or Final DIP Order as to such claims, leaving the estates' rights to challenge the DIP Lender's intercompany unsecured claims fully reserved. The DIP Lender has agreed to a substantial investigation budget for the Debtors and the Committee—including the Debtors' independent director's separate legal counsel whose investigation the DIP Lender understands to be well under way—aggregating $400,000, and has consented to the Debtors' weekly funding of a Carve-Out into an escrow account.

3.      Perhaps because the DIP Lender did not overreach from the outset, the Committee Objection is premised on a tactical misinterpretation of the Interim DIP Order, unwarranted challenges to standard terms for DIP financing, an exaggeration of the impact of typical protections granted to parties providing credit support, and a refusal to acknowledge the very substantial sum ($1.6 million over 12 weeks) provided in the Budget for the Committee's professional fees and expenses. The Court should overrule the Committee Objection and approve the relief sought by the Debtors in the Motions on a final basis.

3

**I.      The VBOR Product Delivery Covenant is Reasonable in the Context of the Necessary $40 Million in Funding and Credit Support.**

4.      The DIP Lender and Nirma are providing a collective $40 million of credit and credit support for the Debtors, through the DIP Lender's $20 million DIP Loan and Nirma's $20 million guarantee of certain of the Debtors' obligations under the Supply Agreement.  As is detailed more fully in the Motions (and even as acknowledged by the Committee, *see* Committee Objection at ¶ 3) this liquidity is necessary for the Debtors' business to continue operating and to fund these Chapter 11 Cases through a sale process.  In this context, the VBOR product delivery requirement in the DIP Credit Agreement is entirely reasonable.  Accepting *arguendo* the Committee's approximate $1 million valuation for such product, a $1 million fee for $20 million in DIP financing and $20 million additional credit support would be far from "gross overreach."  Yet the DIP Facility does not treat the VBOR deliveries as simply a fee.  Rather, the VBOR deliveries will reduce Nirma's prepetition pre-payment to SVM for such product.  The Committee Objection does not come close to demonstrating that a requirement to deliver of approximately $1 million of VBOR for which Nirma already has paid SVM—not merely as a fee, but to reduce outstanding prepayment obligations of SVM— is commercially unreasonable in the context of the $40 million of credit support being provided to the Debtors.

5.      Additionally, the DIP Lender will work with the Debtors to revise the proposed Final DIP Order to provide that while the purchase price for postpetition VBOR Product deliveries made by SVM to Nirma pursuant to the DIP Credit Agreement and Exhibit C thereto will be credited against unfulfilled prepetition prepayments by Nirma or its non-debtor affiliates to SVM as of the Petition Date ("Prepayments"), to the extent the purchase price of such Product delivered by SVM to Nirma postpetition exceeds the Prepayments and is not otherwise paid to SVM, the balance of the purchase price of any such Product shall reduce the DIP Obligations, with

any dispute regarding whether and to what extent a Prepayment balance existed as of the Petition Date to be resolved by the Court in the future if the parties cannot resolve that on their own.  In that way, the issue of whether and to what extent a Prepayment balance exists can be left for another day and not delay entry of a Final DIP Order, while all rights of the Committee to challenge the Prepayment balance are preserved.

**II.      The Committee's Budget and fully funded Carve Out are More than Adequate.**

6.      The Committee's attempts to cry poor in the Committee Objection are belied by the substantial budget provided for its professionals in the Budget—the Committee is afforded a substantial $1.6 million budget to cover 12 weeks.  This is beyond adequate and, what is more, the Committee's budget is *fully funded* through the date of any Carve Out Trigger Notice (should there be one) by weekly payments by the Debtors into a Carve Out escrow fund.  Pursuant to the Interim DIP Order, the DIP Lender is, on a weekly basis, directly funding an account for, among other things, the payment of the Committee's professionals.  *See generally* Interim DIP Order at ¶ 12.  Even in an Event of Default, the Debtors are permitted to provide funding into that escrow account for an amount that equates to approximately one week of professional fees following the issuance of a Carve Out Trigger Notice. *Id*., at ¶ 12(d).  Given that weekly cash funding, the Committee's professionals are well aware that they have no need to rely on proceeds of other estate assets to fund their Carve Out.  Moreover, if unsecured creditors are, as the Committee speculates, at risk of being "out of the money," one would expect the Committee to adopt a responsible approach to controlling its professionals' spending.  In all events $1.6 million should easily fund the Committee's professionals for 12 weeks or more.

**III.   The DIP Liens Are Not Intended to Attach to Causes of Action against KHI, but Encumbering Proceeds of any such Causes of Action is Appropriate under the Circumstances.**

7.      For the avoidance of doubt, and as the DIP Lender's counsel confirmed to the Committee's professionals in their very first call, the DIP Lender does not intend for the DIP Liens to encumber causes of action against any insiders or affiliates of the Debtors, including KHI and Nirma, but rather to encumber the *proceeds* of any such causes of action.  The DIP Lender understands that the proposed Final DIP Order will be revised to make that clear.  However, liens on proceeds of any such causes of action are a negotiated component of the DIP Lender's overall collateral package.  While KHI does not concede that the estates have any causes of action that they could successfully bring against KHI or its affiliates, the proposed orders are structured to avoid the inequitable situation where the estates borrow money from KHI or obtain credit support from Nirma that they fail to repay, and still recover separately from KHI or its affiliates.

8.      In Lazard the Debtors had a top-tier investment banking firm scouring the market for another lender who would provide a junior DIP loan, and while the DIP Lender would have much preferred that they had succeeded in that endeavor, as Mr. Tempke notes in his declaration "Other than the DIP Lender, to date, no third party has been willing to provide the Debtors with financing, particularly on a junior or unsecured basis, absent obtaining a parent guarantee." Tempke Declaration, D.I. 15-5, at ¶14.  That absence of alternative sources of funding is telling evidence of the risk inherent in the DIP Facility, and the reasonableness of the collateral package required by the DIP Lender.

IV. **The Interim DIP Order Clearly Provides for the Release of KHI Solely in its Capacity as DIP Lender and the Proposed Final DIP Order Will Clearly Provide the Same.**

9.      The Committee patently misconstrues the releases granted to KHI in the Interim DIP Order.  Contrary to the Committee's misstatement, the Interim DIP Order only provides a release to KHI *in its capacity as DIP Lender* and solely as relates to the DIP Loan Documents and the DIP Orders.  *See* Interim DIP Order at ¶ 28 ("Effective upon entry of this Interim Order, the Debtors hereby full, finally and forever release and discharge the Dip Lender" and other related parties "*solely in their capacity as such*" and only with respect to claims "*directly or indirectly arising out of, connected with or relating to the DIP Loan Documents and the DIP Orders.*") (emphasis added).  The DIP Lender will work with the Debtors to work out mutually agreeable language for the Final DIP Order to reiterate the obvious limited scope of this release.

V. **Superpriority Administrative Expense Claims Relating to the Receivables Facility will be Appropriately Tied to Postpetition Obligations**

10.      In an effort to address the Committee's objections regarding the Receivables Facility, the DIP Lender will work with the Debtors  and HSBC to revise the proposed Final DIP Order to clarify that (i) amounts received by HSBC under the Receivables Facility postpetition will be applied first to reduce the Debtors' prepetition obligations under the Receivables Facility until such obligations are paid in full, and thereafter to reduce the Debtors postpetition obligations under the Receivables Facility, and (ii) as relates to the Receivables Facility, only the post-petition obligations of the Debtors thereunder, and any postpetition diminution in value of HSBC's prepetition collateral securing the Receivables Facility, will be granted superpriority administrative expense status.  These changes to the Final DIP Order should obviate the Committee's concerns related to the scope of the superpriority administrative expense claim for the Receivables Facility.

**VI.    Nirma is Not Improving Its Position, Nor Is It Inverting the Bankruptcy Code's Priority Scheme—It Is Simply Being Granted Appropriate Protections for Providing Postpetition Credit Support.**

11.    The Committee makes much about Nirma's subrogation rights vis-à-vis HSBC's liens securing the HBCS loans that Nirma is guaranteeing. The Committee calls the arrangement a "backdoor priority inversion" but the reality is far from nefarious.  Nirma will essentially step into HSBC's shoes with respect to its claims and liens to the extent that the Debtors fail to meet their loan obligations to HSBC and Nirma pays those loans.  This is neither an improvement of position nor an inversion of the Bankruptcy Code.  Further, the Debtors have advised that their ability to continue operations postpetition is contingent upon ongoing liquidity support from the Receivables Facility, and Nirma's postpetition guarantee of that facility has facilitated the Debtors' continued postpetition access to that facility.

12.    Along the same lines, the Committee accuses the DIP Lender and Nirma of a "dual-track priority inversion" based on the DIP Loan and Nirma's guarantee of the Supply Agreement.  Not so.  The guarantee of the Supply Agreement was given post-petition, and the documents make clear that the Debtors' obligations under the related Reimbursement Agreement, secured by the liens and superpriority claims set forth in the Interim Supply Agreement Order, are an integral part of the overall transaction.  It is undisputed that Nirma's guarantee is facilitating TATA's provision of $20 million in liquidity under the Supply Agreement. The protections granted to Nirma are not an inversion of the Bankruptcy Code or a conversion of equity into secured debt—they are simply protections that are an integral component of Nirma's provision of postpetition credit support to the Debtors.

8

**VII.    The Debtors' Waivers under Section 506(c) and the Section 552(b) are Appropriate under the Circumstances.**

13.    The Debtors' waivers of their surcharge rights under section 506(c) and marshalling rights under section 552(b) were both bargained-for by the DIP Lender and appropriate under the circumstances of these Chapter 11 Cases.

14.    With respect to the waiver under section 506(c), the Debtors have prepared and ultimately agreed to a Budget for post-petition costs and expenses, which the DIP Lender is funding through the DIP Loan, and the DIP Lender has consented to the Debtors' weekly funding of the Carve Out to cover the estates' and Committee's professional fees and costs.  In light of this, it would be inequitable for the Debtors to then surcharge the DIP Lender and subordinate it to other administrative expense claims under section 506(c) when the parties have negotiated the terms for funding of the administration of the cases.  The 506(c) waiver is required by the DIP Lender to provide the DIP Loan, and the Debtors, with the approval of their independent director, are well within their business judgment in granting that waiver to obtain the necessary funding.

15.    Similarly, the waiver of the section 552(b) equities of the case exception was a bargained-for condition for the DIP Lender to provide the DIP Loan.  Again, the DIP Lender is funding the ongoing operation of the Debtors and has subordinated its interest to a meaningful Carve Out for professionals, and HSBC has agreed to continue the Receivables Facility postpetition. Section 552(b) waivers are appropriate under such circumstances.  In particular, here the Debtors will continue to generate post-petition receivables, which will serve as collateral against which the Debtors will borrow under the Receivables Facility.  It would be inappropriate under the circumstances for the DIP Lender or HSBC to even have face a challenge to whether, under the equities of the case, their liens extend to accounts receivable.  As with the section 506(c)

9

waiver, it is well within the Debtors' business judgment, exercised with the approval of their independent director, to agree to the section 552(b) waiver.

### VIII. The Nirma Limited Scheme of Arrangement in the Nature of Demerger Has no Bearing on the Pending Motions

16.     As noted by the Committee, and as is a matter of public record, Nirma is in the initial stages of a proposed Scheme of Arrangement in the Nature of Demerger in India, under India's corporate laws, which is similar to a divisive merger under U.S. corporate law.  The Committee does not suggest that the Scheme of Arrangement approval process will be concluded any time soon in India, if at all, and indeed it faces a regulatory approval process in India, a creditor meeting and vote thereafter (likely in mid-to-late December 2026), and a court approval process thereafter before India's National Company Law Tribunal (likely late in the first quarter or early in the second quarter of 2027).  During that time, the Committee will have ample opportunity to educate itself on that process if it so desires.  In all events, pursuant to the Supply Motion, Nirma is providing credit support to the Debtors, not incurring liabilities to the Debtors.  That being the case, while the Committee may find it convenient to raise the Scheme of Arrangement as a distraction, it fails to show how this has any bearing whatsoever on the Motions before the Court.

**CONCLUSION**

**WHEREFORE**, the DIP Lender and Nirma respectfully request that the Court overrule the Committee Objection and approve the relief sought by the Debtors in the Motions on a final basis.

Dated: July 17, 2026
Wilmington, Delaware

Respectfully submitted,

*/s/ David M. Fournier*
**TROUTMAN PEPPER LOCKE LLP**
David M. Fournier (DE No. 2812)
Kenneth A. Listwak (DE No. 6300)
1313 N. Market Street, Suite 1000
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Email: david.fournier@troutman.com
         ken.listwak@troutman.com

*Counsel to Karnavati Holdings, Inc. and Nirma Limited*