**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SEARLES VALLEY MINERALS INC., *et al.*,[1] | ) | Case No. 26-10966 (BLS) |
| Debtors. | ) | (Jointly Administered) |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER APPROVING THE IMPLEMENTATION OF THE DEBTORS' (I) KEY EMPLOYEE INCENTIVE PLAN AND (II) NON-INSIDER KEY EMPLOYEE RETENTION PLAN**

Searles Valley Minerals Inc. ("**SVM**") and certain of its subsidiaries, the debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), hereby move (this "**Motion**") the United States Bankruptcy Court for the District of Delaware (this "**Court**") for entry of the proposed order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), granting the relief described below. In support of this Motion, the Debtors rely upon and incorporate by reference the previously filed *Declaration of Adrian Frankum in Support of Chapter 11 Petitions and First Day Papers* [Docket No. 17] (the "**First Day Declaration**"), and the contemporaneously filed *Declaration of Philip J. Gund in Support of the Motion of Debtors for Entry of an Order Approving the Implementation of the Debtors' (I) Key Employee Incentive Plan and (II) Non-Insider Key Employee Retention Plan* (the "**Gund Declaration**") and *Declaration of Douglas Friske in Support of the Motion of Debtors for Entry*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Minerals Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

*of an Order Approving the Implementation of the Debtors' (I) Key Employee Incentive Plan and (II) Non-Insider Key Employee Retention Plan* (the "**Friske Declaration**")[2] and further represent as follows:

## PRELIMINARY STATEMENT

1. This is a sale case, and the Debtors are keenly focused on maximizing value through the sale process. As in any sale case, it is critical to incentivize those employees who are central to the sale process—particularly, those with the technical expertise regarding the highly-specialized mining processes at the Debtors' facilities. These employees must continue to educate and engage with potential bidders, lead complex site visits, direct careful preparation of precise brine samples, and respond to extensive information requests for the sale process to succeed. Additionally, it is critical that the employees who have been instrumental in maintaining the Debtors' ongoing business throughout its transition into chapter 11 continue to do so through the closing of a sale. To incentivize these key employees, the Debtors, in consultation with their advisors and disinterested board members, have developed a key employee incentive plan (the "**KEIP**") and a non-insider key employee retention plan ("**KERP**").

2. The participants in the Debtors' proposed KEIP have taken on significant additional duties in these Chapter 11 Cases that go well beyond their normal day-to-day duties. Specifically, the four participants in the KEIP, in addition to managing the ongoing business operations of the Debtors while in chapter 11, are investing substantial time and effort in the Debtors' sale process. Without their know-how and sustained efforts, the sale process simply could not succeed. Thus, to incentivize them, the Debtors and their advisors, in consultation with their disinterested board

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the Gund Declaration, or the Friske Declaration, as applicable.

members, have designed a KEIP that rewards participants for achieving key milestones designed to maximize sale value. In the event that, despite the participants' significant efforts, a sale does not close, the KEIP toggles to facilitate an orderly and efficient wind-down. Importantly, KEIP payouts will not be made until either a sale is consummated or the wind-down is effectively completed.

3. Meanwhile, the participants in the KERP are non-insider employees whose roles are critical to preserving the Debtors' ongoing operations for potential going-concern buyers. The retention payments under the KERP will ensure that such key non-insider employees will continue to perform these critical functions through the close of a sale transaction.

4. Both the KEIP and KERP are reasonable, accounted for within the budget for the DIP Facility (the "**DIP Budget**"), consistent with the requirements of the Bankruptcy Code, and reflect a sound exercise of the Debtors' business judgment. The DIP Lender supports the programs and the Debtors engaged with the Committee's advisors regarding the terms of the programs prior to the filing of the Motion. The Debtors expect to continue to work with the Committee's advisors during the period before the hearing on the Motion in an effort to build consensus. The Debtors also have been in contact with the U.S. Trustee regarding the motion and also expect to work with the U.S. Trustee's office in the time before the hearing to answer any questions and address any issues raised by the U.S. Trustee.[3] Accordingly, the Debtors respectfully request that the Court enter the Proposed Order, authorizing them to implement the KEIP and the KERP.

---

[3] Given that the performance milestones under the proposed key employee incentive plan are imminent, the Debtors determined that filing this Motion at this time was necessary and appropriate to ensure that the proposed programs effectively incentivize the Debtors' employees, and the Debtors' employees are aligned with the Debtors' goals of maximizing value through the sale process.

5. The Debtors took the time to develop a well-measured program to achieve their case objectives against the background of uncertainty faced by their employees. It is imperative that the programs be put into place as quickly as possible given the timeline of these cases.

## RELIEF REQUESTED

6. The Debtors respectfully request entry of the Proposed Order authorizing, but not directing, the Debtors to implement the KEIP and the KERP.

## JURISDICTION AND VENUE

7. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157(a)–(b)(1) and 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

8. The legal predicates for the relief requested herein are sections 105(a), 363(b), 503(b), 503(c), and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**").

9. Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to the entry of a final order with respect to this Motion if it is determined that this Court would lack Article III power to enter such final order absent the consent of the parties.

## BACKGROUND

### I. The Chapter 11 Cases

10. On June 15, 2026 (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11**

**Cases**"). These Chapter 11 Cases are being jointly administered under Local Bankruptcy Rule 1015-1.

11. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

12. On June 26, 2026 and June 29, 2026, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors' [Docket Nos. 104 and 109] (the "**Committee**").

13. SVM (together with its Debtor and non-Debtor subsidiaries, the "**Company**") operates a vertically integrated mining and processing complex at Searles Lake in Trona, California, where it produces critical industrial minerals, including borates, sodium sulfate, and salt, sourced from one of the largest known deposits of water-soluble borates in North America. The Company is among the largest and lowest cost producers of borates, serving a diversified global customer base across industrial, agricultural, and specialty chemical end markets. The Company historically mined and processed Sodium Carbonate (soda ash) until February 2026, and continues to source and supply soda ash to its customers in North America. In addition, the Debtors source and provide potable water for approximately 760 residential and commercial customers in certain areas on the west shoreline of Searles Lake, California, including the town of Trona, California. The Company's business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First Day Declaration.

## II. The Compensation Plans

14. As the Debtors work towards the consummation of a sale, it is imperative that key members of the Debtors' management team and personnel are properly incentivized to drive a competitive marketing process and maximize value for all stakeholders. Accordingly, the Debtors hired Willis Towers Watson U.S. LLC ("**WTW**") as compensation consultant to assist the Debtors

with developing programs that would help ensure that the goals of their management team and certain key employees are aligned with maximizing value.

15. Historically, the Debtors have been able to hire and retain personnel using competitive salaries and benefits. For example, prior to the Petition Date, in the ordinary course of its business, the Debtors maintained an annual bonus plan (the "**Bonus Plan**") for certain highly qualified employees designed to attract, retain, and motivate those employees to serve the Company by expending maximum efforts to improve the Company's business and earnings. Payments under the Bonus Plan were historically scheduled for the first pay period of June each year. In May 2026, bonus payments were made to certain employees, including four KEIP Participants and six of the nine KERP Participants, for completion of the Debtors' mothballing of their soda ash production (the "**Soda Ash Bonuses**") in lieu of any payments under the Bonus Plan for the prior fiscal year, which were less than the maximum bonus opportunities available to participants under the Bonus Plan. No payments under the Bonus Plan are anticipated to be paid during these Chapter 11 Cases.

16. Without the ability to offer competitive incentivizing compensation to the Debtors' management and critical advisory personnel, the Debtors do not believe that the KEIP Participants (defined below) will remain adequately motivated to solicit the highest and best bids for the sale of its assets to the benefit of all stakeholders while continuing to manage day-to-day operations.

17. In addition, the bankruptcy filing has negatively impacted the Debtors ability to retain critical personnel. Coupled with the mothballing of the Debtors' soda ash operations in February 2026 and the corresponding reduction of approximately 46% of the Debtors' prior workforce, the filing of these Chapter 11 Cases creates an atmosphere of uncertainty and has led to concerns from employees that further workforce downsizings may occur. In addition, many

key employees have assumed additional duties and responsibilities. These factors have greatly increased the risk that other companies, including competitors, may successfully recruit the Debtors' most talented and experienced operating personnel. Without the ability to offer a retention bonus, the Debtors are at risk of losing these critical personnel and seeing business suffer. Payments under both programs are provided for under the DIP Budget, which has been heavily vetted with key constituents in these Chapter 11 Cases.

18. Accordingly, the Debtors have worked with WTW to design the KEIP and the KERP to offer market compensation and provide adequate incentives to maximize stakeholder recoveries. On July 27, 2026, after deliberation and consultation with WTW and the Debtor's other legal and financial advisors, the disinterested members of the Board approved both the KEIP and the KERP.[4]

**A. The Proposed KEIP**

19. The Debtors identified four members of their senior leadership team, consisting of the Debtors' President (the "**President**"); the Chief Financial Officer (the "**CFO**"); the Vice President of Sales and Logistics (the "**VP**"); and the technical advisor (the "**Technical Advisor**," and collectively with the CEO, VP, and CFO, the "**KEIP Participants**," and each individually, an "**KEIP Participant**") who are central to a successful chapter 11 sale process. The KEIP Participants are responsible for executing the Debtors' operating and strategic plans, including maintaining the Debtors' business operations, managing the Debtors' sale and marketing process, overseeing and addressing issues that arise during these Chapter 11 Cases, as well as maintaining employee morale during these Chapter 11 Cases (the "**Sale-Related Responsibilities**"). The

[4] The Technical Advisor (defined below), who is also a member of the Board, recused himself from deliberation and approval of the KEIP and KERP.

Debtors do not believe that the KEIP Participants can be easily replaced without significant operational setbacks and material efficiency losses that would have an outsized negative impact during the planned 90-day sale process. The KEIP Participants are vital to the successful outcome of these Chapter 11 Cases as well as the Debtors' ability to continue operations.

20. Performance under the KEIP is assessed based on achievement of predefined restructuring objectives that fall into three general categories: (a) specific milestones positioning the Company for the consummation of a sale, and (b) if a sale is consummated, sale value maximization, or (c) if a sale is not ultimately consummated, execution of an orderly wind-down. Importantly, the KEIP is not a "pay-to-stay" retention plan. The KEIP is an incentive-based program tailored to facilitate a competitive sale process. By tying a meaningful portion of the KEIP Participants' compensation to the success of the sale process (as described in more detail below), the Debtors seek to motivate the KEIP Participants to remain actively involved in the solicitation of higher and better offers for the sale for the benefit of all stakeholders, while also continuing their current day-to-day responsibilities to ensure that the Debtors operate efficiently and effectively during the sale process. Each of the KEIP Participants plays a key role in the operation of the Company's business and plays a central role in facilitating the sale effort both through the Sale-Related Responsibilities each KEIP Participant has assumed and through the services the KEIP Participants provide in their respective roles with the Company.

21. Under the KEIP, the target incentive payment to a KEIP Participant is 100% of their current base salary (the "**Target Value**") and the maximum incentive payment a KEIP Participant will be able to earn is equal to 150% of their current base salary (the "**Maximum Value**"). The aggregate cost for all KEIP Participants if the target award is paid is $1,570,000 and if the maximum award is paid is $2,355,000.

22. KEIP Participants will be eligible to earn an incentive payment equal to the Target Value, which is equal to approximately 67% of the Maximum Value, upon the closing of a sale (the "**Sale Payment**") in the event they complete each of the milestones set forth in the table below (the "**Sale Milestones**"). KEIP Participants will be eligible to earn the percentage of the Sale Payment set forth in the following table upon the completion of the Sale Milestones.

| **Sale Milestone** | **% of Sale Payment Earned Upon Completion** |
|---|---|
| Receipt of Qualified Bids (as defined in the Bidding Procedures Order) | 30% |
| Successful completion of Auction (as defined in the Bidding Procedures Order)[5] | 35% |
| Closing of a sale and execution of acceptable transition services agreement | 35% |

23. In addition, KEIP Participants can earn up to an additional approximately 33% of the Maximum Value, based on transaction value generated from the sale (the "**Transaction Value Payment**") as follows:

| **Sale Value** | **% of Transaction Value Payment Earned** |
|---|---|
| Less than $40,000,000 | 0% |
| $40,000,000–$99,999,999 | 40% |
| $100,000,000–119,999,999 | 40% |
| $120,000,000 or higher | 20% |

24. In the event no sale closing occurs, KEIP Participants will be eligible to earn up to approximately 43.55% of the Maximum Value for Sale Milestones achieved and an additional approximately 33% of the Maximum Value (the "**Wind-Down Payment**") upon completion of

[5] If the Debtors are required to, or determine, in consultation with the Consultation Parties (as defined in the Bidding Procedures Order) to cancel the Auction, the Auction will be treated as completed.

the milestones set forth in the following table (the "**Wind-Down Milestones**"). The percentage of the Wind-Down Payment that may be earned by each KEIP Participant upon achievement of the Wind-Down Milestones is set forth in the following table.

| Wind-Down Milestone | % of Wind-Down Payment Earned Upon Completion |
|---|---|
| Successful development of a wind-down plan | 40% |
| Transfer of water company and other operations, as required by such wind-down plan | 30% |
| Regulatory, legal, and financial closeout requirements completed | 15% |
| Final wind-down completed on schedule and on budget | 15% |

25. KEIP Participants will only be paid upon the earlier of the (a) closing of the sale or (b) effective date of a plan implementing the wind-down (such date, the "**Payment Date**").[6] KEIP Participants generally must be employed as of the applicable payment date in order to receive their incentive payment. However, if a KEIP Participant's employment is terminated prior to the applicable payment date by the Debtors without cause, or as a result of the participant's death or disability, the participant will be eligible to receive an incentive award on the Payment Date based on performance of the applicable objectives achieved prior to the date of such termination, death

[6] If a sale closes, the Payment Date will occur upon the closing of the sale and will consist of the Sale Payment to the extent Sale Milestones are achieved and Transaction Value Payment to the extent the sale valuation is achieved. If a sale does not close but a wind-down is completed, the Payment Date will occur upon the effective date of a plan implementing the wind-down and consist of the applicable percentage of the Sale Payment to the extent Sale Milestones are achieved and the Wind-Down Payment to the extent the Wind-Down Milestones are also achieved. For the avoidance of doubt, the maximum that can be earned in the wind-down scenario is approximately 76.85% of the Maximum Value.

or disability, subject to (a) Board approval and (b) the participant's (or its estate's) execution of a release and continued compliance with any applicable restrictive covenants. Any KEIP Participant who is terminated for cause or who voluntarily resigns without good reason will forfeit in full any unpaid incentive awards.

26. For the avoidance of doubt, payments under the KEIP will be in lieu of any other performance bonus or retention compensation otherwise payable to the KEIP Participants by the Debtors pursuant to any prepetition bonus plan or employment agreement between the KEIP Participant and the Debtors.

**B. Market-Based Design of the KEIP**

27. In designing the KEIP, the Debtors and WTW sought to ensure appropriate target compensation levels and incentives for KEIP Participants based on market comparisons to similar talent. WTW compared the target cash compensation and target total direct compensation opportunities available to the KEIP Participants with those available to others in similar roles at companies outside bankruptcy proceedings. In addition, WTW examined a group of 20 key employee incentive plans (based on companies with comparable revenues and industries) that were disclosed in public filings since 2018, with an emphasis on companies pursuing asset sales or transaction-driven restructuring processes. WTW compared the KEIP design and cost with the reference group of key employee incentive plans based on total cost, cost per participant, cost as a percentage of revenue, participation dynamics, and payment metrics. Further, the disinterested members of the Board, with WTW's input, also concluded that the metrics used in the proposed KEIP are consistent with the practice among similar key employee incentive plans.

28. Compared to the total target direct compensation opportunities available to the benchmark parties of similar talent, the proposed total target direct compensation of the KEIP Participants (base salary plus target KEIP award) positions the participants, in the aggregate,

approximately 3% below the market median and 26% below the market 75th percentile. At the Maximum Value, compensation (base salary plus maximum KEIP award) for the KEIP Participants, in the aggregate, is slightly below the market 75th percentile for total direct compensation for participants with similar roles and titles, which is well within market standards.

29. On a total program cost basis, compared to the reference group, WTW's benchmarking analysis demonstrates that the cost of the KEIP at the Target Value and Maximum Value are within the range of observed practice for the reference group, with Target Value at the 87th percentile and Maximum Value at the 90th percentile. Market maximum incentive opportunities commonly range from 100% to 200% of target opportunity (median 150%), with awards delivered in cash upon completion of the applicable restructuring outcome, placing the KEIP squarely within the competitive range of market opportunities. Additionally, the KEIP's performance structure—with awards earned only upon achievement of transaction-based restructuring objectives—is consistent with each of the benchmarked restructuring incentive plans, which used sale- or emergence-related metrics as the predominant performance measure.

**C. The Proposed KERP**

30. Under the proposed KERP, nine critical non-insider employees (collectively, the "**KERP Participants**") will be eligible to receive retention payments (the "**Retention Payments**"). The KERP Participants are critical to the Debtors' ongoing business operations and have expertise that is essential for the sale process. If any of these employees were to resign before the sale is consummated, it would be difficult, time-consuming, and expensive for the Debtors to attract and hire qualified replacements, which could significantly impair the Debtors' operations and sale value.

31. Each KERP Participant will be eligible to receive an amount equal to approximately 33.3% of the KERP Participant's base salary upon the earliest to occur of the following (such date,

the "**KERP Trigger Date**"): (a) consummation of a sale, (b) completion of an approved wind-down process, or (c) six months after the Petition Date. The KERP has a maximum cost of $518,407 in the aggregate for all KERP Participants.

32. In order to receive a payment under the KERP, the KERP Participant must remain continuously employed by the Debtors from the Petition Date through the KERP Trigger Date. However, if a KERP Participant's employment with the Debtors is terminated prior to the KERP Trigger Date without cause, or due to death or disability, such KERP Participant will remain eligible to receive the Retention Payment on the KERP Trigger Date, subject to the participant's (or its estate's) execution of a release and continued compliance with any applicable restrictive covenants. A KERP Participant who voluntarily resigns or is terminated for cause will forfeit any unpaid Retention Payment. The Debtors reserve the right to replace a KERP Participant with another employee in the event of a resignation or termination for Cause.

33. For the avoidance of doubt, payments under the KERP will be in lieu of any other performance bonus or retention compensation otherwise payable to the KERP Participants by the Debtors pursuant to any prepetition bonus plan or employment agreement between the KERP Participant and the Debtors.

**D. Market-Based Design of the KERP**

34. WTW also conducted a market analysis for the KERP. Based on a review of non-insider employee retention programs in distressed and in-court situations, the total cost of the KERP is at the 72nd percentile on an aggregate basis relative to the market dataset. The Company's retention period of approximately six months is generally aligned with the market median of seven months and directly aligns with the expected timeline of these Chapter 11 Cases. The KERP's nine participants is less than the market median of 22, reflecting a highly selective

approach focused on critical non-insider roles required to maintain operations and execute the transaction.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

### I. Authorization of the KEIP Is Appropriate Pursuant to Bankruptcy Code Section 363(b)(1).

35. Bankruptcy Code section 363(b)(1) provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Use of estate property outside the ordinary course of business is entrusted to the sound business judgment of a debtor. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (stating that under normal circumstances, courts will defer to debtor's judgment in using property under section 363(b) if there is legitimate business justification). Thus, the estate's property may be used other than in the ordinary course of business if the debtor can show a "sound business purpose" for such use. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a §363(b) application expressly find from the evidence presented before him [supports a] good business reason to grant the application."); *In re Del. Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991). If a debtor shows a valid business purpose, the court applies the "business judgment rule," a presumption "that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985).

36. Applying the business judgment rule in chapter 11 cases, courts have routinely permitted employee payments that are outside the normal course of business. *See, e.g.*, *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153–55 (D. Del. 1999) (affirming bankruptcy court's authorization of key employee

compensation program, holding "[i]n determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); *In re Glob. Home Prods.*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); *see also Martin*, 91 F.3d at 395 (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)).

37. The Debtors' implementation of the KEIP is a reasonable exercise of business judgment and thus satisfies the standards set forth by Bankruptcy Code section 363(b)(1). In addition to their usual day-to-day job responsibilities managing the Debtors' businesses and maintaining vital relationships with their employee base, key customers, and suppliers, and other valuable contract counterparties, the KEIP Participants are driving and supporting the sale process. The Debtors are seeking to maximize value through the sale process. Accordingly, the KEIP aligns the interests of the KEIP Participants with the Debtors' other stakeholders, as the payments under the KEIP are tied to specific, measurable outcomes: (a) the consummation of a value-maximizing sale through the ongoing, Court-approved sale process, and then maximization of sale value and (b) if a sale is not consummated, the timely and efficient completion of an organized wind-down. As such, the KEIP is calibrated to incentivize the KEIP Participants to prioritize maximizing the value generated by the sale process for the benefit of the Debtors' estates and stakeholders, while ensuring that, in the alternative, the estates are wound down in an orderly manner that preserves and distributes value to creditors. Additionally, as set forth above and more fully in the Gund Declaration and the Friske Declaration, payment levels under the KEIP are reasonable and were determined based on a thorough benchmarking-analysis performed by WTW. Accordingly, the

Debtors believe that valid business reasons exist for the implementation of the KEIP and, therefore, that this Court should approve its implementation.

38. This and other courts have approved similar employee incentive programs as valid exercises of business judgment. *See, e.g.*, *In re Boundless Broadband, LLC*, Case No. 25-10948 (BLS) (Bankr. D. Del. July 8, 2025) (approving a KEIP for six members of the debtor's senior leadership team, with cash awards tied to the successful sale of the debtor's businesses and/or assets ); *In re White Forest Resources, Inc.*, No. 25-10195 (TMH) (Bankr. D. Del. May 19, 2025) (approving a KEIP for 17 participants designed to incentivize participants to achieve both (i) a sale of the debtor's mining assets and (ii) a consummation of a transaction for the debtor's remaining operations); *In re Benson Hill, Inc.*, No. 25-10539 (TMH) (Bankr. D. Del. Apr. 29, 2025) (authorizing KEIP awards tied to three milestones, which include entry of a DIP order, a sale order, and consummation of a sale or reorganization); *In re Crucible Industries LLC*, No. 24-31059 (WAK) (Bankr. N.D.N.Y. Dec. 23, 2024) (approving a KEIP for three employees tied to new product sales, new customer orders, specified operating expenditure, environmental compliance, safety metrics and receipt of qualified bids); *In re SC Healthcare Holding, LLC*, No. 24-10443 (TMH) (Bankr. D. Del. Sept. 15, 2024) (approving a KEIP for four participants with metrics tied to closure of asset sales, confirmation of a chapter 11 plan, economic transition of facilities, and closure of facilities designated for wind down); *In re Sientra, Inc.*, Case No. 24-10245 (JTD) (Bankr. D. Del. Mar. 26, 2024) (approving a KEIP for four employees with incentive payouts tied to the closing of a sale of the debtor's assets); *In re Amyris Inc.*, Case No. 23-11131 (TMH) (Bankr. D. Del. Sept. 14, 2023) (approving a KEIP for 12 employees comprising of two award pools tied to DIP budget compliance and chapter 11 plan confirmation); *In re DCL Holdings* (USA) Inc., No. 22-11319 (JKS) (Bankr. D. Del. Jan. 19, 2023) (approving a KEIP for four executive employees

tied to realization of a qualified bidder (in addition to the stalking horse bid) and maintenance of net cash flows in excess DIP budget projections).

## II. The KEIP Is Incentivizing and Thus Not Governed by Bankruptcy Code Sections 503(c)(1) and 503(c)(2).

39. By its plain language, Bankruptcy Code section 503(c)(1) pertains solely to retention payments to insiders. *See id.* § 503(c)(1). Likewise, Bankruptcy Code section 503(c)(2) pertains solely to severance payments to insiders. *See* 11 U.S.C. § 503(c)(2). Neither of these sections apply to performance-based incentive plans such as the KEIP, which allots payments based on the successful achievement of the sale and wind-down and does not provide benefits to KEIP Participants due to their termination of their employment with the Debtors. *See In re Velo Holdings Inc.*, 472 B.R. 201, 208 n.6 (Bankr. S.D.N.Y. 2012) (noting inapplicability of Bankruptcy Code section 503(c)(1) to incentivizing plans); *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (applying Bankruptcy Code section 503(c)(3) to evaluate management incentive plan in absence of applicability of sections 503(c)(1) and 503(c)(2)).

40. The KEIP is not intended to provide bonuses for retention. In particular, the KEIP comprises only targeted incentive payments to the Debtors' employees who are the most critical to maximizing the value of the Debtors' business through the sale process. Although the KEIP Participants are "insiders" within the meaning of the Bankruptcy Code, the KEIP has been crafted with great care to ensure the metrics directly incentivize and motivate the four KEIP Participants to meet the objectives set forth therein.

41. Aspects of the KEIP may have some retentive effect, but the fact that the KEIP may encourage the KEIP Participants to remain with the Debtors throughout the Chapter 11 Cases does not bar implementation of the KEIP. *In re Aralez Pharm. US Inc.*, Case No. 18-12425 (MG), 2018 WL 6060356, at *5 (Bankr. S.D.N.Y. Nov. 19, 2018) (stating that "a plan may be permitted even

if it has some retentive effect”). Indeed, all successful incentive programs have the indirect benefit of incentivizing an employee to remain with the company. *See In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (noting that “all compensation has a retention element” but that this element did not outweigh the primary goal of “motivating performance”). The Sale Payment incentivizes the KEIP Participants to consummate a sale, and “there remains a risk that the transactions will not close,” *Aralez*, 2018 WL 6060356, at *4 (finding a KEIP incentivizing even though the threshold award levels was below the stalking horse bidder’s price). In addition, the Transaction Value Payment, which could result in payment of up to 33% of the Maximum Value, encourages the KEIP Participants to maximize the value of the Debtors’ estates by tying a portion of the payments to increased sale value. In the event that the Debtors do not consummate a sale, the KEIP Participants will be incentivized to wind down the Debtors’ operations in a timely and cost-effective manner.

42. The targets and milestones presented by the KEIP require the KEIP Participants to work hard to maximize stakeholder recoveries, and the plan as a whole has a primarily incentivizing effect. Accordingly, the Debtors respectfully submit that sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the KEIP.

## III. The KEIP Is Justified by the Facts and Circumstances and Satisfies Bankruptcy Code Section 503(c)(3).

43. The KEIP also satisfies the standard set forth in Bankruptcy Code section 503(c)(3), which provides:

> [There shall neither be allowed, nor paid--] (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).

44. In this and other districts, courts have concluded that whether payments to employees are justified by the "facts and circumstances" of a case is to be determined by application of the business-judgment rule incorporated into Bankruptcy Code section 363(b). *See In re Dana Corp.*, 358 B.R. at 576; *In re Nobex Corp.*, Case No. 05-20050 (MFW) (Bankr. D. Del. Jan. 12, 2006) ("So I do read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or obligations made outside the ordinary course of business are those that are justified by the facts and circumstances of the case."); 4 Collier on Bankruptcy ¶ 503.18 (16th ed. 2022) ("[W]here there are meaningful and challenging goals, courts have found that the plans are primarily incentivizing and subject to the section 503(c)(3) business judgment test, not the stricter tests in section 503(c)(1)."). Accordingly, whether an incentive plan is justified by the facts and circumstances of the case and the analysis of whether the approval of such plan is a sound exercise of the debtors' business judgment are coextensive inquiries.

45. In *In re Global Home Products*, the bankruptcy court set forth various factors for evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of a management incentive plan under Bankruptcy Code section 503(c)(3). These factors include (the "**Dana Factors**"): (a) whether the plan is calculated to achieve the desired performance; (b) whether the scope of the plan is fair and reasonable or whether it discriminates unfairly; (c) whether the cost of the plan is reasonable in the context of the debtor's assets, liabilities, and earning potential; (d) whether the plan is consistent with industry standards; (e) whether the debtor employed appropriate due diligence efforts in developing the plan; and (f) whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation. *See In re Glob. Home Prods.*, 369 B.R. at 786 (citing *In re Dana Corp.*, 358 B.R. at 576–77). The Debtors' KEIP satisfies each of the foregoing factors.

46. ***First***, the Debtors carefully designed and refined the KEIP to motivate and reward the KEIP Participants for their significant efforts and the increased demands placed upon them in connection with the Chapter 11 Cases and the sale process. Specifically, the KEIP will motivate the KEIP Participants to pursue and successfully consummate a sale that generates value for the benefit of the Debtors' estates and stakeholders.

47. ***Second***, the scope of the KEIP is fair and reasonable. As noted above, the KEIP includes only four of the Debtors' Employees—those who are the most critical to maximizing the value of the Debtors' business through the sale process, and the total target direct compensation opportunities are in line with those available to similar talent. In addition, the payment timing of the KEIP is consistent with market practice and the metrics are consistent with the majority practice among the companies examined for comparison. Moreover, the KEIP incentivizes the KEIP Participants to successfully close a sale at the highest value they can achieve, or if a sale doesn't close, effectively and efficiently wind-down operations.

48. ***Third***, the cost is reasonable and justified given the size of the Debtors' businesses, the complexity of the Chapter 11 Cases, and the value that performance targets under the KEIP would generate for the Debtors' estates and stakeholders. As noted above, WTW's benchmarking analysis demonstrates that the cost of the KEIP at the Target Value and Maximum Value are within the range of observed practice for the reference group, with Target Value at the 87th percentile and Maximum Value at the 90th percentile. Additionally, the KEIP's four-participant group is consistent with the market median of five participants for restructuring KEIPs.

49. ***Fourth***, the KEIP is consistent in general design with market practice. As noted above, the KEIP is well within market ranges; WTW's benchmarking analysis confirms that total compensation for the KEIP Participants falls approximately 3% below the market median, and that

the KEIP's Target Value and Maximum Value fall within the competitive range of restructuring market practices, and cost is within competitive range.

50. ***Finally***, the Debtors closely consulted with their outside compensation consultants who looked at comparator cases to ensure that the KEIP meets the Company's goals of incentivizing its senior management to maximize stakeholder recoveries while staying within market norms. As noted above, the KEIP was ultimately approved by disinterested members of the Board.

51. For all of the foregoing reasons, the Debtors respectfully submit that the KEIP is justified by the facts and circumstances of these chapter 11 cases, is a sound exercise of business judgment, and that implementation of the KEIP is in the best interests of the Debtors, their estates, creditors and all other stakeholders.

## IV. The KERP Should Be Approved Because It Is Within the Debtors' Business Judgment.

52. The KERP also should be approved under the business judgment rule applicable to transactions outside the ordinary course of business. 11 U.S.C. §§ 363(b). As noted above, without the KERP, the Debtors are at risk of the KERP Participants leaving for other opportunities. If any of the KERP Participants were to resign before the sale is consummated, it would be difficult, time-consuming, and expensive for the Debtors to attract and hire qualified replacements, which could significantly impair the Debtors' operations and frustrate the sale process. The KERP was designed with input from WTW and is well within the market standards for design and cost. Accordingly, the KERP should be approved as a valid exercise of the Debtors' business judgment.

53. The KERP is not subject to the restrictions set forth in sections 503(c)(1) and (2) of the Bankruptcy Code because the KERP is not applicable to any "insiders" (as such term is defined by section 101(31) of the Bankruptcy Code). Generally, the Bankruptcy Code defines an "insider"

to include, among other things, "an officer of the debtor" and a "person in control of the debtor." 11 U.S.C. § 101(31). Courts have also concluded that an employee may be an "insider" if that employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *In re Velo Holdings, Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citation omitted). An employee's job title, alone, does not make that employee an "insider" as defined by the Bankruptcy Code. *See In re Borders Grp., Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (noting that "[c]ompanies often give employees the title 'director' or 'director-level,'" but do not give them decision-making authority akin to an "executive" and concluding that certain "director-level" employees in that case were not insiders); *see also In re Foothills Texas, Inc.*, 408 B.R. 573, 574-75 (Bankr. D. Del. 2009) (noting that the presumption of an officer as an insider based on title may be rebutted with "evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, *i.e.*, he or she is not taking part in the management of the debtor").

54. None of the KERP Participants are officers or hold executive-level decision-making positions with the Debtors. Therefore, none of the KERP Participants is an "insider" of the Debtors (as such term is defined by the Bankruptcy Code) and the restrictions of section 503(c)(1) and (2) of the Bankruptcy Code are inapplicable to the KERP.

55. The KERP is also not prohibited by Section 503(c)(3) of the Bankruptcy Code because these payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). As discussed above, courts have generally held that this "justified by the facts and circumstances" standard is no different from the business judgment standard applied by courts in

determining whether to authorize the use, sale or lease of property outside the ordinary course of business under section 363(b) of the Bankruptcy Code. .

56. Finally, to the extent applicable, the KERP easily satisfies each of the Dana Factors. As to the first and third Dana Factors, the KERP was designed to motivate the KERP Participants for their significant efforts in these Chapter 11 Cases and to ensure that they continue to focus their full effort and attention on the Debtors' day-to-day operations through the closing of the sale. The KERP fairly compensates the KERP Participants for the increased demands placed upon them in connection with these Chapter 11 Cases, thereby maximizing the value of the Debtors' chapter 11 estates for the benefit of all parties in interest. As to the remaining Dana Factors, the KERP (like the KEIP) was designed by the Debtors with the assistance of WTW, which (a) priced the KERP based on comparisons with similar retention plans of other comparable companies; (b) structured the KERP to be within industry standards; (c) performed due diligence for purposes of designing and implementing the KERP; and (d) provided independent advice in performing due diligence and formulating the KERP. As noted above, the KERP was ultimately approved by the Board.

57. The KERP is similar to retention plans routinely approved in this district. *See, e.g.*, *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Mar. 26, 2024) (approving a KERP for 14 employees retained through the closing date of the sale); *In re Proterra Inc.*, No. 23-11120 (BLS) (Bankr. D. Del. Oct. 5, 2023) (approving a KERP for 35 employees retained through the six-month or one-year anniversary of when the KERP payment was made or if a sale transaction occurs, through the 30-day period following such sale); *In re Amyris, Inc.*, No. 23-11131 (TMH) (Bankr. D. Del. Sept. 14, 2023) (approving a KERP for 78 employees retained as of a specified date); *In re Plastiq Inc.*, No. 23-10671 (BLS) (Bankr. D. Del. July 25, 2023) (approving a KERP for 11 participants retained through closing of the sale).

58. Accordingly, the Debtors respectfully submit that the KERP is justified by the facts and circumstances of these chapter 11 cases, is a sound exercise of business judgment, and that implementation of the KERP is in the best interests of the Debtors, their estates, creditors and all other stakeholders. For the reasons discussed above, the Debtors' KERP should be approved.

**RESERVATION OF RIGHTS**

59. Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

**NOTICE**

60. Notice of this Motion will be given to: (a) the U.S. Trustee, (b) counsel to the Prepetition Secured Lender, (c) counsel to the DIP Lender, (d) counsel to the Committee, (e) the office of the attorney general for each of the states in which the Debtors operate, (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service, (h) the United States Department of Justice; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (j) all parties entitled to notice pursuant to Local Bankruptcy Rules 2002-1(b) and 9013-1. The Debtors submit that no other or further notice is required.

**NO PRIOR REQUEST**

61. No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

The Debtors respectfully request that this Court enter the Proposed Order, substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
July 27, 2026

*<u>/s/ Laura Davis Jones</u>*

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: 302-652-4100
ljones@pszjlaw.com
joneill@pszjlaw.com
ecorma@pszjlaw.com

*Co-Counsel to Debtors and Debtors in Possession*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Joseph O. Larkin (I.D. No. 4883)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Joseph.Larkin@skadden.com

- and -

James J. Mazza, Jr.
Jennifer Madden
320 S. Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
James.Mazza@skadden.com
Jennifer.Madden@skadden.com

- and -

Destiny N. Almogue
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone: (213) 687-5000
Destiny.Almogue@skadden.com

*Co-Counsel to Debtors and Debtors in Possession*