**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SEARLES VALLEY MINERALS INC., *et al.*,[1] | ) | Case No. 26-10966 (BLS) |
| Debtors. | ) | (Jointly Administered) |

**DECLARATION OF PHILIP J. GUND IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER APPROVING THE IMPLEMENTATION OF THE DEBTORS' (I) KEY EMPLOYEE INCENTIVE PLAN AND (II) NON-INSIDER KEY EMPLOYEE RETENTION PLAN**

I, Philip J. Gund, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Senior Managing Director with Ankura Consulting Group, LLC ("**Ankura**"), an interim management and restructuring advisory services firm with numerous offices throughout the country and the financial advisor to Searles Valley Minerals Inc. ("**SVM**") and its debtor subsidiaries (collectively, the "**Debtors**" and, together with SVM's non-Debtor subsidiary, the "**Company**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2. I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for Entry of an Order Approving the Implementation of the Debtors' (I) Key Employee Incentive Plan and (II) Non-Insider Key Employee Retention Plan* (the "**Motion**").[2]

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Minerals Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the Motion, filed contemporaneously herewith.

3. Except as otherwise indicated, all statements set forth in this Declaration are based upon the following: (a) my personal knowledge, belief, or opinion; (b) information learned from my review of the Debtors' books and records and materials filed in the Chapter 11 Cases; (c) information supplied to me or verified by the Debtors' employees or advisors and/or employees of Ankura working directly under my supervision and direction; and (d) my professional experience, knowledge, skill, education, and/or training concerning financial restructurings, sale and capital raise transactions. If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis. I am not being specifically compensated for this testimony other than through payments received by Ankura as a professional that has been retained by the Debtors. I am over the age of eighteen years and am authorized to submit this Declaration on behalf of the Debtors.

4. I am familiar with the Debtors' proposed Key Employee Incentive Plan (the "**KEIP**") and proposed Key Employee Retention Plan (the "**KERP**"), as described in the Motion, having helped determine the terms therein.

## Background and Qualifications

5. Since 2014, Ankura has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. Ankura's debtor advisory services include a wide range of activities targeted at stabilizing and improving a company's financial position. Ankura's expertise relevant to the Chapter 11 Cases includes: (a) turnaround and restructuring consulting; (b) analyzing and testing company cash flow projections; (c) managing communications with lenders, board members, employees, investors, and creditor constituencies; (d) cash management and liquidity enhancement; (e) financial modeling and forecasting; (f) operational improvement; (g) strategic business plan development; (h) customer and vendor management; and (i) bankruptcy services,

including contingency planning, preparing schedules and statements, preference analysis, claims resolution, and executory contract analysis.

6. In addition, Ankura and its professionals have assisted and advised numerous financially troubled companies from a variety of industries in complex financial restructurings and liquidations, both out of court and in chapter 11 cases. Ankura professionals have been retained in numerous large, complex chapter cases, including, among others: *In re Genesis Healthcare, Inc.*, Case No. 25-80185 (SGJ) (Bankr. N.D. Tex. Sep. 5, 2025); *In re Azzur Grp. Holdings LLC*, Case No. 25- 10342 (KBO) (Bankr. D. Del. April 8, 2025); *In re CarePoint Health Sys. Inc.*, Case No. 24-12534 (JKS) (Bankr. D. Del. Dec. 10, 2024); *In re AIO US, Inc.*, No. 24-11836 (CTG) (Bankr. D. Del. Sept. 24, 2024); *In re Amyris, Inc.*, No. 23-11131 (TMH) (Bankr, D. Del. Sept. 14, 2023); *In re LaVie Care Ctrs., LLC*, Case No. 24-55507 (PMB) (Bankr. N.D. Ga. June 28, 2024); *In re Anagram Holdings, LLC*, No. 23-90901 (MI) (Bankr. S.D. Tex. Dec. 26, 2023) [Docket No. 294]; *In re FB Debt Financing Guarantor, LLC*, No. 23-10025 (KBO) (Bankr, D. Del. Feb. 6, 2023); *In re Country Fresh Holding Co.*, No. 21-30574 (MI) (Bankr. S.D. Tex. Mar. 31, 2021); *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. Va. July 9, 2020); *In re Brooks Brothers Grp., Inc.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 7, 2020); *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. May 19, 2020); *In re Elk Petroleum, Inc.*, No. 19- 11157 (LSS) (Bankr. D. Del. July 25, 2019); *In re MTE Holdings LLC*, No. 19-12269 (CTG)(Bankr. D. Del. Feb. 26, 2020); *In re High Ridge Brands Co.*, No. 19-12689 (BLS) (Bankr. D. Del. Dec. 18, 2019); *In re Emerge Energy Services LP*, No. 19-11563 (KBO) (Bankr. D. Del. Dec. 18, 2019); *In re Payless Holdings LLC*, No. 19-40883 (Bankr. E.D. Mo. Feb. 18, 2019); *In re Fallbrook Techs. Inc.*, No. 18-10384 (MFW) (Bankr. D. Del. Feb. 26, 2018); *In re Model Reorg Acquisition, LLC*, No. 17-11794 (CSS) (Bankr. D. Del. Oct. 4, 2017); *In re Last Call Guarantor, LLC*, No. 16-11844

(KG) (Bankr. D. Del. Sept. 2, 2016); *In re SynCardia Systems Inc.*, No. 16-11599 (MFW) (Bankr. D. Del. Aug. 1, 2016); *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 11, 2016).

7. As noted, I am a Senior Managing Director of Ankura, based in New York. I have 43 years of professional experience, including 37 years working with troubled companies and their creditors, investors, and court-appointed officials, and I have earned a national reputation as a restructuring expert and crisis manager, forging consensual agreement among diverse parties across a broad range of industries. I have advised and assisted clients on all aspects of the workout process and have served as Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer in crisis and interim management situations. I have also served as a Responsible Officer in liquidation matters and as a member of the board of directors of certain companies. My experience includes serving as the Chief Financial Officer of SunEdison Inc. and its subsidiaries; the Chief Restructuring Officer of Avon Products, Inc., a leading manufacturer and marketer of beauty, fashion, and home products with operations and customers across the globe; Chief Restructuring Officer of Marelli Holdings, Co. and Marelli North America, Inc., one of the largest international automotive parts suppliers in the world and a pioneer in motorsports and in automobile manufacturing and design; Chief Restructuring Officer of Amyris, Inc., the world's leading manufacturer of ingredients with synthetic biology; Restructuring Officer and Chief Financial Officer of American Commercial Barge lines, one of the largest barging operations on the inland waterways, among numerous other engagements, including as advisor to the Chapter 11 trustee in Lehr Construction, one of the largest interior construction companies in the New York area; advisor to Advantage Car Rental; advisor to the senior lenders of Ahern Rental, one of the largest high-reach equipment rental companies in the United States; and advisor to the

management of the Daily News to evaluate operations and possible cost reductions during its chapter 11 proceeding. In several of the cases in which I have been involved, I have participated in the process of designing incentive and retention compensation plans for debtors. I hold a BBA from Pace University and am a certified public accountant and certified insolvency and restructuring advisor.

**The Debtors' Need for the KEIP**

8. Based on discussions with the Debtors and their advisors, I understand that, prior to the Petition Date, in the ordinary course of business, the Debtors maintained an annual bonus plan (the "**Bonus Plan**") for certain highly qualified employees designed to attract, retain, and motivate those employees to serve the Company by expending maximum efforts to improve the Company's business and earnings. It is my further understanding that payments under the Bonus Plan were historically scheduled for the first pay period of June each year. I also understand that, in May 2026, bonus payments were made to certain employees, including four KEIP Participants and six of the nine KERP Participants, for completion of the Debtors' mothballing of their soda ash production (the "**Soda Ash Bonuses**") in lieu of any payments under the Bonus Plan for the prior fiscal year, which were less than the maximum bonus opportunities available to participants under the Bonus Plan. It is my further understanding that no payments under the Bonus Plan are anticipated to be paid during these Chapter 11 Cases.

9. Without the ability to offer competitive incentivizing compensation to the Debtors' management and critical advisory personnel, I do not believe that the KEIP Participants (defined below) will remain adequately motivated to solicit the highest and best bids for the sale of its assets to the benefit of all stakeholders while continuing to manage day-to-day operations.

10. The employees eligible to participate in the KEIP (the "**KEIP Participants**") are four members of the Debtors' senior leadership team: the President; the Chief Financial Officer; the Vice President of Sales and Logistics; and the Debtors' technical advisor. The KEIP Participants are responsible for executing the Debtors' operating and strategic plans, including maintaining the Debtors' business operations, managing the Debtors' sale and marketing process, overseeing and addressing issues during these Chapter 11 Cases, as well as maintaining employee morale during these Chapter 11 Cases. They are also educating and engaging with potential bidders, leading complex site visits, directing careful preparation of precise brine samples, and responding to extensive information requests—and must continue to do so for the sale process to succeed. Accordingly, the KEIP Participants have assumed significant additional duties and responsibilities in these Chapter 11 Cases that go way beyond their normal day-to-day job duties. I do not believe that the KEIP Participants can be easily replaced without significant operational setbacks and material efficiency losses that would have outsized negative impact during the anticipated 90-day sale process in these Chapter 11 Cases. I believe that the KEIP Participants are vital to the successful outcome of the sale process and these Chapter 11 Cases as well as the Debtors' ability to continue operations.

**The Debtors' Need for the KERP**

11. Based on my discussions with the Debtors, it is my understanding that, historically, the Debtors have been able to hire and retain personnel using competitive salaries and benefits. However, I believe that the bankruptcy filing and other recent events have negatively impacted the Debtors' ability to retain the KERP Participants. I further understand that the Debtors mothballed their soda ash operations in February 2026, resulting in a reduction of approximately 46% of the Debtors' prior workforce, and that this development has contributed to the atmosphere of uncertainty among the Debtors' employees regarding the possibility of further workforce

reductions. From my experience working with the Debtors, I have witnessed that the bankruptcy filing has further contributed to an atmosphere of uncertainty as to employees generally and led to concerns from employees that additional workforce downsizings may occur. I believe that these factors have greatly increased the risk that other companies, including competitors, may successfully recruit the Debtors' most talented and experienced operating personnel. Without the ability to offer a retention bonus, the Debtors are at risk of losing these critical personnel and seeing business suffer.

12. The employees eligible to participate in the KERP (the "**KERP Participants**") are nine critical non-insider employees holding key managerial positions in the Debtor's operations. The few selected KERP Participants are experienced and talented individuals that are intimately familiar with the Debtors' business and possess significant, highly marketable industry expertise. I believe that if any of the KERP Participants were to resign before the sale is consummated, it would be difficult, time-consuming, and expensive for the Debtors to attract and hire qualified replacements, which could significantly impair the Debtors' operations and sale value.

**The Development of the KEIP and KERP**

13. In order to incentivize certain key employees to work towards the consummation of a sale and the completion of a wind-down and to retain other key employees during the sale and wind-down processes, the Debtors retained Willis Towers Watson U.S. LLC ("**WTW**") as compensation consultant to assist them in developing the KEIP and KERP intended to align the goals of the Debtors' management team and employees with maximizing value during these Chapter 11 Cases and preserving the Debtors' ongoing operations for potential going-concern buyers.

**The Proposed KEIP**

14. Performance under the KEIP is assessed based on achievement of predefined restructuring objectives that fall into three general categories: (a) specific milestones positioning the Company for the consummation of a sale, and (b) if a sale is consummated, stakeholder value maximization, or (c) if a sale not ultimately consummated, execution of an orderly wind-down. Under the KEIP, the target incentive payment to a KEIP Participant is 100% of their current base salary (the "**Target Value**") and the maximum incentive payment a KEIP Participant will be able to earn is equal to 150% of their current base salary (the "**Maximum Value**"). The aggregate cost for all KEIP Participants if the target award is paid is $1,570,000 and if the maximum award is paid is $2,355,000. These costs were accounted for within the budget I helped to prepare in connection with the DIP Facility (the "**DIP Budget**"), which budget has been heavily vetted with key constituents in the Chapter 11 Cases, including the DIP Lender and the Committee.

15. KEIP Participants will be eligible to earn an incentive payment equal to the Target Value, which is equal to approximately 67% of the Maximum Value, upon the closing of a sale (the "**Sale Payment**") in the event they complete each of the milestones set forth in the table below (the "**Sale Milestones**"). KEIP Participants will be eligible to earn the percentage of the Sale Payment set forth in the following table upon the completion of the Sale Milsetones.

| Sale Milestone | % of Sale Payment Earned Upon Completion |
|---|---|
| Receipt of Qualified Bids (as defined in the Bidding Procedures Order) | 30% |
| Successful completion of Auction (as defined in the Bidding Procedures Order)[3] | 35% |

[3] If the Debtors are required to, or determine, in consultation with the Consultation Parties (as defined in the Bidding Procedures Order) to, cancel the Auction, the Auction will be treated as completed.

| | |
|---|---|
| Closing of a sale and execution of acceptable transition services agreement | 35% |

16. In addition, KEIP Participants can earn up to an additional approximately 33% of the Maximum Value, based on transaction value generated from the sale (the "**Transaction Value Payment**") as follows:

| Sale Value | % of Transaction Value Payment Earned |
|---|---|
| Less than $40,000,000 | 0% |
| $40,000,000–$99,999,999 | 40% |
| $100,000,000–119,999,999 | 40% |
| $120,000,000 or higher | 20% |

17. In the event no sale closing occurs, KEIP Participants will be eligible to earn up to approximately 43.55% of the Maximum Value for Sale Milestones achieved and an additional approximately 33% of the Maximum Value (the "**Wind-Down Payment**") upon completion of the milestones set forth in the following table (the "**Wind-Down Milestones**"). The percentage of the Wind-Down Payment that may be earned by each KEIP Participant upon achievement of the Wind-Down Milestones is set forth in the following table.

| Wind-Down Milestone | % of Wind-Down Payment Earned Upon Completion |
|---|---|
| Successful development of a wind-down plan | 40% |
| Transfer of water company and other operations, as required by such wind-down plan | 30% |
| Regulatory, legal, and financial closeout requirements completed | 15% |
| Final wind-down completed on schedule and on budget | 15% |

18. KEIP Participants will only be paid upon the earlier of the (a) closing of the sale or (b) effective date of a plan implementing the wind-down (such date, the "**Payment Date**").[4] KEIP Participants generally must be employed as of the applicable payment date in order to receive their incentive payment. However, if a KEIP Participant's employment is terminated prior to the applicable payment date by the Debtors without cause, or as a result of the participant's death or disability, the participant will be eligible to receive an incentive award on the Payment Date based on performance of the applicable objectives achieved prior to the date of such termination, death or disability, subject to (a) approval by SVM's board of directors (the "**Board**") and (b) the participant's (or its estate's) execution of a release and continued compliance with any applicable restrictive covenants. Any KEIP Participant who is terminated for cause or who voluntarily resigns without good reason will forfeit in full any unpaid incentive awards.

19. Payments under the KEIP will be in lieu of any other performance bonus or retention compensation otherwise payable to the KEIP Participants by the Debtors pursuant to any prepetition bonus plan or employment agreement between the KEIP Participant and the Debtors.

20. I believe the design of the KEIP is tailored to facilitate a competitive sale process, and that the KEIP is not a "pay-to-stay" retention plan. By tying a meaningful portion of the KEIP Participants' compensation to the requisite fulfillment of the Sale Milestones and Wind-Down Milestones, as applicable, the KEIP motivates the KEIP Participants to remain actively involved in soliciting higher and better offers while continuing to fulfill their day-to-day responsibilities.

[4] If a sale closes, the Payment Date will occur upon the closing of the sale and will consist of the Sale Payment to the extent Sale Milestones are achieved and Transaction Value Payment to the extent the sale valuation is achieved. If a sale does not close but a wind-down is completed, the Payment Date will occur upon the effective date of a plan implementing the wind-down and consist of the Sale Payment to the extent Sale Milestones are achieved and the Wind-Down Payment to the extent the Wind-Down Milestones are also achieved. For the avoidance of doubt, the maximum that can be earned in the wind-down scenario is approximately 76.85% of the Maximum Value.

These milestones are sufficiently challenging. Thus, the KEIP is critical in helping to ensure that the Debtors maximize the value of the sale and operate efficiently and effectively during the sale process.

**The Proposed KERP**

21. Under the proposed KERP, the KERP Participants will be eligible to receive retention payments, equal to approximately 33.3% of the KERP Participant's base salary (the "**Retention Payments**"), upon the earliest to occur of the following of the following (such date, the "**KERP Trigger Date**"): (a) consummation of a sale or (b) completion of an approved wind-down process; provided that (x) the KERP Participant remains continuously employed by the Debtors from the Petition Date through the KERP Trigger Date and (y) the KERP Trigger Date occurs no later than six months after the Petition Date. The KERP has a maximum cost of $518,407 in the aggregate for all KERP Participants. This cost has also been factored into the DIP Budget.

22. In order to receive a payment under the KERP, the KERP Participant must remain continuously employed by the Debtors from the Petition Date through the KERP Trigger Date. However, if a KERP Participant's employment with the Debtors is terminated prior to the KERP Trigger Date without cause, or due to death or disability, such KERP Participant will remain eligible to receive the Retention Payment on the KERP Trigger Date, subject to the participant's (or its estate's) execution of a release and continued compliance with any applicable restrictive covenants A KERP Participant who voluntarily resigns or is terminated for cause will forfeit any unpaid Retention Payment.

23. Payments under the KERP will be in lieu of any other performance bonus or retention compensation otherwise payable to the KERP Participants by the Debtors pursuant to

any prepetition bonus plan or employment agreement between the KERP Participant and the Debtors.

24. I believe that the KERP will incentive the KERP Participants to remain employed by the Debtors and to continue to perform their critical functions through the closing of a sale transaction, thereby preserving the Debtors' ongoing operations for potential going-concern buyers. Therefore, the KERP is also critical in helping to ensure that the Debtors operate efficiently and effectively during the sale process for the benefit of going concern bidders and in maximizing the value of the sale.

**The KEIP and KERP are Market-Standard**

25. The KEIP and the KERP were designed by the Debtors, with the assistance of WTW, and in consultation with the Debtors' other advisors and the disinterested members of the Board. I understand that WTW conducted a market analysis for the programs, which (a) priced the KEIP and KERP based on comparisons with similar incentive and retention plans of other comparable companies; (b) structured the KEIP and KERP to be within industry standards; (c) performed due diligence for purposes of designing and implementing the KEIP and KERP; and (d) provided independent advice in formulating the KEIP and KERP.

26. Based on my experience and the market analysis conducted by WTW, and after substantial deliberation and consultation with WTW and the Debtor's other legal and financial advisors, I believe that the cost and design of the KEIP and KERP are reasonable and appropriate in light of the number of KEIP Participants and KERP Participants and the total value that would be achieved for the Debtors' estates. In particular, I believe that the KEIP and the KERP are reasonable and appropriate in these Chapter 11 Cases because they were designed consistently with the DIP Budget and because of (a) the KEIP's ability to incentivize the KEIP Participants,

who are the employees most likely to impact the sale process and maximize value for the Debtors' stakeholders and (b) the KERP's retentive effect on critical employees.

27. Accordingly, I respectfully submit that the Debtor's implementation of the KEIP and KERP are necessary and reasonable, justified by the facts and circumstances of these Chapter 11 Cases, reflect a sound exercise of the Debtors' business judgment, and are in the best interest of the Debtors, their estates, and serve to benefit all stakeholders.

***[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]***

I, Philip J. Gund, pursuant to section 1746 of title 28 of the United States code hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 27, 2026

/s/ *Philip J. Gund*
Philip J. Gund
Senior Managing Director
Ankura Consulting Group, LLC