**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SEARLES VALLEY MINERALS INC., *et al.*,[1] | ) | Case No. 26-10966 (BLS) |
| Debtors. | ) | (Jointly Administered) |

**DECLARATION OF DOUGLAS FRISKE**
**IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER APPROVING THE IMPLEMENTATION OF THE DEBTORS' (I) KEY EMPLOYEE INCENTIVE PLAN AND (II) NON-INSIDER KEY EMPLOYEE RETENTION PLAN**

I, Douglas Friske, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Senior Managing Director at Willis Towers Watson U.S. LLC ("**WTW**"), an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. Searles Valley Minerals Inc. ("**SVM**") and its debtor subsidiaries (collectively, the "**Debtors**" and, together with SVM's non-Debtor subsidiary, the "**Company**") engaged WTW to provide certain compensation consulting services in connection with the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2. I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for Entry of an Order Approving the Implementation of the Debtors' (I) Key Employee Incentive*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Minerals Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

*Plan and (II) Non-Insider Key Employee Retention Plan* (the "**Motion**").[2]

3. Except as otherwise indicated, all statements set forth in this Declaration are based upon the following: (a) my personal knowledge; (b) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives; (c) information obtained from members of the Debtors' management team and advisors; (d) my review of the Debtors' businesses and compensation practices; (e) research conducted by myself and my team into compensation practices for similarly situated companies; (f) my team's research into the key employee incentive plans and key employee retention plans adopted by firms that went through chapter 11 proceedings; and (g) my experience in developing such plans with similarly situated companies that have sought relief under chapter 11. If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis. I am not being specifically compensated for this testimony other than through payments received by WTW as a professional that has been retained by the Debtors. I am over the age of eighteen years and am authorized to submit this Declaration on behalf of the Debtors.

4. I am familiar with the structure of the Debtors' prepetition compensation programs and the structure of the Debtors' Key Employee Incentive Plan (the "**KEIP**") and the Debtors' Key Employee Retention Plan (the "**KERP**"). I have reviewed the Motion and believe that it accurately reflects the circumstances leading to the development of the KEIP and KERP and the justification and need for relief.

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the Motion, filed contemporaneously herewith.

**Background and Qualifications**

5. WTW is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. WTW designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals. WTW focuses on two key business segments: risk and broking and health, wealth and career.

6. Incentive plans, retention plans, and other pay program designs also constitute typical offerings by WTW to its clients. Notably, WTW has consulted with many distressed clients in circumstances similar to that of the Debtors, as well as companies in the normal course outside of distressed situations. Of course, not all of WTW's distressed clients file for chapter 11.

7. My responsibilities at WTW have primarily involved consulting to large companies, specifically with regard to executive compensation. I have worked with numerous Fortune 1000 companies and have participated in the development and design of hundreds of management and employee incentive plans for companies inside and outside of bankruptcy. I am frequently retained by large companies to advise them on their employee compensation strategies, programs, and pay levels.

8. I am highly experienced in executive, management, and employee compensation matters with more than 35 years of experience in the field. During this time, I have been the lead or supporting employee compensation expert in over 100 bankruptcy cases and have frequently testified as to the reasonableness of various post-petition compensation arrangements. Specifically, I have been involved in the review and design of key employee incentive plans, management incentive plans, and other similar-type plans in various chapter 11 cases.

9. I received my Bachelor's Degree in Finance from the University of Illinois in 1986. After working at Allstate and Chubb Insurance Companies, I returned to school at Northwestern

University. I received a Master's degree in Management from Northwestern University's J.L. Kellogg Graduate School of Management in 1990. Since that time, I have been employed by WTW or its predecessor firms.

**KEIP and KERP Development**

10. The Debtors retained WTW as compensation consultant to assist the Debtors in developing the KEIP and KERP, which are intended to align the goals of the Debtors' management team and certain other key employees with successfully consummating a sale and maximizing value.

11. Since WTW began working with the Debtors, I have familiarized myself with the Debtors' operations, businesses, and restructuring challenges. At the start of our engagement, WTW discussed with the Debtors' advisors the Debtors' operational history, financial performance, anticipated sale process, and other issues relating to the Debtors' workforce and employee programs. My team and I reviewed the structure of the Debtors' prepetition compensation programs, paying specific attention to target payout levels, participating employees, and performance metrics.

12. My team and I conducted due diligence on the design, structure, and cost of key employee incentive plans and key employee retention plans in comparable restructuring situations and applied this knowledge, along with my experience designing such plans, to work with Debtors' outside advisors and the disinterested members of SVM's board of directors (the "**Board**") on the development of the KEIP and KERP. Specifically, my team and I provided input and advice on the design, structure, and cost of the KEIP and KERP for reasonableness and consistency with market practice. Subsequently, I reviewed the design, structure and cost of the proposed KEIP and KERP with the disinterested members of the Board.

**The Proposed KEIP**

13. In order to maximize the value obtained through the restructuring process, companies commonly implement incentive arrangements for key employees. The KEIP is designed to facilitate a competitive sale process by tying a meaningful portion of the compensation of the eligible KEIP Participants to certain milestones positioning the Company for the consummation and success of the sale as well as wind-down activities if a sale is not consummated.

14. Performance under the KEIP is assessed based on achievement of predefined restructuring objectives that fall into three general categories: (a) specific milestones positioning the Company for the consummation of a sale, and (b) if a sale is consummated, stakeholder value maximization, or (c) if a sale not ultimately consummated, execution of an orderly wind-down. Under the KEIP, the target incentive payment to a KEIP Participant is 100% of their current base salary (the "**Target Value**") and the maximum incentive payment a KEIP Participant will be able to earn is equal to 150% of their current base salary (the "**Maximum Value**"). The aggregate cost for all KEIP Participants if the target award is paid is $1,570,000 and if the maximum award is paid is $2,355,000.

15. KEIP Participants will be eligible to earn an incentive payment equal to the Target Value, which is equal to approximately 67% of the Maximum Value, upon the closing of a sale (the "**Sale Payment**") in the event they complete each of the milestones set forth in the table below (the "**Sale Milestones**"). KEIP Participants will be eligible to earn the percentage of the Sale Payment set forth in the following table upon the completion of the Sale Milestones.

| **Sale Milestone** | **% of Sale Payment Earned Upon Completion** |
|---|---|
| Receipt of Qualified Bids (as defined in the Bidding Procedures Order) | 30% |

| | |
|---|---|
| Successful completion of Auction (as defined in the Bidding Procedures Order)[3] | 35% |
| Closing of a sale and execution of acceptable transition services agreement | 35% |

16. In addition, KEIP Participants can earn up to an additional approximately 33% of the Maximum Value, based on transaction value generated from the sale (the "**Transaction Value Payment**") as follows:

| **Sale Value** | **% of Transaction Value Payment Earned** |
|---|---|
| Less than $40,000,000 | 0% |
| $40,000,000–$99,999,999 | 40% |
| $100,000,000–119,999,999 | 40% |
| $120,000,000 or higher | 20% |

17. In the event no sale closing occurs, KEIP Participants will be eligible to earn up to approximately 43.55% of the Maximum Value for Sale Milestones achieved and an additional approximately 33% of the Maximum Value (the "**Wind-Down Payment**") upon completion of the milestones set forth in the following table (the "**Wind-Down Milestones**"). The percentage of the Wind-Down Payment that may be earned by each KEIP Participant upon achievement of the Wind-Down Milestones is set forth in the following table.

| **Wind-Down Milestone** | **% of Wind-Down Payment Earned Upon Completion** |
|---|---|
| Successful development of a wind-down plan | 40% |
| Transfer of water company and other operations, as required by such wind-down plan | 30% |

[3] If the Debtors are required to, or determine, in consultation with the Consultation Parties (as defined in the Bidding Procedures Order) to, cancel the Auction, the Auction will be treated as completed.

| | |
|---|---|
| Regulatory, legal, and financial closeout requirements completed | 15% |
| Final wind-down completed on schedule and on budget | 15% |

18. KEIP Participants will only be paid upon the earlier of the (a) closing of the sale or (b) effective date of a plan implementing the wind-down (such date, the "**Payment Date**").[4] KEIP Participants generally must be employed as of the applicable payment date in order to receive their incentive payment. However, if a KEIP Participant's employment is terminated prior to the applicable payment date by the Debtors without cause, or as a result of the participant's death or disability, the participant will be eligible to receive an incentive award on the Payment Date based on performance of the applicable objectives achieved prior to the date of such termination, death or disability, subject to (a) Board approval and (b) the participant's (or its estate's) execution of a release and continued compliance with any applicable restrictive covenants. Any KEIP Participant who is terminated for cause or who voluntarily resigns without good reason will forfeit in full any unpaid incentive awards.

**Market-Based Design of the KEIP**

19. In designing and assessing the reasonableness of the proposed KEIP, my team and I reviewed 20 restructuring-related key employee incentive plans disclosed in public filings since 2018, with a focus on companies pursuing asset sales or transaction-driven restructuring processes. WTW excluded from its reference group (a) companies with pre-filing revenue greater than 4.0x

[4] If a sale closes, the Payment Date will occur upon the closing of the sale and will consist of the Sale Payment to the extent Sale Milestones are achieved and Transaction Value Payment to the extent the sale valuation is achieved. If a sale does not close but a wind-down is completed, the Payment Date will occur upon the effective date of a plan implementing the wind-down and consist of the Sale Payment to the extent Sale Milestones are achieved and the Wind-Down Payment to the extent the Wind-Down Milestones are also achieved. For the avoidance of doubt, the maximum that can be earned in the wind-down scenario is approximately 76.85% of the Maximum Value.

or less than 0.25x the pre-filing revenue of SVM and (b) financial services, life sciences and healthcare companies, which I believe creates a more comparable dataset. WTW also referenced its General Industry Executive Compensation Survey, a private proprietary database, for reference to total target cash compensation and total target direct compensation opportunities available to other benchmark positions with similar roles to the KEIP Participants.

20. In designing the KEIP, my team and I, in consultation with the Debtors' advisors, sought to ensure appropriate target compensation levels for KEIP Participants based on market comparisons to similar talent. WTW compared the target cash compensation and target total direct compensation opportunities available to the KEIP Participants with those available to others in similar roles at companies outside bankruptcy proceedings. In addition, WTW compared the KEIP design and cost with the reference group of key employee incentive plans based on total cost, cost per participant, cost as a percentage of revenue, participation dynamics, and payment metrics. As noted above, the maximum payout is designed to provide a participant with 150% of their base salary. Based on our analysis, market maximum incentive opportunities commonly range from 100% to 200% of target opportunity, with the median being approximately 150%.

21. Based WTW's analysis, the proposed target total direct compensation of the KEIP Participants (base salary plus target KEIP award) as compared to the target total direct compensation opportunities available to the benchmark parties in WTW's General Industry Executive Compensation Survey are, in the aggregate, approximately 3% below the market median and 26% below the market 75th percentile. The target total direct compensation for the Vice President of Sales and Logistics remains below the market median, and the President and CFO's target total direct compensation is near the market median. At the Maximum Value to be paid to the KEIP Participants, the compensation (base salary plus maximum KEIP award) for the KEIP

Participants, in the aggregate, is slightly below the market 75th percentile for target total direct compensation for participants with similar roles and titles.

22. On a total program cost basis, compared to the reference group, WTW's benchmarking analysis demonstrates that the total cost of the KEIP at the Target Value and Maximum Value are within the range of observed practice for the reference group, with Target Value at the 87th percentile and Maximum Value at the 90th percentile.

23. Additionally, the KEIP's performance structure—with awards earned only upon achievement of transaction-based restructuring objectives—is consistent with the benchmarked key employee incentive plans, which used transaction-related metrics as the predominant performance measure.

24. Based on the foregoing and my education, experience with incentive-based compensation programs employed by chapter 11 debtors, and the work I have done in this case, I believe the KEIP is generally in-line with market practice and is reasonably designed to incentivize the KEIP Participants to consummate a sale and pursue higher values. In the event that a sale doesn't close, the KEIP's toggle to the Wind-Down Milestones is reasonably designed to incentivize the KEIP Participants to carryout a successful and efficient wind-down. In my opinion the KEIP is reasonable under the facts and circumstances.

**<u>The Proposed KERP</u>**

25. Under the proposed KERP, the eligible KERP Participants will be eligible to receive retention payments. Each KERP Participant will be eligible to receive an amount equal to approximately 33.3% of the KERP Participant's base salary upon the earliest to occur of the following (such date, the "**KERP Trigger Date**"): (a) consummation of a sale, (b) completion of

an approved wind-down process, or (c) six months after the Petition Date. The KERP has a maximum cost of $518,407 in the aggregate for all KERP Participants.

**Market-Based Design of the KERP**

26. My team and I also conducted a market analysis of the KERP, reviewing 15 non-insider employee retention plans in distressed and in-court situations that have been disclosed in public filings since 2018. Based on our review of the reference group retention plans, the total cost of the KERP is at the 72nd percentile on an aggregate basis relative to the market dataset. In addition, the Company's retention period of approximately six months is generally aligned with the market median of seven months. Our analysis also demonstrates that the KERP's nine (9) participants is less than the market median of 22.

27. Based on my education, experience with retention programs employed by chapter 11 debtors, and the work I have done in this case, I believe the KERP is generally in line with market practices, is reasonable, and is designed to retain the KERP Participants.

***[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]***

I, Douglas Friske, pursuant to section 1746 of title 28 of the United States code hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 27, 2026

/s/ *Douglas Friske*
Douglas Friske
Managing Director
Willis Towers Watson U.S. LLC