**IN THE UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>SEARLES VALLEY MINERALS INC., et al.<br>Debtors, | Chapter 11<br>Case No. 26-10966<br>(Jointly Administered) |

**DECLARATION OF MICHAEL S. DORSI IN SUPPORT OF MOTION BY CALIFORNIA AIR RESOURCES BOARD'S SEEKING:**

**(1) AN ORDER CLARIFYING THAT THE SALE OF SEARLES VALLEY MINERALS' ASSETS WILL NOT IMPAIR FUTURE ENVIRONMENTAL LAW OBLIGATIONS IN CALIFORNIA, OR, IN THE ALTERNATIVE,**

**(2) AN ORDER THAT THE SALE OF SEARLES VALLEY MINERALS' ASSETS CANNOT "CLEAR" ENVIRONMENTAL LAW OBLIGATIONS UNDER 11 U.S.C. 363(f), OR, IN THE ALTERNATIVE,**

**(3) AN ORDER PROVIDING ADEQUATE PROTECTION TO THE CALIFORNIA AIR RESOURCES BOARD DURING AND AFTER THE SALE OF SEARLES VALLEY MINERAL'S ASSETS.**

I, Michael S. Dorsi, pursuant to 28 U.S.C. §1746, declare as follows:

1. I am a Deputy Attorney General in the California Office of the Attorney General and am counsel for the California Air Resources Board (CARB), a regulator of Debtor Searles Valley Minerals Inc. I submit this declaration in support of CARB's Motion, filed herewith.

2. The statements in this declaration are based upon my personal knowledge, information, and belief except as specified herein. If called upon to testify, I would testify competently to the facts set for in this declaration.

3. I have reviewed the attached documents. I obtained these documents from the CARB website. I am familiar with CARB's website, and CARB maintains accurate copies of documents on the website. Accordingly, I can attest that these documents are true and correct copies of the documents indicated in the following index:

INDEX OF EXHIBITS

Exhibit 1: CARB Initial Statement of Reasons (Jan. 30, 2018)

Exhibit 2: CARB Final Statement of Reasons (May 2018)

Exhibit 3: CARB Cap-and-Invest Program Vintage 2026 Allocation Summary (Dec. 2025)

***

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 12, 2026.

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI (CA BAR NO. 281865)

As the attorney responsible for electronically filing this document, I attest that attorney Michael S. Dorsi has authorized me to file this document on his behalf. Attorney Dorsi satisfies the requirements for electronic filing in this Court, but his request to be permitted to file by ECF has not yet been approved.

Dated: August 12, 2026

*/s/ Ryan Zick*
RYAN ZICK (CA BAR NO. 303649)

# Exhibit 1

Exhibit 1
to Declaration of
Michael S. Dorsi
Aug. 12, 2026

State of California
AIR RESOURCES BOARD

**PUBLIC HEARING TO CONSIDER THE PROPOSED AMENDMENTS TO THE CALIFORNIA CAP ON GREENHOUSE GAS EMISSIONS AND MARKET-BASED COMPLIANCE MECHANISMS REGULATION**

# STAFF REPORT: INITIAL STATEMENT OF REASONS

**DATE OF RELEASE: January 30, 2018**
**SCHEDULED FOR CONSIDERATION: March 22, 2018**

Location**:**

**Riverside County Administrative Center**
**4080 Lemon Street, 1st Floor**
**Riverside, California 92501**

This report has been reviewed by the staff of the California Air Resources Board and approved for publication. Approval does not signify that the contents necessarily reflect the views and policies of the California Air Resources Board, nor does mention of trade names or commercial products constitute endorsement or recommendation for use.

This Page Intentionally Left Blank

**Table of Contents**

**EXECUTIVE SUMMARY** .................... ES-1
**I. INTRODUCTION AND BACKGROUND** .................... 1
**A.** Description of the Public Problem .................... 1
**B.** Background .................... 4
**C.** Public Process for the Proposed Amendments .................... 9
**II. THE PROBLEM THAT THE PROPOSAL IS INTENDED TO ADDRESS** .................... 9
**A.** Description of Problems that this Proposal Is Intended to Address .................... 9
**B.** Proposed Solutions to the Problems .................... 12
**III. SUMMARY OF SPECIFIC PURPOSE OF AND RATIONALE FOR EACH ADOPTION, AMENDMENT, OR REPEAL** .................... 13
**IV. BENEFITS ANTICIPATED FROM THE REGULATORY ACTION, INCLUDING THE BENEFITS OR GOALS PROVIDED IN THE AUTHORIZING STATUTE** .................... 14
**V. AIR QUALITY** .................... 15
**VI. ENVIRONMENTAL ANALYSIS** .................... 15
**A. Introduction** .................... 15
**VII. ENVIRONMENTAL JUSTICE** .................... 20
**VIII. ECONOMIC IMPACTS ASSESSMENT** .................... 21
**IX. EVALUATION OF REGULATORY ALTERNATIVES** .................... 22
**X. JUSTIFICATION FOR ADOPTION OF REGULATIONS DIFFERENT FROM FEDERAL REGULATIONS CONTAINED IN THE CODE OF FEDERAL REGULATIONS** .................... 24
**XI. REFERENCES** .................... 24
**XII. APPENDICES** .................... 27
**Appendix A.** Proposed Regulation Order. .................... 27
**Appendix B.** *In re: La Paloma Generating Company, LLC*, Case No. 16-12700, Opinion, Docket No. 881 .................... 27
**Appendix C.** *In re: La Paloma Generating Company, LLC*, Case No. 16-12700, Order, Docket No. 882. .................... 27

This Page Intentionally Left Blank

# EXECUTIVE SUMMARY

The California Air Resources Board (CARB or Board) staff is proposing to amend the California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms Regulation (Cap-and-Trade Regulation or Regulation; title 17, California Code of Regulations, sections 95801 et seq.). The Cap-and-Trade Program (Program) is a key element of California's strategy to reduce greenhouse gas (GHG) emissions; it complements other measures to ensure that California cost-effectively meets its established goals for GHG emissions reductions. This report presents CARB staff's proposal to amend the Cap-and-Trade Regulation to clarify existing provisions related to changes of ownership and successor liability for emissions compliance obligations and the calculation of the Auction Reserve Price now that the linked California and Québec Cap-and-Trade Programs have also linked with Ontario's Cap-and-Trade Program.

**Background on AB 32, SB 32, and the Cap-and-Trade Regulation**

Climate change is one of the most serious environmental threats facing the world today, and California is already feeling its effects. California committed to take action to address the threat through the adoption of the California Global Warming Solutions Act of 2006 (Assembly Bill 32 or AB 32; Chapter 488, Statutes of 2006), which is codified at California Health and Safety Code sections 38500 et seq. AB 32 requires California to reduce GHG emissions to 1990 levels by 2020, to maintain and continue GHG emissions reductions beyond 2020, and to develop a comprehensive strategy to reduce dependence on fossil fuels, to stimulate investment in clean and efficient technologies, and to improve air quality and public health. It identifies CARB as the State agency charged with monitoring and regulating sources of the GHG emissions that cause climate change. AB 32 also requires CARB to work with other jurisdictions to identify and facilitate the development of integrated and cost-effective regional, national, and international GHG reduction programs. Furthermore, AB 32 authorizes CARB to utilize a market-based mechanism to reduce GHG emissions. CARB promulgated the Cap-and-Trade Regulation pursuant to this authority.

The Legislature recently reaffirmed California's commitment to taking action against climate change by adopting Senate Bill (SB) 32 (Chapter 250, Statutes of 2016), which further directs CARB to ensure that state GHG emissions are reduced to at least 40 percent below the 1990 level no later than December 31, 2030. In addition, AB 398 (Chapter 135, Statutes of 2017) amends certain provisions of AB 32 to take effect starting January 1, 2021, and it clarifies the role of the Cap-and-Trade Program in achieving the 2030 GHG reduction target.

The Regulation establishes a declining limit on major sources of GHG emissions, and it creates a powerful economic incentive for significant investment in cleaner, more efficient technologies. The Program applies to emissions that cover approximately 80 percent of the State's GHG emissions. CARB creates allowances equal to the total amount of permissible emissions (i.e., the "cap") over a given compliance period. One allowance equals one metric ton of carbon dioxide equivalent emissions. Fewer

allowances are created each year, thus the annual cap declines and statewide emissions are reduced over time. An increasing annual auction reserve (or floor) price for allowances and the reduction in annual allowance budgets creates a steady and sustained pressure for covered entities to reduce their GHGs. All covered entities in the Cap-and-Trade Program are still subject to the air quality permit limits for criteria and toxic air pollutants.

The Program is designed to achieve the most cost-effective statewide GHG emissions reductions; there are no individual or facility-specific emissions reduction requirements. Each entity covered by the Regulation has a compliance obligation that is equivalent to its GHG emissions over a compliance period, and entities are required to meet that compliance obligation by acquiring and surrendering allowances in an amount equal to their compliance obligation. Covered entities can also meet a limited portion of their compliance obligation by acquiring and surrendering offset credits, which are compliance instruments that are based on rigorously verified emission reductions that occur from projects outside the scope of the Program. Like allowances, each offset credit is equal to one metric ton of carbon dioxide equivalent emissions. The Program began in January 2013 and achieved a near 100 percent compliance rate for the first compliance period (2013-2014), as well as for the first two years of the second compliance period (2015-2017).

Allowances are issued by CARB and distributed by free allocation – to minimize leakage and protect ratepayers – and by sale at auctions. Offset credits are issued by CARB to qualifying offset projects. Secondary markets exist where allowances and offset credits may be sold and traded among Program participants. Covered entities must submit allowances and offsets to account for their GHG emissions. Entities have flexibility to choose the lowest-cost approach to achieving Program compliance; they may purchase allowances at auction, trade allowances and offset credits with others, or take steps to reduce emissions at their own facilities. Monies from the sale of State-owned allowances at auction are placed into the Greenhouse Gas Reduction Fund and are appropriated, through the budgeting process, consistent with state law to further the purposes of AB 32.

The Program is also designed to accommodate regional trading programs. Since 2007, California has been a partner in the Western Climate Initiative (WCI), an effort of U.S. states and Canadian provinces working together to implement policies to combat climate change, including through the development of a regional cap-and-trade system. Staff works with other WCI jurisdictions to ensure that rigorous and compatible systems are being developed. This cooperation facilitates future Program linkages with other developing GHG reduction programs in the region. On January 1, 2014, California and Québec linked their respective cap-and-trade programs. On January 1, 2018, the Program linked with the cap-and-trade program in Ontario.

## Regulatory Development of the Cap-and-Trade Regulation

The Regulation was adopted by the Board in October 2011, and it took effect January 1, 2012. The first allowance auction occurred in November 2012, and the first compliance period began January 1, 2013. In 2012, CARB proposed two sets of amendments to the Regulation. The first set of amendments, related to program implementation, was approved by the Board in June 2012 and took effect in September 2012. The second set of amendments, related to jurisdictional linkage with Québec, was approved by the Board in April 2013 and took effect in October 2013. The start date for the linked California and Québec Cap-and-Trade Programs was January 1, 2014. The Board approved additional amendments in 2014 and 2015.

Most recently, the Board approved amendments on July 27, 2017 that clarify compliance obligations for certain sectors; continue Program linkage with Québec, Canada beyond 2020; link the Program with the new cap-and-trade program in Ontario, Canada beginning January 2018; and establish a post-2020 framework for caps, enabling future auction and allocation of allowances, and continuing all other provisions needed to implement the Program after 2020. In adopting these amendments, that took effect on October 1, 2017, the Board recognized that additional regulatory modifications to the Cap-and-Trade Program are required through a new rulemaking process to implement the AB 398 requirements for the post-2020 Cap-and-Trade Program. Board Resolution 17-21 directed the Executive Officer to initiate this rulemaking process. On October 12, 2017,[1] CARB held a workshop on next steps for that rulemaking process, which will be conclude after the much more narrow amendments described in this staff report.

The full regulatory record and background for these previous Cap-and-Trade Regulation rulemakings is available at the main Cap-and-Trade Program webpage.[2]

## Proposed Amendments to the Cap-and-Trade Regulation

CARB staff has proposed amendments to the Cap-and-Trade Regulation in order to:

- Clarify existing requirements related to changes of facility ownership. Specifically, the proposed amendments clarify that the Cap-and-Trade Regulation requires a successor entity after a change in ownership to be responsible for the outstanding, pre-transfer compliance obligation of the predecessor covered entity. This clarification is made in light of ongoing bankruptcy litigation involving a covered entity in the Program.

- Clarify the regulatory procedure for establishing the Auction Reserve Price. Under the existing California Regulation, the Auction Reserve Price in effect for a specific joint auction is determined as the higher of the Annual Auction Reserve Prices established individually by California and Québec, after converting the

[1] https://www.arb.ca.gov/cc/capandtrade/meetings/20171012/ct_presentation_11oct2017.pdf
[2] https://www.arb.ca.gov/cc/capandtrade/capandtrade.htm

prices to a common currency. California's Regulation does not reflect changes in Ontario's regulation, and does not recognize the possibility that the joint Auction Reserve Price could be set by the Ontario Auction Reserve Price. The proposed amendment is necessary to reflect that Ontario and Québec use Province-specific inflation rates when setting their Annual Auction Reserve Prices. Without the proposed amendment, in the unlikely event that Ontario's Auction Reserve Price were higher than both California's and Québec's, this could prevent the CARB Executive Officer from certifying the auction result.

The proposed amendments do not change any of the structure or operation of the Program, nor do they introduce any new environmental or economic impact on entities covered by the Program requirements. These amendments improve upon and clarify the existing requirements.

As mentioned above, CARB staff will also continue with the rulemaking process to propose more substantial modifications to comport with the requirements of AB 398. That process will conclude after the proposal contained in this staff report.

**Staff Recommendation**

Staff recommends that the Board adopt the proposed amendments to the Cap-and-Trade Regulation.

# I. INTRODUCTION AND BACKGROUND

This Staff Report presents CARB staff's rationale for proposed amendments to the California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms Regulation (Cap-and-Trade Regulation or Regulation, title 17, California Code of Regulations, sections 95801 et seq.), which was developed pursuant to the California Global Warming Solutions Act of 2006 (Assembly Bill 32 or AB 32; Chapter 488, Statutes of 2006). AB 32 established an initial goal for California to reduce statewide greenhouse gas (GHG) emissions to 1990 levels by the year 2020 and to maintain and continue GHG emissions reductions beyond 2020. As one of the suite of measures developed to help the State achieve the 2020 limit, the Cap-and-Trade Regulation is designed to cost-effectively reduce GHG emissions by establishing a cap covering the State's major emission sources, applying a cost to those GHG emissions, and therefore driving investment in cleaner and more efficient technologies.

Senate Bill (SB) 32 (Chapter 250, Statutes of 2016) further directs CARB to ensure that state GHG emissions are reduced to at least 40 percent below the 1990 level no later than December 31, 2030. In addition, AB 398 (Chapter 135, Statutes of 2017) amends certain provisions of AB 32 to take effect starting January 1, 2021, and clarifies the role of the Cap-and-Trade Program in achieving the 2030 GHG reduction target.

The proposed amendments clarify existing requirements and pertain to the third compliance period of the Cap-and-Trade Program (Program), which began January 1, 2018, and beyond.

This introduction describes the climate change problem that is addressed by the Regulation, provides background information on California's Climate Change Scoping Plan, the Cap-and-Trade Program, and the Western Climate Initiative (WCI). The proposed amendments build upon the Regulation that is currently in force, including all previous amendments approved by the Board.

## A. Description of the Public Problem

Climate scientists agree that global warming and other shifts in the climate system observed over the past century are caused by human activities. These recorded changes are occurring at an unprecedented rate (Cook 2016). According to new research, unabated GHG emissions could allow sea levels to rise up to ten feet by the end of this century—an outcome that could devastate coastal communities in California and around the world (California Ocean Protection Council 2017).

California is already feeling the effects of climate change, and projections show that these effects will continue and worsen over the coming centuries. The impacts of climate change have been documented by the Office of Environmental Health Hazard Assessment (OEHHA) in the Indicators of Climate Change Report (OEHHA 2018), which details the following changes that are occurring already:

- A recorded increase in annual average temperatures, as well as increases in daily minimum and maximum temperatures.
- An increase in the occurrence of extreme events, including wildfire and heat waves.
- A reduction in spring runoff volumes, as a result of declining snowpack.
- A decrease in winter chill hours, necessary for the production of high-value fruit and nut crops.
- Changes in the timing and location of species sightings, including migration upslope of flora and fauna, and earlier appearance of Central Valley butterflies.

In addition to these trends, the State's current conditions point to a changing climate. California's recent historic drought incited land subsidence, pest invasions that killed over 100 million trees, and water shortages throughout the State. Recent scientific studies show that such extreme drought conditions are more likely to occur under a changing climate (Diffenbaugh et al. 2015; Cayan et al. 2010). The total statewide economic cost of the 2013–2014 drought was estimated at $2.2 billion, with a total loss of 17,100 jobs (Howitt et al. 2014). In the Central Valley, the drought cost California agriculture about $2.7 billion and more than 20,000 jobs in 2015, which highlights the critical need for developing drought resilience (Williams et al. 2015). Drought affects other sectors as well. An analysis of the amount of water consumed in meeting California's energy needs between 1990 and 2012 shows that while California's energy policies have supported climate mitigation efforts, the performance of these policies have increased vulnerability to climate impacts, especially greater hydrologic uncertainty (Fulton and Cooley 2015).

Several publications carefully examined the potential role of climate change in the recent California drought. One study examined both precipitation and runoff in the Sacramento and San Joaquin River basins, and found that 10 of the past 14 years between 2000 and 2014 have been below normal, and recent years have been the driest and hottest in the full instrumental record from 1895 through November 2014 (Mann and Gleick 2015). In another study, the authors show that the increasing co-occurrence of dry years with warm years raises the risk of drought, highlighting the critical role of elevated temperatures in altering water availability and increasing overall drought intensity and impact (Diffenbaugh et al. 2015). Generally, there is growing risk of unprecedented drought in the western United States driven primarily by rising temperatures, regardless of whether or not there is a clear precipitation trend (Cook et al. 2015). Even more recently, California experienced the deadliest wildfires in its history. Climate change is making events like these more frequent, more catastrophic, and more costly.

A warming climate also causes sea level to rise; first, by warming the oceans which causes the water to expand, and second, by melting land ice which transfers water to the ocean. Even if storms do not become more intense or frequent, sea level rise itself will magnify the adverse impact of any storm surge and high waves on the California coast. Some observational studies report that the largest waves are already getting higher and winds are getting stronger (National Research Council of the

National Academy of Sciences 2012). Further, as temperatures warm and GHG concentrations increase more carbon dioxide dissolves in the ocean, making it more acidic. More acidic ocean water affects a wide variety of marine species, including species that people rely on for food. Recent projections indicate that if no significant GHG mitigation efforts are taken, the San Francisco Bay Area may experience sea level rise between 1.6 to 3.4 feet, and in an extreme scenario involving the rapid loss of the Antarctic ice sheet, sea levels along California's coastline could rise up to 10 feet by 2100 (California Ocean Protection Council 2017). This change is likely to have substantial ecological and economic consequences in California and worldwide (Chan et al. 2016).

While more intense dry periods are anticipated under warmer conditions, extremes on the wet end of the spectrum are also expected to increase due to more frequent warm, wet atmospheric river events and a higher proportion of precipitation falling as rain instead of snow. In recent years, atmospheric rivers have also been recognized as the cause of the large majority of major floods in rivers all along the U.S. West Coast and as the source of 30–50 percent of all precipitation in the same region (Dettinger 2013). These extreme precipitation events, together with the rising snowline, often cause devastating floods in major river basins (e.g., California's Russian River). It was estimated that the top 50 observed floods in the U.S. Pacific Northwest were due to atmospheric rivers (Warner et al. 2012). Looking ahead, the frequency and severity of atmospheric rivers on the U.S. West Coast will increase due to higher atmospheric water vapor that occurs with rising temperature, leading to more frequent flooding (Hagos et al. 2016; Payne and Magnusdottir 2015).

Climate change can drive extreme weather events such as coastal storm surges, drought, wildfires, floods, and heat waves, and disrupt environmental systems including our forests and oceans. As GHG emissions continue to accumulate and climate disruption grows, such destructive events will become more frequent. Several recent studies project increased precipitation within hurricanes over ocean regions (Easterling et al. 2016; National Academy of Sciences 2016). The primary physical mechanism for this increase is higher water vapor in the warmer atmosphere, which enhances moisture convergence in a storm for a given circulation strength. Since hurricanes are responsible for many of the most extreme precipitation events, such events are likely to become more extreme. Anthropogenic warming by the end of the 21st century will likely cause tropical cyclones globally to become more intense on average. This change implies an even larger percentage increase in the destructive potential per storm, assuming no changes in storm size (Sobel et al. 2016; Kossin et al. 2016). Thus, the historical record, which once set our expectations for the traditional range of weather and other natural events, is becoming an increasingly unreliable predictor of the conditions we will face in the future. Consequently, the best available science must drive effective climate policy.

It is imperative that California continue to work to reduce GHG emissions in order to decrease the probability of these impacts. In 2005, Governor Schwarzenegger issued Executive Order S-3-05 (EO S-3-05), which set, among other things, targets of reducing

GHG emissions to 1990 levels by 2020 and to 80 percent below 1990 statewide levels by 2050. In 2006, California enacted AB 32 to address this public problem by requiring cost-effective reductions in GHG emissions and by codifying the 2020 target. AB 32 directed CARB to continue its leadership role on climate change and to develop a scoping plan identifying integrated and cost-effective regional, national, and international GHG reduction programs. In 2015, Governor Brown issued Executive Order B-30-15 (EO B-30-15), which set a goal of reducing statewide GHG emissions to 40 percent below 1990 levels by 2030. In 2016, the Legislature passed, and Governor Brown signed, SB 32, which codified the 40 percent reduction goal from 1990 levels by 2030.

In July 2017, Governor Brown signed a legislative package clarifying the role of the Cap-and-Trade Program in achieving the 2030 GHG reduction target (AB 398; Chapter 135, Statutes of 2017) and establishing a new program to improve air quality in local communities (AB 617; Chapter 136, Statutes of 2017). The legislation helps ensure California continues to meet its ambitious climate change goals while addressing air pollution in communities with the dirtiest air. AB 398 also provided direction on the 2017 Scoping Plan Update and for its adoption by January 1, 2018. CARB initiated a separate rulemaking process to implement the requirements of AB 398, as they pertain to the Cap-and-Trade Program, at a public workshop on October 12, 2017, and will continue that process in parallel to the rulemaking described in this staff report. With respect to AB 617, CARB has begun work to implement a new community-focused air quality program including monitoring and emission reduction plans.

On December 14, 2017, the CARB Board unanimously approved the 2017 Climate Change Scoping Plan (CARB 2017a), which sets out specific measures to accomplish California’s plan to reduce climate-changing gases an additional 40 percent below 1990 levels by 2030 pursuant to SB 32.

## B. Background

### *1. Climate Change Scoping Plan*

Pursuant to AB 32, the first Climate Change Scoping Plan (CARB 2008) (Initial Scoping Plan) was adopted in 2008 and laid out a comprehensive program to reduce California’s GHG emissions to 1990 levels by 2020, to reduce the State’s dependence on fossil fuels, to stimulate investment in clean and efficient technologies, and to improve air quality and public health. The Initial Scoping Plan presented the first economy-wide approach to reducing emissions and highlighted the value of combining both carbon pricing with other complementary programs to meet California’s 2020 GHG emissions target while ensuring progress in all sectors. The coordinated set of policies in the Initial Scoping Plan employed strategies tailored to specific needs, including market-based compliance mechanisms, performance standards, technology requirements, and voluntary reductions. The Initial Scoping Plan also described a conceptual design for a cap-and-trade program that included eventual linkage to other cap-and-trade programs to form a larger regional trading program. As implemented, the Cap-and-Trade

Program is designed to work in concert with other measures, such as standards for cleaner vehicles, low-carbon fuels, renewable electricity, and energy efficiency. The Program also complements and supports California's existing efforts to reduce criteria and toxic air pollutants. AB 32 also requires the Scoping Plan to be updated at least once every five years.

The First Update to the Scoping Plan (First Update), approved in 2014, presented an update on the program and its progress toward meeting the 2020 limit (CARB 2014). It also developed the first vision for long-term progress beyond 2020. In doing so, the First Update laid the groundwork for the goals set forth in Executive Orders S-3-05[3] and B-16-2012.[4] It also identified the need for a 2030 mid-term target to establish a continuum of actions to maintain and continue reductions, rather than only focusing on targets for 2020 or 2050.

On December 14, 2017, the CARB Board unanimously approved the 2017 Climate Change Scoping plan update. Over 20 state agencies collaborated to produce the Plan, informed by 15 state agency-sponsored workshops and more than 500 public comments. The broad range of state agencies involved reflects the complex nature of addressing climate change, and the need to work across institutional boundaries and traditional economic sectors to effectively reduce GHG emissions. The 2017 Scoping Plan Update incorporates, coordinates, and leverages many existing and ongoing efforts and identifies new policies and actions to accomplish the State's climate goals.

Guided by legislative direction, the actions identified in the 2017 Scoping Plan Update (CARB 2017a) reduce overall GHG emissions in California and deliver policy signals that will continue to drive investment and certainty in a low carbon economy. The 2017 Scoping Plan Update builds upon the successful framework established by the Initial Scoping Plan and First Update, while identifying new, technologically feasible, and cost-effective strategies to ensure that California meets its GHG reduction targets in a way that promotes and rewards innovation, continues to foster economic growth, and delivers improvements to the environment and public health, including in disadvantaged communities. The plan includes policies to require direct GHG reductions at some of the State's largest stationary sources and mobile sources. These policies include the use of lower GHG fuels, efficiency regulations, and the Cap-and-Trade Program, which constrains and reduces emissions at covered sources.

### *2. Cap-and-Trade Regulation*

California's Cap-and-Trade Regulation was adopted by CARB in October 2011, and the Regulation took effect on January 1, 2012. The first allowance auction occurred in November 2012, and the first compliance period began on January 1, 2013. On January 1, 2014, California and Québec formally linked their Cap-and-Trade Programs, allowing transfers of compliance instruments between the two jurisdictions.

---

[3] https://www.gov.ca.gov/news.php?id=1861
[4] https://www.gov.ca.gov/news.php?id=17472

On January 1, 2018, California, Quebec, and Ontario formally linked their Cap-and-Trade Programs, allowing transfers of compliance instruments between the three jurisdictions.

The Program establishes a hard declining cap on major sources of statewide GHG emissions, and it creates a strong economic incentive for investments in cleaner, more efficient technologies. Each entity covered by the Program has a compliance obligation that is equivalent to its GHG emissions, and each covered entity is required to meet that compliance obligation by acquiring and surrendering allowances and a limited quantity of offset credits in an amount equal to its compliance obligation. CARB creates allowances equal to the total amount of permissible emissions (i.e., the cap) each year. One allowance equals one metric ton of carbon dioxide equivalent (using the 100-year global warming potentials of different GHGs). Because the cap declines, fewer allowances are created each year and overall emissions decrease over time.

The first three compliance periods in the Program are: 2013-2014, 2015-2017, and 2018-2020. Multiyear compliance periods provide entities time to develop compliance responses when annual emissions vary due to drought, economic conditions, or other unique production conditions.

The Program is designed to achieve the most cost-effective statewide GHG emissions reductions. There are no individual or facility-specific emissions reduction requirements; rather, each covered entity must acquire and surrender compliance instruments in an amount equal to its total GHG emissions during each compliance period. Covered entities can also meet a portion of their compliance obligation by surrendering offset credits, which are compliance instruments that are derived from rigorously verified emissions reductions from projects outside the scope of the Program. Like allowances, each offset credit is equal to one metric ton of carbon dioxide equivalent emissions. Allowances are issued by CARB and distributed by free allocation and by sale at auction; offset credits are issued by CARB for emission reductions at qualifying offset projects. A market exists where allowances and offset credits may be sold and traded among Program participants. By virtue of being linked to the Québec and Ontario Cap-and-Trade Systems, California entities can also use Québec and Ontario-issued allowances and offsets, as all compliance instruments issued by all three jurisdictions are fully fungible.

Covered entities subject to the Program have flexibility to develop their most cost-effective compliance strategy. They may find methods to reduce emissions at their own facilities, trade allowances with other firms, and/or purchase allowances at auction. Through these mechanisms, the Program leverages the power of the market to find the most cost-effective methods to reach California's environmental goals. The ability to auction and trade allowances establishes a price signal needed to drive long-term investment in cleaner fuels and more efficient use of energy, and affords those parties that are regulated by the Program the flexibility to seek out and implement the lowest-cost options to reduce emissions.

In 2012, CARB proposed two sets of amendments to the Regulation. The first set of amendments, related to program implementation, was approved by the Board in June 2012, and these amendments took effect in September 2012. The second set of amendments, related to jurisdictional linkage with Québec, was approved by the Board in April 2013, and these amendments took effect in October 2013. The start date for linking the California and Québec Cap-and-Trade Programs was January 1, 2014.

In 2013, CARB proposed another set of amendments to the Regulation. The amendments extended transition assistance for some covered entities, refined the required data collected from registered participants to support market oversight, and added an additional cost containment measure. These amendments also included a new Mine Methane Capture compliance offset protocol, updates to offset implementation and usage, refinement of resource shuffling provisions, and changes to the surrender order of compliance instruments. The Board approved these amendments in April 2014, and they took effect July 1, 2014.

In 2014, CARB staff proposed an additional two sets of Cap-and-Trade Regulation amendments. The first set of targeted amendments clarified the quantification of production data, updated the compliance offset protocols, and modified requirements related to compliance, corporate association disclosures, and offset transfer price reporting related to the transaction of market instruments. This first set of 2014 amendments was adopted by the Board in September 2014, and they took effect January 1, 2015. The second set of 2014 amendments modified the Regulation to include a new Rice Cultivation Compliance Offset Protocol and to update the United States Forest Compliance Offset Protocol to allow eligibility for projects in parts of Alaska. This second set of amendments was adopted by the Board in June 2015 and became effective November 1, 2015.

In 2016 and 2017, CARB staff proposed an additional set of amendments to the Regulation. The amendments ensure that quantifiable and verifiable GHG emissions reductions are achieved by the Cap-and-Trade Program; continue the allocation of allowances to utilities on behalf of rate-payers; clarify compliance obligations for certain sectors; continue Program linkage with Quebec, Canada beyond 2020; link the Program with the new cap-and-trade program in Ontario Canada beginning January 2018; and extend the program beyond 2020 by establishing new emissions caps, enabling future auction and allocation of allowances, and continuing all other provisions needed to implement the Program after 2020. The Board approved these amendments on July 27, 2017 and they took effect October 1, 2017.

Pursuant to AB 398, CARB must conduct additional evaluations and propose further amendments to the regulation that will take effect starting January 1, 2021, regarding a price ceiling, price containment points, and lower offsets usage limits, among other requirements. Pursuant to Board Resolution 17-21 (CARB 2017b), in adopting the amendments to the Cap-and-Trade Regulation that took effect on October 1, 2017, the Board directed CARB's Executive Officer to initiate a new rulemaking process to

implement the AB 398 requirements. On October 12, 2017,[5] CARB laid out next steps for this new rulemaking process, and that process will conclude following the conclusion of the rulemaking described in this staff report.

*3. Western Climate Initiative and Linkage with Other Jurisdictions*

California, Québec, and Ontario are members of WCI, a collaboration among states and provinces that was initiated in 2007 to address climate change at a regional level. Within WCI, the three jurisdictions collaborated on the development of cap-and-trade program-design recommendations, providing a roadmap for program implementation and harmonization. California's Cap-and-Trade Regulation was developed concurrently with the WCI design documents that provide a template for a regional cap-and-trade program. The similar design features and minimum stringency requirements drawn from the WCI process facilitate linkage among the California, Québec, and Ontario programs.

The California Cap-and-Trade Program is currently linked with the cap-and-trade program in the Canadian provinces of Québec and Ontario. The economic advantages of linking with other jurisdictions are analogous to the benefits of including multiple sectors under a broad California Cap-and-Trade Program. Increasing the number of sources that are able to trade allowances expands opportunities for low-cost emissions reductions, thus reducing the overall cost of reductions, and it improves the efficiency and liquidity of the allowance market.

Senate Bill 1018 (SB 1018; Chapter 39, Statutes of 2012) requires that the Governor make four findings prior to linking the California Program with other jurisdictions. Under SB 1018, the Governor must find that the linked program:

- Has requirements that are equivalent to or stricter than the California Program;
- Will allow for continued enforceability of AB 32 and related statutes;
- Is fully enforceable within its own jurisdiction; and
- Does not impose liability on California.

Governor Brown made these four findings for linkage with Québec and Ontario, confirming the relative stringency of the programs.

To ensure continued harmonization between the programs, CARB has consulted with Québec and Ontario on the proposed amendments and will continue to coordinate with Québec and Ontario to ensure the smooth functioning of the linked Program, consistent with the requirements in SB 1018.

[5] https://www.arb.ca.gov/cc/capandtrade/meetings/20171012/ct_presentation_11oct2017.pdf

### C. Public Process for the Proposed Amendments

The proposed amendments build upon the Regulation that is currently in force, including all previous amendments approved by the Board. These amendments are narrow in scope, and are being released for public comment prior to a public Board hearing on March 22, 2018. These amendments are expected to be completed earlier than, a more comprehensive rulemaking process to amend the Cap-and-Trade Regulation to implement AB 398 requirements.

Although the proposed amendments are not anticipated to affect electricity and natural gas providers, since they are primarily clarifications, CARB staff has consulted with the Public Utilities Commission as required by Health and Safety Code section 38562(f) in order to minimize duplicative or inconsistent regulatory requirements.

## II. THE PROBLEM THAT THE PROPOSAL IS INTENDED TO ADDRESS

This chapter provides a description of the problem that the proposed amendments to the Cap-and-Trade Regulation are intended to address, as well as a description of how the proposed amendments resolve the problem. Descriptions of the underlying purpose and rationale for each proposed amendment are provided in Chapter III.

### A. Description of Problems that this Proposal Is Intended to Address

*Successor Liability*

La Paloma Generating Company, LLC (La Paloma) was an entity covered under the Cap-and-Trade Regulation for emissions from La Paloma Generating Station, a large natural gas, combined-cycle electricity generating facility (the Facility) in McKittrick, California. La Paloma filed for bankruptcy in December 2016 and developed a Reorganization Plan, whereby it would sell the power plant to its creditor, LNV. The bankruptcy case is *In re: La Paloma Generating Company, LLC*, Case No. 16-12700, U.S. District Court, District of Delaware, Bankruptcy Court.

LNV and CARB disputed whether LNV would be responsible for any outstanding compliance obligation from the Facility's pre-sale emissions and so stipulated that the Bankruptcy Court would resolve whether La Paloma could transfer the Facility to a purchaser free and clear of any obligation to surrender compliance instruments under the Cap-and-Trade Program for emissions generated by the Facility during the period before the transfer of the Facility. CARB asserted that a successor after a change in ownership (whether through a bankruptcy proceeding or some other process) is responsible for any outstanding (i.e., unsurrendered) compliance obligation based on its longstanding interpretation and implementation of the Cap-and-Trade Regulation. LNV argued that the Regulation does not provide for successor liability.

On November 9, 2017, the Bankruptcy Court issued an opinion and order on the stipulated question. The Court found that, because this case turns on interpreting

California law, the court applies the rules of regulatory construction that a California court would apply in deciding the issue presented. Those rules include deferring to an agency's interpretation of a regulation involving its area of expertise unless the challenged construction contradicts the clear language and purpose of the interpreted provision. Additionally, when an agency's intent cannot be discerned from the regulation's text, courts consider extrinsic aids (e.g., the purpose of the regulation) to determine the agency's intent.

Contrary to CARB's interpretation of the Regulation, the court held that "[t]he Regulation does not provide for successor liability nor does it in anyway make a Purchaser of a Facility liable for the emissions of the former-Covered Entity. Nor does it explicitly express the need for a purchasing entity to provide for the former-Covered Entity's emissions." (Appendix B, *In re: La Paloma Generating Company, LLC*, Case No. 16-12700, Opinion, Docket No. 881, at 18.) The court also entered an order allowing La Paloma to sell the Facility to LNV free and clear of any obligation on LNV's part to surrender compliance instruments for emissions generated by the Facility. (*See* Appendix C, *In re: La Paloma Generating Company, LLC*, Case No. 16-12700, Order, Docket No. 882.)

On November 20, 2017, CARB filed a notice of appeal to appeal the Bankruptcy Court's Order to the U.S. District Court, District of Delaware and, on November 21, 2017, moved to stay the effect of the Order pending the appeal. Subsequently, LNV objected to CARB's stay motion and the bankruptcy court held a hearing to consider CARB's stay motion on January 9, 2018. The bankruptcy court denied CARB's stay motion.

CARB maintains that the Bankruptcy Court reached an incorrect result in its Opinion and Order. Namely, the entire purpose of the Cap-and-Trade Regulation is, pursuant to the Legislature's direction in AB 32, to cap aggregate emissions and reduce the amount permitted under the cap every year through a market-based system. Allowing covered entities to sell their facilities without the purchaser assuming the compliance obligation may open a loophole in the operation of the Program and undermine the cap. Additionally, several provisions of the Cap-and-Trade Regulation—read together—necessarily mean that the successor after a change in ownership is responsible for the outstanding compliance obligation of a transferred facility, including with respect to pre-sale emissions.

Briefing on the merits of the appeal is expected to occur in early 2018. While CARB is confident in its litigating position, CARB recognizes the negative implications of the uncertainty created by the Bankruptcy Court Opinion. If the Opinion and Order stand, then other covered entities could attempt to sell their facilities in order to avoid their compliance obligations and other purchasing entities could assert that they are not responsible for the compliance obligations stemming from the pre-sale emissions of facilities they purchase. Therefore, out of an abundance of caution, CARB proposes to amend the Cap-and-Trade Regulation to clarify, consistent with its longstanding approach to the Regulation, that a successor entity after a change in ownership is

responsible for the outstanding, pre-sale compliance obligation of the predecessor entity.

*Auction Reserve Price*

Staff is also proposing a modification to the Cap-and-Trade Regulation provision that describes the administration and format of auctions specific to the setting of the Auction Reserve Price (sometimes called the floor price). The California, Québec, and Ontario regulations include a procedure to reconcile differences between jurisdiction-specific Auction Reserve Price values. The jurisdiction-specific Auction Reserve Price values are announced each year on the first business day in December. California announces its Auction Reserve Price in U.S. dollars (USD). Both Québec and Ontario announce their Auction Reserve Prices in Canadian dollars (CAD). The procedure in the California, Québec, and Ontario regulations uses a specified exchange rate to determine the Auction Reserve Price (in USD and CAD) effective during a joint auction. The Auction Reserve Price in effect for a joint auction is determined as the higher of the Annual Auction Reserve Prices established in USD and CAD after applying the established Auction Exchange Rate.

In 2017, while California was promulgating amendments to the Regulation, Ontario was simultaneously developing and revising its own Cap-and-Trade Regulation. As noted previously, the amendments to the California Regulation became effective on October 1, 2017. In November 2017, Ontario published a proposed regulatory revision that went into effect on December 9, 2017. Ontario’s updated regulatory proposal removed a reference to the minimum price as the higher of the Annual Auction Reserve Prices most recently established, as of the day of the auction, for each of Québec and California. Ontario’s regulation now establishes that the Auction Reserve Price is the higher of the Auction Reserve Price in Ontario for the auction year, the Auction Reserve Price in Québec for the auction year, and the Auction Reserve Price for the auction year in California.

The timing of the California and Ontario regulatory amendments create a mismatch between the two regulations. Pursuant to section 95911(c)(3)(D) of the California Regulation, the Auction Reserve Price in Canadian dollars shall be the Canadian dollar Auction Reserve Price for the previous calendar year increased annually by 5 percent plus adjusted for inflation in the manner provided for in section 83.3 of the Financial Administration Act (R.S.Q., c. A-6.001) of Québec. However, the Ontario and Québec regulations now stipulate that the Auction Reserve Price used in a joint auction is the higher of the Annual Auction Reserve Price established by Ontario, Québec, or California for the auction year. The California Regulation does not explicitly recognize the Ontario Auction Reserve Price, nor that it could be a different CAD value than the Québec Auction Reserve Price due to the use of different inflation rates between Ontario and Québec.

This regulatory mismatch gives rise to a possible – though highly unlikely – scenario that may hinder CARB's ability to certify a joint auction. The following conditions would all need to occur for this to happen:

- The Ontario Auction Reserve Price would have to be higher than the Québec Auction Reserve Price, as it is in 2018; **and**
- The Ontario Auction Reserve Price USD value would have to be higher than the California Auction Reserve Price, after applying the established Auction Exchange Rate. Given recent exchange rates between USD and CAD, this potential outcome is unlikely in the near term.

Under the conditions listed above, the Québec and Ontario regulations would establish the Auction Reserve Price based on the Ontario Auction Reserve Price, while the California Regulation would establish the Auction Reserve Price based on the California Auction Reserve Price. Pursuant to the California Regulation, CARB's Executive Officer would not be able to certify that an auction was conducted according to the California Regulation if the auction was conducted with an Auction Reserve Price based on the Ontario Auction Reserve Price.

The proposed modification will reconcile this difference, ensure consistency across all three regulations, and ensure that California can certify joint auctions with other jurisdictions operating a GHG ETS to which California has linked, including Ontario.

### B. Proposed Solutions to the Problems

*Successor Liability*

The proposed amendment would clarify that the Cap-and-Trade Regulation requires a successor entity after a change in ownership to be responsible for the outstanding, pre-transfer compliance obligation of the predecessor covered entity. This has long been CARB's interpretation of the Cap-and-Trade Regulation, and all ownership changes that have occurred to date—besides the La Paloma matter—have resulted in the purchasing or succeeding entity being responsible for the outstanding compliance obligation of the selling or preceding entity. While CARB is appealing the Bankruptcy Court Order and is confident in its litigating position, CARB wants to ensure that the requirements of the Cap-and-Trade Regulation are clear to all market participants. The proposed amendment ensures that all market participants operate under the same requirements and that every purchaser after a change in ownership must account for the outstanding (i.e., unsurrendered) compliance obligation of the predecessor covered entity.

In fact, despite ruling against CARB on whether the Cap-and-Trade Regulation currently provides for successor liability, the Bankruptcy Court stated that "…there is nothing [ ] preventing CARB from creating such successor liability in the Regulation in the future." (Opinion, at 18, note 51.) In other words, the court found that CARB could, but did not, impose successor liability in the Cap-and-Trade Regulation. While CARB maintains that the Bankruptcy Court reached an incorrect result, CARB nevertheless has full

discretion to clarify that successor liability applies with respect to any change in ownership of a facility or entity subject to the Cap-and-Trade Program, as the court itself recognized.

*Auction Reserve Price*

The proposed amendment would clarify the process for setting the Auction Reserve Price. The process would compare the California Auction Reserve Price with the Auction Reserve Prices set by all linked jurisdictions (currently Québec and Ontario) when expressed in a common currency, and select the highest value. This amendment would remove the current problem that California's Regulation would not expressly recognize an Auction Reserve Price set by Ontario.

## III. SUMMARY OF SPECIFIC PURPOSE OF AND RATIONALE FOR EACH ADOPTION, AMENDMENT, OR REPEAL

This chapter provides a summary of the specific purpose of each proposed amendment and the rationale for CARB staff's determination of why the proposed amendments are reasonably necessary to carry out the purpose of the provisions of law they are clarifying and to address the problem as described in Chapter II above. The proposed regulatory amendments are shown in Appendix A: Proposed Regulation Order.

### Subarticle 5: Registration and Accounts

### § 95835. Changes to Entity Type and Reassignment of Facilities Already Registered to Different Entity Accounts.

**Summary of Section 95835(b).**

The proposed text indicates that, when the ownership of a facility changes, whether by merger, acquisition, or any other means, the successor entity after the change in ownership is expressly liable for the unsurrendered compliance obligation of the predecessor covered entity that is party to the change in ownership transaction. The proposed text also states that the unsurrendered compliance obligation of the predecessor covered entity consists of the quantity of verified reported emissions, assigned emissions, and emissions that have been released from the subject facility but not reported yet for which the covered entity would be required to submit compliance instruments to CARB absent the change of ownership, but that the covered entity has not surrendered to CARB at the time of the change of ownership. The proposed text also states that Subarticle 7 compliance requirements are interpreted and enforced in light of the successor entity being expressly liable for the unsurrendered compliance obligation of the predecessor covered entity. The purpose of this text is to ensure that all market participants operate under the same requirements and that every purchaser after a change in ownership must account for the outstanding (i.e., unsurrendered) compliance obligation of the predecessor covered entity.

**<u>Rationale for Section 95835(b).</u>**

The proposed changes are needed to clarify that the Cap-and-Trade Regulation imposes successor liability with respect to any change in ownership. The changes make more specific CARB's existing interpretation, and they are designed, out of an abundance of caution, to respond to the uncertainty created by the Bankruptcy Court's Opinion. The amendment addresses the problem caused by the uncertainty (as described in Chapter II) by explicitly stating that the successor (e.g., purchaser) after a change in ownership is responsible for the unsurrendered compliance obligation of the predecessor (e.g., seller) regardless of the means by which the ownership change occurs.

**Subarticle 10: Auction and Sale of California Greenhouse Gas Allowances**

**§ 95911. Format for Auction of California GHG Allowances**

**<u>Summary of Section 95911(c)(3)(D).</u>**

Section 95911(c)(3)(D) is amended to indicate that the Auction Reserve Price in Canadian dollars is the highest Auction Reserve Price established in Canadian dollars by any jurisdiction that publishes its minimum price in Canadian dollars that is operating an External GHG ETS to which California has linked pursuant to subarticle 12. This amendment would strike out the specific reference to Québec's Auction Reserve Price. The purpose of this amendment is to reconcile differences between jurisdiction-specific Auction Reserve Prices for linked jurisdictions participating in a joint auction and does not change existing policy.

**<u>Rationale for Section 95911(c)(3)(D).</u>**

This change is necessary to reconcile differences between jurisdiction-specific Auction Reserve Prices for linked jurisdictions participating in a joint auction. In practical terms, the change is necessary to clarify that the Auction Reserve Price for any joint auction shall be the higher of the minimum Annual Auction Reserve Prices established by California, Ontario, and Québec; and in turn, remove any uncertainty as to CARB's Executive Officer being able to certify the results of a joint auction in which Ontario's Auction Reserve Price was the highest.

## IV. BENEFITS ANTICIPATED FROM THE REGULATORY ACTION, INCLUDING THE BENEFITS OR GOALS PROVIDED IN THE AUTHORIZING STATUTE

Government Code section 11346.2(b)(1) requires enumeration of the anticipated benefits of the regulatory action, including the benefits and goals of the authorizing statute. The benefits that accrue from the proposed action on successor liability include improved operation of the existing Cap-and-Trade Regulation, further supporting the environmental integrity of the Program through the removal of a potential loophole, the promotion of fairness vis-à-vis covered entities' compliance obligations, and increased

program certainty through clarifying predecessor and successor liability after a change in ownership (including, but not limited to, an ownership change via a bankruptcy proceeding). The amendment will also ensure clarity for entities planning to purchase other registered entities as they value the compliance obligations they would be assuming.

The proposed action on determination of the Auction Reserve Price for joint auctions removes one potential outcome that could prevent the Executive Officer from certifying the results of a joint auction, by ensuring that the Auction Reserve Price for a specific joint auction could be set by the Ontario Auction Reserve Price. Under the existing California Regulation, California may not recognize the same joint Auction Reserve Price recognized by Ontario and Québec. In this case, the Executive Officer could not certify the auction as consistent with the California Regulation. This outcome would reduce market participants' confidence in the market, which could reduce market participation and liquidity. The failure to certify an auction would reduce market efficiency because the market relies on auction settlement prices as a broad measure of market participants' valuation of allowances.

## V. AIR QUALITY

This chapter describes the expected GHG and criteria pollutant emissions benefits associated with the proposed amendments. The proposed amendments are designed to ensure additional clarity in the operation of successor liability and the determination of Auction Reserve Prices. The amendments do not alter the manner in which the Cap-and-Trade Regulation is designed to reduce statewide GHG emissions, although the successor liability provision will help further ensure emissions obligations are surrendered even after a change of ownership event. As such, the air quality benefits both to GHG emissions and to criteria pollutant emissions described in Chapter III of the Staff Report for the 2016 amendments (which went into effect on October 1, 2017) continue to apply and are hereby incorporated by reference. (CARB 2016).

## VI. ENVIRONMENTAL ANALYSIS

### A. Introduction

This chapter provides the basis for CARB's determination that no subsequent or supplemental environmental analysis is required for the proposed amendments. A brief explanation of this determination is provided in section D below. CARB's regulatory program—which involves the adoption, approval, amendment, or repeal of standards, rules, regulations, or plans for the protection and enhancement of the State's ambient air quality—has been certified by the California Secretary for Natural Resources under Public Resources Code section 21080.5 of the California Environmental Quality Act (CEQA) (14 CCR 15251(d)). Public agencies with certified regulatory programs are exempt from certain CEQA requirements, including but not limited to, preparing environmental impact reports, negative declarations, and initial studies. CARB, as a lead agency, prepares a substitute environmental document (referred to as an

“Environmental Analysis” or “EA”) as part of the Staff Report to comply with CEQA (17 CCR 60000-60008).

This EA for the proposed amendments serves as a substitute document equivalent to an addendum to the prior July 17, 2017 final EA prepared for the Amendments to the California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms Regulation (2017 EA) (CARB 2017d) to explain CARB’s determination that no additional environmental analysis is required for the proposed amendments.

## B. Prior Environmental Analysis

As noted above, CARB, as the lead agency, previously prepared the 2017 EA under its certified regulatory program (Cal. Code Regs., tit. 17, §§ 60000 through 60008) to comply with the requirements of CEQA.  The 2017 EA provided an environmental analysis which focused on reasonably foreseeable potentially significant adverse and beneficial impacts on the physical environment resulting from reasonably foreseeable compliance responses taken in response to implementation of the amendments proposed in that rulemaking that went into effect on October 1, 2017 (2017 Amendments) (CARB 2016).

Impacts associated with the 2017 Amendments included: beneficial short-term and long-term impacts to air quality (statewide), energy demand and greenhouse gases; less-than-significant impacts to aesthetics, agriculture and forest resources, air quality, biological resources, cultural resources, energy demand, geology, soils, and mineral resources, greenhouse gases, hazards and hazardous materials, hydrology and water quality, land use and planning, noise, population, employment, and housing, public services, recreation, transportation and traffic and utilities and service systems; and potentially significant and unavoidable adverse impacts to aesthetics, agriculture and forest resources, air quality (construction-related impacts, potential localized increases, and potential odor impacts from Livestock Protocol implementation), biological resources, cultural resources, geology and soils, hazards and hazardous materials, hydrology and water quality, land use and planning, noise, recreation, and transportation/traffic.

While the 2017 EA concluded that many impacts associated with the 2017 Amendments could be reduced to a less than-significant level through conditions of approval applied to project-specific development, the authority to require and implement that mitigation lies with land use agencies or other agencies approving the development projects, not with CARB.  Consequently, the 2017 EA took a conservative approach in its significance conclusions and disclosed, for CEQA compliance purposes, that impacts from the development of new facilities or modification of existing facilities associated with reasonably foreseeable compliance responses to the 2017 Amendments could be potentially significant and unavoidable under several resource areas.  These significance determinations are discussed in greater detail in the 2017 EA (CARB 2017d).

### C. Proposed Modifications

As described in greater detail in the Executive Summary and Chapter II of this Staff Report, CARB staff's proposal is to amend the Cap-and-Trade Regulation to clarify existing provisions related to successor liability for outstanding compliance obligations after a change in ownership and the calculation of the Auction Reserve Price now that the linked California and Québec Cap-and-Trade Programs have also linked with Ontario's Cap-and-Trade Program.

The proposed amendments do not change the structure or operation of the Program, nor do they introduce any new environmental impacts resulting from compliance responses undertaken by entities covered by the Program requirements. As explained in the Executive Summary and Chapter II, these amendments improve upon and clarify the existing requirements.

### D. Analysis

1. <u>Legal Standards</u>

When considering modifications to a regulation for which a substitute document equivalent to an EIR or negative declaration has previously been prepared, CARB looks to Public Resources Code section 21166 and CEQA Guidelines section 15162 for guidance on the requirements for subsequent or supplemental environmental review.

CEQA Guidelines section 15162 states:

> *(a) When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:*
>
> *(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;*
>
> *(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or*
>
> *(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:*

*(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration;*

*(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;*

*(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or*

*(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative.*

If a subsequent or supplemental EIR or negative declaration is not required, the lead agency may document its decision and supporting evidence in an addendum (14 CCR 15164 (e)). The addendum and lead agency's findings should include a brief explanation, supported by substantial evidence, of the decision not to prepare a subsequent or supplemental EIR or negative declaration (14 CCR 15164(e)). An addendum need not be circulated for public review, but must be considered by the lead agency prior to making a decision on the project (14 CCR 15164(c), (d)).

2. <u>Basis for Determination</u>

CARB has determined that the proposed amendments do not involve any changes that result in any new significant adverse environmental impacts or a substantial increase in the severity of the significant adverse impacts previously disclosed in the 2017 EA (CARB 2017d). Further, there are no changes in circumstances or new information that would otherwise warrant any subsequent or supplemental environmental review. The 2017 EA adequately addresses the implementation of the regulation as modified by the proposed amendments and no additional environmental analysis is required. The basis for CARB's determination that none of the conditions requiring further environmental review are triggered by the proposed modifications is based on the following analysis.

*(1) There are no substantial changes to the regulation previously analyzed in the Environmental Analysis which require major revisions to the Environmental Analysis involving new significant environmental effects or a substantial increase in the severity of previously identified effects.*

The proposed amendments clarify existing change of ownership provisions and auction administration provisions. These changes to the Cap-and-Trade Regulation do not substantially change the reasonably foreseeable compliance responses of the regulated entities covered by the Cap-and-Trade Regulation used as the basis for the impacts analysis in the 2017 EA. The amendment to Section 95835(b) clarifies, consistent with

CARB's longstanding approach to the Regulation, that a successor entity after a change in ownership is responsible for the outstanding, pre-sale compliance obligation of the predecessor entity. This amendment does not alter covered entities' existing approaches to compliance with the Cap-and-Trade Regulation and, therefore, this is not a substantial change. Additionally, the amendment to Section 95911(c)(3)(D) clarifies that the Auction Reserve Price for any joint auction shall be the higher of the minimum Auction Reserve Prices established by California, Ontario, and Québec. This amendment also does not alter covered entities' compliance responses, especially in light of the unlikelihood of Ontario having the highest minimum Auction Reserve Price, and, thereby, this is not a substantial change. As explained above under "Prior Environmental Analysis," the 2017 EA determined that potentially significant adverse indirect impacts could result from the implementation of the Cap-and-Trade Regulation. The proposed amendments do not alter the compliance responses or lead to any new compliance responses that involve new significant environmental effects or a substantial increase in the severity of previously identified effects in the 2017 EA.

*(2) There are no substantial changes with respect to the circumstances under which the regulation is being undertaken which require major revisions to the previous Environmental Analysis involving new significant environmental effects or a substantial increase in the severity of previously identified effects.*

There are no substantial changes to the environmental setting or circumstances in which the amendments to the Cap-and-Trade Regulation are being implemented compared to that analyzed in the 2017 EA. As explained above, the amendments clarify existing change of ownership provisions and auction administration provisions and do not alter the compliance responses of the regulated entities or result in any changes that significantly affect the physical environment.

*(3) There is no new information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous Environmental Analysis was certified as complete, that changes the conclusions of the Environmental Analysis with regard to impacts, mitigation measures, or alternatives;*

No new information of substantial importance has become available to CARB staff since the 2017 EA was certified. The project will not have any significant effects that are not discussed in the 2017 EA. Significant effects previously examined will not be substantially more severe than previously analyzed in the 2017 EA. No newly-feasible or different mitigation measures are known which could substantially reduce one or more of the previously-identified significant effects of the project. Therefore, the conclusions in the 2017 EA about the compliance responses for the Cap-and-Trade Regulation have not changed, and the potential environmental impacts to any resource areas have not changed.

In sum, no supplemental or subsequent environmental analysis is required for these proposed amendments to the Cap-and-Trade Regulation because, as described above,

the proposed changes do not result in any new environmental impacts or in a substantial increase in severity to the impacts previously disclosed in the 2017 EA. Further, there are no changes in circumstances or new information that would otherwise warrant an additional environmental review.

## VII. ENVIRONMENTAL JUSTICE

State law defines environmental justice as the fair treatment of people of all races, cultures, and incomes with respect to the development, adoption, implementation, and enforcement of environmental laws, regulations, and policies. Government Code, section 65040.12, subdivision (c). CARB is committed to making environmental justice an integral part of its activities. The Board approved its Environmental Justice Policies and Actions (Policies) on December 13, 2001, to establish a framework for incorporating environmental justice into CARB's programs consistent with the directives of State law (ARB 2001). These policies apply to all communities in California, but recognize that environmental justice issues have been raised more in the context of low-income and minority communities.

Actions of CARB, local air districts, and federal air pollution control programs have made substantial progress towards improving the air quality in California. However, some communities continue to experience higher exposures than others because of the cumulative impacts of air pollution from multiple sources.

Adoption and implementation of the proposed amendments to the Regulation will have no negative environmental impacts on environmental justice communities. The proposed amendments do not alter any compliance pathway for any covered entity, and they apply equally to all facilities throughout the state. Moreover, they are not expected to create any adverse environmental impact (see Chapter VI) or economic impact (see Chapter VIII), and as such no disproportionate harm will be felt by environmental justice communities.

Assembly Bill 197 (AB 197, Garcia, Chapter 250, Statutes of 2016) provides that, when adopting rules and regulations pursuant to Division 25.5 of the Health and Safety Code to achieve emissions reductions beyond the 2020 statewide greenhouse gas limit, CARB shall follow the requirements in Health and Safety Code section 38562(b), consider the social costs of the emissions of greenhouse gases, and prioritize emissions reduction rules and regulations that result in direct emission reductions from various sources.

CARB designed the Cap-and-Trade Regulation taking into account section 38562(b).[6] The proposed amendments are minor, but nevertheless follow the requirements of section 38562(b). In addition, CARB considered the social costs of GHG emissions and prioritized emissions reduction rules and regulations that result in direct emission

---

[6] *See* Proposed Regulation to Implement the California Cap-and-Trade Program, Staff Report: Initial Statement of Reasons, at II-50 - II-53 (2010), *available at*: https://www.arb.ca.gov/regact/2010/capandtrade10/capisor.pdf.

reductions from various sources when it promulgated regulatory amendments in 2017 to extend the Cap-and-Trade Program post-2020. (CARB 2017c.) The proposed amendments here are wholly consistent with these considerations pursuant to AB 197.

## VIII. ECONOMIC IMPACTS ASSESSMENT

*Successor Liability*

CARB proposes to amend the Cap-and-Trade Regulation to clarify its longstanding interpretation of the Regulation that a successor entity after a change in ownership is responsible for the outstanding, pre-sale compliance obligation of the predecessor entity. This provision clarifies the meaning of the Regulation. The change does not create any new obligations on entities or redistribute existing obligations between entities covered by this Regulation and, therefore, there are no economic impacts associated with this change in the Regulation. For CARB's analysis of the economic impacts of the Regulation, see the Economic Impacts of the Proposed Regulation section of the Proposed Regulation to Implement the California Cap-and-Trade Program, Staff Report: Initial Statement of Reasons (CARB 2010).

*Auction Reserve Price*

The proposed amendment to section 95911(c)(3)(D) would recognize the use of the highest Auction Reserve Price established in Canadian dollars by any jurisdiction that publishes its Auction Reserve Price in Canadian dollars that is operating an External GHG ETS to which California has linked pursuant to subarticle 12, rather than only an Auction Reserve Price established in Canadian dollars by Québec. The amendment would reconcile differences between jurisdiction-specific Auction Reserve Prices for linked jurisdictions participating in a joint auction, and under the specific conditions described in Section II.A of this staff report, could result in CARB setting the Auction Reserve Price equal to the Auction Reserve Price set by Ontario when all prices are expressed in a common currency and the Ontario price is higher than the Québec and California prices.

Table 1 shows the 2017 and 2018 Auction Reserve Prices for the three linked jurisdictions.

**Table 1 Auction Reserve Prices**

| | CA Auction Reserve Price (USD) | QC Auction Reserve Price (CAD) | ON Auction Reserve Price (CAD) |
|---|---|---|---|
| 2017 | $13.57 | $13.56 | See note |
| 2018 | $14.53 | $14.35 | $14.68 |

**Note:** In 2017, the Ontario Auction Reserve Price was determined as the higher of the most recently published California and Québec Annual Auction Reserve Price after applying the exchange rate established for each auction.

As discussed in Section II.A, two factors affect the comparison of the yearly Auction Reserve Price in each jurisdiction used in auctions: the rate of inflation in the linked jurisdictions and the USD CAD currency exchange rate. In 2018 the Ontario Auction Reserve Price was greater than the Québec Auction Reserve Price. To determine whether the Ontario price is higher than the California price, the Ontario price would have to be converted to U.S. dollars, based on the exchange rate in effect for a specific joint auction.

As of December 29, 2017, the USD CAD exchange rate was 1.2545.[7] The Ontario Auction Reserve Price could only be the chosen Auction Reserve Price for a specific joint auction if the exchange rate in effect for the auction is less than 1.01. Historically, the USD CAD exchange rate has not been below 1.01 since 2013, so it is most likely that the California Auction Reserve Price will be the chosen Auction Reserve Price at least through 2018. Given the unlikelihood that the Ontario Auction Reserve Price will be higher than the California Auction Reserve Price CARB staff expects no adverse economic impacts from linking with Ontario because of the Auction Reserve Price or as a result of the proposed amendments.

Government Code section 11346.3(b)(1) states that "[a] state agency proposing to adopt, amend, or repeal a regulation that is not a major regulation […] shall prepare an economic impact assessment that assesses whether and to what extent it will affect" the creation or elimination of jobs within the state; the creation of new businesses or the elimination of existing businesses within the state; the expansion of businesses currently doing business within the state; and the benefits of the regulation to the health and welfare of California residents, worker safety, and the state's environment. CARB has assessed the economic impacts of the proposed action and determined that there will be no impacts from the proposed action with respect to the creation or elimination of jobs within the state; the creation of new businesses or the elimination of existing businesses within the state; the expansion of businesses currently doing business within the state; or, worker safety. The proposed action, by clarifying liability under the Cap-and-Trade Regulation and ensuring compliance with the Cap-and-Trade Program, may yield nonmonetary public health and environmental benefits.

## IX. EVALUATION OF REGULATORY ALTERNATIVES

Government Code section 11346.2, subdivision (b)(4) requires CARB to consider and evaluate reasonable alternatives to the proposed regulatory action and provide reasons for rejecting those alternatives. This section discusses alternatives evaluated and provides reasons why these alternatives were not included in the proposal. As explained below, no alternative proposed was found to be less burdensome and equally effective in achieving the purposes of the regulation in a manner than ensures full compliance with the authorizing law. The Board has not identified any reasonable alternatives that would lessen any adverse impact on small business.

---

[7] http://www.bankofcanada.ca/rates/exchange/daily-exchange-rates/

Take No Action Alternative for Complete Regulation. An overall “no action” alternative means that no revisions would be made to the existing Cap-and-Trade Regulation. Under this alternative, CARB and entities covered by the Regulation would continue to operate pursuant to the requirements of the existing Regulation. If CARB were to take no action, the uncertainty over successor liability resulting from the bankruptcy court decision described above would continue to persist, and the potential uncertainty in the ability of the Executive Officer to certify an auction in the unlikely event Ontario’s Annual Auction Reserve Price were to be higher than both Québec’s and California’s would persist as well. For these reasons, the take no action alternative is neither practical nor beneficial to CARB and covered entities and other market participants.

Modify Only the Change of Ownership Provision. Under this alternative, CARB would only promulgate the amendments to the change of ownership provision, and not the Auction Reserve Price provision. As described in the take no action alternative, if CARB were to take no action on the Auction Reserve Price provision, the potential uncertainty in the ability of the Executive Officer to certify an auction in the unlikely event Ontario’s Annual Auction Reserve Price were to be higher than both Québec’s and California’s would persist. As such, this alternative is neither practical nor beneficial to CARB and covered entities and other market participants.

Modify Only the Auction Reserve Price Provision. Under this alternative, CARB would only promulgate the amendments to the Auction Reserve Price provision, and not the change of ownership provision. As described in the take no action alternative, if CARB were to take no action on the change of ownership provision, the uncertainty over successor liability resulting from the bankruptcy court decision described above would continue to persist. As such, this alternative is neither practical nor beneficial to CARB and covered entities and other market participants.

**Small Business Alternative**

The Board has not identified any reasonable alternatives that would lessen any adverse impact on small business.

**Performance Standards in Place of Prescriptive Standards**

With respect to Government Code sections 11346.2(b)(4)(A) and 11346.2(b)(1), the proposed amendments do not mandate the use of specific technologies or equipment, or prescribe specific actions or procedures on regulated entities.

**Health and Safety Code section 57005 Major Regulation Alternatives**

CARB estimates the proposed regulation will not have an economic impact on the state’s business enterprises of more than $10 million in one or more years of implementation.

## X. JUSTIFICATION FOR ADOPTION OF REGULATIONS DIFFERENT FROM FEDERAL REGULATIONS CONTAINED IN THE CODE OF FEDERAL REGULATIONS

Government Code section 11346.2(b)(6) requires CARB to describe its efforts to avoid unnecessary duplication or conflicts with federal regulations that address the same issues. No federal regulations address the same issues as CARB's proposed regulations, so the proposed amendments do not conflict with nor duplicate any federal regulations.

## XI. REFERENCES


Bank of Canada, Daily Exchange Rates Web page. Accessed January 8, 2018. http://www.bankofcanada.ca/rates/exchange/daily-exchange-rates/.

California Air Resources Board (2001). Policies and Actions for Environmental Justice. December 13, 2001: https://www.arb.ca.gov/ch/programs/ej/ejpolicies.pdf.

California Air Resources Board (2008). Climate Change Scoping Plan: A Framework for Change. December 2008: https://www.arb.ca.gov/cc/scopingplan/document/adopted_scoping_plan.pdf.

California Air Resources Board (2010) Proposed Regulation to Implement the California Cap-and-Trade Program, Staff Report: Initial Statement of Reasons. Released October 2010. https://www.arb.ca.gov/regact/2010/capandtrade10/capisor.pdf.

California Air Resources Board (2014). First Update to the Climate Change Scoping Plan: Building on the Framework. May 2014: https://www.arb.ca.gov/cc/scopingplan/2013_update/first_update_climate_change_scoping_plan.pdf.

California Air Resources Board (2016). Proposed Amendments to the California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms, Staff Report: Initial Statement of Reasons. Released August 2, 2016: https://www.arb.ca.gov/regact/2016/capandtrade16/isor.pdf.

California Air Resources Board (2017a). California's 2017 Climate Change Scoping Plan. November 2017: https://www.arb.ca.gov/cc/scopingplan/scoping_plan_2017.pdf.

California Air Resources Board (2017b). Board Resolution 17-21. Filed August 4, 2017: https://www.arb.ca.gov/regact/2016/capandtrade16/ctreso17-21.pdf.

California Air Resources Board (2017c). Second Notice of Public Availability of Modified Text. April 13, 2017: https://www.arb.ca.gov/regact/2016/capandtrade16/2nd15daynot.pdf.

California Air Resources Board (2017d). Final Environmental Analysis Prepared for the Proposed Amendments to the California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms Regulation. Released July 17, 2017: https://www.arb.ca.gov/regact/2016/capandtrade16/finalea.pdf.

California Ocean Protection Council (2017). Rising Seas in California: An Update On Sea-Level Rise Science. April 2017: www.opc.ca.gov/webmaster/ftp/pdf/docs/rising-seas-in-california-an-update-on-sea-level-rise-science.pdf.

Cayan, D., T. Das, D. W. Pierce, T. P. Barnett, M. Tyree, and A. Gershunov (2010). Future Dryness in the Southwest US and Hydrology of the Early 21st Century Drought. *Proceedings of the National Academy of Sciences* 107(50): 21272–21276. December 14, 2010: http://www.pnas.org/content/107/50/21271.full.pdf.

Chan, F., et al. (2016). The West Coast Ocean Acidification and Hypoxia Science Panel: Major Findings, Recommendations, and Actions. California Ocean Science Trust, Oakland, California, USA. April 2016: http://westcoastoah.org/wp-content/uploads/2016/04/OAH-Panel-Key-Findings-Recommendations-and-Actions-4.4.16-FINAL.pdf.

Cook, B. I., T. R. Ault, and J. E. Smerdon (2015). Unprecedented 21st century drought risk in the American Southwest and Central Plains. *Science Advances* 1(1), e1400082, doi:10.1126/sciadv.1400082. February 12, 2015: http://advances.sciencemag.org/content/1/1/e1400082.full.pdf.

Cook, J., et al. (2016). Consensus on consensus: A synthesis of consensus estimates on human-caused global warming. *Environmental Research Letters* 11:048002 doi:10.1088/1748-9326/11/4/048002. April 13, 2016: http://iopscience.iop.org/article/10.1088/1748-9326/11/4/048002/pdf.

Dettinger, M. D. (2013). Atmospheric rivers as drought busters on the U.S. West Coast. *Journal of Hydrometeorology* 14:1721-1732, doi:10.1175/JHM-D-13-02.1. December, 2013: http://journals.ametsoc.org/doi/pdf/10.1175/JHM-D-13-02.1.

Diffenbaugh, N. S., D. L. Swain, and D. Touma (2015). Anthropogenic warming has increased drought risk in California. Proceedings of the National Academy of Sciences of the United States of America. 10.1073/pnas.1422385112. March 31, 2015: www.pnas.org/content/112/13/3931.full.pdf.

Easterling, D.R., K.E. Kunkel, M.F. Wehner, and L. Sun (2016). Detection and attribution of climate extremes in the observed record. *Weather and Climate Extremes,* 11, 17-27. January 18, 2016: https://reader.elsevier.com/reader/sd/7CC2EC06CF06706A9EA4576FC60CB496FFCDF98A779642230F47A039484815F6DE80EB8F432E93605C4C3A71EC58E17A.

Fulton, J., and H. Cooley (2015). The Water Footprint of California's Energy System, 1990–2012. *Environmental Science & Technology* 49(6):3314–3321. February 26, 2015: pubs.acs.org/doi/abs/10.1021/es505034x.

Hagos, S. M., L. R. Leung, J.-H. Yoon, J. Lu, and Y. Gao (2016). A projection of changes in landfalling atmospheric river frequency and extreme precipitation over western North America from the Large Ensemble CESM simulations. Geophysical Research Letters, 43 (3), 357-1363. February 6, 2016: http://onlinelibrary.wiley.com/doi/10.1002/2015GL067392/full.

Howitt, R., J. Medellin-Azuara, D. MacEwan, J. Lund, and D. Summer (2014). Economic Impacts of 2014 Drought on California Agriculture. Accessed July 23, 2014: https://watershed.ucdavis.edu/files/biblio/DroughtReport_23July2014_0.pdf.

Kossin, J. P., K. A. Emanuel, and S. J. Camargo (2016). Past and projected changes in western North Pacific tropical cyclone exposure. *Journal of Climate*, 29 (16), 5725-5739. August 15, 2016: http://journals.ametsoc.org/doi/pdf/10.1175/JCLI-D-16-0076.1.

Mann, M. E., and P. H. Gleick (2015). Climate change and California drought in the 21st century. Proceedings of the National Academy of Sciences of the United States of America, 112(13):3858–3859. March 31, 2015: http://www.pnas.org/content/112/13/3858.full.pdf.

National Academy of Sciences (2016). Attribution of Extreme Weather Events in the Context of Climate Change. The National Academies Press, Washington, DC, 186 pp. DOI: 10.17226/21852. 2016: http://dx.doi.org/10.17226/21852.

National Research Council of the National Academy of Sciences (2012). Sea-Level Rise for the Coasts of California, Oregon, and Washington: Past, Present, and Future. National Academies Press. 2012: https://www.nap.edu/resource/13389/sea-level-rise-brief-final.pdf.

Office of Environmental Health Hazard Assessment. Indicators of Climate Change in California (2018). Accessed January 8, 2018: https://oehha.ca.gov/climate-change/document/indicators-climate-change-california.

Payne, A. E., and G. Magnusdottir (2015). An evaluation of atmospheric rivers over the North Pacific in CMIP5 and their response to warming under RCP 8.5. Journal of Geophysical Research: Atmospheres, 120 (21), 11,173-111,190. November 13, 2015: http://onlinelibrary.wiley.com/doi/10.1002/2015JD023586/epdf .

Sobel, A.H., S.J. Camargo, T.M. Hall, C.-Y. Lee, M.K. Tippett, and A.A. Wing (2016). Human influence on tropical cyclone intensity. *Science,* 353, 242-246. July 15, 2016: http://science.sciencemag.org/content/353/6296/242/tab-pdf.

Warner, M. D., C. F. Mass, and E. P. Salathé. (2012). Wintertime extreme precipitation events along the Pacific Northwest coast: Climatology and synoptic evolution. *Monthly Weather Review* 140:2021–43. July 2012: http://journals.ametsoc.org/doi/pdf/10.1175/MWR-D-11-00197.1.

Williams, A. P., et al. (2015). Contribution of anthropogenic warming to California drought during 2012–2014. *Geophysical Research Letters*. August 31, 2015: http://onlinelibrary.wiley.com/doi/10.1002/2015GL064924/epdf.

## XII. APPENDICES

**Appendix A.** Proposed Regulation Order.
**Appendix B.** *In re: La Paloma Generating Company, LLC*, Case No. 16-12700, Opinion, Docket No. 881.
**Appendix C.** *In re: La Paloma Generating Company, LLC*, Case No. 16-12700, Order, Docket No. 882.

# Exhibit 2

Exhibit 2
to Declaration of
Michael S. Dorsi
Aug. 12, 2026

**State of California**

**Environmental Protection Agency**

**AIR RESOURCES BOARD**

# AMENDMENTS TO THE CALIFORNIA CAP ON GREENHOUSE GAS EMISSIONS AND MARKET-BASED COMPLIANCE MECHANISMS REGULATION

**Final Statement of Reasons**

**May 2018**

This Page Intentionally Left Blank

**Table of Contents**

**I. GENERAL** ....................................................................................................4
**A. Action Taken in This Rulemaking** ................................................................4
**B. Mandates and Fiscal Impacts to Local Governments and School Districts** ……………………………………………………………………………………4
**C. Updates to the Initial statement of Reasons**… ………………………………4

**II. CONSIDERATION OF ALTERNATIVES** ............................................................5
**III. SUMMARY OF COMMENTS AND AGENCY RESPONSE** ...............................5
**IV. PEER REVIEW** ..............................................................................................6

# I. GENERAL

## A. Action Taken in This Rulemaking

In this rulemaking, the California Air Resources Board (CARB or the Board) is adopting amendments to the California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms Regulation (California Cap-and-Trade Regulation or Regulation) to (1) clarify that the Cap-and-Trade Regulation requires a successor entity after a change in ownership to be responsible for the outstanding, pretransfer compliance obligation of the predecessor covered entity and (2) clarify the process for setting the Auction Reserve Price, by comparing the California Auction Reserve Price with the Auction Reserve Prices set by all linked jurisdictions (currently Québec and Ontario) when expressed in a common currency and selecting the highest value.

The amendments were developed pursuant to the requirements of the California Global Warming Solutions Act of 2006, also known as Assembly Bill 32 (AB 32). The amendments are codified at Title 17, Subchapter 10, Article 5, sections 95835 and 95911.

The amendments to the Regulation were initiated with the posting of the notice of public hearing on January 30, 2018, which indicated that the Board would consider the amendments at a public hearing scheduled for March 22, 2018, and publication of the notice in the California Regulatory Notice Register on February 2, 2018. A Staff Report (or ISOR) entitled "Proposed Amendments to the California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms Regulation," was released January 30, 2018, and is incorporated by reference herein. The full text of the proposed regulatory amendments, and documents relied upon, were made available for public review on January 30, 2018. The public comment period commenced on February 2, 2018, and ran for 45 days to March 19, 2018. The public did not submit comments on the proposed amendments during the 45-day comment period.

At the March 22, 2018 public hearing, the Board approved Resolution 18-4, adopting the final regulatory amendments.

## B. Mandates and Fiscal Impacts to Local Governments and School Districts

The Board has determined that this regulatory action will not result in a mandate to any local agency or school district the costs of which are reimbursable by the state pursuant to Part 7 (commencing with section 17500), Division 4, Title 2 of the Government Code.

## C. Updates to the Initial Statement of Reasons

Non-substantial grammatical changes were made to section 95911 subd. (c)(3)(D).

Health and Safety Code section 38562 was incorrectly listed as reference citation in the 45-day Notice. Additionally, regarding the economic impact analysis, the proposed regulation will not benefit worker safety.

The page numbers cited for Hagos, S. M., L. R. Leung, J.-H. Yoon, J. Lu, and Y. Gao (2016) cited as a Reference were incorrectly listed as pages 357-1363. The correct pages are 1357-1363.

## II. CONSIDERATION OF ALTERNATIVES

Staff is required to consider alternatives to the proposed amendments for the Cap-and-Trade Regulation. As discussed in Chapter IX of the ISOR, staff analyzed the following alternatives to the proposed amendments to the Cap-and-Trade Regulation:

- Take no action (i.e., do not revise the Cap-and-Trade Regulation)
- Modify only the change of ownership provision
- Modify only the Auction Reserve Price provision

For the reasons set forth in the ISOR, the Board determined that no alternative considered by the agency would be more effective in carrying out the purpose for which the regulatory action was proposed, or would be as effective and less burdensome to affected private persons, or would be more cost-effective to affected private persons and equally effective in implementing the statutory policy or other provisions of law than the action taken by the Board.

## III. SUMMARY OF COMMENTS AND AGENCY RESPONSE

Although no written comments were received during the 45-day comment period for the amendments, one person presented oral comments at the March 22, 2018 Board Hearing. Listed below is the individual who provided comments during the Board Hearing:

| Commenter | Affiliation |
|---|---|
| Harvey Eder | In his personal capacity and on behalf of the Public Solar Power Coalition |

1. **<u>Comment</u>**: CARB should pursue zero emission vehicles as trucks and batteries are now cost effective. The Air Resources Board isn't doing enough to follow legislative intent that fossil fuels, especially imports, should not be used. There needs to be studies on "dirty gases" such as formaldehyde and benzene and health studies indicate health cost savings would be very large for reductions in the emission of these gases. CARB should also be aware of developments in the solar industry, especially concentrated solar and seasonal storage options.

Agency Response: This comment is outside of the scope of this rulemaking. This comment is irrelevant, as it is not specifically directed at CARB's proposed action or to the procedures followed by CARB in proposing or adopting the action.

## IV. PEER REVIEW

Health and Safety Code Section 57004 sets forth requirements for peer review of identified portions of rulemakings proposed by entities within the California Environmental Protection Agency, including CARB. Specifically, the scientific basis or scientific portion of a proposed rule may be subject to this peer review process. Here, CARB determined that the rulemaking at issue does not contain a scientific basis or a scientific portion subject to peer review, and thus no peer review as set forth in section 57004 was or is needed to be performed.

# Exhibit 3

Exhibit 3
to Declaration of
Michael S. Dorsi
Aug. 12, 2026

December 2025

# Cap-and-Invest Program Vintage 2026 Allocation Summary

This document provides a summary of vintage 2026 allowance allocation under the Cap-and-Invest Program (Program, formerly Cap-and-Trade) aggregated by sector. Industrial allowance allocation data are disaggregated by general industrial activity. Allowance allocation methodologies for each sector can be found in Cap-and-Trade Regulation (Regulation) sections 95890 through 95895. Details on allowance allocation to electrical distribution utilities (EDU) are not included in this document and are instead posted online at Post-2020 EDU Allocation Table (EDU).

Because facility-level allowance allocation data could reveal confidential business information, the allocations to each industrial sector presented in Table 1 below are aggregated so that they include at least five companies.

Entities that received no vintage 2026 allocation or that have a negative allocation balance that will carry over to next year do not appear in this document. Also, pursuant to section 95835(c), an entity with emissions below the Program inclusion threshold for a full compliance period may request to exit the Program. Facilities exiting the Program are not eligible to receive allowance allocation and do not appear in this document.

The “Total Allocation” values in Table 1 are the sum of vintage 2026 allowances allocated to eligible entities. “Total Allocation” values exclude any negative allocation balance that will carry over to next year. “Total Allocation” values include allowances that have true-up value. Vintage 2026 allowances with true-up value are eligible to be used for compliance for covered emissions in 2024 and subsequent years, and the quantity “Total True-Up Value” is a subset of “Total Allocation” in Table 1.

The vintage 2026 allowance allocation to electrical distribution utilities in Table 1 reflects a reduction from the total amount in Table 9-4 of the Regulation to account for 2024 Energy Imbalance Market (EIM) Outstanding Emissions. CARB directly retired these allowances for EIM Outstanding Emissions in 2024 as required by sections 95852(l)(2) and 95892(a)(3) of the Regulation to address emissions leakage related to operation of the EIM.

Detailed information regarding allocation to industrial and other sectors may be found on CARB’s Allowance Allocation web page. Questions regarding allowance allocation may be directed to the Cap-and-Trade Program’s Allocation account allocation@arb.ca.gov.

**Table 1. Summary of Vintage 2026 Allowance Allocation.**

| Sector | Total Allocation | Total True-Up Value | Total Facilities |
|---|---|---|---|
| Petroleum Refining and Hydrogen Production | 17,155,465 | 1,264,325 | 25 |
| Crude Petroleum and Natural Gas Extraction | 2,955,127 | 18,120 | 22 |
| Cement, Lime, Gypsum, and Clay Product Manufacturing | 5,552,089 | 71,459 | 12 |
| Fruit and Vegetable Canning | 497,004 | 39,713 | 12 |
| Other Food Manufacturing | 455,448 | 70,354 | 15 |
| Dairy Product Manufacturing | 258,532 | 7,792 | 8 |
| Glass Manufacturing | 365,133 | 8,672 | 8 |
| Metal Processing and Manufacturing | 198,216 | 11,933 | 6 |
| Chemical, Biological, and Pharmaceutical Manufacturing | 325,719 | 0 | 8 |
| Misc. Industrial Facilities and Legacy Contract Generators | 1,411,232 | 34,643 | 15 |
| **Total Industrial Facilities and Legacy Contract Generators (sum of above rows)** | **29,173,965** | **1,527,011** | **131** |
| **Natural Gas Suppliers** | **31,086,842** | **0** | **7** |
| **Universities and Public Service Facilities** | **679,969** | **0** | **13** |
| **Public Wholesale Water Agencies** | **30,961** | **0** | **1** |
| **Electrical Distribution Utilities[1]** | **72,851,585** | **0** | **54** |
| **TOTAL ALLOWANCE ALLOCATION** | **133,823,322** | **1,527,011** | **206** |

[1] The total vintage 2026 allowance allocation to electrical distribution utilities reflects a deduction of 1,067,067 allowances from the total amount in Table 9-4 of the Regulation to account for 2024 EIM Outstanding Emissions.

**Table 2. NAICS Codes and Facilities Included in Petroleum Refining and Hydrogen Production in Table 1.**

| Sector | NAICS Codes | Facility Names and ARB IDs |
|---|---|---|
| Petroleum Refining and Hydrogen Production | • 324110 – Petroleum Refineries<br>• 324199 – All Other Petroleum and Coal Products Manufacturing<br>• 325120 – Industrial Gas Manufacturing<br>• 325199 – All Other Basic Organic Chemical Manufacturing | 100127 – Air Products Wilmington Hydrogen Plant |
| | | 100138 – Chevron Products Company - El Segundo Refinery, 90245 |
| | | 100217 – Torrance Refinery |
| | | 100303 – Phillips 66 Company - San Francisco Refinery |
| | | 100329 – Phillips 66 Company - Los Angeles Refinery - Wilmington Plant |
| | | 100372 – Valero Refining Company - California, Benicia Refinery and Benicia Asphalt Plant |
| | | 100913 – Phillips 66 Company - Los Angeles Refinery - Carson Plant |
| | | 100914 – Martinez Refining Company LLC |
| | | 101017 – Air Products and Chemicals - Martinez |
| | | 101053 – Linde Inc. |
| | | 101162 – Lunday-Thagard Company, DBA World Oil Refining |
| | | 101205 – Ultramar Inc – Valero Wilmington |
| | | 101237 - Central Valley Renewable Fuels, LLC |
| | | 101239 – San Joaquin Refining Company |
| | | 101246 – Los Angeles Refinery |
| | | 101248 – Air Products Carson Hydrogen Plant |
| | | 101331 – Martinez Renewable Fuel Facility |
| | | 101384 – Chevron Products Company - Richmond Refinery, 94802 |
| | | 101507 – Kern Oil Refinery |
| | | 101512 – Air Products Manufacturing Corporation, Sacramento |
| | | 101701 – Air Liquide El Segundo Hydrogen Plant |
| | | 101709 – DeMenno/Kerdoon |
| | | 101749 – Air Liquide Large Industries US L.P. - Rodeo Hydrogen Plant |
| | | 104005 – Tricor Refining, LLC |
| | | 104917 – Air Products West Coast Hydrogen |

**Table 3. NAICS Codes and Facilities Included in Crude Petroleum and Natural Gas Extraction in Table 1.**

| Sector | NAICS Codes | Facility Names and ARB IDs |
|---|---|---|
| Crude Petroleum and Natural Gas Extraction | • 211111 – Crude Petroleum and Natural Gas Extraction<br>• 211112 – Natural Gas Liquid Extraction | 100895 – Shadow Wolf Energy |
| | | 101231 – Grade 6 Oil, LLC |
| | | 101460 – TRC Cypress Group, LLC |
| | | 101674 – Pacific Coast Energy Company LP |
| | | 101703 – Midstream Energy Partners |
| | | 103016 – Sentinel Peak Resources - Arroyo Grande Oil Production Facility |
| | | 104011 – Chevron AAPG 740 Coastal Basin |
| | | 104012 – Chevron AAPG 745 San Joaquin Basin |
| | | 104014 – California Resources Elk Hills, LLC - 35R Gas Plant |
| | | 104017 – Aera Energy Ventura Basin |
| | | 104018 – Aera Energy Coastal Basins |
| | | 104029 – California Resources Production Corporation – Sacramento Valley Basin 730 |
| | | 104030 – California Resources Production Corporation - San Joaquin Valley Basin 745 |
| | | 104033 – CALNRG - Ventura Basin 755 incl. SCVGP Gas Plant |
| | | 104072 – California Resources Production Corporation - 760 Los Angeles Basin |
| | | 104081 – Sentinel Peak Resources - SJV Basin Facility |
| | | 104090 – Signal Hill Petroleum Facilities |
| | | 104094 – Berry Petroleum Company - San Joaquin Basin |
| | | 104097 – Naftex Operating Company |
| | | 104215 – E&B Natural Resources - San Joaquin Valley |
| | | 104426 – Holmes Western Oil Corporation |
| | | 104488 – Crimson Resource Management Corp |

**Table 4. NAICS Codes and Facilities Included in Cement, Lime, Gypsum, and Clay Product Manufacturing in Table 1.**

| Sector | NAICS Codes | Facility Names and ARB IDs |
|---|---|---|
| Cement, Lime, Gypsum, and Clay Product Manufacturing | • 327310 – Cement Manufacturing<br>• 327420 – Gypsum Product Manufacturing | 100013 – CalPortland Company, Oro Grande Plant |
| | | 101010 – Mitsubishi Cement 2000 |
| | | 101029 – CalPortland Company, Mojave Plant |
| | | 101271 – U.S. Gypsum Co Plaster City Plant |
| | | 101314 – National Cement Company - Lebec |
| | | 101381 – CalPortland Redding Cement Plant |
| | | 101461 – Tehachapi Cement Plant |
| | | 101476 – Cemex Construction Materials Pacific LLC - Victorville Plant |
| | | 101697 – Gold Bond Building Products, LLC - Long Beach |
| | | 101700 – Georgia-Pacific Gypsum LLC - Antioch |
| | | 104415 – Gold Bond Building Products, LLC - Richmond |
| | | 104733 – PABCO Gypsum Newark |

**Table 5. NAICS Codes and Facilities Included in Fruit and Vegetable Canning in Table 1.**

| Sector | NAICS Codes | Facility Names and ARB IDs |
|---|---|---|
| Fruit and Vegetable Canning | • 311421 – Fruit and Vegetable Canning | 100936 – Campbell Soup Supply Company, L.L.C. - Dixon |
| | | 100972 – Los Gatos Tomato Products |
| | | 101008 – Ingomar Packing Company |
| | | 101025 – Stanislaus Food Products |
| | | 101207 – Pacific Coast Producers |
| | | 101498 – Morning Star Packing Company – Los Banos |
| | | 101499 – Liberty Packing - Los Banos (Morning Star) |
| | | 101502 – Tomatek / Neil Jones Food Companies |
| | | 101503 – ConAgra - Oakdale |
| | | 101504 – J. G. Boswell Tomato Company Kings |
| | | 101536 – Morning Star Packing Company - Williams |
| | | 101705 – J. G. Boswell Tomato Company Kern |

**Table 6. NAICS Codes and Facilities Included in Other Food Manufacturing in Table 1.**

| Sector | NAICS Codes | Facility Names and ARB IDs |
|---|---|---|
| Other Food Manufacturing | • 111419 – Other Food Crops Grown Under Cover<br>• 311313 – Beet Sugar Manufacturing<br>• 311423 – Dried and Dehydrated Food Manufacturing<br>• 311613 – Rendering and Meat Byproduct Processing<br>• 311615 – Poultry Processing<br>• 311911 – Roasted Nuts and Peanut Butter Manufacturing<br>• 311919 – Other Snack Food Manufacturing<br>• 311991 – Perishable Prepared Food Manufacturing<br>• 312120 – Breweries<br>• 312130 – Wineries | 100958 – E & J Gallo Winery - Fresno<br>101235 – Frito Lay - Kern Plant<br>101241 – Spreckels Sugar Company, Inc.- Brawley<br>101284 – Olam West Coast Inc- Gilroy<br>101315 – Sensient Natural Ingredients LLC<br>101473 – Anheuser-Busch LLC - Los Angeles Brewery<br>101575 – Foster Poultry Farms - Livingston Complex, 95334<br>101693 – Wm. Bolthouse Farms, Inc.<br>101736 – WP&A Lost Hills<br>104207 – Frito Lay - Modesto<br>104337 – Darling Ingredients Inc. – Los Angeles<br>104359 – Windset Farms<br>104364 - GH Camarillo LLC<br>104743 - Central Valley Meat<br>104957 - C&H Sugar Company Inc. |

**Table 7. NAICS Codes and Facilities Included in Dairy Product Manufacturing in Table 1.**

| Sector | NAICS Codes | Facility Names and ARB IDs |
|---|---|---|
| Dairy Product Manufacturing | • 311513 – Cheese Manufacturing<br>• 311514 – Dry, Condensed, and Evaporated Dairy Product Manufacturing | 100959 – California Dairies, Inc. Fresno |
| | | 101186 – Saputo Cheese USA Inc. - Paige |
| | | 101190 – California Dairies, Inc. Turlock |
| | | 101197 – California Dairies, Inc. Visalia |
| | | 101288 – Hilmar Cheese Company |
| | | 101465 – Land O' Lakes, Inc. |
| | | 101509 – California Dairies, Inc. Tipton |
| | | 101716 – Leprino Foods - Lemoore West |

**Table 8. NAICS Codes and Facilities Included in Glass Manufacturing in Table 1.**

| Sector | NAICS Codes | Facility Names and ARB IDs |
|---|---|---|
| Glass Manufacturing | • 327211 – Flat Glass Manufacturing<br>• 327213 – Glass Container Manufacturing<br>• 327993 – Mineral Wool Manufacturing | 100917 – CertainTeed Corporation |
| | | 101183 – Owens-Brockway Glass Container, Tracy |
| | | 101342 – Ardagh Glass Inc. |
| | | 101475 – Owens-Brockway Glass Container, Vernon |
| | | 101513 – Vitro Flat Glass LLC |
| | | 101721 – Guardian Industries, LLC |
| | | 103018 – Gallo Glass Company |
| | | 104122 – Johns Manville |

**Table 9. NAICS Codes and Facilities Included in Metal Processing and Manufacturing in Table 1.**

| Sector | NAICS Codes | Facility Names and ARB IDs |
|---|---|---|
| Metal Processing and Manufacturing | • 331221 – Rolled Steel Shape Manufacturing<br>• 331314 – Secondary Smelting and Alloying of Aluminum<br>• 331492 – Secondary Smelting, Refining, and Alloying of Nonferrous Metal (except Copper and Aluminum)<br>• 331511 – Iron Foundries<br>• 332112 – Nonferrous Forging | 100953 – Vista Metals Corp.<br>100954 – California Steel Industries<br>101469 – United States Pipe & Foundry Co. LLC<br>101734 – Carlton Forge Works<br>104197 – Ecobat Resources California Inc.<br>104329 – Shultz Steel Company |

**Table10. NAICS Codes and Facilities Included in Chemical, Biological, and Pharmaceutical Manufacturing in Table 1.**

| Sector | NAICS Codes | Facility Names and ARB IDs |
|---|---|---|
| Chemical, Biological, and Pharmaceutical Manufacturing | • 325188 – All Other Basic Inorganic Chemical Manufacturing<br>• 325193 – Ethyl Alcohol Manufacturing<br>• 325194 – Cyclic Crude, intermediate, and gum and wood chemical manufacturing<br>• 325199 – All Other Basic Organic Chemical Manufacturing<br>• 325412 – Pharmaceutical Preparation Manufacturing<br>• 325414 – Biological Product (except Diagnostic) Manufacturing | 100259 – Eco Services - Dominguez<br>100389 – Braun Medical Inc<br>101451 – Genentech Inc South San Francisco<br>101519 – CP Kelco San Diego<br>101685 – Pixley Cogeneration Partners / Calgren Renewable Fuels<br>101733 – Corteva Agriscience – Pittsburg<br>104347 – Aemetis Advanced Fuels Keyes, Inc.<br>104423 – Procter & Gamble Manufacturing Co. – Sacramento |

**Table 11. NAICS Codes and Facilities Included in Miscellaneous Industrial Facilities, Legacy Contract Generators, and Waste-to-Energy Facilities in Table 1.**

| Sector | NAICS Codes | Facility Names and ARB IDs |
|---|---|---|
| Miscellaneous Industrial Facilities and Legacy Contract Generators | • 212299 – All Other Metal Ore Mining<br>• 212391 – Potash, Soda, and Borate Mineral Mining<br>• 212399 – All Other Nonmetallic Mineral Mining<br>• 221112 – Fossil Fuel Electric Power Generation<br>• 313310 – Textile and Fabric Finishing Mills<br>• 322121 – Paper (except Newsprint) Mills<br>• 322130 – Paperboard Mills<br>• 333611 – Turbine and Turbine Generator Set Units Manufacturing<br>• 336111 – Automobile Manufacturing<br>• 333612 - Speed Changer, Industrial High-Speed Drive, and Gear Manufacturing<br>• 488119 – Other Airport Operations | 100011 – Searles Valley Minerals Inc.<br>100195 - New-Indy Ontario LLC Linerboard Mill<br>100300 – U.S. Borax<br>101118 – Solar Turbines Incorporated - Kearny Mesa<br>101243 – Dicalite Minerals Corp.<br>101263 – Crockett Cogeneration Project<br>101318 – Imerys Minerals California, Inc.<br>101323 – Los Angeles International Airport (LAX)<br>101356 – New-Indy Oxnard LLC<br>101582 – P&G Paper Products Co.<br>101740 – Panoche Energy Center, LLC<br>104227 – Northrop Grumman Marine Systems - Sunnyvale<br>104322 – MP Mine Operations<br>104516 – Tesla Motors<br>104633 – Matchmaster Dyeing & Finishing |

**Table 12. Facilities Included in Natural Gas Supplier Allocation in Table 1.**

| Facility Names and ARB IDs |
|---|
| 5002 – Southern California Gas Company |
| 5003 – Long Beach Gas & Oil Dept (LBGO) |
| 5008 – City of Vernon, Gas Municipal Utility Department |
| 5011 – City of Palo Alto - Gas Utility |
| 5013 – Southwest Gas Distribution Facilities |
| 104024 – Pacific Gas and Electric Company (PG&E) - Supplier of Natural Gas |
| 104085 – San Diego Gas and Electric (SDG&E) - Local Distribution |

**Table 13. Facilities Included in University and Public Service Facility Allocation in Table 1.**

| Facility Names and ARB IDs |
|---|
| 100207 – Loma Linda University |
| 100273 – University of California, Santa Cruz, UCSC EH&S Office |
| 100305 – University of California, Davis |
| 100327 – California Institute of Technology (CalTech) |
| 100328 – Civic Center Cogen, LA County |
| 100997 – University of California, Los Angeles, UCLA |
| 101296 – University of California, Irvine |
| 101305 – University of California, San Diego, UCSD |
| 101399 – California State University, San Diego |
| 101416 – University of California, San Francisco |
| 104068 – UC Davis Medical Center |
| 104372 – University of California, Santa Barbara |
| 104514 – University of California, Berkeley |

**Table 14. Facilities Included in Public Wholesale Water Agency Allocation in Table 1.**

| Facility Names and ARB IDs |
|---|
| 2046 – Metropolitan Water District of Southern California (MWD) |

# Exhibit 4

Exhibit 4
to Declaration of
Michael S. Dorsi
Aug. 12, 2026