**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SEARLES VALLEY MINERALS INC., *et al.*,[1] | ) | Case No. 26-10966 (BLS) |
| Debtors. | ) | (Jointly Administered) |
| | ) | Related Docket Nos. 18, 140 |

**DECLARATION OF CHRISTIAN TEMPKE IN SUPPORT OF THE DEBTORS' SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS AS A GOING CONCERN**

I, Christian Tempke, hereby declare as follows:

1. I am a Managing Director at Lazard Frères & Co. LLC, which has its principal office at 30 Rockefeller Plaza, New York, New York 10012. Lazard Frères & Co. LLC, along with Lazard & Co., Limited (collectively, "**Lazard**") is the retained investment banker for the Debtors in the above-captioned Chapter 11 Cases.[2]

2. I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for Entry of Orders (I) Approving Bidding Procedures for the Sale of Certain Or All of the Debtors' Assets; (B) Authorizing the Debtors to Designate One Or More Stalking Horse Bidders and to Provide Bid Protections; (C) Approving Assumption and Assignment Procedures; (D) Scheduling a Hearing to Consider Any Proposed Sale; and (II) (A) Approving the Sale of the*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Minerals Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

[2] *See Order (I) Authorizing the Employment and Retention of Lazard Frères & Co. LLC and Lazard & Co., Limited as Investment Banker to the Debtors and Debtors in Possession, Effective as of the Petition Date, (II) Approving the Terms of the Engagement Letter, (III) Waiving Certain Time-Keeping Requirements Pursuant to Local Rule 2016-2(H), and (IV) Granting Related Relief.* [Docket No. 181].

*Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 18] (the "**Sale Motion**")[3] and the *Notice of Successful Bidder for Going Concern Sale of the Debtors' Assets and Cancellation of the Auction*, filed substantially contemporaneously herewith.

3. I previously submitted a declaration to this Court in support of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing; (B) Continue Access Financing Under its Receivables Facility; and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing and (V) Granting Related Relief* [Docket No. 15-5] (the "**DIP Declaration**"). The DIP Declaration sets forth, among other things, my relevant experience and qualifications as a Managing Director at Lazard and the circumstances surrounding Lazard's retention by the Debtors.

4. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon the following: (a) my personal knowledge, belief, or opinion; (b) information learned from my review of the Debtors' books and records and materials filed in these Chapter 11 Cases; (c) information supplied to me or verified by the Debtors' employees, other advisors, and/or employees of Lazard working directly under my supervision and directions; and (d) my professional experience, knowledge, skill, education, and/or training concerning financing restructurings and sale and capital raise transactions. If called as a witness, I could and would testify competently to the statements set forth in this Declaration. I am not being specifically

[3] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion.

compensated for this testimony other than through payments received by Lazard as the Debtors' retained investment banker. I am authorized by the Debtors to submit this Declaration on their behalf.

**The Sale Process**

5. As discussed in the DIP Declaration, the Debtors, with the assistance of Lazard, have undertaken a comprehensive marketing process for the sale of their business. Beginning in August 2025, the Debtors, with the assistance of Lazard, commenced a comprehensive strategic marketing process to gauge market interest in the Debtors' business (the "**SVM Sale Process**"). In connection with the SVM Sale Process, Lazard contacted over one hundred forty (140) parties, with fifty (50) parties executing non-disclosure agreements ("**NDAs**") and obtaining confidential information about the Debtors' business. As the SVM Sale Process further developed, it became clear in April 2026 that an out-of-court transaction was not viable due in part to the Debtors' legacy liabilities and the lack of appetite from potential buyers to acquire the Debtors' business outside of a court-supervised process. At that time, Lazard pivoted to the preparation of an in-court process and shifted discussions with several buyers to potentially acquire the assets as part of an in-court sale process.

6. On the Petition Date, the Debtors filed the Sale Motion and Lazard has continued to lead the postpetition marketing process to sell substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. In this process, Lazard engaged with over one hundred twenty-five (125) parties, with over fifty-five (55) of these partes executing NDAs.

7. On July 7, 2026, the Court entered the *Order (A) Approving Bidding Procedures for the Sale of Certain or All of the Debtors' Assets; (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections; (C) Approving Assumption*

*and Assignment Procedures; (D) Scheduling a Hearing to Consider Any Proposed Sale; and (E) Granting Certain Related Relief* [Docket No. 140] (the "**Bidding Procedures Order**").

8. Pursuant to the Bidding Procedures Order, initial indications of interest were to be submitted by July 10, 2026 (the "**Non-Binding LOI Deadline**"), with Qualified Bids and Good Faith Deposits originally due on August 6, 2026 (the "**Original Bid Deadline**"). The Debtors received six indications of interest on the Non-Binding LOI Deadline, three for going-concern transactions and three for other discrete assets, including for soda ash contracts. In consultation with the Consultation Parties, the Debtors extended the Original Bid Deadline to August 17, 2026 (the "**Extended Bid Deadline**"). After the Original Bid Deadline but prior to the Extended Bid Deadline, two going-concern Bidders (the "**Going-Concern Bidders**") requested permission to engage in discussions to submit a joint Bid as both parties indicated separately that a submission of a standalone Bid was becoming less likely. After consulting with the Consultation Parties, the Debtors consented to the Going Concern Bidders engaging in such discussions. Shortly after the Debtors provided their consent, however, these Going-Concern Bidders informed the Debtors that they would not pursue a joint Bid and instead would continue in the sale process and submit separate, individual Bids. As a result, the Debtors informed both Going-Concern Bidders that they could no longer have discussion with one another.

9. On the Extended Bid Deadline, the Debtors received two Bids for substantially all of their assets on a going-concern basis (the "**Going Concern Bids**") from the Going-Concern Bidders and three Bids for certain discrete assets, including the Debtors' soda ash contracts.[4] Each of the Going-Concern Bids required financing support for their proposed acquisition and both sought that support from the Debtors' ultimate parent, Nirma Limited (the "**Sponsor**"). In

---

[4] The Debtors also received a non-binding LOI.

consultation with the Consultation Parties, the Debtors adjourned a going-concern auction to a later to be determined date to continue negotiations with the Going-Concern Bidders.

10. At a hearing on August 26, 2026, this Court overruled the California Air Resources Board's ("**CARB**") objection to a going-concern sale of the Debtors' assets free and clear of their obligations under the California Cap-and-Invest Program. Since then, the Debtors continued negotiating terms of a potential going-concern sale with the two Going-Concern Bidders.

11. Through extensive negotiations, the Debtors were able to significantly improve economic and certain other terms of both Going-Concern Bids relative to the Going-Concern Bids submitted at the Extended Bid Deadline; however, both Going-Concern Bidders conditioned improvements to their Going-Concern Bids on the Debtors selecting them as the Successful Bidder without a subsequent auction.

12. After extensive negotiations, the Debtors, in consultation with the Consultation Parties, determined that the Bid submitted by 5E SVM, LLC (the "**Successful Bidder**") represents the highest or otherwise best bid available to the estates (the "**Sale Transaction**"). Importantly, it is also the only actionable and viable Going-Concern Bid the Debtors have at this time as the Sponsor currently does not support financing the Going-Concern Bid of the second bidder at current terms.

13. The Successful Bid consists of:

- approximately $3.35 million in cash consideration paid at closing;

- 8.3 million shares of common stock of 5E Advanced Materials, Inc. (representing approximately $11.0 million based on the September 14, 2026 closing price);[5] and

- a $6.22 million senior unsecured note bearing 14.5% payable-in-kind interest.

14. In addition to the purchase price consideration outlined above, the Successful Bidder will also pay approximately $0.5 million of cure costs related to the transferred contracts. Moreover, given the going-concern nature of the Bid, the Successful Bidder has committed to offering employment to the vast majority of the existing employees.

15. For its part, the Sponsor has agreed to provide the following financial support to the Successful Bid:

- $10.0 million in secured credit facility debt bearing 8% payable-in-kind interest with a 9-month maturity and a $1.0 million fee upon the earlier of repayment in full or maturity; and

- a line of credit for, among other things, guaranteeing certain surety and reclamation bonds for up to 12 months worth approximately $7.5 million.[6]

16. The Successful Bidder's Asset Purchase Agreement ("**APA**") provides that all causes of action against the Sponsor, their affiliates, and their and the Sellers' respective directors, officers and agents and all Avoidance Actions against designated parties that are owned by the Debtors are part of the Transferred Assets under the Sale Transaction. As a condition to providing support for the Successful Bidder's Bid, the Sponsor required that the

---

[5] 5E Advanced Materials, Inc. ("**5E**") is the parent of the Successful Bidder and is a public company focused on becoming a vertically integrated global leader and supplier of refined borates and advanced boron derivative materials. 5E's stock trades on the NASDAQ under the ticker: FEAM and the per share price as of September 14, 2026 was $1.33.

[6] To bridge the Debtors to the closing of the sale and subsequent wind-down of the estates through a liquidating chapter 11 plan, the Debtors will be entering into an upsize of their junior DIP facility with Karnavati Holdings, Inc. The Debtors will file a separate stipulation memorializing the DIP upsizing.

Debtors’ estates provide a release of claims against it, its affiliates, and their and the Sellers’ respective directors, officers and agents.

17. The Debtors, the Sponsor, and the Official Committee of Unsecured Creditors (the "**UCC**") have reached a global resolution whereby the UCC agreed not to oppose the Sale, including the Nirma Releases, and has such other terms that I understand will be read on the record at the Sale Hearing. As contemplated in that global resolution, the Sponsor has agreed in the APA to provide $3 million of consideration to the Debtors' estates in exchange for the releases set forth in the APA.

18. The Debtors also reached a full and final resolution of CARB's objection, pursuant to which: (a) the Debtors will exchange approximately 16,048 carbon credits to satisfy the Debtors’ postpetition emissions obligations under the Cap-and-Invest Program; (b) CARB has agreed not to pursue an appeal and will withdraw its stay pending appeal request; and (c) CARB will not file a proof of claim, thereby significantly reducing the overall unsecured claims pool in these cases.

19. The Sale Order reflects the terms of the Sale Transaction and certain discussions with other constituents.

**The Sale Transaction Was Negotiated in Good Faith**

20. The Debtors negotiated the Sale Transaction with the Going-Concern Bidders in consultation with the Consultation Parties over several weeks. The Debtors accommodated requests for additional diligence and continued negotiations beyond the Extended Bid Deadline to improve their Bids and pursue an agreement with the Sponsor. The Debtors exchanged multiple rounds of transaction documents and participated in several drafting sessions.

21. Given the negotiating history, I believe that the Sale Transaction was negotiated in good faith, at arms'-length between sophisticated parties each represented by experienced and competent counsel, and without any collusion.

**A Free and Clear Sale Order is a Crucial Aspect of the Sale Transaction**

22. Pursuant to the terms of the Successful Bidder's APA, the Successful Bidder required that the Transferred Assets be sold free and clear of all liens and claims (including, without limitation, any potential successor liability claims). This is a foundational requirement of the Sale Transaction. I understand that the Successful Bidder would have offered substantially less to acquire the Transferred Assets, or would not have participated in the sale process at all, if the Successful Bidder could not acquire such Transferred Assets free and clear of any liens and claims or successor liability, including any CARB claims or interests.

**Prompt Consummation of the Sale Transaction is Necessary to Preserve Value of the Debtors' Estates**

23. Prompt consummation of the Sale Transaction is critical given the Debtors' financial situation. Given the estates' cash burn, delay in moving forward with the Sale Transaction would have a detrimental effect on the Debtors' estates, their stakeholders, and their employees.

**Conclusion**

24. In light of the foregoing, and based on my experience as an investment banker and my personal knowledge of and involvement in the Debtors' sale process and the commercial circumstances surrounding such process, I believe that the sale process was fair and thorough, conducted in good faith and without collusion, and generated the highest and otherwise best offer for the Debtors' estates. I further believe that the Debtors' decision to select the Successful

Bidder as the winning Going-Concern Bidder and that the entry of a free and clear Sale Order will preserve value for the Debtor's estates and their stakeholders.

***[Remainder of Page Intentionally Left Blank]***

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: September 15, 2026

*_/s/ Christian Tempke_*
Christian Tempke
Managing Director
Lazard Frères & Co. LLC