**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Searles Valley Minerals, Inc., *et al.*,[1] | ) | Case No. 26-10966 (BLS) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | | **Re: D.I. 409, 410, 411 and 415** |

**PROCESS EQUIPMENT, INC.'S:**

**(A) OBJECTION TO MOTION OF DEBTORS FOR LEAVE TO FILE LATE REPLY IN SUPPORT OF SALE MOTION AND (B) PROCEDURAL RESPONSE TO DEBTOR'S OBJECTION TO FILED CLAIM #34 OF PROCESS EQUIPMENT**

Process Equipment, Inc. dba Process Barron ("Process"), by and through its undersigned counsel, hereby files its: (a) Objection (the "Objection") to *Motion of Debtors for Leave to File Late Reply in Support of Sale Motion* [D.I. 410] (the "Motion for Leave") and (b) Procedural Response to *Debtor's Objection to Filed Claim #34 of Process Equipment* [D.I. 409] ("Claim Objection"), and respectfully requests that the Court deny the Motion for Leave and not consider at the September 28, 2026 hearing (the "September 28 Hearing"), for the purpose of determining adequate protection owed to Process, the following pleadings and factual declarations:

(1) the Claim Objection;

(2) the *Declaration of Philip J. Gund in Support of Debtors' Objection to Filed Claim #34 of Process Equipment Inc. and Reply of Debtors to Limited Objection by Process Equipment, Inc. to Sale and Disposition of Sale Proceeds* [D.I. 411] (the "Gund Declaration"),

(3) Declaration of Christian Tempke in Support of Debtors' *Objection to Filed Claim #34 of Process Equipment Inc. and Reply of Debtors to Limited Objection by Process Equipment, Inc. to Sale and Disposition of Sale Proceeds* [D.I. 415] (the "Tempke

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Mineral Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

Declaration" and, with the Gund Declaration, the "Declarations"), and

(4) the proposed Reply attached as Exhibit B to the Motion for Leave (the "Proposed Reply").

As discussed more fully below, none of the foregoing pleadings and Declarations, constituting over 47 pages of law and contested fact filed immediately before the September 28 Hearing, are properly noticed or before the Court. Although they confirm the "candlepower" of the powerhouse firms who prepared them, and that such firms obviously are able to burn a candle at both ends, the relief requested by the so-called "Reply" and Claim Objection deny Process's right to fair notice and an opportunity to be heard, discovery with respect to the Declarations and presentation of competing facts, Due Process, and the Bankruptcy Rules and procedures that govern filing and noticing of a substantive claim objection and commencing an adversary proceeding.

The Claim Objection is not a mere "related-document" as it is portrayed in the Amended Agenda [DI 416]. It is a substantive standalone claim objection, supported by the First Day Declaration and Gund Declaration, that requires 30 days' notice. Process is also entitled to a discovery schedule that permits discovery of Mr. Gund, Mr. Tempke and any third parties; *e.g.*, the Buyer. The Objection also has to be properly noticed and served in accordance with the Bankruptcy Rules before it may be heard. Here, the Debtors purport to give short notice by way of footnote 4 in the Proposed Reply. This is patently deficient.

The "Reply" is actually one or more counts of an adversary proceeding masquerading as a Reply; *e.g.*, Process has the burden of showing the validity, priority, and extent of Process' asserted lien *by a preponderance of the evidence*. Proposed Reply at 13. Even by the Debtor's stated position, Process needs time to take discovery and develop that evidence to meet its burden. Further, the Debtors already have filed an Omnibus Reply [DI 378], listed just above

their second Proposed Reply in the Amended Agenda, that was considered at the Sale Hearing. The Reply also inappropriately seeks to bootstrap into the September 28 Hearing the Objection, and thereby introduces facts that Process contests, including that Process stopped work before the job was complete. Process responds by pointing to the Stop Work Order it received from the Debtors. *See* **Exhibit A**. The evidentiary record for the Sale hearing is closed, the Sale Order has been entered and the Objection is not properly before the Court by way of the Reply or otherwise.

The only evidentiary matter before the Court is Process' §546(b) Notice and its secured Proof of Claim. According to the Third Circuit in *In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012) ("*Heritage*"):

> "[A] burden-shifting approach strikes us as most appropriate in the instant scenario. The initial burden should be on the party challenging a secured claim's value, because '11 U.S.C. § 502(a) and Bankruptcy Rule 3001(f) grant prima facie effect to the validity and amount of a properly filed claim.' . . . It is only fair, then, that the party seeking to negate the presumptively valid amount of a secured claim—and thereby affect the rights of a creditor—bear the initial burden. . . . If the movant establishes with sufficient evidence that the proof of claim overvalues a creditor's secured claim because the collateral is of insufficient value, the burden shifts." (internal citations omitted).

The Debtors had ample time to file appropriate pleadings well in advance of the Sale Hearing to mount challenges to Process' secured Proof of Claim and/or §546(b) Notice. They chose not to do so, and cannot now do so at the direct expense of Process' right to Due Process, take discovery and appropriate notice under the Bankruptcy Rules. This does not affect the Sale closing. It only affects the disposition of the proceeds of sale.

The Debtors cannot look backwards to augment the evidentiary record conducted at the Sale hearing or tack on relief to a completed hearing by way of a Proposed Reply or a Claim Objection that requires the filing of new pleadings, discovery and an appropriate hearing date

following discovery. In contrast, there are no surprises from Process. Process filed the Process Objection about one month before the Sale hearing and its secured proof of claim and 546(b) were on file at least several months before that. Having failed to file necessary pleadings in advance of the Sale hearing, the Debtors should not be permitted to create a need for urgency now.

For purposes of the September 28 Hearing, the Court must balance the Debtor's interest in immediately sweeping all Cash Consideration from the Sale closing to pay Lazard and lien holders other than Process, thereby mooting Process's right to seek meaningful appellate review, against Process' right to defend its presumptively valid secured proof of claim against the Debtor's recent onslaught of pleadings. Process submits that its right to adequate protection should not be adjudicated by way of a late-filed second "Reply" that purports to bootstrap in a Claim Objection. Process has met its initial burden under *Heritage;* the Debtor has *not* met its burden on the record before the Court. Further, the cases relied on by the Debtors actually confirm that a full evidentiary record is necessary in a valuation fight; not a Zoom hearing.

In support thereof, Process states as follows:

## BACKGROUND

### A. The Debtor Failed to Pay Process for: (a) Its Actual Costs and (b) Work Performed to Improve the Property.

1. Pursuant to a certain Master Work Agreement for Construction or Field Services dated December 5, 2024 ("MWA") by and between Process and Searles Valley Minerals, Inc. (the "Debtor") and Purchase Order CS2407540 dated December 19, 2024 issued in connection with the MWA, Process provided design engineering, labor, equipment, and materials relating to the Debtor's Trona Boiler ID & FD Fan Electrification Project (the "Project") at the property

located at 13200 Main Street, Trona, CA 93562 (the "Property"). The Debtor did not pay Process's invoices for the Project.

2. To summarize:

**Summary of Process Barron Proposal dated October 17, 2024**

ProcessBarron proposed a turnkey **design/build project** for Searles Valley Minerals' Boiler Nos. 25 and 26 ID and FD fan electrification project at the Trona facility. The total proposal price was **$3,177,435**, with motor delivery estimated at 36 weeks.

**Purpose and overall scope**
The project's purpose was to permanently convert four existing boiler fans from steam-turbine drives to electric-motor drives, enabling SVM to eliminate its 45-pound steam header and use the displaced steam to generate electricity.

ProcessBarron's proposal expressly included the **design engineering, labor and materials** necessary to:

- Engineer and install permanent concrete motor and bearing pedestals.
- Modify existing fan systems and structures.
- Relocate piping and structural supports.
- Manufacture replacement fan rotors and extended shafts.
- Supply and install four large electric motors and couplings.
- Set, shim, align and grout the motors.
- Install couplings and balance the rotating assemblies onsite.

The proposal describes the work as a single integrated project, not merely a sale of motors or loose equipment.

**Equipment and installation by fan**

| **Fan** | **Principal equipment** | **Principal site work** |
|---|---|---|
| No. 25 FD | 500 HP WEG motor and coupling | Design and installation of concrete pedestal; walkway-support modifications; motor installation, alignment and grouting; onsite balancing |
| No. 26 FD | 500 HP WEG motor and coupling | Concrete pedestal; structural modifications; condensate drain relocation; motor installation, alignment and grouting; onsite balancing |
| No. 25 ID | 3,000 HP WEG motor, coupling and complete replacement rotor with extended shaft | Demolition of damaged bearing pedestal; new concrete motor/bearing pedestal; rotor and coupling installation; motor alignment, grouting and onsite balancing |
| No. 26 ID | 3,000 HP WEG motor, coupling and complete replacement rotor with extended shaft | New concrete pedestal; structural changes affecting plant access and bracing; rotor and coupling installation; motor alignment, grouting and onsite balancing |

The two ID-fan rotors were to be manufactured specifically for these existing fans using measurements obtained at SVM's facility, SVM's original drawings and applicable performance curves. The replacement shafts were designed to permit operation from either the existing turbine side or the new

motor side.

**Permanent integration with the facility**

Several provisions are particularly relevant to the mechanics-lien and fixture issues:

1. **The motors were designed to be installed on permanent concrete pedestals** constructed specifically for the existing SVM fans.
2. **Motor installation expressly included setting, shimming, alignment and grouting.** The motors were therefore intended to be physically secured and precisely aligned with the existing fan assemblies.
3. **The new ID-fan rotors and shafts were custom-designed components of the existing fans.** They were not generic standalone equipment.
4. **Existing facility components required demolition or alteration**, including a bearing pedestal, structural bracing, walkway supports, piping and a condensate drain.
5. **The project required onsite balancing of the completed rotating assemblies**, demonstrating that the motors, couplings, shafts and rotors were intended to function as integrated parts of SVM's boiler-fan systems.
6. The proposal's stated purpose could only be achieved through the completed installation. The motors or rotors, standing alone, would not accomplish the elimination of the steam header or the conversion of the fans.

**Commercial terms relevant to the dispute**

- The proposal states a single lump-sum price of **$3,177,435**.
- It does **not allocate the price** among motors, rotors, engineering, fabrication, concrete work, structural work or installation labor; i.e., there is no contractual basis for the Debtors' assertion that the lien should automatically be reduced by 50% because certain motors or a rotor were allegedly uninstalled.
- The price was based on ProcessBarron's engineering review, 3D scans and prior communications with SVM. Final engineering and site conditions could affect price or schedule.
- Payment was generally due 30 days after invoicing. If SVM delayed shipment, payment became due 30 days after ProcessBarron was ready to ship.
- Cancellation required SVM to pay costs incurred for engineering, manufacturing and outside purchases completed or irrevocably committed through cancellation.
- ProcessBarron retained the right to subcontract portions of the work.

**Title provision**

The standard terms state that title to equipment passed to SVM upon delivery to the carrier at the shipping point, with SVM assuming the risk of loss thereafter.

This provision may be relevant in two respects:

- It establishes that SVM owned the delivered motors and other equipment, even if installation had not been completed.
- The Debtors may cite it when arguing that undelivered or uninstalled items remained personal property. However, the proposal's detailed installation requirements demonstrate that the equipment was custom-procured for permanent incorporation into SVM's existing boiler-fan systems.

**Exclusions**

ProcessBarron excluded electrical wiring and conduit, electrical-supply modifications, VFD supply and installation, unloading/staging, permits and prevailing wages. These exclusions reinforce that ProcessBarron's responsibility was principally the mechanical, structural and civil integration of the new drive equipment.

There is a minor internal ambiguity concerning freight: the individual scopes for several fans include "equipment freight to jobsite," while the general exclusion list identifies freight as excluded.

ProcessBarron's proposal strongly supports characterizing ProcessBarron's undertaking as an integrated **work of improvement involving engineering, custom fabrication, materials and onsite construction services**. It does not support treating the contract as four independent motor purchases.
It also undermines a mechanical 50% reduction of the lien because:

- the contract contains no component-level price allocation;
- the engineering, fabrication and installation scopes were interdependent;
- much of the work benefited the real-property installation even before final connection; and
- the Debtors have not shown any evidence—beyond an unsupported percentage—to allocate the contract value between allegedly lienable and non-lienable work.

3. On May 6, 2026, the Debtor issued to Process a written "Notice to Stop Work" for the Project (the "Stop Work Order"). A true and correct copy of the Stop Work Order is attached hereto as **Exhibit A**. The Stop Work Order directed Process "to immediately cease all work related to the CCR25002 Utilities Boiler FD & ID Fan Electrification Project, effective immediately upon receipt of this correspondence." Stop Work Order at 1.

4. At the time the Stop Work Order issued, Process had incurred substantial actual costs in connection with work performed on the Project in amounts not less than as set forth below:

| Line ItemType | Actual Hours | Actual Cost |
|---|---|---|
| Motors | | $559,451.11 |
| Materials | | $487,980.00 |
| Machining and freight | | $61,551.30 |
| Shop Labor | 2,384 | $235,094.61 |
| Rental Equipment and consumables | | $55,049.89 |
| Travel Cost | | $99,533.00 |
| Civil and Crane | | $540,627.21 |
| Field Labor | 2,658 | $175,639.24 |
| Project Management | 320 | $46,800.00 |
| Staff Engineering | 560 | $98,000.00 |
| Shop Management | 280 | $61,600.00 |
| **GRAND TOTAL** | | **$2,421,326.36** |

**B. Process Provided Notice of Its Mechanic's Lien Rights in June and Filed a Secured Proof of Claim in Early July**

5. To protect its rights, Process recorded a Mechanics Lien with the Office of the County Recorder, San Bernardino County, California (Document No. 2026-0153549) against the Property in the amount of $3,178,916.26, pursuant to California Civil Code § 8000 *et seq*.

6. On June 19, 2026, in accordance with § 546(b) of the Bankruptcy Code, Process provided notice (the "§ 546(b) Notice") to all interested parties of Process's rights as the holder of a Mechanic's Lien in and to the Property. *See* D.I. 84.

7. On July 8, 2026, Process filed Proof of Claim No. 34 against SVM in the amount of $3,178,916.26 (the "Proof of Claim"). The Proof of Claim expressly asserts a secured claim based upon Process's mechanic's lien and attaches supporting documentation, including the parties' Master Work Agreement and Purchase Order.

**C. Process Filed Its Limited Objection to the Sale**

8. On June 15, 2026, the Debtors filed the *Motion of Debtors for Entry of Orders (I) Approving Bidding Procedures for the Sale of Certain or All of the Debtors' Assets; (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections; (C) Approving Assumption and Assignment Procedures; (D) Scheduling a Hearing to Consider any Proposed Sale; and (II) (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. 18] (the "Sale Motion").

9. On August 18, 2026, Process filed its *Limited Objection by Process Equipment, Inc. to Sale and Disposition of Sale Proceeds* [D.I. 292] (the "Process Objection") in response to the Sale Motion. Process did not object to the proposed sale itself. Rather, Process requested

adequate protection of its asserted lien interest in the amount of $3,178,916.26, the amount set forth in the Mechanic's Lien and filed Proof of Claim. The Process Objection sought payment of its Proof of Claim amount at closing or, alternatively, segregation of sale proceeds to cover the Proof of Claim amount pending determination of Process's rights. *See* Process Objection ¶¶ 12–15 [D.I. 292].

**D. The Debtors Submitted an Omnibus Reply in Connection with the Sale Hearing.**

**10.** On September 15, 2026, about one month *after* the Process Objection was filed, the Debtors filed their *Omnibus Reply of Debtors in Support of [the] Sale Motion* [D.I. 378] (the "Omnibus Reply"). The hearing on the Sale Motion was held on September 15, 2026 (the "Sale Hearing").

**E. The Court Approved the Sale**

11. At the Sale Hearing, the Court approved the sale of substantially all of the Debtors' assets to 5E SVM, LLC (the "Buyer"). The Sale Order expressly acknowledges Process' mechanic's lien, the Process Objection, and Process's July 8, 2026 Proof of Claim asserting a secured claim of not less than $3,178,916.26. *See* Sale Order ¶ 42 [D.I. 399].

12. Paragraph 43 of the Sale Order reserves "any and all of the rights and arguments" of the Debtors, Process, and certain other parties concerning, among other things, the Process Objection, the Project, the Property, allocation of the purchase price, valuation of property subject to Process's lien, and the validity, extent, and priority of Process's asserted lien. Sale Order ¶ 43 [D.I. 399]. While ¶ 43 adjourns the hearing on the Process Objection for twelve (12) days to September 28, 2026, *see* Sale Order ¶ 43 [D.I. 399], it does not authorize or direct a full evidentiary hearing for September 28. This is especially true because the September 28 Hearing is by Zoom.

**F. The Debtors Filed a Substantive Claim Objection, Evidentiary Declarations, and a Proposed "Reply" on the Eve of the September 28 Hearing**

13. In connection with the September 28 Hearing, the Debtor loaded the docket. The Debtors filed four (4) new pleadings directed at Process: (a) the Claim Objection [D.I. 409]; (b) the Motion for Leave, including the Proposed Reply [D.I. 410]; and (c) the Gund Declaration [D.I. 411]. On September 25, 2026, one business day before the September 28 Hearing, the Debtors filed the Tempke Declaration [D.I. 415]. The Debtors' pleadings total 47 pages of new contested fact and law.

14. On September 24, 2026, the Debtors filed their notice of amended agenda for the September 28 Hearing [D.I. 413] (the "Amended Agenda"), listing the Claim Objection as "Related Document D." The Debtors' Proposed Reply states that the Claim Objection "is set to be heard on October 13, 2026." Proposed Reply at 1 n.4 (Ex. B to D.I. 410). It is axiomatic that a "Proposed Reply" is not the proper method for providing notice for a hearing on a substantive Claim Objection.

15. The Claim Objection and Proposed Reply raise new factual and legal issues, after entry of the Sale Order, concerning the validity, extent, amount and secured nature of Process's mechanic's lien. Based on Declarations, that Process has not had a full and fair opportunity to investigate or contest, the Debtors propose not to reserve any Cash Consideration, but instead to reserve 155,688 shares of common stock of the Buyer's parent, 5E Advanced Materials, Inc., which they assert, based on a recent stock bump, has a value of approximately $325,000, as adequate protection for Process. Proposed Reply ¶¶ 4–5, 32–33 (Ex. B to D.I. 410). The Debtors propose no mechanism to counter any subsequent slide in the value of the Stock Consideration.

16. The Debtors rely on the declaration of Philip J. Gund, a Senior Managing Director of Ankura Consulting Group, LLC ("Ankura"), for the installation status of Process's motors and

rotors. Gund Decl. ¶¶ 8–10 [D.I. 411]. But Mr. Gund's testimony is most likely entirely hearsay because Ankura was retained after the Debtors issued the Stop Work Order.[2] Further, Mr. Gund's opinion is subject to challenge because his expertise lies in turnaround advisory services not design, engineering, manufacturing, and installation of industrial fan systems. Gund Decl. ¶¶ 3–4 [D.I. 411].

17. The Debtors offer the Tempke Declaration to support their valuation of the Utility Facility. Mr. Tempke, a Managing Director of Lazard, the Debtors' investment banker, states that he "understand[s] that the Buyer has indicated to the Debtors" an allocation of the sale consideration that "implies approximately $117,000 to $250,000 of the sale consideration to be allocated to the utility facility." Tempke Declaration at 3 [D.I. 415]. This statement is entirely hearsay and without a foundation. Mr. Tempke also testifies that "Lazard has not conducted an independent valuation or appraisal of the transferred assets and has not conducted any analysis as to the allocation of the sale consideration," and that Lazard "does not have any insight into how Buyer has determined to allocate purchase price." Tempke Declaration at 3 [D.I. 415].[3]

## ARGUMENT

[2] The Debtors applied to retain Ankura effective as of the Petition Date [D.I. 100], and on July 20, 2026, the Court approved that retention [D.I. 223]. This all occurred *after* the Debtors sent the Stop Work Order.

[3] The Tempke Decl. should be stricken and not given any weight by the Court to the extent offered for valuation purposes. Mr. Tempke is a managing director at Lazard Freres & Co., LLC ("Lazard"). The APA expressly provides for $3,357,906 in Cash Consideration as part of the Purchase Price. APA § 2.6(a) [D.I. 377-1]. But the Tempke Decl. expressly acknowledges that $3 million of the total $3,357,906 in Cash Consideration is being set aside *for Lazard*. Tempke Decl. at 1. The APA also requires Sellers to "first segregate from the Cash Consideration" an amount sufficient to pay the Banker's Fees. APA § 2.7(a) [D.I. 377-1]. Under the APA, the term "Banker's Fees" is defined to mean the fees and expenses owed to Lazard. Lazard is therefore competing with Process for the same Cash Consideration. The bias in the Tempke Decl. is self-evident. Plus, Process' *in rem* interest in the Utility Property is senior to Lazard's expense of administration against the estate and that payment priority attaches to the proceeds of sale.

The foregoing impugns the Debtors' claim that Section 2.7(a) provides that the entire Cash Consideration is consumed at closing. *See* APA §§ 2.6(a), 2.7(a), (d) [D.I. 377-1]; Sale Order ¶ 41 [D.I. 399] Nothing in the APA establishes that the $3,357,906 in Cash Consideration is reduced to zero. The Debtors lack authority to sweep liened sale proceeds for the benefit of an administrative creditor.

## I. THE MOTION FOR LEAVE TO FILE A LATE REPLY SHOULD BE DENIED

18. *First*, the Debtors already filed their Omnibus Reply, the Court conducted an evidentiary hearing and the Sale Order has been entered. The Debtors should respect the doctrine of finality with respect to entry of the Sale Order and not seek to revisit that closed hearing for the purpose of objecting to Process' secured claim or adjudicating relief that requires an adversary proceeding. The Debtors should now be required to prepare and properly notice new pleadings and permit Process to respond and take discovery, as the Bankruptcy Rules require.

19. *Second*, even assuming the Court views the "Reply" as a reply (it should not), the Debtors have not shown the requisite cause to allow it. Local Rule 9006-1(d) provides that "[r]eply papers by the movant …may be filed by 4:00 p.m. prevailing Eastern Time the day prior to the deadline for filing the agenda." Del. Bankr. L.R. 9006-1(d). Although allowing the Proposed Reply is a matter left to the Court's discretion, the Third Circuit instructs the following should be considered by the trial court in the exercise of that discretion: (1) the danger of prejudice to the opposing party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993); *Ragguette v. Premier Wines & Spirits*, 691 F.3d 315, 324 (3d Cir. 2012); *In re Smidth & Co.*, 413 B.R. 161, 166 (Bankr. D. Del. 2009).

20. The Motion for Leave fails to address these factors and for that reason alone should be denied. The Motion for Leave, at best, offers the following conclusory remark: "neither Process nor any other party will be prejudiced by the filing of a late Reply." Motion for Leave ¶¶ 13–14 [D.I. 410]. That self-serving remark does not address the factors and the Motion for Leave should be denied based on an examination of the factors set forth below.

### A. The Late Filed Reply Would Severely Prejudice Process by Placing a Substantive Claim Objection, a Reply in the Nature of an Adversary Proceeding and Declarations Containing New Evidence Before the Court at a Zoom Hearing on Five Days' Notice.

21. The first factor weighs heavily against the Debtors. The Proposed Reply would prejudice Process greatly. It would permit heavily fact dependent and contested legal relief against Process to proceed without first requiring the commencement of an adversary proceeding with attendant discovery. It also seeks to bring before the Court a substantive Claim Objection, that was not properly noticed or served, supported by new factual material that Process has had no meaningful opportunity to investigate.

22. The Court conducted an evidentiary hearing on the Sale Motion on September 15, 2026 and entered the Sale Order on September 21, 2026 [D.I. 399]. The Sale Order reflects that the Court considered the Sale Motion, the objections thereto, the Debtors' responses, the arguments of counsel, and the evidence presented at the Sale Hearing. The Proposed Reply is styled as a reply "in further support of" the Sale Motion, and it asks the Court to "overrule Process's Objection and enter the Sale Order." Proposed Reply ¶ 35 (Ex. B to D.I. 410). The Debtors are thus asking the Court to revisit an order that has already been entered to add factual and legal determinations adverse to Process.

23. Although paragraph 43 of the Sale Order *reserved* the parties' rights with respect to the Process Objection, that reservation preserved the Process dispute for further determination. It did not reopen the evidentiary record made at the Sale Motion or give the Debtors an unrestricted opportunity to supplement their prior briefing with new arguments and evidence after the evidentiary hearing concluded. The reservation of rights language should not be treated as a pathway to deny Process' right to Due Process and a fair hearing on new substantive relief.

24. The Debtors nonetheless rely on paragraph 43 of the Sale Order to justify their post-hearing filings and their attempt to place these additional issues before the Court at the September 28 Hearing. Motion for Leave ¶ 10 [D.I. 410]. That reliance is misplaced. Disputes concerning the validity, priority, or extent of Process's lien must be litigated through an adversary proceeding. *See* Fed. R. Bankr. P. 7001(b) (providing that an adversary proceeding includes "a proceeding to determine the validity, priority, or extent of a lien or other interest in property"); Fed. R. Bankr. P. 7001(i) (providing for an adversary proceeding seeking declaratory relief concerning matters described in Rule 7001(a)–(h)). The Bankruptcy Rules likewise prohibit a party from joining a demand for relief that requires an adversary proceeding with an objection to a claim. *See* Fed. R. Bankr. P. 3007(b).

25. The Debtors' central contention—that motors and rotors supplied by Process never became fixtures and therefore fall outside Process's mechanic's lien—is both a fact intensive and legal challenge to the validity and extent of the asserted lien. Claim Objection ¶¶ 16–20 [D.I. 409]; Proposed Reply ¶ 29 (Ex. B to D.I. 410). Paragraph 43's reservation of rights did not permit the Debtors to bypass Process' rights to Due Process or the need for the Debtors to commence an adversary proceeding to put those disputes before the Court at the September 28 Hearing through a late Proposed Reply, or a Claim Objection never properly served with notice.

26. The second form of prejudice is equally serious and deceptive. The Proposed Reply is not merely responsive legal argument limited to matters already briefed. It relies upon the newly filed Claim Objection and Declarations to introduce new factual and evidentiary matters concerning the installation and fixture status of Process' equipment, the value of the Utility Facility, and the allocation of the sale consideration. Proposed Reply ¶¶ 1–5, 16, 29–33 (Ex. B to D.I. 410). The Amended Agenda then lists the Claim Objection as "Related Document

D" to the September 28 Hearing. It does so even though the Claim Objection is a standalone contested matter that the Debtors incorrectly state "is set to be heard on October 13, 2026." Proposed Reply at 1 n.4 (Ex. B to D.I. 410). Again, a Proposed Reply cannot function as notice of a Claim Objection.

27. The Debtors' contentions run afoul of the Bankruptcy Rules and fundamental fairness. Bankruptcy Rule 3007(a)(1) requires that an objection to a claim and notice of the objection be filed and served at least thirty days before any scheduled hearing on the objection. Fed. R. Bankr. P. 3007(a)(1). That notice requirement protects a claimant's right to a meaningful opportunity to respond before its claim is adjudicated. Process also has the right to propound discovery with respect to the Declarations and statements concerning value purportedly made by the Buyer.

28. Due process requires notice reasonably calculated to apprise an affected party of the proceeding and a meaningful opportunity to present its objections. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The Debtors filed the Claim Objection on September 23, 2026, only five days before the September 28 Hearing. Yet the Proposed Reply relies directly upon the Claim Objection and the Gund Declaration to argue that Process has not established a secured claim, that portions of Process's equipment do not support a mechanic's lien, and that the value of Process's collateral is no more than approximately $250,000. Proposed Reply ¶¶ 2–3, 16, 29–32 (Ex. B to D.I. 410). The Debtors cannot circumvent the thirty-day notice requirement by filing the Claim Objection on September 23 and then litigating its substance indirectly through the Proposed Reply on September 28. Doing so would deprive Process of the meaningful opportunity to respond under Rule 3007 and basic principles of Due Process.

29. The Debtors' new pleadings and Declarations thus seek to materially expand the factual record only days before the September 28 Hearing. The Debtors filed them on Wednesday, September 23, leaving Process two business days before a Monday hearing. In that time, Process has no meaningful opportunity to investigate the factual basis for Mr. Gund's testimony, obtain the books and records and other information upon which he relies, investigate the Debtors' communications with the Buyer concerning valuation and allocation, take appropriate discovery, or prepare responsive evidence.

30. The prejudice is compounded by what the Debtors filed next. The valuation on which the Debtors' proposed reserve rests was not in the Gund Declaration, which addresses only the terms of Process's lien and the installation status of the equipment. Gund Decl. ¶¶ 8–10 [D.I. 411]. On Friday, September 25—the business day before the September 28 Hearing—the Debtors filed the Tempke Declaration to supply it. Tempke Declaration [D.I. 415]. That declaration does not cure the problem. It confirms it. Mr. Tempke's $117,000 to $250,000 figure rests entirely on what he "understand[s]" the Buyer "has indicated to the Debtors" about its intended allocation. Tempke Declaration at 3 [D.I. 415]. The only source of the allocation is the hearsay statement of the Buyer, which has not submitted a declaration. Process thus has no witness with knowledge to cross-examine on that figure, no documents with which to test it, and only one business day in which to litigate it.

## B. The Proposed Reply Comes After the Sale Has Been Approved and the Sale Order Entered

31. The length of the delay must be considered together with its impact on the proceedings. Here, the Proposed Reply arrives after the Sale Hearing has concluded, after the Sale Order has been entered, and with the sale scheduled to close by October 1, 2026. Motion for Leave ¶¶ 8–9, 13 [D.I. 410]. A second reply "in support of" a sale motion that has already been

granted serves no valid purpose in the sale proceeding. Its only effect is to reshape the separate, reserved Process dispute on the eve of the hearing. And measured from the filing of the Process Objection on August 18, 2026, the Debtors' full response comes more than five weeks later. Nor have the late filings stopped. On September 25, the Debtors filed the Tempke Declaration. Tempke Declaration [D.I. 415]. Each additional filing further shortens the time Process has to respond before the September 28 Hearing. This is an unfair curtailment of Process' right to Due Process.

**C. The Delay Was Caused by the Debtors and Was Entirely Within Their Control**

32. The reason for the delay weighs most heavily against the Debtors. Courts routinely deny late filed claims or late filed replies when the delay is caused by lack of diligence or reasons within the movant's control. *See In re RS Legacy Corp.*, 577 B.R. 134, 142 (Bankr. D. Del. 2017) (denying late filing a claim because the claimant learned of her potential claim eleven months before filing and offered no explanation for delay); *In re Nortel Networks, Inc.*, 531 B.R. 53, 66 (Bankr. D. Del. 2015) (disallowing a late filed claim because the claimant had all the necessary information to discover any potential claims).

33. Process' Objection was before the Court on September 15. Before that date, the Debtors had every fact and every argument in the Proposed Reply in hand. Process' § 546(b) Notice, attaching its recorded mechanic's lien and describing the work and the parcel, has been on file since June 19, 2026. § 546(b) Notice [D.I. 84]. Process's Proof of Claim, attaching the MWA and the Purchase Order, has been on file since July 8, 2026. Proof of Claim No. 34. The Process Objection, filed August 18, 2026, stated exactly what Process sought—payment of its secured claim at closing or, alternatively, the segregation of sufficient sale proceeds. Process Objection ¶¶ 12–15 [D.I. 292]. At the Sale Hearing on September 15, 2026, Process again

objected to a reserve of the Buyer's stock and requested cash, as the Debtors themselves acknowledge. Proposed Reply ¶ 26 (Ex. B to D.I. 410). Nothing in the Proposed Reply responds to any argument that Process raised for the first time after September 15.

34. The facts on which the Debtors now rely were within their own control from the outset. The installation status of the motors and rotors at the Debtors' own utility plant has not changed since May 6, 2026, when the Debtor directed Process "to immediately cease all work." Stop Work Order at 1; Gund Decl. ¶ 10 [D.I. 411]. Ankura has served as the Debtors' advisor since the Petition Date, and nowhere does Mr. Gund identify a single fact he learned after the Process Objection was filed. Ankura Retention Application [D.I. 100]; Ankura Retention Order [D.I. 223]; Gund Decl. ¶¶ 1–10 [D.I. 411]. The allocation relayed in the Tempke Declaration is what the Buyer indicated "per the APA requirement," and the Debtors executed their asset purchase agreement with the Buyer on September 14, 2026. Tempke Declaration at 2–3 [D.I. 415]. Mr. Tempke submitted the Sale Declaration the next day, and it said nothing about Process or the Utility Facility. Sale Declaration [D.I. 379]. Nothing prevented the Debtors from obtaining the same testimony from the same witnesses *before* the Sale Hearing.

35. The Debtors explain that their efforts "have involved input from multiple parties on matters including price allocation and reservation of value that other parties claim rights to or liens on," and that, with closing targeted for October 1, 2026, "the Debtors and their advisors have focused their attention on resolving these issues in conjunction with other parties." Motion for Leave ¶ 13 [D.I. 410]. Process does not doubt that closing a sale of substantially all of a debtor's assets places significant demands on the estate's professionals. But those demands do not explain the delay here. The Debtors have known since August 18 who objected, on what grounds, and what relief Process sought. The Process Objection was adjourned to a date certain.

The Debtors' decision to give priority to other parties was a choice within their reasonable control. The Debtors were in contact with Process throughout this period, having represented on September 15 that they had "initiated discussions with Process in an effort to resolve the objection." Omnibus Reply, Ex. A [D.I. 378].

36. Finally, the Debtors already exercised their right to reply before the Sale Hearing. The Omnibus Reply identified Process as one of only two remaining lien claimants and addressed its request for adequate protection, but did so in one paragraph, one footnote, and one chart entry. Omnibus Reply ¶ 11 & n.10 [D.I. 378]; Omnibus Reply, Ex. A [D.I. 378]. The Debtors knew of every issue now raised in the Proposed Reply when they filed the Omnibus Reply. The Proposed Reply is therefore not the Debtors' first response to the Process Objection. It is a second bite at the apple, and the delay it seeks to excuse is the product of the Debtors' decision to file an intentionally incomplete first reply. Local Rule 9006-1(d) affords a movant the opportunity to reply. It does not, however, afford movant a second reply to cure the omissions of the first.

**D. The Good-Faith Factor Does Not Favor Granting Leave**

37. The Debtors have placed the Claim Objection before the Court for the September 28 Hearing without the notice the Bankruptcy Rules require. Bankruptcy Rule 3007(a)(1) requires that a claim objection and notice of the objection be filed and served at least thirty days before any scheduled hearing on the objection. Fed. R. Bankr. P. 3007(a)(1). The Debtors filed the Claim Objection on September 23, 2026, and purport to give notice through the Proposed Reply; *i.e.*, it "is set to be heard on October 13, 2026." Proposed Reply at 1 n.4 (Ex. B to D.I. 410). The Amended Agenda lists the Claim Objection as "Related Document D" to the September 28 Hearing, and the Proposed Reply relies on it throughout. Proposed Reply ¶¶ 2 n.4,

13, 16, 29 (Ex. B to D.I. 410). A party seeking leave to cure its own late filing should not use that leave to bring before the Court a matter that has not been properly noticed for the hearing, and the Debtors' effort to do so weighs against granting leave.

38. The Proposed Reply cites *In re Fontainebleau Las Vegas Holdings, LLC* twice, and both times for propositions that court did *not* adopt. The Debtors first cite it as applying the Rule 3001(f) presumption in the adequate-protection context "only where no party put forth evidence challenging the statutory lienholders' claims," and as "endorsing the full burden-shifting framework once evidence is produced." Proposed Reply ¶ 15 (Ex. B to D.I. 410). The court actually said something different. It held that mechanics' lienholders whose liens were disputed were entitled to adequate protection based on their proofs of claim. *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 748 (S.D. Fla. 2010). It explained that "neither the 'highly contentious circumstances' nor the fact that the issue of priority has been disputed alters the analysis." *Id.* at 748 n.29. It also held that the burden does not shift merely because an objection is raised; the court must first determine "whether the proof has overcome the prima facie case," and "without such a finding, the Statutory Lienholders would not yet have had an opportunity to prove the validity of their claims." *Id.* The Debtors then cite *Fontainebleau* as "evaluating [an] adequate-protection package . . . that included replacement liens, cash payments, and reporting obligations." Proposed Reply ¶ 22 (Ex. B to D.I. 410). But the court found that the debtors "did not make cash payments or provide additional or replacement liens to the Statutory Lienholders." *Fontainebleau*, 434 B.R. at 748. It held that the lienholders "were not adequately protected." *Id.* at 754. The Debtor, at a minimum, fails to describe one of its key legal authorities accurately.

39. The Proposed Reply states that "Process ceased all work on the project before the Debtors filed for chapter 11 protection." Proposed Reply ¶ 1 (Ex. B to D.I. 410). The Claim Objection likewise states that "the work stopped well short" of permanent installation. Claim Objection ¶ 19 [D.I. 409]. Neither filing mentions that the work stopped because *the Debtor* directed Process to stop on May 6, 2026. Stop Work Order at 1. Taken together, these circumstances do not weigh in favor of granting leave. Describing the work as having stopped without disclosing that the Debtor stopped it gives the Court an incomplete account of a fact central to the Claim Objection and, taken together with the foregoing, the good-faith factor does not favor granting leave.

## II. THE AUTHORITIES CITED IN THE PROPOSED REPLY WERE DECIDED IN THE CONTEXT OF ADVERSARY PROCEEDINGS OR ON A FULL EVIDENTIARY RECORD

40. Given the compressed timeline, Process has not had the opportunity to review the Proposed Reply fully, and Process reserves all rights. Even a cursory review, however, shows that key authorities on which the Debtors rely to resolve questions about Process' lien were decided in, or expressly reserved for, adversary proceedings, or were resolved only on a fully developed evidentiary record. That confirms the prejudice to Process of resolving those questions at the September 28 Hearing on the basis of a late reply and a Claim Objection never noticed.

41. In *In re Heritage Highgate, Inc.*, the creditors' committee moved to value the secured claims under section 506(a) and supported its motion with a 140-page appraisal prepared by an experienced real estate appraisal firm, which the bankruptcy court had already accepted as evidence at a contested cash collateral hearing. *In re Heritage Highgate, Inc.*, 679 F.3d 132,

136–37 (3d Cir. 2012)("*Heritage*"). The bankruptcy court then resolved the motion after a hearing on an appraisal the parties had adjusted through stipulations of fact. *Id.* at 145–46.

42. The Third Circuit in *Heritage* noted that courts considering burden of proof issues under §506(a) have reached divergent results. *Id*. at *139-140. *Compare In re Parson*, 2025 WL 2076506 (Bankr. E.D. Mo. July 23, 2025) *with In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 748 (S.D. Fla. 2010). As set forth above, the Third Circuit in *Heritage* at *140 adopted a burden-shifting approach with the initial burden should be on the party challenging a secured claim's value.

Here, Process has filed a presumptively valid secured claim in the amount of $3,178,916.26, and such claim and value has not been challenged with sufficient evidence at the September 28 Hearing.

43. In *In re Robertson*, each party called a witness at trial to testify to the value of the collateral, and the court fixed that value only after "considering the testimony, the demeanor of the witnesses, and reviewing the analyses of the appraisers." *In re Robertson*, 135 B.R. 350, 352–53 (Bankr. E.D. Ark. 1992).

44. No comparable evidentiary record (or any) exists here. The Debtors' valuation rests on a declaration filed the business day before the September 28 Hearing, in which the declarant testifies that Lazard "has not conducted an independent valuation or appraisal of the transferred assets." Tempke Declaration at 3 [D.I. 415]. The Debtors' own authorities thus confirm that the questions raised in the Proposed Reply should be resolved in an adversary proceeding under Bankruptcy Rule 7001, on a full evidentiary record, and not in the context of a late reply filed on the eve of the September 28 Hearing.

45. The Debtors rely on *In re MPM Silicones, LLC* for the proposition that stock paid by a third-party buyer in exchange for a debtor's assets constitutes proceeds to which a secured creditor's lien attaches. Proposed Reply ¶ 20 (Ex. B to D.I. 410). *MPM Silicones* was decided in adversary proceedings, on motions to dismiss under Bankruptcy Rule 7012. *BOKF, N.A. v. JPMorgan Chase Bank, N.A. (In re MPM Silicones, LLC)*, 518 B.R. 740, 743–44 (Bankr. S.D.N.Y. 2014). Moreover, the language the Debtors quote was not the court's holding on the facts before it. The court held that stock issued by the reorganized debtor under a chapter 11 plan was not proceeds of the collateral and referred to stock paid by a third-party buyer only to distinguish that situation. *Id.* at 755–56.

46. Likewise, in *Fontainebleau*, on which the Debtors rely for both the burden of proof and the forms of adequate protection, the court held that the validity and priority of the mechanics' liens at issue "will be decided in the adversary proceedings," and that the lienholders were entitled to adequate protection in the meantime on the strength of their proofs of claim. *Fontainebleau*, 434 B.R. at 748.

47. Accordingly, the Motion for Leave should be denied and the Debtors should not be permitted to use the Proposed Reply to bootstrap in the Claim Objection, the Gund Declaration, the Tempke Declaration, or other new evidentiary material into the September 28 Hearing. The Court should decline to adjudicate the Claim Objection, directly or indirectly, at the September 28 Hearing, and should decline to make findings at that hearing that would determine the allowance, amount, classification, validity, extent, or secured status of Claim No. 34. Those issues should be addressed only after Process has received the notice and opportunity to respond required by Bankruptcy Rule 3007 and, to the extent the Debtors challenge the

validity or extent of Process's lien, in an adversary proceeding commenced under Bankruptcy Rule 7001.

WHEREFORE, Process respectfully requests that the Court (i) deny the Motion for Leave; (ii) decline to consider the Claim Objection, the Gund Declaration, the Tempke Declaration, and the Proposed Reply at the September 28 Hearing; and (iii) grant Process such other and further relief as the Court deems just and proper.

Dated: September 28, 2026
Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

*/s/ Frederick B. Rosner*
Frederick B. Rosner (DE 3995)
Zichen Jiang (DE #7686)
824 N. Market Street, Suite 810
Wilmington, Delaware 19801
Telephone: (302) 777-1111
Email: rosner@teamrosner.com
jiang@teamrosner.com

*Counsel to Process Equipment, Inc.*