**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SEARLES VALLEY MINERALS INC., *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-10966<br><br>(Jointly Administered) |

~~<1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Minerals Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.>~~

# AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF SEARLES VALLEY MINERALS, INC. AND ITS DEBTOR AFFILIATES

**Dated: ~~September 29~~October 15, 2026**


**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Edward A. Corma (DE Bar No. 6718) 919
North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
ljones@pszjlaw.com
joneill@pszjlaw.com
ecorma@pszjlaw.com

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
James J. Mazza, Jr. (admitted *pro hac vice*) Jennifer Madden (admitted *pro hac vice*) Claire Stephens (admitted *pro hac vice*~~-pending~~) 320 S. Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
James.Mazza@skadden.com
Jennifer.Madden@skadden.com
Claire.Stephens@skadden.com
~~*Co-Counsel <for Debtors and Debtors in Possession>*~~

*Counsels >for Debtors and Debtors in Possession<*


>[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Minerals Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.<

## IMPORTANT INFORMATION REGARDING THIS COMBINED DISCLOSURE STATEMENT AND PLAN[2]

The Debtors are soliciting votes on this Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Searles Valley Minerals Inc., and its Debtor Affiliates from the Holders of Claims in Classes 3 and 4.

~~<[2] Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in the Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Searles Valley Minerals, Inc., and its Debtor Affiliates (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto), the "Disclosure Statement," the "Combined Disclosure Statement and Plan," or the "Plan," as applicable).>~~

If you are a Holder of a Claim in Class 3 or 4, you are receiving this document and the accompanying materials because you are entitled to vote on the Plan. Before submitting a Ballot to vote on the Plan, you should review this Combined Disclosure Statement and Plan.

**ABSENT THE WRITTEN CONSENT OF THE DEBTORS, ALL BALLOTS MUST BE PROPERLY COMPLETED, EXECUTED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS IN THE BALLOTS AND THE SOLICITATION AND TABULATION PROCEDURES, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE DEBTORS' CLAIMS AGENT, STRETTO, INC., NO LATER THAN NOVEMBER ~~13~~16, 2026, AT 4:00 P.M. (PREVAILING EASTERN TIME). BALLOTS MUST BE SUBMITTED TO THE CLAIMS AGENT ELECTRONICALLY (ON THE CLAIMS AGENT'S ONLINE PORTAL) OR BY PHYSICAL DELIVERY BY HAND OR MAIL.**

You can vote electronically by visiting the case information website maintained by the Claims Agent (https://cases.stretto.com/svm/), Click on the "File a Ballot" section of the website and follow the instructions to submit your Ballot.

If you choose to vote via a paper Ballot, you must deliver, prior to the Voting Deadline, an original, completed, and executed Ballot in the pre-addressed postage-paid envelope that accompanied your Ballot or as follows:

**If by First-Class Mail, Hand Delivery or Overnight Mail**

Searles Valley Minerals Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

**PLEASE READ YOUR BALLOT CAREFULLY FOR FURTHER INFORMATION AND INSTRUCTIONS. FAILURE TO ABIDE BY SUCH INSTRUCTIONS MAY RESULT IN YOUR BALLOT NOT BEING COUNTED.**

>[2] Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in the Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Searles Valley Minerals, Inc., and its Debtor Affiliates (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto), the "Disclosure Statement," the "Combined Disclosure Statement and Plan," or the "Plan," as applicable).<

## PRELIMINARY STATEMENT AND DISCLAIMERS

The Bankruptcy Court has established November ~~13~~16, 2026 at 4:00 p.m. (prevailing Eastern Time) as the deadline for filing and serving objections to the final approval of the Disclosure Statement and the confirmation of the Plan (the "Combined Disclosure Statement and Plan Objection Deadline"). *See* D.I. [_]. Any objection to the final approval of the Disclosure Statement or the confirmation of the Plan must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the Solicitation Order (D.I. [_]), (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Bankruptcy Court no later than the Combined Disclosure Statement and Plan Objection Deadline.

The Confirmation Hearing will commence on November ~~18~~23, 2026 at ~~2:00 p.m~~10:30 a.m. (prevailing Eastern Time) in the Bankruptcy Court before the Honorable Brendan L. Shannon, Courtroom 1, 6th Floor, 824 N. Market St., Wilmington, DE 19801. The Confirmation Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Bankruptcy Court or by filing a notice on the docket of these Chapter 11 Cases. In accordance with the modification provisions of the Plan, the Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

This Combined Disclosure Statement and Plan contains summaries of certain provisions and certain other documents and information. The financial information included herein is provided solely for the purpose of soliciting votes on the Combined Disclosure Statement and Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Combined Disclosure Statement and Plan. Although the summaries in the Disclosure Statement do not constitute admissions of fact, liability, stipulation, or waiver by the Debtors or any other party, the Debtors believe that the summaries contained in the Disclosure Statement are fair and accurate. The summaries of the financial information in the Disclosure Statement and the documents that are attached to, or incorporated by reference in, this Combined Disclosure Statement and Plan are qualified in their entirety by reference to such information and documents.

Except as otherwise provided herein or in accordance with applicable law, the Debtors are under no duty to update or supplement the Combined Disclosure Statement and Plan. The Bankruptcy Court's approval or confirmation of the Combined Disclosure Statement and Plan does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Combined Disclosure Statement and Plan. The statements and information contained herein have been made as of the date hereof unless otherwise specified. The facts and information set forth herein may have changed since the date of the Combined Disclosure Statement and Plan. All Holders of Claims entitled to vote on the Plan are advised and encouraged to read the Combined Disclosure Statement and Plan in its entirety before voting on the Plan. No Holder of a Claim should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in the Combined Disclosure Statement and Plan (including the

documents attached hereto). The Combined Disclosure Statement and Plan does not constitute, and shall not be deemed to constitute, legal, business, financial, tax, or other advice,

including as

it relates to Holders of Claims against or Interests in the Debtors or any other party in interest. Any Person or Entity desiring any such advice should consult with their own advisors.

Although the Debtors have attempted to ensure the accuracy of the financial information provided herein or incorporated herein by reference, such information has not been audited, except to the extent specifically indicated herein. The financial information provided has been prepared by the Debtors' management and their restructuring advisor. Such information, while presented with numerical specificity, is necessarily based on a variety of estimates and assumptions that, although considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market, financial, and other uncertainties and contingencies, many of which are beyond the Debtors' control. The Debtors caution that no representations can be made as to the accuracy of such information or the ability to achieve the projected results. Further, events and circumstances occurring after the date on which the financial information was prepared may be different from those assumed or may have been unanticipated and, thus, the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Such information, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur.

With respect to any contested matters, adversary proceedings, and any other pending, threatened, or potential litigation or other actions, nothing in the Combined Disclosure Statement and Plan, nor any action taken by the Debtors in connection herewith, is or may be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in accordance with rule 408 of the Federal Rules of Evidence and any applicable analogous state or foreign laws or rules.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No Person or other Entity is or has been authorized to give any information with respect hereto and the matters addressed herein, other than that which is contained herein or incorporated herein by reference. No representations concerning the Debtors, or the value of their property have been authorized by the Debtors other than as set forth herein. Any information, representations, or inducements made to obtain a vote on the Plan other than, or inconsistent with, the information contained herein should not be relied upon by any Holder of a Claim.

The Combined Disclosure Statement and Plan contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Combined Disclosure Statement and Plan, the words "believe," "expect," "anticipate," "estimate," "intend," "project," "plan," "likely," "may," "will," "should," "shall," or other words or phrases of similar import generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the

forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees. Forward-looking

statements are subject to
risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in the Combined Disclosure Statement and Plan. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update or revise any forward-looking statement, whether as a result of new information, subsequent events, anticipated or unanticipated circumstances, or otherwise. See Article V for a discussion of certain considerations and risk factors that Holders entitled to vote on the Plan should consider.

This Combined Disclosure Statement and Plan has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and not in accordance with federal or state securities laws or other non-applicable bankruptcy laws. This Combined Disclosure Statement and Plan has not been approved or disapproved by the SEC or any state or non-U.S. regulatory authority and neither the SEC nor any state or non-U.S. regulatory authority has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the solicitation of votes on the Plan, nor this Combined Disclosure Statement and Plan, is intended to constitute an offer to sell or the solicitation of an offer to buy securities in any state or other jurisdiction in which such offer or solicitation is not authorized or is unlawful.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION 4

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES 25

2.1. General Rules of Classification 25
2.2. Unimpaired Classes of Claims 29
2.3. Impaired Classes of Claims. 29
2.4. Impaired Class of Interests. 29

ARTICLE III BACKGROUND AND DISCLOSURES ~~29~~30

3.1. General Background. ~~29~~30
3.2. Events Leading to Chapter 11. 34
3.3. The Chapter 11 Cases. 37

ARTICLE IV CONFIRMATION AND VOTING PROCEDURES 47

4.1. Confirmation Procedure 47
4.2. Procedure for Objections. ~~47~~48
4.3. Requirements for Confirmation. 48
4.4. Classification of Claims and Interests ~~48~~49
4.5. Impaired Claims or Interests ~~49~~50
4.6. Confirmation Without Necessary Acceptances; Cramdown. 50
4.7. Feasibility 51
4.8. Best Interests Test and Liquidation Analysis. ~~51~~52
4.9. Releases by the Debtors. ~~53~~54
4.10. Acceptance of the Plan. 54

ARTICLE V CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ~~54~~55

5.1. The Plan May Not Be Accepted.

~~54~~55
5.2. The Plan May Not Be Confirmed. 55
5.3. Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections. 55
5.4. Claims May Be Reclassified. ~~55~~56
5.5. The Plan May Not Be Consummated. 56
5.6. Recoveries May Be Substantially Diluted. ~~56~~57
5.7. The Plan Releases May Not Be Approved. ~~56~~57
5.8. Certain Tax Considerations. ~~56~~57

ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS 57

6.1. Administrative Claims 57
6.2. Professional Fee Claims ~~58~~59
6.3. Tax Claims 59
6.4. DIP Facility Claims ~~59~~60

ARTICLE VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS 60

7.1. Class 1: Priority Claims. ~~60~~61
7.2. Class 2: Other Secured Claims ~~60~~61
7.3. Class 3: Prepetition Loan Claims 61
7.4. Class 4: General Unsecured Claims ~~61~~62
7.5. Class 5: Subordinated Claims. 62
7.6. Class 6: Interests ~~62~~63
7.7. Reservation of Rights Regarding Claims and Interests ~~62~~63
7.8. Certain Federal Income Tax Consequences ~~62~~63

ARTICLE VIII ACCEPTANCE OR REJECTION OF THE PLAN ~~67~~68

8.1. Classes Entitled to Vote. ~~67~~68
8.2. Acceptance by Impaired Classes of Claims. ~~67~~68
8.3. Presumed Acceptance by Unimpaired Classes. ~~67~~68
8.4. Presumed Rejections by Impaired Classes. ~~67~~68
8.5. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code. ~~67~~68
8.6. Controversy Concerning Impairment. ~~67~~68
8.7. Elimination of Vacant Classes. 68
8.8. Voting Classes; Deemed Acceptance by Non-Voting Classes. ~~68~~69

ARTICLE IX MEANS OF IMPLEMENTING THE PLAN ~~68~~69

9.1. Plan Funding. ~~68~~69

9.2. Transfer of Permits, Interests, and Dissolution of the Debtors. ~~68~~69
9.3. Retention of Books and Records. ~~69~~70
9.4. The GUC Liquidating Trust. ~~69~~70
9.5. GUC Liquidating Trustee and Oversight Board. ~~71~~72
9.6. GUC Liquidating Trust Fees and Expenses. 74
9.7. The Wind-Down Trust. ~~74~~75
9.8. Wind-Down Trustee and Wind-Down Trust Oversight Board. 76
9.9. Wind-Down Trust Fees and Expenses. ~~80~~81
9.10. Wind-Down Trustee as Estate Representative and Successor. ~~80~~81
9.11. Corporate Action. 81
9.12. Directors, Officers, Managers, Members and Authorized Persons of the Debtors. ~~81~~82
9.13. Closing of the Chapter 11 Cases. ~~81~~82
9.14. Committee ~~82~~83
9.15. Effectuating Documents; Further Transactions. ~~82~~83
9.16. Release of Liens. ~~82~~83
9.17. Exemption from Certain Transfer Taxes. ~~82~~83
9.18. Setoffs. 83
9.19. Withdrawal of Plan. ~~83~~84
9.20. Insurance Preservation. ~~83~~84
9.21. D&O Insurance Policies. ~~83~~84
9.22. Indemnification of Directors, Officers, and Employees. ~~84~~85
9.23. Withholding and Reporting Requirements. ~~84~~85
9.24. Cancellation of Authorized but Unissued Shares. ~~85~~86

ARTICLE X EFFECT OF PLAN ON CLAIMS AND INTERESTS ~~85~~86

10.1. Binding Effect. ~~85~~86
10.2. Treatment of Claims. ~~85~~86
10.3. No Discharge of the Debtors. ~~86~~87
10.4. Injunction. ~~86~~87
10.5. Exculpation. 87
10.6. Releases by the Debtors. ~~87~~88
10.7. Releases by Holders of Claims ~~88~~89
10.8. Terms of Injunctions or Stays. ~~90~~91

ARTICLE XI EXECUTORY CONTRACTS AND UNEXPIRED LEASES ~~90~~91

11.1. Executory Contracts and Unexpired Leases Deemed Rejected. ~~90~~91
11.2. Claims Based on Rejection of Executory Contracts and Unexpired Leases. ~~91~~92
11.3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ~~91~~92
11.4. Modifications, Amendments, Supplements, Restatements, or Other Agreements. ~~92~~93
11.5. Reservation of Rights. ~~92~~93

ARTICLE XII DISTRIBUTIONS ~~92~~93

12.1. Distribution Record Date ~~92~~93
12.2. Delivery of Distributions and Undeliverable or Unclaimed Distributions. 93
12.3. Interest on Claims ~~94~~95
12.4. Withholding and Reporting Requirements. ~~94~~95
12.5. Miscellaneous Distribution Provisions 95
12.6. De Minimis Distribution Provisions ~~95~~96

ARTICLE XIII PROCEDURES FOR DISPUTED CLAIMS ~~95~~96

13.1. Objections to Claims ~~95~~96
13.2. Estimation of Claims. 96
13.3. Disputed Claims Reserves. ~~96~~97
13.4. No Distribution Pending Allowance 97
13.5. Resolution of Claims. 97
13.6. Elimination of Duplicate Claims. ~~97~~98
13.7. Amendments to Late Filed Claims 98
13.8. Insured Claims ~~98~~99

ARTICLE XIV CONFIRMATION AND CONSUMMATION OF THE PLAN ~~98~~99

14.1. Conditions to Confirmation. ~~98~~99
14.2. Conditions to Effective Date. 99
14.3. Waiver of Conditions. ~~100~~101
14.4. Consequences of Non-Occurrence of Effective Date. ~~100~~101
14.5. Substantial Consummation. ~~101~~102
14.6. Effect of Vacatur of Confirmation Order. ~~101~~102

ARTICLE XV ADMINISTRATIVE PROVISIONS ~~101~~102

15.1. Retention of Jurisdiction. ~~101~~102
15.2. Amendments. ~~103~~104
15.3. No Revesting of Assets. ~~104~~105
15.4. Subordinated Claims ~~104~~105
15.5. Severability of Plan Provisions Upon Confirmation. ~~104~~105
15.6. Successors and Assigns. ~~105~~106
15.7. Governing Law. ~~105~~106
15.8. Corporate Action. ~~105~~106
15.9. Entire Agreement. ~~105~~106
15.10. Miscellaneous Rules. ~~105~~106
15.11. Notices. ~~106~~107
15.12. No Admissions or Waiver. ~~106~~107

ARTICLE XVI RECOMMENDATION ~~106~~107

## INTRODUCTION

The Debtors propose this *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Searles Valley Minerals, Inc. and its Debtor Affiliates* pursuant to sections 105, 1125, and 1129 of the Bankruptcy Code[3] for the disposition of the Debtors' remaining Assets and distribution of the proceeds of the Assets to the Holders of Allowed Claims against the Debtors as set forth herein. The Debtors are the proponents of the Combined Disclosure Statement and Plan within the meaning of Bankruptcy Code section 1129. [The Committee supports confirmation of the Combined Disclosure Statement and Plan and urges all creditors to vote to accept the Combined Disclosure Statement and Plan.]

Although proposed jointly for administrative purposes, the Combined Disclosure Statement and Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code.

The classifications of Claims and Interests set forth in Article II of the Combined Disclosure Statement and Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Combined Disclosure Statement and Plan contemplates the substantive consolidation of the Debtors solely for purposes of distributions.

The Combined Disclosure Statement and Plan reflects a comprehensive settlement reached after extensive arm's-length negotiations between and among the Debtors, the Sponsor, and the Committee. In connection with those negotiations, the Debtors ultimately entered into the Going Concern Purchase Agreement, which provides for the sale of substantially all of the Debtors' Assets on a going concern basis to the 5E Buyer. The 5E Buyer is an affiliate of 5E Advanced Materials, Inc., a publicly traded, development stage company with a market capitalization of over $100 million focused on becoming a vertically integrated global leader and supplier of refined borates, advanced boron derivative materials, and critical materials. In addition, following the successful auction of their Soda Ash Contracts held on August 25, 2026, the Debtors entered into the Soda Ash Purchase Agreement pursuant to which the Debtors sold their Soda Ash Contracts for $21.5 million to TCNA.

Together, the Asset Purchase Transactions preserve the Debtors' operations and hundreds of jobs, while also ensuring that the town of Trona, California continues to have a source of potable water. The Asset Purchase Transactions further lay the groundwork for the effective resolution of these chapter 11 cases. Collectively, the Asset Sale Transactions resulted in:

- the $21.5 million purchase price for the Debtors' Soda Ash Contracts, which consist of (a) $17 million in debt forgiveness representing the Debtors' outstanding balance under the Supply and Liquidity Agreement, (b) $4.16 million in cash consideration,

[3] Capitalized terms used herein have the meanings ascribed to them in Article I unless otherwise defined elsewhere in the Combined Disclosure Statement and Plan.

and (c) waiver of the $340 thousand termination fee under the Supply and Liquidity Agreement; and

- the purchase price consideration for the Going Concern Sale Transaction, valued at approximately $34 million as of September 22, 2026, which consists of (a) $3,357,906 in cash (which includes $357,906 attributable to Prepaid Expenses), (b) 8,300,000 shares of publicly traded common stock of 5E Advanced Materials, Inc. (representing approximately $24.4 million based on the September 22, 2026 closing price), (c) a $6,220,000 senior unsecured promissory note bearing a 14.5% payable-in-kind interest, and (d) the assumption of certain liabilities and cure costs. The Going Concern Sale Transaction includes financial support from the Sponsor consisting of (x) $10.0 million in senior secured credit facility debt bearing 8% payable-in-kind interest with a 9-month maturity and subject to a $1.0 million fee payable upon the earlier of repayment in full or maturity; and (y) financial backing for certain surety bonds for up to 12 months, worth approximately $7.5 million.

Creditors whose contracts or other liabilities are assumed by the Buyers or their designee pursuant to the Asset Purchase Agreements are Unimpaired and are not being solicited to vote on this Combined Disclosure Statement and Plan and will not receive a distribution from the Debtors thereunder. Creditors whose unsecured claims are not assumed pursuant to the Soda Ash Purchase Agreement or the Going Concern Purchase Agreement are Impaired and will receive a Distribution on account of their Allowed Claims, and any such unsecured creditors are being solicited to vote on this Combined Disclosure Statement and Plan as set forth herein.

The Combined Disclosure Statement and Plan is a liquidating chapter 11 plan ~~predicated upon~~following the Going Concern Closing, which ~~is expected to occur on or around~~occurred on October 1, 2026, and the Soda Ash Closing, which occurred on September 11, 2026. After the Effective Date, after completing all remaining ordinary course business operations, fiduciary obligations, and the administration of this Combined Disclosure Statement and Plan, the Wind-Down Debtors will continue in existence under the direction of the Wind-Down Trustee until dissolved, for the limited purposes set forth in Article IX, and the GUC Liquidating Trust will administer the GUC Liquidating Trust Assets for the benefit of Holders of Allowed General Unsecured Claims. Upon completion of the Wind Down and the administration of the GUC Liquidating Trust in accordance with Article IX, the GUC Liquidating Trust will be terminated in accordance with the GUC Liquidating Trust Agreement. Each Holder of a Class 3 Claim or Class 4 Claim against any Debtor entitled to vote to accept or reject the Combined Disclosure Statement and Plan is encouraged to read the Combined Disclosure Statement and Plan in its entirety before voting.

Subject to the restrictions or modifications as set forth in Bankruptcy Code section 1127, Bankruptcy Rule 3019, and in this Combined Disclosure Statement and Plan, the Debtors expressly reserve the right to alter, amend, modify, or supplement (one or more times), revoke, or withdraw the Combined Disclosure Statement and Plan one or more times before its substantial consummation in accordance with the terms hereof (including all appendices, exhibits, schedules, and supplements (including the Plan Supplement)). Other agreements and documents may supplement this Plan; such items have been or may be filed with the Bankruptcy Court.

The purpose of the Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors who have the right to vote on the Plan so that they can make informed decisions in doing so. Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot together with this Combined Disclosure Statement and Plan to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

The Disclosure Statement includes information pertaining to the Debtors' prepetition business operations and financial history and the events leading up to the Chapter 11 Cases. In addition, the Disclosure Statement describes the effects of confirmation of the Plan, certain risk factors associated with the Plan, the way Distributions will be made, the confirmation process, and confirmation requirements.

On [●], 2026, the Bankruptcy Court entered the Solicitation Order (D.I. [__]). Entry of the Solicitation Order does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration proposed thereunder. The Bankruptcy Court's interim approval of the Disclosure Statement contained herein does indicate, however, that the Bankruptcy Court has determined on an interim basis that the Disclosure Statement contains adequate information to permit a Holder entitled to vote on the Plan to make an informed judgment in doing so. The adequacy of the Disclosure Statement is still subject to final approval by the Bankruptcy Court at the Confirmation Hearing.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

The Debtors believe that confirmation and Consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors. The Plan provides for an equitable Distribution to Holders of Claims and the compromise and settlement of certain Claims and controversies among the Debtors and their key stakeholders. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in the loss of significant value (and a corresponding reduction in the Distributions to Holders of Claims in certain Classes), and the potential for delay, litigation, and additional costs. Consequently, the Debtors urge all eligible Holders of Claims entitled to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims Agent on or before the Voting Deadline.

## PROPOSED SOLICITATION AND CONFIRMATION TIMELINE[4]

Both the nature of the Debtors' business and the milestones under the Debtors' DIP Credit Agreement make an efficient chapter 11 process essential. Subject to court approval, the Debtors intend to solicit votes to accept or reject the Combined Disclosure Statement and Plan

[4] The proposed dates in the chart above are subject to the Court's availability and approval.

and proceed in accordance with the following timeline, which is consistent with the milestones

below and the Bankruptcy Code.

| DESCRIPTION | DEADLINE |
|---|---|
| Voting Procedures Hearing Objection Deadline | October 6, 2026 at 4:00 p.m. (ET) |
| Voting Procedures and Interim Disclosure Statement Hearing | October ~~13~~15, 2026 at ~~10:00 a.m~~11:00 a.m. (ET) |
| Voting Record Date | October ~~13~~15, 2026 |
| Deadline to object to Claims for voting purposes | October 26, 2026 |
| Deadline to Mail Solicitation Packages / Commencement of Solicitation ~~Commences~~ | Within three (3) business days after entry of the Interim Approval and Procedures Order |
| Deadline to File Plan Supplement | November ~~6~~9, 2026 |
| Deadline to File Rule 3018 Motions | November ~~7~~9, 2026 at 4:00 p.m. (ET) |
| Deadline for Responses to Rule 3018 Motions | November ~~13~~16, 2026 |
| Voting Deadline | November ~~13~~16, 2026 at 4:00 p.m. (ET) |
| Deadline to file and serve Objections to Combined Disclosure Statement and Plan Confirmation and/or final approval of the adequacy of the Disclosures | November ~~13~~16, 2026 at 4:00 p.m. (ET) |
| Deadline to file: (1) Voting Tabulation Affidavit; (2) Confirmation Brief; (3) reply to any objection to Confirmation; or (4) reply to any objection to Rule 3018 Motion | November ~~16~~19, 2026 at 4:00 p.m. (ET) |
| Combined Hearing on final approval of Disclosures and Confirmation of the Combined Disclosure Statement and Plan | November ~~18~~23, 2026 at ~~2:00 p.m~~10:30 a.m. (ET) |

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**

1.1 "503(b)(9) Claims" means Claims arising under section 503(b)(9) of the Bankruptcy Code Filed against any of the Debtors.

1.2 "5E" means 5E Advanced Materials, Inc. and its Affiliates.

1.3 "5E Buyer" means 5E SVM, LLC.

1.4 "Administrative Expense Claim" means any right to payment constituting actual and necessary costs and expenses of preserving the Estates under Bankruptcy Code sections 503(b) and 507(a)(2) including, without limitation: (a) Professional Fee Claims, (b) any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code, and (c) all Claims arising under Bankruptcy Code section 503(b)(9)

1.5 "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.6 "Allowed" means, with respect to a Claim in a specified Class, an Allowed Administrative Claim, or a Tax Claim, such Claim is: (a) either (i) scheduled by the Debtors in their Schedules of assets and liabilities in a liquidated amount and not scheduled as contingent or disputed and not superseded by a Proof of Claim or subject to setoff; or (ii) asserted in the Chapter 11 Cases by a Proof of Claim which has been timely filed, or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules, or any applicable order of the Bankruptcy Court, or late filed with leave of Court; and (b) either (i) not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules, and/or applicable orders of the Bankruptcy Court; or (ii) that has otherwise been allowed by a Final Order or pursuant to this Plan. An Allowed Claim: (y) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed when the context so requires; and (z) shall be net of any valid setoff amount, which amount shall be deemed to have been set off in accordance with the provisions of this Plan; provided that any Claim based on or arising out of a liability of a Debtor that was assumed by the Buyers (or their designee) pursuant to either of the Asset Purchase Agreements shall automatically be deemed withdrawn on the Effective Date and the Claims Agent shall be directed to expunge any such Claim from the Claims Register in accordance with Article XIII. "Allowed," "Allow," "Allowance," and "Allowing" shall have correlative meanings.

1.7 "Ankura" means Ankura Consulting Group, LLC as restructuring advisor to the Debtors.

1.8 "Asset Purchase Agreements" means, collectively, the Going Concern Purchase Agreement and the Soda Ash Purchase Agreement.

1.9 "Asset Sale Transactions" means, collectively, the Going Concern Sale Transaction and the Soda Ash Sale Transaction.

1.10 "Assets" means all of the Debtors' right, title, and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

1.11 "Assumption Schedule" means the schedule of any Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Debtors on the Effective Date pursuant to the Plan and section 365 of the Bankruptcy Code, as approved by the DIP Lender and in consultation with the Committee, which will be included in the Plan Supplement, as may be amended, modified, or supplemented from time to time in accordance with the Plan and Confirmation Order.

1.12 "Avoidance Actions" means any and all Causes of Action and rights to recover or avoid transfers or to avoid any lien of the Estates under chapter 5 of the Bankruptcy Code or applicable state law or otherwise.

1.13 "Ballot" means the voting form approved by the Bankruptcy Court and distributed to each Holder of an Impaired Claim entitled to vote on the Plan, on which the Holder is to indicate acceptance or rejection of the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Combined Disclosure Statement and Plan.

1.14 "Banker's Fees" means the aggregate amount of fees and expenses payable to the Debtors' financial advisor, Lazard, in connection with the transactions contemplated by the Asset Purchase Agreements, as authorized pursuant to the Sale Orders entered by the Bankruptcy Court at (D.I. 181, 341).

1.15 "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these Chapter 11 Cases.

1.16 "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases or, if such Court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases in lieu of the United States Bankruptcy Court for the District of Delaware.

1.17 "Bankruptcy Exception" means the exception defined in Internal Revenue Code § 108(a).

1.18 "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

1.19 "Bar Date" means, with respect to any particular Claim or Interest, the applicable date set by the Bankruptcy Court as the last day for filing a proof of claim, request for allowance of an Administrative Claim or proof of Interest against the Debtors in these Chapter 11 Cases, as set forth in the Bar Date Order.

1.20 "Bar Date Order" means the Order: (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code; (II) Setting a Bar Date for the Filing of Proofs of Claim by Governmental Units; (III) Setting Bar Dates for the Filing of Requests for Allowance of Administrative Expense Claims; (IV) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date; (V) Approving the Form of and Manner for Filing Proofs of Claim; (VI) Approving of Notice Bar Dates; and (VII) Granting Related Relief (D.I. 398).

1.21 "Board" means the Debtors' current and former directors, managers, or members, as applicable.

1.22 "Budget" shall have the meaning ascribed to it in the Final DIP Order.

1.23 "Business Day" means any day, other than a Saturday, Sunday, or a legal holiday (as used in Bankruptcy Rule 9006(a)).

1.24 "Buyer Nirma Release" has the meaning set forth in the Going Concern Purchase Agreement.

1.25 "Buyers" means the TCNA as to the Soda Ash Sale Transaction and the 5E Buyer as to the Going Concern Sale Transaction.

1.26 "Cash" means legal tender of the United States of America or its equivalents,

including but not limited to bank deposits, checks, and other similar items.

1.27 "Cash Consideration" means the payment by Buyer pursuant to the Going Concern Purchase Agreement in an aggregate amount equal to $3,357,906, which includes $357,906 to account for certain prepaid expenses.

1.28 "Cause of Action" means any claims, Claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of state, federal, or other law. For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code (including Avoidance Actions); and (d) all other claims or causes of action, including those for fraud, mistake, duress, and usury.

1.29 "Challenge" means any challenge to the validity, priority, extent, enforceability, amount, seniority, avoidability, or perfection of debts owed to or liens or other interests granted in favor of the party asserting such debts, liens, or other interests.

1.30 "Challenge Deadline" has the meaning set forth in the Final DIP Order, as modified or supplemented by the Committee Settlement.

1.31 "Chapter 11 Cases" means the Chapter 11 Cases initiated by the Debtors' filing on the Petition Date of voluntary petitions for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code, jointly administered under the caption In re Searles Valley Minerals, Inc. et al., Case No. 26-10966 (BLS).

1.32 "CITSS" means compliance instrument tracking system service.

1.33 "Claim" shall have the meaning set forth in Bankruptcy Code section 101(5).

1.34 "Claims Agent" means the Debtors' claims and noticing agent appointed in the Chapter 11 Cases, Stretto Inc.

1.35 "Claims Register" means the official register of Claims maintained on https://www.pacer.gov/.

1.36 "Class" means any group of substantially similar Claims or Interests classified by the Combined Disclosure Statement and Plan pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

1.37 "COD Income" means income from discharge of indebtedness as defined by Internal Revenue Code §61(a)(11).

1.38 "Committee" means the official committee of unsecured creditors appointed by

the U.S. Trustee in these Chapter 11 Cases (D.I. 104, as amended by D.I. 109 and D.I. 351), pursuant to section 1102(a) of the Bankruptcy Code, as it may be reconstituted from time to time.

1.39 "Committee Professionals' Budget" means the aggregate DIP Budget of $3,000,000 for all Committee Professionals for the period between the Petition Date and November ~~13~~16, 2026.

1.40 "Committee Settlement" means the settlement reached among the Debtors, the DIP Lender, the Committee, and the Sponsor in connection with the Going Concern Sale Transaction, the terms of which are reflected on the record of the hearing on approval of the Going Concern Sale

1.41 "Company" means the Debtors and their non-Debtor subsidiaries.

1.42 "Confirmation" means confirmation of the Combined Disclosure Statement and Plan pursuant to Bankruptcy Code section 1129.

1.43 "Confirmation Date" means the date on which the Confirmation Order is entered on the Bankruptcy Court docket.

1.44 "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider (a) approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to Bankruptcy Code section 1125, and (b) confirmation of the Combined Disclosure Statement and Plan pursuant to Bankruptcy Code section 1129, as such hearing may be adjourned or continued from time to time.

1.45 "Confirmation Order" means the Order of the Bankruptcy Court confirming the Combined Disclosure Statement and Plan pursuant to Bankruptcy Code section 1129.

1.46 "Consummation" means the occurrence of the Effective Date of the Plan.

1.47 "Creditor" means any Person that is the Holder of a Claim against the Debtors.

1.48 "D&O Insurance Policies" means all insurance policies (including but not limited to any "tail policy") issued or providing coverage for liabilities against any of the Debtors' D&Os, and all agreements, documents, or instruments relating thereto.

1.49 "D&Os" means all current and former directors, officers, managers and members of any of the Debtors.

1.50 "Debtors" means Searles Valley Minerals Inc., Trona Railway Company LLC, and Searles Domestic Water Company LLC.

1.51 "Demand Line Facility" means that certain financing facility extended to SVM by the Prepetition Secured Lender pursuant to a facility letter dated as of August 29, 2025 among Searles Valley Minerals, Inc. and HSBC Bank USA, National Association (as modified, amended, amended and restated, or supplemented from time to time).

1.52 "DIP Credit Agreement" means that certain Debtor-in-Possession Credit Agreement, dated June 15, 2026, by and among Searles Valley Minerals Inc. as DIP Borrower, Trona Railway Company LLC and Searles Domestic Water Company LLC as DIP Guarantors,

and Karnavati Holdings, Inc., as DIP Lender, as the same may be modified, amended, or supplemented from time to time, in accordance with the terms thereof, and attached to the DIP Motion as Exhibit 2.

1.53 "DIP Facility" means the senior secured superpriority loan facility provided to the Debtors pursuant to the terms of the DIP Credit Agreement authorized by the Final DIP Order and any other applicable order of the Bankruptcy Court.

1.54 "DIP Facility Claims" means all Claims asserted against the Debtors by the DIP Lender arising under that certain DIP Credit Agreement, including, without limitation, principal, accrued and unpaid interest, any reimbursement obligations (contingent or otherwise), all fees, expenses, and disbursements (including, without limitations, attorneys' fees, financial advisors' fees, and related expenses and disbursements incurred by, or on behalf of, the DIP Lender), indemnification obligations, all other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof.

1.55 "DIP Lender" means Karnavati Holdings, Inc.

1.56 "DIP Liens" means the senior secured superpriority liens granted to the DIP Lender in the Debtors' Assets under the Final DIP Order.

1.57 "DIP Motion" means the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing; (B) Continue to Access Financing under Its Receivables Facility; and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Lender; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing and (V) Granting Related Relief (D.I. 15).

1.58 "DIP Parties" means SVM, as the borrower, and TRC and SDWC, as the guarantors, under the DIP Credit Agreement.

1.59 "Disallowed" means with respect to any Claim or portion thereof, any Claim against any of the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn, in whole or in part, by the Holder thereof; (iii) if listed in the Schedules as zero or as disputed, contingent, partially liquidated or unliquidated and in respect of which a Proof of Claim has not been timely Filed or deemed timely Filed; (iv) has been reclassified, expunged, subordinated, or estimated to the extent that such reclassification, expungement, subordination, or estimation results in a reduction in the Filed amount of any Proof of Claim or proof of Interest; (v) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code as determined by a Final Order; (vi) has been (x) paid or required to be paid by a purchaser pursuant to a Bankruptcy Court-approved purchase agreement or order approving a sale of certain of the Debtors' assets during the course of these Chapter 11 Cases (including the Sale Orders and Asset Purchase Agreements), except as expressly set forth in the Sale Orders, or (y) listed in the Schedules in an amount greater than zero and as non-contingent, liquidated, and undisputed and been paid by the Debtors (a) after the Petition Date pursuant to an order of the Bankruptcy Court or (b) before the Petition Date and was inadvertently listed in the Schedules, and with respect to such Claim, a notice of satisfaction of Claim has been filed or will be filed with respect to such Claim and the Holder of such Claim fails to object to or respond to such notice of satisfaction; and (vii) where the Holder of a Claim is a Person or Entity from which

property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such Property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code.

1.60 "Disputed Claim" means any Claim or Interest (i) which has not yet been Allowed or Disallowed in accordance with the terms of this Plan or (ii) held by a Person or Entity against whom or which any of the Debtors, the GUC Liquidating Trust or the Wind-Down Trust has commenced a proceeding, including an objection to such Claim or Interest. For the purposes of this Plan, a Claim shall be considered a Disputed Claim in its entirety before the time that an objection has been or may be filed with respect to such Claim if: (a) the amount or classification of the Claim specified in a relevant Proof of Claim exceeds the amount or classification of any corresponding Claim scheduled in the Debtors' Schedules of assets and liabilities; (b) any corresponding Claim scheduled by the Debtors has been scheduled as disputed, contingent or unliquidated; (c) no corresponding Claim has been scheduled by the Debtors in their Schedules of assets and liabilities; or (d) the Claim was not timely or properly Filed.

1.61 "Disputed Claims Reserve" means any reserve established and maintained by the Wind-Down Trustee for the benefit of Holders of Disputed Non-GUC Claims in accordance with Section 13.3.

1.62 "Disputed GUC Claims Reserve" means GUC Liquidating Trust Assets allocable to Disputed Claims.

1.63 "Disputed Non-GUC Claims" means Disputed Claims that are Non-GUC Claims.

1.64 "Disputed Wind-Down Claims Reserve" means Wind-Down Trust Assets allocable to Disputed Claims.

1.65 "Distribution" means the distribution of Cash or other property, as the case may be, in accordance with this Plan in respect of the Holders of Allowed Claims.

1.66 "Distribution Address" means the address for a Holder set forth in a Proof of Claim, as amended or supplemented. If no Proof of Claim is filed with respect to a particular Claim, such defined term means the address for the Holder set forth in the Debtors' Schedules.

1.67 "Distribution Date" means: (i) with respect to the GUC Liquidating Trust, the date determined by the GUC Liquidating Trustee when Distributions will be made from the GUC Liquidating Trust under the Plan, and (ii) with respect to the Wind-Down Trust, the date determined by the Wind-Down Trustee when Distributions will be made from the Wind-Down Trust under the Plan.

1.68 "Distribution Record Date" means the record date for purposes of making Distributions under this Plan on account of Allowed Claims, which shall be the Confirmation Date.

1.69 "Effective Date" means, with respect to each Debtor, the date that the Plan becomes effective, which shall be after all the conditions specified in Section 14.2 of the Plan

have been satisfied or waived (to the extent waivable).

1.70 "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.71 "Estate" or "Estates" means individually or collectively, the estate of each Debtor created under section 541 of the Bankruptcy Code on the Petition Date.

1.72 "Estate Causes of Action" means any and all Causes of Action of the Debtors, including, but not limited to, (1) the Avoidance Actions; (2) commercial tort claims as defined in Article 9 of the UCC, other than Claims or Causes of Action included in "Transferred Assets" in the Going Concern Purchase Agreement; (3) Causes of Action against any Person whether sounding in tort, contract, equity, statute or any other legal or equitable theory of recovery; (4) the non-exclusive right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Bankruptcy Code section 505; (5) any claims for veil-piercing, alter ego liability, or de facto merger, and (6) all other rights, Claims or Causes of Action. Estate Causes of Action shall include, for the avoidance of doubt, direct or derivative Claims or Causes of Action against (a) any and all current and former officers, directors, shareholders, members, managers, employees, Affiliates, or insiders of the Debtors, including but not limited to for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, contract, tort, equity or under and pursuant to any D&O or fiduciary insurance policies (including for bad faith) maintained by the Debtors; (b) any other Person who transacted business with the Debtors or engaged in conduct with the parties identified in subsection (a) of this paragraph to the detriment of the Debtor; and (c) any Affiliates of the Persons within subsections (a) and (b) of this paragraph. Estate Cause of Action shall not include Causes of Action that are (i) released pursuant to the Going Concern Purchase Agreement, or (ii) Purchased Assets.

1.73 "Excluded Assets" means Assets of the Debtors that are not Purchased Assets or GUC Liquidating Trust Assets.

1.74 "Exculpated Parties" means the following, in their respective capacities as such: (a) the Debtors; (b) each current or former director or officer of any Debtor who served in such capacity at any time between the Petition Date and the Effective Date; (c) all Professionals retained by the Debtors or the Committee during the Chapter 11 Cases, (d) the Committee and each member of the Committee; and (e) the Wind-Down Trust; (f) the Wind-Down Trustee; (g) the GUC Liquidating Trust; (h) the GUC Liquidating Trustee; and (i) the Related Parties for each Entity in the foregoing clauses (c) and (d) to the extent they are estate fiduciaries.

1.75 "Executory Contract" means a contract to which a Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.76 "Extended Committee Budget" means $500,000 provided under the Budget to fund the Committee's retained Professionals for the period of September 11, 2026 through and including November 1316, 2026.

1.77 "Extended Committee Budget Savings" means the amount, if any, by which the aggregate allowed fees and expenses of the Committee's Professionals for the period of September 11, 2026 through and including November 13, 2026 are less than $500,000.any unused portion of the Extended Committee Budget.

1.78 "Fee Application" means an application for allowance and payment of a Professional Fee Claim.

1.79 "File," "Filed," or "Filing" means, respectively, file, filed, or filing with the Bankruptcy Court or Stretto in these Chapter 11 Cases.

1.80 "Final Administrative Claims Bar Date" means the date that is thirty days following the Effective Date.

1.81 "Final Decree" means the order entered pursuant to Bankruptcy Code section 350, Bankruptcy Rule 3022, and Local Rule 5009-1 closing the Chapter 11 Case.

1.82 "Final DIP Order" means the Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Lender, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief (D.I. 231), entered by the Bankruptcy Court on July 22, 2026.

1.83 "Final Order" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (b) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 may be filed with respect to such order.

1.84 "General Bar Date" means October 21, 2026, as the deadline for each person or entity, other than a Governmental Unit, to file a Proof of Claim in respect of any prepetition claim against the Debtors, including, without limitation, any secured claim, unsecured claim, priority claim, or claim asserted under section 503(b)(9) of the Bankruptcy Code, unless otherwise provided in this Order.

1.85 "General Unsecured Claims" means any unsecured nonpriority Claim against the Debtors other than Subordinated Claims. General Unsecured Claims shall not include Claims that are not Allowed or are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise. General Unsecured Claims include Intercompany Claims; provided, however, that any Claims of the Prepetition Secured Lender, the Sponsor, the DIP Lender, and any of their respective Affiliates and Related Parties (other than SVME) shall not be General Unsecured Claims.

1.86 "Going Concern Closing" means the closing of the Going Concern Sale Transaction in accordance with the Going Concern Purchase Agreement.

1.87 "Going Concern Purchase Agreement" means that certain asset purchase

agreement dated as of September 14, 2026 by and between Searles Valley Minerals Inc., Trona Railway Company LLC, and Searles Domestic Water Company LLC, as Sellers, the 5E Buyer, and 5E Advanced Materials, Inc., and the Sponsor, as filed in the Chapter 11 Cases at D.I. 399-1, including all schedules and exhibits thereto (as may be amended, supplemented, or otherwise modified from time to time).

1.88 "Going Concern Sale Order" means the Order (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief (D.I. 399).

1.89 "Going Concern Sale Transaction" means the sale of the Debtors' Assets to the 5E Buyer pursuant to the Going Concern Sale Order.

1.90 "Governmental Bar Date" means December 14, 2026, the date established by the Bankruptcy Court pursuant to the Bar Date Order for the submission of Proofs of Claim by Governmental Units against the Debtors.

1.91 "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.92 "GUC Chapter 5 Actions" means all Avoidance Actions of the Debtors or their Estates, excluding: (i) all Causes of Action sold or released pursuant to the Going Concern Purchase Agreement, (ii) any causes of action arising under section 549 of the Bankruptcy Code (or under section 550 of the Bankruptcy Code related thereto), and (iii) any Avoidance Actions against the Prepetition Secured Lender or any of its Affiliates or Related Parties.

1.93 "GUC Liquidating Trust" means the trust established on the Effective Date for the sole benefit of Holders of Allowed General Unsecured Claims.

1.94 "GUC Liquidating Trust Accounts" means one or more trust accounts to be established an maintained in one or more federally insured domestic banks in the name of the GUC Liquidating Trust, as set forth herein.

1.95 "GUC Liquidating Trust Agreement" means the trust agreement, in form and content reasonably acceptable to the Debtors, the Committee and the DIP Lender, to be filed as part of the Plan Supplement, which will, among other things: (a) establish and govern the GUC Liquidating Trust; (b) set forth the respective powers, duties, and responsibilities of the GUC Liquidating Trustee; and (c) provide for the administration of General Unsecured Claims and for Distributions to Holders of Allowed General Unsecured Claims in accordance with Article XII hereof.

1.96 "GUC Liquidating Trust Assets" means (i) the GUC Liquidating Trust Cash, and (ii) the GUC Chapter 5 Actions.

1.97 "GUC Liquidating Trust Cash" means: (i) the $3,000,000 received by the Debtors pursuant to section 2.9(f) of the Going Concern Purchase Agreement; and (ii) the Extended Committee Budget Savings, if any.

1.98 "GUC Liquidating Trust Expenses" means any and all fees, costs, and expenses

incurred by the GUC Liquidating Trust or the GUC Liquidating Trustee (or any professional or other Person retained by the GUC Liquidating Trustee) on or after the Effective Date in connection with any of their duties under the Plan and the GUC Liquidating Trust Agreement, including, without limitation, any administrative fees, attorneys' fees and expenses, insurance fees, taxes, fees payable to the Office of the U.S. Trustee in the Chapter 11 Cases on account of the disbursements and other payments by the GUC Liquidating Trust to the extent that such disbursements and other payments are found by a court of competent jurisdiction to be "disbursements" that are subject to UST Trustee Fees, and any allowed fees and expenses of Committee Professionals in the Chapter 11 Cases in excess of ~~$3,000,000~~the Committee Professionals' Budget, in the aggregate.

1.99 "GUC Liquidating Trustee" means the person, to be disclosed in the Plan Supplement, who will be appointed as of the Effective Date as trustee of the GUC Liquidating Trust and shall be responsible for the duties, powers, and affairs of the GUC Liquidating Trust in accordance with the GUC Liquidating Trust Agreement, which person shall be selected by the Committee and disclosed, together with disclosure of terms of compensation, in the Plan Supplement.

1.100 "GUC Liquidating Trustee Professionals" means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals retained by the GUC Liquidating Trustee (in their capacities as such).

1.101 "GUC Oversight Board" means an oversight board of the GUC Liquidating Trust.

1.102 "Holder" or "Holders" means a Person or an Entity holding a Claim or Interest.

1.103 "Impaired" means, with respect to any Class, a Class that is impaired within the meaning of Bankruptcy Code sections 1123(a)(4) and 1124.

1.104 "Insider" has the meaning set forth in section 101(31) of the Bankruptcy Code.

1.105 "Insurance Policies" means all insurance policies and all surety bonds and related agreements of indemnity that have been issued at any time or provide coverage, benefits, or proceeds to any of the Debtors and all agreements, documents, or instruments relating thereto, including the D&O Insurance Policies.

1.106 "Insured Claim" means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' Insurance Policies.

1.107 "Insurer" means any company or other entity that issued an Insurance Policy, any third-party administrator, and any respective predecessors and/or Affiliates thereof.

1.108 "Intercompany Claims" means any Claim held by a Debtor against another Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Debtor with respect to the other Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against the other Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against the other Debtor.

1.109 "Interest" means any "equity security" in the Debtors as defined in Bankruptcy Code section 101(16), including, without limitation, all issued, unissued, authorized or

outstanding ownership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

1.110 "Interim Administrative Claims Bar Date" means October 21, 2026.

1.111 "Interim Approval and Procedures Order" means the order of the Bankruptcy Court conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit the Combined Disclosure Statement and Plan.

1.112 "Interim Compensation Procedures Order" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* (D.I. 183), entered by the Bankruptcy Court on July 13, 2026.

1.113 "Interim DIP Order" means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Lender, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. 59), entered by the Bankruptcy Court on June 17, 2026.

1.114 "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

1.115 "IRS" means the United States Internal Revenue Service.

1.116 "KHI" means Karnavati Holdings, Inc.

1.117 "Lazard" means, collectively, Lazard Frères & Co. and Lazard & Co, Limited, as investment banker to the Debtors.

1.118 "Lien" means: (a) a judicial lien as defined in section 101(36) of the Bankruptcy Code; (b) a lien as defined in section 101(37) of the Bankruptcy Code; (c) a security interest as defined in section 101(51) of the Bankruptcy Code; (d) a statutory lien as defined in section 101(53) of the Bankruptcy Code; and (e) any other lien, interest, charge, or encumbrance.

1.119 "Lienholder Reserve" means any proceeds of the Asset Sale Transactions held as adequate protection for Process Equipment Inc. in accordance with any Bankruptcy Code order or any other resolution of the Process Limited Objection upon the Going Concern Closing.

1.120 "Local Rules" means the Local Rules of the United States Bankruptcy Court for the District of Delaware.

1.121 "Nirma Buyer Release" has the meaning set forth in Going Concern Purchase Agreement.

1.122 "Nirma Released Parties" has the meaning set forth in the Going Concern Purchase Agreement.

1.123 "Non-GUC Chapter 5 Actions" means all Debtor causes of action arising under

Chapter 5 of the Bankruptcy Code that are not GUC Chapter 5 Actions.

1.124 "Non-GUC Claims" means all Claims other than General Unsecured Claims.

1.125 "Note Consideration" means the consideration provided pursuant to that certain senior unsecured promissory note in the original principal amount of $6,220,000 in accordance with the terms and conditions set forth in the term sheet attached as Exhibit A-2 to the Going Concern Purchase Agreement.

1.126 "Opt-Out Election" means the election by a Holder of a Claim or Interest to opt out of the release of the non-Debtor Released Parties under Section 10.7 of the Plan (but not any other releases, exculpations, or injunctions), made by either (i) checking the "opt out" box on the Ballot submitted in accordance with the instructions set forth on it or (ii) submitting an Opt-Out Form in accordance with the instructions set forth on it.

1.127 "Opt-Out Form" means the form included with the Plan voting solicitation materials that a Holder of a Claim or Interest may use to make an Opt-Out Election.

~~1.127~~1.128 "Other Secured Claims" means any Secured Claim other than the DIP Facility Claims or Prepetition Loan Claims.

~~1.128~~1.129 "Person" is defined in section 101(41) of the Bankruptcy Code.

~~1.129~~1.130 "Permits" means those certain permits and licenses held by the Debtors, if any, that the Debtors will be required to maintain in effect after the Effective Date pursuant to the terms of the Asset Purchase Agreements.

~~1.130~~1.131 "Permit Transfer Date" means, for each Debtor, the date on which such Debtor has transferred to the Buyer, or its designee, all Permits or the date on which the Buyer confirms in writing to such Debtor that it requires no further Permits to be transferred to it by such Debtor.

~~1.131~~1.132 "Petition Date" means June 15, 2026, the date the Debtors commenced the Chapter 11 Cases.

~~1.132~~1.133 "Plan Documents" means the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the Consummation of this Plan, including, without limitation, the documents to be included in the Plan Supplement, and all exhibits to the Plan and the Disclosure Statement.

~~1.133~~1.134 "Plan Supplement" means the supplemental appendix to this Plan that is filed with the Bankruptcy Court and contains, among other things: (a) the form of GUC Liquidating Trust Agreement; (b) the form of Wind-Down Trust Agreement; (c) the Assumption Schedule, if any;
(d) the identity and terms of compensation of the ~~trustees of the~~ GUC Liquidating ~~Trust and~~Trustee and GUC Oversight Board and the Wind-Down ~~Trust~~Trustee; and (e) any schedules, lists, or documents that supplement this Plan and are identified as part of the Plan Supplement.

~~1.134~~1.135 "Prepetition Loan Claims" means all Claims asserted against the Debtors by the Prepetition Secured Lender arising under the Prepetition Secured Facilities, including,

without limitation, principal, accrued and unpaid interest, fees, expenses, and obligations in respect of letters of credit.

~~1.135~~1.136 "Prepetition Secured Facilities" means the Demand Line Facility and the Receivables Facility.

~~1.136~~1.137 "Prepetition Secured Lender" means HSBC Bank USA, National Association.

~~1.137~~1.138 "Priority Claims" means any Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than Administrative Expense Claims and Priority Tax Claims.

~~1.138~~1.139 "Priority Tax Claims" means Claims of a Governmental Unit against any Debtor entitled to priority pursuant to Bankruptcy Code section 507(a)(8) or specified section of Bankruptcy Code section 502(i).

~~1.139~~1.140 "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class or other Classes entitled to share in the same recovery.

~~1.140~~1.141 "Process" means Process Equipment, Inc. dba Process Baron.

~~1.141~~1.142 "Process Limited Objection" means the *Limited Objection by Process Equipment, Inc. to Sale and Disposition of Sale Proceeds* (D.I. 292).

~~1.142~~1.143 "Professional" or collectively "Professionals," means any professional Person or Entity employed in these Chapter 11 Cases by Bankruptcy Court order pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code.

~~1.143~~1.144 "Professional Fee Claims" means a Claim for compensation or reimbursement of expenses of a Professional pursuant to section 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with the Chapter 11 Cases. "Professional Fee Claim" does not include any

Claim for compensation or reimbursement of expenses related to services rendered after the Effective Date by the GUC Liquidating Trustee Professionals or the Wind-Down Trustee Professionals.

~~1.144~~1.145 "Professional Fee Claims Bar Date" means the date that is thirty (30) days after the Effective Date.

~~1.145~~1.146 "Professional Fees Escrow Account" means the professional fee escrow account created pursuant to the Final DIP Order and funded pursuant thereto and the Budget for the purpose of payment of Allowed Professional Fee Claims. For the avoidance of doubt, the Professional Fees Escrow Account, and all funds held therein, are (and shall be deemed) held in trust exclusively for the benefit of the Professionals and shall be available only to satisfy Professional Fee Claims (to the extent unpaid).

~~1.146~~1.147 "Proof of Claim" means a proof of Claim filed against any of the Debtors in these Chapter 11 Cases.

~~1.147~~1.148 "Purchase Price" means the aggregate consideration for the purchase, sale, assignment, and conveyance of the Assets transferred pursuant to the Going Concern Purchase Agreement, which consists of (a) the Cash Consideration, (b) the Stock Consideration, (c) the Note Consideration, and (d) the assumption of certain assumed liabilities, each in accordance with the Going Concern Purchase Agreement.

~~1.148~~1.149 "Purchased Assets" means Assets purchased pursuant to the Asset Purchase Agreements.

~~1.149~~1.150 "Receivables Facility" means that certain credit facility extended to SVM by the Prepetition Secured Lender pursuant to the Recourse Receivables Purchase Agreement, dated as of March 29, 2024 among Searles Valley Minerals, Inc. and HSBC Bank USA, National Association (as modified, amended, amended and restated, or supplemented from time to time), including as continued in effect during the Chapter 11 Cases pursuant to the Final DIP Order.

~~1.150~~1.151 "Rejection Claims" means any Claim arising from, or relating to, the rejection of an executory contract or unexpired lease pursuant to Bankruptcy Code section 365(a) by any of the Debtors, as limited, in the case of a rejected unexpired lease, by Bankruptcy Code section 502(b)(6).

~~1.151~~1.152 "Related Parties" mean, collectively, with respect to any Person or Entity, such Person's or Entity's current or former affiliates, directors, managers, officers, members, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, directors, managers, owners, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, investment bankers, consultants, representatives, each in their respective capacities as such. "Related Parties" means the collective plural of Related Party.

~~1.152~~1.153 "Release by Debtors" means the release given by the Debtors, their Estates, the Wind-Down Debtors, and the GUC Liquidating Trust to the Released Parties as set forth in Article 10.6.

~~1.153~~1.154 "Released Parties" means, collectively, and in each case in its capacity as such: (a) the Debtors and their Estates; (b) the current and former employees, D&Os, agents, representatives, advisors, attorneys, investment bankers, and financial advisors of the Debtors, (c) the Wind-Down Debtors; (d) the Wind-Down Trustee; (e) the DIP Lender; (f) the Prepetition Secured Lender; (g) the Nirma Released Parties; (h) the GUC Liquidating Trust and the GUC Liquidating Trustee; (i) the Committee and each of the members of the Committee in its respective capacity as a member of the Committee; (j) all Professionals retained by the Committee and any of its members in the Chapter 11 Cases; and (k) each Related Party of each Entity in clauses (a) through (j).

~~1.154~~1.155 "Releasing Parties" means, collectively, and in each case in its capacity as such: (a) Holders of Claims; (b) the Committee and the members of the Committee in their capacity as members of the Committee; and (c) each Related Party of each Entity in clauses (a) through (c) for which such Entity is legally entitled to bind such Related Party to the

releases contained herein; *provided*, that the following shall not be a Releasing Party: (i) any Holder of a Claim or Interest in a Class that is deemed to reject this Combined Disclosure Statement and Plan pursuant to section 1126(g) of the Bankruptcy Code and that is not entitled to vote to accept or reject this Combined Disclosure Statement and Plan; (ii) any Holder of a Claim that validly makes an Opt-Out Election; (iii) any Holder of a Claim that timely objects to such releases and does not withdraw such objection before Confirmation; (iv) any Holder of a Claim that timely votes to reject the Combined Disclosure Statement and Plan; (v) the DIP Lender; or (vi) the Prepetition Secured Lender.

~~1.155~~1.156 "Retained Causes of Action" means all Causes of Action and defenses of the Debtors or the Estates existing as of the Effective Date, whether direct or derivative, whether known or unknown, in each case that are not expressly released under the Plan or Confirmation Order, including as identified in the Plan Supplement. For the avoidance of doubt, the Retained Causes of Action do not include any Causes of Action sold or released pursuant to the Going Concern Purchase Agreement or Going Concern Sale Order.

~~1.156~~1.157 "Rule 3018 Motion" means a motion for temporary allowance of a claim for the purpose of voting on this Combined Disclosure Statement and Plan.

~~1.157~~1.158 "Sale Motion" means the *Motion of Debtors for Entry of Orders (I) Approving Bidding Procedures for the Sale of Certain or All of the Debtors' Assets; (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections; (C) Approving Assumption and Assignment Procedures; (D) Scheduling a Hearing to Consider Any Proposed Sale; and (II) (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and*

*Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (D.I. 18)

~~1.158~~1.159 "Sale Orders" means, collectively, the Soda Ash Sale Order and the Going Concern Sale Order.

~~1.159~~1.160 "Schedules" mean the schedules of assets and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code as the same may have been amended, modified, or supplemented from time to time.

~~1.160~~1.161 "SDWC" means Searles Domestic Water Company LLC.

~~1.161~~1.162 "Secured Claims" means Claims which are: (a) secured by a valid and perfected lien in collateral which is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such collateral after deducting for all senior liens, (i) as set forth in this Combined Disclosure Statement and Plan, (ii) as agreed to by the Holder of such Claim, the Debtors, and the DIP Lender, or (iii) as determined by a Final Order in accordance with Bankruptcy Code section 506(a); or (b) subject to a valid right of setoff under Bankruptcy Code section 553; *provided*, that Secured Claims shall not include Prepetition Loan Claims.

~~1.162~~1.163 "Sellers" means the sellers pursuant to the Going Concern Purchase Agreement, collectively, (i) Searles Valley Minerals Inc.; (ii) Trona Railway Company LLC, and (iii) Searles Domestic Water Company LLC.

~~1.163~~1.164 "Sellers Nirma Release" has the meaning set forth in the Going Concern Purchase Agreement.

~~1.164~~1.165 "Skadden" means Skadden, Arps, Slate, Meagher & Flom LLP, as counsel to the Debtors.

~~1.165~~1.166 "Soda Ash Closing" means the closing of the Soda Ash Sale Transaction in accordance with the Soda Ash Purchase Agreement.

~~1.166~~1.167 "Soda Ash Contracts" means those soda ash contracts sold pursuant to the Soda Ash Purchase Agreement.

~~1.167~~1.168 "Soda Ash Purchase Agreement" means that certain Assignment and Assumption Agreement by and between SVM and the TCNA, dated as of August 17, 2026 (as may be amended, supplemented, or otherwise modified from time to time).

~~1.168~~1.169 "Soda Ash Sale Hearing" means the sale hearing on August 26, 2026.

~~1.169~~1.170 "Soda Ash Sale Order" means the *Order (A) Approving the Assumption and Assignment of Certain Executory Contracts Free and Clear of all Liens, Claims, and Encumbrances, and (B) Granting Related Relief* (D.I. 341).

~~1.170~~1.171 "Soda Ash Sale Transaction" means the assumption and assignment of certain of the Debtors' soda ash contracts to TCNA pursuant to the Soda Ash Sale Order.

~~1.171~~1.172 "Solicitation Materials" means all solicitation materials with respect to the Plan, including the Disclosure Statement and related Ballots, which have been approved by the Bankruptcy Court pursuant to the Solicitation Order.

~~1.172~~1.173 "Solicitation Order" means the [____] (D.I. [____]), entered by the Bankruptcy Court on [_____ ], 2026.

~~1.173~~1.174 "Solicitation Package" means the packages to be distributed to creditors for solicitation of votes on this Combined Disclosure Statement and Plan.

~~1.174~~1.175 "Solicitation Procedures" means the procedures approved by Solicitation Order by which the Debtors solicit votes to accept or reject the Plan.

~~1.175~~1.176 "Sponsor" means Nirma Limited.

~~1.176~~1.177 "Stock Consideration" means the issuance by 5E Advanced Materials, Inc. of 8,300,000 shares of publicly traded common stock of 5E Advanced Materials, Inc. pursuant to the Going Concern Purchase Agreement.

~~1.177~~1.178 "Stretto" means Stretto Inc.

~~1.178~~1.179 "Subordinated Claim" means any Claim subject to subordination, whether pursuant to a Final Order of the Bankruptcy Court, under section 510 of the Bankruptcy Code, or by written consent of the Holder of such Claim, whether such Final Order is entered, or such consent is given prior to or following the Effective Date.

~~1.179~~1.180 "Supply and Liquidity Agreement" means that certain Soda Ash Supply and Liquidity Agreement dated as of June 7, 2026, among SVM and TCNA.

~~1.180~~1.181 "Supply and Liquidity Motion" means the *Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Assume Soda Ash Supply and Liquidity Agreement and Obtain Financing Thereunder* (D.I. 12).

~~1.181~~1.182 "SVM" means Searles Valley Minerals, Inc.

~~1.182~~1.183 "SVME" means Searles Valley Minerals Europe S.A.S.

~~1.183~~1.184 "TCNA" means TATA Chemicals North America Inc.

~~1.184~~1.185 "TRC" means Trona Railway Company LLC.

~~1.185~~1.186 "Tax Code" means the Internal Revenue Code, as amended.

~~1.186~~1.187 "Tax Claim" means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

~~1.187~~1.188 "Tax Refund" means any tax refund that is refunded to the Debtors from the United States Internal Revenue Service or other taxing authority.

~~1.188~~1.189 "Treasury Regulations" means the regulations, including temporary regulations or any successor regulations, promulgated under the United States Internal Revenue Code, as amended from time to time.

~~1.189~~1.190 "TSA" means the transition services agreement contemplated by section 6.20 of the Going Concern Purchase Agreement.

~~1.190~~1.191 "Unclaimed Distribution" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

~~1.191~~1.192 "Unclaimed Distribution Deadline" means ninety (90) days after the date of the applicable Distribution.

~~1.192~~1.193 "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

~~1.193~~1.194 "Unimpaired" means, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

~~1.194~~1.195 "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

~~1.195~~1.196 "U.S. Trustee Fees" mean fees payable pursuant to 28 U.S.C. § 1930 and any interest thereon pursuant to 31 U.S.C. § 3717, to the extent

applicable to these Chapter 11 Cases.

~~1.196~~1.197 "Voting Class" means a Class whose members are entitled to vote on this Plan.

~~1.197~~1.198 "Voting Deadline" shall mean November ~~13~~16, 2026 at 4:00 p.m. (prevailing Eastern Time), the date specified in the Combined Disclosure Statement and Plan, the Ballots, the Solicitation Order, or related Solicitation Materials approved by the Bankruptcy Court as the last date for Holders of Claims entitled to vote on this Plan to submit their Ballots with respect to this Plan, as such date may be extended.

~~1.198~~1.199 "Voting Record Date" means the date established by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

~~1.199~~1.200 "Wind Down" means the wind down, liquidation, and dissolution of the Wind- Down Debtors and final administration of the Estates following the Effective Date as set forth in Article IX.

~~1.200~~1.201 "Wind-Down Amount" means the amount of $1.5-2 million, to be used to fund the Wind Down, pay the reasonable fees and expenses of the Wind-Down Trustee and the Wind- Down Debtors, and satisfy Plan obligations in accordance with the Wind-Down Budget.

~~1.201~~1.202 "Wind-Down Budget" means the budget to be Filed with the Plan Supplement, in form and content reasonably acceptable to the Debtors and the DIP Lender, governing the fees, expenses, and other amounts to be incurred by the Wind-Down Debtors and the Wind-Down Trustee in connection with the Wind-Down Transactions and satisfaction of Plan obligations.

~~1.202~~1.203 "Wind-Down Debtors" means the Debtors, on and after the Effective Date, continuing in existence for the limited purposes set forth in Article IX.

~~1.203~~1.204 "Wind-Down Transactions" means the transactions contemplated by Article IX, including the liquidation of the Wind-Down Trust Assets, administration and resolution of Non- GUC Claims, establishment and funding of the Disputed Claims Reserve, Distributions, and dissolution of the Wind-Down Debtors.

~~1.204~~1.205 "Wind-Down Trust" means the trust to be created pursuant to the Plan on the Effective Date.

~~1.205~~1.206 "Wind-Down Trust Agreement" means the trust agreement to be filed as part of the Plan Supplement, in form and content reasonably acceptable to the Debtors, the DIP Lender and the Committee, which will, among other things: (a) establish and govern the Wind-Down Trust; (b) set forth the respective powers, duties, and responsibilities of the Wind-Down Trustee and the Wind-Down Trust Oversight Board; (c) provide for the administration of all Claims asserted as administrative, priority or secured claims; and (d) provide for Distributions to Holders of Allowed Claims that are not Class 4 Claims, in accordance with Article XII hereof.

~~1.206~~1.207 "Wind-Down Trust Assets" means all property, including the Wind-Down

Amount, of the estate of each Debtor as of the Effective Date, excluding only (i) GUC Liquidating Trust Assets and (ii) any Permit that is required to be maintained in the name of one or more of the Debtors following the Effective Date under applicable law or the Asset Purchase Agreements.; Wind-Down Trust Assets shall not include shares of the Stock Consideration that were not distributed to the Prepetition Secured Lender's designee or the DIP Lender >at Closing under and as defined in <the Going Concern Purchase Agreement, which shares shall be distributed in accordance with Sections 6.4 and 7.3 of this Plan.

1.2071.208 "Wind-Down Trust Expenses" means any and all reasonable fees, costs, and expenses incurred by the Wind-Down Trust or the Wind-Down Trustee (or any professional or other Person retained by the Wind-Down Trustee) on or after the Effective Date in connection with any of their duties under the Plan and the Wind-Down Trust Agreement, including, without limitation, any administrative fees, attorneys' fees and expenses, insurance fees, and taxes, and fees payable to the United States Trustee after the Effective Date based on disbursements of the Debtors prior to the Effective Date or disbursements of the Wind-Down Trust following the Effective Date.

1.2081.209 "Wind-Down Trust Oversight Board" means the board comprising between one and three members established under the Plan and the Wind-Down Trust Agreement to oversee the Wind-Down Trustee's performance of its duties and otherwise serve the functions set forth in the Wind-Down Trust Agreement. The initial members of the Wind-Down Trust Oversight Board shall be selected by the DIP Lender and disclosed in the Plan Supplement.

1.2091.210 "Wind-Down Trustee" means the Person appointed under the Combined Disclosure Statement and Plan, identified in the Plan Supplement, to serve as the trustee of the Wind-Down Trust, with the powers, duties, and responsibilities set forth in the Plan and the Wind-Down Trust Agreement.

1.2101.211 "Wind-Down Trustee Agreement" means the agreement included in the Plan Supplement identifying the Wind-Down Trustee and setting forth the terms and conditions of the Wind-Down Trustee's retention and implementation of the Combined Disclosure Statement and Plan.

1.2111.212 "Wind-Down Trustee Professionals" means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals retained by the Wind-Down Trustee (in their capacities as such).

1.2121.213 "Wind-Down Trust Retained Causes of Action" means all Retained Causes of Action that are not GUC Chapter 5 Actions, including, but not limited to, any Non-GUC Chapter 5 Actions.

**Rules of Interpretation**

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein, unless the context requires otherwise. The words "include" and "including" shall mean "include, without limitation," or "including, without limitation," as the case may be. Whenever from the context it is appropriate, each term,

whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein but used in the Bankruptcy Code or the Bankruptcy Rules, is used as defined in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

Any reference in this Plan to a contract, instrument, release, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, release, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any reference to any entity as a holder of a Claim or Interest includes that entity's successors and assigns.

In the event of an inconsistency between the Plan and any other document other than the Confirmation Order, the terms of the Plan shall control (unless expressly stated otherwise herein or in such other document). The provisions of the Plan, the GUC Liquidating Trust Agreement, the Wind-Down Trust Agreement, and the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; provided that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern. In the event of an inconsistency between the Confirmation Order, the GUC Liquidating Trust Agreement, and the Wind-Down Trust Agreement, the terms of the Confirmation Order shall govern solely to the extent of such inconsistency.

To the extent that the Combined Disclosure Statement and Plan conflicts with or is inconsistent with the Sale Orders, the Sale Orders shall control. In the event of any inconsistency between any provision of the Combined Disclosure Statement and Plan and any provision of the Confirmation Order, the Confirmation Order shall control and take precedence.

**Appendices and Plan Documents**

All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Copies of the Plan Documents are available free of charge https://cases.stretto.com/svm/ or at www.deb.uscourts.gov, or by contacting the Claims Agent via email at TeamSVM@stretto.com with "Searles Valley Minerals – Solicitation Inquiry" in the subject line or by phone at (855) 296-3324 (U.S. and Canada) or +1 (626) 746-1263 (International).

## ARTICLE II

## <u>CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES</u>

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

### 2.1. General Rules of Classification.

The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, confirmation of the Plan, and making Distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan. Notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan of liquidation for each Debtor. Except for purposes of Distributions as set forth herein, the Plan is not premised upon and will not cause the substantive consolidation of any of the Debtors, but the Debtors and other parties in interest reserve the right to seek, in connection with confirmation of the Plan, substantive consolidation of the Debtors. For brevity and convenience, the classification and treatment of Claims and Interests have been arranged into one table set below in this section. Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including the claims reconciliation process. Actual recoveries may vary widely within these ranges, and without any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and the actual Distributions received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, the Debtors emphasize that they make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class, and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims, DIP Facility Claims, Professional Fee Claims, and Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below in Article II of the Plan. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and Distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code.

| Class | Plan Treatment | Status | Projected Recovery | Estimated Amount |
|---|---|---|---|---|
| **Class 1 – Priority Claims** | Each Holder of an Allowed Class 1 Priority Claim shall receive Cash in an amount equal to the unpaid portion of such Allowed Priority Claim. | Unimpaired Not Entitled to Vote Deemed to Accept Plan | 100% | $~~100K~~1.9M – $~~200K~~4.3M[5] |
| **Class 2 – Other Secured Claims** | Each Holder of an Allowed Class 2 Other Secured Claim shall receive, at the option of the Debtors and DIP Lender, as applicable: (i) Cash in an ~~amount equal to the Allowed amount of such Claim; (ii) its collateral in full satisfaction of its Claim; or (iii) such other treatment sufficient to render such Holder's Allowed Secured Claim Unimpaired.~~ | Unimpaired Not Entitled to Vote Deemed to ~~Accept Plan~~ | 100% | $~~200K~~400K – $~~500K~~3.4M[6] |

[5] High end of Estimated Amount of Class 1 -- Priority Claims includes Claims that the Debtors contest the validity and amount of, and the Debtors plan to actively contest these Claims. This amount also includes Claims that were asserted as secured, but that the Debtors believe to be properly classified as Priority Claims.

[6] High end of Estimated Amount of Class 2 -- Other Secured Claims includes Claims that the Debtors contest the validity and amount of, and the Debtors plan to actively contest these Claims. The Debtors have filed their objection to the Claim of Process [Docket No. 409]. As required by the *Order Regarding Adequate Protection for Claim #34 of Process Equipment, Inc.* [Docket No. 444], the Debtors have established a reserve of the equity sale proceeds pending agreement with Process or further order of the Court.

| | | | | |
|---|---|---|---|---|
| ~~**Class 3 – Prepetition Loan Claims**~~ | amount equal to the Allowed amount of such Claim; (ii) its collateral in full satisfaction of its Claim; or (iii) such other treatment sufficient to render such Holder's Allowed ~~The Holder of the Prepetition Loan Claims shall receive (a) all proceeds from the~~Secured Claim Unimpaired. | ~~Impaired Entitled to Vote~~Accept Plan | ~~43%~~ | ~~$82M~~ |
| **Class 3 – Prepetition Loan Claims** | The Holder >of the Prepetition Loan Claims <shall receive (a) all proceeds from the collection of any accounts receivable of the Debtors; and (b) itself or by distribution to its designee, ~~(i) a 50% interest in the Note Consideration, and (ii)~~ 50% | Impaired Entitled to Vote | 50% – 53% | $82M |

| | | | | |
|---|---|---|---|---|
| | of the shares of the Stock Consideration~~,~~ that ~~have~~were not ~~been~~ distributed ~~at Closing under and as defined in~~to its designee or the DIP Lender at the Going Concern ~~Purchase Agreement, in each case ((b)(i) and (ii)) to the extent not previously distributed, and~~Closing, subject to dilution by Stock Consideration distributed to Process Equipment from the Lienholder Reserve, if any; and (c) the Tax Refund~~.~~, if any.[7]<br><br>Any Stock Consideration remaining in the Lienholder Reserve upon payment in full of any Allowed Secured Claim of Process Equipment, or proceeds thereof, shall be promptly distributed 50% to the Prepetition Secured Lender or its designee and 50% to the DIP Lender.<br><br>All other Wind-Down Trust Assets and proceeds thereof remaining after payment of ~~all Allowed Administrative Expense Claims, Allowed Priority Claims, and costs of administration of the Wind-Down Trust shall be distributed in equal parts to the Prepetition Secured Lender or its designee on account <of the Prepetition Loan Claims >and the DIP Lender on account of the DIP~~ | | | |

[7] The amount of the Tax Refund, if any, is contingent on the taxing authority's determination regarding the validity and amount of any such refund, and therefore the projected recoveries do not include any such Tax

Refund.

| | | | | |
|---|---|---|---|---|
| | all Allowed Administrative Expense Claims, Allowed Priority Claims, and costs of administration of the Wind-Down Trust shall be distributed in equal parts to the Prepetition Secured Lender or its designee on account of the Prepetition Loan Claims and the DIP Lender on account of the DIP Facility Claims until the DIP Facility Claims are paid in full, and thereafter in full to the Prepetition Secured Lender or its designee on account of the Prepetition Loan Claims.<br><br>The liens and claims of the Holders of Prepetition Loan Claims and DIP Facility Claims shall continue to attach to the Wind-Down Trust Assets in the same priority as they attached to the Debtors' assets immediately prior the occurrence of the Effective Date. | | | |
| **Class 4 – General Unsecured Claims** | Each Holder of an Allowed Class 4 General Unsecured Claim shall receive, in full and final satisfaction, settlement, and release of and in exchange for its Allowed Class 4 Claim, its *Pro Rata* share of the Distributions made by the GUC Liquidating Trust. | Impaired Entitled to Vote | 3.0 – 3.6%3% – 4% | $70M71M – $85M |
| **Class 5 – Subordinated Claims** | Each Holder of an Allowed Class 5 Claim shall receive no Distribution on account of their Subordinated Claims. All General Unsecured Claims of the Sponsor and non-Debtor | Impaired<br>Not Entitled to Vote<br>Deemed to Reject Plan | 0% | $0 |

| | | | | |
|---|---|---|---|---|
| | Affiliates, with the exception of the General Unsecured Claims of SVME which shall be Class 4 General Unsecured Claims, shall be Class 5 Claims | | | |
| | Claims of the Sponsor and non-Debtor Affiliates, with the exception of the General Unsecured Claims of SVME which shall be Class 4 General Unsecured Claims, shall be Class 5 Claims | | | |
| **Class 6 – Interests** | All Interests shall vest in the Wind-Down Trust. Each Holder of an Allowed Class 6 Interest shall receive no Distribution on account of their Interests. | Impaired Not Entitled to vote Deemed to Reject Plan | 0% | $0 |
| | Interest shall receive no Distribution on account of their Interests. | Deemed to Reject Plan | | |

**2.2. Unimpaired Classes of Claims.**

**Class 1: Priority Claims.** Class 1 shall consist of Priority Claims against the Debtors. Class 1 Claims are Unimpaired by the Plan, and the Holders of Allowed Class 1 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

**Class 2: Secured Claims.** Class 2 shall consist of Secured Claims against the Debtors. Class 2 Claims are Unimpaired by the Plan, and the Holders of Allowed Class 2 Claims are deemed to accept the Plan and, therefore, are not entitled to vote on the Plan.

**2.3. Impaired Classes of Claims.**

**Class 3: Prepetition Loan Claims.** Class 3 shall consist of the Prepetition Loan Claims. Class 3 Claims are Impaired by the Plan, and the Holders of the Prepetition Loan Claims are entitled to vote to accept or reject the Plan.

**Class 4: General Unsecured Claims.** Class 4 shall consist of all Allowed General Unsecured Claims against the Debtors. Class 4 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

**Class 5: Subordinated Claims.** Class 5 shall consist of all Subordinated Claims. Because Holders of Class 5 Subordinated Claims will receive no Distribution under the Plan, Holders of Class 5 Subordinated Claims are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

**2.4. Impaired Class of Interests.**

**Class 6: Interests.** Class 6 shall consist of all Interests. Holders of Class 6 Interests will receive no Distribution under the Plan. Holders of Class 6 Interests are deemed to reject the Plan and, therefore, not entitled to vote on the Plan.

## ARTICLE III

## BACKGROUND AND DISCLOSURES

**3.1. General Background.**

(a) **The Debtors' Business.**

With headquarters in Overland Park, Kansas, SVM operates a vertically integrated mining and processing complex at Searles Lake in Trona, California employing approximately 280 people. The Company's facilities at Searles Lake are located on one of only four known reserves of -water-soluble borates in the world and one of only five natural soda ash mining locations in the United States. With a nationwide customer base concentrated in Southern

California and Baja, Mexico, the Company supplies customers with critical minerals essential to downstream applications and manufacturing of a myriad of everyday products—from glassware utilized in the beverage industry or pharmaceutical labs to household laundry detergents.

Searles Lake is one of only five natural soda ash mining locations in the United States and one of only four known water-soluble sodium borate (tincal) deposits globally, and it is the second largest deposit of boron in the world. Mining operations at Searles Lake have a long history, dating back more than 150 years. John Searles, who first discovered the lake while searching for gold in 1862, and his brother, Dennis, founded the San Bernardino Borax Mining Company at Searles Lake and commenced borax mining operations.

Since then, the mining business transferred ownership a number of times, including most recently in 2007 when Searles Valley Minerals Operations Inc., the predecessor of SVM, was acquired by its current sponsor, the Sponsor, a manufacturer of industrial and consumer products (including detergents, soaps, and salts) headquartered in Ahmedabad, Gujarat, India. The Sponsor and Navin Overseas FZC ("Navin"), an affiliate of the Sponsor, were customers of SVM that have purchased an aggregate of approximately $9.8 million, $9.2 million, and $6.2 million of V-BOR (defined below) in calendar years 2023, 2024, and 2025, respectively. The Sponsor and Navin also historically purchased soda ash from SVM, with aggregate annual sales of less than $1 million in each of 2024 and 2025.

Instead of traditional open pit mining, the Debtors extracted minerals from the dry lakebed using Warm Solution Mining ("WSM"), an environmentally friendly solution mining process. The WSM process works through the injection of hot brine into the subsurface salt deposit layers via injection wells to dissolve minerals. The mineral rich brine is then pumped back to the surface through production wells.

The Debtors historically operated three processing plants at Searles Lake: Westend,

Argus, and Trona. Activity at the Argus and Trona facilities is currently mothballed, but as of the Petition Date the Debtors continued to conduct mining and processing operations at the Westend facility. Below is summary description of the historic operations at each facility:

- Westend: At Westend, unrefined primary borax is extracted from both fresh lake brine and carbonated brine from the Argus Soda Ash Consolidation ("SAC") plant. Primary and secondary recovery borax from the upstream borax plant is dissolved and recrystallized, converting it from borax decahydrate to the pentahydrate form ("V-BOR"). Historically, the Westend plant had high primary borax and V-BOR production rates. However, primary Borax production was impacted as a result of the Ridgecrest Earthquakes (defined below) in 2019, resulting in a drop in brine grade and negatively impacting profitability.

- Argus: Historically, soda ash was produced at the Argus facility. This was accomplished by carbonating lake brine with $CO_2$ to form sodium bicarbonate that would then be crystallized and converted back to sodium carbonate (dense soda ash). The Argus plant also has an additional SAC unit to carbonate brine to be fed to the Westend facility. As discussed in further detail below, soda ash production has declined since 2021 due to a combination of both technical and commercial challenges and in February 2026 the Company shut down soda ash operations to preserve liquidity.

- Trona: Boric acid ("BAX") is produced at the Trona plant by reacting the primary borax produced at Westend with sulfuric acid. Historically, BAX was produced at the Trona plant using borax extracted via the liquid-liquid extraction ("LLX") unit, but in 2024 the Company mothballed the LLX plant due to high chemicals and utilities costs that resulted in poor production economics.

(b) **Other Operational Aspects of the Debtors' Business**

*i. Railway and Logistics*

The Debtors' facilities are well-connected for distributing product in North America through its short-line railway. Debtor TRC owns and operates the TRC Railway that runs from the Company's facilities to an interconnect with the Union Pacific main line. The TRC Railway has capacity to transport the entire output from the Debtors' production facilities (approximately 1.8 million tons per year) using a fleet of approximately 1,600 leased railcars. The Debtors historically maintained port facilities at Long Beach and San Diego with dedicated distribution capability. The San Diego facilities include a dedicated storage capability. The Debtors' facilities at Searles Lake connect to the San Diego Port via the TRC Railway and Union Pacific main line and to the Long Beach Port via a transloader into the BNSF Railroad. In February 2026, contemporaneously with the mothballing of its soda ash facilities and layoffs, the Debtors halted their use of the San Diego Port.

*ii. BLM Leases*

The United States government owns a large portion of the land used by the Debtors to source and process finished goods. The Debtors lease this land through the United States

Department of the Interior's Bureau of Land Management (the "BLM"). As part of the lease agreements with the BLM, the Debtors pay a royalty fee based upon the value of production removed from the land as part of the Debtors' operations. The royalty fee is calculated as a percentage of net sales.

*iii. Water Sourcing and Supply*

SVM maintains five water wells and two 30-mile pipelines used to source water in the Searles Lake area. SVM uses approximately 90 percent of the water sourced in its own mining operations and sells the remaining 10 percent to SDWC. SDWC is a water utility company, regulated by the California Public Utilities Commission, and distributes the water obtained from SVM to provide clean, safe drinking water for approximately 760 residential and commercial customers in certain areas on the west shoreline of Searles Lake, California, including the town of Trona, California.

*iv. Employees*

As of the Petition Date, the Debtors employed approximately 279 full-time employees and one part-time employee. All of the Debtors' employees are located in the United States.

Approximately four of the Debtors employees are represented by the International Association of Sheet Metal, Air, Rail and Transportation Workers Transportation Division GO-887 (the "Union"). All of the Union-represented employees are employed by TRC and TRC's relationship with the Union is reflected in a collective bargaining agreement.

(c) **The Debtors' Corporate and Capital Structure**

SVM is the direct parent company of TRC and SDWC. Each of TRC and SDWC is organized in Delaware. SVM is incorporated in Delaware. SVM also directly holds 100 percent of the common stock in one non-Debtor entity: SVME. SVME is a French entity that historically served as an international sales outpost. SVM is wholly owned by the DIP Lender, which is a Delaware corporation. The DIP Lender is wholly owned by the Sponsor.

SVM is obligated as borrower on two secured credit facilities, the Demand Line Facility and the Receivables Facility. As of the Petition Date, the aggregate, outstanding principal amount of the Debtors' funded secured indebtedness was approximately $85.5 million, consisting of (a) approximately $47.4 million in term loan and $12.1 million of letters of credit issued and outstanding under the Demand Line Facility, and (b) approximately $26 million outstanding under the Receivables Facility. As approved in the Final DIP Order, the Receivables Facility has continued in effect during the Chapter 11 Cases.

*i. Demand Line of Credit*

SVM maintained a demand line of credit with the Prepetition Secured Lender pursuant to the Demand Line Facility which provided for a line of credit up to an aggregate amount of $59,500,000 for working capital purposes with a sublimit for performance and/or financial standby letters of credit (the "LOC Sublimit"). Amounts borrowed under the Demand Line Facility accrued interest at a rate of either eight percent, for prime term loans, or SOFR + 2.25 percent, for floating term loans. The Demand Line Facility is secured by a first priority lien on all of the personal property of SVM and SVM's obligations under the Demand Line Facility are

guaranteed by the Sponsor. The Demand Line Facility was subject to annual renewal by the Prepetition Secured Lender in its sole discretion on April 30th of each year. As of the Petition Date, approximately $47,417,900 of principal amount was outstanding under the Demand Line Facility on account of general working capital loans. In addition, as of the Petition Date, approximately $12,082,021 in letters of credit had been issued under the LOC Sublimit.

*ii. Receivables Facility*

SVM also maintains a receivables purchase facility with the Prepetition Secured Lender. Through the Receivables Facility, the Prepetition Secured Lender advanced funds to SVM through the purchase of substantially all of SVM's eligible trade receivables and SVM repaid such advances upon collection of applicable receivables. The Receivables Facility is secured by a lien on substantially all of SVM's personal property (*pari passu* with the lien under the Demand Line). Advances under the Receivables Facility accrue interest at a variable rate of SOFR + 2.25 percent. In connection with the Debtors' agreement with the Prepetition Secured Lender for the consensual use of cash collateral during these Chapter 11 Cases, the Sponsor provided a guarantee of up to $30 million for SVM's obligations under the Receivables Facility. The

Receivables Facility was subject to automatic renewal for successive one-year periods, but may be terminated by either SVM or the Prepetition Secured Lender upon 30 days' notice. As of the Petition Date, approximately $25,989,612 was outstanding under the Receivables Facility. The Prepetition Secured Lender has agreed to allow continued access to the Receivables Facility to provide the Debtors critical liquidity during the course of the Chapter 11 Cases.

*iii. Unsecured Obligations*

Unsecured Parent Loans

Prior to the Petition Date, SVM received a series of unsecured loans from its sole shareholder, the DIP Lender, between 2019 and 2026 (the "Initial Parent Loans"). In addition, on January 12, 2026, SVM, as borrower, and the DIP Lender, as lender, entered into that certain 2026 Term Loan Agreement (the "2026 Parent Loan" and, together with the Initial Parent Loans, the "Unsecured Parent Loans"), providing an additional $10 million term loan to SVM at an annual interest rate of SOFR + 2.25 percent. As of the Petition Date, approximately $135,198,063 was outstanding under the Unsecured Parent Loans. The Unsecured Parent Loans will not share in any distributions from the GUC Liquidating Trust and shall be subordinated to Allowed Class 4 Claims.

Cap-and-Invest Obligations

California has implemented a program (the "Cap-and-Invest Program") to cap greenhouse gas ("GHG") emissions from certain entities ("Covered Entities"), requiring the Covered Entities to surrender allowances equal to their GHG emissions throughout each three-year compliance program period. These allowances can be bought and sold at auctions administered by California or in private transactions. To protect certain industries from financial hardship arising from the Cap-and-Invest Program, California distributes a certain number of allowances, without charge, to Covered Entities in industries it seeks to protect from financial hardship. Covered Entities must surrender allowances equal to 30 percent of their emissions annually, with the remaining 70 percent due at the end of each three-year compliance period.

SVM is a Covered Entity operating in one of the industries for which California distributes allowances without charge. Each calendar year SVM measures its carbon emissions and a third-party representative of the state of California verifies the carbon emission measurements. The number of allowances SVM receives is based on average production in prior years. Total emissions net of allowances represents the total shortfall financial obligation for the year. Based on recent market prices of allowances, SVM estimates that, as of the Petition Date, it has a net financial obligation of approximately $76.3 million owing in connection with the Cap-and-Invest Program. SVM historically would satisfy such financial obligation by purchasing credits on the market.

The Debtors' obligations under the Cap-and-Invest Program were resolved in connection with the Going Concern Sale Order, as discussed below.

Other Unsecured Amounts

In the ordinary course of business, the Debtors incurred trade debt and other general unsecured debt on varying terms prepetition. The Debtors estimate they had approximately $47.2 million in general unsecured claims as of the Petition Date, excluding any rejection damages claims.

*iv. Common Stock*

SVM is privately held and 100 percent of its common stock is owned by the DIP Lender. The DIP Lender is wholly owned by the Sponsor.

**3.2. Events Leading to Chapter 11.**

The Debtors faced a series of challenges in recent years that required substantial capital expenditures and increased production costs. Meanwhile, demand for soda ash—historically the Debtors largest source of revenue—diminished. At various junctures, the Debtors took steps to address these challenges. Despite these efforts, the Debtors ultimately filed their voluntary bankruptcy petitions on June 15, 2026 to preserve the value of its business in the face of mounting operating losses and a liquidity shortfall. The following provides additional detail concerning the specific obstacles faced by the Company and the measures undertaken by the Company in the period prior to the Petition Date.

(a) **Impact of Ridgecrest Earthquakes**

SVM has faced significant long-term operational challenges attributable to seismic and geological conditions at its facility, and these challenges have placed considerable strain on the business and its capital structure.

On July 4th and 5th, 2019, two earthquakes (the "Ridgecrest Earthquakes") occurred consecutively to the north and northeast of the town of Ridgecrest, California, approximately 25 miles from SVM's facilities at Searles Lake. The Ridgecrest Earthquakes caused significant above-ground and subsurface damage to SVM's operations and the lake. The damage to the Debtors' extraction operations has yet to be fully restored and as of the Petition Date remained at approximately 50 percent of production levels prior to the Ridgecrest Earthquakes.

SVM suffered significant, direct financial losses from the Ridgecrest Earthquakes. The Debtors incurred approximately $50 million in losses from repairs and lost revenue during the recovery period. The disruption in operations resulted in a decline in EBITDA from approximately $52 million in fiscal year 2019 to just $2 million in fiscal year 2020. In addition, as a result of the Ridgecrest Earthquakes, SVM's facilities were offline for approximately two months in 2019. During that period, no heat was added to the lake. Cooling of the lake reduced the brine concentration level, resulting in reduced production and a corresponding reduction in revenue for the Debtors' business.

(b) **Challenging Market Conditions for Soda Ash**

The global soda ash market is experiencing a period of significant volatility, negatively impacting pricing and margins across the industry. These headwinds have been driven by, among other things, worldwide oversupply, including as a result of synthetic soda ash production, primarily from China; sluggish downstream demand in key sectors, including construction and glassmaking; and increased production costs due largely to heightened environmental regulation.

As a result of these challenges, the Debtors' soda ash operations began operating at a significant loss. Net sales of soda ash decreased from approximately $223 million for fiscal year 2023 to approximately $147 million for fiscal year 2026.

(c) **Prepetition Assessment of Strategic Alternatives and Sale Process**

To address the challenges presented by the changing soda ash market and the impacts of the Ridgecrest Earthquakes, the Company, with the assistance of its advisors, began to explore various strategic alternatives, including pursuing a transformation plan to shift the focus of the Company's soda ash production to increasing borate production and potentially expanding into other more profitable markets. However, implementation of these plans would require substantial capital expenditures, and the Company was facing a mounting liquidity shortfall. In February 2024, SVM and the DIP Lender engaged Lazard as their investment banker to assist in the evaluation and marketing of the Debtors' assets for a potential sale transaction and, in August 2025, the Debtors, with the assistance of Lazard, commenced a sale process. In connection with that process and subsequent engagement to date, Lazard contacted over 140 parties, with 50 parties executing NDAs and obtaining confidential information on the Debtors' business. As the sale process further developed, it became clear in April 2026 that an out-of-court transaction was not viable due in part to the Debtors' legacy liabilities that would transfer with the business and the unwillingness from potential buyers to acquire the Debtors' business outside of a court-supervised process. At that time, Lazard shifted discussions with several buyers to potentially acquire the assets as part of an in-court sale process.

Throughout 2025 and beginning of 2026, projected liquidity continued to rapidly diminish. By early 2026, the Company was operating at a monthly loss of more than $5 million. To address this situation and preserve the value of the business, the Company made the difficult decision to mothball soda ash production in February 2026. In connection with its mothballing of soda ash production, the Company implemented a corresponding reduction in force, laying off 240 employees and independent contractors (approximately 46 percent of its prior workforce).

In April 2026, the Debtors pivoted to exploring a potential in-court transaction, including a section 363 sale of assets. Working with Lazard and other advisors, the Debtors reached back out to several potential buyers to discuss a potential section 363 transaction. As of the Petition

Date the Debtors and Lazard remained in discussions with various parties with respect to a potential sale of the Debtors' assets through a section 363 sale.

In addition, prior to commencing these Chapter 11 Cases, the Company took measures to put in place independent corporate governance mechanisms. Specifically, on May 26, 2026, SVM appointed a new independent director, John S. Dubel (in such capacity, the "Independent Director"), to its Board. The Independent Director, together with any other disinterested members of the Board, was delegated the authority to review, negotiate, and approve related party transactions between the Company, on the one hand, and its shareholder, the DIP Lender, and the Sponsor, on the other. Consistent with these delegations, the Independent Director is also reviewing historical transactions between the Debtors and their Affiliates. The approval of the Independent Director is also required with respect to the Company's entry into any restructuring transaction.

On June 12, the Board authorized the formation of a special independent committee comprised solely of the Independent Director (the "Independent Committee"), which was delegated exclusive authority to review, negotiate, and approve transactions between the DIP Lender and the Debtors, including terms of the DIP Facility provided to the Debtors by the DIP Lender.

(d) **Liquidity and Financing Arrangements**

When the Debtors decided to explore a potential section 363 sale process, the Debtors, together with their advisors, began canvassing the market for liquidity sources to fund its operations and the sale process. With the assistance of Lazard and Ankura, the Debtors analyzed their liquidity needs and commenced a process to identify potential financing sources to fund an in-court sale process. Lazard contacted over 35 parties to explore interest in potentially providing such financing. At the same time, the Sponsor and the Debtors' advisors also began to engage with soda ash suppliers to capture liquidity from the Debtors' soda ash contracts.

*i. Supply and Liquidity Agreement*

As a result of these efforts, the Debtors entered into the Supply and Liquidity Agreement. Pursuant to the Supply and Liquidity Agreement, TCNA provided the Debtors with unsecured, interest-free liquidity advances of $20 million and to fulfill the Debtors' soda ash requirements to the Debtors' end users. In exchange, under the Supply and Liquidity Agreement, TCNA received payments on account of soda ash receipts at an agreed price per metric ton and superpriority administrative expense claims. The Debtors' obligations under the Supply and Liquidity Agreement were guaranteed by the Sponsor and, in return, SVM agreed to provide the Sponsor with non-priming, postpetition liens and superpriority administrative expense claims on account of its contingent reimbursement claims against SVM under the guarantee. The Supply and Liquidity Agreement provided the Debtors with $20 million of postpetition funding, which since has been satisfied in full pursuant to the Soda Ash Sale Transaction discussed below.

*ii. DIP Facility and Cash Collateral*

In addition, and to supplement their cash needs to fund a potential section 363 sale, the Debtors also procured the $20 million junior financing DIP Facility from the DIP Lender. Pursuant to the terms of the DIP Facility, the DIP Lender received a junior lien on all assets

subject to the Prepetition Secured Lender's liens and a first-priority lien on all unencumbered assets (*e.g.*, real property), subject to certain limitations on liens on recoveries from avoidance actions and commercial tort claims as detailed in the Final DIP Order.

The Debtors and their advisors also engaged in negotiations with the Prepetition Secured Lender with respect to consensual use of its cash collateral and continued access to the Receivables Facility in the ordinary course of business for up to $30 million of funding under the Receivables Facility during the course of the Chapter 11 Cases. As a result of those negotiations, the Prepetition Secured Lender agreed to the consensual use of cash collateral. In exchange for continued access to the Receivables Facility during the Chapter 11 Cases, the Debtors granted the Prepetition Secured Lender certain additional liens on unencumbered collateral as of the Petition Date and superpriority administrative expense claims.

### 3.3. The Chapter 11 Cases.

#### (a) **Generally.**

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court in order to pursue a value-maximizing sale transaction for the Debtors' assets and complete an orderly winddown. The commencement of a chapter 11 case creates an estate that is composed of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." After the Petition Date, the Debtors continued to operate their business as debtors and debtors in possession. By order entered June 16, 2026 (D.I. 4), these Chapter 11 Cases are jointly administered for procedural purposes only. On June 26, 2026, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* in connection with these Chapter 11 Cases (D.I. 104), followed by the *Amended Notice of Appointment of Committee of Unsecured Creditors* filed on June 29, 2026 (D.I. 109), and the *Second Amended Notice of Appointment of Committee of Unsecured Creditor* filed on September 3, 2026 (D.I. 351).

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan.

#### (b) **"First Day" Motions.**

On the Petition Date, the Debtors filed a number of "first-day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of these Chapter 11 Cases. On June 16, 2026, the Bankruptcy Court entered the following orders and interim orders providing various first-day relief:

- *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (D.I. 44)

- *Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information and (II) Granting Related Relief* (D.I. 45)

- *Interim Order (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, Change, and Enter into New Insurance Policies; and (II) Granting Related Relief* (D.I. 46)

- *Interim Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments; and (II) Granting Related Relief* (D.I. 47)

- *Interim Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* (D.I. 48)

- *Interim Order Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* (D.I. 49).

- *Interim Order Authorizing Debtors to (I)(A) Pay Certain Prepetition Employee Obligations and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* (D.I. 54).

- *Interim Order Authorizing Debtors to (I)(A) Continue Operating their Cash Management System, (B) Honor Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions; and (III) Granting Related Relief* (D.I. 55).

On July 7, 2026 and July 8, 2026, the Bankruptcy Court entered the following final orders providing various first-day relief on a final basis, specifically:

- *Final Order (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, Change, and Enter into New Insurance Policies; and (II) Granting Related Relief* (D.I. 141)

- *Final Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments; and (II) Granting Related Relief* (D.I. 142)
- *Final Order Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* (D.I. 144).

- *Final Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* (D.I. 152)

- *Final Order Authorizing Debtors to (I)(A) Continue Operating their Cash Management System, (B) Honor Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions; and (III) Granting Related Relief* (D.I. 153).

- *Final Order Authorizing Debtors to (I)(A) Pay Certain Prepetition Employee Obligations and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* (D.I. 154).

(c) **The Supply and Liquidity Motion and the DIP Motion**

On the Petition Date, the Debtors also filed the Supply and Liquidity Motion and the DIP Motion. These motions sought authorization for the Debtors to obtain postpetition funding from two sources in order to preserve the Debtors' going-concern value and maintain ordinary-course operations through the closing of a value-maximizing transaction, *i.e.* the Supply and Liquidity Agreement and the DIP Facility. On June 16, 2026, the Bankruptcy Court entered interim orders approving the Supply and Liquidity Motion and the DIP Motion, respectively, providing for an initial $7.0 million liquidity advance under the Supply and Liquidity Agreement and initial financing of $7.5 million under the DIP Facility. *See* D.I. 50 and 59, respectively.

Objections to the DIP Motion were filed by Sisecam Chemical Resources LLC ("Sisecam") and the Committee. (D.I. 110, 161). The Debtors filed a reply to the Committee in support of the DIP Motion and in response to the objections. (D.I. 215).

Following the appointment of the Committee, the parties negotiated certain revisions to the relief sought by the Supply and Liquidity Motion and the DIP Motion, including, among other things:[5][8]

- The carving out of 25% of the proceeds of Avoidance Actions and commercial tort claims against certain Debtor affiliated Entities and the Prepetition Lender and 50% of the proceeds from all other Avoidance actions and commercial tort claims from the DIP Collateral;

- An increase to the Budget for the fees and expenses of Committee Professionals

[8] > Capitalized terms used but not defined in the following list shall have the meaning ascribed to them in the Final DIP Order. <

- An increase to the Committee's investigation budget; and

- The elimination of certain obligations under the DIP Credit Agreement to provide the Sponsor with V-BOR.

On July 22, 2026, the Bankruptcy Court entered an order granting the Supply and Liquidity Motion on a final basis (D.I. 231) and the Final DIP Order.

[5] < Capitalized terms used but not defined in the following list shall have the meaning ascribed to them in the Final

~~DIP Order.>~~

On September 24, 2026, the Bankruptcy Court entered an order modifying the DIP Credit Agreement and approving the DIP Credit Agreement, as modified by stipulation between the Debtors and the DIP Lender (D.I. 412). Such modifications provided for, among other things, an additional $5 million in funding, a revised Budget, and the modification of certain milestones under the DIP Credit Agreement.

(d) **Retention of Professional Advisors.**

The Debtors, through various applications which were subsequently approved by the Bankruptcy Court, employed: (i) Skadden, Arps, Slate, Meagher & Flom LLP, as counsel to the Debtors (D.I. 186); (ii) Pachulski Stang Ziehl & Jones, as counsel to the Debtors (D.I. 184); (iii) Ankura Consulting Group, as restructuring advisor to the Debtors (D.I. 223); (iv) Lazard, as investment banker to the Debtors (D.I. 181); and (v) Stretto, as the Debtors' Claims Agent (D.I. 60).

(e) **The Asset Sale Transactions**

On the Petition Date, the Debtors filed the Sale Motion. On July 7, 2026, the Court entered the *Order (A) Approving Bidding Procedures for the Sale of Certain or All of the Debtors' Assets; (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections; (C) Approving Assumption and Assignment Procedures; (D) Scheduling a Hearing to Consider Any Proposed Sale; and (E) Granting Certain Related Relief* (D.I. 140) (the "Bidding Procedures Order").

*i. Postpetition Marketing Process*

Although the Debtors did not consummate an out-of-court sale transaction, the Debtors' prepetition marketing process provided a head start on a potential transaction, paving the way for an expeditious in court process to punctuate the Debtors' prepetition efforts and ensure that the Debtors receive the highest and otherwise best offer(s) for their Assets. Beginning on the Petition Date, the Debtors, in consultation with Lazard, launched a postpetition marketing process to sell certain or substantially all of their Assets. The Debtors pursued a dual-track approach, which monetized discrete assets, such as the Soda Ash Contracts, while preserving the opportunity to sell their remaining Assets in a going concern sale. The Debtors engaged in two separate transactions, (i) the Soda Ash Sale Transaction and (ii) the Going Concern Sale Transaction. Lazard engaged with over 140 parties regarding a potential sale of the Debtors' assets. Each potential buyer received a teaser document or participated in high-level discussions about the transaction. Fifty of these parties entered into confidentiality agreements with the Debtors and were provided access to a virtual data room that included, among other things, confidential information about the Debtors' business and their operating assets. Several parties participated in management meetings or calls. Pursuant to the Bidding Procedures, the Debtors requested that initial indications of interest be submitted by July 10, 2026 (the "Non-Binding LOI Deadline"), with Bids and Good Faith Deposits due on August 17, 2026 (the "Bid Deadline", previously August 6, 2026). The Debtors received six indications of interest on the Non-Binding LOI Deadline. On the Bid Deadline, the Debtors received two Bids for substantially all of their Assets and three Bids for certain discrete Assets. As described in the Sale Motion, the Debtors sought approval to sell their assets free and clear of all claims, liens, interests, and encumbrances

pursuant to sections 105, 363, and 365 of the Bankruptcy Code.

Effectuating a free and clear sale transaction was critical to preserving the Debtors' going-concern business, as no going-concern bidder was willing to acquire the Debtors' assets burdened by the Debtors' legacy compliance obligations arising under California's Cap-and-Trade Regulation or the prospect that the buyer would be held liable as a successor to the Debtors for those obligations.

*ii. Soda Ash Sale Transaction*

On August 25, 2026, the Debtors held an Auction (as defined in the Bidding Procedures Order) for the sale of their Soda Ash Contracts. Two parties ultimately participated in the Auction: TCNA and American Soda Ash LLC. TCNA submitted the final overbid and was declared the successful bidder with a purchase price of $21.5 million, which consists of $17.0 million in cancellation of the Debtors' outstanding debt under the Supply and Liquidity Agreement, $4.16 million in cash consideration, and a waiver of $340,000 in respect of the termination fee that would have to be paid by any other bidder for the termination of the Supply and Liquidity Agreement.

On August 26, 2026, the Court held the Soda Ash Sale Hearing. On August 28, 2026, the Bankruptcy Court entered the Soda Ash Sale Order, approving the assumption and assignment of certain of the Debtors' Soda Ash Contracts to TCNA pursuant to sections 105, 363, and 365 of the Bankruptcy Code. As part of the consideration provided by TCNA in the Soda Ash Sale Transaction, TCNA cancelled and forgave all outstanding Liquidity Advances (as defined in the Supply and Liquidity Agreement) outstanding as of August 28, 2026, and at the same time TCNA terminated the corporate guarantee provided by the Sponsor. On September 11, 2026, the Soda Ash Sale Transaction closed.

*iii. Going Concern Sale Transaction*

Following the Soda Ash Sale Hearing, the Debtors continued negotiating terms of a going concern sale of the Debtors' remaining Assets with two bidders, the 5E Buyer and another bidder. The good faith, arms'-length negotiations spanned several weeks, during which period the Debtors exchanged multiple rounds of revised transaction documents with each potential buyer and engaged in several drafting sessions to resolve various commercial issues. In order to provide additional runway between the signing of an asset purchase agreement and the closing of the sale transaction, the bidders requested support from the Sponsor and the Prepetition Secured Lender through additional DIP financing. In the end, the 5E Buyer's bid was the only actionable option that has the support of the Sponsor and the Prepetition Secured Lender. As such, the Auction was cancelled and the Debtors entered into a private transaction to sell substantially all of their remaining Assets to the 5E Buyer. On September 14, 2026, the Debtors entered into the Going Concern Purchase Agreement with the 5E Buyer.

Pursuant to the Going Concern Purchase Agreement, the 5E Buyer's purchase price consideration consists of (a) $3,357,906 in cash consideration paid at the Going Concern Closing, (b) 8,300,000 shares of common stock of 5E Advanced Materials, Inc. (representing approximately $24.4 million based on the September 22, 2026 closing price)[69], and (c) a $6.22 million senior unsecured note bearing 14.5% payable-in-kind interest. In addition to the

purchase price consideration, the 5E Buyer will also pay approximately $0.5 million of cure costs related to the transferred contracts. Moreover, given the going-concern nature of the bid, the 5E Buyer ~~has committed to operating~~offered employment to the vast majority of the Debtors' existing employees. In addition, the Going Concern Sale Transaction includes financial support from the Sponsor. This support is made up of (a) $10.0 million in senior secured credit facility debt (the "Bridge Facility") bearing 8.0% payable-in-kind interest with a 9-month maturity and subject to a $1.0 million fee payable upon the earlier of repayment in full or maturity; (b) financial support for certain surety bonds for up to 12 months worth approximately $7.5 million. The Going Concern Closing occurred on October 1, 2026, and at the Going Concern Closing>, in accordance with the Going Concern <Sale Order, 50% of the Note Consideration and 3,072,091 shares of Stock Consideration were indefeasibly distributed to the DIP Lender and 50% of the Note Consideration and 3,072,091 shares of Stock Consideration were indefeasibly distributed to the designee of the Prepetition Secured Lender. Of the remaining shares of Stock Consideration, (i) 312,500 were held back at the Going Concern Closing pursuant to Section 2.9(e)(viii) of the Going Concern Purchase Agreement for delivery on the Deferred Issuance Date (as defined in that subsection), whereupon they will be issued 50% to the designee of the Prepetition Secured Lender and 50% to the DIP Lender in accordance with the Going Concern Sale Order; and (ii) 1,843,318 are held in the Lienholder Reserve.

- In connection with the Going Concern Sale Transaction, the Debtors reached a settlement with the Committee regarding the Sellers Nirma Release, which settlement is reflected on the record of the Going Concern Sale Hearing on September 15, 2026. After that hearing, the Court entered the Going Concern Sale Order approving the sale of substantially all of the Debtors' remaining Assets to 5E. The Going Concern Purchase Agreement provides for Purchase Price to be distributed to pay in full the Banker's Fees and provide each of the DIP Lender and the Prepetition Secured Lender a 50% interest in the Note Consideration and 50% of the shares of the Stock Consideration, all in accordance the terms of the Going Concern Purchase Agreement. Further, the Going Concern Purchase Agreement provides for the liens of the DIP Lender and the Prepetition Secured Lender to continue to attach to the proceeds of the Going Concern Transaction and for any remaining proceeds following the Going Concern Closing to be segregated and held by the Debtors in a separate, interest-bearing account pending further Order of the Bankruptcy Court directing the distribution thereof.

- Together, the Asset Sale Transactions resulted in the sale of the Debtors' Soda Ash Contracts, the assumption of a substantial portion of the Debtors' trade debt relationships, obligations, and certain Executory Contracts and Leases, and the assumption of certain liabilities specified in the schedules to the Asset Purchase Agreements. The Debtors believe the resulting Asset Purchase Agreements reflect the best possible outcome for creditors and parties in interest in these Chapter 11 Cases. The Combined Disclosure Statement and Plan also provides for an orderly post-

[9] >5E Advanced Materials, Inc. is the parent of the 5E Buyer and is a public company focused on becoming a vertically integrated global leader and supplier of refined borates and advanced boron derivative materials. 5E Advanced Materials, Inc.'s stock trades on the Nasdaq under the ticker: FEAM and the per share price as of September 22, 2026 was $2.94.<

Effective Date liquidation structure. The Wind-Down Debtors will remain in existence for limited administrative purposes under the direction of the Wind-Down Trustee, while the GUC Liquidating Trust, acting through the GUC Liquidating Trustee, will administer the GUC Liquidating Trust Assets and reconcile and distribute Allowed General Unsecured Claims. This structure is intended to preserve recoveries, centralize post-Effective Date administration, and avoid unnecessary costs.

~~[6] <5E Advanced Materials, Inc. is the parent of the 5E Buyer and is a public company focused on becoming a vertically integrated global leader and supplier of refined borates and advanced boron derivative materials. 5E Advanced Materials, Inc.'s stock trades on the Nasdaq under the ticker: FEAM and the per share price as of September 22, 2026 was $2.94.>~~

**COPIES OF THE ASSET PURCHASE AGREEMENTS CAN BE VIEWED ON THE DOCKET OF THE CHAPTER 11 CASES FREE OF CHARGE AT HTTPS://CASES.STRETTO.COM/SVM/COURT-DOCKET/ (SEE DOCKET NOS. 332-2, 399). CREDITORS AND PARTIES IN INTEREST ARE ENCOURAGED TO CAREFULLY REVIEW BOTH THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE ASSET PURCHASE AGREEMENTS.**

*iv. Committee Settlement*

In connection with the Going Concern Sale Transaction, the Debtors, the DIP Lender, the Sponsor, and the Committee engaged in extensive, good-faith negotiations to resolve certain disputes relating to, among other things, the scope of the releases to be provided to the Nirma Released Parties, the Committee's right to investigate and challenge the liens and claims of the Prepetition Secured Lender, and the establishment and funding of the GUC Liquidating Trust for the benefit of General Unsecured Creditors. The resulting Committee Settlement, as read into the record at the Sale Hearing, provides in material part as follows:

- The Committee agreed not to oppose entry of the Going Concern Sale Order, including without limitation the approval therein of the Sellers Nirma Release effective upon the Closing under the Going Concern Purchase Agreement and the allocation of sale proceeds set forth in section 2.7 of the Going Concern Purchase Agreement. The application of sale consideration to the Debtors' loan obligations to the Prepetition Secured Lender and the DIP loan obligations as provided in the Going Concern Purchase Agreement shall not be subject to any Challenge by the Committee. To minimize costs for all parties, the Committee agreed to suspend all work on (a) investigation of the Prepetition Secured Lender and its liens and claims, as well as (b) work on any potential Challenge under the Final DIP Order (collectively, the "Committee Investigation"), until at least the earlier of the Going Concern Closing under the Going Concern Purchase Agreement or the termination of the Going Concern Purchase Agreement. The Challenge Deadline will be extended, for the Committee only, to the earlier of the Going Concern Closing and the date that is 2 weeks following any termination of the Going Concern Purchase Agreement, unless terminated earlier by agreement of the Committee and the Prepetition Secured Lender, it being understood that the Challenge Deadline already has expired for anyone other than the Committee. There shall be no cap on fees for the Committee

Investigation performed to date, subject to the Committee's overall budget.

- Provided that no Challenge or other claim has been brought by the Committee or with the participation of the Committee against the Prepetition Secured Lender or any Nirma Released Parties, and that the suspension of work provided for in section (ii) above continues, (1) the DIP Lender, the Debtors, and the Committee will use commercially reasonable good faith efforts to negotiate a consensual chapter 11 plan, and (2) the DIP Lender will not support a chapter 11 plan without the Committee's consent that does not:

  - establish the GUC Liquidating Trust for the sole benefit of General Unsecured Creditors (excluding the Prepetition Secured Lender, the Sponsor, the DIP Lender and their Affiliates, none of whom shall be entitled to receive any distributions from the GUC Liquidating Trust), with the GUC Liquidating Trustee and the GUC Oversight Board selected by the Committee, funded and vested only with (i) the $3 million in funding provided in the Going Concern Purchase Agreement as consideration for the Sellers Nirma Release; (ii) the Remaining Chapter 5 Actions, and (iii) ~~any unused portion of~~ the Extended Committee Budget Savings, and in which such trust funding and the Remaining Chapter 5 Actions will be the sole assets vested in such trust and used solely to pay (w) any allowed fees and expenses of Committee Professionals in excess in the aggregate of the Committee Professionals' Budget, (x) the GUC Liquidating Trust's costs and expenses, including for administration of General Unsecured Claims, (y) distributions on General Unsecured Claims, and (z) any U.S. Trustee Fees owed on disbursements from the GUC Liquidating Trust; and

  - transfer to the GUC Liquidating Trust all Remaining Chapter 5 Actions with all such claims to be prosecuted, settled, or waived as determined by the GUC Liquidating Trustee in his or her sole discretion.

- The Nirma Released Parties will include without limitation all present or former officers, directors and managers of the Debtors, and under any chapter 11 plan that contains the provisions of the foregoing section, the Debtors and Committee will support, without limitation, (a) all officers, directors and managers of the Debtors, as well as the Prepetition Secured Lender and its Affiliates and related persons, receiving broad general releases of claims not released under the Going Concern Purchase Agreement (if any), including without limitation any chapter 5 avoidance claims, and (b) the allowance of the Prepetition Secured Lender's secured claims as provided in the Final DIP Order. The Extended Committee Budget will be budgeted for Committee Professionals under the DIP Budget for the period September 11, 2026 through November ~~13~~16, 2026, for an aggregate DIP Budget amounting to the Committee Professionals' Budget for the period between the Petition Date and November ~~13~~16, 2026.

*v. The CARB Objections.*

On August 12, 2026, the California Air Resources Board ("CARB") filed the *California*

*Air Resources Board's Motion Seeking (1) An Order Clarifying That The Sale of Searles Valley Minerals' Assets Will Not Impair Future Environmental Law Obligations In California, Or, In The Alternative, (2) An Order That The Sale of Searles Valley Minerals' Assets Cannot "Clear" Environmental Law Obligations Under 11 U.S.C. 363(f), Or, In The Alternative, (3) An Order Providing Adequate Protection To The California Air Resources Board During And After The Sale of Searles Valley Minerals' Assets* (D.I. 273) (the "CARB Motion"), seeking, among other things, a ruling that the Debtors' sale of assets under section 363 of the Bankruptcy Code would not extinguish the Debtors' obligations under California's Cap-and-Trade Regulation, arguing that those compliance obligations fall outside the scope of section 363(f)'s free-and-clear power.

On August 21, 2026, the Debtors filed the *Debtors' Omnibus (I) Response to the Motion and Objection of California Air Resources Board and (II) Reply in Further Support of Their Sale Motion* (D.I. 310) in reply to California's (the "CARB Reply"). On August 26, 2026, the Court held a hearing on the CARB Motion and CARB Reply, at which the Court overruled and denied the CARB Motion on the merits.

On September 10, 2026, CARB filed the *California Air Resources Board's Request for Stay Pending Appeal* (D.I. 366) (the "Stay Request"), stating that it would make the request orally at the September 11, 2026 hearing and acknowledging that it was filing in advance of the time for the Court to decide the request on the basis that absent a stay, section 363(m) would deprive CARB of its substantive right to carry out its program and its procedural right to appeal.

On September 11, 2026, the Debtors filed the *Debtors' Response to California Air Resources Board's Premature Request for Stay Pending Appeal* (D.I. . 369) (the "Stay Response") on the basis that the Stay Request was premature and procedurally improper because there was nothing to stay: no hearing had yet been held on the Sale Motion and no final sale order had been entered. Prior to the Court's ruling on the Stay Request and Stay Response, the Debtors and CARB reached a settlement agreement (the "CARB Settlement").

Under the terms of the CARB Settlement, at the Going Concern Closing, SVM agreed to surrender approximately 16,048 compliance instruments, constituting all of its currently held compliance instruments, to CARB. CARB confirmed and agreed that such surrender shall satisfy the Debtors' obligations under the CARB Programs (other than reporting obligations prior to the Going Concern Closing) occurring after the Petition Date but prior to the Going Concern Closing, and that upon such surrender, CARB agrees it will not hold any postpetition administrative expense claims against, or interests in, the Debtors or their Estates. CARB also agreed not to file or assert any proof of claim in the Chapter 11 Cases and to withdraw any existing filings with prejudice, and agreed to withhold any free allocation of vintage-2027 allowances otherwise to be released into SVM's CITSS account. Following the closing of the Going Concern Closing, the 5E Buyer shall be permitted to establish a new CITSS account. CARB also agreed to withdraw its motion and any request for a stay pending appeal of the Going Concern Sale Order or the ruling at the CARB Hearing, and agreed not to pursue any appeal thereof. The 5E Buyer remains subject to compliance with environmental laws of general applicability with respect to post-Going Concern Closing ownership and operations, including reporting obligations arising after the Going Concern Closing under the CARB Programs.

*vi. Process Objection.*

On August 18, 2026, Process Equipment, Inc. dba Process Baron filed the Process Limited Objection, pursuant to which Process sought adequate protection in connection with the Going Concern Sale Transaction with respect to the Process's asserted mechanics lien of approximately $3.18 million for work on the Trona Boiler ID & FD Fan Electrification Project at 13200 Main Street, Trona, California 93562. The Process Limited Objection asserted lien based on that certain Master Work Agreement dated December 5, 2024 and Purchase Order CS2407540 dated December 19, 2024.

At the Going Concern Sale Hearing, the Court ordered that a hearing on Process Limited Objection's claim of adequate protection be adjourned until September 28, 2026. On September 23, 2026, the Debtors filed the *Reply of Debtors to Limited Objection by Process Equipment, Inc. to Sale and Disposition of Sale Proceeds and in Support of Motion of Debtors for Entry of Orders (I) Approving Bidding Procedures for the Sale of Certain or All of the Debtors' Assets; (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections; (C) Approving Assumption and Assignment Procedures; (D) Scheduling a Hearing to Consider Any Proposed Sale; and (II) (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (D.I. 410-2) (the "Process Reply") and the *Debtors' Objection to Filed Claim #34 of Process Equipment Inc.* (D.I. 409) (the "Objection") seeking reduction of the lien to its proper amount. The Debtors dispute the extent of the asserted lien for the reasons set forth in the Process Reply. ~~On the record at the September 28, 2026 hearing on the Process Limited Objection, the Court ordered~~Pursuant to an order of the Bankruptcy Court entered on October 1, 2026 (D.I. 444), the Debtors ~~to reserve~~are holding 1,843,318 shares of Stock Consideration ~~valued at $4 million~~in the Lienholder Reserve as adequate protection for Process's mechanics lien claim. A hearing will be held to determine the validity, extent, and priority of Process's mechanic's lien claim, which will determine the value, if any, that will be distributed to Process on account of its mechanics' lien claim.

(f) **Filing of the Debtors' Schedules and Establishment of the Bar Dates.**

On July 13, 2026, the Debtors filed the schedules of assets and liabilities and statements of financial affairs for each Debtor. (D.I. 188-94) and on August 14, 2026, SVM filed amended schedules of assets and liabilities an amended statement of financial affairs (D.I. 279-80) and TRC filed an amended schedule G (D.I. 281).

On September 21, 2026, the Bankruptcy Court entered the Bar Date Order. Pursuant to the Bar Date Order, the Bankruptcy Court established the following Bar Dates:

**i.** **General Bar Date:** October 21, 2026, as the deadline to file a Proof of Claim in respect of any prepetition Claim against the Debtors, including, without limitation, any secured Claim, unsecured Claim, priority Claim, or 503(b)(9) Claim;

**ii.** **Interim Administrative Claims Bar Date:** October 21, 2026 as the deadline to file a request to allow any unpaid Administrative Claims (excluding 503(b)(9) claims and Professional Fee Claims) against the Debtors arising on or after the Petition Date and through and including September 1, 2026;

**iii. Final Administrative Claims Bar Date:** the date that is thirty days following the Effective Date of the Plan as the deadline to file a request to allow any unpaid Administrative Claims (excluding 503(b)(9) claims and Professional Fee Claims) against the Debtors arising after September 1, 2026;

**iv. Governmental Bar Date:** December 14, 2026, as the deadline by which a Governmental Unit must file a Proof of Claim in respect of a prepetition Claim against the Debtors;

**v. Rejection Damages Bar Date:** the later of (i) the General Bar Date, October 21, 2026, or, if applicable, the Governmental Bar Date, December 14, 2026 and (ii) the date that is thirty (30) days following service of an order approving rejection of an Executory Contract or

Unexpired Lease of the Debtors as the deadline by which any Person or Entity asserting a Claim for damages against the Debtors arising from such rejection must file a Proof of Claim on account of such damages; and

**vi. Amended Schedules Bar Date:** the later of (i) the General Bar Date (ii) the date that is 30 days after the later of (a) the effective date of the rejection of such executory contract or unexpired lease, or (b) entry of any order authorizing the rejection of such executory contract or unexpired lease; and (iii) any date that the Bankruptcy Court may fix in the applicable order approving such rejection.

(g) **The Wind-Down of the Estates.**

Following Going Concern Closing and Soda Ash Closing, the Debtors will be focused principally on winding down their Estates and making Distributions. This Combined Disclosure Statement and Plan provides for the GUC Liquidating Trust Assets and the Wind-Down Trust Assets to be vested in the respective trusts and administered and distributed to Holders of Allowed Claims in accordance with the terms of the Combined Disclosure Statement and Plan. The Non-GUC Chapter 5 Actions will remain in the Estates and will be preserved and administered in accordance with this Plan.

## ARTICLE IV

## CONFIRMATION AND VOTING PROCEDURES

**4.1. Confirmation Procedure.**

On [__], 2026, the Bankruptcy Court entered the Solicitation Order conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled for November ~~18~~23, 2026 at ~~2:00 p.m~~10:30 a.m. (prevailing Eastern Time) to consider
(a) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice other than by filing a notice on the docket of these Chapter 11 Cases.

**4.2. Procedure for Objections.**

Any objection to final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on: (a) co-counsel for the Debtors, (i) Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801 (Attn: Joseph Larkin (joseph.larkin@skadden.com)), 320 S. Canal Street, Chicago, Illinois 60606 (Attn: James J. Mazza, Jr., (james.mazza@skadden.com), Jennifer Madden (jennifer.madden@skadden.com), and Claire Stephens (claire.stephens@skadden.com)), and (ii) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899 (Courier 19801) (Attn: Laura Davis Jones (ljones@pszjlaw.com), James O'Neill (joneill@pszjlaw.com), and Edward A. Corma (ecorma@pszjlaw.com)); (b) the U.S. Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, DE 19801, Attn: Jane Leamy (jane.leamy@usdoj.gov); and (c) counsel to the Committee, Womble Bond Dickinson (US) LLP, 1313 N. Market Street, Suite 1200, Wilmington, Delaware, 19801 (Attn: Matthew Ward (matthew.ward@wbd-us.com), Lisa Tancredi (lisa.tancredi@wbd-us.com), and Marcy McLaughlin Smith (marcy.mclaughlin@wbd-us.com)) and 300 North Greene Street, Suite 1900, Greensboro, North Carolina 27401 (Attn: Philip Mohr (philip.mohr@wbd-us.com)), in each case, by no later than November ~~13~~16, 2026 at 4:00 p.m. (prevailing Eastern Time). Unless an objection is timely-filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

**4.3. Requirements for Confirmation.**

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class, and (b) must be feasible. The Bankruptcy Court must also find that (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code, and (iii) the Plan has been proposed in good faith.

**4.4. Classification of Claims and Interests.**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the

holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If this occurs, the Debtors intend, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including contractual subordination, if any) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

**4.5. Impaired Claims or Interests.**

Pursuant to the Plan and the provisions of the Bankruptcy Code, only classes of Claims or Interests that are Impaired under the Plan that are not deemed to reject the Plan may vote to accept or reject the Plan.

Under the Plan, only Holders of Claims in Classes 3 and 4 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims or Interests in Classes 5 and 6 are

Impaired and deemed to reject the Plan. Therefore, Holders of Claims or Interests in Classes 5 and 6 are not entitled to vote on the Plan. Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are presumed to accept the Plan.

**4.6. Confirmation Without Necessary Acceptances; Cramdown.**

In the event that any Impaired Class of Claims or Interests does not accept a plan with respect to any debtor, the debtor nevertheless may move for confirmation of its plan. A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting Impaired Class of claims or interests. Here, because Holders of Claims and Interests in Classes 5 and 6 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, in part, as no Holder of a Claim or Interest junior to those in Classes 5 and 6 will receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests, provided that a debtor may be afforded wide latitude for separately classifying and treating claims of the same priority based on, among other factors, the differing factual or legal nature or attributes of the claims or their holders. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, when taking into account the nature and attribute of such Claims and Interests and their Holders. No Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, including the "absolute priority rule," as follows:

(a) **Secured Creditors.** Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b) **Unsecured Creditors.** Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) **Interests.** Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the "cramdown" test and absolute priority rule, where required. The proposed treatment of Claims and Interests provides that each Holder of such Claim or Interest will be treated identically within their respective class and that, except when agreed to by such Holder, no Holder of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Interest.

### 4.7. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not likely be followed by liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Debtors' principal Assets have been liquidated and the Plan provides for the Distribution of all the Cash proceeds of the Debtors' Assets to Holders of Claims that are Allowed as of the Effective Date in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the GUC Liquidating Trust and the Wind-Down Trust to meet their respective discrete obligations under the Plan. Based on the Debtors' analysis, the GUC Liquidating Trust and the Wind-Down Trust will each have sufficient assets to accomplish their respective tasks under the Plan. Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 4.8. Best Interests Test and Liquidation Analysis.

Even if a plan is accepted by the Holders of each Class of Claims and Interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of

a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each Impaired Class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best

interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

The Liquidation Analysis was prepared for the sole purpose of assisting the Bankruptcy Court and holders of Impaired Claims or Interests in making a determination that the Plan satisfies the "best interests" test and should not be used for any other purpose. The determination of the hypothetical liquidation proceeds, and costs of the liquidation of the Debtors' Assets, is an uncertain process involving estimates and assumptions that are inherently subject to significant business and economic uncertainties and contingencies outside the control of the Debtors, their management, and their advisors. Inevitably, certain assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis.

WHILE DEEMED REASONABLE BASED ON THE FACTS CURRENTLY AVAILABLE, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, except as otherwise set forth herein, estimated Allowed Claims are based upon an initial review of the Proofs of Claim filed on or before September 27, 2026, and as well as various other financial statements and reports (the "Financial Reports"). Estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of any Allowed Claims and Interests under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNTS OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to

the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The hypothetical Liquidation Analysis assumes conversion of each of the Debtors'

Chapter 11 Cases to chapter 7 liquidation cases on November ~~19~~24, 2026. On the Conversion Date, it is assumed the Bankruptcy Court would Appoint a chapter 7 trustee to oversee the liquidation of the Debtors' Estates. The costs of liquidation under chapter 7 of the Bankruptcy Code would include compensation of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the chapter 7 trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. The Debtors' professionals and contractors have spent months familiarizing themselves with the Debtors' books and records, assets, liabilities, claimant pool, corporate history, causes of action, and other potential sources of recovery. A chapter 7 trustee and any professionals retained by the trustee would not have the same institutional knowledge, creating significant inefficiencies and ballooning the cost of administering the Estates. Conversion also would likely delay the liquidation process and ultimate distribution to creditors. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in chapter 7 cases.

Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code. Attached hereto as **Exhibit A** is a hypothetical chapter 7 liquidation analysis.

**4.9. Releases by the Debtors.**

Article X of this Combined Disclosure Statement and Plan contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Combined Disclosure Statement and Plan will affect any claim, interest, right, or action with regard to the Debtors and certain third parties.

**THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

**FOR THE AVOIDANCE OF DOUBT, THE THIRD-PARTY RELEASES SET FORTH IN THE GOING CONCERN PURCHASE AGREEMENT ARE SEPARATE FROM AND UNAFFECTED BY THE RELEASES PROVIDED UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THE THIRD-PARTY RELEASES SET FORTH IN THE GOING CONCERN PURCHASE AGREEMENT AND THE TERMS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, THE TERMS OF THE THIRD-PARTY RELEASES SET FORTH IN THE GOING CONCERN PURCHASE AGREEMENT SHALL CONTROL.**

Under the voting procedures described in Article IV of this Combined Disclosure Statement and Plan, the Debtors believe that these releases, exculpations, and injunction language are considered consensual under applicable bankruptcy law.

The Combined Disclosure Statement and Plan memorializes the Releases by the Debtors in favor of the Released Parties pursuant to the Going Concern Sale Order. The Debtors are not aware of any potential claims or causes of action against the Released Parties.

**4.10. Acceptance of the Plan.**

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of Ballots are set forth in the Solicitation Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AGENT VIA EMAIL AT TEAMSVM@STRETTO.COM WITH A REFERENCE TO "SEARLES VALLEY MINERALS – SOLICITATION INQUIRY" IN THE SUBJECT LINE; OR BY PHONE AT (855) 296-3324 (U.S. AND CANADA) OR +1 (626) 746-1263 (INTERNATIONAL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.

**ARTICLE V**

**CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**

**THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**5.1. The Plan May Not Be Accepted.**

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that

the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

**5.2. The Plan May Not Be Confirmed.**

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determines that the combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met. Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately might receive with respect to their Claims or Interests in a subsequent plan of liquidation.

**5.3. Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections.**

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors, including the amount and value of assets available for Distribution and the number and value of Claims ultimately Allowed in these cases. Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

**5.4. Claims May Be Reclassified.**

As previously described, section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition

of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in

accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and Consummation of the Plan and could increase the risk that the Plan will not be Consummated.

**5.5. The Plan May Not Be Consummated.**

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be Consummated.

**5.6. Recoveries May Be Substantially Diluted.**

There can be no assurance that the estimated Claim amounts set forth in the Plan are correct, and the actual Allowed amounts of Claims may differ from the estimates. The estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein, thereby materially reducing the recovery to the Holders of Claims under the Plan.

**5.7. The Plan Releases May Not Be Approved.**

There can be no assurance that the releases, as provided in Article X of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan, or the Plan not being confirmed.

**5.8. Certain Tax Considerations.**

There are a number of material income tax considerations, risks, and uncertainties associated with the Plan described in this Combined Disclosure Statement and Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING

ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VI

## TREATMENT OF UNCLASSIFIED CLAIMS

Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Unimpaired Claims are conclusively presumed to have accepted this Plan. The Holders of Administrative Claims, Professional Fee Claims, Tax Claims, Priority Claims, and Secured Claims are not Impaired under this Plan.

### 6.1. Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for U.S. Trustee Fees) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the Allowed amount of such Administrative Claim either: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim; (d) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder and the Debtors, or (ii) if after the Effective Date, such Holder and the Wind-Down Trustee; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Holders of Additional Administrative Claims, other than Holders of Professional Fee Claims and Claims for U.S. Trustee Fees, must file on the docket of these cases and serve on the GUC Liquidating Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to be actually received on or before the Interim Administrative Claims Bar Date or the Final Administrative Claims Bar Date, as applicable pursuant to the Bar Date Order. Any Person or Entity required to timely file such request for payment that fails to do so shall not be treated as a creditor with respect to such Claim for the purpose of Distribution in these Chapter 11 Cases on account of such Claim and will be barred, estopped, and enjoined from asserting such Claim against the Debtors. The notice of confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the Final Administrative Claim Bar Date and shall constitute notice of such Bar Date.

For the avoidance of doubt, the deadline for Filing requests for payment of 503(b)(9) Claims is the General Bar Date. The deadline for Filing requests for payment of Administrative

Claims that arose on or before September 1, 2026 is the Interim Administrative Claims Bar Date. The deadline for Filing requests for payment of Administrative Claims that arose after September 1, 2026 will be the Final Administrative Claim Bar Date. None of these deadlines are extended by this Combined Disclosure Statement and Plan nor by the Confirmation Order.

~~With respect <to U.S. Trustee Fees>, all fees due, payable, and/or that may come due to the~~

All U.S. Trustee ~~pursuant to section 1930 of Title 28 of the United States Code on account of the period on or before the~~Fees prior to the Effective Date shall be paid by the Debtors on the Effective Date~~, or as soon as practicable thereafter to the extent said amount was not yet due and/or billed. For the avoidance of doubt, distributions from the Wind-Down Trust and distributions from the GUC Liquidating Trust, respectively shall not constitute "disbursements" made by or on behalf of any of the Debtors under 28 U.S.C. § 1930(a)(6).~~. The Debtors shall file all monthly operating reports due prior to the Effective Date when due, using UST Form 11-MOR. After the Effective Date, (a) the Wind-Down Trust shall file final monthly operating reports for each of the Debtors, and (b) the Wind-Down Debtors, Wind-Down Trust and GUC Liquidating Trust each shall (i) file with the Bankruptcy Court separate UST Form 11-PCR reports when due; and (ii) pay any and all U.S. Trustee Fees for which it is liable under applicable law when due and payable. With respect to the Chapter 11 Case of each Debtor, the Wind Down Trust shall pay the U.S. Trustee Fees accrued by that particular Wind-Down Debtor from and after the Effective Date until the earliest of (a) that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; and (b) the final Distribution Date for the Wind-Down Trust; *provided that* >any U.S. Trustee Fees arising from a <disbursement by (i) >the GUC Liquidating Trust shall <>be paid by the GUC Liquidating <Trust >from the GUC Liquidating Trust Assets<, and (ii) the Wind- Down Trust shall >be paid by the Wind-Down Trust <>from the Wind-Down Trust Assets<; and *provided further*, that if the final Distribution Date for the Wind-Down Trust occurs before the final Distribution Date for the GUC Liquidating Trust, the GUC Liquidating Trust shall pay all

~~To the extent that a court of competent jurisdiction determines that a distribution from the GUC Liquidating Trust or a distribution from the Wind-Down Trust constitutes a "disbursement" made on behalf of the Debtors under 28 U.S.C. § 1930(a)(6), then <any U.S. Trustee Fees arising from a >distribution from <the GUC Liquidating Trust shall >solely <be paid by the GUC Liquidating >Trustee <from the GUC Liquidating Trust Assets >and any U.S. Trustee Fees arising from a distribution from the Wind-Down Trust shall solely <be paid by the Wind-Down Trust >Trustee <from the Wind-Down Trust Assets>.~~

U.S. Trustee Fees accruing by that Debtor and with respect to that Debtor's Chapter 11 Case after the final Distribution Date of the Wind-Down Trust, until the closing of that Debtor's Chapter 11 Case, and file all related UST Form 11-PCR reports.

For the avoidance of doubt, disbursements >from the GUC Liquidating Trust <or Wind-Down Trust, respectively, shall not be subject >to U.S. Trustee Fees <to the extent that funds transferred to such trust on the Effective Date are included in the calculation of Debtor disbursements on which U.S. Trustee Fees were paid.

The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

**6.2. Professional Fee Claims.**

In accordance with the terms of the Final DIP Order, Allowed Professional Fee Claims shall be paid from the Professional Fees Escrow Account, which shall be maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates, the GUC Liquidating Trust, or the Wind-Down Trust; *provided, however*, that after all Allowed Professional Fee Claims have been paid in full, Fee Applications in connection with all Professional Fee Claims have been timely Filed, there are no Fee Applications pending before the Bankruptcy Court, and there are no Disputed Professional Fee Claims, any remaining Cash in such reserve shall be: (i) to the extent of the Extended Committee Budget Savings, if any, distributed to the GUC Liquidating Trust and (ii) otherwise distributed to the Wind-Down Trust. No Liens, Claims, or interests shall encumber the Professional Fees Escrow Account in any way.

All requests for final allowance of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed and served in accordance with the Interim Compensation Procedures Order by the date that is thirty (30) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. If a final application for a Professional Fee Claim is not Filed within thirty (30) days after the Effective Date, such Professional Fee Claim shall be deemed waived, and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The notice of confirmation to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) shall set forth the deadline to file requests for payment of Professional Fee Claims. Objections to the Allowance of Professional Fee Claims must be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days after the filing of the applicable Fee Application.

**6.3. Tax Claims.**

Unless otherwise agreed to by the Holder of an Allowed Tax Claim, each Holder of an Allowed Tax Claim will receive in full and final satisfaction of such Allowed Tax Claim Cash in an amount equal to the unpaid portion of such Allowed Tax Claim either: (a) if a Tax Claim is Allowed on or prior to the Effective Date, on the Effective Date by the Debtors; (b) if such Tax Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Tax Claim becomes a Final Order; (c) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder and the Debtors or (ii) if after the Effective Date, such Holder and the Wind-Down Trustee; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that all Allowed Tax Claims that are not due and payable on or before the Effective Date shall be paid by the Wind-Down Trustee in the ordinary course of business as they become due. Any Claim or demand for any penalty (a) will be subject to treatment as a General Unsecured Claim, if and to the extent it is an Allowed Claim, and (b) the Holder of an Allowed Tax Claim shall not assess or attempt to collect such amounts from the Debtors, the Estates, the Wind-Down Trustee, or the Wind-Down Trust except as a General Unsecured Claim, if and to the extent it is an Allowed Claim.

**6.4. DIP Facility Claims.**

On the Effective Date, the DIP Lender as Holder of the DIP Facility Claims shall receive

~~(i) a 50% interest in the Note Consideration, and (ii)~~ 50% of the shares of the Stock Consideration~~, in each case to the extent (if at all)~~ that were not distributed to the Prepetition Secured Lender's designee or the DIP Lender at ~~Closing under and as defined in~~ the Going Concern ~~Purchase Agreement~~Closing, subject ~~only~~ to dilution by Stock Consideration distributed to Process Equipment from the Lienholder Reserve, if any. Any Stock Consideration ~~or~~ remaining in the Lienholder Reserve upon payment in full of any Allowed Secured Claim of Process, or proceeds thereof, shall be promptly distributed 50% to the Prepetition Secured Lender or its designee and 50% to the DIP Lender.

~~<The liens and claims of the DIP Lender shall continue to attach to all proceeds from the sale of Transferred Assets under the Going Concern Purchase Agreement ><with the same validity, extent, and priority as existed immediately prior to the Going Concern Closing, and such proceeds shall be >segregated and held in a separate, interest-bearing account pending further Order of the Bankruptcy Court directing the distribution thereof<, in accordance with the Going Concern >Purchase Agreement.~~

Except as may be earlier distributed to the Holders of the Prepetition Secured Claims or the DIP Lender, or their repective designees, pursuant to the foregoing paragraph of this Section ~~All~~6.4 or the first two paragraphs of Section 7.3 of this Plan, all other Wind-Down Trust Assets and proceeds thereof remaining after payment of all Allowed Administrative Expense Claims, Allowed Priority Claims, and costs of administration of the Wind-Down Trust shall be distributed in equal parts to the Prepetition Secured Lender or its designee on account of the Prepetition Loan Claims and the DIP Lender on account of the DIP Facility Claims until the DIP Facility Claims are paid in full, and thereafter in full to the Prepetition Secured Lender or its designee on account of the Prepetition Loan Claims.

>The liens and claims of the DIP Lender shall continue to attach to all proceeds from the sale of Transferred Assets under the Going Concern Purchase Agreement <that have not already been distributed to the DIP Lender or the designee of the Prepetition Secured Lender, >with the same validity, extent, and priority as existed immediately prior to the Going Concern Closing, and such proceeds shall be <distributed in accordance with this Plan.

The liens and claims of the DIP Lender and Prepetition Secured Lender shall continue to attach to the Wind-Down Trust Assets in the same priority as they attached to the Debtors' assets immediately prior the occurrence of the Effective Date.

## ARTICLE VII

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

The Claims in Classes 1 and 2 are Unimpaired, conclusively presumed to accept the Plan and are not entitled to vote on the Plan. The Claims in Classes 3 and 4 are Impaired and entitled to vote to accept or reject this Plan. Holders of Claims in Class 5 and Interests in Class 6 are conclusively deemed to reject the Plan and, therefore, are not entitled to vote on the Plan.

**7.1. Class 1: Priority Claims.**

Except to the extent that a Holder of an Allowed Priority Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Priority Claim has not been paid in full prior to the Effective Date, each Holder of an Allowed Priority Claim will receive in full and final satisfaction of such Allowed Priority Claim an amount of Cash equal to the unpaid portion of such Allowed Priority Claim either: (a) if a Priority Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter; (b) if such Priority Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Priority Claim becomes a Final Order; (c) at such time as may be agreed upon by (i) if prior to the Effective Date, such Holder and the Debtors, or (ii) if after the Effective Date, such Holder and the Wind-Down Trustee; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court. Any Allowed Priority Claim after the Effective Date shall be paid by the Wind-Down Trustee.

Class 1 is Unimpaired and is deemed to accept the Combined Disclosure Statement and Plan.

**7.2. Class 2: Other Secured Claims.**

Except to the extent that a Holder of an Allowed Other Secured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Other Secured Claim has not been paid in full prior to the Effective Date, each Holder of an Allowed Other Secured Claim, at the option of the Debtors and DIP Lender, shall (i) be paid in full in Cash; (ii) receive the collateral securing its Allowed Other Secured Claim, plus post-petition interest to the extent required under Bankruptcy Code section 506(b); or (iii) receive other treatment rendering such Claim Unimpaired in accordance with Bankruptcy Code section 1124, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is reasonably practicable. In the event the Debtors treat a Claim under clause (i) of this Section, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization, or approval of any Person.

Class 2 is Unimpaired under the Combined Disclosure Statement and Plan and is deemed to accept the Combined Disclosure Statement and Plan.

**7.3. Class 3: Prepetition Loan Claims.**

Except to the extent that a Holder of a Prepetition Loan Claim agrees to a less favorable treatment, the Holder of the Prepetition Loan Claims shall receive (a) all proceeds from the collection of any accounts receivable of the Debtors; and (b) itself or by distribution to its designee, ~~(i) a 50% interest in the Note Consideration, and (ii)~~ 50% of the shares of the Stock Consideration~~,~~ that ~~have~~were not ~~been~~ distributed ~~<at Closing under and as defined in>~~to its designee or the DIP Lender at the Going Concern ~~Purchase Agreement, in each case ((b)(i) and (ii)) to the extent not previously distributed, and~~Closing, subject to dilution by Stock

Consideration distributed to Process Equipment from the Lienholder Reserve, if any; and (c) the Tax Refund.

Any Stock Consideration or remaining in the Lienholder Reserve upon payment in full of any Allowed Secured Claim of Process, or proceeds thereof, shall be promptly distributed 50% to the Prepetition Secured Lender or its designee and 50% to the DIP Lender.

~~All~~Except as may be earlier distributed to the Holders of the Prepetition Secured Claims or the DIP Lender, or their repective designees, pursuant to the foregoing two paragraph of this Section 7.3 or the first paragraph of Section 7.3 of this Plan, all other Wind-Down Trust Assets and proceeds thereof remaining after payment of all Allowed Administrative Expense Claims, Allowed Priority Claims, and costs of administration of the Wind-Down Trust shall be distributed in equal parts to the Prepetition Secured Lender or its designee on account of the Prepetition Loan Claims and the DIP Lender on account of the DIP Facility Claims until the DIP Facility Claims are paid in full, and thereafter in full to the Prepetition Secured Lender or its designee on account of the Prepetition Loan Claims.

The liens and claims of the Holders of Prepetition Loan Claims and DIP Facility Claims shall continue to attach to the Wind-Down Trust Assets in the same priority as they attached to the Debtors' assets immediately prior the occurrence of the Effective Date.

Class 3 is Impaired under the under the Combined Disclosure Statement and Plan and is entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

**7.4. Class 4: General Unsecured Claims.**

Except to the extent that a Holder of an Allowed General Unsecured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Claim has not been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed General Unsecured Claim in Class 4 shall receive in full and final satisfaction, settlement, and release of and in exchange for its Allowed Class 4 General Unsecured Claim, such Holder's *Pro Rata* share of GUC Liquidating Trust Interests, entitling such Holder to a *Pro Rata* share of the GUC Liquidating Trust Assets in accordance with the GUC Liquidating Trust Agreement. Distributions on account of Class 4 General Unsecured Claims shall be made by the GUC Liquidating Trust, acting through the GUC Liquidating Trustee, in accordance with the GUC Liquidating Trust Agreement.

Class 4 is Impaired under the Combined Disclosure Statement and Plan and entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

**7.5. Class 5: Subordinated Claims.**

Holders of Claims in Class 5 Subordinated Claims shall receive no Distribution on account of their Subordinated Claims pursuant to the Combined Disclosure Statement and Plan. For the avoidance of doubt, the General Unsecured Claims of the Sponsor and its non-Debtor Affiliates, with the exception of the General Unsecured Claims of SVME which shall be Class 4 General Unsecured Claims, shall be Class 5 Subordinated Claims.

Class 5 is Impaired under the Combined Disclosure Statement and Plan and is deemed to reject the Combined Disclosure Statement and Plan.

### 7.6. Class 6: Interests.

Holders of Class 6 Interests will retain no ownership interests or distribution under the Combined Disclosure Statement and Plan and, on the Effective Date, shall be deemed cancelled, null, and void.

Class 6 is Impaired under the Combined Disclosure Statement and Plan and is deemed to reject the Combined Disclosure Statement and Plan.

### 7.7. Reservation of Rights Regarding Claims and Interests.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

### 7.8. Certain Federal Income Tax Consequences

The following discussion is a summary of certain U.S. federal income tax consequences of the Combined Disclosure Statement and Plan to the Debtors and to Holders of Claims. This discussion is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules, and pronouncements of the IRS, all as in effect on the date hereof.

Due to the complexity of certain aspects of the Combined Disclosure Statement and Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Combined Disclosure Statement and Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims in light of their personal

circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Interests as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local, or estate and gift taxation is addressed.

For purposes of the following discussion, a "U.S. Holder" is a beneficial owner of a

Claim that is (i) a citizen or individual resident of the United States; (ii) a corporation (or other entity classified as a corporation for United States federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to United States federal income taxation regardless of its source; or (iv) a trust that (a) is subject to the primary supervision of a United States court and has one or more United States persons, within the meaning of Internal Revenue Code section 7701(a)(30), who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury regulations to be treated as a United States person.

If a partnership (including any entity classified as a partnership for United States federal income tax purposes) holds Claims, the United States federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership that owns a Claim (and its partners) should consult their tax advisors regarding the consequences of the transactions described in this Combined Disclosure Statement and Plan.

**EACH HOLDER OF A CLAIM IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.**

(a) **Certain Federal Income Tax Consequences to the Debtors**

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from COD Income to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (a) the adjusted issue price of the discharged indebtedness less (b) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness.

The recognition of COD Income may be treated differently in the context of a confirmed chapter 11 plan. For example, under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to section 108(b) of the Tax Code to reduce certain of that taxpayer's tax attributes to the extent of the amount of COD Income. The Tax Attributes of

the taxpayer generally are reduced in the following order: net operating losses, general business and minimum tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets and, finally, foreign tax credit carry forwards. If the amount of COD Income exceeds the amount of Tax Attributes available to be reduced, the excess still is excluded from income. Pursuant to section 108(b)(4)(A) of the Tax Code, the reduction of Tax Attributes does not occur until the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized. Section 108(e)(2) of the Tax Code provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's

satisfaction of the debt would have given rise to a deduction for United States federal income tax

purposes.

(b) **Certain Federal Income Tax Consequences to U.S. Holders of Prepetition Loan Claims**

The following summary discusses certain United States federal income tax consequences of the transactions contemplated by this Combined Disclosure Statement and Plan to Holders of Prepetition Loan Claims that are U.S. Holders. These consequences (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things: (i) the manner in which a U.S. Holder of a Prepetition Loan Claim acquired the Prepetition Loan Claim; (ii) the length of time the Prepetition Loan Claim has been held; (iii) the U.S. Holder's method of tax accounting; (iv) whether the U.S. Holder has taken a bad debt deduction with respect to the Prepetition Loan Claim (or any portion of the Prepetition Loan Claim) in the current or prior taxable years; (v) whether the Prepetition Loan Claim was acquired at a discount; (vi) whether the U.S. Holder of a Prepetition Loan Claim has previously included in its taxable income accrued but unpaid interest with respect to the Prepetition Loan Claim; and (vii) whether the Prepetition Loan Claim is an installment obligation for United States federal income tax purposes. The tax consequences described below are not exclusive, and some of the conclusions expressed are uncertain. U.S. Holders may be treated for United States federal income tax purposes in certain respects other than as set forth herein. Therefore, each U.S. Holder of a Prepetition Loan Claim is strongly urged to consult its own tax advisor regarding information that may be relevant to its particular situation and circumstances and the tax consequences to it of the transactions contemplated by the Plan.

The receipt by a U.S. Holder of any property in exchange for a Prepetition Loan Claim pursuant to the Plan should be treated as a taxable transaction for United States federal income tax purposes. In general, subject to the "market discount" rules discussed below, a U.S. Holder of a Prepetition Loan Claim will recognize gain or loss with respect to its Prepetition Loan Claim in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value of any other consideration received or treated as received in respect of its Claim for U.S. federal income tax purposes (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income). The character of any income or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. U.S. Holders of Prepetition Loan Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.

If a U.S. Holder of a Prepetition Loan Claim had purchased its interest in the applicable facility at a price less than such facility's "revised issue price" (generally, the issue price increased by all previous holders' inclusions of original issue discount), the difference would constitute "market discount" for United States federal income tax purposes. Gain recognized by a U.S. Holder in the exchange of a Prepetition Loan Claim bearing market discount pursuant to the Combined Disclosure Statement and Plan should generally be treated as ordinary interest income to the extent of the market discount accrued on such Prepetition Loan Claim during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include accrued market discount

in taxable income currently. U.S. Holders should consult their tax advisors regarding the potential application of the market discount rules.

To the extent that any Prepetition Loan Claim entitled to a distribution under the Combined Disclosure Statement and Plan is composed of indebtedness and accrued but unpaid interest thereon, the Debtors intend to take the position that such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Prepetition Loan Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. If any distribution under the Plan is treated as being allocated first to accrued but unpaid interest, a U.S. Holder of such Claim would realize ordinary income with respect to the distribution in an amount equal to the lesser of such distribution and the accrued but unpaid interest not already taken into income under the U.S. Holder's method of accounting, regardless of whether the U.S. Holder otherwise realizes a loss as a result of the Combined Disclosure Statement and Plan. Conversely, a U.S. Holder of a surrendered Prepetition Loan Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest (including any accrued market discount for U.S. federal income tax purposes) on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

(c) **Tax Consequences of the GUC Liquidating Trust and U.S. Holders of Beneficial Interests Therein**

In furtherance of Section 7.11 of the Combined Disclosure Statement and Plan, (i) the GUC Liquidating Trust is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code for the benefit of Holders of Allowed General Unsecured Claims; (ii) the sole purpose of the GUC Liquidating Trust is intended to be the liquidation and distribution of the GUC Liquidating Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims, with no objective to continue or engage in

the conduct of a trade or business; (iii) the transfer of the GUC Liquidating Trust Assets to the GUC Liquidating Trust is intended to be treated for all purposes of the Tax Code as a deemed transfer of such GUC Liquidating Trust Assets to the GUC Liquidating Trust Beneficiaries, followed by a deemed transfer of the GUC Liquidating Trust Assets by the GUC Liquidating Trust Beneficiaries to the GUC Liquidating Trust in exchange for the GUC Liquidating Trust Interests; (iv) the GUC Liquidating Trust Beneficiaries are intended to be treated as the grantors and deemed owners of the GUC Liquidating Trust; (v) the Debtors, the Estates, the Wind-Down Debtors, the GUC Liquidating Trust, the GUC Liquidating Trustee, and the GUC Liquidating Trust Beneficiaries shall report consistently with the valuation of the GUC Liquidating Trust Assets transferred to the GUC Liquidating Trust as determined by the Plan Administrator (or its

designee) for all U.S. federal income tax purposes; (vi) the GUC Liquidating Trustee shall file tax returns for the GUC Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vii) the GUC Liquidating Trustee will annually send to the GUC

Liquidating Trust Beneficiaries a statement setting forth the income and expenditures of the trust as relevant for U.S. federal income tax purposes, and, accordingly, each holder of a GUC Liquidating Trust Interest will be required to report on its U.S. federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the GUC Liquidating Trust. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the IRS of a private letter ruling if the GUC Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not successfully contested by the GUC Liquidating Trustee), the GUC Liquidating Trustee may timely elect to (i) treat any portion of the GUC Liquidating Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, the Debtors and the Estates, holders of General Unsecured Claims, and the GUC Liquidating Trustee are required to report for United States federal, state, and local income tax purposes consistently with the foregoing.

While the foregoing discussion assumes that the GUC Liquidating Trust would be treated as a "liquidating trust" and thus as a "grantor trust" for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the GUC Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the GUC Liquidating Trust and the Holders of GUC Liquidating Trust Interests could vary from those discussed herein. Holders are urged to consult their tax advisors regarding the U.S. federal income tax treatment of the GUC Liquidating Trust, the transfer of the GUC Liquidating Trust Assets to the GUC Liquidating Trust, ownership of GUC Liquidating Trust Interests, and receipt of Distributions therefrom.

(d) **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION

IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES TO THE DEBTORS AND HOLDERS ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE UNITED STATES FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN.

## ARTICLE VIII

## ACCEPTANCE OR REJECTION OF THE PLAN

### 8.1. Classes Entitled to Vote.

Because Claims in Classes 3 and 4 are Impaired, are not deemed to reject the Plan, and

will receive or retain property or an interest in property under the Plan, the Holders of Classes 3 and 4 Claims are entitled to vote to accept or reject the Plan.

**8.2. Acceptance by Impaired Classes of Claims.**

In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

**8.3. Presumed Acceptance by Unimpaired Classes.**

Because Claims in Classes 1 and 2 are Unimpaired, pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1 and 2 are presumed to have accepted the Plan and, therefore, Holders of such Claims are not entitled to vote to accept or reject the Plan.

**8.4. Presumed Rejections by Impaired Classes.**

Because Holders of Subordinated Claims in Class 5 and Holders of Interests in Class 6 will receive no Distribution under the Plan, they are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

**8.5. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.**

To the extent that any Impaired Class votes to reject the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**8.6. Controversy Concerning Impairment.**

If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall determine such controversy on or before the Confirmation Date.

**8.7. Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance.

**8.8. Voting Classes; Deemed Acceptance by Non-Voting Classes.**

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

# ARTICLE IX

## MEANS OF IMPLEMENTING THE PLAN

In addition to the provisions set forth elsewhere in this Combined Disclosure Statement and Plan, the following shall constitute the means of execution and implementation of this Plan.

### 9.1. Plan Funding.

The Plan is funded primarily from the Wind-Down Trust Assets and the proceeds of the Asset Purchase Agreements, including the Cash Consideration, Note Consideration and Stock Consideration to the extent not previously distributed, the GUC Liquidating Trust Cash received pursuant to the Going Concern Purchase Agreement, and the proceeds of the Soda Ash Sale Transaction to the extent not previously distributed. All Distributions under the Combined Disclosure Statement and Plan shall be made from such proceeds and the other Assets of the Estates, as further described herein. Distributions under the Plan with respect to Allowed Class 4 Claims and the portion (if any) of Allowed Professional Fee Claims of Committee Professionals in excess of $3 million in the aggregate, shall be made solely by the GUC Liquidating Trust and funded solely from GUC Liquidating Trust Assets. Distributions under the Plan with respect to all Claims that are not General Unsecured Claims shall be by the Wind-Down Trust and funded from Wind-Down Trust Assets.

### 9.2. Transfer of Permits, Interests, and Dissolution of the Debtors.

On and after the Effective Date, the Debtors shall continue to exist for the purposes of maintaining and keeping in place the Permits, transferring the Permits to the Buyer, and continuing to perform under the TSA. On the Effective Date, the Wind-Down Trustee shall automatically, without the need for any corporate action or approval and without the need for any corporate filings, be made the sole director and sole officer of each of the Debtors.

To the extent that Class 4 votes to accept the Plan, immediately following the occurrence of all of the Debtors' Permit Transfer Dates, all Interests in Debtor SVM shall automatically vest in the Wind-Down Trust, with the ownership of the Interests in the other Debtors left unchanged. To the extent that Class 4 does not vote to accept the Plan, immediately following the occurrence of the Permit Transfer Date for each of Debtor, the Interests in such Debtor shall automatically vest in the Wind-Down Trust.

Upon the closing of each of their respective Chapter 11 Cases and the entry by the Bankruptcy Court of a final decree in each such case, or such earlier date as the Wind-Down Trustee may determine, each Debtor shall be automatically and immediately deemed dissolved, in accordance with section 303 of the Delaware General Corporation Law or other applicable law, without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided that notwithstanding such dissolution, the Wind-Down Trustee shall retain the authority to file all applicable or necessary federal, state, or local filings (including tax filings) to the extent required for each of the Debtors (including to the extent deemed necessary or appropriate by the Wind-Down Trustee).

**9.3. Retention of Books and Records.**

On the Effective Date, the Wind-Down Trustee shall provide for the retention and storage of the books, records, and files that shall have been delivered to the Wind-Down Trust until such time as all such books, records, and files are no longer required to be retained under applicable law or as otherwise authorized by the Bankruptcy Court. With respect to any books and records that are not, in the view of the Wind-Down Trustee, after having consulted with the GUC Liquidating Trustee, relevant for the continuing prosecution of any objections to Claims, defense of any potential Claims or actions against the Debtors, the GUC Liquidating Trust, or the Wind-Down Trust, any Causes of Action, or the wind-down of the Debtors' Estates, the Wind-Down Trustee shall be free, in its reasonable discretion, to abandon, destroy, or otherwise dispose of such books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other order of the Bankruptcy Court and shall have no liability for same.

The Wind-Down Trustee shall reasonably cooperate with the GUC Liquidating Trustee to provide the GUC Liquidating Trust with any of the Debtors' books and records upon the GUC Liquidating Trustee's reasonable request.

**9.4. The GUC Liquidating Trust.**

(a) **Establishment of the GUC Liquidating Trust.** The GUC Liquidating Trust shall be established and shall become effective on the Effective Date.

(b) **Vesting of GUC Liquidating Trust Assets.** Upon the occurrence of the Effective Date, the GUC Liquidating Trust Assets shall be transferred to the GUC Liquidating Trust in accordance with this Plan. Upon transfer of the GUC Liquidating Trust Assets, the Debtors shall have no further duties or responsibilities in connection with the implementation of this Plan as it related to the GUC Liquidating Trust (except as otherwise explicitly provided for in this Plan). The GUC Liquidating Trust Assets shall vest in the GUC Liquidating Trust free and clear of all Liens, claims, and interests.

(c) **GUC Liquidating Trust Assets.** Without limiting the generality of the foregoing subsection (b):

*i.* ***GUC Liquidating Trust Cash as of the Effective Date***. All GUC Liquidating Trust Cash held by the Debtors as of the Effective Date will transfer to the GUC Liquidating Trust (provided that the Professional Fees Escrow Account will continue to be maintained and held in escrow as set forth in section 6.2 of this Plan).

*ii.* ***GUC Chapter 5 Actions***. All GUC Chapter 5 Actions will be contributed to the GUC Liquidating Trust on the Effective Date. Subject only to any approval(s) required of the GUC Oversight Board pursuant to the GUC Liquidating Trust Agreement, GUC Chapter 5 Actions may be investigated, prosecuted, settled, released or abandoned by the GUC Liquidating Trustee in its sole discretion. The GUC Liquidating Trust, in the name of the GUC Liquidating Trustee shall have the sole authority and standing to commence and litigate all GUC Chapter 5 Actions. No Entity may rely on the absence of a specific reference in this Combined Disclosure Statement and Plan or the Plan Supplement to any Cause of Action against it as any indication that the GUC

Liquidating Trust will pursue or not pursue any and all available GUC Chapter 5 Actions.

(d) **Creation and Maintenance of GUC Liquidating Trust Accounts.** Prior to the Effective Date, one or more GUC Liquidating Trust Accounts will be created, as directed by the Committee. Cash deposited in the trust accounts on the Effective Date and thereafter will be invested, held, and used solely as provided in the GUC Liquidating Trust Agreement. The GUC Liquidating Trustee is authorized to establish additional GUC Liquidating Trust Accounts after the Effective Date, in accordance with the terms of the GUC Liquidating Trust Agreement, as applicable. After the funding of the GUC Liquidating Trust Accounts on the Effective Date, the trust accounts will be funded, as applicable, by Cash proceeds obtained through litigation, settlement, disposition, or other monetization of the GUC Liquidating Trust Assets.

(e) **GUC Liquidating Trust Distributions.** All Distributions to the Holders of Allowed General Unsecured Claims that are not Allowed as of the Effective Date but subsequently Allowed, shall be from the GUC Liquidating Trust. The GUC Liquidating Trust shall, among other things, administer the GUC Liquidating Trust Assets. Upon obtaining an order of the Bankruptcy Court authorizing final Distributions to beneficiaries of the GUC Liquidating Trust, any funds remaining in the GUC Liquidating Trust Accounts shall be distributed, in accordance with this Plan and the GUC Liquidating Trust Agreement, and the GUC Liquidating Trust Accounts shall be closed. Except as otherwise provided in this Plan, the GUC Liquidating Trustee shall make Distributions in accordance with the GUC Liquidating Trust Agreement; *provided, however,* that the GUC Liquidating Trustee may postpone any Distribution if the GUC Liquidating Trustee determines that the amount of such Distributions would be too small to justify the administrative costs associated with making it.

(f) **Duration of the GUC Liquidating Trust.** The GUC Liquidating Trust shall have an initial term of two years; *provided*, *however*, that the GUC Liquidating Trustee shall be authorized to extend the GUC Liquidating Trust. The GUC Liquidating Trust may be terminated earlier than its scheduled termination if the GUC Liquidating Trustee determines that

it has administered all the GUC Liquidating Trust Assets and performed all other duties required by this Plan and the GUC Liquidating Trust Agreement. To the extent that the final Distribution Date of the GUC Liquidating Trust occurs after the final Distribution Date of the Wind-Down Trust, the GUC Liquidating Trustee shall seek entry of a Final Order closing the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code >as soon as practicable after the <final Distribution Date for the GUC Liquidating Trust.

**9.5. GUC Liquidating Trustee and Oversight Board.**

(a) **Appointment.** The initial GUC Liquidating Trustee will be disclosed in the Plan Supplement. The appointment of the GUC Liquidating Trustee shall be approved in the Confirmation Order and be effective as of the Effective Date. Successor GUC Liquidating Trustee(s) may be appointed in accordance with the GUC Liquidating Trust Agreement.

The members of the GUC Oversight Board shall be disclosed in the Plan Supplement. The appointments and acceptances of each of the members of the GUC Oversight Board shall be approved and confirmed in the Confirmation Order. Any successor members of the GUC Oversight Board shall be appointed in accordance with the GUC Liquidating Trust Agreement.

(b) **Term.** The GUC Liquidating Trustee's term, including without limitation

the term of any Successor GUC Liquidating Trustee(s), shall expire upon termination of the GUC Liquidating Trust pursuant to this Plan and/or the GUC Liquidating Trust Agreement.

(c) **Removal.** The ~~U.S. Trustee or any creditor that is a beneficiary of the GUC Liquidating Trust may request the removal of the~~ GUC Liquidating Trustee ~~for "cause" pursuant to a motion Filed with the Bankruptcy Court and served upon (a) the GUC Liquidating Trustee and its counsel, (b) the U.S. Trustee (if not the movant), and (c) all other Entities that have formally requested notice pursuant to Bankruptcy Rule 2002. In connection with any such motion to remove the GUC Liquidating Trustee, "cause" will include: (a) the GUC Liquidating Trustee's willful failure to perform his, her, or its material duties hereunder, which is not remedied within thirty (30) days of notice; (b) the GUC Liquidating Trustee's death; (c) the GUC Liquidating Trustee's mental or physical incapacity that materially and adversely affects the GUC Liquidating Trustee's ability to perform his, her, or its duties under the Plan; (d) the GUC Liquidating Trustee's commission of an act of fraud, theft, or embezzlement in connection with the GUC Liquidating Trustee's duties under this Plan; (e) the GUC Liquidating Trustee's conviction for the commission of a felony with all appeals having been exhausted or appeal periods lapsed; provided, however, that no "cause" shall exist involving clause (a) above until the GUC Liquidating Trustee first has failed to cure such failure within thirty (30) days of having been given written notice of such failure. For purposes of the foregoing, no act or failure to act on the part of the GUC Liquidating Trustee shall be considered "willful" unless it is done, or permitted to be done, by the GUC Liquidating Trustee without reasonable belief that the GUC Liquidating Trustee's action or omission was in the best interests of the Debtors. The GUC Liquidating Trust Oversight Board may remove and replace the GUC Liquidating Trustee without cause, subject to the provisions of the GUC~~may be removed in accordance with the terms of the Liquidating Trust Agreement.

(d) **Powers and Duties.** The GUC Liquidating Trustee shall be the representative of the Debtors' Estates solely with respect to the GUC Liquidating Trust Assets and Class 4 Claims (with the Wind-Down Trustee being the representative of the Debtors' Estates in all other respects) and shall have the rights and powers set forth in the GUC Liquidating Trust Agreement including, but not limited to, the rights and powers of a trustee under the Bankruptcy Code. The GUC Liquidating Trustee shall be governed in all things by the

terms of the GUC Liquidating Trust Agreement and this Plan. The GUC Liquidating Trustee shall administer the GUC Liquidating Trust and the GUC Liquidating Trust Assets, and make Distributions in accordance with this Plan and the GUC Liquidating Trust Agreement. Subject to the terms of the GUC Liquidating Trust Agreement, the GUC Liquidating Trustee shall be authorized, empowered, and directed to take all actions necessary to comply with this Plan and exercise and fulfill the duties and obligations arising hereunder, including, without limitation:

*i.* to administer all Class 4 Claims, including the filing of objections to claims asserted as General Unsecured Claims (other than Claims of the Sponsor or its non-Debtor Affiliates, except for SVME) and the litigation, settlement or other resolutions of Claims asserted as General Unsecured Claims;

*ii.* to make Distributions of the GUC Liquidating Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay or reserve for GUC Liquidating Trust Expenses, to Holders of Allowed Class 4 Claims as provided for or

contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof, including the establishment and maintenance of appropriate reserves in accordance with this Plan and the GUC Liquidating Trust Agreement, in the name of the Debtors or the GUC Liquidating Trustee, even in the event of the dissolution of the Debtors;

*iii.* to take all actions necessary to preserve and maximize the value of the GUC Liquidating Trust Assets;

*iv.* to prosecute, settle, release or abandon any GUC Chapter 5 Actions, by which the GUC Liquidating Trust is hereby granted standing to prosecute any of such GUC Chapter 5 Actions, and the authority to settle GUC Chapter 5 Actions without Bankruptcy Court approval;

*v.* to maintain, at the expense of the GUC Liquidating Trust, customary insurance coverage for the protection of the GUC Liquidating Trustee and GUC ~~Liquidating Trust~~ Oversight Board on and after the Effective Date;

*vi.* to object to any claims asserted as Class 4 Claims (Disputed or otherwise), and to defend, compromise and/or settle any Class 4 Claims prior to or following objection without the necessity of approval of the Bankruptcy Court;

*vii.* to make decisions, without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the GUC Liquidating Trust and to pay, from the GUC Liquidating Trust Assets, (i) the charges incurred by the GUC Liquidating Trust on or after the Effective Date for services of professionals, without application to the Bankruptcy Court, and (ii) disbursements, expenses or related support services relating to implementation of the Plan, without application to the Bankruptcy Court;

*viii.* to cause, on behalf of the GUC Liquidating Trust, all necessary tax returns and all other appropriate or necessary documents to be prepared or filed timely, in accordance with the Plan;

*ix.* to maintain appropriate books and records (including financial books and records) to govern the liquidation and Distribution of the GUC Liquidating Trust Assets;

*x.* to pay fees payable in the Chapter 11 Cases pursuant to 28 U.S.C. § 1930(a)(6) based on disbursements of the GUC Liquidating Trust to the extent that such disbursements are found by a court of competent jurisdiction to be "disbursements" in accordance with Section 6.1 of the Plan, and to file with the Bankruptcy Court and serve on the U.S. Trustee quarterly post-confirmation financial reports for the GUC Liquidating Trust until such time as such reports are no longer required, or the Bankruptcy Court orders otherwise, a final decree is entered closing these Chapter 11 Cases, or the Chapter 11 Cases are converted or dismissed;

*xi.* To dissolve the GUC Liquidating Trust if the GUC Liquidating Trustee determines, in reliance on such professionals as it may retain, that the expense of administering the GUC Liquidating Trust so as to make a final Distribution is likely to

exceed the value of the remaining GUC Liquidating Trust Assets;~~ and~~

*xii.* To be the Estate representative and successor of the Debtors upon and after the Estate Representative Transition Date, if any; and

~~*xii*~~*xiii*. To do all other acts or things consistent with the provisions of this Plan and the Confirmation Order that the GUC Liquidating Trustee deems reasonably necessary or desirable with respect to administration of the GUC Liquidating Trust.

(e) **Limitation of Liability; Exculpation of GUC Liquidating Trustee.** The GUC Liquidating Trustee (and its agents and professionals) and the GUC Oversight Board and the current and any former members thereof (and any of their agents and professionals) shall not be liable for actions taken or omitted in their respective capacities as, or on behalf of, the GUC Liquidating Trustee or the GUC Liquidating Trust, except those acts arising out of its or their gross negligence, actual fraud, or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. The GUC Liquidating Trustee (and its agents and professionals) and the GUC Oversight Board and the current and any former members thereof (and each of their agents and professionals) shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the GUC Liquidating Trust or the GUC Liquidating Trustee (and its agents and professionals) and/or the GUC Oversight Board and the current and any former members thereof (and each of their agents and professionals), except for any actions or inactions involving gross negligence, actual fraud, or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. Any indemnification claims of any parties entitled to indemnification under this subsection shall be satisfied ~~<from the GUC Liquidating Trust >Assets, as provided in~~in accordance with the GUC Liquidating Trust Agreement. The GUC Liquidating Trustee, the GUC Oversight Board, and each of its current and any former members, shall be entitled to rely, in good faith, on the advice of their professionals.

(f) **Records.** The GUC Liquidating Trustee shall be provided with copies of or access to all documents and business records of the Debtors, to the extent available, as may be necessary for the disposition of GUC Liquidating Trust Assets and administration of Class 4 Claims.

(g) **Insurance.** The GUC Liquidating Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the GUC Liquidating Trust's

sole expense, for the GUC Liquidating Trustee (and its agents and professionals) and the GUC Oversight Board and the current and any former members thereof (and any of their agents and professionals), including coverage with respect to the liabilities, duties and obligations of the GUC Liquidating Trustee and the Oversight Board, which insurance coverage may, at the sole option of the GUC Liquidating Trustee, be extended for a reasonable period after the termination of the GUC Liquidating Trust Agreement.

**9.6. GUC Liquidating Trust Fees and Expenses.**

From and after the Effective Date, the GUC Liquidating Trust Expenses shall be paid ~~in~~from the GUC Liquidating Trust Cash, including as set forth in the GUC Liquidating Trust Agreement. Notwithstanding anything to the contrary herein or in the Plan, neither the GUC Liquidating Trustee nor the GUC Oversight Board shall be required to take any action, including

with respect to the GUC Liquidating Trust Assets, absent requisite funding of the GUC Liquidating Trust Expenses. Notwithstanding anything to the contrary in this Plan, GUC Liquidating Trust Expenses shall be paid or reserved for prior to any Distributions being made to any Holders of Allowed Class 4 Claims.

Without any further notice to any party or action, order, or approval of the Bankruptcy Court, the GUC Liquidating Trustee, on behalf of the GUC Liquidating Trust, and the GUC Oversight Board and each of its then current members, may employ professionals and pay in the ordinary course of business the reasonable fees of any employed professional (including Professionals previously employed by the Debtors, but excluding any Affiliates, relatives, or Related Persons to the GUC Liquidating Trustee) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the GUC Liquidating Trustee, are necessary to assist the GUC Liquidating Trustee in the performance of the GUC Liquidating Trustee's duties under the Plan and the GUC Liquidating Trust Agreement, subject to any limitations and procedures established under the GUC Liquidating Trust Agreement.

**9.7. The Wind-Down Trust.**

(a) **Establishment of the Wind-Down Trust.** The Wind-Down Trust shall be established and shall become effective on the Effective Date.

(b) **Vesting of Wind-Down Trust Assets.** Upon the occurrence of the Effective Date, (a) the members of each Debtor's Board of Directors or managers, as the case may be, shall be deemed to have resigned; (b) the Wind-Down Trustee shall become the sole officer and director of each of the Debtors without need for any corporate action, and (c) the Wind-Down Trust Assets shall vest in the Wind-Down Trust in accordance with this Plan.

The Wind-Down Trust Assets shall vest in the Wind-Down Trust free and clear of all Liens, claims, and interests, except for those of the Prepetition Secured Lender and the DIP Lender, whose Liens, claims, and interests shall attach to the Wind-Down Trust assets with the same priority that such Liens, claims, and interests were attached the property of the Debtors.

(c) **Wind-Down Trust Assets.** Without limiting the generality of the foregoing subsection (b):

*i.* ***Cash as of the Effective Date.*** All Cash held by the Debtors as of the Effective Date that is not GUC Liquidating Trust Cash will transfer to and vest in the Wind-Down Trust on the Effective Date (provided that the Professional Fees Escrow Account will continue to be maintained and held in escrow as set forth in, and subject to the provisions of, section 6.2 of this Plan).

*ii.* ***Wind-Down Trust Retained Causes of Action.*** All Wind-Down Trust Retained Causes of Action will be contributed to and vest in the Wind-Down Trust on the Effective Date. The Wind-Down Trust shall have the authority and standing to commence and litigate, settle, release or abandon all Wind-Down Trust Retained Causes of Action that are not released under this Plan. No Entity may rely on the absence of a specific reference in this Combined Disclosure Statement and Plan or the Plan Supplement to any Cause of Action against it as any indication that the Wind-Down Trust will pursue or not pursue any and all available Wind-Down Trust Retained Causes of

Action. The Wind-Down Trustee reserves all rights to prosecute any and all Wind-Down Trust Retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan or to the extent released pursuant to other Orders of the Bankruptcy Court.

*iii.* ***Other Unsold Assets.*** On the Effective Date, all other Wind-Down Trust Assets will be contributed to and shall vest in the Wind-Down Trust, so that the Wind-Down Trustee may liquidate the other unsold assets and distribute the proceeds in accordance with this Plan; *provided*, *however*, that Permits shall not be Wind-Down Trust Assets to the extent prohibited by any applicable law and SVM's Interests in SDWC and TRC shall only vest in the Wind-Down Trust and become Wind-Down Trust Assets on the Permit Transfer Date.

(d) **Creation and Maintenance of Wind-Down Trust Accounts.** On or prior to the Effective Date, appropriate trust accounts will be established and maintained in one or more federally insured domestic banks in the name of the Wind-Down Trust. Cash deposited in the trust accounts will be invested, held, and used solely as provided in the Wind-Down Trust Agreement. The Wind-Down Trustee is authorized to establish additional trust accounts after the Effective Date, consistent with the terms of the Wind-Down Trust Agreement, as applicable. After the funding of the trust accounts on the Effective Date, the trust accounts will be funded, as applicable, by Cash proceeds obtained through litigation, settlement, disposition, or other monetization of the Wind-Down Trust Assets. Upon obtaining an order of the Bankruptcy Court authorizing final Distributions, any funds remaining in the trust accounts shall be distributed in accordance with this Plan and the Wind-Down Trust Agreement, and the trust accounts may be closed.

(e) **Wind-Down Trust Distributions.** All Distributions to the Holders of Administrative Claims, Tax Claims and Priority Claims, and of any Other Secured Claims that are to be paid in cash under the Plan, in each case that are not Allowed as of the Effective Date but subsequently Allowed, shall be from the Wind-Down Trust. The Wind-Down Trust shall, among other things, administer the Wind-Down Trust Assets. The Wind-Down Trustee shall distribute the Wind-Down Trust Assets in accordance with the Plan and the Wind-Down Trust Agreement.

(f) **Duration of the Wind-Down Trust.** The Wind-Down Trust shall have an initial term of two years; *provided*, *however*, that the Wind-Down Trustee shall be authorized to extend the Wind-Down Trust. The Wind-Down Trust may be terminated earlier than its scheduled termination if the Wind-Down Trustee determines that it has administered all the Wind-Down Trust Assets and performed all other duties required by this Plan and the Wind-Down Trust Agreement. ~~<As soon as practicable after the >~~~~later of~~To the extent that the final Distribution Date ~~for~~of the Wind-Down Trust occurs after the final Distribution Date of the GUC Liquidating Trust~~ and the final Distribution Date for the Wind-Down Trust (unless all asserted Claims are resolved sooner)~~, the Wind-Down Trustee shall seek entry of a Final Order closing the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code as soon as practicable after the final Distribution Date for the Wind-Down Trust.

**9.8. Wind-Down Trustee and Wind-Down Trust Oversight Board.**

(a) **Appointment.** The initial Wind-Down Trustee and such person's

compensation will be disclosed in the Plan Supplement. The appointment of the Wind-Down Trustee shall be approved in the Confirmation Order and be effective as of the Effective Date. Successor Wind-Down Trustee(s) shall be appointed as set forth in the Wind-Down Trust Agreement.

The Wind-Down Trust Oversight Board and its members shall be selected by KHI, and their appointments and acceptances shall be approved and confirmed in the Confirmation Order. Any successor oversight board member shall be appointed in accordance with the Wind-Down Trust Agreement.

(b) **Term.** The Wind-Down Trustee's term, including without limitation the term of any successor Wind-Down Trustee(s), shall expire upon termination of the Wind-Down Trust pursuant to this Plan and/or the Wind-Down Trust Agreement.

Each Wind-Down Trust Oversight Board member's term, including without limitation the term of any successor member(s), shall expire upon termination of the Wind-Down Trust pursuant to this Plan and/or the Wind-Down Trust Agreement.

(c) **Removal of the Wind-Down Trustee.** The U.S. Trustee or any creditor that is a beneficiary of the Wind-Down Trust may request the removal of the Wind-Down Trustee for "cause" pursuant to a motion Filed with the Bankruptcy Court and served upon (a) the Wind-Down Trustee and its counsel, (b) the U.S. Trustee (if not the movant), (c) all Oversight Board members, and all other Entities that have formally requested notice pursuant to Bankruptcy Rule 2002. In connection with any such motion to remove the Wind-Down Trustee, "cause" will include: (a) the Wind-Down Trustee's willful failure to perform his, her, or its material duties hereunder, which is not remedied within thirty (30) days of notice; (b) the Wind-Down Trustee's death; (c) the Wind-Down Trustee's mental or physical incapacity that materially and adversely affects the Wind-Down Trustee's ability to perform his, her, or its duties under the Plan; (d) the Wind-Down Trustee's commission of an act of fraud, theft, or embezzlement in connection with the Wind-Down Trustee's duties under this Plan; (e) the Wind-Down Trustee's conviction for the commission of a felony with all appeals having been exhausted or appeal periods lapsed; provided, however, that no "cause" shall exist involving clause (a) above until the Wind-Down Trustee first has failed to cure such failure within thirty (30) days of having been given written notice of such failure. For purposes of the foregoing, no act or failure to act on the part of the Wind-Down Trustee shall be considered "willful" unless it is done, or permitted to be done, by the Wind-Down Trustee without reasonable belief that the Wind-Down Trustee's action or omission was in the best interests of the Debtors. The Wind-Down Trust Oversight Board may remove and replace the Wind-Down Trustee without cause, subject to the provisions of the Wind-Down Trust Agreement, and without the need for any action by or approval of the Bankruptcy Court.

(d) **Powers and Duties of the Wind-Down Trustee.** Except with respect to the GUC Liquidating Trust Assets and Class 4 Claims, the Wind-Down Trustee shall be the exclusive representative of the Debtors' Estates and shall have the rights and powers set forth in the Wind-Down Trust Agreement including, but not limited to, the rights and powers of a trustee under the Bankruptcy Code. The Wind-Down Trustee shall be governed in all things by the terms of the Wind-Down Trust Agreement and this Plan and subject to the supervision of the Wind-Down Trust Oversight Board. The Wind-Down Trustee shall administer the Wind-Down Trust and the Wind-Down Trust Assets, and make Distributions in accordance with this Plan and

the Wind-Down Trust Agreement. In addition, the Wind-Down Trustee shall, in accordance with the terms of this Plan, take all actions necessary to wind down the affairs of the Debtors consistent with this Plan and applicable non-bankruptcy law. Subject to the terms of the Wind-Down Trust Agreement, the Wind-Down Trustee shall be authorized, empowered, and directed to take all actions necessary to comply with this Plan and exercise and fulfill the duties and obligations arising hereunder, including, without limitation:

*i.* except with respect to the GUC Liquidating Trust Assets and Class 4 Claims, to exercise all power and authority that may be or could have been exercised, and take all actions that may be or could have been taken by the Debtors with like effect as if authorized, exercised and taken by unanimous action of the Debtors' partners, members, officers, directors, and equity holders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor, the dissolution of any Debtor, and the assertion or waiver of any Debtors' attorney/client privilege;

*ii.* except with respect to Class 4 Claims, to make Distributions of the Wind-Down Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay Wind-Down Trust Expenses, to Holders of Allowed Claims (except for Class 4 Claims) as provided for or contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof, including the establishment and maintenance of appropriate reserves in accordance with this Plan and the Wind-Down Trust Agreement, in the name of the Debtors or the Wind-Down Trustee, even in the event of the dissolution of the Debtors;

*iii.* to continue to perform the Debtors' obligations under the TSA, as necessary;

*iv.* subject to the applicable provisions of the Plan, to administer the winding-up of the affairs of the Debtors;

*v.* to take all actions necessary to preserve and maximize the value of the Wind-Down Trust Assets;

*vi.* to abandon, pursuant to section 554 of the Bankruptcy Code or otherwise, any asset vested in the Wind-Down Trust;

*vii.* to prosecute the Wind-Down Trust Retained Causes of Action transferred to the Wind-Down Trust, by which the Wind-Down Trust is hereby granted standing to prosecute any of such Wind-Down Trust Retained Causes of Action and the authority to settle such Wind-Down Trust Retained Causes of Action without Bankruptcy Court approval;

*viii.* to maintain customary insurance coverage for the protection of the Wind-Down Trustee and professionals on and after the Effective Date;

*ix.* except with respect to Class 4 Claims, to object to any Claims (Disputed or otherwise), and to defend, compromise and/or settle any Claims (other than Class 4 Claims) prior to or following objection without the necessity of approval of the Bankruptcy Court;

*x.* to make decisions, without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Wind-Down Trust and to pay, from the Wind-Down Trust Assets, (i) the charges incurred by the Wind-Down Trust on or after the Effective Date for services of professionals, without application to the Bankruptcy Court, and (ii) disbursements, expenses or related support services relating to the winding down of the Debtors and implementation of the Plan, without application to the Bankruptcy Court;

*xi.* to cause, on behalf of the Wind-Down Trust, the Debtors, and their Estates all necessary tax returns and all other appropriate or necessary documents related to municipal, state, federal, or other tax law to be prepared or filed timely, in accordance with the Plan;

*xii.* to maintain appropriate books and records (including financial books and records) to govern the liquidation and Distribution of the Wind-Down Trust Assets;

*xiii.* to pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the U.S. Trustee quarterly post-confirmation financial reports for each of the Debtors until such time as such reports are no longer required, or the Bankruptcy Court orders otherwise, a final decree is entered closing these Chapter 11 Cases, or the Chapter 11 Cases are converted or dismissed;

*xiv.* to dissolve the Wind-Down Trust if the Wind-Down Trustee determines, in reliance on such professionals as it may retain, that the expense of administering the Wind-Down Trust so as to make a final Distribution is likely to exceed the value of the remaining Wind-Down Trust Assets;

~~Cases;~~

*xv.* to seek one or more final decrees closing the Debtors' Chapter 11 Cases;

*xvi.* to do all other acts or things consistent with the provisions of this Plan that the Wind-Down Trustee deems reasonably necessary or desirable with respect to implementing this Plan;

*xvii.* to determine in their sole discretion the allocation of the Wind-Down Trust Assets (and the proceeds thereof) among the Debtors, except as expressly set forth in this Plan; and

*xviii.* to be the Estate representative and successor of the Debtors and the Committee for all purposes, except with respect to the GUC Liquidating Trust Assets and Class 4 Claims, as to which the GUC Liquidating Trustee has been appointed for such purposes.

(e) **Supervision of the Wind-Down Trust Oversight Board.** In all respects, as set forth in the Wind-Down Trust Agreement, the Wind-Down Trustee's actions (including, without limitation, all actions taken pursuant to the powers and duties of the Wind-Down Trustee set forth in this Plan) shall be subject to the supervision of the Wind-Down Trust Oversight Board.

(f) **Limitation of Liability; Exculpation of Wind-Down Trustee and Wind-Down Trust Oversight Board.** The Wind-Down Trustee, the Wind-Down Trust Oversight Board and the members thereof, and their respective agents and professionals shall not be liable for actions taken or omitted in their respective capacities as, or on behalf of, the Wind-Down Trustee, the Wind-Down Trust, or the Wind-Down Trust Oversight Board, except those acts arising out of its or their gross negligence, actual fraud, or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. The Wind-Down Trustee, the Wind-Down Trust Oversight Board and its members, and their respective agents and professionals shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the Wind-Down Trustee, the Wind-Down Trust, or the Wind-Down Trust Oversight Board, except for any actions or inactions involving gross negligence, actual fraud, or willful misconduct, each as determined by a Final Order from a court of competent jurisdiction. Any indemnification claims of the Wind-Down Trustee, the Wind-Down Trust Oversight Board and its members, and the other parties entitled to indemnification under this subsection shall be satisfied from the Wind-Down Trust Assets, as provided in the Wind-Down Trust Agreement. The Wind-Down Trustee and the Wind-Down Trust Oversight Board shall be entitled to rely, in good faith, on the advice of their respective professionals.

(g) **Records.** The Wind-Down Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors.

(h) **Insurance.** The Wind-Down Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Wind-Down Trust's sole expense, for itself, its respective agents and the Wind-Down Trust Oversight Board members, including

coverage with respect to the liabilities, duties and obligations of the Wind-Down Trustee and Wind-Down Trust Oversight Board members, which insurance coverage may, with approval of the Wind-Down Trust Oversight Board, be extended for a reasonable period after the termination of the Wind-Down Trust Agreement.

(i) **Abandonment of Assets.** The Wind-Down Trustee shall have the right, pursuant to section 554 of the Bankruptcy Code or otherwise, to abandon in any commercially reasonable manner (including by abandonment or donation to a charitable organization) any assets that the Wind-Down Trustee concludes are of no benefit to the Wind-Down Trust or its beneficiaries or too impractical to distribute.

(j) **Collection of Accounts Receivable.** The Wind-Down Trustee shall be required to make all reasonable efforts to collect any and all outstanding accounts receivable due to the Debtors as of the Effective Date and to remit all proceeds of such collected accounts receivable to the Prepetition Secured Lender or its designee. The Wind-Down Trustee shall not enter into a settlement with any Person regarding any such accounts receivable without the express written consent of the Prepetition Secured Lender.

(k) **Wind-Down Trust Distributions.** Except as otherwise provided in this Plan, the Wind-Down Trustee shall make Distributions in accordance with the Wind-Down Trust Agreement; *provided, however,* that the Wind-Down Trustee may postpone any Distribution if the Wind-Down Trustee determines that the amount of such Distribution would be too small to justify the administrative costs associated with making it. The Wind-Down Trustee shall make continuing efforts to dispose of the Wind-Down Trust Assets, respectively, to make timely Distributions, and not unduly prolong the duration of the Wind-Down Trust.

**9.9. Wind-Down Trust Fees and Expenses.**

From and after the Effective Date, the Wind-Down Trust Expenses shall be paid in Cash from Wind-Down Trust Assets, including as set forth in the Wind-Down Trust Agreement. Notwithstanding anything to the contrary herein or in the Plan, the Wind-Down Trustee shall not be required to take any action, including with respect to the Wind-Down Trust Assets, absent requisite funding of the Wind-Down Trust Expenses. Notwithstanding anything to the contrary in this Plan, Wind-Down Trust Expenses shall be paid or reserved for prior to any Distributions being made to any Holders of Allowed Claims that are payable from the Wind-Down Trust.

Without any further notice to any party or action, order, or approval of the Bankruptcy Court, the Wind-Down Trustee, on behalf of the Wind-Down Trust, may employ professionals and pay in the ordinary course of business the reasonable fees of any employed professional (including Professionals previously employed by the Debtors, but excluding any Affiliates, relatives, or Related Persons to the Wind-Down Trustee) for services rendered or expenses

incurred on and after the Effective Date that, in the discretion of the Wind-Down Trustee, are necessary to assist the Wind-Down Trustee in the performance of the Wind-Down Trustee's duties under the Plan and the Wind-Down Trust Agreement, subject to any limitations and procedures established under the Wind-Down Trust Agreement.

**9.10. Wind-Down Trustee as Estate Representative and Successor.**

Pursuant to sections 1123(a)(5)(B), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code, the Wind-Down Trustee shall be the representative of the Debtors' Estates and successor to the Debtors for all purposes, except with respect to the GUC Liquidating Trust Assets and Class 4 Claims, until the final Distribution Date of the Wind-Down Trust. The Wind-Down Trustee shall have all rights and powers of a trustee under the Bankruptcy Code. Pursuant to sections 1123(a)(5)(B), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code, the GUC Liquidating Trustee shall become the representative of the Debtors' Estates and successor to the Debtors upon the final Distribution Date of the Wind-Down Trust, if that occurs prior to the final Distribution Date of the GUC Liquidating Trust (such date of transition of Debtors' Estate representative status, if any, being the "Estate Representative Transition Date").

**9.11. Corporate Action.**

Upon the Effective Date, all actions contemplated by the Plan (including any action to be undertaken by the GUC Liquidating Trustee, the Wind-Down Trustee, or the Debtors) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the GUC Liquidating Trustee, the Wind-Down Trustee, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

**9.12. Directors, Officers, Managers, Members and Authorized Persons of the Debtors.**

On the Effective Date, each of the Debtors' directors, officers and managers shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Wind-Down Trustee, such directors, officers and managers shall have no continuing or further obligations to the Debtors following the occurrence of the Effective Date. On the Effective Date, the Wind-Down Trustee shall be appointed automatically, without the need for any corporate action or approval and without the need for any corporate filings, as the sole director and sole officer of each of the Debtors.

**9.13. Closing of the Chapter 11 Cases.**

On and after the Effective Date, except in connection with the GUC Liquidating Trust Assets, the Chapter 11 Cases of each of the Debtors will be administered by the Wind-Down Trust, and the Wind-Down Trustee shall be authorized to file a motion requesting entry of an order of the Bankruptcy Court closing the Chapter 11 Cases of SVM, TRC, and/or SDWC at such time as the Wind-Down Trustee may determine. ~~Such motion~~Upon and after the Estate

Representative Transition Date, if any, the Chapter 11 Cases of each of the Debtors whose cases have not been earlier closed will be administered by the GUC Liquidating Trustee, and the GUC Liquidating Trustee shall be authorized to file a motion requesting entry of an order of the Bankruptcy Court closing such Chapter 11 Cases at such time as the GUC Liquidating Trustee may determine. Such motions may be heard by the Bankruptcy Court on fourteen days' notice to the U.S. Trustee and all other parties entitled to notice under Local Rule 2002-1(b).

Each Estate shall be deemed to appoint the GUC Liquidating Trustee to prosecute claims and defenses, solely with respect to the GUC Liquidating Trust Assets, and make Distributions solely to Allowed Class 4 Claims, and deemed to appoint the Wind-Down Trustee to prosecute all claims and defenses that are not GUC Liquidating Trust Assets, to make Distributions to Allowed Claims (other than Class 4 Claims), and attend to other wind-down affairs on behalf of each of the other Debtors as if such Estates continued to exist solely for that purpose. The Wind-Down Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with this

Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court and file a motion under Local Rule 3022-1(a) to close the chapter 11 case of Searles Valley Minerals, Inc., and of any other Debtor whose case remains open at that time. Upon the filing of such a motion, the Wind-Down Trustee shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c), as to which the GUC Liquidating shall reasonably cooperate with the Wind-Down Trustee to provide any necessary information.

**9.14. Committee.**

On the Effective Date, the Committee will be dissolved and cease to exist. The dissolution of the Committee under this Section shall not prevent any Professional from filing a final Professional Fee Claim for fees and expenses for services rendered to the Committee through the Effective Date and receiving payment with respect to the same.

On the Effective Date, the GUC Liquidating Trust shall be established and the GUC Liquidating Trustee shall assume all responsibilities with respect to the administration of the GUC Liquidating Trust Assets and Distributions to Holders of Allowed General Unsecured Claims in accordance with the GUC Liquidating Trust Agreement, and the Combined Disclosure Statement and Plan.

**9.15. Effectuating Documents; Further Transactions.**

On the Effective Date, the GUC Liquidating Trustee, the Wind-Down Trustee, and the Debtors are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**9.16. Release of Liens.**

Except as otherwise provided in this Plan, the Confirmation Order, or in any document, instrument, or other agreement created in connection with this Plan, on the Effective Date, all mortgages, deeds of trust, Liens, or other security Interests against the property of the Estates shall be released except only as provided in this Plan with respect to the Liens of the Prepetition

Secured Lender and the DIP Lender. The Wind-Down Trustee shall have the authority to file Lien releases in connection with the foregoing.

**9.17. Exemption from Certain Transfer Taxes.**

To the maximum extent provided by section 1146 of the Bankruptcy Code, under this Plan, (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors or (b) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be taxed under any law imposing a stamp tax or similar tax. To the extent that either the GUC Liquidating Trustee or the Wind-Down Trustee elects to sell any property after the Confirmation Date, such sales of

property will be exempt from any transfer taxes in accordance with section 1146(a) of the Bankruptcy Code. All subsequent issuances, transfers, or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases shall be deemed to be or have been done in furtherance of this Plan.

**9.18. Setoffs.**

On or after the Effective Date, the Wind-Down Trustee may, pursuant to applicable law, offset against any Administrative, Priority, Tax or Other Secured Claim, before any Distribution is made on account of such Claim, any and all claims that the Debtors or Wind-Down Trustee may hold against the Holder of such Claim.

**9.19. Withdrawal of Plan.**

The Debtors reserve the right to revoke and withdraw or modify this Plan at any time prior to the Confirmation Date or, if the Debtors are for any reason unable to Consummate this Plan after the Confirmation Date, at any time up to the Effective Date. If the Debtors revoke or withdraw this Plan, (a) nothing contained in this Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any Entity in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, this Plan was not filed and the Effective Date did not occur.

**9.20. Insurance Preservation.**

Nothing in this Plan shall diminish or impair the enforceability of any Insurance Policy and related agreements that may cover Claims and Causes of Action against the Debtors, the D&Os, or any other Entity. Without limiting the foregoing, and notwithstanding anything else in this Plan, (i) nothing in this Plan shall limit any insured from obtaining coverage under any of the Insurance Policies and related agreements, provided, however, that other orders of the Bankruptcy Court, whether entered before or after the Effective Date, may limit insureds from obtaining the proceeds of such coverage for reasons other than this Plan and shall not be affected by this Plan; and (ii) nothing in this Plan (including, without limitation, any provision that purports to be preemptory or supervening or grants an injunction, discharge, or a release) shall in any way operate to impair, diminish, or waive, or have the effect of impairing, diminishing or waiving, the legal or contractual rights, claims, defenses, liabilities or obligations of any Entity

pursuant to any insurance policies and related agreements, including, without limitation, the terms, conditions, limitations, exclusions, and endorsements thereof, that may cover Claims or Causes of Action against the Debtors, the Estates, the GUC Liquidating Trustee, the GUC Liquidating Trust, the Wind-Down Trustee, the Wind-Down Trust, the D&Os, any insurers or any other Entity.

**9.21. D&O Insurance Policies.**

As of the Effective Date, the D&O Insurance Policies and coverage for defense and indemnity under any of the D&O Insurance Policies shall remain in full force and effect subject to the terms and conditions of the D&O Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not impair or otherwise modify the

D&O Insurance Policies. For the avoidance of doubt, the D&O Insurance Policies provide coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff or tail coverage after the Effective Date to the fullest extent permitted by such policies. On and after the Effective Date, neither the Debtors nor the Wind-Down Trustee shall terminate or otherwise reduce the coverage under any of the D&O Insurance Policies in effect or purchased as of the Effective Date, and all directors and officers of the Debtors at any time shall

be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date. For the avoidance of doubt, nothing herein shall be construed as the Debtors assuming any obligation with respect to any self-insured retention, deductible, or any other payment obligation for which the applicable insurer has the ability to assert a prepetition Claim against the applicable Debtor in accordance with the Bar Date Order or other order of the Bankruptcy Court. Further, notwithstanding the foregoing, all rights, claims, objections, defenses, or counterclaims of the Debtors or the Wind-Down Trust, as applicable, with respect to any Claim filed by a D&O are expressly preserved.

**9.22. Indemnification of Directors, Officers, and Employees.**

Any obligation of the Debtors to indemnify and reimburse any Person or Entity serving at any time on or after the Petition Date as one of the Debtors' officers or employees by reason of such Person's or Entity's service in such capacity, or as an officer or employee of any of the Debtors, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor(s), in accordance with any applicable law, or any combination of the foregoing, shall survive confirmation of the Plan and the Effective Date solely with respect to actions or Claims arising after the Petition Date until the Effective Date.

**9.23. Withholding and Reporting Requirements.**

(a) **Withholding Rights.** In connection with the Plan, any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, provincial, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each Holder of an Allowed Claim or any other Person that receives a Distribution pursuant to the Plan shall be liable for any taxes imposed by any Governmental Unit, including, without limitation, income,

withholding, and other taxes, on account of such Distribution. Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b) **Forms.** Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, or such other Person designated by the GUC Liquidating Trustee or Wind-Down Trustee (which entity shall subsequently deliver to the GUC Liquidating Trustee or Wind-Down Trustee, as applicable, any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 or any other form or document as reasonably requested by the GUC Liquidating Trustee or the Wind-Down

Trustee, as applicable, or such other Person designated by the GUC Liquidating Trustee or Wind-Down Trustee to eliminate or reduce any tax (including withholding tax), unless the GUC Liquidating Trustee or the Wind-Down Trustee, or such other Person designated by the GUC Liquidating Trustee or Wind-Down Trustee, determines it is not required to eliminate or reduce any tax (including withholding tax). If such request is made by the GUC Liquidating Trustee, the Wind-Down Trustee or such other Person designated by the GUC Liquidating Trustee or Wind-

Down Trustee and the Holder fails to comply before the date that is 150 days after the request is made, the amount of such Distribution shall irrevocably revert to the GUC Liquidating Trust or the Wind-Down Trust, as applicable, and any Claim in respect of such Distribution shall be forever barred from assertion against any Debtor and its respective property (or the GUC Liquidating Trust, GUC Liquidating Trustee, the Wind-Down Trust, or the Wind-Down Trustee).

**9.24. Cancellation of Authorized but Unissued Shares.**

All authorized but unissued shares of the Debtors shall be deemed automatically and immediately cancelled as of the Effective Date without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors with respect to such authorized shares shall be deemed immediately extinguished and terminated as of the Effective Date.

## ARTICLE X

## EFFECT OF PLAN ON CLAIMS AND INTERESTS

**10.1. Binding Effect.**

This Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the GUC Liquidating Trust, the GUC Liquidating Trustee, the Wind-Down Trust, and the Wind-Down Trustee.

By voting on the Plan or by accepting Distributions pursuant to the Plan (in whatever sum), each Holder of an Allowed Claim or Interest extinguished, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to and accepted the terms of the

Plan, and each such Holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such Holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever. Any Entity that makes an Opt-Out Election is not bound by the release of non-Debtor Released Parties in Section 10.7 of the Plan but is bound by the other releases, exculpations, and injunctions in the Plan.

**10.2. Treatment of Claims.**

Notwithstanding anything contained in this Plan to the contrary, the allowance, classification, and treatment of all Allowed Claims and their respective Distributions and treatments under this Plan take into account and conform to the relative priority and rights of the

Claims and the Interests in each Class with due regard to any contractual, legal, and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(b) and (c) of the Bankruptcy Code or otherwise.

As of the Effective Date, any and all such rights described in the preceding sentence are settled and compromised pursuant to this Plan.

**10.3. No Discharge of the Debtors.**

Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation will not discharge Claims against the Debtors; provided, however, that no Holder of any Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, and may not seek recourse against, any assets of the Debtors, any of the Estates, the GUC Liquidating Trust, the GUC Liquidating Trustee, the Wind-Down Trust, the Wind-Down Trustee, and/or their respective successors, assigns, and/or property of any of the foregoing, except as expressly provided in this Plan.

**10.4. Injunction.**

(a) From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are satisfied, treated, extinguished, or released pursuant to the Plan, from taking any of the following actions against the Debtors, the Released Parties, the GUC Liquidating Trustee, the GUC Liquidating Trust, the Wind-Down Trustee, the Wind-Down Trust, or the property of any of the Debtors, the Released Parties, the GUC Liquidating Trustee, the GUC Liquidating Trust, the Wind-Down Trustee, the Wind-Down Trust: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum); (ii) enforcing, levying, attaching (including, without limitation, any prejudgment or postjudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind; (iv) asserting a right of setoff unless such setoff was formally

asserted in a timely Filed Proof of Claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Confirmation Order (notwithstanding any indication in any Proof of Claim or otherwise that such Holder intends to preserve any right of setoff) as provided by applicable law or right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(b) Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, and other parties in interest, along with their Related Persons, shall be enjoined from taking any actions to interfere with the implementation or substantial

Consummation of this Plan by the Debtors, the GUC Liquidating Trust, the Wind-Down Trust, and/or their respective Related Persons, as applicable.

**10.5. Exculpation.**

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each of the Exculpated Parties are hereby exculpated from any liability for, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, or loss arising ~~on or after~~

between the Petition Date ~~through~~and the Effective Date in connection with or arising out of the filing or administration of the Chapter 11 Cases, the postpetition marketing and sale process, the postpetition purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit of the Disclosure Statement, the Soda Ash Sale Transaction, the Going Concern Sale Transaction, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or Consummation of the Plan; the occurrence of the Effective Date; the DIP Credit Agreement; the post-Effective Date administration of the Plan or the property to be distributed under the Plan (including GUC Liquidating Trust Assets and the Wind-Down Trust Assets); the creation of the GUC Liquidating Trust or the Wind-Down Trust; or the transactions in furtherance of any of the foregoing; except for intentional fraud or willful misconduct, as determined by a Final Order, but in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth herein does not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**10.6. Releases by the Debtors.**

**PURSUANT TO BANKRUPTCY CODE SECTION 1123(B), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE COMBINED DISCLOSURE STATEMENT AND PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASED PARTIES SHALL BE DEEMED RELEASED BY THE DEBTORS AND THEIR ESTATES (ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, INCLUDING THE WIND-DOWN DEBTORS, THE GUC**

**LIQUIDATING TRUST AND THE WIND-DOWN TRUST), FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THE ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT THE DEBTORS OR THEIR ESTATES, AS APPLICABLE, WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT, OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY**

**MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, TRANSFER, OR RESCISSION OF THE PURCHASE, SALE, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE COMBINED DISCLOSURE STATEMENT AND PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, AND ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTORS OR THE ESTATES.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASE OF THE RELEASED PARTIES BY THE DEBTORS AND THE ESTATES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE RELEASE BY THE DEBTORS AND THEIR ESTATES IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTORS; (C) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES, AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO THE DEBTORS OR ~~HEIR~~THEIR ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE RELEASE BY THE DEBTORS AND THE ESTATES.**

**10.7. Releases by Holders of Claims.**

**EFFECTIVE AS OF THE EFFECTIVE DATE--AND EXCEPT TO THE EXTENT A HOLDER OF A CLAIM MAKES AN OPT-OUT ELECTION--FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE OBLIGATIONS OF THE**

**DEBTORS UNDER THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE CONTRIBUTIONS OF THE RELEASED PARTIES TO FACILITATE AND IMPLEMENT THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASING PARTIES, AND EACH OF THE RELEASING PARTIES' SUCCESSORS AND ASSIGNS, SHALL BE DEEMED TO, COMPLETELY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASE, WAIVE, VOID AND EXTINGUISH THE RELEASED PARTIES FROM ANY CLAIM, ~~CLAIM,~~ CAUSE OF ACTION, OBLIGATION, SUIT, JUDGMENT, DAMAGES, DEBT, RIGHT,**

**REMEDY OR LIABILITY, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, CONTINGENT OR FIXED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THE ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) FOR ANY ACT, OMISSION OR OTHER OCCURRENCE IN CONNECTION WITH, RELATING TO,**

**OR ARISING OUT OF, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS AND/OR ANY AFFILIATE OF THE DEBTORS (INCLUDING, IN EITHER CASE, THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE ESTATES, IN-OR OUT-OF-COURT RESTRUCTURING EFFORTS OF THE DEBTORS OR ANY AFFILIATE THEREOF, INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE DIP FACILITY, THE SALE TRANSACTIONS, THE NEGOTIATION AND FILING OF THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE FILING OF THE CHAPTER 11 CASES, THE SETTLEMENT OF CLAIMS OR RENEGOTIATION OF EXECUTORY CONTRACTS, THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE PURSUIT OF CONFIRMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE CONSUMMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN, OR THE ADMINISTRATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN, AND THE NEGOTIATION, FORMULATION, OR PREPARATION OF ANY OF THE FOREGOING, OR ANY OTHER ACT OR OMISSION, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

**WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EFFECTIVE AS OF THE EFFECTIVE DATE, ~~THE~~ (X) THE DIP LENDER, (Y) THE PREPETITION SECURED LENDER, AND (Z) THE SPONSOR, AND EACH OF THEIR SUCCESSORS AND ASSIGNS, FOR GOOD AND VALUABLE CONSIDERATION, SHALL BE DEEMED TO, COMPLETELY, CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASE, WAIVE, VOID AND EXTINGUISH THE D&OS FROM ANY CLAIM, CAUSE OF ACTION,**

**OBLIGATION, SUIT, JUDGMENT, DAMAGES, DEBT, RIGHT, REMEDY OR LIABILITY, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, MATURED OR UNMATURED, CONTINGENT OR FIXED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THE ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) FOR ANY ACT, OMISSION OR OTHER OCCURRENCE IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS AND/OR ANY AFFILIATE OF THE DEBTORS (INCLUDING, IN EITHER CASE, THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE ESTATES, IN-OR OUT-OF-COURT RESTRUCTURING EFFORTS OF THE DEBTORS OR ANY AFFILIATE THEREOF, INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE DIP FACILITY, THE SALE TRANSACTIONS, THE NEGOTIATION AND FILING OF THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE FILING OF THE CHAPTER 11 CASES, THE SETTLEMENT OF CLAIMS OR RENEGOTIATION OF EXECUTORY CONTRACTS, THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE PURSUIT OF CONFIRMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE CONSUMMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN, OR THE ADMINISTRATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN, AND THE NEGOTIATION, FORMULATION, OR PREPARATION OF ANY OF THE FOREGOING, OR ANY OTHER ACT OR OMISSION, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH IN THIS SECTION 10.7 DO NOT RELEASE: (A) THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO THE TREATMENT PROVIDED FOR SUCH ALLOWED CLAIM IN THIS PLAN; (B) ANY CLAIMS AND LIENS OF THE DIP LENDER OR THE PREPETITION SECURED LENDER; OR (C) ANY POST-PLAN EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY SALE TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN.**

**10.8. Terms of Injunctions or Stays.**

Unless otherwise provided in this Plan, all injunctions or stays provided for in these Chapter 11 Cases pursuant to Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the cases are closed.

# ARTICLE XI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 11.1. Executory Contracts and Unexpired Leases Deemed Rejected.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned (including any Executory Contract or Unexpired Lease assumed and assigned in connection with the Asset Sale Transactions), shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (ii) is an Insurance Policy, including any D&O Insurance Policy; (iii) is a Permit; or (iv) is identified for assumption on the Assumption Schedule, if any, included in the Plan Supplement and approved by the DIP Lender. Executory Contracts and Unexpired Leases identified for assumption on the Assumption Schedule, if any, shall be deemed assumed pursuant to section 365 of the Bankruptcy Code as of the Effective Date.

### 11.2. Claims Based on Rejection of Executory Contracts and Unexpired Leases.

Unless otherwise provided by an Order of the Bankruptcy Court, any Proofs of Claim based on Rejection Claims pursuant to the Plan must be filed with the Bankruptcy Court and served on the GUC Liquidating Trustee no later than thirty (30) days after the notice of occurrence of the Effective Date. The notice of occurrence of the Effective Date shall include the date by which Proofs of Claim based on the Rejection Claim must be filed.

Any Rejection Claims not filed with the Bankruptcy Court within such time will be forever barred from assertion, and shall not be enforceable against the Debtors, the GUC Liquidating Trust, the Debtors' Estates, or the property for any of the foregoing, and any Rejection Claim shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

The GUC Liquidating Trustee shall have the right to object to, settle, compromise, or otherwise resolve any Rejection Claim. All Allowed Rejection Claims shall be treated as Class 4 General Unsecured Claims pursuant to the terms of the Combined Disclosure Statement and Plan.

### 11.3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any obligation to cure any default, pursuant to section 365 of the Bankruptcy Code (a "Cure Obligation") due under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, if any, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in full in Cash on the Effective Date (or as soon as reasonably practicable thereafter), subject to the limitation described below, by the Debtors or the Wind-Down Trust, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (i) the amount of the Cure Obligation, (ii) the ability of the Wind-Down Trust or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease, or (iii) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of one or more Final Orders, which may include the Confirmation Order, resolving the dispute and approving the assumption or assumption and assignment (as applicable); provided, that the Debtors or the Wind-Down Trust (as applicable)

may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**11.4. Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**11.5. Reservation of Rights.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease in the Assumption Schedule, the Soda Ash Sale Order, or the Going Concern Sale Order, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or the Wind-Down Trustee, as applicable, shall have sixty (60) days following entry of a Final Order resolving such

dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## ARTICLE XII

## DISTRIBUTIONS

### 12.1. Distribution Record Date.

The Debtors, the GUC Liquidating Trustee, and the Wind-Down Trustee shall have no obligation to recognize any transfer of the Claims (i) occurring on or after the Effective Date, or (ii) that does not comply with the Bankruptcy Code or Bankruptcy Rules, including Bankruptcy Rule 3001(e).

### 12.2. Delivery of Distributions and Undeliverable or Unclaimed Distributions.

(a) **Delivery of Distributions in General.** Distributions to Holders of Allowed Claims shall be made (i) at the addresses set forth on the Proofs of Claim Filed by such Holders, (ii) at the addresses set forth in any written notices of address changes delivered to the GUC Liquidating Trustee with respect to Class 4 Claims or to the Wind-Down Trustee with respect to all other Claims after the date of any related Proof of Claim, (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, has not received a written notice of a change of address, (iv) at the addresses set forth in the other records of the Debtors or the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, at the time of the Distribution, or (v) any change of address as reflected on the Bankruptcy Court docket.

Distributions shall be made from the GUC Liquidating Trust or the Wind-Down Trust, as applicable, in accordance with the terms of this Plan and, if applicable, the GUC Liquidating Trust Agreement or the Wind-Down Trust Agreement, as applicable.

In making Distributions under this Plan, the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, may rely upon the accuracy of the claims register maintained by the Claims Agent in these Chapter 11 Cases, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

(b) **Undeliverable and Unclaimed Distributions.** If the Distribution to any Holder of an Allowed Claim is returned to the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions shall be made to such Holder unless and until the GUC Liquidating Trustee or Wind-Down Trustee, as applicable, is notified in writing of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest. If a Distribution is returned as undeliverable, the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, shall use reasonable efforts to determine such Creditor's then-current address. Unclaimed Distributions shall be returned to the GUC Liquidating Trust or the Wind-Down Trust, as applicable, until such Distributions are claimed.

(c) **Treatment of Unclaimed Distributions.** Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Unclaimed Distribution within three (3) months after (i) the final Distribution Date for the GUC Liquidating Trust for

Unclaimed Distributions on Allowed Class 4 Claims or (ii) the final Distribution Date for the Wind-Down Trust for Unclaimed Distributions for all other Allowed Claims, shall be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such Claim for an Unclaimed Distribution against the Debtors and their Estates, the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, the GUC Liquidating Trust or the Wind-Down Trust, as applicable, or their

respective agents, attorneys, representatives, employees or independent contractors, or any of its or their property. In such cases, any Cash otherwise reserved for Unclaimed Distributions shall become the property of the GUC Liquidating Trust or the Wind-Down Trust, as applicable, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be distributed in accordance with the terms of this Plan and the GUC Liquidating Trust Agreement or the Wind-Down Trust Agreement, as applicable. Nothing contained in this Plan, the GUC Liquidating Trust Agreement, or the Wind-Down Trust Agreement shall require the Debtors, the GUC Liquidating Trustee, or the Wind-Down Trustee to attempt to locate any Holder of an Allowed Claim.

**12.3. Interest on Claims.**

Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim. Except as specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid on any Disputed Claim (to the extent it becomes an Allowed Claim) in respect of the period from the Petition Date to the date a final Distribution is made thereon. No penalty shall be Allowed on or as a component of any Claim.

**12.4. Withholding and Reporting Requirements.**

In connection with this Plan and all Distributions under this Plan, the GUC Liquidating Trustee and the Wind-Down Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding, payment, and reporting requirements. The GUC Liquidating Trustee and the Wind-Down Trustee shall each be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.

All Entities holding Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes. No Distribution shall be made to or on behalf of such Entity pursuant to this Plan unless and until such Entity has furnished such information. Any property to be distributed pursuant to this Plan shall be deemed: (i) pending the receipt of such information in the manner established by the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, an Undeliverable Distribution pursuant to section 12.2(b) of this Plan; or (ii) if such information is not received by the deadline established by the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with section 12.2(c) of this Plan.

Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit,

including income, withholding, and other tax obligations, on account of such Distribution, and
(b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Debtors (for Distributions to be made on the Effective Date as set forth in Section 9.2 of the Plan) or the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, (for all other Distributions) for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the GUC Liquidating Trustee or the Wind-Down Trustee in connection with such Distribution.

**12.5. Miscellaneous Distribution Provisions.**

(a) **Method of Cash Distributions.** Any Cash payment to be made by the Debtors, the GUC Liquidating Trustee, or the Wind-Down Trustee, as applicable, pursuant to this Plan will be in U.S. dollars and may be made, at the sole discretion of the Debtors, the GUC Liquidating Trustee, or the Wind-Down Trustee, as applicable, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law. In the case of foreign creditors, Cash payments may be made, at the option of the Debtors, the GUC Liquidating Trustee, or the Wind-Down Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular jurisdiction.

(b) **No Distribution in Excess of Amount of Allowed Claim.** Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

(c) **Distributions on Non-Business Days.** Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

**12.6. De Minimis Distribution Provisions.**

No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $100.00. Any Distribution not made pursuant to this Section 12.6 shall be treated as an Unclaimed Distribution and is subject to Section 12.4 hereof. If after an initial Distribution to Holders of Allowed Class 4 Claims the GUC Liquidating Trustee in the exercise of its business judgment determines that funds remaining in the GUC Liquidating Trust cannot be economically distributed, such funds may, with the approval of the GUC ~~Liquidating Trust~~ Oversight Board, be donated to a 501(c)(3) charitable organization of the GUC Liquidating Trustee's choosing.

**ARTICLE XIII**

**PROCEDURES FOR DISPUTED CLAIMS**

**13.1. Objections to Claims.**

Unless otherwise provided in this Plan, after the Effective Date, the GUC Liquidating Trustee (solely with respect to Claims that are only asserted as Class 4 Claims) and the Wind-Down Trustee (with respect to all other Claims) shall have standing to object to Claims in order

to have the Bankruptcy Court determine, or consensually resolve, the amount and treatment of any Claim. If a General Unsecured Claim is asserted in a proof of claim or request for allowance of claim that also asserts an Administrative, Priority, Tax or Other Secured Claim, the Wind- Down Trustee shall have sole standing to object to such Claim. Except as otherwise provided in this Plan, if a party files a Proof of Claim and (i) the GUC Liquidating Trustee or the Wind- Down Trustee, as applicable, files an objection to that Claim or otherwise formally challenges the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim shall be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in this Plan.

**13.2. Estimation of Claims.**

The Debtors, the GUC Liquidating Trustee or the Wind-Down Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. If the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the GUC Liquidating Trustee (with respect to Class 4 Claims) or the Wind-Down Trustee (with respect to all Claims except for Class 4 Claims) may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**13.3. Disputed Claims Reserves.**

(a) **Disputed GUC Claims Reserve.** On the Effective Date or as soon thereafter as is practicable, the GUC Liquidating Trustee may establish and administer a Disputed GUC Claims Reserve for Disputed Claims in accordance with the GUC Liquidating Trust Agreement. The GUC Liquidating Trustee may reserve in Cash the expected recovery that such Disputed Claim would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing) with respect to each such Disputed Claim. The GUC Liquidating Trustee may administer the Disputed GUC Claims Reserves by book entry. For the avoidance of doubt, the foregoing subparagraph (a) is solely with respect to the administration of Class 4 Claims.

(b) **Disputed Wind-Down Claims Reserve.** On the Effective Date or as soon thereafter as is practicable, the Wind-Down Trustee may establish and administer a Disputed Wind-Down Claims Reserve for Disputed Claims in accordance with the Wind-Down Trust Agreement. The Wind-Down Trustee may reserve in Cash the expected recovery that such Disputed Claim would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a

hearing) with respect to each such Disputed Claim. The Wind-Down Trustee may administer the Disputed Wind-Down Claims Reserves by book entry. For the avoidance of doubt, the foregoing

subparagraph (b) is solely with respect to the administration of Claims that are not Class 4 Claims.

**13.4. No Distribution Pending Allowance.**

No Distribution provided under the Plan shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim; provided however, that a Distribution may be made on an Allowed portion of a Claim pending adjudication of the Disputed portion of such Claim.

**13.5. Resolution of Claims.**

(a) **Resolution of Claims by the GUC Liquidating Trustee.** Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the GUC Liquidating Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Class 4 Claims, Disputed Claims that are Class 4 Claims, or GUC Chapter 5 Actions, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. From and after the Effective Date, the GUC Liquidating Trustee may settle or compromise any Disputed Claim that is a Class 4 Claim or GUC Chapter 5 Action without approval of the Bankruptcy Court.

(b) **Resolution of Claims by the Wind-Down Trustee.** Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Wind-Down Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims (except for Claims that are only asserted as Class 4 Claims), Disputed Claims (except for Disputed Claims that are only asserted as Class 4 Claims), rights, Causes of Action (except for GUC Chapter 5 Actions), suits and proceedings, whether in law or in equity, whether known or unknown, that the Wind-Down Trust may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. From and after the Effective Date, the Wind-Down Trustee may settle or compromise any Disputed Claim, right, claim, Cause of Action (except for GUC Chapter 5 Actions), suit, or proceeding without approval of the Bankruptcy Court.

**13.6. Elimination of Duplicate Claims.**

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors, the GUC Liquidating Trustee, or the Wind-Down Trustee, as applicable, (i) upon stipulation between the parties in interest without a Claim objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court, or (ii) a notice of satisfaction filed on the docket and served on the applicable claimant or Interest Holder, provided that such modification shall become effective only after ten days' notice to parties in interest and an opportunity to object.

**13.7. Amendments to Late Filed Claims.**

Following the Effective Date, except as otherwise provided in this Plan (including with respect to the filing of Claims by Governmental Units by the Governmental Bar Date), the Confirmation Order, the GUC Liquidating Trust Agreement, or the Wind-Down Trust Agreement, no Claim may be filed, amended, or supplemented without the approval of the Bankruptcy Court or without the prior written authorization of the GUC Liquidating Trustee (with respect to only Class 4 Claims) or the Wind-Down Trustee (with respect to all other Claims), and any such new or amended Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

**13.8. Insured Claims.**

If any portion of an Allowed Claim is an Insured Claim, no Distributions under the Plan shall be made on account of such Allowed Claim until the Holder of such Allowed Claim has exhausted all remedies with respect to any applicable Insurance Policies. To the extent that the Debtors' Insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged (i) without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court and (ii) with a notice of satisfaction filed on the docket and served on the applicable claimant or Interest Holder.

## ARTICLE XIV

## CONFIRMATION AND CONSUMMATION OF THE PLAN

**14.1. Conditions to Confirmation.**

The following are conditions precedent to the occurrence of the Confirmation Date.

(a) A Final Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court;

(b) the Confirmation Order presented to the Court for Approval shall be in form and substance reasonably acceptable to the Debtors, the DIP Lender, the Committee, and the Buyers;

(c) the Combined Disclosure Statement and Plan shall not have been materially amended, altered, or modified except in accordance with Article XV herein;

(d) All documents contained in the Plan Supplement shall be in form and substance reasonably acceptable to the Debtors, DIP Lender and Committee, and approved by the Bankruptcy Court;

(e) the Receivables Facility has been paid down to not more than

$~~[~~2,000,000~~]~~, which condition may be waived by the DIP Lender in its sole discretion; and

(f) All provisions, terms, and conditions hereof shall be approved by the Confirmation Order.

**14.2. Conditions to Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing:

(a) the Bankruptcy Court shall have entered the Confirmation Order that is in form and substance reasonably acceptable to the Debtors, DIP Lender, and the Committee, and the Confirmation Order shall be a Final Order, with no stay in effect;

(b) the Confirmation Order shall have been entered and shall provide that the Debtors, the GUC Liquidating Trust, the GUC Liquidating Trustee, the Wind-Down Trust, and the Wind-Down Trustee are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with this Plan and effectuate, advance, or further the purposes thereof;

(c) the Confirmation Order, the Plan, and all Plan exhibits shall be in form and substance reasonably acceptable to the Debtors, DIP Lender and Committee and shall have been executed and delivered by all parties signatory thereto;

(d) all other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed;

(e) the conditions precedent to the closing of the Asset Purchase Agreements shall have been satisfied or waived in accordance with the terms thereof;

(f) the Going Concern Closing and the Soda Ash Closing shall have occurred;

(g) the Receivables Facility has been paid down to not more than $0.00, which condition may be waived by the DIP Lender in its sole discretion;

(h) the Combined Disclosure Statement and Plan shall not have been materially amended, altered, or modified from the Combined Disclosure Statement and Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with Article XV herein;

(i) the GUC Liquidating Trust Agreement shall have been executed, the GUC Liquidating Trust shall be ready to receive the GUC Liquidating Trust Assets, and the GUC Liquidating Trust shall have been established in accordance with Article IX;

(j) the Wind-Down Trust Agreement shall have been executed, the Wind-Down Trust shall be ready to receive the Wind-Down Trust Assets, and the Wind-Down Trust shall have been established in accordance with Article IX;

(~~j~~k) the Wind-Down Trustee and the member(s) of the Wind-Down Trust Oversight Board shall have been appointed and shall have accepted ~~the~~such appointment in accordance with the Plan Supplement and each such appointment shall have been approved and

confirmed in the Confirmation Order;

(kl) the GUC Liquidating Trustee and the members of the GUC Oversight Board shall have been selected by the Committee and the GUC Liquidating Trustee and each member of the GUC Oversight Board shall have accepted such appointment, and each such appointment shall have been approved and confirmed in the Confirmation Order;

(lm) all other documents and agreements necessary to implement this Plan on the Effective Date (if any), shall have been effectuated or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Unit in accordance with applicable laws, and all other actions required to be taken in connection with the Effective Date shall have occurred;

(mn) the Debtors shall have sufficient Cash available to (i) satisfy all Allowed Administrative Claims, Priority Claims and Other Secured Claims (other than the Other Secured Claims of (y) Process Equipment, and (z) any Holder of an Other Secured Claim whose treatment under this Plan on account of such Claim is solely the surrender to such Holder of the collateral securing such Claim) in the amounts Allowed or such lesser amounts agreed to with the Holder of such Allowed Administrative Claim;Claim; and (b) adequate reserve for any Disputed Administrative Claims, Priority Claims and Other Secured Claims (other than the Other Secured Claims of (y) Process Equipment, and (z) any Holder of an Other Secured Claim whose treatment under this Plan on account of such Claim is solely the surrender to such Holder of the collateral securing such Claim) in an amount acceptable to the Debtors and the DIP Lender or determined by the Court;

(no) the Wind-Down Amount shall have been funded in accordance with the Wind-Down Budget;

(op) the Debtors shall have Filed the Notice of the Effective Date; and

(pq) unless such deadline has been extended by written agreement of the Debtors, the DIP Lender and the Committee (which may be by email), the Effective Date shall occur not later than fourteen (14) days after entry of the Confirmation Order.

**14.3. Waiver of Conditions.**

The conditions precedent to Confirmation and conditions precedent to the Effective Date may be waived in whole or in part, in writing, by each of the Debtors, the DIP Lender, the Buyer, and the Committee, without further order of the Bankruptcy Court.

**14.4. Consequences of Non-Occurrence of Effective Date.**

If the Effective Date does not timely occur, the Debtors, DIP Lender, the Committee, and any other party in interest reserve all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated and that this Plan be null and void in all respects. If the Bankruptcy Court enters an order vacating the Confirmation Order, the time within which the Debtors may assume and assign or reject all Executory Contracts and Unexpired Leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further

extensions.

If the conditions precedent to the Effective Date are not satisfied or waived, the Debtors may, upon motion and notice to parties in interest, seek to vacate the Confirmation Order; provided, however, that notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions precedent to the Effective Date are satisfied or waived before the Bankruptcy Court enters an order granting such motion.

If the Confirmation Order is vacated: (i) the Combined Disclosure Statement and Plan is null and void in all respects; and (ii) nothing contained in the Combined Disclosure Statement and Plan shall (a) constitute a waiver or release of any Claims by or against the Debtors, or (b) prejudice, in any manner, the rights of the Debtors or any other party in interest.

**14.5. Substantial Consummation.**

On the Effective Date, the Plan shall be deemed to be substantially Consummated under sections 1101 and 1127(b) of the Bankruptcy Code. Upon occurrence of the Effective Date, the Wind-Down Trust shall file a notice of occurrence of Effective Date.

**14.6. Effect of Vacatur of Confirmation Order.**

If the Confirmation Order is vacated, (a) no further Distributions under the Plan shall be made; (b) the Debtors and all Holders of Claims and Interests shall, to the extent deemed possible, be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

## ARTICLE XV

## <u>ADMINISTRATIVE PROVISIONS</u>

**15.1. Retention of Jurisdiction.**

Notwithstanding confirmation of this Plan or occurrence of the Effective Date, and except as otherwise provided by applicable law, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including for the following purposes:

(a) to determine the allowability, classification, or priority of Claims upon objection of the GUC Liquidating Trustee, the Wind-Down Trustee, or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual liens and other encumbrances;

(b) to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance, and Consummation

of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in these Chapter 11 Cases on or before the Effective Date with respect to any Entity;

(c) to protect the property of the Estates, including the GUC Liquidating Trust Assets and the Wind-Down Trust Assets, from Claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens on property of the Estates, the GUC Liquidating Trust Assets, or the Wind-Down Trust Assets;

(d) to determine any and all applications for allowance of Professional Fee Claims;

(e) to determine any Priority Claim, Administrative Claims, or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

(f) to resolve any disputes arising under or related to the implementation, execution, Consummation, or interpretation of this Plan and the making of Distributions hereunder;

(g) to determine any and all motions related to the rejection, assumption, assumption and assignment of Executory Contracts or Unexpired Leases, or to determine any motion to reject an Executory Contract or Unexpired Lease pursuant to section 11.1 of this Plan;

(h) to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of these Chapter 11 Cases, including any remands;

(i) to enter one or more Final Orders closing one or more of the Chapter 11 Cases;

(j) to modify this Plan under section 1127 of the Bankruptcy Code, to remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order to carry out its intent and purposes;

(k) to issue such orders in aid of Consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non- bankruptcy law, with respect to any Entity, to the fullest extent authorized by the Bankruptcy Code;

(l) to enable the Wind-Down Trustee or the GUC Liquidating Trustee, as applicable, to prosecute any and all proceedings to recover any transfers, assets, properties, or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state, or local laws except as may be expressly waived pursuant to this Plan;

(m) to determine any tax liability of the Debtors, the GUC Liquidating Trust, or the Wind-Down Trust pursuant to section 505 of the Bankruptcy Code, and to address any request by the GUC Liquidating Trustee, the GUC Liquidating Trust, the Wind-Down Trustee,

or the Wind-Down Trust for a prompt audit pursuant to section 505(b) of the Bankruptcy Code;

(n) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(o) to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Bar Date Order or the otherwise applicable Bar Date, the hearing to consider interim approval of the Disclosure Statement or the Confirmation Hearing;

(p) to resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in these Chapter 11 Cases;

(q) to resolve any disputes concerning any exculpation of a non-Debtor hereunder or the injunction against acts, employment of process or actions against such non-Debtor arising hereunder;

(r) to approve any Distributions, or objections thereto, under this Plan;

(s) to approve any Claims settlement entered into by the GUC Liquidating Trustee or the Wind-Down Trustee; and

(t) to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code;

(u) to enforce, interpret, and determine any disputes arising in connection with the Sale Orders and the Asset Purchase Agreements, any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

(v) to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(w) to hear and determine disputes concerning the GUC Liquidating Trust, the GUC Liquidating Trust Agreement, the GUC Liquidating Trustee, the Wind-Down Trustee, the Wind-Down Trustee Agreement, or the Wind-Down Debtors;

(x) to hear and determine disputes concerning the Disputed Claims Reserve and the estimation, allowance, classification, or resolution of any Claim; and

(y) to hear and determine matters concerning the implementation of the Wind-Down Transactions, the Wind Down, and the dissolution of the Wind-Down Debtors.

**15.2. Amendments.**

(a) **Preconfirmation Amendment.** The Debtors may modify this Plan at any time prior to the entry of the Confirmation Order, with the consent of the DIP Lender and Committee (in each case not to be unreasonably withheld), provided that this Plan, as modified, and the Disclosure Statement pertaining thereto meet applicable Bankruptcy Code requirements.

(b) **Postconfirmation Amendment Not Requiring Resolicitation.** After the

entry of the Confirmation Order, the Debtors may modify this Plan, with the consent of the DIP Lender and Committee (in each case not to be unreasonably withheld), to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided that: (i) the Debtors obtain approval of the Bankruptcy Court for such modification, after notice and a hearing; and (ii) such modification shall not materially and adversely affect the interests, rights, treatment or Distributions of the Sponsor, the DIP Lender or any Class of Allowed Claims or Interests under this Plan.

(c) **Postconfirmation and Pre-Consummation Amendment Requiring Resolicitation.** After the Confirmation Date and before substantial Consummation of this Plan, the Debtors may modify this Plan with the consent of the DIP Lender and Committee (in each case not to be unreasonably withheld) in a way that materially or adversely affects the interests, rights, treatment, or Distributions of a Class of Claims or Interests, provided that: (i) this Plan, as modified, meets applicable Bankruptcy Code requirements; (ii) the Debtors obtain Bankruptcy Court approval for such modification, after notice and a hearing; (iii) such modification is accepted by at least two-thirds in amount, and more than one-half in number, of Allowed Claims or Interests voting in each Class materially or adversely affected by such modification; and (iv) the Debtors comply with section 1125 of the Bankruptcy Code with respect to this Plan as modified.

**15.3. No Revesting of Assets.**

To the extent not otherwise distributed in accordance with this Plan, the property of the Debtors' Estates shall not revest in the Debtors on or after the Effective Date but shall instead vest in the Wind-Down Trust, to be administered by the Wind-Down Trustee in accordance with this Plan and the Wind-Down Trust Agreement, unless such property is a GUC Liquidating Trust Asset, in which case such property shall instead vest in the GUC Liquidating Trust, to be administered or preserved by the GUC Liquidating Trustee, in accordance with this Plan and the GUC Liquidating Trust Agreement.

**15.4. Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 509 and 510 of the Bankruptcy Code, or otherwise. Pursuant to sections 509 and 510 of the Bankruptcy Code, the Debtors reserve the right for the Wind-Down Trustee to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**15.5. Severability of Plan Provisions Upon Confirmation.**

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall

then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan; and (iii) nonseverable and mutually dependent.

**15.6. Successors and Assigns.**

The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Person or Entity.

**15.7. Governing Law.**

Except to the extent that the Bankruptcy Code, Bankruptcy Rules, or other federal laws apply, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

**15.8. Corporate Action.**

Any matters provided for under this Plan involving the corporate structure of the Debtors or corporate action, as the case may be, to be taken by or required of the Debtors shall be deemed to have occurred and be effective as of the Effective Date and shall be authorized and approved in all respects, without any requirement of further action by the Debtors or the Wind-Down Trustee, as the case may be.

**15.9. Entire Agreement.**

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**15.10. Miscellaneous Rules.**

This Combined Disclosure Statement and Plan is subject to the following miscellaneous rules: (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order; (ii) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; and (iii) whenever this Plan provides that a payment or Distribution shall occur "on" any date, it shall mean "on, or as soon as reasonably practicable after," such date.

**15.11. Notices.**

All notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by mail and addressed to:

**GUC Liquidating Trustee:**

[To be disclosed in the Plan Supplement]

**Wind-Down Trustee:**

[To be disclosed in the Plan Supplement]

**Debtors:**

Pachulski Stang Ziehl & Jones LLP,
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Attn: Laura Davis Jones, James E. O'Neill, and Edward A. Corma

-and –

Skadden, Arps, Slate, Meagher & Flom LLP
320 S. Canal Street
Chicago, Illinois 60606
Attn: James J. Mazza, Jr., Jennifer Madden, and Claire Stephens

**15.12. No Admissions or Waiver.**

Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including liability on any Claim or the propriety of a Claim's classification.

**ARTICLE XVI**

**RECOMMENDATION**

In the opinion of the Debtors and the Committee, the Combined Disclosure Statement and Plan is superior and preferable to the alternatives described in this Combined Disclosure Statement and Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Combined Disclosure Statement and Plan vote to accept the Combined Disclosure Statement and Plan and support Confirmation. [As set forth in the Committee Solicitation Letter, the Committee likewise recommends votes in favor of the Combined Disclosure Statement and Plan.]

Dated: Wilmington, Delaware
~~September 29~~October 15,
2026

/s/ ~~Laura Davis Jones~~*DRAFT*
**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705

(Courier 19801)
Telephone:
302-652-4100
ljones@pszjlaw.com
joneill@pszjlaw.com
ecorma@pszjlaw.com

*Co-Counsel to Debtors and Debtors in Possession*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
James J. Mazza, Jr.
Jennifer Madden
Claire ~~Stepehens~~Stephens 320 S. Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
James.Mazza@skadden.com
Jennifer.Madden@skadden.com
Claire.Stephens@skadden.com

*Co-Counsel to Debtors and Debtors in Possession*

**EXHIBIT A**

**Liquidation Analysis**

[~~To be~~ Filed at Docket No. 480-1]