# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SEARLES VALLEY MINERALS INC.[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-10966 (BLS)<br><br>(Jointly Administered)<br><br>**Obj. Deadline: Nov. 9, 2026 at 4:00 p.m.**<br>**Hearing Date: Nov. 23, 2026 at 10:30 a.m.** |

**DECLARATION OF JONATHAN KANTOR IN SUPPPORT OF INFINITY TRANSPORTATION 2020-1, LLC AND INFINITY TRANSPORTATION 2024, LLC'S MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM FOR POST-PETITION USE OF LEASED EQUIPMENT**

I, Jonathan Kantor, hereby certify, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that:

1. I am the Chief Financial Officer of Infinity Transportation Equipment Leasing, LLC, as Servicer for Infinity Transportation 2020-1, LLC and Infinity Transportation 2024, LLC (collectively, "Infinity"). I am a custodian of records for Infinity, or am otherwise qualified by my position and responsibilities to testify about Infinity's records and the manner in which they are created and maintained. I have personal knowledge of Infinity's record-keeping practices and procedures, and I am authorized to make this declaration on Infinity's behalf.

2. I submit this declaration in support of *Infinity Transportation 2020-1, LLC and Infinity Transportation 2024, LLC's Motion for Allowance and Payment of Administrative Expense Claim for Post-Petition Use of Leased Equipment* (the "Motion"), which is filed simultaneously herewith, and for all other purposes permitted by law.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Minerals Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

3. Trona Railway Company LLC ("Trona") entered into two leases in 1993 for railcars (the "Infinity Railcars"). Both of those leases were subsequently assigned to Infinity.

4. A copy of the first lease, a Railroad Car Net Lease Agreement dated March 31, 1993 (the "March 1993 Lease"), is attached hereto as Exhibit A.

5. On or around September 10, 2021, The CIT Group/Equipment Financing, Inc. ("CIT") assigned the March 1993 Lease to Infinity. Following this assignment, Infinity was Trona's lessor under the March 1993 Lease.

6. After the most recent amendment to the March 1993 Lease's rider, entered into on March 7, 2025, Trona leased railcars from Infinity at a rate of $375.00 per month.

7. A copy of the second lease, a Railroad Car Net Lease Agreement dated December 15, 1993 (the "December 1993 Lease" and together with the March 1993 Lease, the "Leases"), is attached hereto as Exhibit B.

8. On or around December 16, 2024, First Citizens Bank & Trust Company assigned the December 1993 Lease to Infinity. Following this assignment, Infinity was Trona's lessor under the December 1993 Lease.

9. After the most recent amendment to the December 1993 Lease's rider, entered into on August 25, 2021, Trona leased railcars from Infinity at a rate of $395.00 per month.

10. The underlying content of the Leases is substantially the same.

11. The Leases (and their riders) each set rent to be charged at a monthly rate per railcar. Accordingly, Infinity consistently invoiced Trona monthly for the rent owed under both Leases.

12. The spreadsheet attached hereto as Exhibit C identifies each of the Infinity Railcars that Trona loaded and shipped between the Petition Date and the date Infinity gained possession of all of the Infinity Railcars. Each row represents an Infinity Railcar. Columns A

and B provide the mark and number of each Infinity Railcar. Columns C-E provide the dates and number of days that the Infinity Railcars were in use by Trona and Searles Valley Minerals Inc. (collectively, the "Debtors") on or after the Petition Date. Column K applies the monthly rental rate under the Leases to each Infinity Railcar, and Column L prorates the monthly rental rate for the number of days the Debtors used each Infinity Railcar on or after the Petition Date. Finally, Column M reflects the penalty "Holdover Rate" under the Leases, which is the amount to which Infinity would be entitled due to Trona holding over the Infinity Railcars beyond the termination dates of the Leases (calculated at 1.5 times the standard contract rate).

13. Infinity obtained tracing information for the Infinity Railcars from railroad industry car tracking systems, which show continuous use of the Infinity Railcars after the Petition Date. Based on an analysis of the information obtained from the tracking systems, Infinity has determined that 42 Infinity Railcars subject to the March 1993 Lease were in use by the Debtors after the Petition Date and 72 Infinity Railcars subject to the December 1993 Lease were in use by the Debtors after the Petition Date.

14. In total, 114 Infinity Railcars were used by the Debtors after the Petition Date.

15. On any given day since the Petition Date, the Infinity Railcars were utilized – they were continuously loaded with a commodity or were in transit or unloaded on another railroad other than the railroad associated with Trona.

16. Based on the tracing data in Infinity's possession, it appears that at a monthly rate of $375 per railcar, the rent owed for the period in which the March 1993 Infinity Railcars[2] were used post-petition totals $15,875. Had Trona paid the Holdover Rate under the March 1993

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

Lease, the total amount owing to Infinity would have been $23,812.50.

17. Based on the tracing data in Infinity's possession, it appears that at a monthly rate of $395 per railcar, the rent owed for the period in which the December 1993 Infinity Railcars were used post-petition totals $26,175.33. Had Trona paid the Holdover Rate under the December 1993 Lease, the total amount owing to Infinity would have been $39,263.

18. The rent owed for the period in which all of the Infinity Railcars were used post-petition totals $42,050.33. Had Trona paid the Holdover Rate under both Leases, the total amount owing to Infinity would have been $63,075.50.

19. For the period between the Petition Date and September 29, 2026, the date the last Infinity Railcar was emptied and returned to Infinity's possession, Infinity is entitled to receive outstanding rents of $42,050.33, which represents the monthly contractual rate of each of the Infinity Railcars in the Leases prorated based on the number of days each Infinity Railcar was actually used following the Petition Date.

20. The attached records (the "Records") were made at or near the time of the acts, events, conditions, or transactions they reflect. They were made by, or from information transmitted by, persons with knowledge of those matters.

21. The Records were kept in the course of Infinity's regularly conducted business activities. If is Infinity's regular practice to make and keep records of this kind. Infinity relies on the accuracy of these records in conducting its business.

*[SIGNATURE ON FOLLOWING PAGE]*

I declare under penalty of perjury that the foregoing is true and correct. Executed in Atlanta, Georgia, this 21st day of October, 2026.

Signed by:
By: Jonathan Kantor
5D1D88D34EBF4B3...
Jonathan Kantor

Chief Financial Officer

Infinity Transportation Equipment Leasing, LLC, as Servicer for Infinity Transportation 2020-1, LLC and Infinity Transportation 2024, LLC

# **EXHIBIT A**

# GENERAL ELECTRIC RAILCAR SERVICES CORPORATION
# RAILROAD CAR NET LEASE AGREEMENT

This Lease Agreement, dated March 31, 1993, (hereinafter called the "Agreement") by and between General Electric Railcar Leasing Services Corporation, a Delaware corporation, with its principal office at 33 West Monroe Street, 24th Floor, Chicago, IL 60603, (hereinafter called "Lessor") and Trona Railway, a California corporation, with its principal office at 13068 Matin Street, Trona, California 93562 (hereinafter called "Lessee").

In consideration of the mutual terms and conditions hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE 1: LEASE AGREEMENT

Lessor agrees to lease to the Lessee, and Lessee agrees to lease from Lessor, the cars shown on each Rider hereto and such additional Riders as may be added from time to time by agreement of the parties and signed by their duly authorized representatives (all such cars being hereinafter referred to as a "car" or the "cars"). Each Rider shall set forth a brief description of the car or cars covered thereby, including such facts as the number of cars, the Association of American Railroads (AAR) or Department of Transportation (DOT) specifications, rental charges, term throughout which the car or cars shall remain in Lessee's service and such other information as may be desired by both parties. It is the intent of all parties to this Agreement to characterize this Agreement as a true lease.

## ARTICLE 2: TERM

The term of this Agreement, with respect to each car, shall commence upon the initial delivery of such car to Lessee in the manner set forth in Article 3 and shall terminate on the earlier of the loss or destruction of such car or, with respect to all cars leased hereunder, at the end of the lease term set forth in the Rider(s) attached hereto; provided, however, that without limiting any other rights Lessor may have against Lessee, if Lessee is responsible for such loss or destruction of a car under Paragraph C of Article 8, this Agreement, with respect to such car, shall continue until Lessee pays to Lessor the Settlement Value (defined in Article 9 hereof) of such car as determined immediately prior to such loss or destruction. Notwithstanding the expiration or termination of this Agreement, the obligations of the Lessee hereunder shall continue in effect with regard to each car until each car is returned to the possession of the Lessor in clean condition in accordance with Article 14 hereof.

## ARTICLE 3: DELIVERY

A. Delivery of Rider No. 1 Cars

Lessee hereby confirms and acknowledges delivery of the cars ("Rider No. 1 Cars") listed on Rider No. 1 ("Rider No. 1") attached hereto. Lessee hereby confirms and acknowledges inspecting such Rider No. 1 Cars and hereby confirms and acknowledges that such Rider No. 1 Cars are in fit and suitable condition for the purpose of transporting the commodities Lessee is or is intending to transport therein, and that it has conclusively and unconditionally accepted such Rider No. 1 Cars. Lessee and Lessor hereby confirm and acknowledge that Rider No. 1 is in full force and effect.

B. Delivery of Rider No. 2 Cars

On or before April 30, 1993, subject to this Paragraph B of Article 3, Lessor agrees to deliver to Lessee the cars ("Rider No. 2 Cars") listed on Rider No. 2 ("Rider No. 2") attached hereto, which Rider No. 2 shall automatically be in full force and effect as soon as the first Rider No. 2 Car is delivered to Lessee in accordance with this Paragraph B of Article 3. Lessor agrees to deliver each Rider No. 2 Car to Lessee, and Lessee agrees to accept such delivery. The obligations of the Lessor to deliver the Rider No. 2 Cars shall be excused, and Lessor shall not be liable for any causes beyond the reasonable control of Lessor (including, but not limited to, delays caused by fire, labor difficulties, delays of carriers and materials suppliers, governmental authority, late delivery by the manufacturer of the Rider No. 2 Cars or late delivery by a prior Lessee) and, in the event of a delay in such delivery, Lessor shall deliver the Rider No. 2 Cars to Lessee as soon as reasonably possible thereafter.

C. Place of Delivery

Lessor shall cause the Rider No. 2 Cars to be delivered to Lessee at the point of manufacture.

D. Cost of Delivery

Lessee shall pay all freight charges and other costs, if any, of the delivery of the cars from the point of manufacture.

## ARTICLE 4: ACCEPTANCE OF CARS

Upon delivery of the Rider No. 2, Lessee shall promptly inspect each Rider No. 2 Car and shall accept such Rider No. 2 Car if it: (a) complies with the description set forth in Rider No. 2, and (b) is fit and suitable for operation as those terms are defined in Interchange Rules adopted by the AAR (the "Interchange Rules"). Upon acceptance, Lessee shall deliver to Lessor a Certificate of Acceptance in the form attached hereto as Exhibit A. Notwithstanding the foregoing, Lessee shall be deemed to have

accepted any Rider No. 2 Car delivered hereunder if, with respect to such Rider No. 2 Car, the Lessee shall: (c) load, or otherwise use the Rider No. 2 Car, or (d) fail to notify Lessor, in writing, within five (5) business days after delivery of Lessee's rejection of the Rider No. 2 Car and the specific reasons why the Rider No. 2 Car does not meet the applicable standards set forth in the Rider(s) or the Interchange Rules. If Lessee rejects any Rider No. 2 Car, Lessor shall have the right to have the rejected Rider No. 2 Car inspected by an inspector acceptable to both Lessor and Lessee. The cost of such inspection will be paid by the Lessor if the cause for rejection is affirmed by the inspector, otherwise such cost will be borne by Lessee. The Lessee shall be deemed to have accepted any Rider No. 2 Car for which the inspector determines that good cause for rejection did not exist. The decision of the inspector shall be final and binding upon the parties. The Lessee's acceptance, however affected, shall be deemed effective as of the delivery date and the monthly rentals as hereinafter set forth shall accrue from the delivery date. Such acceptance shall conclusively establish that such Rider No. 2 Cars conform to the applicable standards set forth in the Rider No. 2 and the Interchange Rules.

## ARTICLE 5: MARKINGS

At the time of delivery of the cars by Lessor to Lessee, the cars will be plainly marked on each side with the identification marks of Lessee. If such markings (or any of the markings required pursuant to Article 12) shall at any time be removed or become illegible, wholly or in part, Lessee shall immediately cause such markings to be restored or replaced at Lessee's expense. Lessee shall not otherwise place, or permit to be placed, any lettering or marking of any kind upon the cars without Lessor's prior written consent.

## ARTICLE 6: PAYMENT OF RENTALS

The monthly rental with respect to each car shall be as set forth in the Rider(s), and, subject to Article 2, shall accrue from (and including) the date of delivery at the point of manufacture to (and excluding) the date the car is redelivered in accordance with Article 14. The rental shall be payable to Lessor at the address set forth in Article 24 in advance, on or before the first day of each calendar month during the term hereof; provided, however, that the rental for each car for the month in which it is delivered shall be prorated for the number of business days (including the date of delivery) remaining in such month; and shall be payable on or before the first day of the next succeeding calendar month. The amount by which rental payments for any month exceed the pro rata rental due for the cars leased to Lessee during such month shall be refunded to Lessee within ten (10) business days of the end of such calendar month.

This Lease is a net lease. Lessee's obligation to pay Lessor all rentals and other amounts hereunder, unless such obligation shall be terminated pursuant to the express provisions of this Agreement, shall be absolute and unconditional; and Lessee shall not be entitled to any abatement or reduction of, or set off against, such rentals or other amounts irrespective of any claim, counterclaim, recoupment, defense or other right which Lessee may have, directly or indirectly, against the Lessor, the manufacturer of the cars or any other person or entity.

ARTICLE 7: TITLE AND USAGE

A. Title to the Cars

Lessee acknowledges and agrees that by the execution of this Agreement it does not obtain, and by payments and performance hereunder it does not, and will not, have or obtain any title to the cars or any property right or interest therein, legal or equitable, except solely as Lessee hereunder and subject to all of the terms hereof. Lessee shall keep the cars free from any liens or encumbrances created by or through Lessee other than (a) liens thereon for taxes, assessments, levies, fees, and other governmental and similar charges not due and payable or the amount and validity of which is being contested by Lessee in good faith and (b) any liens of mechanics, suppliers, materialmen and laborers for work or services performed or materials furnished in connection with the cars which are not more than 30 days past due or the amount or validity of which is being contested by Lessee in good faith; provided that, no liens or encumbrances of any kind or nature, regardless of their maturity or the good faith challenge of Lessee shall be allowed to exist with respect to any car being returned to Lessor and for which, it is intended that this Agreement shall terminate. If after 10 days notice, Lessee fails to remove, or bond-up, any such lien or encumbrance, Lessor shall have the right but not the obligation to cause such lien or encumbrance to be removed and Lessee agrees to reimburse Lessor for any and all expenses incurred by Lessor in connection therewith within 5 business days after receipt by Lessee of Lessor's invoice for such expenses. These expenses shall include, but are not limited to filing fees, legal fees and bond premiums. Lessor may charge such expenses to Lessee as additional rent due from Lessee hereunder, together with interest thereon, at the rate equal to the lesser of one and one-half percent (1-1/2%) per month or the highest interest rate permitted by law, in the event Lessee does not reimburse Lessor within the 5 days prescribed. Nothing in this paragraph shall be construed to limit any and all other rights and remedies of Lessor.

B. Usage of the Cars

Throughout the continuance of this Lease, so long as Lessee is not in default under this Lease, Lessee shall be entitled to possession of each car from the date the lease becomes effective as

to such car and shall use such car in the usual interchange of traffic, provided, however that Lessee agrees that the cars shall, at all times, be used: (a) in conformity with all Interchange Rules, (b) in compliance with the terms and conditions of this Lease, and (c) only in the continental limits of the United States unless Lessee has specified written authorization from Lessor.

Lessee shall not use any car to transport or store any commodity listed on the Commodity Restriction List set forth on Exhibit B attached hereto.

In the event any car is used outside of the continental United States for any reason whatsoever, Lessee shall assume full responsibility for all costs, taxes, duties or other charges incidental to such use including costs incurred in returning any such car to the continental United States.

It is understood and agreed that Lessor is not intended to be and will not act as a facility for the transportation, storage or disposal of hazardous or toxic waste, substances or materials.

Lessee agrees to indemnify, defend, protect and hold harmless Lessor from and against any and all claims, liabilities, damages, injuries, and expenses (including attorney's fees and expenses) for Environmental Claims (as defined below) in connection with, or alleged to be in connection with, the operation, use, possession, storage, abandonment or return of any car, or with any location whatsoever (including without limitation any landfill) owned, operated or used for the treatment, storage, transportation or disposal of any waste. Lessee also agrees to indemnify Lessor for any and all costs, claims, liabilities, damages, injuries and expenses (including without limitation attorney's fees and expenses) incurred in connection with the treatment, storage transportation or disposal by Lessor of any waste left in the cars upon return (including per maintenance or repair) of the cars.

For purposes of this Section, "Environmental Claim" means any accusation, allegation, notice of violation, claim, demand, abatement order, direction, investigation, litigation or any other proceeding by any governmental authority or any person (including any corporation, partnership, association or any other organization or entity) for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment or natural resources, reimbursement of environmental cleanup costs, nuisance, pollution, contamination, fines, penalties, restrictions, attorney's fees, health effects monitoring or any other adverse effects on the environment arising under any Environmental Law.

For purposes of this section, "Environmental Law" means any application foreign, federal, state or local statute, law (including common law), ordinance, rule regulation, order (whether voluntary or not) relating to the environment, natural resources,

or human health and safety including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Material Transportation Act (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act, also known as the Solid Waste Disposal Act (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (15 U.S.C § 2601 et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and any analogous state or local law, as such laws have been or will be amended or supplemented now or in the future, and expressly including any additional law (including common law), ordinance, rule, or regulation relating to the environment, natural resources, or human health and safety which may be enacted, produced or promulgated in the future.

C. Lessee's Right to Transfer or Sublease

Lessee shall not transfer, sublease or assign the cars or its interest and obligations pursuant to this Agreement, nor shall a transfer, sublease or assignment by operation of law or otherwise of Lessee's interest in the cars or this Agreement be effective against Lessor, without Lessor's prior written consent, which consent shall not be unreasonably withheld. No transfer, sublease or assignment of this Agreement or of the cars in violation of this Agreement shall relieve Lessee from any of its obligations to Lessor under this Agreement.

Notwithstanding the foregoing paragraph, Lessee shall have the right to sublease any of the cars (i) for single trips to its customers or suppliers, and to cause each car so subleased to be boarded or placarded with the name of the sublessee in accordance with the provisions of the demurrage tariffs lawfully in effect, where the sole purpose of such subleasing is to obtain an exemption from demurrage for said cars so subleased and (ii) to any affiliate of Lessee (an affiliate being defined for purposes of this Article 7 as a business entity controlled by or under common control of the Lessee); provided, however, that notwithstanding any such sublease, Lessee shall continue to remain liable to Lessor for the fulfillment of Lessee's obligations under this Lease.

Notwithstanding the first paragraph of Article 7, Section C, Lessee may sublease the cars to an unaffiliated third party for a short term, not to exceed two years, without Lessor's consent; provided that, notwithstanding any such sublease, Lessee shall continue to remain liable to Lessor for fulfillment of Lessee's obligations under this Lease.

ARTICLE 8: MAINTENANCE AND REPAIRS

A. Maintenance Responsibility

Lessee at its own expense will maintain and keep each car (including any parts installed or replacements made to any car

hereunder) (a) in good operating order, repair, appearance and condition, reasonable wear and tear excepted, (b) in compliance with all Applicable Laws (as defined below), (c) ready for service, and (d) eligible for unrestricted railroad interchange in the hands of Lessee or Lessor in accordance with the interchange rules of the Interchange Rules. Without limiting the generality of any of the foregoing, Lessee shall be responsible for (i) repairing any and all corrosion and abrasion damage and (ii) maintaining the interior lining, if applicable, of each car in good serviceable condition, suitable for immediate continued use in the services in which such car has been placed during the term of the applicable Riders.

Lessee agrees, for the benefit of Lessor, at all times to comply in all material respects (including, without limitation, with respect to the use, maintenance and operating of each car) with all applicable laws of the jurisdictions in which operations involving the cars extend, with the Interchange Rules, to the extent applicable, and with all lawful rules of the DOT, the Interstate Commerce Commission and any other legislative, executive, administrative or judicial body exercising any power or jurisdiction over the cars, to the extent that such laws and rules affect the title, operation or use of the cars (all such laws and rules to such extent being hereinafter called the "Applicable Laws"), and in the event that, prior to the expiration of the term of this Agreement and any Riders hereunder, any Applicable Law requires any alteration, replacement, addition or modification of or to any part on any car for the continued use in unrestricted interchange in the United States and Canada, Lessee will conform therewith at its own expense; provided, however, that Lessee may at its own expense, in good faith, contest the validity or application o any Applicable Law in any reasonable manner which does not, in the opinion of Lessor, adversely affect the property or rights of Lessor under this Agreement or the use of the car; provided further that, if Lessee, in its sole discretion, shall determine that any such required alteration, replacement, addition or modification is uneconomical to make, Lessee may upon 30 days written notice to Lessor, terminate this Agreement and return the cars to Lessor in accordance with Article 14 hereof and Lessee shall pay to Lessor a sum equal to the amount of rent which would otherwise have occurred under this Agreement with respect to such returned cars if this agreement had continued to the end of its term discounted to present value.

By way of addition to and not to limit Lessee's responsibilities hereunder, Lessee shall cause he cars to be painted at least once sometime during the tenth to fifteenth year of this Agreement. Such responsibility shall include, without limitation, blasting the exterior of the cars in compliance with the manufacturer's specifications to obtain the proper profile to allow for the application of an exterior paint system in compliance with the manufacturer's specifications.

B. Alterations

Lessee shall not alter the physical structure of any of the cars without the prior written approval of Lessor. Any modification, alteration or addition to the cars required by any governmental law, rule, regulation, requirement or the Interchange Rules shall be Lessee's responsibility and at its expense.

C. Responsibility for Lost, Destroyed or Damaged Cars

If any of the cars, or any part thereof, shall be lost, destroyed or damaged (such occurrences being hereinafter called "Casualty Occurrences"), then Lessee shall be responsible for, and shall indemnify Lessor and hold Lessor harmless from (as provided in Article 9 hereof), the loss, destruction or damage to the cars, or part thereof, during the term; provided however, Lessee shall not be responsible to the extent that the Interchange Rules place responsibility upon a railroad subscribing to such Interchange Rules and Lessor shall actually receive payment from such railroad; provided further, that Lessee shall not be responsible if such loss, destruction or damage to the cars, any part thereof or appurtenances thereto was caused by the sole active negligence or willful misconduct of Lessor. In the event Lessor shall receive payment from a railroad following payment by Lessee on account of a Casualty Occurrence, Lessor shall remit such payment to Lessee up to the amount of Lessee's earlier payment.

Notwithstanding anything contained herein to the contrary, Lessee shall be responsible for, and the provisions of this Paragraph C of Article 8 shall apply to, the loss, destruction or damage to a car or any part thereof during the term which shall: (a) be occasioned by the misuse or negligence of Lessee, its consignee, agent or sublessee, (b) occur while such car is on the tracks of Lessee or any private siding or track, or on the track of any railroad that does not subscribe to the Interchange Rules or any private or industrial railroad, or (c) be caused by any commodity which may be transported or stored in or on such car.

Lessee shall notify Lessor of the loss or destruction of any of the cars within two (2) business days after the date of such event. If a car is lost or destroyed and Lessor is responsible for such loss or destruction, Lessor shall, at its option, have the right to: (d) substitute for such car another car of the same type, capacity and condition; provided, however, that the rental rate for a substituted car shall be the same as the car replaced in such substitute car, or (e) withdraw the car from this Agreement, and, therefore, reduce the number of cars leased hereunder.

ARTICLE 9: INDEMNIFICATION BY LESSEE

A. Damages, Losses and Injuries Due to Operation of the Cars

Lessee shall defend (if such defense is tendered to Lessee),

indemnify and hold Lessor harmless from and against and does hereby release Lessor from all claims, suits, liabilities, losses, damages, costs and expenses, including attorneys' fees, in any way arising out of, or resulting from, the condition, storage, use, loss of use, maintenance or operation of the cars, or any other cause whatsoever, even though the same may have resulted from Lessor's concurrent negligence with Lessee or any third party, whether active or passive. In all cases to which this indemnity agreement applies, Lessee's obligation shall be to indemnify Lessor for the full amount of the claim, suit, liability, loss, damage, cost or expense involved and principles of comparative negligence shall not apply.

Lessor and Lessee shall cooperate with and assist each other in any reasonable manner requested, but without affecting their respective obligations under this Article or Article 8, to establish proper claims against parties responsible for the loss, destruction of or damage to, the cars.

On the rental payment date next succeeding a Casualty Occurrence (the "Payment Date"), Lessee shall pay Lessor the sum of (i) the Settlement Value (as defined below) of such car or cars and (ii) all rental and other amounts which are due under this Agreement as of such Payment Date. Upon payment of all such sums this Agreement shall terminate as to such cars and (except in the case of loss, theft or complete destruction of such cars) Lessor shall be entitled to recover possession of such cars. The "Settlement Value" shall equal the sum of the percentage amount set forth in Exhibit C for the Payment Date times the original purchase price for such car or cars.

B. Losses to and Damages Caused by Commodities

Lessor shall not be liable for any loss of, or damage to, commodities, or any part thereof, loaded or shipped in the cars, however such loss or damage shall be caused or shall result; and Lessee shall be responsible for, indemnify Lessor against and save Lessor harmless from, any such loss, damage or claim therefor. In the event any of the cars, fittings or appurtenances thereto, including all interior lading protective devices, special interior linings and removable parts, if any, shall become damaged by any commodity loaded therein, Lessee shall be responsible for such damage, and shall indemnify Lessor against and save Lessor harmless from, any such loss, damage or claim therefor according to the same terms of indemnification set forth in Paragraph A of Section 9.

C. Loss of Use of Car

Notwithstanding any provision contained herein to the contrary, Lessor shall not be liable to Lessee for any damages, costs or losses which result from the loss of the use of any of the cars for any reason whatsoever.

ARTICLE 10: INSURANCE

Lessee, at its expense, shall keep the cars insured with companies that have types of coverage and policy limits satisfactory to Lessor with premiums prepaid thereon. Any physical damage policy shall name Lessor as loss payee; and any liability policy shall name Lessor as an additional insured and all such policies shall carry an endorsement by the insurer that Lessor will receive thirty (30) business days written notice of the alteration or cancellation of such policy or policies. Failure by Lessee to procure such insurance shall not affect Lessee's obligations under the terms of this Lease and the loss or destruction of, or damage to, the cars shall not terminate this Lease nor, except to the extent that Lessor is actually compensated by insurance paid for by Lessee, as hereinabove provided, relieve Lessee from liability under the provisions of this Lease. Should Lessee fail to procure or maintain such insurance, Lessor shall have the option, but shall not be obligated to do so for the account of Lessee and, in such event, Lessee shall reimburse Lessor within seven (7) business days after receipt of an invoice therefor, and the failure to make such reimbursement when due shall be deemed an event of default hereunder. All insurance maintained and carried by Lessee hereunder shall be primary and without right of contribution from insurance carried by and maintained by Lessor.

ARTICLE 11: TAXES AND OTHER CHARGES

Except as otherwise hereinafter provided, Lessee shall pay and indemnify and hold Lessor harmless from any and all

(a) taxes including, without limitation, any taxes (withholding or otherwise) imposed by Canada or any province thereof or any governmental or administrative subdivision thereof, sales and/or use taxes, gross receipts, franchise, single business and personal property taxes; and

(b) license fees, assessments, charges, fines, levies, imposts, duties, tariffs, customs, switching, demurrage, track storage, detention, freight, special handling and empty mileage charges, including penalties and interest thereon, levied or imposed by any foreign Federal, state or local government or taxing authority, railroad or other agency upon or with respect to the cars, or Lessor in connection with the cars or the lease thereof hereunder, and Lessee shall prepare and file all returns and reports required in connection with the foregoing and shall furnish copies thereof to Lessor upon request.

Notwithstanding the foregoing, Lessee shall not be responsible for any tax imposed by the United States or any state or governmental subdivision thereof which is measured solely by Lessor's net income, unless such tax is in substitution for or

releases Lessee from the payment of any taxes for which Lessee would otherwise be obligated under Article 11.

ARTICLE 12: ASSIGNMENT, TRANSFERS, ENCUMBRANCES

All rights of Lessor hereunder may be assigned, pledged, mortgaged, transferred or otherwise disposed of, either in whole or in part, and/or Lessor may assign, pledge, mortgage, transfer or otherwise dispose of title to the cars, with or without notice to Lessee. In the event of any such assignment, pledge, mortgage, transfer or other disposition, this Agreement and all rights of Lessee hereunder or those of any person, firm or corporation who claims or who may hereafter claim any rights in this Agreement under or through Lessee, are hereby made subject and subordinate to the terms, covenants and conditions of any chattel mortgage, conditional sale agreement, equipment trust agreement or other agreements or assignments covering the cars heretofore or hereafter created and entered into by Lessor, its successors or assigns and to all of the rights of any such chattel mortgagee, assignee, trustee or other holder of legal title to or security interest in the cars; provided, however, that so long as Lessee is not in default hereunder Lessor shall continue to perform its obligations hereunder, and Lessee shall be entitled to use the cars in accordance with the terms and conditions hereof. Any sublease or assignment of the cars permitted by this Agreement that is entered into by Lessee or its successors or assigns shall contain language which expressly makes such assignment or sublease subject to the subordination contained herein. At the request of Lessor or any chattel mortgagee, assignee, Lessee, at Lessor's expense, shall letter or mark the cars to identify the legal owner of the cars and, if applicable, place on each side of each car, in letters not less than one inch in height, the words "Ownership Subject to a Security Agreement Filed Under the Interstate Commerce Act, Section 11303" or other appropriate words reasonably requested.

In the event that Lessor assigns its interest in this Agreement, Lessee, at the request of Lessor, shall execute and deliver to Lessor an Acknowledgment of Assignment of Agreement in form satisfactory to Lessor and upon such request and execution furnish to Lessor an opinion of counsel that such Acknowledgment has been duly authorized, executed and delivered by Lessee and constitutes a valid, legal and binding instrument, enforceable in accordance with its terms. Lessor agrees that an assignment to an assignee with a net worth of less than $50,000,000 must be approved in advance in writing by Lessee.

ARTICLE 13: DEFAULT BY LESSEE

If Lessee defaults in the payment of any sum of money to be paid under this Agreement and such default continues for a period of ten (10) business days after written notice to Lessee of such default; or if Lessee shall breach any of its insurance obligations under Article 12; or if any cars are illegally used; or if North

American Chemical Company fails to pay one or more of their respective debts of a material amount (as defined below) as they become due, after giving effect to applicable grace periods, excluding the amount of any debt with the Lessee actively and in good faith shall dispute; or if Lessee shall default under another agreement with Lessor; or if Lessee fails to perform any other covenant or condition required to be performed by Lessee which failure shall not be remedied within ten (10) business days after notice thereof by Lessor to Lessee; or if Lessee shall dissolve, make or commit any act of bankruptcy, or if any proceeding under any bankruptcy or insolvency statute of any laws relating to relief of debtors is commenced by Lessee, or if any such proceeding is commenced against Lessee and same shall not have been removed within thirty (30) business days of the date of the filing thereof, or if a receiver, trustee or liquidator is appointed for Lessee or for all or a substantial part of Lessee's assets with Lessee's consent, or if, without Lessee's consent, the same shall not have been removed within thirty (30) business days of the date of the appointment thereof; or if any order, judgment or decree be entered by a court of competent jurisdiction and continue unpaid and in effect for any period of thirty (30) consecutive business days without a stay of execution, or if a writ of attachment or execution is levied on any car and is not discharged within ten (10) business days thereafter, Lessor may exercise one or more of the following remedies with respect to the cars:

1. Immediately terminate this Agreement and Lessee's right hereunder;

2. Require Lessee to return the cars to Lessor at Lessee's expense, and if Lessee fails to so comply, Lessor may take possession of such cars without demand or notice and without court order or legal process. Lessee hereby waives any damages occasioned by such taking of possession whether or not Lessee was in default at the time possession was taken, so long as Lessor reasonably believes that Lessee was in default at such time; Lessee acknowledges that it may have a right to notice of possession and the taking of possession with a court order or other legal process. Lessee, however, knowingly waives any right to such notice of possession and the taking of such possession without court order or legal process;

3. Lease the cars to such persons, at such rental and for such period of time as lessor shall elect. Lessor shall apply the proceeds from such leasing, less all costs and expenses incurred in the recovery, repair, storage and renting of such cars, toward the payment of Lessee's obligations hereunder. Lessee shall remain liable for any deficiency, which, at Lessor's option, shall be paid monthly, as suffered, or immediately or at the end of the term as damages for Lessee's default;

4. Bring legal action to recover all rent or other amounts then accrued or thereafter accruing from Lessee to Lessor under any provision hereunder; and

5. Pursue any other remedy which Lessor may have.

For purposes of this Article 13 only, the term "material amount" shall mean an aggregate of outstanding debts for borrowed money in the amount of $4,500,000.

Each remedy is cumulative and may be enforced separately or concurrently. In the event of default, Lessee shall pay to Lessor all costs and expenses including reasonable attorneys' fees expended by Lessor in the enforcement of its rights and remedies hereunder, and Lessee shall pay interest on any amount owing to Lessor from the time such amount becomes due hereunder at a rate per annum equal to three percentage points above the prime rate of The First National Bank of Chicago, such rate to be reduced, however, to the extent it exceeds the maximum rate permitted by applicable law. In addition, Lessee shall, without expense to Lessor, assist Lessor in repossessing the cars and shall, for a reasonable time if required, furnish suitable trackage space for the storage of the cars.

If Lessee fails to perform any of its obligations hereunder, Lessor, at Lessee's expense, and without waiving any rights it may have against Lessee for such nonperformance, may itself render such performance. Lessee shall reimburse Lessor on demand for all sums so paid by Lessor on Lessee's behalf, together with interest at a rate equal to three percentage points above the prime rate of The First National Bank of Chicago, such rate to be reduced however, to the extent it exceeds the applicable law.

## ARTICLE 14: DELIVERY AT END OF TERM

Lessee shall not deliver the cars prior to the end of the term without the prior written consent of Lessor. Notwithstanding anything contained herein to the contrary, Lessee shall not load any car leased hereunder during the final fifteen (15) business days of the term, except as otherwise provided in the Rider(s).

At the end of the term, Lessee, at its expense, shall deliver each car to Lessor, or to a subsequent lessee, at the point designated by Lessor, empty, free from residue, accumulations or deposits from commodities transported in or on the cars while in service of Lessee, in the same good order and condition as it was delivered by Lessor to Lessee, ordinary wear and tear excepted and in interchange condition, suitable for loading, free from all charges and liens, except those which may result from an act or omission of Lessor. Lessee, at its expense, shall remove or cause to be removed from the cars any of Lessee's special advertising, lettering or other markings. Lessee shall, on demand, reimburse

Lessor for the expense of cleaning any car that contains residue or such other cost which may be incurred to place a car in the condition described above.

If any car is not redelivered to Lessor or not delivered to a subsequent lessee on or before the date on which the term ends, or in the event that a car so delivered is not in the condition required by this Article 14, Lessee shall pay rental for each day that each car is not delivered as required herein or until each car is delivered in the condition required, at a rate equal to one hundred fifty percent (150%) of the rate in effect just prior to such term's end. Lessee shall pay to Lessor on or before the last day of each month the amount Lessee is obligated to pay to Lessor for such month under this Article 14. In addition to any other indemnity provided herein and any payments to be made to Lessor hereunder, Lessee shall also indemnify and hold Lessor harmless from and against all losses, injuries, liabilities, claims and demands whatsoever, including those asserted by a subsequent lessee arising out of or as a result of such late delivery or failure to deliver in the condition required.

ARTICLE 15: WARRANTIES AND REPRESENTATIONS

LESSEE ACKNOWLEDGES AND AGREES (a) THAT EACH CAR IS OF A SIZE, DESIGN, CAPACITY, AND MANUFACTURE SELECTED BY LESSEE; (b) THAT LESSEE IS SATISFIED THAT THE SAME IS SUITABLE FOR ITS PURPOSES; (c) THAT LESSOR IS NOT MANUFACTURER THEREOF; AND THAT (d) THAT LESSOR HAS NOT MADE, AND DOES NOT HEREBY MAKE, ANY REPRESENTATION OR WARRANTY OR COVENANT, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE DESIGN, NON-INFRINGEMENT, COMPLIANCE WITH SPECIFICATIONS, OPERATION OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN, THE CARS OR ANY COMPONENT THEREOF DELIVERED TO THE LESSEE HEREUNDER, AND LESSOR DOES NOT MAKE ANY WARRANTY OF MERCHANTABILITY OR FITNESS OF THE CARS OR ANY COMPONENT THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY CAR OR ANY COMPONENT THEREOF (EITHER UPON DELIVERY THEREOF TO THE LESSEE OR OTHERWISE), IT BEING AGREED THAT ALL SUCH RISKS, AS BETWEEN LESSOR AND LESSEE, ARE TO BE BORNE BY LESSEE. LESSOR SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY TO LESSEE OR ANY OTHER PERSON WITH RESPECT TO ANY OF THE FOLLOWING: (i) ANY LIABILITY, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED DIRECTLY OR INDIRECTLY BY ANY CARS OR BY ANY INADEQUACY THEREOF OR DEFICIENCY OR DEFECT THEREIN OR BY ANY OTHER CIRCUMSTANCES IN CONNECTION THEREWITH; (ii) THE USE, OPERATION OR PERFORMANCE OF ANY CARS OR ANY RISKS RELATING THERETO; (iii) ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OF ANY NATURE, INCLUDING BUT NOT LIMITED TO INTERRUPTION OF SERVICE, LOSS OF BUSINESS OR ANTICIPATED PROFITS; OR (iv) THE DELIVERY, OPERATION, SERVICING, MAINTENANCE, REPAIR, IMPROVEMENT OR REPLACEMENT OF ANY CARS. Lessee shall be solely responsible for determining that the specifications and design of any car are appropriate for the commodities loaded therein. During the period of any lease hereunder in which Lessee renders faithful performance

of its obligations, Lessor hereby assigns to Lessee any factory or dealer warranty, whether express or implied, or other legal right Lessor may have against the manufacturer in connection with defects in the cars covered by this Agreement.

ARTICLE 16: OPINION OF COUNSEL

Lessee, on or before the execution of this Agreement, shall furnish to Lessor an opinion of Lessee's counsel, satisfactory to counsel for Lessor and in form and substance satisfactory to such counsel, that as of the date of the Agreement:

1. Lessee is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware and is either duly qualified to do business and is in good standing in such other jurisdictions in which the business and activities of Lessee require such qualification or its failure to so qualify in such other jurisdiction will not have a material adverse impact on this Agreement.

2. Lessee has full corporate power to enter into this Agreement.

3. The Agreement has been duly authorized, executed and delivered by Lessee and constitutes a valid, legal and binding agreement, enforceable in accordance with its terms.

4. No approval is required by Lessee from any governmental or public body or authority with respect to the entering into or performance of this Agreement.

5. The entering into and performance of this Agreement will not conflict with, or result in a breach of, the terms, conditions or provision of any law or any regulations, order, injunction, permit, franchise or decree of any court or governmental instrumentality.

6. The entering into and performance of this Agreement will not conflict with, or result in a breach of, the terms, conditions or provisions of any indenture, agreement or other instrument to which Lessee is party or by which it or any of its property is bound.

7. Lessee is neither an organization described in Section 48(a)(4) nor a governmental unit described in Section 48(a)(5) of the Internal Revenue Code of 1986, as amended.

## ARTICLE 17: RIGHT OF INSPECTION

Lessor, or its assignee, shall, at any reasonable time and without interfering with Lessee's operations, have the right to inspect the cars by its authorized representative wherever they may be located for the purpose of determining compliance by Lessee with its obligations hereunder. Lessee shall use its best effort to obtain permission, if necessary, for Lessor or its representative to enter upon any premises where the cars may be located.

## ARTICLE 18: REPORT AND NOTICES

A. Notification of Liens

Lessee shall notify Lessor, in writing, within three (3) business days after any attachment, lien (including any tax and mechanics' liens) or other judicial process attaches to the cars.

B. Report of Location

Within five (5) business days after receipt of written demand from Lessor, Lessee shall give Lessor written notice of the approximate location of the cars.

## ARTICLE 19: ASSIGNMENT OF RIGHTS

Except as otherwise provided in Article 12 and Paragraph C of Article 7, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

## ARTICLE 20: GOVERNMENTAL LAWS

Lessee shall comply with all governmental laws, rules, regulations, requirements and the Interchange Rules (herein collectively referred to as the "Rules") with respect to the use, operation and maintenance of any interior lading protective devices, special interior linings or removable parts. Lessee, at its expense, shall further comply with the Rules in the event such Rules require a change or replacement of any equipment or appliance on the cars or in case any additional or other equipment or appliance is required to be installed on the cars.

## ARTICLE 21: USE OF CARS ON CERTAIN ROADS UNDER AAR CIRCULAR O T-5

Lessor shall have no responsibility and it shall be Lessee's sole responsibility to obtain from any railroad all the necessary authority to place the cars in service under the provisions of AAR Circular OT-5 as promulgated by the AAR and all supplements thereto and reissues thereof or subsequent directives (such authority hereinafter called "consent(s)"). Lessor shall not be liable for Lessee's failure to obtain such consents for any reason whatsoever and this Agreement shall remain in full force and effect notwithstanding any failure of Lessee to obtain such consents.

## ARTICLE 22: ADMINISTRATION OF AGREEMENT

Lessee agrees to make available to Lessor information concerning the movement of the cars reasonably required for the efficient administration of this Agreement.

Lessee agrees to cooperate with Lessor for the purpose of complying with any reasonable requirements of any lender, the Interstate Commerce Commission or the provisions of Article 9 of the Uniform Commercial Code provided such cooperation does not materially affect the rights of liabilities or Lessee hereunder.

## ARTICLE 23: MISCELLANEOUS

A. Entire Agreement

This Agreement, together with any and all exhibits attached hereto, constitutes the entire agreement between Lessor and Lessee and it shall not be amended, altered or changed except by written agreement signed by the parties hereto. No waiver of any provision of this Agreement nor consent to any departure by Lessee therefrom shall be effective unless the same shall be in writing signed by both parties, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

Within 30 days prior to the end of each 12 consecutive month period of this Agreement. Lessee shall provide to Lessor a list, certified by its principal financial officer, identifying the cars subject to this Agreement and stating that (i) such cars are currently in service and in good condition (ii) there exist no event of default under this Agreement and (iii) except as provided in such notice in writing, there has been no change in the Lessee's insurance coverage as required under Article 10 and that such policies are in full force and effect.

Consolidated

B. Financial Reports

Lessee will furnish Lessor with: (i) as soon as practicable and in any event within 45 days after the end of each of the first three quarterly periods of each fiscal year of Lessee, balance sheets of Lessee as at the end of such period [and the previous fiscal quarter] and consolidated statements of income for such period and statements of changes in financial position of Lessee for the period from the beginning of the current fiscal year to the end of such period, setting forth in comparative form the figures for the corresponding periods in the previous fiscal year, all in reasonable detail, prepared in accordance with generally accepted accounting principles applied on a consistent basis except as otherwise disclosed, and certified as complete and correct, subject to changes resulting from audit and year-end adjustments, by the principal financial officer of the Lessee; and (ii) as soon as practicable and in any event within 90 days after the end of each fiscal year [or within such shorter period as applicable stock

consolidate

exchange regulations, if any, may require for mailing of the annual report to stockholders), a balance sheet of Lessee as at the end of such year, and consolidated statements of income, stockholders' equity and changes in financial position of Lessee for such year, setting forth in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with generally accepted accounting principles applied on a consistent basis except as otherwise disclosed, (and accompanied by a report and opinion of independent certified public accountants of recognized standing selected by Lessee and satisfactory to GE Railcar, which opinion and report shall have been prepared in accordance with generally accepted auditing standards) and certified by the principal financial officer of Lessee. All financial reports may be submitted on a consolidated basis.

C. Broker's Fees

All amounts payable with respect to any claim for investment banking, brokerage or finder's fees or other commissions in respect of the transactions contemplated by or in any way related to this

Agreement shall be for the account of the party engaging such person or entity.

D. Governing Law

This Agreement shall be interpreted under and performance shall be governed by the laws of the State of Illinois.

E. Conflict with Interchange Rules

In the event the Interchange Rules conflict with any provision of this Agreement, this Agreement shall govern.

F. Riders and Exhibits

All riders and Exhibits attached hereto are incorporated herein by this reference.

G. Payments

All payments to be made under this Agreement shall be made at the addresses set forth in Article 24.

H. Severability

If any term or provision of this Agreement or the application thereof shall, to any extent, be invalid or unenforceable, such invalidity or unenforceability shall not affect or render invalid or unenforceable any other provision of this Agreement, and this Agreement shall be valid and enforced to the fullest extent permitted by law.

I. Headings

The headings that have been used to designate the various Sections and Articles hereof are solely for convenience in reading and ease of reference and shall not be construed in any event or manner as interpretive or limiting the interpretation of the same.

J. Survival

All indemnities contained in this Agreement shall survive the termination hereof. In addition, the obligation to pay any deficiency as well as the obligation for any and all other payments by Lessee to Lessor hereunder shall survive the termination of this Agreement or the Lease Contained herein.

ARTICLE 24: ADDRESSING OF NOTICES

Any notice required or permitted hereunder shall be in writing and shall be delivered to the respective parties hereto by personal delivery thereof or by telegram, telex, telecopier or deposit in the United States mail as a certified or registered matter, return receipt requested, postage prepaid, and addressed to the respective parties as follows, unless otherwise advised in writing.

Lessee to Lessor:

TO: General Electric Railcar
Leasing Company
33 West Monroe Street
24th Floor
Chicago, Illinois 60603

ATTENTION: General Counsel

Lessor to Lessee:

TO: Trona Railways Company
13068 Matin Street
Trona, California 93562

ATTENTION: Manager, Rail Operations

With a copy to:

North American Chemical Company
8300 College Boulevard
Overland Park, MO 66210

[The remainder of this page was intentionally left blank. The next page contains the signature page.]

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed and delivered as of the 4/ day of March, 1993.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: [signature]
Vice President

ATTEST:

By: [signature]
Assistant Secretary

LESSEE: TRONA RAILWAY COMPANY

By: [signature] 1/13/99
~~Vice~~ President

ATTEST:

By: [signature] 1/15/99
~~Assistant Secretary~~
VP/G.M. Searles
Scott Randolph

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed and delivered as of the 31 day of March, 1993.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: ______________________
Vice President

ATTEST:

By: ______________________
Assistant Secretary

LESSEE: TRONA RAILWAY COMPANY

By: ______________________
Vice President

ATTEST:

By: ______________________
Assistant Secretary

THE STATE OF _____)
)
COUNTY OF ________)

Before me, the undersigned, a Notary Public in and for said County and State, on this day personally appeared ______________, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of the said ______________________________, a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under by hand and seal of office this ________ day of ______________________, 19__.

______________________________
Notary Public

My commission expires:

THE STATE OF Illinois)
)
COUNTY OF Cook)

On this 31 day of March, 1993, before me personally appeared Ted F. Weiland, to me personally known, who, being by me duly sworn, says that he is Senior Vice President, Finance of General Electric Railcar Leasing Services Corp.; that one of the seals affixed to the foregoing instrument is the corporate seal of said corporation, and that said instrument was signed and sealed on behalf of said corporation by authority of its Board of Directors, and he acknowledged that the execution of the foregoing instrument was the free act and deed of said corporation.

Antoinette Hopkins
Notary Public

My Commission Expires:

"OFFICIAL SEAL"
Antoinette Hopkins
Notary Public, State of Illinois
My Commission Expires 3/3/97

C:\WP51\TUCKER\NACLES.4

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed and delivered as of the ___ day of March, 1993.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: ______________________
Vice President

ATTEST:

By: ______________________
Assistant Secretary

LESSEE: TRONA RAILWAY COMPANY

By: ~~Vice President~~ President 1/13/99

ATTEST:

By: ______________________ 1/15/99
~~Assistant Secretary~~
VP/GM Baron
Scott Randolph

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed and delivered as of the ___ day of March, 1993.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: ______________________
Vice President

ATTEST:

By: ______________________
Assistant Secretary

LESSEE: TRONA RAILWAY COMPANY

By: ______________________
Vice President

ATTEST:

By: ______________________
Assistant Secretary

[illegible]

EXHIBIT A

CERTIFICATE OF ACCEPTANCE

[To Be Supplied]

EXHIBIT B

COMMODITY RESTRICTION LIST

| CAS Number | Commodity |
|---|---|
| 74862 | Acetylene |
| 106978 | Butane |
| 106990 | Butadiene |
| 25167673 | Butene |
| 107006 | Butyne |
| 630080 | Carbon Monoxide |
| 7782505 | Chlorine |
| 287230 | Cyclo Butane |
| 75194 | Cyclo Propane |
| 75683 | Difluoro-1-Chloroethane |
| 124403 | Dimethylamine-Anhydrous |
| 463821 | Dimethyl Propane |
| 74840 | Ethane |
| 75003 | Ethyl Chloride |
| 74851 | Ethylene |
| 74908 | Hydrocyanic Acid |
| 7783064 | Hydrogen Sulfide |
| 75285 | Isobutane |
| 74828 | Methane |
| 563462 | Methyl Butene |
| 74872 | Methyl Chloride |
| 115106 | Methyl Ether |
| 593533 | Methyl Fluoride |
| 74931 | Methyl Mercaptan |
| 115117 | Methyl Propene |
| 7803512 | Phosphine |
| 75445 | Phosgene |
| 74986 | Propane |
| 115071 | Propylene |
| 74997 | Propyne |
| 116143 | Tetrafluoroethylene |
| 75503 | Trimethylamine |
| - | Vinyl Acetylene |
| 75014 | Vinyl Chloride Monomer |

| CAS Number | Commodity |
|---|---|
| - | Alkyl Lead Compound |
| 107119 | Allylamine |
| 107051 | Allylchloride |
| 7726956 | Bromine |
| 75649 | tert-Butylamine |
| 1097728 | n-Butyl Lithium |
| 598301 | sec-Butyl Lithium |
| 76062 | Chloropicrin |
| 7790945 | Chlorosulfonic Acid |
| 2524041 | Diethylthiophosphorylchloride |
| 75047 | Ethylamine |
| 75218 | Ethylene Oxide |
| 109955 | Ethyl Nitrite |
| 110009 | Furan |
| 74895 | Methylamine |
| 79221 | Methyl Chloroformate |
| 624839 | Methyl Isocyanate |
| - | Nitro Carbo Nitrate |
| 504609 | 1, 3-Pentadiene |
| 10025873 | Phosphorus Oxychloride |
| 7719122 | Phosphorus Trichloride |
| 106967 | Propargyl Bromide |
| 107108 | Mono-N-Propylamine |
| 7446095 | Sulphur Dioxide |
| 75741 | Tetramethyl Lead |
| 7550450 | Titanium Tetrachloride |
| 75354 | Vinylidene Chloride |

CUSTOMER TERMINATION REPO[illegible]

| DATE | TERMINATION VALUE PERCENTAGE |
|---|---|
| 4 1993 | 100.146 |
| 5 1993 | 100.285 |
| 6 1993 | 100.418 |
| 7 1993 | 100.544 |
| 8 1993 | 100.667 |
| 9 1993 | 100.784 |
| 10 1993 | 100.893 |
| 11 1993 | 101.000 |
| 12 1993 | 101.100 |
| 1 1994 | 101.193 |
| 2 1994 | 101.283 |
| 3 1994 | 101.369 |
| 4 1994 | 101.444 |
| 5 1994 | 101.509 |
| 6 1994 | 101.564 |
| 7 1994 | 101.608 |
| 8 1994 | 101.648 |
| 9 1994 | 101.678 |
| 10 1994 | 101.698 |
| 11 1994 | 101.714 |
| 12 1994 | 101.719 |
| 1 1995 | 101.714 |
| 2 1995 | 101.705 |
| 3 1995 | 101.691 |
| 4 1995 | 101.670 |
| 5 1995 | 101.641 |
| 6 1995 | 101.604 |
| 7 1995 | 101.560 |
| 8 1995 | 101.513 |
| 9 1995 | 101.458 |
| 10 1995 | 101.396 |
| 11 1995 | 101.329 |
| 12 1995 | 101.256 |
| 1 1996 | 101.174 |
| 2 1996 | 101.089 |
| 3 1996 | 101.000 |
| 4 1996 | 100.905 |
| 5 1996 | 100.804 |
| 6 1996 | 100.699 |
| 7 1996 | 100.588 |
| 8 1996 | 100.473 |
| 9 1996 | 100.353 |
| 10 1996 | 100.228 |
| 11 1996 | 100.098 |
| 12 1996 | 99.964 |
| 1 1997 | 99.824 |
| 2 1997 | 99.680 |
| 3 1997 | 99.531 |
| 4 1997 | 99.379 |
| 5 1997 | 99.223 |
| 6 1997 | 99.063 |
| 7 1997 | 98.900 |
| 8 1997 | 98.732 |

STOMER TERMINATION REPORT

| DATE | TERMINATION VALUE PERCENTAGE |
|---|---|
| 9 1997 | 98.561 |
| 10 1997 | 98.386 |
| 11 1997 | 98.206 |
| 12 1997 | 98.023 |
| 1 1998 | 97.836 |
| 2 1998 | 97.645 |
| 3 1998 | 97.449 |
| 4 1998 | 97.250 |
| 5 1998 | 97.047 |
| 6 1998 | 96.840 |
| 7 1998 | 96.629 |
| 8 1998 | 96.414 |
| 9 1998 | 96.195 |
| 10 1998 | 95.972 |
| 11 1998 | 95.744 |
| 12 1998 | 95.513 |
| 1 1999 | 95.277 |
| 2 1999 | 95.037 |
| 3 1999 | 94.793 |
| 4 1999 | 94.545 |
| 5 1999 | 94.292 |
| 6 1999 | 94.036 |
| 7 1999 | 93.776 |
| 8 1999 | 93.511 |
| 9 1999 | 93.241 |
| 10 1999 | 92.968 |
| 11 1999 | 92.690 |
| 12 1999 | 92.408 |
| 1 2000 | 92.122 |
| 2 2000 | 91.831 |
| 3 2000 | 91.535 |
| 4 2000 | 91.238 |
| 5 2000 | 90.938 |
| 6 2000 | 90.636 |
| 7 2000 | 90.331 |
| 8 2000 | 90.022 |
| 9 2000 | 89.711 |
| 10 2000 | 89.397 |
| 11 2000 | 89.078 |
| 12 2000 | 88.757 |
| 1 2001 | 88.434 |
| 2 2001 | 88.106 |
| 3 2001 | 87.773 |
| 4 2001 | 87.442 |
| 5 2001 | 87.110 |
| 6 2001 | 86.777 |
| 7 2001 | 86.444 |
| 8 2001 | 86.107 |

# CUSTOMER TERMINATION REPORT

| DATE | TERMINATION VALUE PERCENTAGE |
|---|---|
| 9 2001 | 85.768 |
| 10 2001 | 85.430 |
| 11 2001 | 85.086 |
| 12 2001 | 84.742 |
| 1 2002 | 84.397 |
| 2 2002 | 84.047 |
| 3 2002 | 83.694 |
| 4 2002 | 83.343 |
| 5 2002 | 82.990 |
| 6 2002 | 82.637 |
| 7 2002 | 82.284 |
| 8 2002 | 81.925 |
| 9 2002 | 81.566 |
| 10 2002 | 81.206 |
| 11 2002 | 80.842 |
| 12 2002 | 80.476 |
| 1 2003 | 80.110 |
| 2 2003 | 79.739 |
| 3 2003 | 79.364 |
| 4 2003 | 78.991 |
| 5 2003 | 78.617 |
| 6 2003 | 78.242 |
| 7 2003 | 77.866 |
| 8 2003 | 77.485 |
| 9 2003 | 77.104 |
| 10 2003 | 76.721 |
| 11 2003 | 76.334 |
| 12 2003 | 75.945 |
| 1 2004 | 75.556 |
| 2 2004 | 75.162 |
| 3 2004 | 74.764 |
| 4 2004 | 74.367 |
| 5 2004 | 73.969 |
| 6 2004 | 73.570 |
| 7 2004 | 73.171 |
| 8 2004 | 72.766 |
| 9 2004 | 72.360 |
| 10 2004 | 71.953 |
| 11 2004 | 71.541 |
| 12 2004 | 71.128 |
| 1 2005 | 70.714 |
| 2 2005 | 70.294 |
| 3 2005 | 69.871 |
| 4 2005 | 69.449 |
| 5 2005 | 69.025 |
| 6 2005 | 68.601 |
| 7 2005 | 68.176 |
| 8 2005 | 67.745 |

CUSTOMER TERMINATION REPORT

| DATE | TERMINATION VALUE PERCENTAGE |
|---|---|
| 9 2005 | 67.313 |
| 10 2005 | 66.880 |
| 11 2005 | 66.441 |
| 12 2005 | 66.001 |
| 1 2006 | 65.560 |
| 2 2006 | 65.114 |
| 3 2006 | 64.664 |
| 4 2006 | 64.214 |
| 5 2006 | 63.763 |
| 6 2006 | 63.311 |
| 7 2006 | 62.857 |
| 8 2006 | 62.398 |
| 9 2006 | 61.938 |
| 10 2006 | 61.477 |
| 11 2006 | 61.009 |
| 12 2006 | 60.541 |
| 1 2007 | 60.071 |
| 2 2007 | 59.596 |
| 3 2007 | 59.116 |
| 4 2007 | 58.637 |
| 5 2007 | 58.156 |
| 6 2007 | 57.674 |
| 7 2007 | 57.191 |
| 8 2007 | 56.701 |
| 9 2007 | 56.211 |
| 10 2007 | 55.721 |
| 11 2007 | 55.284 |
| 12 2007 | 54.844 |
| 1 2008 | 54.401 |
| 2 2008 | 53.954 |
| 3 2008 | 53.505 |
| 4 2008 | 53.053 |
| 5 2008 | 52.597 |
| 6 2008 | 52.138 |
| 7 2008 | 51.676 |
| 8 2008 | 51.211 |
| 9 2008 | 50.743 |
| 10 2008 | 50.271 |
| 11 2008 | 49.797 |
| 12 2008 | 49.319 |
| 1 2009 | 48.837 |
| 2 2009 | 48.352 |
| 3 2009 | 47.864 |
| 4 2009 | 47.373 |
| 5 2009 | 46.878 |
| 6 2009 | 46.380 |
| 7 2009 | 45.878 |
| 8 2009 | 45.373 |

# C TOMER TERMINATION REPORT

| DATE | TERMINATION VALUE PERCENTAGE |
|---|---|
| 9 2009 | 44.864 |
| 10 2009 | 44.352 |
| 11 2009 | 43.836 |
| 12 2009 | 43.317 |
| 1 2010 | 42.794 |
| 2 2010 | 42.268 |
| 3 2010 | 41.737 |
| 4 2010 | 41.204 |
| 5 2010 | 40.666 |
| 6 2010 | 40.125 |
| 7 2010 | 39.580 |
| 8 2010 | 39.031 |
| 9 2010 | 38.479 |
| 10 2010 | 37.922 |
| 11 2010 | 37.362 |
| 12 2010 | 36.798 |
| 1 2011 | 36.220 |
| 2 2011 | 35.658 |
| 3 2011 | 35.082 |
| 4 2011 | 34.502 |
| 5 2011 | 33.918 |
| 6 2011 | 33.330 |
| 7 2011 | 32.738 |
| 8 2011 | 32.142 |
| 9 2011 | 31.542 |
| 10 2011 | 30.938 |
| 11 2011 | 30.329 |
| 12 2011 | 29.716 |
| 1 2012 | 29.100 |
| 2 2012 | 28.478 |
| 3 2012 | 27.853 |
| 4 2012 | 27.223 |
| 5 2012 | 26.589 |
| 6 2012 | 25.950 |
| 7 2012 | 25.307 |
| 8 2012 | 24.660 |
| 9 2012 | 24.008 |
| 10 2012 | 23.351 |
| 11 2012 | 22.690 |
| 12 2012 | 22.024 |
| 1 2013 | 21.354 |
| 2 2013 | 20.679 |
| 3 2013 | 20.000 |

**SECRETARY'S CERTIFICATE**

The undersigned Assistant Secretary of General Electric Railcar Services Corporation hereby certifies that the document listed below and attached hereto is a true and complete copy of the original document that is maintained in ordinary course of business of General Electric Railcar Services Corporation.

**Document**

Rider No. 1 dated March 31, 1993 to Railroad Car Net Lease Agreement by and between General Electric Railcar Services Corporation and Trona Railway

Executed this 12th day of January, 1999.

Ricki Knapp

Ricki Knapp

Effective this 31 day of March, 1993, this Rider shall become a part of the Railroad Car Net Lease Agreement between General Electric Railcar Leasing Services Corporation, Lessor, and Trona Railway Company, Lessee, dated March 31, 1993, and the cars described herein shall be leased to Lessee, subject to the terms and conditions in said Railroad Car Net Lease Agreement, during the term and for the rental shown below:

| Number of Cars | Type and Description | Approximate Capacity (gallonage or cubic feet) | Base Monthly Rental (Per Car) |
|---|---|---|---|
| 618 | Covered triple hopper cars equipped with trough hatches and gravity outlets Specification L-30102A, revised September 11, 1992<br><br>DGHX 3000 through 3056, 3058 through 3506, 3510 through 3568, 3570 through 3572, 3574 through 3582, 3584, 3585, 3587, 3589 through 3622, 3624, 3625, 3626, 3628 | 4,750 CF | $383.00 |

+4 as Frt Surt/mo

Initial Delivery Freight Charges - Notwithstanding Article 3.D., Lessor shall pay, on Lessee's behalf, all freight charges pertaining to the initial delivery of the cars from the point of manufacture. Lessor shall amortize the aggregate freight charges over the lease term by increasing the monthly rental by an amount equal to the product of the mean freight charge multiplied by an interest factor of 0.008997.

The minimum rental period for the cars leased hereunder shall be two hundred forty (240) months, and the cars shall continue under lease thereafter for successive sixty (60) month terms, at the same rate and under the same conditions, unless notice, in writing, requesting cancellation shall be given by either party to the other at least sixty (60) days prior to expiration of the initial term or any successive term for cars covered by this Rider. Thereafter, this Rider shall terminate automatically upon the date of release of the last car covered by this Rider.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: [signature]
Vice President

LESSEE: TRONA RAILWAY COMPANY

By: ______________________
Vice President

C:\WP51\TUCKER\NACLES.4

Effective this 31 day of March, 1993, this Rider shall become a part of the Railroad Car Net Lease Agreement between General Electric Railcar Leasing Services Corporation, Lessor, and Trona Railway Company, Lessee, dated March 31, 1993, and the cars described herein shall be leased to Lessee, subject to the terms and conditions in said Railroad Car Net Lease Agreement, during the term and for the rental shown below:

| Number of Cars | Type and Description | Approximate Capacity (gallonage or cubic feet) | Base Monthly Rental (Per Car) |
|---|---|---|---|
| 618 | Covered triple hopper cars equipped with trough hatches and gravity outlets Specification L-30102A, revised September 11, 1992<br><br>DGHX 3000 through 3056, 3058 through 3506, 3510 through 3568, 3570 through 3572, 3574 through 3582, 3584, 3585, 3587, 3589 through 3622, 3624, 3625, 3626, 3628 | 4,750 CF | $383.00 |

Initial Delivery Freight Charges - Notwithstanding Article 3.D., Lessor shall pay, on Lessee's behalf, all freight charges pertaining to the initial delivery of the cars from the point of manufacture. Lessor shall amortize the aggregate freight charges over the lease term by increasing the monthly rental by an amount equal to the product of the mean freight charge multiplied by an interest factor of 0.008997.

The minimum rental period for the cars leased hereunder shall be two hundred forty (240) months, and the cars shall continue under lease thereafter for successive sixty (60) month terms, at the same rate and under the same conditions, unless notice, in writing, requesting cancellation shall be given by either party to the other at least sixty (60) days prior to expiration of the initial term or any successive term for cars covered by this Rider. Thereafter, this Rider shall terminate automatically upon the date of release of the last car covered by this Rider.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: [signature]
Vice President

LESSEE: TRONA RAILWAY COMPANY

By: [signature] 1/13/99
~~Vice~~ President

C:\WP\TUCKER\RACLES.4

01/13/99 WED [illegible] FMC CHEMICALS →→→ TRONA ADMIN 008

RIDER No. 1

Effective this ___ day of March, 1993, this Rider shall become a part of the Railroad Car Net Lease Agreement between General Electric Railcar Leasing Services Corporation, Lessor, and Trona Railway Company, Lessee, dated March ___, 1993, and the cars described herein shall be leased to Lessee, subject to the terms and conditions in said Railroad Car Net Lease Agreement, during the term and for the rental shown below:

| Number of Cars | Type and Description | Approximate Capacity (gallonage or cubic feet) | Base Monthly Rental (Per Car) |
|---|---|---|---|
| 111 | Covered triple hopper cars equipped with trough hatches and gravity outlets Specification [illegible], Revised [illegible] 11, 1992<br><br>[illegible] 3400 through 3454, 3458 through 3464, 3510 through 3540, 3576 through 3572, 3574 through 3583, 3584, 3585, 3587, 3592 through 3673, 3624, 3625, 3626, 3618 | 4,740 CF | [illegible] |

Initial Delivery Freight Charges - Notwithstanding Article 1.D., Lessor shall pay, on Lessee's behalf, all freight charges pertaining to the initial delivery of the cars from the point of manufacture. Lessor shall amortize the aggregate freight charges over the lease term by increasing the monthly rental by an amount equal to the product of the base freight charge multiplied by an interest factor of 0.[illegible].

The minimum rental period for the cars leased hereunder shall be two hundred forty (240) months, and the cars shall continue under lease thereafter for successive sixty (60) month terms, at the same rate and under the same conditions, unless notice, in writing, requesting cancellation shall be given by either party to the other at least sixty (60) days prior to expiration of the initial term or any successive term for cars covered by this Rider. Thereafter, this Rider shall terminate automatically upon the date of release of the last car covered by this Rider.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: ______________________
A Vice President

LESSEE: TRONA RAILWAY COMPANY

By: ______________________ [signature]
Vice President

[signature] President 1-13-99

[illegible] 33

— TOTAL PAGE.003 —

TOTAL P.02

PAGE.003

MAR 31 '93 18:01

JAN 13 '99 10:27 FR GE RAILCAR LEASING 312 853 5518 TO 919133387953 P.06/09

RIDER NO. 1

Effective this ___ day of March, 1993, this Rider shall become a part of the Railroad Car Net Lease Agreement between General Electric Railcar Leasing Services Corporation, Lessor, and [illegible] Railway Company, Lessee, dated March ____, 1993, and the cars described herein shall be leased to Lessee, subject to the terms and conditions in said Railroad Car Net Lease Agreement, during the term and for the rental shown below:

| Number of Cars | Type and Description | Approximate Capacity (gallonage or cubic feet) | Base Monthly Rental (Per Car) |
|---|---|---|---|
| [illegible] | Covered triple hopper cars equipped with trough hatches and gravity outlets Specification [illegible], revised September [illegible], 1992<br><br>[illegible] 3600 through [illegible] | 4,7[illegible]0 CF | $[illegible] |

Initial Delivery Freight Charges - Notwithstanding Article [illegible], Lessor shall pay, on Lessee's behalf, all freight charges pertaining to the initial delivery of the cars from the point of manufacture. Lessor shall amortize the aggregate freight charges over the lease term by increasing the monthly rental by an amount equal to the product of the mean freight charge multiplied by an interest factor of 0.008397.

The minimum rental period for the cars leased hereunder shall be two hundred forty (240) months, and the cars shall continue under lease thereafter for successive sixty (60) month terms, at the same rate and under the same conditions, unless notice, in writing, requesting cancellation shall be given by either party to the other at least sixty (60) days prior to expiration of the initial term or any successive term for cars covered by this Rider. Thereafter, this Rider shall terminate automatically upon the date of release of the last car covered by this Rider.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: ______________________
A Vice President

LESSEE: [illegible] RAILWAY COMPANY

By: ______________________
[illegible] President

[illegible]

# SECRETARY'S CERTIFICATE

The undersigned Assistant Secretary of General Electric Railcar Services Corporation hereby certifies that the document listed below and attached hereto is a true and complete copy of the original document that is maintained in ordinary course of business of General Electric Railcar Services Corporation.

## Document

Rider No. 2 dated March 31, 1993 to Railroad Car Net Lease Agreement by and between General Electric Railcar Services Corporation and Trona Railway

Executed this 12th day of January, 1999.

Ricki Knapp

Ricki Knapp

Effective thi 31 day of March, 1993 become a part of the Railroad Car Net Lease Agreement between General Electric Railcar Leasing Services Corporation, Lessor, and Trona Railway Company, Lessee, dated March 31, 1993, and the cars described herein shall be leased to Lessee, subject to the terms and conditions in said Railroad Car Net Lease Agreement, during the term and for the rental shown below:

| Number of Cars | Type and Description | Approximate Capacity (gallonage or cubic feet) | Base Monthly Rental (Per Car) |
|---|---|---|---|
| 32 | Covered triple hopper cars equipped with trough hatches and gravity outlets Specification L-30102A, revised September 11, 1992<br><br>(DGHX 3057, 3507 through 3509, 3569, 3573, 3583, 3586, 3588, 3623, 3627, 3629 through 3649) | 4,750 CF | $383.00 |
| 50 | Covered triple hopper cars equipped with trough hatches and gravity pneumatic outlet gates Specifications L-30102A, revised September 11, 1992<br><br>(DGHX 4000 through 4049) | 4,750 CF | $423.0C |

Initial Delivery Freight Charges - Notwithstanding Article 3.D., Lessor shall pay, on Lessee's behalf, all freight charges pertaining to the initial delivery of the cars from the point of manufacture. Lessor shall amortize the aggregate freight charges over the lease term by increasing the monthly rental by an amount equal to the product of the mean freight charge multiplied by an interest factor of 0.008997.

The minimum rental period for the cars leased hereunder shall be two hundred forty (240) months, and the cars shall continue under lease thereafter for successive sixty (60) month terms, at the same rate and under the same conditions, unless notice, in writing, requesting cancellation shall be given by either party to the other at least sixty (60) days prior to expiration of the initial term or any successive term for cars covered by this Rider. Thereafter, this Rider shall terminate automatically upon the date of release of the last car covered by this Rider.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: [signature]
Vice President

LESSEE: TRONA RAILWAY COMPANY

By: [signature] 1/13/99
~~Vice~~ President

C:\WP51\TUCKER\WACLES 6

Effective thi 31 day of March, 1993 this Rider shall become a part of the Railroad Car Net Lease Agreement between General Electric Railcar Leasing Services Corporation, Lessor, and Trona Railway Company, Lessee, dated March 31, 1993, and the cars described herein shall be leased to Lessee, subject to the terms and conditions in said Railroad Car Net Lease Agreement, during the term and for the rental shown below:

| Number of Cars | Type and Description | Approximate Capacity (gallonage or cubic feet) | Base Monthly Rental (Per Car) |
|---|---|---|---|
| 32 | Covered triple hopper cars equipped with trough hatches and gravity outlets Specification L-30102A, revised September 11, 1992<br><br>(DGHX 3057, 3507 through 3509, 3569, 3573, 3583, 3586, 3588, 3623, 3627, 3629 through 3649) | 4,750 CF | $383.00 |
| 50 | Covered triple hopper cars equipped with trough hatches and gravity pneumatic outlet gates Specifications L-30102A, revised September 11, 1992<br><br>(DGHX 4000 through 4049) | 4,750 CF | $423.00 |

Initial Delivery Freight Charges - Notwithstanding Article 3.D., Lessor shall pay, on Lessee's behalf, all freight charges pertaining to the initial delivery of the cars from the point of manufacture. Lessor shall amortize the aggregate freight charges over the lease term by increasing the monthly rental by an amount equal to the product of the mean freight charge multiplied by an interest factor of 0.008997.

The minimum rental period for the cars leased hereunder shall be two hundred forty (240) months, and the cars shall continue under lease thereafter for successive sixty (60) month terms, at the same rate and under the same conditions, unless notice, in writing, requesting cancellation shall be given by either party to the other at least sixty (60) days prior to expiration of the initial term or any successive term for cars covered by this Rider. Thereafter, this Rider shall terminate automatically upon the date of release of the last car covered by this Rider.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: [signature]
Vice President

LESSEE: TRONA RAILWAY COMPANY

By: ______________________
Vice President

01/13/99 WED 10:34 FAX 913 338 7897 IMC CHEMICALS →→→ TRONA ADMIN ☑007

JAN 13 '99 10:28 FR GE RAILCAR LEASING 312 853 5518 TO 919133387953 P.06/09

MAR 31 '93 03:44PM [illegible] SANDERS TO [illegible] P.36/38

FROM GE RAILCAR

MAR 28 '93 [illegible]

RIDER NO. 2

Effective this ___ day of March, 1993, this Rider shall become a part of the Railroad Car Net Lease Agreement between General Electric Railcar Leasing Services Corporation, Lessor, and Trona Railway Company, Lessee, dated March ___, 1993, and the cars described herein shall be leased to Lessee, subject to the terms and conditions in said Railroad Car Net Lease Agreement, during the term and for the rental shown below:

| Number of Cars | Type and Description | Approximate Capacity (Gallonage or Cubic Feet) | Base Monthly Rental (Per Car) |
|---|---|---|---|
| 22 | Covered triple hopper cars equipped with trough hatches and gravity outlets Specification [illegible], revised September [illegible] (TRNX 3097, 3502 through 3509, [illegible], 3572, [illegible] through [illegible]) | 4,750 CF | $[illegible] |
| 58 | Covered triple hopper cars equipped with trough hatches and gravity pneumatic outlet gates. Specifications [illegible], revised September [illegible] (TRNX 4000-4049) | 6,750 CF | $423.00 |

Initial Delivery Freight Charges - Notwithstanding Article 3.D., Lessor shall pay, on Lessee's behalf, all freight charges pertaining to the initial delivery of the cars from the point of manufacture. Lessor shall amortize the aggregate freight charges over the lease term by increasing the monthly rental by an amount equal to the product of the said freight charges multiplied by an interest factor of [illegible].

The minimum rental period for the cars leased hereunder shall be two hundred forty (240) months, and the cars shall continue under lease thereafter for successive sixty (60) month terms, at the same rate and under the same conditions, unless notice, in writing, requesting cancellation shall be given by either party to the other at least sixty (60) days prior to expiration of the initial term or any successive term for cars covered by this Rider. Thereafter, this Rider shall terminate automatically upon the date of release of the last car covered by this Rider.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: ______________________
A Vice President

LESSEE: TRONA RAILWAY COMPANY

By: [signature]
Vice President

[signature]
President

1/13/99

[illegible] 13 [illegible] TOTAL PAGE [illegible]

Post-it™ brand fax transmittal memo 7671 | # of pages ▸

| To [illegible] | From |
|---|---|
| Co. | Co. |
| Dept. | Phone # |
| Fax # | Fax # 3[illegible] |

MAR 31 '93 18:00 PAGE [illegible]

MAR 31 '93 04:54PM FROM [illegible] TO [illegible]46914 P.2 P.01

MAR 31 '93 09:44AM [illegible] XHELL SANDERS FROM CC RAILCAR TO 518162?4C914 P.002/P.36/38

MAR 30 '93 [illegible]

# RIDER NO. 2

Effective this ____ day of March, 1993, this Rider shall become a part of the Railroad Car Net Lease Agreement between General Electric Railcar Leasing Services Corporation, Lessor, and Texas Railway Company, Lessee, dated March ___, 1993, and the cars described herein shall be leased to Lessee, subject to the terms and conditions in said Railroad Car Net Lease Agreement, during the term and for the rental shown below:

| Number of Cars | Type and Description | Approximate Capacity (gallonage or cubic feet) | Base Monthly Rental (Per Car) |
|---|---|---|---|
| 22 | Covered triple hopper cars equipped with trough hatches and gravity outlets Specification L-301023, revised September 11, 1992<br><br>(DGRX 3087, 3507 through 3509, 3559, 3522, 3535, 3576, 3581, 3621, 3627, 3656 through 3662) | 4,750 CF | $[illegible].00 |
| 50 | Covered triple hopper cars equipped with trough hatches and gravity pneumatic outlet gates, Specifications L-301023, revised September 11, 1992.<br><br>(DGRX 4000-4049) | 4,750 CF | $423.00 |

Initial Delivery Freight Charges - Notwithstanding Article 3.D., Lessor shall pay, on Lessee's behalf, all freight charges pertaining to the initial delivery of the cars from the point of manufacture. Lessor shall amortize the aggregate freight charges over the lease term by increasing the monthly rental by an amount equal to the product of the mean freight charge multiplied by an interest factor of 0.008987.

The minimum rental period for the cars leased hereunder shall be two hundred forty (240) months, and the cars shall continue under lease thereafter for successive sixty (60) month terms, at the same rate and under the same conditions, unless notice, in writing, requesting cancellation shall be given by either party to the other at least sixty (60) days prior to expiration of the initial term or any successive term for cars covered by this Rider. Thereafter, this Rider shall terminate automatically upon the date of release of the last car covered by this Rider.

LESSOR: GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: ____________________
A Vice President

LESSEE: TEXAS RAILWAY COMPANY

By: [signature]
President

[illegible] 21

** TOTAL PAGE.002 **

Post-it™ brand fax transmittal memo 7671 | # of pages ▶ 2

| | |
|---|---|
| To | From |
| Co. | Co. |
| Dept. | Phone # |
| Fax # | Fax # |

MAR 31 '93 18:00 PAGE.002

# EXHIBIT B

EXHIBIT A

Copy of CIT Lease Agreement

# GENERAL ELECTRIC RAILCAR SERVICES CORPORATION RAILROAD CAR NET LEASE AGREEMENT

This Lease Agreement, dated December 15, 1993, (hereinafter called the "Agreement") by and between General Electric Railcar Leasing Services Corporation, a Delaware corporation, with its principal office at 33 West Monroe Street, 24th Floor, Chicago, IL 60603, (hereinafter called "Lessor") and The Hutchinson & Northern Railway Company, a Kansas corporation, with its principal office at 8300 College Boulevard, Overland Park, Missouri 66210 (hereinafter called "Lessee").

In consideration of the mutual terms and conditions hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE 1: LEASE AGREEMENT

Lessor agrees to lease to the Lessee, and Lessee agrees to lease from Lessor, the cars shown on each Rider hereto and such additional Riders as may be added from time to time by agreement of the parties and signed by their duly authorized representatives (all such cars being hereinafter referred to a "car" or the "cars"). Each Rider shall set forth a brief description of the car or cars covered thereby, including such facts as the number of cars, the Association of American Railroads (AAR) or Department of Transportation (DOT) specifications, rental charges, term throughout which the car or cars shall remain in Lessee's service and such other information as may be desired by both parties. It is the intent of all parties to this Agreement to characterize this Agreement as a true lease.

## ARTICLE 2: TERM

The term of this Agreement, with respect to each car, shall commence upon the initial delivery of such car to Lessee in the manner set forth in Article 3 and shall terminate on the earlier of the loss or destruction of such car or, with respect to all cars leased hereunder, at the end of the lease term set forth in the Rider(s) attached hereto; provided, however, that without limiting any other rights Lessor may have against Lessee, if Lessee is responsible for such loss or destruction of a car under Paragraph C of Article 8, this Agreement, with respect to such car, shall continue until Lessee pays to Lessor the Settlement Value (defined in Article 9 hereof) of such car as determined immediately prior to such loss or destruction. Notwithstanding the expiration or termination of this Agreement, the obligations of the Lessee hereunder shall continue in effect with regard to each car until each car is returned to the possession of the Lessor in clean condition in accordance with Article 14 hereof.

## ARTICLE 3: DELIVERY

A. Delivery of Rider Cars

Lessor shall cause each car described on a Rider to be delivered to Lessee at the point of manufacture on or before the date specified in such Rider. The obligations of Lessor to deliver any car subject to a Rider shall be excused, and Lessor shall not be liable for any delay or failure to deliver such car for causes beyond the reasonable control of Lessor (including, but not limited to, delays caused by fire, labor difficulties, delays of carriers and materials suppliers, governmental authority, failure or late delivery by the manufacturer of such car or late delivery by a prior Lessee) and, in the event of a delay in such delivery, Lessor shall deliver such car to Lessee as soon as reasonably possible thereafter.

B. Cost of Delivery

Lessee shall pay all freight charges and other costs, if any, of the delivery of the cars from the point of manufacture.

## ARTICLE 4: ACCEPTANCE OF CARS

Upon delivery of a car, Lessee shall promptly inspect such car and shall accept such car if it: (a) complies with the description set forth in the applicable Rider, and (b) is fit and suitable for operation as those terms are defined in Interchange Rules adopted by the AAR (the "Interchange Rules"). Upon acceptance, Lessee shall deliver to Lessor a Certificate of Acceptance in the form attached hereto as Exhibit A. Notwithstanding the foregoing, Lessee shall be deemed to have accepted any car delivered hereunder if, with respect to such car, the Lessee shall: (c) load, or otherwise use the car, or (d) fail to notify Lessor, in writing, within five (5) business days after delivery of Lessee's rejection of the car and the specific reasons why the car does not meet the applicable standards set forth in the Rider(s) or the Interchange Rules. If Lessee rejects any car, Lessor shall have the right to have the rejected car inspected by an inspector acceptable to both Lessor and Lessee. The cost of such inspection will be paid by the Lessor if the cause for rejection is affirmed by the inspector, otherwise such cost will be borne by Lessee. The Lessee shall be deemed to have accepted any car for which the inspector determines that good cause for rejection did not exist. The decision of the inspector shall be final and binding upon the parties. The Lessee's acceptance, however affected, shall be deemed effective as of the delivery date and the monthly rentals as hereinafter set forth shall accrue from the delivery date. Such acceptance shall conclusively establish that such car conform to the applicable standards set forth in the applicable Rider and the Interchange Rules.

## ARTICLE 5: MARKINGS

At the time of delivery of the cars by Lessor to Lessee, the cars will be plainly marked on each side with the identification marks of Lessee. If such markings (or any of the markings required pursuant to Article 12) shall at any time be removed or become illegible, wholly or in part, Lessee shall immediately cause such markings to be restored or replaced at Lessee's expense. Lessee shall not otherwise place, or permit to be placed, any lettering or marking of any kind upon the cars without Lessor's prior written consent.

## ARTICLE 6: PAYMENT OF RENTALS

The monthly rental with respect to each car shall be as set forth in the Rider(s), and, subject to Article 2, shall accrue from (and including) the date of delivery at the point of manufacture to (and excluding) the date the car is redelivered in accordance with Article 14. The rental shall be payable to Lessor at the address set forth in Article 24 in advance, on or before the first day of each calendar month during the term hereof; provided, however, that the rental for each car for the month in which it is delivered shall be prorated for the number of business days (including the date of delivery) remaining in such month; and shall be payable on or before the first day of the next succeeding calendar month. The amount by which rental payments for any month exceed the pro rata rental due for the cars leased to Lessee during such month shall be refunded to Lessee within ten (10) business days of the end of such calendar month.

This Lease is a net lease. Lessee's obligation to pay Lessor all rentals and other amounts hereunder, unless such obligation shall be terminated pursuant to the express provisions of this Agreement, shall be absolute and unconditional; and Lessee shall not be entitled to any abatement or reduction of, or set off against, such rentals or other amounts irrespective of any claim, counterclaim, recoupment, defense or other right which Lessee may have, directly or indirectly, against the Lessor, the manufacturer of the cars or any other person or entity.

## ARTICLE 7: TITLE AND USAGE

A. Title to the Cars

Lessee acknowledges and agrees that by the execution of this Agreement it does not obtain, and by payments and performance hereunder it does not, and will not, have or obtain any title to the cars or any property right or interest therein, legal or equitable, except solely as Lessee hereunder and subject to all of the terms hereof. Lessee shall keep the cars free from any liens or encumbrances created by or through Lessee other than (a) liens thereon for taxes, assessments, levies, fees, and other governmental and similar charges not due and payable or the amount

and validity of which is being contested by Lessee in good faith and (b) any liens of mechanics, suppliers, materialmen and laborers for work or services performed or materials furnished in connection with the cars which are not more than 30 days past due or the amount or validity of which is being contested by Lessee in good faith; provided that, no liens or encumbrances of any kind or nature, regardless of their maturity or the good faith challenge of Lessee shall be allowed to exist with respect to any car being returned to Lessor and for which, it is intended that this Agreement shall terminate. If after 10 days notice, Lessee fails to remove, or bond-up, any such lien or encumbrance, Lessor shall have the right but not the obligation to cause such lien or encumbrance to be removed and Lessee agrees to reimburse Lessor for any and all expenses incurred by Lessor in connection therewith within 5 business days after receipt by Lessee of Lessor's invoice for such expenses. These expenses shall include, but are not limited to filing fees, legal fees and bond premiums. Lessor may charge such expenses to Lessee as additional rent due from Lessee hereunder, together with interest thereon, at the rate equal to the lesser of one and one-half percent (1-1/2%) per month or the highest interest rate permitted by law, in the event Lessee does not reimburse Lessor within the 5 days prescribed. Nothing in this paragraph shall be construed to limit any and all other rights and remedies of Lessor.

B. Usage of the Cars

Throughout the continuance of this Lease, so long as Lessee is not in default under this Lease, Lessee shall be entitled to possession of each car from the date the lease becomes effective as to such car and shall use such car in the usual interchange of traffic, provided, however that Lessee agrees that the cars shall, at all times, be used: (a) in conformity with all Interchange Rules, (b) in compliance with the terms and conditions of this Lease, and (c) only in the continental limits of the United States unless Lessee has specified written authorization from Lessor.

Lessee shall not use any car to transport or store any commodity listed on the Commodity Restriction List set forth on Exhibit B attached hereto.

In the event any car is used outside of the continental United States for any reason whatsoever, Lessee shall assume full responsibility for all costs, taxes, duties or other charges incidental to such use including costs incurred in returning any such car to the continental United States.

It is understood and agreed that Lessor is not intended to be and will not act as a facility for the transportation, storage or disposal of hazardous or toxic waste, substances or materials.

Lessee agrees to indemnify, defend, protect and hold harmless Lessor from and against any and all claims, liabilities, damages,

injuries, and expenses (including attorney's fees and expenses) for Environmental Claims (as defined below) in connection with, or alleged to be in connection with, the operation, use, possession, storage, abandonment or return of any car, or with any location whatsoever (including without limitation any landfill) owned, operated or used for the treatment, storage, transportation or disposal of any waste. Lessee also agrees to indemnify Lessor for any and all costs, claims, liabilities, damages, injuries and expenses (including without limitation attorney's fees and expenses) incurred in connection with the treatment, storage transportation or disposal by Lessor of any waste left in the cars upon return (including per maintenance or repair) of the cars.

For purposes of this Section, "Environmental Claim" means any accusation, allegation, notice of violation, claim, demand, abatement order, direction, investigation, litigation or any other proceeding by any governmental authority or any person (including any corporation, partnership, association or any other organization or entity) for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment or natural resources, reimbursement of environmental cleanup costs, nuisance, pollution, contamination, fines, penalties, restrictions, attorney's fees, health effects monitoring or any other adverse effects on the environment arising under any Environmental Law.

For purposes of this section, "Environmental Law" means any application foreign, federal, state or local statute, law (including common law), ordinance, rule regulation, order (whether voluntary or not) relating to the environment, natural resources, or human health and safety including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Material Transportation Act (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act, also known as the Solid Waste Disposal Act (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (15 U.S.C § 2601 et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and any analogous state or local law, as such laws have been or will be amended or supplemented now or in the future, and expressly including any additional law (including common law), ordinance, rule, or regulation relating to the environment, natural resources, or human health and safety which may be enacted, produced or promulgated in the future.

C. Lessee's Right to Transfer or Sublease

Lessee shall not transfer, sublease or assign the cars or its interest and obligations pursuant to this Agreement, nor shall a transfer, sublease or assignment by operation of law or otherwise of Lessee's interest in the cars or this Agreement be effective against Lessor, without Lessor's prior written consent, which consent shall not be unreasonably withheld. No transfer, sublease

or assignment of this Agreement or of the cars in violation of this Agreement shall relieve Lessee from any of its obligations to Lessor under this Agreement.

Notwithstanding the foregoing paragraph, Lessee shall have the right to sublease any of the cars (i) for single trips to its customers or suppliers, and to cause each car so subleased to be boarded or placarded with the name of the sublessee in accordance with the provisions of the demurrage tariffs lawfully in effect, where the sole purpose of such subleasing is to obtain an exemption from demurrage for said cars so subleased and (ii) to any affiliate of Lessee (an affiliate being defined for purposes of this Article 7 as a business entity controlled by or under common control of the Lessee); provided, however, that notwithstanding any such sublease, Lessee shall continue to remain liable to Lessor for the fulfillment of Lessee's obligations under this Lease.

Notwithstanding the first paragraph of Article 7, Section C, Lessee may sublease the cars to an unaffiliated third party for a short term, not to exceed two years, without Lessor's consent; provided that, notwithstanding any such sublease, Lessee shall continue to remain liable to Lessor for fulfillment of Lessee's obligations under this Lease.

## ARTICLE 8: MAINTENANCE AND REPAIRS

A. Maintenance Responsibility

Lessee at its own expense will maintain and keep each car (including any parts installed or replacements made to any car hereunder) (a) in good operating order, repair, appearance and condition, reasonable wear and tear excepted, (b) in compliance with all Applicable Laws (as defined below), (c) ready for service, and (d) eligible for unrestricted railroad interchange in the hands of Lessee or Lessor in accordance with the interchange rules of the Interchange Rules. Without limiting the generality of any of the foregoing, Lessee shall be responsible for (i) repairing any and all corrosion and abrasion damage and (ii) maintaining the interior lining, if applicable, of each car in good serviceable condition, suitable for immediate continued use in the services in which such car has been placed during the term of the applicable Riders.

Lessee agrees, for the benefit of Lessor, at all times to comply in all material respects (including, without limitation, with respect to the use, maintenance and operating of each car) with all applicable laws of the jurisdictions in which operations involving the cars extend, with the Interchange Rules, to the extent applicable, and with all lawful rules of the DOT, the Interstate Commerce Commission and any other legislative, executive, administrative or judicial body exercising any power or jurisdiction over the cars, to the extent that such laws and rules affect the title, operation or use of the cars (all such laws and rules to such extent being hereinafter called the "Applicable

Laws"), and in the event that, prior to the expiration of the term of this Agreement and any Riders hereunder, any Applicable Law requires any alteration, replacement, addition or modification of or to any part on any car for the continued use in unrestricted interchange in the United States and Canada, Lessee will conform therewith at its own expense; provided, however, that Lessee may at its own expense, in good faith, contest the validity or application o any Applicable Law in any reasonable manner which does not, in the opinion of Lessor, adversely affect the property or rights of Lessor under this Agreement or the use of the car; provided further that, if Lessee, in its sole discretion, shall determine that any such required alteration, replacement, addition or modification is uneconomical to make, Lessee may upon 30 days written notice to Lessor, terminate this Agreement and return the cars to Lessor in accordance with Article 14 hereof and Lessee shall pay to Lessor a sum equal to the amount of rent which would otherwise have occurred under this Agreement with respect to such returned cars if this agreement had continued to the end of its term discounted to present value.

By way of addition to and not to limit Lessee's responsibilities hereunder, Lessee shall cause he cars to be painted at least once sometime during the tenth to fifteenth year of this Agreement. Such responsibility shall include, without limitation, blasting the exterior of the cars in compliance with the manufacturer's specifications to obtain the proper profile to allow for the application of an exterior paint system in compliance with the manufacturer's specifications.

B. Alterations

Lessee shall not alter the physical structure of any of the cars without the prior written approval of Lessor. Any modification, alteration or addition to the cars required by any governmental law, rule, regulation, requirement or the Interchange Rules shall be Lessee's responsibility and at its expense.

C. Responsibility for Lost, Destroyed or Damaged Cars

If any of the cars, or any part thereof, shall be lost, destroyed or damaged (such occurrences being hereinafter called "Casualty Occurrences"), then Lessee shall be responsible for, and shall indemnify Lessor and hold Lessor harmless from (as provided in Article 9 hereof), the loss, destruction or damage to the cars, or part thereof, during the term; provided however, Lessee shall not be responsible to the extent that the Interchange Rules place responsibility upon a railroad subscribing to such Interchange Rules and Lessor shall actually receive payment from such railroad; provided further, that Lessee shall not be responsible if such loss, destruction or damage to the cars, any part thereof or appurtenances thereto was caused by the sole active negligence or willful misconduct of Lessor. In the event Lessor shall receive payment from a railroad following payment by Lessee on account of

a Casualty Occurrence, Lessor shall remit such payment to Lessee up to the amount of Lessee's earlier payment.

Notwithstanding anything contained herein to the contrary, Lessee shall be responsible for, and the provisions of this Paragraph C of Article 8 shall apply to, the loss, destruction or damage to a car or any part thereof during the term which shall: (a) be occasioned by the misuse or negligence of Lessee, its consignee, agent or sublessee, (b) occur while such car is on the tracks of Lessee or any private siding or track, or on the track of any railroad that does not subscribe to the Interchange Rules or any private or industrial railroad, or (c) be caused by any commodity which may be transported or stored in or on such car.

Lessee shall notify Lessor of the loss or destruction of any of the cars within two (2) business days after the date of such event. If a car is lost or destroyed and Lessor is responsible for such loss or destruction, Lessor shall, at its option, have the right to: (d) substitute for such car another car of the same type, capacity and condition; provided, however, that the rental rate for a substituted car shall be the same as the car replaced in such substitute car, or (e) withdraw the car from this Agreement, and, therefore, reduce the number of cars leased hereunder.

## ARTICLE 9: INDEMNIFICATION BY LESSEE

A. Damages, Losses and Injuries Due to Operation of the Cars

Lessee shall defend (if such defense is tendered to Lessee), indemnify and hold Lessor harmless from and against and does hereby release Lessor from all claims, suits, liabilities, losses, damages, costs and expenses, including attorneys' fees, in any way arising out of, or resulting from, the condition, storage, use, loss of use, maintenance or operation of the cars, or any other cause whatsoever, even though the same may have resulted from Lessor's concurrent negligence with Lessee or any third party, whether active or passive. In all cases to which this indemnity agreement applies, Lessee's obligation shall be to indemnify Lessor for the full amount of the claim, suit, liability, loss, damage, cost or expense involved and principles of comparative negligence shall not apply.

Lessor and Lessee shall cooperate with and assist each other in any reasonable manner requested, but without affecting their respective obligations under this Article or Article 8, to establish proper claims against parties responsible for the loss, destruction of or damage to, the cars.

On the rental payment date next succeeding a Casualty Occurrence (the "Payment Date"), Lessee shall pay Lessor the sum of (i) the Settlement Value (as defined below) of such car or cars and (ii) all rental and other amounts which are due under this Agreement as of such Payment Date. Upon payment of all such sums

this Agreement shall terminate as to such cars and (except in the case of loss, theft or complete destruction of such cars) Lessor shall be entitled to recover possession of such cars. The "Settlement Value" shall equal the sum of the percentage amount set forth in Exhibit C for the Payment Date times the original purchase price for such car or cars.

B. Losses to and Damages Caused by Commodities

Lessor shall not be liable for any loss of, or damage to, commodities, or any part thereof, loaded or shipped in the cars, however such loss or damage shall be caused or shall result; and Lessee shall be responsible for, indemnify Lessor against and save Lessor harmless from, any such loss, damage or claim therefor. In the event any of the cars, fittings or appurtenances thereto, including all interior lading protective devices, special interior linings and removable parts, if any, shall become damaged by any commodity loaded therein, Lessee shall be responsible for such damage, and shall indemnify Lessor against and save Lessor harmless from, any such loss, damage or claim therefor according to the same terms of indemnification set forth in Paragraph A of Section 9.

C. Loss of Use of Car

Notwithstanding any provision contained herein to the contrary, Lessor shall not be liable to Lessee for any damages, costs or losses which result from the loss of the use of any of the cars for any reason whatsoever.

ARTICLE 10: INSURANCE

Lessee, at its expense, shall keep the cars insured with companies that have types of coverage and policy limits satisfactory to Lessor with premiums prepaid thereon. Any physical damage policy shall name Lessor as loss payee; and any liability policy shall name Lessor as an additional insured and all such policies shall carry an endorsement by the insurer that Lessor will receive thirty (30) business days written notice of the alteration or cancellation of such policy or policies. Failure by Lessee to procure such insurance shall not affect Lessee's obligations under the terms of this Lease and the loss or destruction of, or damage to, the cars shall not terminate this Lease nor, except to the extent that Lessor is actually compensated by insurance paid for by Lessee, as hereinabove provided, relieve Lessee from liability under the provisions of this Lease. Should Lessee fail to procure or maintain such insurance, Lessor shall have the option, but shall not be obligated to do so for the account of Lessee and, in such event, Lessee shall reimburse Lessor within seven (7) business days after receipt of an invoice therefor, and the failure to make such reimbursement when due shall be deemed an event of default hereunder. All insurance maintained and carried by Lessee hereunder shall be primary and without right of contribution from insurance carried by and maintained by Lessor.

ARTICLE 11: TAXES AND OTHER CHARGES

Except as otherwise hereinafter provided, Lessee shall pay and indemnify and hold Lessor harmless from any and all

(a) taxes including, without limitation, any taxes (withholding or otherwise) imposed by Canada or any province thereof or any governmental or administrative subdivision thereof, sales and/or use taxes (including, without limitation, state taxes on Lessor, Lessee or the manufacturer (to the extent Lessor is otherwise by agreement required to pay such taxes) imposed as a result of the purchase and delivery of the cars into service), gross receipts, franchise, single business and personal property taxes; and

(b) license fees, assessments, charges, fines, levies, imposts, duties, tariffs, customs, switching, demurrage, track storage, detention, freight, special handling and empty mileage charges, including penalties and interest thereon, levied or imposed by any foreign Federal, state or local government or taxing authority, railroad or other agency upon or with respect to the cars, or Lessor in connection with the cars or the lease thereof hereunder, and Lessee shall prepare and file all returns and reports required in connection with the foregoing and shall furnish copies thereof to Lessor upon request.

Notwithstanding the foregoing, Lessee shall not be responsible for any tax imposed by the United States or any state or governmental subdivision thereof which is measured solely by Lessor's net income, unless such tax is in substitution for or releases Lessee from the payment of any taxes for which Lessee would otherwise be obligated under Article 11.

ARTICLE 12: ASSIGNMENT, TRANSFERS, ENCUMBRANCES

All rights of Lessor hereunder may be assigned, pledged, mortgaged, transferred or otherwise disposed of, either in whole or in part, and/or Lessor may assign, pledge, mortgage, transfer or otherwise dispose of title to the cars, with or without notice to Lessee. In the event of any such assignment, pledge, mortgage, transfer or other disposition, this Agreement and all rights of Lessee hereunder or those of any person, firm or corporation who claims or who may hereafter claim any rights in this Agreement under or through Lessee, are hereby made subject and subordinate to the terms, covenants and conditions of any chattel mortgage, conditional sale agreement, equipment trust agreement or other agreements or assignments covering the cars heretofore or hereafter created and entered into by Lessor, its successors or assigns and to all of the rights of any such chattel mortgagee, assignee, trustee or other holder of legal title to or security interest in the cars; provided, however, that so long as Lessee is not in

default hereunder Lessor shall continue to perform its obligations hereunder, and Lessee shall be entitled to use the cars in accordance with the terms and conditions hereof. Any sublease or assignment of the cars permitted by this Agreement that is entered into by Lessee or its successors or assigns shall contain language which expressly makes such assignment or sublease subject to the subordination contained herein. At the request of Lessor or any chattel mortgagee, assignee, Lessee, at Lessor's expense, shall letter or mark the cars to identify the legal owner of the cars and, if applicable, place on each side of each car, in letters not less than one inch in height, the words "Ownership Subject to a Security Agreement Filed Under the Interstate Commerce Act, Section 11303" or other appropriate words reasonably requested.

In the event that Lessor assigns its interest in this Agreement, Lessee, at the request of Lessor, shall execute and deliver to Lessor an Acknowledgment of Assignment of Agreement in form satisfactory to Lessor and upon such request and execution furnish to Lessor an opinion of counsel that such Acknowledgment has been duly authorized, executed and delivered by Lessee and constitutes a valid, legal and binding instrument, enforceable in accordance with its terms. Lessor agrees that an assignment to an assignee with a net worth of less than $50,000,000 must be approved in advance in writing by Lessee.

## ARTICLE 13: DEFAULT BY LESSEE

If Lessee defaults in the payment of any sum of money to be paid under this Agreement and such default continues for a period of ten (10) business days after written notice to Lessee of such default; or if Lessee shall breach any of its insurance obligations under Article 12; or if any cars are illegally used; or if North American Chemical Company, Lessee or Harris Chemical North America, Inc. fails to pay one or more of their respective debts of a material amount (as defined below) as they become due, after giving effect to applicable grace periods, excluding the amount of any debt with the Lessee actively and in good faith shall dispute; or if Lessee shall default under another agreement with Lessor; or if Lessee fails to perform any other covenant or condition required to be performed by Lessee which failure shall not be remedied within ten (10) business days after notice thereof by Lessor to Lessee; or if Lessee shall dissolve, make or commit any act of bankruptcy, or if any proceeding under any bankruptcy or insolvency statute of any laws relating to relief of debtors is commenced by Lessee, or if any such proceeding is commenced against Lessee and same shall not have been removed within thirty (30) business days of the date of the filing thereof, or if a receiver, trustee or liquidator is appointed for Lessee or for all or a substantial part of Lessee's assets with Lessee's consent, or if, without Lessee's consent, the same shall not have been removed within thirty (30) business days of the date of the appointment thereof; or if any order, judgment or decree be entered by a court of competent jurisdiction and continue unpaid and in effect for any period of thirty (30)

consecutive business days without a stay of execution, or if a writ of attachment or execution is levied on any car and is not discharged within ten (10) business days thereafter; or if Trona Railway Company shall default under any agreement between Trona Railway Company and Lessor, Lessor may exercise one or more of the following remedies with respect to the cars:

1. Immediately terminate this Agreement and Lessee's right hereunder;

2. Require Lessee to return the cars to Lessor at Lessee's expense, and if Lessee fails to so comply, Lessor may take possession of such cars without demand or notice and without court order or legal process. Lessee hereby waives any damages occasioned by such taking of possession whether or not Lessee was in default at the time possession was taken, so long as Lessor reasonably believes that Lessee was in default at such time; Lessee acknowledges that it may have a right to notice of possession and the taking of possession with a court order or other legal process. Lessee, however, knowingly waives any right to such notice of possession and the taking of such possession without court order or legal process;

3. Lease the cars to such persons, at such rental and for such period of time as lessor shall elect. Lessor shall apply the proceeds from such leasing, less all costs and expenses incurred in the recovery, repair, storage and renting of such cars, toward the payment of Lessee's obligations hereunder. Lessee shall remain liable for any deficiency, which, at Lessor's option, shall be paid monthly, as suffered, or immediately or at the end of the term as damages for Lessee's default;

4. Bring legal action to recover all rent or other amounts then accrued or thereafter accruing from Lessee to Lessor under any provision hereunder; and

5. Pursue any other remedy which Lessor may have.

For purposes of this Article 13 only, the term "material amount" shall mean an aggregate of outstanding debts for borrowed money in the amount of $4,500,000.

Each remedy is cumulative and may be enforced separately or concurrently. In the event of default, Lessee shall pay to Lessor all costs and expenses including reasonable attorneys' fees expended by Lessor in the enforcement of its rights and remedies hereunder, and Lessee shall pay interest on any amount owing to Lessor from the time such amount becomes due hereunder at a rate per annum equal to three percentage points above the prime rate of The First National Bank of Chicago, such rate to be reduced,

however, to the extent it exceeds the maximum rate permitted by applicable law. In addition, Lessee shall, without expense to Lessor, assist Lessor in repossessing the cars and shall, for a reasonable time if required, furnish suitable trackage space for the storage of the cars.

If Lessee fails to perform any of its obligations hereunder, Lessor, at Lessee's expense, and without waiving any rights it may have against Lessee for such nonperformance, may itself render such performance. Lessee shall reimburse Lessor on demand for all sums so paid by Lessor on Lessee's behalf, together with interest at a rate equal to three percentage points above the prime rate of The First National Bank of Chicago, such rate to be reduced however, to the extent it exceeds the applicable law.

ARTICLE 14: DELIVERY AT END OF TERM

Lessee shall not deliver the cars prior to the end of the term without the prior written consent of Lessor. Notwithstanding anything contained herein to the contrary, Lessee shall not load any car leased hereunder during the final fifteen (15) business days of the term, except as otherwise provided in the Rider(s).

At the end of the term, Lessee, at its expense, shall deliver each car to Lessor, or to a subsequent lessee, at the point designated by Lessor, empty, free from residue, accumulations or deposits from commodities transported in or on the cars while in service of Lessee, in the same good order and condition as it was delivered by Lessor to Lessee, ordinary wear and tear excepted and in interchange condition, suitable for loading, free from all charges and liens, except those which may result from an act or omission of Lessor. Lessee, at its expense, shall remove or cause to be removed from the cars any of Lessee's special advertising, lettering or other markings. Lessee shall, on demand, reimburse Lessor for the expense of cleaning any car that contains residue or such other cost which may be incurred to place a car in the condition described above.

If any car is not redelivered to Lessor or not delivered to a subsequent lessee on or before the date on which the term ends, or in the event that a car so delivered is not in the condition required by this Article 14, Lessee shall pay rental for each day that each car is not delivered as required herein or until each car is delivered in the condition required, at a rate equal to one hundred fifty percent (150%) of the rate in effect just prior to such term's end. Lessee shall pay to Lessor on or before the last day of each month the amount Lessee is obligated to pay to Lessor for such month under this Article 14. In addition to any other indemnity provided herein and any payments to be made to Lessor hereunder, Lessee shall also indemnify and hold Lessor harmless from and against all losses, injuries, liabilities, claims and demands whatsoever, including those asserted by a subsequent lessee

arising out of or as a result of such late delivery or failure to deliver in the condition required.

ARTICLE 15: WARRANTIES AND REPRESENTATIONS

LESSEE ACKNOWLEDGES AND AGREES (a) THAT EACH CAR IS OF A SIZE, DESIGN, CAPACITY, AND MANUFACTURE SELECTED BY LESSEE; (b) THAT LESSEE IS SATISFIED THAT THE SAME IS SUITABLE FOR ITS PURPOSES; (c) THAT LESSOR IS NOT MANUFACTURER THEREOF; AND THAT (d) THAT LESSOR HAS NOT MADE, AND DOES NOT HEREBY MAKE, ANY REPRESENTATION OR WARRANTY OR COVENANT, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE DESIGN, NON-INFRINGEMENT, COMPLIANCE WITH SPECIFICATIONS, OPERATION OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN, THE CARS OR ANY COMPONENT THEREOF DELIVERED TO THE LESSEE HEREUNDER, AND LESSOR DOES NOT MAKE ANY WARRANTY OF MERCHANTABILITY OR FITNESS OF THE CARS OR ANY COMPONENT THEREOF FOR ANY PARTICULAR PURPOSE, OR ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY CAR OR ANY COMPONENT THEREOF (EITHER UPON DELIVERY THEREOF TO THE LESSEE OR OTHERWISE), IT BEING AGREED THAT ALL SUCH RISKS, AS BETWEEN LESSOR AND LESSEE, ARE TO BE BORNE BY LESSEE. LESSOR SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY TO LESSEE OR ANY OTHER PERSON WITH RESPECT TO ANY OF THE FOLLOWING: (i) ANY LIABILITY, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED DIRECTLY OR INDIRECTLY BY ANY CARS OR BY ANY INADEQUACY THEREOF OR DEFICIENCY OR DEFECT THEREIN OR BY ANY OTHER CIRCUMSTANCES IN CONNECTION THEREWITH; (ii) THE USE, OPERATION OR PERFORMANCE OF ANY CARS OR ANY RISKS RELATING THERETO; (iii) ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OF ANY NATURE, INCLUDING BUT NOT LIMITED TO INTERRUPTION OF SERVICE, LOSS OF BUSINESS OR ANTICIPATED PROFITS; OR (iv) THE DELIVERY, OPERATION, SERVICING, MAINTENANCE, REPAIR, IMPROVEMENT OR REPLACEMENT OF ANY CARS. Lessee shall be solely responsible for determining that the specifications and design of any car are appropriate for the commodities loaded therein. During the period of any lease hereunder in which Lessee renders faithful performance of its obligations, Lessor hereby assigns to Lessee any factory or dealer warranty, whether express or implied, or other legal right Lessor may have against the manufacturer in connection with defects in the cars covered by this Agreement.

ARTICLE 16: OPINION OF COUNSEL

Lessee, on or before the execution of this Agreement, shall furnish to Lessor an opinion of Lessee's counsel, satisfactory to counsel for Lessor and in form and substance satisfactory to such counsel, that as of the date of the Agreement:

1. Lessee is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware and is either duly qualified to do business and is in good standing in such other jurisdictions in which the business and activities of Lessee require such qualification or its failure to so

qualify in such other jurisdiction will not have a material adverse impact on this Agreement.

2. Lessee has full corporate power to enter into this Agreement.

3. The Agreement has been duly authorized, executed and delivered by Lessee and constitutes a valid, legal and binding agreement, enforceable in accordance with its terms.

4. No approval is required by Lessee from any governmental or public body or authority with respect to the entering into or performance of this Agreement.

5. The entering into and performance of this Agreement will not conflict with, or result in a breach of, the terms, conditions or provision of any law or any regulations, order, injunction, permit, franchise or decree of any court or governmental instrumentality.

6. The entering into and performance of this Agreement will not conflict with, or result in a breach of, the terms, conditions or provisions of any indenture, agreement or other instrument to which Lessee is party or by which it or any of its property is bound.

7. Lessee is neither an organization described in Section 48(a)(4) nor a governmental unit described in Section 48(a)(5) of the Internal Revenue Code of 1986, as amended.

ARTICLE 17: RIGHT OF INSPECTION

Lessor, or its assignee, shall, at any reasonable time and without interfering with Lessee's operations, have the right to inspect the cars by its authorized representative wherever they may be located for the purpose of determining compliance by Lessee with its obligations hereunder. Lessee shall use its best effort to obtain permission, if necessary, for Lessor or its representative to enter upon any premises where the cars may be located.

ARTICLE 18: REPORT AND NOTICES

A. Notification of Liens

Lessee shall notify Lessor, in writing, within three (3) business days after any attachment, lien (including any tax and mechanics' liens) or other judicial process attaches to the cars.

B. Report of Location

Within five (5) business days after receipt of written demand from Lessor, Lessee shall give Lessor written notice of the approximate location of the cars.

ARTICLE 19: ASSIGNMENT OF RIGHTS

Except as otherwise provided in Article 12 and Paragraph C of Article 7, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

ARTICLE 20: GOVERNMENTAL LAWS

Lessee shall comply with all governmental laws, rules, regulations, requirements and the Interchange Rules (herein collectively referred to as the "Rules") with respect to the use, operation and maintenance of any interior lading protective devices, special interior linings or removable parts. Lessee, at its expense, shall further comply with the Rules in the event such Rules require a change or replacement of any equipment or appliance on the cars or in case any additional or other equipment or appliance is required to be installed on the cars.

ARTICLE 21: USE OF CARS ON CERTAIN ROADS UNDER AAR CIRCULAR O T-5

Lessor shall have no responsibility and it shall be Lessee's sole responsibility to obtain from any railroad all the necessary authority to place the cars in service under the provisions of AAR Circular OT-5 as promulgated by the AAR and all supplements thereto and reissues thereof or subsequent directives (such authority hereinafter called "consent(s)"). Lessor shall not be liable for Lessee's failure to obtain such consents for any reason whatsoever and this Agreement shall remain in full force and effect notwithstanding any failure of Lessee to obtain such consents.

ARTICLE 22: ADMINISTRATION OF AGREEMENT

Lessee agrees to make available to Lessor information concerning the movement of the cars reasonably required for the efficient administration of this Agreement.

Lessee agrees to cooperate with Lessor for the purpose of complying with any reasonable requirements of any lender, the Interstate Commerce Commission or the provisions of Article 9 of the Uniform Commercial Code provided such cooperation does not materially affect the rights of liabilities or Lessee hereunder.

ARTICLE 23: MISCELLANEOUS

A. Entire Agreement

This Agreement, together with any and all exhibits attached hereto, constitutes the entire agreement between Lessor and Lessee and it shall not be amended, altered or changed except by written

agreement signed by the parties hereto. No waiver of any provision of this Agreement nor consent to any departure by Lessee therefrom shall be effective unless the same shall be in writing signed by both parties, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

Within 30 days prior to the end of each 12 consecutive month period of this Agreement. Lessee shall provide to Lessor a list, certified by its principal financial officer, identifying the cars subject to this Agreement and stating that (i) such cars are currently in service and in good condition (ii) there exist no event of default under this Agreement and (iii) except as provided in such notice in writing, there has been no change in the Lessee's insurance coverage as required under Article 10 and that such policies are in full force and effect.

B. Financial Reports

Lessee will furnish Lessor with: (i) as soon as practicable and in any event within 45 days after the end of each of the first three quarterly periods of each fiscal year of Lessee, balance sheets of Lessee as at the end of such period and the previous fiscal quarter, and consolidated statements of income for such period and statements of changes in financial position of Lessee for the period from the beginning of the current fiscal year to the end of such period, setting forth in comparative form the figures for the corresponding periods in the previous fiscal year, all in reasonable detail, prepared in accordance with generally accepted accounting principles applied on a consistent basis except as otherwise disclosed, and certified as complete and correct, subject to changes resulting from audit and year-end adjustments, by the principal financial officer of the Lessee; and (ii) as soon as practicable and in any event within 90 days after the end of each fiscal year (or within such shorter period as applicable stock exchange regulations, if any, may require for mailing of the annual report to stockholders), a balance sheet of Lessee as at the end of such year, and consolidated statements of income, stockholders' equity and changes in financial position of Lessee for such year, setting forth in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with generally accepted accounting principles applied on a consistent basis except as otherwise disclosed, and accompanied by a report and opinion of independent certified public accountants of recognized standing selected by Lessee and satisfactory to GE Railcar, which opinion and report shall have been prepared in accordance with generally accepted auditing standards, and certified by the principal financial officer of Lessee. All financial reports may be submitted on a consolidated basis.

C. Broker's Fees

All amounts payable with respect to any claim for investment banking, brokerage or finder's fees or other commissions in respect of the transactions contemplated by or in any way related to this Agreement shall be for the account of the party engaging such person or entity.

D. Governing Law

This Agreement shall be interpreted under and performance shall be governed by the laws of the State of Illinois.

E. Conflict with Interchange Rules

In the event the Interchange Rules conflict with any provision of this Agreement, this Agreement shall govern.

F. Riders and Exhibits

All riders and Exhibits attached hereto are incorporated herein by this reference.

G. Payments

All payments to be made under this Agreement shall be made at the addresses set forth in Article 24.

H. Severability

If any term or provision of this Agreement or the application thereof shall, to any extent, be invalid or unenforceable, such invalidity or unenforceability shall not affect or render invalid or unenforceable any other provision of this Agreement, and this Agreement shall be valid and enforced to the fullest extent permitted by law.

I. Headings

The headings that have been used to designate the various Sections and Articles hereof are solely for convenience in reading and ease of reference and shall not be construed in any event or manner as interpretive or limiting the interpretation of the same.

J. Survival

All indemnities contained in this Agreement shall survive the termination hereof. In addition, the obligation to pay any deficiency as well as the obligation for any and all other payments by Lessee to Lessor hereunder shall survive the termination of this Agreement or the Lease contained herein.

ARTICLE 24: ADDRESSING OF NOTICES

Any notice required or permitted hereunder shall be in writing and shall be delivered to the respective parties hereto by personal delivery thereof or by telegram, telex, telecopier or deposit in the United States mail as a certified or registered matter, return

receipt requested, postage prepaid, and addressed to the respective parties as follows, unless otherwise advised in writing.

Lessee to Lessor:

TO: General Electric Railcar Leasing Company
33 West Monroe Street
24th Floor
Chicago, Illinois 60603

ATTENTION: General Counsel

Lessor to Lessee:

TO: The Hutchinson & Northern Railway Company
8300 College Boulevard
Overland Park, MO 66210

ATTENTION: Manager, Rail Operations

With a copy to:

North American Chemical Company
8300 College Boulevard
Overland Park, MO 66210

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed and delivered as of the 15th day of December, 1993.

**LESSOR:** GENERAL ELECTRIC RAILCAR LEASING SERVICES CORPORATION

By: Thomas F. Keeley
Vice President

ATTEST:

By: ____________________
Assistant Secretary

**LESSEE:** THE HUTCHINSON & NORTHERN RAILWAY COMPANY

By: Mark C. [signature]
President

ATTEST:

By: Susan E. Day
Assistant Secretary

L:\users\lob\mkt\nacler.5
December 10, 1993

THE HUTCHINSON & NORTHERN RAILWAY COMPANY

By: [signature]

Name: MARK C. DEMETRIUS

Title: PRESIDENT

kc-134010.1

STATE OF KANSAS )
) SS
COUNTY OF JOHNSON )

I, the undersigned, a Notary Public in and for the County and State aforesaid, do hereby certify that Mark C. Demetree, President of THE HUTCHINSON AND NORTHERN RAILWAY COMPANY, personally known to me to be the person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered this instrument at his free and voluntary act for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this 22nd, day of December, 1993.

Jonette L. Killman
Notary Public

My commission expires: 9-17-95

NOTARY PUBLIC STATE OF KANSAS JONETTE L. KILLMAN My Appt. Exp. 9-17-95

kc-134010.1

THE STATE OF Kansas )
)
COUNTY OF Johnson )

Before me, the undersigned, a Notary Public in and for said County and State, on this day personally appeared Mark C. Demetree, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of the said The Hutchinson & Northern Railway Company, a Kansas corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under by hand and seal of office this 31st day of January, 1994.

Jonette L. Killmar
Notary Public

My commission expires:
9-17-95

NOTARY PUBLIC JONETTE L. KILLMAR My Appt. Exp. 9-17-95

THE STATE OF Illinois )
)
COUNTY OF Cook )

On this 30th day of December, 1993, before me personally appeared Thomas F. Kealey, to me personally known, who, being by me duly sworn, says that he is Vice President of General Electric Railcar Leasing Services Corporation, that one of the seals affixed to the foregoing instrument is the corporate seal of said corporation, and that said instrument was signed and sealed on behalf of said corporation by authority of its Board of Directors, and he acknowledged that the execution of the foregoing instrument was the free act and deed of said corporation.

Laura M. O'Brien
Notary Public

My Commission Expires: 1/18/95

" OFFICIAL SEAL "
LAURA M. O'BRIEN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 1/18/95

L:\users\lob\mkt\ascles.5
December 10, 1993

CERTIFICATE OF ACCEPTANCE

EXHIBIT A

[To Be Provided]

EXHIBIT B

COMMODITY RESTRICTION LIST

| CAS Number | Commodity |
|---|---|
| 74862 | Acetylene |
| 106978 | Butane |
| 106990 | Butadiene |
| 25167673 | Butene |
| 107006 | Butyne |
| 630080 | Carbon Monoxide |
| 7782505 | Chlorine |
| 287230 | Cyclo Butane |
| 75194 | Cyclo Propane |
| 75683 | Difluoro-1-Chloroethane |
| 124403 | Dimethylamine-Anhydrous |
| 463821 | Dimethyl Propane |
| 74840 | Ethane |
| 75003 | Ethyl Chloride |
| 74851 | Ethylene |
| 74908 | Hydrocyanic Acid |
| 7783064 | Hydrogen Sulfide |
| 75285 | Isobutane |
| 74828 | Methane |
| 563462 | Methyl Butene |
| 74872 | Methyl Chloride |
| 115106 | Methyl Ether |
| 593533 | Methyl Fluoride |
| 74931 | Methyl Mercaptan |
| 115117 | Methyl Propene |
| 7803512 | Phosphine |
| 75445 | Phosgene |
| 74986 | Propane |
| 115071 | Propylene |
| 74997 | Propyne |
| 116143 | Tetrafluoroethylene |
| 75503 | Trimethylamine |
| - | Vinyl Acetylene |
| 75014 | Vinyl Chloride Monomer |

| CAS Number | Commodity |
|---|---|
| - | Alkyl Lead Compound |
| 107119 | Allylamine |
| 107051 | Allylchloride |
| 7726956 | Bromine |
| 75649 | tert-Butylamine |
| 1097728 | n-Butyl Lithium |
| 598301 | sec-Butyl Lithium |
| 76062 | Chloropicrin |
| 7790945 | Chlorosulfonic Acid |
| 2524041 | Diethylthiophosphorylchloride |
| 75047 | Ethylamine |
| 75218 | Ethylene Oxide |
| 109955 | Ethyl Nitrite |
| 110009 | Furan |
| 74895 | Methylamine |
| 79221 | Methyl Chloroformate |
| 624839 | Methyl Isocyanate |
| - | Nitro Carbo Nitrate |
| 504609 | 1, 3-Pentadiene |
| 10025873 | Phosphorus Oxychloride |
| 7719122 | Phosphorus Trichloride |
| 106967 | Propargyl Bromide |
| 107108 | Mono-N-Propylamine |
| 7446095 | Sulphur Dioxide |
| 75741 | Tetramethyl Lead |
| 7550450 | Titanium Tetrachloride |
| 75354 | Vinylidene Chloride |

## SETTLEMENT VALUE TABLE

## EXHIBIT C

| *Payment* | *Termination Value Percentage* |
|---|---|
| 1. | 100.146 |
| 2. | 100.285 |
| 3. | 100.418 |
| 4. | 100.544 |
| 5. | 100.667 |
| 6. | 100.784 |
| 7. | 100.893 |
| 8. | 101.000 |
| 9. | 101.100 |
| 10. | 101.193 |
| 11. | 101.283 |
| 12. | 101.369 |
| 13. | 101.444 |
| 14. | 101.509 |
| 15. | 101.564 |
| 16. | 101.608 |
| 17. | 101.648 |
| 18. | 101.678 |
| 19. | 101.698 |
| 20. | 101.714 |
| 21. | 101.719 |
| 22. | 101.714 |
| 23. | 101.705 |
| 24. | 101.691 |
| 25. | 101.670 |
| 26. | 101.641 |
| 27. | 101.604 |
| 28. | 101.560 |
| 29. | 101.513 |
| 30. | 101.458 |
| 31. | 101.396 |
| 32. | 101.329 |
| 33. | 101.256 |
| 34. | 101.174 |
| 35. | 101.089 |
| 36. | 101.000 |
| 37. | 100.905 |
| 38. | 100.804 |
| 39. | 100.699 |
| 40. | 100.588 |
| 41. | 100.473 |
| 42. | 100.353 |
| 43. | 100.228 |

SETTLEMENT VALUE TABLE

EXHIBIT C

| Payment | Termination Value Percentage |
|---|---|
| 44. | 100.098 |
| 45. | 99.964 |
| 46. | 99.824 |
| 47. | 99.680 |
| 48. | 99.531 |
| 49. | 99.379 |
| 50. | 99.223 |
| 51. | 99.063 |
| 52. | 99.900 |
| 53. | 98.732 |
| 54. | 98.561 |
| 55. | 98.386 |
| 56. | 98.206 |
| 57. | 98.023 |
| 58. | 97.836 |
| 59. | 97.645 |
| 60. | 97.449 |
| 61. | 97.250 |
| 62. | 97.047 |
| 63. | 96.840 |
| 64. | 96.629 |
| 65. | 96.414 |
| 66. | 96.195 |
| 67. | 95.972 |
| 68. | 95.744 |
| 69. | 95.513 |
| 70. | 95.277 |
| 71. | 95.037 |
| 72. | 94.793 |
| 73. | 94.545 |
| 74. | 94.292 |
| 75. | 94.036 |
| 76. | 93.776 |
| 77. | 93.511 |
| 78. | 93.241 |
| 79. | 92.968 |
| 80. | 92.690 |
| 81. | 92.408 |
| 82. | 92.122 |
| 83. | 91.831 |
| 84. | 91.535 |

## SETTLEMENT VALUE TABLE

## EXHIBIT C

| *Payment* | *Termination Value Percentage* |
|---|---|
| 85. | 91.238 |
| 86. | 90.938 |
| 87. | 90.636 |
| 88. | 90.331 |
| 89. | 90.022 |
| 90. | 89.711 |
| 91. | 89.397 |
| 92. | 89.078 |
| 93. | 88.757 |
| 94. | 88.434 |
| 95. | 88.106 |
| 96. | 87.773 |
| 97. | 87.442 |
| 98. | 87.110 |
| 99. | 86.777 |
| 100. | 86.444 |
| 101. | 86.107 |
| 102. | 85.768 |
| 103. | 85.430 |
| 104. | 85.086 |
| 105. | 84.742 |
| 106. | 84.397 |
| 107. | 84.047 |
| 108. | 83.694 |
| 109. | 83.343 |
| 110. | 82.990 |
| 111. | 82.637 |
| 112. | 82.284 |
| 113. | 81.925 |
| 114. | 81.566 |
| 115. | 81.206 |
| 116. | 80.842 |
| 117. | 80.476 |
| 118. | 80.110 |
| 119. | 79.739 |
| 120. | 79.364 |
| 121. | 78.991 |
| 122. | 78.617 |
| 123. | 78.242 |
| 124. | 77.866 |
| 125. | 77.485 |

## SETTLEMENT VALUE TABLE

## EXHIBIT C

| *Payment* | *Termination Value Percentage* |
|---|---|
| 126. | 77.104 |
| 127. | 76.721 |
| 128. | 76.334 |
| 129. | 75.945 |
| 130. | 75.566 |
| 131. | 75.162 |
| 132. | 74.764 |
| 133. | 74.397 |
| 134. | 73.969 |
| 135. | 73.570 |
| 136. | 73.171 |
| 137. | 72.766 |
| 138. | 72.360 |
| 139. | 71.953 |
| 140. | 71.541 |
| 141. | 71.128 |
| 142. | 70.714 |
| 143. | 70.294 |
| 144. | 69.871 |
| 145. | 69.449 |
| 146. | 69.025 |
| 147. | 68.601 |
| 148. | 68.176 |
| 149. | 67.745 |
| 150. | 67.313 |
| 151. | 66.880 |
| 152. | 66.441 |
| 153. | 66.001 |
| 154. | 65.560 |
| 155. | 65.114 |
| 156. | 64.664 |
| 157. | 64.214 |
| 158. | 63.763 |
| 159. | 63.311 |
| 160. | 62.857 |
| 161. | 62.398 |
| 162. | 61.938 |
| 163. | 61.477 |
| 164. | 61.009 |
| 165. | 60.541 |
| 166. | 60.071 |

SETTLEMENT VALUE TABLE

EXHIBIT C

| Payment | Termination Value Percentage |
|---|---|
| 167. | 59.596 |
| 168. | 59.116 |
| 169. | 58.637 |
| 170. | 58.156 |
| 171. | 57.674 |
| 172. | 57.191 |
| 173. | 56.701 |
| 174. | 56.211 |
| 175. | 55.721 |
| 176. | 55.284 |
| 177. | 54.844 |
| 178. | 54.401 |
| 179. | 53.954 |
| 180. | 53.505 |
| 181. | 53.053 |
| 182. | 52.597 |
| 183. | 52.138 |
| 184. | 51.676 |
| 185. | 51.211 |
| 186. | 50.743 |
| 187. | 50.271 |
| 188. | 49.797 |
| 189. | 49.319 |
| 190. | 48.837 |
| 191. | 48.352 |
| 192. | 47.864 |
| 193. | 47.373 |
| 194. | 46.878 |
| 195. | 46.380 |
| 196. | 45.878 |
| 197. | 45.373 |
| 198. | 44.864 |
| 199. | 44.352 |
| 200. | 43.836 |
| 201. | 43.317 |
| 202. | 42.794 |
| 203. | 42.268 |
| 204. | 41.737 |
| 205. | 41.204 |
| 206. | 40.666 |
| 207. | 40.125 |

SETTLEMENT VALUE TABLE

EXHIBIT C

| *Payment* | *Termination Value Percentage* |
|---|---|
| 208. | 39.580 |
| 209. | 39.031 |
| 210. | 38.479 |
| 211. | 37.922 |
| 212. | 37.362 |
| 213. | 36.798 |
| 214. | 36.230 |
| 215. | 35.658 |
| 216. | 35.082 |
| 217. | 34.502 |
| 218. | 33.918 |
| 219. | 33.330 |
| 220. | 32.738 |
| 221. | 32.142 |
| 222. | 31.542 |
| 223. | 30.938 |
| 224. | 30.329 |
| 225. | 29.716 |
| 226. | 29.100 |
| 227. | 28.478 |
| 228. | 27.853 |
| 229. | 27.223 |
| 230. | 26.589 |
| 231. | 25.950 |
| 232. | 25.307 |
| 233. | 24.660 |
| 234. | 24.008 |
| 235. | 23.351 |
| 236. | 22.690 |
| 237. | 22.024 |
| 238. | 21.354 |
| 239. | 20.679 |
| 240. and after | 20.000 |

# **EXHIBIT C**

## Debtors' Post-Petition Usage of Infinity Railcars

| Mark | Number | Load Date | Emptied Date | Days in Use | STCC | Commodity | Deal # | Destination | Consignee | Rent Amount | Daily Rate | Holdover Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DGHX | 3334 | 6/30/2026 | 7/16/2026 | 17 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 375 | $212.50 | $318.75 |
| DGHX | 3347 | 8/4/2026 | 8/27/2026 | 24 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | SANLUIPOT, SL | INDUSTRIA VIDRIERA DEL POTOSI S DERL DE CV | 375 | $300.00 | $450.00 |
| DGHX | 3347 | 6/23/2026 | 7/7/2026 | 15 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 375 | $187.50 | $281.25 |
| DGHX | 3349 | 6/30/2026 | 7/16/2026 | 17 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 375 | $212.50 | $318.75 |
| DGHX | 3354 | 6/15/2026 | 6/27/2026 | 13 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | Portland, OR | | 375 | $162.50 | $243.75 |
| DGHX | 3354 | 7/18/2026 | 9/9/2026 | 54 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | TRONA, CA | No Billing | 375 | $675.00 | $1,012.50 |
| DGHX | 3366 | 7/18/2026 | 8/18/2026 | 32 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $400.00 | $600.00 |
| DGHX | 3366 | 6/15/2026 | 6/23/2026 | 9 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | XALOSTOC, EM | FABRICA DE JABON LA CORONA SA DE CV | 375 | $112.50 | $168.75 |
| DGHX | 3385 | 6/15/2026 | 6/22/2026 | 8 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | MODESTO, CA | GALLO GLASS CO. | 375 | $100.00 | $150.00 |
| DGHX | 3385 | 7/9/2026 | 8/1/2026 | 24 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | MODESTO, CA | GALLO GLASS CO. | 375 | $300.00 | $450.00 |
| DGHX | 3394 | 6/15/2026 | 7/22/2026 | 38 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $475.00 | $712.50 |
| DGHX | 3412 | 7/9/2026 | 7/29/2026 | 21 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | MODESTO, CA | GALLO GLASS CO. | 375 | $262.50 | $393.75 |
| DGHX | 3414 | 6/15/2026 | 7/22/2026 | 38 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $475.00 | $712.50 |
| DGHX | 3416 | 6/15/2026 | 7/22/2026 | 38 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $475.00 | $712.50 |
| DGHX | 3416 | 7/29/2026 | 8/15/2026 | 18 | 2812323 | Sodium Carbonate (Soda Ash) | 2667 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 375 | $225.00 | $337.50 |
| DGHX | 3425 | 6/15/2026 | 9/22/2026 | 100 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | San Diego, CA | SVM - NATI | 375 | $1,250.00 | $1,875.00 |
| DGHX | 3440 | 6/30/2026 | 7/16/2026 | 17 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 375 | $212.50 | $318.75 |
| DGHX | 3452 | 6/30/2026 | 7/17/2026 | 18 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | SANANA, JA | SAVERGLASS S DE RL DE CV | 375 | $225.00 | $337.50 |
| DGHX | 3456 | 6/30/2026 | 7/31/2026 | 32 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | TEPEXPAN, EM | SAINT GOBAIN MEXICO SA DE CV | 375 | $400.00 | $600.00 |
| DGHX | 3465 | 6/15/2026 | 7/16/2026 | 32 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | SANLUIPOT, SL | INDUSTRIA VIDRIERA DEL POTOSI S DERL DE CV | 375 | $400.00 | $600.00 |
| DGHX | 3474 | 6/30/2026 | 8/1/2026 | 33 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | TEPEXPAN, EM | SAINT GOBAIN MEXICO SA DE CV | 375 | $412.50 | $618.75 |
| DGHX | 3483 | 6/15/2026 | 6/23/2026 | 9 | 2812322 | Sodium Carbonate (Soda Ash) | 2667 | PANTACO, DF | | 375 | $112.50 | $168.75 |
| DGHX | 3496 | 6/15/2026 | 7/13/2026 | 29 | 2812356 | Sodium Sulfate | 3382 | TOPGRANDE, NL | | 375 | $362.50 | $543.75 |
| DGHX | 3512 | 6/15/2026 | 8/18/2026 | 65 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $812.50 | $1,218.75 |
| DGHX | 3514 | 7/7/2026 | 8/6/2026 | 31 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | MEOQUI | VICHISA SA DE CV | 375 | $387.50 | $581.25 |
| DGHX | 3523 | 6/15/2026 | 7/22/2026 | 38 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $475.00 | $712.50 |
| DGHX | 3531 | 6/16/2026 | 7/18/2026 | 33 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | TEPEXPAN, EM | SAINT GOBAIN MEXICO SA DE CV | 375 | $412.50 | $618.75 |
| DGHX | 3541 | 7/28/2026 | 8/10/2026 | 14 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 375 | $175.00 | $262.50 |
| DGHX | 3542 | 6/15/2026 | 7/23/2026 | 39 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $487.50 | $731.25 |
| DGHX | 3542 | 7/28/2026 | 8/15/2026 | 19 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 375 | $237.50 | $356.25 |
| DGHX | 3546 | 6/15/2026 | 7/17/2026 | 33 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | CRATBT, PA | Tata Chemicals, C/O NS TBT | 375 | $412.50 | $618.75 |
| DGHX | 3554 | 6/30/2026 | 7/28/2026 | 29 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | TEPEXPAN, EM | SAINT GOBAIN MEXICO SA DE CV | 375 | $362.50 | $543.75 |
| DGHX | 3571 | 6/15/2026 | 8/18/2026 | 65 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $812.50 | $1,218.75 |
| DGHX | 3585 | 6/15/2026 | 7/23/2026 | 39 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $487.50 | $731.25 |
| DGHX | 3585 | 7/28/2026 | 8/15/2026 | 19 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 375 | $237.50 | $356.25 |
| DGHX | 3625 | 6/30/2026 | 8/1/2026 | 33 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | TEPEXPAN, EM | SAINT GOBAIN MEXICO SA DE CV | 375 | $412.50 | $618.75 |
| DGHX | 3639 | 6/15/2026 | 7/23/2026 | 39 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $487.50 | $731.25 |
| DGHX | 3639 | 7/28/2026 | 8/15/2026 | 19 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 375 | $237.50 | $356.25 |
| DGHX | 3645 | 6/15/2026 | 7/23/2026 | 39 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $487.50 | $731.25 |
| DGHX | 3645 | 7/28/2026 | 8/15/2026 | 19 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 375 | $237.50 | $356.25 |
| DGHX | 3647 | 6/15/2026 | 7/23/2026 | 39 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 375 | $487.50 | $731.25 |
| DGHX | 3647 | 7/28/2026 | 8/18/2026 | 22 | 2812322 | Sodium Carbonate (Soda Ash) | 3382 | SANLUIPOT, SL | INDUSTRIA VIDRIERA DEL POTOSI S DERL DE CV | 375 | $275.00 | $412.50 |
| AJPX | 6512 | 6/15/2026 | 6/24/2026 | 10 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | SANANA, JA | SAVERGLASS S DE RL DE CV | 395 | $131.67 | $197.50 |
| AJPX | 6518 | 6/15/2026 | 6/18/2026 | 4 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | JONESBORO, AR | ARKANSAS GLASS CONTAINER CORP | 395 | $52.67 | $79.00 |
| AJPX | 6523 | 7/8/2026 | 7/18/2026 | 11 | 2812356 | Sodium Sulfate | 3348 | PANTACO, DF | POSSEHL S.A. DE C.V. | 395 | $144.83 | $217.25 |
| AJPX | 6531 | 6/18/2026 | 7/13/2026 | 26 | 2812311 | Sodium Borate | 3348 | FAIRFAX, KS | CERTAINTEED | 395 | $342.33 | $513.50 |

**Debtors' Post-Petition Usage of Infinity Railcars**

| Mark | Number | Load Date | Emptied Date | Days in Use | STCC | Commodity | Deal # | Destination | Consignee | Rent Amount | Daily Rate | Holdover Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AJPX | 6532 | 6/15/2026 | 6/26/2026 | 12 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $158.00 | $237.00 |
| AJPX | 6534 | 6/30/2026 | 7/17/2026 | 18 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | SANANA, JA | SAVERGLASS S DE RL DE CV | 395 | $237.00 | $355.50 |
| AJPX | 6537 | 7/14/2026 | 8/27/2026 | 45 | 2812356 | Sodium Sulfate | 3348 | VANCOUVER, WA | COLORADO PACIFIC RAILROAD | 395 | $592.50 | $888.75 |
| AJPX | 6552 | 6/23/2026 | 9/24/2026 | 94 | 2812311 | Sodium Borate | 3348 | MILLVILLE, NJ | NIPRO PHARMAPACKAGING AME | 395 | $1,237.67 | $1,856.50 |
| AJPX | 6554 | 6/15/2026 | 7/23/2026 | 39 | 2812311 | Sodium Borate | 3348 | SANJUAVEG, GJ | SUMINISTROS INDUSTRIALES | 395 | $513.50 | $770.25 |
| **AJPX** | **6558** | **7/27/2026** | **8/13/2026** | **18** | **2812312** | **Sodium Borate** | **3348** | **SILVERTHO, CA** | **TATA** | 395 | $237.00 | $355.50 |
| **AJPX** | **6558** | **6/15/2026** | **6/30/2026** | **16** | **2812313** | **Sodium Borate** | **3348** | **SILVERTHO, CA** | **TATA** | 395 | $210.67 | $316.00 |
| AJPX | 6559 | 6/23/2026 | 7/20/2026 | 28 | 2812311 | Sodium Borate | 3348 | FAIRFAX, KS | CERTAINTEED | 395 | $368.67 | $553.00 |
| **AJPX** | **6569** | **6/15/2026** | **7/23/2026** | **39** | **2812322** | **Sodium Carbonate (Soda Ash)** | **3348** | **GLAMIS, CA** | Tata Chemicals, C/O Loup Logistics | 395 | $513.50 | $770.25 |
| **AJPX** | **6569** | **8/5/2026** | **8/21/2026** | **17** | **2812322** | **Sodium Carbonate (Soda Ash)** | **3348** | **SANLUIPOT, SL** | **SUMINISTROS INDUSTRIALES POTOSINOS** | 395 | $223.83 | $335.75 |
| AJPX | 6573 | 6/16/2026 | 7/2/2026 | 17 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $223.83 | $335.75 |
| AJPX | 6574 | 6/15/2026 | 7/5/2026 | 21 | 2812311 | Sodium Borate | 3348 | LANETT, AL | KNAUF INSULATION INC | 395 | $276.50 | $414.75 |
| AJPX | 6575 | 7/27/2026 | 8/13/2026 | 18 | 2812356 | Sodium Sulfate | 3348 | LEWSITON, ID | SEARLES VALLEY WESTEND | 395 | $237.00 | $355.50 |
| AJPX | 6576 | 6/23/2026 | 7/11/2026 | 19 | 2812356 | Sodium Sulfate | 3348 | TOLLERDO, EM | POSSEHL S.A. DE C.V. | 395 | $250.17 | $375.25 |
| AJPX | 6577 | 7/6/2026 | 7/30/2026 | 25 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $329.17 | $493.75 |
| AJPX | 6578 | 7/27/2026 | 8/16/2026 | 21 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $276.50 | $414.75 |
| AJPX | 6579 | 7/16/2026 | 8/4/2026 | 20 | 2812311 | Sodium Borate | 3348 | FAIRFAX, KS | CERTAINTEED | 395 | $263.33 | $395.00 |
| AJPX | 6588 | 7/14/2026 | 8/16/2026 | 34 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $447.67 | $671.50 |
| AJPX | 6590 | 6/15/2026 | 7/22/2026 | 38 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 395 | $500.33 | $750.50 |
| **AJPX** | **6591** | **8/3/2026** | 9/29/2026 | 58 | **2812322** | **Sodium Carbonate (Soda Ash)** | **3348** | **DETROIT, MI** | **Tata Chemicals, C/O CSX Transflo** | 395 | $763.67 | $1,145.50 |
| **AJPX** | **6591** | **7/8/2026** | **7/18/2026** | **11** | **2812322** | **Sodium Carbonate (Soda Ash)** | **3348** | **Mexicali, BJ** | | 395 | $144.83 | $217.25 |
| AJPX | 6605 | 6/15/2026 | 7/10/2026 | 26 | 2812357 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $342.33 | $513.50 |
| AJPX | 6610 | 6/15/2026 | 7/22/2026 | 38 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 395 | $500.33 | $750.50 |
| **AJPX** | **6612** | **6/30/2026** | **7/16/2026** | **17** | **2812322** | **Sodium Carbonate (Soda Ash)** | **3348** | **SACRAMENT, CA** | **TATA** | 395 | $223.83 | $335.75 |
| **AJPX** | **6612** | **8/4/2026** | **9/7/2026** | **35** | **2812322** | **Sodium Carbonate (Soda Ash)** | **3348** | **SANLUIPOT, SL** | **SUMINISTROS INDUSTRIALES POTOSINOS** | 395 | $460.83 | $691.25 |
| AJPX | 6617 | 6/15/2026 | 8/18/2026 | 65 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 395 | $855.83 | $1,283.75 |
| AJPX | 6619 | 6/15/2026 | 6/26/2026 | 12 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $158.00 | $237.00 |
| AJPX | 6621 | 7/14/2026 | 8/11/2026 | 29 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $381.83 | $572.75 |
| AJPX | 6622 | 6/16/2026 | 7/2/2026 | 17 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $223.83 | $335.75 |
| AJPX | 6623 | 7/14/2026 | 8/11/2026 | 29 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $381.83 | $572.75 |
| AJPX | 6624 | 6/15/2026 | 6/27/2026 | 13 | 2812356 | Sodium Sulfate | 3348 | TOLLERDO, EM | POSSEHL S.A. DE C.V. | 395 | $171.17 | $256.75 |
| AJPX | 6625 | 7/14/2026 | 8/16/2026 | 34 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $447.67 | $671.50 |
| AJPX | 6631 | 6/15/2026 | 6/27/2026 | 13 | 2812356 | Sodium Sulfate | 3348 | TOLLERDO, EM | POSSEHL S.A. DE C.V. | 395 | $171.17 | $256.75 |
| AJPX | 6637 | 6/15/2026 | 8/18/2026 | 65 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 395 | $855.83 | $1,283.75 |
| AJPX | 6641 | 7/14/2026 | 8/11/2026 | 29 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $381.83 | $572.75 |
| AJPX | 6642 | 7/14/2026 | 8/16/2026 | 34 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $447.67 | $671.50 |
| AJPX | 6643 | 6/30/2026 | 7/18/2026 | 19 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 395 | $250.17 | $375.25 |
| **AJPX** | **6648** | **7/27/2026** | **8/22/2026** | **27** | **2812356** | **Sodium Sulfate** | **3348** | **XALOSTOC, EM** | **FABRICA DE JABON LA CORON** | 395 | $355.50 | $533.25 |
| **AJPX** | **6648** | **6/15/2026** | **6/22/2026** | **8** | **2812356** | **Sodium Sulfate** | **3348** | **XALOSTOC, EM** | **FABRICA DE JABON LA CORON** | 395 | $105.33 | $158.00 |
| AJPX | 6651 | 7/27/2026 | 8/19/2026 | 24 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $316.00 | $474.00 |
| **AJPX** | **6652** | **7/27/2026** | **8/17/2026** | **22** | **2812356** | **Sodium Sulfate** | **3348** | **XALOSTOC, EM** | **FABRICA DE JABON LA CORON** | 395 | $289.67 | $434.50 |
| **AJPX** | **6652** | **6/15/2026** | **6/23/2026** | **9** | **2812356** | **Sodium Sulfate** | **3348** | **XALOSTOC, EM** | **FABRICA DE JABON LA CORON** | 395 | $118.50 | $177.75 |
| AJPX | 6654 | 7/2/2026 | 7/21/2026 | 20 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | SANLUIPOT, SL | INDUSTRIA VIDRIERA DEL POTOSI S DERL DE CV | 395 | $263.33 | $395.00 |
| AJPX | 6661 | 7/14/2026 | 8/16/2026 | 34 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $447.67 | $671.50 |
| AJPX | 6663 | 6/30/2026 | 7/16/2026 | 17 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | SANLUIPOT, SL | SUMINISTROS INDUSTRIALES POTOSINOS | 395 | $223.83 | $335.75 |
| AJPX | 6666 | 7/14/2026 | 8/18/2026 | 36 | 2812356 | Sodium Sulfate | 3348 | VANCOUVER, WA | SEARLES VALLEY WESTEND | 395 | $474.00 | $711.00 |

**Debtors' Post-Petition Usage of Infinity Railcars**

| Mark | Number | Load Date | Emptied Date | Days in Use | STCC | Commodity | Deal # | Destination | Consignee | Rent Amount | Daily Rate | Holdover Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AJPX | 6667 | 6/16/2026 | 7/8/2026 | 23 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $302.83 | $454.25 |
| AJPX | 6670 | 7/14/2026 | 8/14/2026 | 32 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $421.33 | $632.00 |
| AJPX | 6677 | 7/2/2026 | 7/23/2026 | 22 | 2812356 | Sodium Sulfate | 3348 | TOLLERDO, EM | POSSEHL S.A. DE C.V. | 395 | $289.67 | $434.50 |
| AJPX | 6678 | 6/15/2026 | 6/17/2026 | 3 | 2812356 | Sodium Sulfate | 3348 | TOLLERDO, EM | POSSEHL S.A. DE C.V. | 395 | $39.50 | $59.25 |
| AJPX | 6681 | 6/16/2026 | 7/10/2026 | 25 | 2812356 | Sodium Sulfate | 3348 | PANTACO, DF | PANTACO ADMINISTRADORA SA | 395 | $329.17 | $493.75 |
| AJPX | 6683 | 7/27/2026 | 8/17/2026 | 22 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $289.67 | $434.50 |
| AJPX | 6688 | 6/15/2026 | 6/30/2026 | 16 | 2812356 | Sodium Sulfate | 3348 | TOPGRANDE, NL | CONTROLADORA DE TERMINALE | 395 | $210.67 | $316.00 |
| AJPX | 6699 | 6/15/2026 | 7/23/2026 | 39 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 395 | $513.50 | $770.25 |
| AJPX | 6699 | 7/28/2026 | 8/28/2026 | 32 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | MEOQUI, CL | VICHISA SA DE CV | 395 | $421.33 | $632.00 |
| AJPX | 6712 | 7/14/2026 | 8/14/2026 | 32 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $421.33 | $632.00 |
| AJPX | 6720 | 7/27/2026 | 8/23/2026 | 28 | 2812356 | Sodium Sulfate | 3348 | LEWSITON, ID | RED RIVER SUPPLY | 395 | $368.67 | $553.00 |
| AJPX | 6723 | 7/27/2026 | 8/19/2026 | 24 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $316.00 | $474.00 |
| AJPX | 6725 | 7/27/2026 | 8/16/2026 | 21 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $276.50 | $414.75 |
| AJPX | 6730 | 6/15/2026 | 7/29/2026 | 45 | 2812356 | Sodium Sulfate | 3348 | LEWSITON, ID | AGENT UP | 395 | $592.50 | $888.75 |
| AJPX | 6734 | 7/14/2026 | 8/8/2026 | 26 | 2812356 | Sodium Sulfate | 3348 | XALOSTOC, EM | FABRICA DE JABON LA CORON | 395 | $342.33 | $513.50 |
| AJPX | 6738 | 7/14/2026 | 9/4/2026 | 53 | 2812356 | Sodium Sulfate | 3348 | VANCOUVER, WA | FOOD EXPRESS PLANT | 395 | $697.83 | $1,046.75 |
| AJPX | 6739 | 6/15/2026 | 6/30/2026 | 16 | 2812356 | Sodium Sulfate | 3348 | TOLLERDO, EM | POSSEHL S.A. DE C.V. | 395 | $210.67 | $316.00 |
| AJPX | 6741 | 6/15/2026 | 8/6/2026 | 53 | 2812311 | Sodium Borate | 3348 | MILLVILLE, NJ | NIPRO PHARMAPACKAGING AME | 395 | $697.83 | $1,046.75 |
| AJPX | 6742 | 6/23/2026 | 7/16/2026 | 24 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | SANLUIPOT, SL | INDUSTRIA VIDRIERA DEL POTOSI S DERL DE CV | 395 | $316.00 | $474.00 |
| **AJPX** | **6746** | **6/15/2026** | **7/23/2026** | **39** | **2812322** | **Sodium Carbonate (Soda Ash)** | **3348** | **GLAMIS, CA** | Tata Chemicals, C/O Loup Logistics | 395 | $513.50 | $770.25 |
| **AJPX** | **6746** | **8/4/2026** | **8/20/2026** | **17** | **2812322** | **Sodium Carbonate (Soda Ash)** | **3348** | **SANLUIPOT, SL** | **SUMINISTROS INDUSTRIALES POTOSINOS** | 395 | $223.83 | $335.75 |
| AJPX | 6747 | 6/15/2026 | 8/18/2026 | 65 | 2812322 | Sodium Carbonate (Soda Ash) | 3348 | GLAMIS, CA | Tata Chemicals, C/O Loup Logistics | 395 | $855.83 | $1,283.75 |
| | | | | | | | | | | **Total:** | **$42,050.33** | **$63,075.50** |