**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SEARLES VALLEY MINERALS INC., *et al.*,[1] | ) | Case No. 26-10966 (BLS) |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket Nos. 449, 489** |

**Hearing Date: November 18, 2026 at 2:00 p.m. (ET)**
**Objection Deadline: October 15, 2026 at 4:00 p.m. (ET)**

**DEBTORS' REPLY TO OBJECTION OF PROGRESS RAIL LEASING CORPORATION TO OMNIBUS MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) REJECT CERTAIN UNEXPIRED RAILCAR LEASES NUNC PRO TUNC TO THE REJECTION DATE AND (B) ABANDON CERTAIN PROPERTY AND (II) GRANTING RELATED RELIEF**

Searles Valley Minerals Inc. ("**SVM**") and certain of its subsidiaries, the debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), submit this reply (the "**Reply**") in support of the *Omnibus* Motion *of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Reject Certain Unexpired Railcar Leases Nunc Pro Tunc to the Rejection Date and (B) Abandon Certain Property and (II) Granting Related Relief* [Docket No. 449] (the "**Motion**")[2] and in response to the *Objection of Progress Rail Leasing Corporation* [Docket No. 489] (the "**Objection**" or **"Obj."**) filed by Progress Rail Leasing Corporation ("**Progress**"). In support of this Reply, the Debtors are submitting the *Declaration of Philip J.*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263); Trona Railway Company LLC (3177); and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Minerals Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, Kansas 66210.

[2] Capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Motion.

*Gund in Support of the Debtors' Reply* (the "**Gund Declaration**" or "**Gund Decl.**"), filed contemporaneously herewith, and respectfully state as follows:

## I. PRELIMINARY STATEMENT

1. Progress does not dispute that the Debtors may reject the Railcar Lease[3] or that rejection is a sound exercise of their business judgment. The Objection instead rests on a factual premise that the Railcars "remain in the possession of the Debtors and/or the Purchaser" and that Progress "has no idea where all of the Railcars are located." Obj. ¶¶ 6, 8. That premise is unfounded. The location of every Railcar is known. *First*, Progress has access to computer programs that enable it to track the location of every Railcar. Gund Decl. ¶ 8. *Second*, Progress has been in discussions with TATA Chemicals North America Inc. ("**TATA**"), the buyer of the Debtors' soda ash contracts, since early September regarding TATA re-leasing all of the Railcars. *Id.* ¶ 6. It is the understanding of the Debtors that Progress and TATA have entered into a new lease for the Railcars. The Debtors were not involved directly in these negotiations, but have provided information regarding the status and location of the Railcars to both Progress and TATA. *Id.*

2. It is clear that Progress knew well before the Rejection Date that the Debtors had no use for the Railcars. Indeed, the Section 1168(b) stipulation the Debtors had entered into with Progress expired on September 30, 2026. Stip. ¶ 1. After TATA had been identified as the successful bidder for the soda ash contracts, the Debtors, in fact, coordinated a meeting between Progress and TATA to discuss the possibility of TATA re-leasing the Railcars. *Id.* ¶¶ 5-6. The result of those discussions was that Progress re-leased the full fleet of Railcars to TATA, resulting in significant mitigation of damages for Progress. *Id.* ¶¶ 5-6.

---

[3] Progress's "Railcar Lease" is identified on Schedule 1 to Exhibit A of the Motion.

3. TATA and Progress, with assistance from the Debtors have been in communication regarding the location of each of the Railcars and coordinating the movement of the Railcars to locations requested by TATA. *Id.* ¶ 7. In fact TATA has indicated to the Debtors that they are paying for the relocations of certain of the Railcars in California to their operations in the Green River Basin under the new lease. TATA informed the Debtors that they had arranged for a favorable rate from the Union Pacific for the transfer and requested that TRC provide a discounted switching rate to facilitate the transfer. TRC agreed to the discounted rate based on the Debtors understanding that TATA would be paying for the movement of the Railcars and that no one would assert such costs against the Debtors. *Id.*

4. In other words, with the help of the Debtors, Progress has relet the very equipment it claims it cannot find and is benefiting from TATA's negotiations to relet and move such equipment at a discounted rate.

5. On these facts, the equities strongly favor rejection effective as of September 30, 2026 (the "**Rejection Date**"). That date is the last day of the section 1168 period that Progress itself agreed to extend (Stip. ¶ 1) and is after the date that Progress knew the Debtors would no longer need the Railcars because of the Soda Ash Sale to TATA.

6. Similar to the application of section 1110 of the Bankruptcy Code, section 1168 of the Bankruptcy Code does not entitle a rolling-stock lessor to continuing rent from an estate that does not need and is not using its equipment. *See, e.g., In re Trans World Airlines, Inc.*, 145 F.3d 124, 138-39 (3d Cir. 1998). As the legislative history with respect to sections 1110 and 1168 that the Third Circuit quoted in *Trans World Airlines* puts it, "[i]f the trustee does not need the equipment, he may simply surrender it to the financer." *Id.* at 138 (quoting H.R. Rep. No. 95-

595, at 239 (1977)). The estate's exposure ends when the debtor makes the equipment available, not when the lessor gets around to collecting it. *See id.* at 139.

7. Progress also seeks to invoke section 1168 of the Bankruptcy Code in order to assert administrative claims for costs associated with moving the Railcars to TATA's preferred location and returning the Railcars to a certain condition. However, section 1168(c) does not require the estates to arrange and pay for transporting the Railcars to Progress. The statute is silent as to requirements for the location, condition, and costs for return. Courts construing the parallel language of section 1110(c) have declined to impose lease return conditions on debtors. *See In re Republic Airways Holdings Inc.*, 547 B.R. 578 584-86 (Bankr. S.D.N.Y. 2016) (cited at Obj. ¶ 9 n.3). Simply put, as with Section 1110, 1168 merely requires the Debtors to make the Railcars available for pickup, and the Debtors have done just that.

8. Moreover, in light of Progress reaching an agreement on TATA's lease of the Railcars, not only are the Debtors' estates not receiving any benefit from any expense in connection with the return of the Railcars, but Progress and/or TATA would be receiving a windfall by having the Debtors pay to arrange the return of the Railcars to benefit TATA and/or Progress.

## II. ADDITIONAL BACKGROUND

### A. The Railcar Lease and the Section 1168 Stipulation.

9. Debtor Trona Railway Company LLC ("**TRC**") leases from Progress approximately 262 railcars (the "**Railcars**"). Mot., Ex. A, Sched. 1; Obj. ¶ 2. SVM guarantees TRC's rental obligations. Obj. ¶ 2. Rent is payable monthly in advance on the first of each month. *Id.*

10. TRC and Progress entered into a *Stipulation Regarding Section 1168(b) Extension* (the "**Stipulation**" or **"Stip."**), which the Court approved by order entered August 18, 2026.

[Docket No. 286] (approving the Stipulation, attached thereto as Exhibit 1). The Stipulation recites that the Railcars, together with the records and documents that the Railcar Lease requires to be surrendered or returned with them (collectively, the "**Equipment**"), are rolling stock equipment within the meaning of section 1168(a)(2)(A), and that TRC "has requested, and the Lessor has agreed to grant the Lessee, an extension of the 60-day period specified in Section 1168(a)(1)(A)." Stip. at 2–3 (recitals). The Stipulation's operative terms are limited. Paragraph 1 extends the section 1168 period "for all purposes, through and including September 30, 2026," without prejudice to TRC's right to request further extensions. *Id.* ¶ 1. Paragraph 2 provides that nothing in the Stipulation is "a promise or requirement to pay any particular claim," a waiver of the parties' rights under the Bankruptcy Code, "including the Debtors' right to assume, reject, or seek any other related relief with respect to any contract or lease," or "an alteration, amendment, or other modification of the terms of the [l]ease." *Id.* ¶ 2(c), (d), (f). Paragraph 3 makes the Stipulation the parties' entire agreement on its subject. *Id.* ¶ 3. The Stipulation contains no agreement by TRC to perform under the Railcar Lease pursuant to section 1168(a)(1)(A), no cure of defaults under section 1168(a)(1)(B), and no condition that rent be paid. TRC did not request a further extension, and any further extension would have required both Progress's agreement and the Court's approval. 11 U.S.C. § 1168(b).

11. The Debtors paid for the Railcars for July, August, and September 2026, Obj. ¶ 4. The Stipulation did not require those payments, Stip. ¶ 2(c), and TRC made them without agreeing to perform under the Railcar Lease pursuant section 1168(a)(1)(A).

**B. The Soda Ash Sale and the Status of the Railcars.**

12. The Debtors historically mined and processed soda ash until February 2026. Mot. ¶ 10. Under the Soda Ash Sale, the Debtors sold their soda ash contracts to TATA. *Id.* ¶ 8. The Soda Ash Sale closed on September 11, 2026. *Id.* The Buyers elected not to take the Railcar

Lease, and the Debtors have no remaining operations that could use the Railcars. *Id.* ¶ 12. The Debtors have not used the Railcars since the closing of the Soda Ash Sale. Gund Decl. ¶ 5.

13. The Railcars were used in the Debtors' soda ash business. Before the Rejection Date, the Debtors made clear to Progress and to TATA that they did not need the Railcars and would not be using the Railcars following the Soda Ash Sale. *Id*.

14. The Debtors arranged for a meeting among the Debtors, Progress and TATA in early September to discuss with TATA and Progress the possibility of TATA re-leasing all of the Railcars. *Id*. ¶ 6. The Debtors further understand that Progress and TATA have negotiated a lease agreement with respect to the Railcars, and that TATA is paying for the relocations of certain of the Railcars. *Id.* ¶ 7. Indeed, at TATA's request, TRC is providing a discounted switching rate to facilitate those relocations. *Id.*

15. Progress's protestations that it does not know the location of the Railcars and was unaware of the Debtors' intention to reject the Lease are belied by Progress's own involvement in the negotiations with TATA regarding TATA re-letting the Railcars and coordinating the movement of the Railcars to TATA's desired locations at discounted rates from the Debtors.

**C. The Motion and the Objection.**

16. The Debtors filed the Motion on October 1, 2026. It advised the Lessors that the Debtors "are surrendering the railcars" and that the Lessors "should immediately begin efforts to relet the railcars to mitigate their damages." Mot. ¶ 20. Progress filed the Objection on October 15, 2026. Progress concedes that "bankruptcy courts have in the past permitted retroactive rejection," Obj. ¶ 7, but argues that (a) retroactive rejection is improper because the Railcars have not been surrendered, Obj. ¶ 8; (b) section 1168(c) requires the estates to pay to return the Railcars, Obj. ¶ 9; (c) the abandonment should be limited, Obj. ¶ 10; (d) paragraph 5 of the

proposed order should be stricken, Obj. ¶ 11; and (e) its potential administrative claims should be preserved, Obj. ¶ 12.

## III. REPLY

### A. The Court Should Approve Rejection Effective as of the Rejection Date.

17. Although rejection ordinarily takes effect on entry of the order, the Court's "power to grant retroactive relief is derived from the bankruptcy court's equitable powers so long as it promotes the purposes of § 365(a)." *In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004) (citing *In re Thinking Machs. Corp.*, 67 F.3d 1021, 1028–29 (1st Cir. 1995)). Relevant considerations include whether the debtor acted promptly, whether the counterparty had notice of the debtor's intent to reject, whether the contract benefits the estate, and whether the counterparty's position would produce a windfall at other creditors' expense. *See In re Extraction Oil & Gas*, 622 B.R. 608, 631 (Bankr. D. Del. 2020); *In re At Home Corp.*, 392 F.3d 1064, 1072–75 (9th Cir. 2004); *Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d 602, 608-09 (2d Cir. 2007).

#### 1. The Railcars Were Surrendered to Progress.

18. Progress's only argument against the Rejection Date is that retroactive rejection is "[t]ypically" allowed after the debtor has surrendered the property, citing a 1998 hearing transcript. Obj. ¶ 8 & n.1 (citing Transcript of Hearing, *In re Namco Cybertainment, Inc.*, No. 98-00173 (PJW) (Bankr. D. Del. Apr. 15, 1998), ECF No. 245). Here, the Debtors propose a Rejection Date of September 30, 2026, the date that Progress and the Debtors previously agreed under the Stipulation would be the last day of the Debtors' extension under section 1168.

19. The Debtors have done everything surrender requires of a lessee that no longer needs rolling stock. They stopped using the Railcars, and told Progress that they would not need the Railcars following the Soda Ash Sale. Gund Decl. ¶ 5. Progress, for its part, was negotiating

with TATA concerning the Railcars since early September. *Id.* ¶ 6. A lessor that is coordinating the redeployment of its equipment with a new user cannot credibly claim it lacks access to that equipment or knowledge that the Debtors intend to reject the lease. Thus, the Debtors effectively surrendered the property as of the Rejection Date.

20. Section 1168 also removed any legal barrier to Progress taking the Railcars as of the Rejection Date. The Stipulation extended the section 1168 period "for all purposes, through and including September 30, 2026." Stip. ¶ 1. TRC did not agree to perform or cure under section 1168(a)(1)(A)–(B), and it did not seek a further extension. From October 1, 2026 forward, therefore, Progress's right to take possession of the Railcars was "not limited or otherwise affected by any other provision of this title or by any power of the court." 11 U.S.C. § 1168(a)(1).

2. **The Equities Favor the Rejection Date.**

21. *First*, the Rejection Date is the date Progress itself agreed to as the end of Debtors' extension of the provisions of 1168. Progress extended the section 1168 period "for all purposes, through and including September 30, 2026," Stip. ¶ 1, and the Debtors paid Progress through that date. Obj. ¶ 4. Rejection as of that date gives Progress exactly what it bargained for: payment while the estates had the benefit of the stay, then its equipment.

22. *Second*, Progress had advance notice. The Debtors told Progress before the Rejection Date that they did not need the Railcars and facilitated Progress working with TATA for TATA to relet the Railcars from Progress following the closing of the Soda Ash Sale. Gund Decl. ¶¶ 5-7. Debtors then filed the Motion on October 1, the day after the Rejection Date and the day the Going Concern Sale closed, and expressly told the Lessors to relet or pick-up their equipment. Mot. ¶¶ 9, 20. *See Extraction Oil*, 622 B.R. at 631 (finding *nunc pro tunc* rejection justified when debtor sought relief promptly and retroactive rejection avoided debtors incurring

unnecessary administrative costs that did not provide a benefit to the debtors' estates); *Adelphia*, 482 F.3d at 608-09 (finding retroactive rejection warranted where lessor had notice and the opportunity to relet the premises).

23. *Third*, Progress was already mitigating any damages from rejection of the Railcar Lease. TATA's early-September arrangements with Progress to move the Railcars shows that Progress had, or was close to having, a new user for the Railcars before the Rejection Date. Charging the estates for October rent or to move Railcars that Progress was placing with TATA (and for which TATA would be getting any benefit) would give Progress a windfall at the expense of the Debtors' other creditors.

24. *Fourth*, the Railcar Lease provides no further benefit to the estates. The Debtors have no operations and no use for the Railcars. Mot. ¶¶ 12, 17; Gund Decl. ¶ 5. Thus, any request by Progress for an administrative claim with relating to the return of the Railcars should be denied. *See, e.g., Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (holding that the party seeking an administrative claim has a heavy burden of demonstrating that costs and expenses "provided an actual benefit to the estate" and "were necessary to preserve the value of the estate assets") (internal citation omitted); *In re Cont'l Airlines, Inc.*, 146 B.R. 520, 527–28 (Bankr. D. Del. 1992) (holding aircraft lessor did not demonstrate that failure of compliance with return conditions benefitted the estate).

25. *Fifth*, Progress's own demand confirms that the Railcar Lease is at an end. Progress has made a "written demand" for possession under section 1168(c). Obj. ¶ 9. Under the statute Progress invokes, a lease of rolling stock "shall be deemed rejected" once the trustee is required to surrender and return the equipment. 11 U.S.C. § 1168(c)(2).

### B. Any Post-Rejection Use of the Railcars by a Non-Debtor Is Not Use by the Estates.

26. To the extent any Railcar has been used in soda ash service after the Rejection Date, that use was not by the Debtors or for the benefit of their estates. An administrative expense claim requires that the expense "arise from a [post-petition] transaction with the debtor-in-possession" and be "beneficial to the debtor-in-possession in the operation of the business." *O'Brien Env't Energy*, 181 F.3d at 532–33 (internal citation omitted). Debtors are not using the Railcars and receive no benefit from the use of the Railcars by TATA. Any remedy Progress may have for use of the Railcars lies against the user of the Railcars.

### C. Section 1168(c) Does Not Require the Estates to Transport the Railcars to Progress at the Estates' Expense.

27. Progress argues that the "plain language" of section 1168(c) requires the Debtors to pay to return the Railcars to Progress, and asks the Court to "mandate that the Debtors immediately arrange for and pay for the return of the Railcars." Obj. ¶ 9; at 6. Progress further requests an allowed administrative claim for all costs of locating and retrieving the Railcars. *Id.* ¶ 9.

28. The statute says no such thing. Section 1168(c)(1) requires the trustee to "immediately surrender and return" rolling stock upon a proper demand. It says nothing about location, condition, or cost. Sections 1110 and 1168 are companion statutes that use the same "surrender and return" formulation, *compare* 11 U.S.C. § 1168(c), *with id.* § 1110(c), and Congress explained their shared design: they "protect the estate and the reorganization process by leaving the choice of which the financer will get to the trustee," and "[i]f the trustee does not need the equipment, he may simply surrender it to the financer." *Trans World Airlines*, 145 F.3d at 138 (quoting H.R. Rep. No. 95-595, at 239 (1977)).

29. Courts construing section 1110(c) have accordingly declined to impose lease return conditions on debtors. The *Republic Airways* court observed that the statute "does not specify the conditions for the surrender and return," 547 B.R. at 584, and surveyed decisions declining to require compliance with lease return conditions, including return to a place designated by the financier. *See id.* at 584-85 (discussing *In re US Airways Grp., Inc.*, 287 B.R. 643, 645–47 (Bankr. E.D. Va. 2002)). It noted the *Northwest Airlines* court's observation that "[t]he hallmark of Section 1110 is speed," and the *Delta Air Lines* court's statement that the financier takes the equipment "as is, where it is." *Id.* at 585-86 (quoting hearing transcripts). The court held that it "will not require that the Debtors return the aircraft and related equipment in a particular condition for surrender and return," while preserving the financier's right to claim "costs associated with the surrender and return." *Id.* at 586. It also recognized that the financier "has the burden of retrieving its collateral." *Id.* at 588. Similarly, *Continental Airlines* held that a debtor is not bound by the return provisions of a rejected lease. *Cont'l Airlines*, 146 B.R. at 527–28.

30. *Republic Airways*, which Progress itself cites (Obj. ¶ 9 n.3), thus supports the Debtors' approach. The Debtors have made the Railcars available where they are, have provided the location information, and will cooperate reasonably with retrieval. The facts here also confirm that transporting the Railcars is a commercial matter between Progress and whoever uses them next: Progress's request for an order requiring the estates to arrange and pay for transport should be denied.

31. Applying section 1110, the Third Circuit held that "[o]nce a lease is rejected, the debtor is no longer bound by its terms," and "return obligations arising after rejection would only give rise to an administrative claim if the debtor's failure to meet the conditions conferred an

actual benefit on the estate." *Trans World Airlines*, 145 F.3d at 141 (citing *Cont'l Airlines*, 146 B.R. at 527-28). The Third Circuit adopted the analysis in *Continental Airlines* and found that the only basis for an administrative claim in that case was the fact that the Debtors entered into an express section 1110 agreement with the Lessor and failed to meet the obligations of the 1110 agreement. *Id.* at 141-42.

32. To the extent the Railcar Lease itself contains return provisions, the Debtors' non-performance of those provisions after rejection is a breach deemed to occur immediately before the Petition Date, 11 U.S.C. § 365(g)(1), and gives rise at most to a general unsecured claim.

**D. The Abandonment of Remaining Property Should Be Approved.**

33. Progress acknowledges the Debtors' right to abandon burdensome property under section 554, but invokes the limitation in *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 507 (1986). Obj. ¶ 10. Progress identifies no statute or regulation that the abandonment would violate and no hazard of any kind. The Remaining Property consists of items such as loading and unloading hardware, monitoring devices, and safety liners, Mot. ¶ 14, and the Railcars carried soda ash (sodium carbonate), a non-hazardous industrial mineral. Gund Decl. ¶ 4. Thus, the Debtors maintain that there is no hazardous material being abandoned in connection with the Railcars. *Id.*

34. Progress's request to hold abandonment open until after it inspects the Railcars, Obj. ¶ 10, should be denied. Doing otherwise would leave the estates holding title indefinitely to de minimis property on equipment they neither own nor use. Progress's condition-related claims, if any, are preserved as are Debtors' defenses to any such claims.

### E. The Lessor Should Bear Expense if Debtors Are Forced to Dispose of Unretrieved Railcars.

35. Progress objects that paragraph 5 of the proposed order would allow the Debtors to dispose of unretrieved Railcars "at the applicable Lessors' cost." Obj. ¶ 11. However, Progress is being provided with ample time to retrieve the Railcars. Progress's failure to do so will force the Debtors to incur the expense of disposing of the unretrieved Railcars while providing no benefit to the estates. The Lessor should be required to bear any such expense.

## IV. RESERVATION OF RIGHTS

36. Nothing in this Reply is an admission as to the validity, priority, or amount of any claim asserted by Progress, including those described in paragraph 3 of the Objection or any claim under SVM's guaranty, or a waiver of any claim, defense, or right of the Debtors or their estates, all of which are reserved.

## V. CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) overrule the Objection, (ii) enter the Proposed Order, substantially in the form attached as Exhibit A to the Motion, and (iii) grant such other and further relief as is just and proper.

Dated: November 10, 2026
Wilmington, Delaware

*/s/ Laura Davis Jones*
**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Edward A. Corma (DE Bar No. 6718)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
ljones@pszjlaw.com
joneill@pszjlaw.com
ecorma@pszjlaw.com

*Co-Counsel to Debtors and*
*Debtors in Possession*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
James J. Mazza, Jr. (admitted *pro hac vice*)
Jennifer Madden (admitted *pro hac vice*)
Claire Stephens (admitted *pro hac vice*)
320 S. Canal Street
Chicago, Illinois 60606
Telephone: (312) 407-0700
James.Mazza@skadden.com
Jennifer.Madden@skadden.com
Claire.Stephens@skadden.com

*Co-Counsel to Debtors and*
*Debtors in Possession*