# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEARLES VALLEY MINERALS INC., *et al.*, | ) | Case No. 26-10966 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Related to Docket No. 449, 489 and 552** |
| | ) | |
| | ) | **Obj. Deadline: 10/15/26 by 4:00 p.m.** |
| | ) | **Hearing Date: 11/18/26 at 2:00 p.m.** |

**PROGRESS RAIL LEASING CORPORATION'S SUR-REPLY TO DEBTORS' REPLY TO OBJECTION OF PROGRESS RAIL LEASING CORPORATION TO OMNIBUS MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) REJECT CERTAIN UNEXPIRED RAILCAR LEASES NUNC PRO TUNC TO THE REJECTION DATE AND (B) ABANDON CERTAIN PROPERTY AND (II) GRANTING RELATED RELIEF**

Progress Rail Leasing Corporation ("PRLC"), by and through its undersigned counsel, respectfully submits this sur-reply (the "Sur-Reply") in response to the Reply (Docket No. 552) (the "Reply") filed by the above-captioned debtors (the "Debtors") to the Objection filed by PRLC (Docket No. 489) (the "Objection")[1] to the Omnibus Motion of the Debtors for Entry of an Order (i) Authorizing the Debtors to (a) Reject Certain Unexpired Railcar Leases Nunc Pro Tunc to the Rejection Date and (b) Abandon Certain Property and (ii) Granting Related Relief (Docket No. 449) (the "Rejection Motion"), and respectfully states as follows:

1. Since PRLC filed the Objection to the Rejection Motion on October 15, 2026, certain facts concerning the statements set forth in the Objection have changed, and certain of the parties' arguments concerning the Rejection Motion have developed such that PRLC believes it

[1] Capitalized terms not defined herein shall have the meanings given to them in the Objection.

is necessary to file this Sur-Reply in order to narrow the issues for the Court's consideration at the hearing on the Rejection Motion scheduled for November 18, 2026, at 2:00 p.m. (ET).

2. Currently, the two central issues over which PRLC and the Debtors disagree are as follows:

a. Whether section 1168(c) of the Bankruptcy Code requires the Debtors to pay PRLC's portion of the shipping costs so that 152 of the Railcars can be shipped from the Debtors' former location in California to the location requested by TATA Chemicals Soda Ash Partners LLC ("TATA") in Wyoming, who is the new lessor under a new lease with PRLC regarding the Railcars; and

b. Whether the effective date of rejection of the Contract should be September 30, 2026, as requested by the Debtors, or the date on which an order is entered that authorizes the rejection of the Contract, which PRLC submits should be no earlier than November 3, 2026, the original hearing date scheduled on the Rejection Motion.

<u>Developing Background that May Affect the Legal Arguments at Issue</u>

3. Since the Objection was filed, on or about October 27, 2026, PRLC and TATA entered into a Master Railcar Lease Agreement (Full Service) with TATA (the "New Lease") regarding PRLC's lease of the Railcars to TATA. See Declaration of Roger Kelly (the "Kelly Declaration"), a copy of which is attached hereto as Exhibit 1, ¶ 4, at 2. Pursuant to the New Lease, PRLC is required to pay one-half of the shipping costs that are incurred in order to ship 152 of the Railcars that are currently located in California, to TATA at its operations in Wyoming. *Id.* As of the date hereof, the shipping of the 152 of the Railcars located in California to TATA in Wyoming has not occurred. *Id.*

4. PRLC's and TATA's negotiations regarding the New Lease began in September 2026 and concluded at the end of October 2026. *Id.* At no time in October 2026 nor as of the date hereof, has PRLC had possession of the Railcars. *Id.* ¶ 6, at 3. During the month of October 2026, the 152 Railcars in California were located at the Debtors' former property in

California, which is now owned by a different purchaser of the Debtors' assets, and the 110 Railcars in Wyoming were located at TATA's operations in Wyoming. *Id.*

5. If the New Lease had not been entered into by PRLC and TATA, the Railcars would be required to be shipped to PRLC at its location in Sydney, Nebraska. *Id.* ¶ 5, at 2. In general, shipping railcars to Nebraska from California would cost substantially more than shipping railcars from California to Wyoming, due to the distance involved. *Id.*

Section 1168(c) of the Bankruptcy Code Requires the
Debtors to Pay Shipping Costs for Return of the Railcars

6. Section 1168(c) of the Bankruptcy Code provides plainly and clearly that debtors are required to immediately surrender **and return** to a lessor any equipment covered by section 1168(a) of the Bankruptcy Code if the debtor has not cured all defaults within the time prescribed in section 1168(a) of the Bankruptcy Code and if the party entitled to the rolling stock equipment has made a written demand for possession of the equipment. It is undisputed by PRLC and the Debtors that (i) the Railcars are the type of equipment that is covered by section 1168 of the Bankruptcy Code, and (ii) that the Debtors' first attempt to surrender the Railcars to PRLC was the filing of the Rejection Motion on October 1, 2026. The issue that remains in dispute is what section 1168(c) of the Bankruptcy Code means by its provision that debtors must return rolling stock equipment to lessors such as PRLC.

7. Unfortunately, there is a dearth of case law regarding section 1168 of the Bankruptcy Code generally, and in particular, regarding section 1168(c) of the Bankruptcy Code. One thing that is clear, however, is that the enactment of section 1168 of the Bankruptcy Code was Congress's attempt to provide lessors, secured parties and conditional vendors of rolling stock equipment with extra protections and benefits to which ordinary lessors of equipment are not entitled. Generally speaking, once a debtor rejects any lease of personal property, including

equipment, the debtor must surrender the items at issue to the lessor, but outside of section 1168 of the Bankruptcy Code, there is no provision in the Bankruptcy Code nor is there any principle developed under case law that states that the debtor must physically return the leased items to the lessor.

8. Although the Debtors have attempted in the Reply to convince the Court that PRLC and the Railcars should be treated exactly the same as lessors of all non-rolling stock equipment, and the same as all ordinary equipment that is rejected is treated in chapter 11 cases, the Court should refuse to follow the Debtors' suggestion and instead should enforce the plain language that is contained in section 1168(c) of the Bankruptcy Code and find that the Debtors are required to pay the shipping costs that have been requested by PRLC. Had PRLC not been able to negotiate the terms of the New Lease with TATA,[2] the Railcars were required under the Contract to be returned to PRLC's location in Sydney, Nebraska. It should be undisputed that the shipping of the 152 Railcars in California to Nebraska and the shipping of the 110 Railcars in Wyoming to Nebraska would cost substantially more than the shipping of only the 152 Railcars located in California to Wyoming, because in the former instance, all 262 Railcars would need to be shipped (rather than the costs associated with shipping only the 152 Railcars in California to Wyoming), and over greater distances.

9. PRLC should not be punished because it went through the time and effort of negotiating the New Lease with TATA. The New Lease represents mitigation of damages by and for both PRLC and the Debtors. At the same time, PRLC should not be treated the same

[2] The New Lease is a full-service lease, as opposed to a net lease, which is what the Contract was. As a result, over time, PRLC will incur many more costs in connection with its lease of the Railcars to TATA. Among many other items, under the New Lease, PRLC is responsible for the repair and maintenance of the Railcars during the term of the Lease, which will be expensive due to the Debtors' breaches under the Contract.

way in which lessors of ordinary equipment are treated because ordinary equipment lessors do not have the protections afforded by section 1168 of the Bankruptcy Code, which, among other things, require the physical return of rolling stock equipment.

10. Over the years, Congress and the applicable regulatory government bodies (like the United States Department of Transportation and its predecessor, the Interstate Commerce Commission) have placed a premium on maintaining rail service in the United States presumably because railroads have been the central practical way of delivering bulk commodities and necessities throughout the United States. Section 1168 of the Bankruptcy Code (and any of its predecessor section(s)) is a direct result of this preferential treatment afforded to lessors, secured parties, and conditional vendors of rolling stock equipment. An example of this can be seen by reviewing the legislative history that is recorded from 1992, as Congress was debating passage of the 1994 Bankruptcy Reform Act, which included various modifications to section 1168 of the Bankruptcy Code. In this legislative history from 1992, certain members of Congress engaged in discussions about the uniqueness of railroad cars and about how Congress intended for section 1168 to clarify that costs and expenses associated with the maintenance and return of railcars are administrative expense claims that the estate should pay for under section 503(b)(1)(A) of the Bankruptcy Code. *See* 138 Cong. Rec. 14892 (June 16, 1992) ("Finally, Mr. President, because of the unique nature of the type of equipment we are discussing- multimillion dollar aircraft and railroad cars- this amendment also would clarify that costs and expenses attributed to maintenance and return obligations on equipment covered by sections 1110 and 1168 are administrative expenses of the estate under section 503(b)(1)(A) of the Bankruptcy Code.").

11. Although we may not have access to or possession of case law that directly addresses section 1168(c) of the Bankruptcy Code, we do have access to the unambiguous

language contained in section 1168(c) of the Bankruptcy Code, as well as access to the foregoing legislative history and to the use of common sense. PRLC understands that any claims that it may have against the Debtors regarding the condition of the Railcars and/or related to the Debtors' breaches to repair and maintain the Railcars as required by the Contract, may only be general unsecured claims in this case. However, in the Reply, the Debtors attempt to confuse the issues by arguing that PRLC only has an unsecured claim for all claims it may have relating to the surrender or return of the Railcars. This cannot be the case, because section 1168 exists for lessors of rolling stock equipment, and lessors of rolling stock equipment are explicitly guaranteed that their rolling stock equipment will be returned to them, unlike what the Bankruptcy Code provides for ordinary equipment lessors. To require lessors of rolling stock equipment to bear the return costs like ordinary equipment lessors would render the language of section 1168(c) of the Bankruptcy Code superfluous. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'") (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).

12. Application of section 1168(c) of the Bankruptcy Code to the case at hand clearly mandates that the Debtors must return the Railcars to PRLC. In this particular case, that means that the Debtors should be required to pay for PRLC's portion of the shipping costs to ship the 152 Railcars from California to Wyoming, which is much less than the burden the Debtors would have if PRLC had not mitigated its damages by entering into the New Lease.

<u>The Debtors are Not Entitled to Nunc Pro Tunc Rejection of the Contract</u>

13. Under the Contract, the Debtors were required to pay rent to PRLC on the 1st of every month, in advance, for that month's use of the Railcars. It is undisputed that the Debtors

did not file the Rejection Motion until October 1, 2026, which is the date on which the Debtors owed PRLC rent for the lease of the Railcars for the month of October 2026.

14. It is also undisputed that PRLC did not have possession of the Railcars on October 1, 2026, nor throughout the month of October 2026. In addition, it was completely impossible in reality for PRLC to obtain immediate access to the Railcars on October 1, 2026, as the Railcars were located at properties that the Debtors had recently sold to third parties. Due to the Debtors' choice to close on their sales of assets, which sales benefited the Debtors' estates, as of October 1, 2026, the Debtors could not have actually provided PRLC access to its Railcars even if they had wanted to do so.

15. Accordingly, although PRLC was informed of the Debtors' rejection of the Contract on October 1, 2026, it is undisputed that PRLC did not have possession of the Railcars on October 1, 2026, nor did PRLC have the ability to gain possession of the Railcars on October 1, 2026. Instead, PRLC filed the Objection on October 15, 2026, and the original hearing to consider the Rejection Motion and the Objection was not scheduled until November 3, 2026, which is the date on which the rejection of the Contract should be effective. In sum, the unusual circumstances in which courts may grant nunc pro tunc rejection do not exist in this case, and the Debtors' request to have rejection of the Contract be a date that is earlier even than the date of the filing of the Rejection Motion, should be outright denied.

WHEREFORE, for all of the foregoing reasons, PRLC respectfully requests that the Court enter an order that (i) denies the Rejection Motion, (ii) finds that the effective date of rejection of the Contract is November 3, 2026, (iii) finds that the Debtors must pay PRLC whatever PRLC owes to TATA under the New Lease for shipping costs to ship the CA Railcars

to TATA in Wyoming, and (iv) grants such other and further relief as is just and proper.

Dated: November 13, 2026

*<u>/s/ Karen C. Bifferato</u>*
Karen C. Bifferato (No. 3279)
CONNOLLY GALLAGHER LLP
1201 N. Market Street, 20th Floor
Wilmington, DE 19801
(302) 757-7300
kbifferato@connollygallagher.com

Attorneys for Progress Rail Leasing Corporation

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEARLES VALLEY MINERALS INC., *et al.*, | ) | Case No. 26-10966 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Related to Docket No. 449, 489 and 552** |
| | ) | |
| | ) | **Obj. Deadline: 10/15/26 by 4:00 p.m.** |
| | ) | **Hearing Date: 11/18/26 at 2:00 p.m.** |

**DECLARATION OF ROGER KELLY**

I, Roger Kelly, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief, declare as follows:

1. I submit this Declaration in support of the Sur-Reply filed by PRLC concurrently herewith, as well as in further support of the Objection filed by PRLC (Docket No. 489) (the "Objection")[1] to the Omnibus Motion filed by the above-captioned debtors (the "Debtors") for Entry of an Order (i) Authorizing the Debtors to (a) Reject Certain Unexpired Railcar Leases Nunc Pro Tunc to the Rejection Date and (b) Abandon Certain Property and (ii) Granting Related Relief (Docket No. 449) (the "Rejection Motion").

2. I am currently the Vice-President of Railcar Leasing at Progress Rail Leasing Corporation ("PRLC"), and I have held this position at PRLC from approximately 2013 through 2020 and again from 2022 to present. Prior to 2013, from 2010 to 2013, I was employed by PRLC as the Director of Railcar Leasing. In my current role as the Vice-President of Railcar

[1] Capitalized terms not defined herein shall have the meanings given to them in the Objection.

Caterpillar: Non-Confidential

Leasing at PRLC, I am responsible for all of PRLC's purchases, sales, leasing, and maintenance of its railcars.

3. In my position at PRLC, I was responsible for all negotiations that PRLC had with TATA Chemicals Soda Ash Partners LLC ("TATA"), an affiliate of one of the purchasers of certain of the Debtors' assets. PRLC negotiated with TATA regarding the 262 railcars (the "Railcars") that PRLC leased to the Debtors. Of these 262 Railcars, 152 have been and are currently located at the Debtors' former property in California (the "CA Railcars"), and 110 have been and are currently in TATA's possession and located at TATA's operations in Wyoming (the "WY Railcars").

4. Starting in September of 2026 and throughout the month of October of 2026, PRLS and TATA conducted negotiations over TATA's potential lease of the Railcars pursuant to a different leasing structure than PRLC had with the Debtors under the Contract. Finally, on or about October 27, 2026, PRLC and TATA entered into a Master Railcar Lease Agreement (Full Service) with TATA (the "New Lease") regarding PRLC's lease of the Railcars to TATA. Pursuant to the New Lease, PRLC is required to pay one-half of the shipping costs that are incurred in order to ship the CA Railcars to TATA at its property in Wyoming. Upon information and belief, the shipping of the CA Railcars from California to Wyoming has not occurred as of the date hereof.

5. If the New Lease had not been entered into by PRLC and TATA, the Railcars would need to be shipped to PRLC at its location in Sydney, Nebraska. In my experience, shipping railcars to Nebraska from California would cost substantially more than shipping railcars from California to Wyoming, due to the distance involved.

6. As of the date hereof, PRLC does not have possession of the Railcars, nor did it have possession of the Railcars at any point during the month of October of 2026. Upon information and belief, during the month of October of 2026, the CA Railcars were located at the Debtors' former property in California, which is now owned by a different purchaser of the Debtors' assets, and the WY Railcars were located at TATA's property in Wyoming by way of arrangement or agreement between the Debtors and TATA. As of the date hereof, PRLC has not received any rent from any party for the lease of the Railcars for the month of October of 2026.

Dated: November 13, 2026

*<u>/s/ Roger Kelly</u>*
Roger Kelly
Vice-President of Railcar Leasing
Progress Rail Leasing Corporation